UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


UNITED STATES OF AMERICA    .   4:17-CR-00419

VERSUS                .   HOUSTON, TEXAS

GAZELLE CRAIG, D.O, AND    .   JANUARY 26, 2018

SHANE FAITHFUL          .   1:09 P.M.

. . . . . . . . . . . . . .


SUPPRESSION HEARING AND FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE DAVID HITTNER
UNITED STATES DISTRICT JUDGE

1                           *APPEARANCES*

2

FOR THE GOVERNMENT:

3

        Scott P. Armstrong
4       UNITED STATES DEPARTMENT OF JUSTICE
        1400 New York Avenue Northwest
5       Washington, DC  20005

6       Devon M. Helfmeyer
        UNITED STATES DEPARTMENT OF JUSTICE
7       1000 Louisiana
        Suite 2300
8       Houston, Texas  77002

9   FOR DEFENDANT CRAIG:

10      Don E. Lewis
        Attorney at Law
11      1717 Saint James Place
        Suite 625
12      Houston, Texas  77056

13  FOR DEFENDANT FAITHFUL:

14      Cornel A. Williams
        WILLIAMS AND ASSOCIATES
15      1405 Palm Street
        Houston, Texas  77004

16

17  OFFICIAL COURT REPORTER:

18      Mayra Malone, CSR, RMR, CRR
        U.S. Courthouse
19      515 Rusk, Room 8004
        Houston, Texas  77002
20
Proceedings recorded by mechanical stenography.  Transcript
21  produced by computer-aided transcription.

22

23                          - - - - -

24

25

1                         **INDEX**

2

3

4   LOREN PHILLIPS

5       Direct Examination by Mr. Helfmeyer          19

6       Cross-Examination by Mr. Williams            26

7       Redirect Examination by Mr. Helfmeyer        51

8       Recross-Examination by Mr. Williams          52

9       Recross-Examination by Mr. Williams          54

10  JAMES GAINER

11      Direct Examination by Mr. Williams           57

12      Cross-Examination by Mr. Helfmeyer           62

13      Redirect Examination by Mr. Williams         63

14  MICHAEL MILLS

15      Direct Examination by Mr. Williams           65

16

17

18

19

20

21

22

23

24

25

*PROCEEDINGS*

THE COURT:  Court calls the case, Criminal Matter 17-419, United States versus Craig and Faithful.

Who represents the government?

MR. ARMSTRONG:  Good afternoon, Your Honor.  Scott Armstrong along with my colleague Devon Helfmeyer.

THE COURT:  Who else is at your table, please?

MR. ARMSTRONG:  We also have DEA Diversion Agent Mike Mills and our paralegal specialist Saba Mortezavi.

THE COURT:  Who is representing the defense, please?

MR. WILLIAMS:  Cornel Williams for Shane Faithful, Your Honor.  Good afternoon.

MR. LEWIS:  Don Lewis for Gazelle Craig.

THE COURT:  Now, are your clients here?

MR. LEWIS:  Yes, they are, Your Honor.

THE COURT:  As long as they are here.

Go ahead and have a seat, gentlemen.

We briefly spoke -- by the way, we are in no rush.  We have got the whole rest of the day available.  We will just get it done.  The only thing is I need to take a break at about, what, 3:30 to 4:00.  Aside from that, we can go all the way.  In fact, that jury verdict, by the way, in that odometer case came in, and they found for the plaintiff on it. And we were here until about 6:30.  We got that out of the way so we don't have to take any breaks.  I don't have any juries

13:11   1   deliberating on that matter.

2          Again, give me about a two-minute overview.  I

3   remember it.  I just want to get back in gear.  Give me just a

4   two-minute overview of your case and then a two-minute overview

13:11   5   of what the defense is, if you want to go into any defense.  If

6   you want to remain mute, that's fine.  Okay.  Yes, sir.

7          MR. ARMSTRONG:  Thank you, Judge.  The evidence will

8   show in this case that the defendants, which there are two,

9   Dr. Gazelle Craig and Shane Faithful, were no more than common

13:11   10   drug dealers.  What they were doing was they were writing

11   thousands of prescriptions for controlled substances --

12          THE COURT:  When you say "thousands," how many?

13          MR. ARMSTRONG:  Roughly 31,000 prescriptions.

14          THE COURT:  I have done a bunch of these cases.  This

13:11   15   is, of course, a brand new case, new people and so forth.  I

16   understand it, but I just want to get a feel for it.  But we

17   are looking at about 31,000.  Over how long a period of time?

18          MR. ARMSTRONG:  About two and a half years, Judge.

19          THE COURT:  Go on.  Are there any other defendants in

13:12   20   this case?

21          MR. ARMSTRONG:  No, Judge, just two.

22          THE COURT:  Go on.

23          MR. ARMSTRONG:  The evidence will show that they

24   effectively sold prescriptions for two drugs, hydrocodone, also

13:12   25   known as Norco, and carisoprodol, also known as Soma.  Together

they are a dangerous drug cocktail, and they sold prescriptions

to basically allcomers for about $300 cash per prescription.

THE COURT: Well, they came in for one drug and they

got one drug, that was 300, and if they got two drugs, it would

be, what, 600?

MR. ARMSTRONG: No, Judge. Both prescriptions, one

price.

THE COURT: Okay. What sort of exams do you allege

that they gave, if any, on each visit that they paid to the

clinic?

MR. ARMSTRONG: Very rudimentary, Judge. We are going

to have audio of two visits with Dr. Craig; one with a

confidential human source and one with a DEA agent who went in

in an undercover capacity. Both of those individuals saw

Dr. Craig for roughly a minute.

THE COURT: A minute? A question that I have based

upon the different cases I have had: As far as the

prescription blanks go, okay, where did they get the

prescriptions? Did the doctor sign it with the person in the

office and hand it to them? Was it done by the office manager?

Were the prescription forms professionally made or were they

copied on a copy machine, anything like that relevant here?

MR. ARMSTRONG: Judge, the evidence will show that

Dr. Gazelle Craig signed all of her own prescriptions after

seeing the patient.

13:13  1          THE COURT:  Okay.  That's it.  That's enough.

2          MR. ARMSTRONG:  Thank you, Judge.

3          THE COURT:  How many counts are we going on?  What

4   there are?

13:13  5          MR. ARMSTRONG:  We have one count of 21 USC 846 --

6          THE COURT:  Just tell me about them.

7          MR. ARMSTRONG:  Yes, of course. conspiracy to

8   distribute controlled substances, the hydrocodone and the Soma.

9   That's Count One.

13:13  10         THE COURT:  Go on.

11         MR. ARMSTRONG:  Then we have three substantive counts.

12         THE COURT:  What is your substantive count?

13         MR. ARMSTRONG:  One for a confidential human source

14  visit and another one two months later and then one with a DEA

13:14  15  agent, all three supposed patients.

16         THE COURT:  What is the possible imprisonment range on

17  these?

18         MR. ARMSTRONG:  Twenty years for each count, Judge.

19         THE COURT:  Twenty years without parole or each count?

13:14  20         MR. ARMSTRONG:  Yes, Judge.

21         THE COURT:  Defense, do you want to visit at this time

22  or just get right to the motion?

23         MR. WILLIAMS:  No, Your Honor.  We would like to get

24  directly to the motion as far as Mr. --

13:14  25         THE COURT:  Say that again.

13:14  1        MR. WILLIAMS:  I would like to go directly to the

2  motion.

3        THE COURT:  Okay.  Both sides?

4        MR. LEWIS:  I prefer that, Judge.

13:14  5        THE COURT:  They have that perfect right since they

6  don't have to put any evidence on or make any statements.

7        All right.  The first thing we want to do is the

8  motion to disclose exculpatory evidence, that is the

9  suppression; is that correct?

13:14  10        MR. WILLIAMS:  No, sir.

11        THE COURT:  Hang on a second.  No.  Oh, here it is.

12  Suppression down here.  Give me a second.

13    *(Pause)*

14        THE COURT:  This is when the office manager was

13:15  15  working with the DEA, when she started working with them, is

16  that it?  Is that -- yeah.  That's correct.

17        MR. WILLIAMS:  The suppression goes to the documents

18  that were given to the government.

19        THE COURT:  That's the suppression, but now the

13:15  20  motion -- oh, no.  Wait.  This is for the undercover agent?

21        MR. WILLIAMS:  That's correct.

22        THE COURT:  I'm sorry.  I just went over again

23  everything we did, and I have it all highlighted.  All right.

24  That's right.  This is the designation of an undercover agent.

13:15  25  You both put briefs in on this.  I have read them all.  It's

13:15　　1　　not the first time this has come up.

　　　　2　　　　　　　　All right.  What is the government's position on

　　　　3　　this?  Then we will hear from the defense.

　　　　4　　　　　　　MR. ARMSTRONG:  Judge, our position is that this is

13:15　　5　　not a close call.  Under the --

　　　　6　　　　　　　THE COURT:  Regardless if it is a close call or not,

　　　　7　　you argue your position, please.

　　　　8　　　　　　　MR. ARMSTRONG:  Of course, Judge.  It's a three-part

　　　　9　　test.

13:15　　10　　　　　　　THE COURT:  In the Fifth Circuit anyhow?

　　　　11　　　　　　　MR. ARMSTRONG:  Yes, Judge.

　　　　12　　　　　　　THE COURT:  The Fifth Circuit has got a three-part

　　　　13　　test.

　　　　14　　　　　　　MR. ARMSTRONG:  The UC's or the undercover's level of

13:16　　15　　activity, the helpfulness of that activity to the defense and

　　　　16　　then the government's interest in nondisclosure --

　　　　17　　　　　　　THE COURT:  This is where the confidential human

　　　　18　　source came up.  He didn't have a prescription history, I

　　　　19　　think, with the clinic and they turned him away.  Is that it?

13:16　　20　　　　　　　MR. ARMSTRONG:  Yes, Judge.

　　　　21　　　　　　　THE COURT:  Is that the extent of it?

　　　　22　　　　　　　MR. ARMSTRONG:  Yes, Judge.

　　　　23　　　　　　　THE COURT:  I'm not arguing your side.  I'm now back

　　　　24　　up to speed.  Explain how those three -- how these three

13:16　　25　　factors are applicable to the facts in this case relative to

13:16  1   the confidential human source.

2          MR. ARMSTRONG:  Thank you, Judge.  First, on the

3   activity level, the activity level is very minimal.  So what

4   happened is the source went in and she checks in, signs in and

13:16  5   then she is turned away.

6          THE COURT:  She signs in where?  At the front desk?

7          MR. ARMSTRONG:  Yes, Judge.

8          THE COURT:  Who is at the front desk?  It is not

9   relevant who is at the front desk.  Was it not one of the

13:17  10  defendants in this case?

11         MR. ARMSTRONG:  No, Judge.  It was an office worker.

12  The UC or the undercover agent had zero interaction with either

13  defendant on this visit to the clinic.

14         THE COURT:  Okay.

13:17  15         MR. ARMSTRONG:  So, on the activity level, there is

16  almost zero.

17             On the helpfulness, again, it is the same

18  analysis almost.  She had no interaction with either defendant,

19  so neither defendant can say, I made the informed judgment, I

13:17  20  made the decision to turn this individual away.

21         THE COURT:  The last one, the government's interest in

22  nondisclosure?

23         MR. ARMSTRONG:  Judge, we have a very compelling

24  interest for nondisclosure in this case.  This individual is

13:17  25  working in other ongoing investigations and she is making

recordings and collecting information in an undercover
capacity.

THE COURT:  You didn't do that in this case?  Right?
She was turned away in this case?

MR. ARMSTRONG:  Correct.

THE COURT:  That's all I need to hear.

Defense, please?

MR. WILLIAMS:  Your Honor, I concur that the Fifth
Circuit has a three-prong test.  Where I differ from the
government is the level of activity.

THE COURT:  Okay.  Yes, sir.

MR. WILLIAMS:  And if I may, I would like to back up
to two particular times where undercover sources did go in --

THE COURT:  I'm talking about this one, right?

MR. WILLIAMS:  Yes, sir.

THE COURT:  You are looking to, what is it, you are
looking to compel disclosure from this one?

MR. WILLIAMS:  But I would like to set that up, Judge,
by saying that --

THE COURT:  Go on.

MR. WILLIAMS:  -- prior to that particular date, they
sent two other undercovers in who didn't get prescriptions
also.  The government has revealed those particular people.
Okay.  This same particular scenario.  They have given us both
of those particular people.

13:18    1           Now, as far as the level of activity goes, there

2    was a protocol set up by the clinic.  When you come in, you

3    have to run a DPS check to see if there is prior history.  That

4    was part of the protocol to make sure that --

13:18    5           THE COURT:  A DPS check?

6           MR. WILLIAMS:  Yes.

7           THE COURT:  Department of Public Safety?

8           MR. WILLIAMS:  Yes.

9           THE COURT:  As each patient came in?

13:18    10          MR. WILLIAMS:  Each particular patient has to do that.

11          THE COURT:  Why?

12          MR. WILLIAMS:  Well, it is protocol set up by the

13    particular clinic.

14          THE COURT:  But why?

13:18    15          MR. WILLIAMS:  To make sure that they are not

16    prescribing to just anybody.  If there is a history --

17          THE COURT:  What kind of history can you get with a

18    DPS?  A criminal rap sheet?

19          MR. WILLIAMS:  No.  They show if, in fact, you have

13:19    20    been prescribed any of these drugs within the last six months.

21          THE COURT:  They have that capability.  Okay.

22          MR. WILLIAMS:  All right.  Now, once that -- that was

23    set up by the clinic, Judge, that was set up by the clinic

24    itself.  That was one of the doctor's rules before she would

13:19    25    even determine if, in fact, she would see anybody.

13:19   1              Now, on the date in question, March 10, he came

        2    in --

        3              THE COURT:  Is that usual in clinics?

        4              MR. WILLIAMS:  It is.  It is part of one of the

13:19   5    particular protocols that we use to determine if, in fact,

        6    people are doctor shopping, if, in fact, they are just trying

        7    to get drugs without legitimate purposes.

        8              THE COURT:  I'm familiar with that.

        9              MR. WILLIAMS:  On this day, they come in and they run

13:19   10   the DPS check and he does not have the history.

        11             THE COURT:  Does not?

        12             MR. WILLIAMS:  Does not.  As a result, they tell him,

        13   Look, you don't have a history here, maybe you need to go to

        14   your pharmacy and see if there is any history from your

13:20   15   pharmacy.  He leaves and goes to the pharmacy and comes back.

        16             THE COURT:  Who is that?  Is that somebody else?

        17             MR. WILLIAMS:  No.  Confidential informant.

        18             THE COURT:  I thought it was a woman.  Wait a second.

        19   Hold it.  Get it straight because he is saying it was a man.

13:20   20             MR. WILLIAMS:  I don't know who it is.

        21             THE COURT:  Is it a woman or a man?

        22             MR. ARMSTRONG:  Judge, we would prefer not --

        23             THE COURT:  No, sir.  You already did say it.

        24             MR. ARMSTRONG:  It was a female.

13:20   25             MR. WILLIAMS:  The female.  I'm just finding it out

1   because in all of the --

2   THE COURT:  I wouldn't make you do that because you

3   already said "she."  Go on.

4   MR. ARMSTRONG:  No problem.

5   MR. WILLIAMS:  Now we know this is she, she goes to

6   DPS and retrieves her history and comes backs.  When she comes

7   back with that particular history, that history is over a year

8   old, nine months or a year old which is beyond the time

9   limitations that the clinic sets up in order to see you.

10   Okay?  So after that particular time, now she

11   leaves the particular clinic and goes.  Now, what I would like

12   to point out to the Court's attention, Judge, this doesn't

13   differ at all from what happened to the prior two confidential

14   sources that went in who have already been revealed.  They went

15   in in February.  They turned those over to us, but now they are

16   saying simply because this person is doing continuous work for

17   the government, that we are not entitled to it.  And I don't

18   see how that is differentiated from what had happened on the

19   first two confidential sources that the government sent into

20   the clinic less than a month before.

21   THE COURT:  Okay.  That's the position of the defense,

22   correct?

23   MR. WILLIAMS:  Yes, it is.

24   THE COURT:  I will rule all at once.  I'm just making

25   tentative rulings.  If I need to do any research, I will take a

short break and come out and just read it off to you. Okay.

Then we go to the motion to suppress. I want to hold on that. We are going to do that probably last. Okay? Do you want to go into that now? Because after that, it is strictly objections to the exhibits. And I'm looking now, that is basically it after this. So at this point, maybe we will go ahead and -- how do you want to proceed? How do you propose?

Every time I do this, the government's position is that you put your witnesses on or that they have to put them on. You have got the witnesses. You go first.

MR. HELFMEYER: Judge, Mr. Helfmeyer is going to be handling the hearing.

THE COURT: He is not even answering the questions.

Mr. Helfmeyer, which way are you proceeding? Are you calling witnesses?

MR. HELFMEYER: The state of the law is that it is the defendant's burden to establish that a search was made by a government agent --

THE COURT: The witnesses are?

MR. HELFMEYER: Sorry? They are here. We told the Court we would have two witnesses available, the office worker as well as our agent. They are both here and ready to testify.

THE COURT: How do you want to proceed? I know the burden is on them, because sometimes the government wants to put their own witness on and to lay the predicate.

13:23    1           How do you prefer, sir?

         2           MR. WILLIAMS:  It doesn't matter to me.  If he prefers

         3    for me to call him, I'm going to call him as a hostile witness

         4    because he is a government agent.

13:23    5           THE COURT:  I have always done this over the years,

         6    okay, on suppression hearings.  Technically -- and it is their

         7    burden, but sometimes the government wishes to put their

         8    witnesses on because I usually hear the same thing from the

         9    defense, that they are ready to go at them versus you calling

13:23   10    and getting your position on and then letting the defense take

        11    them after that.

        12           Your preference, what do you want to do?

        13           MR. HELFMEYER:  We will call them.

        14           THE COURT:  Call your witness.

13:23   15           MR. WILLIAMS:  Your Honor, before we get started, I

        16    think they have two witnesses here.  It may be necessary to

        17    have the other witnesses here because this witness can't

        18    testify as to everything, and I think we have already talked

        19    about that.

13:24   20           THE COURT:  I didn't understand your objection.

        21           MR. WILLIAMS:  Basically this witness -- the

        22    government is calling this particular witness.  There is a

        23    confidential source agreement for pay that was signed on

        24    March 1st.  I'm just finding out because I could not read the

13:24   25    signatures on the particular agreement, that this particular

individual did not sign that agreement.  Okay?  I have talked

with the government already, and they said the people who

signed it are available to be called.  Is that correct?

MR. HELFMEYER:  That's correct.  One of them is.

MR. WILLIAMS:  One of them is.  If we need the other

one, I will let you know, but I'm just finding that out.

THE COURT:  Everything has got to be done today and we

are going to get it all done.  Call your first witness.

MR. HELFMEYER:  The state calls Ms. Loren Phillips and

she is on the way from the waiting room.

While we are waiting, Your Honor, I just want

to -- the scope of her testimony at trial is going to be much

broader than it is today, and I anticipate the defense's cross

at trial is going to be much more broad than it should be

today.  I would just ask that the Court make sure -- and I will

object if I feel the cross is getting outside the scope of

direct.

THE COURT:  Absolutely.  The position is that -- were

these documents in her possession?  Isn't that the one?  It's

the suppression hearing.  Was it in her possession?  I actually

have a statement here.

Was Loren Phillips acting as an instrument of the

government at the time she took the documents from Gulfton?

Correct?

MR. HELFMEYER:  Correct.

13:25   1           THE COURT:  That's what I have on my sheet.  Both

        2   sides are going to be on that one point.

        3           MR. WILLIAMS:  For the purposes of this hearing,

        4   Judge, I would like to invoke the rule.

13:25   5           THE COURT:  Anybody else going to testify as to

        6   this -- wait a second.  Are you invoking the rule?

        7           MR. WILLIAMS:  I am, Your Honor.

        8           THE COURT:  Are you the case agent?

        9           CASE AGENT MILLS:  Yes, sir.

13:26  10           THE COURT:  You were going to put him outside.  Do you

       11   have to?  No, you don't, because he is your case agent.

       12           MR. WILLIAMS:  And I have no problem with that, Judge,

       13   but I have been informed by the government that they plan on

       14   using two case agents in this particular case, and I'm going to

13:26  15   object to that, Judge.  I think they are entitled to one.

       16           THE COURT:  Well, we only see one right here now.

       17   Right?  If anybody else shows up and you want to rotate them or

       18   I will entertain that objection if someone else comes in and

       19   sits down as the case agent.  All right?

13:26  20           Sir, you may be seated since you are, in effect,

       21   the corporate representative, as you do it in civil work, but

       22   you are the representative of the government and you may

       23   remain.

       24           CASE AGENT MILLS:  Thank you.

13:26  25           THE COURT:  As soon as that witness is ready, please

13:26    1    call her in.

2            *(Off the record)*

3                THE COURT:  Come on up and be sworn.

4            *(Witness sworn)*

13:30    5                MR. HELFMEYER:  For the record, I'm showing defense

6    counsel what has been marked as Government's Exhibits 603 and

7    604.

8                THE COURT:  Short and to the point, Counsel.  Go on.

9                **LOREN PHILLIPS, DULY SWORN, TESTIFIED:**

13:30   10               **DIRECT EXAMINATION**

11    *BY MR. HELFMEYER:*

12    Q    Good afternoon, ma'am.  Could you please introduce yourself

13    to the judge?

14    A    Loren Phillips.

13:30   15    Q    Ms. Phillips, when did you start working at Gulfton

16    Community Health Center?

17    A    I worked as Shane Faithful's assistant in 2015 in the fall

18    and I started working at Gulfton in 2016.

19    Q    Do you remember when in 2016?

13:30   20    A    I believe it was March.

21    Q    When did you leave Gulfton Community Health Center?

22    A    In December, December 28, 2016.

23    Q    Ms. Phillips, when did you first contact DEA?

24    A    December 28, 2016.

13:30   25    Q    How did you contact DEA?

13:30    1    A    Anonymously earlier that day.

         2    Q    By phone or in person?

         3    A    By phone.

         4    Q    In that initial conversation with DEA, you said it was

13:30    5    anonymous.  You didn't tell them your name?

         6    A    No, sir.

         7    Q    What did you tell DEA?

         8    A    That I was a friend of someone who worked there and I

         9    wanted to know how do I report a complaint.

13:31   10    Q    In that initial conversation with DEA, did the subject of

        11    records of Gulfton Community Health Center come up at all?

        12    A    No.

        13    Q    Did you tell DEA that you had records?

        14    A    No, sir.

13:31   15    Q    And you said you quit later that day?

        16    A    Yes, sir.

        17    Q    When did you next contact DEA?

        18    A    It was in January after the new year.

        19    Q    Did you speak to them the next day as well, on the 29th,

13:31   20    over the phone?

        21    A    I don't recall.

        22    Q    When did you first meet face to face with DEA agents?

        23    A    I believe it was the beginning of 2017.

        24    Q    Was it March 1st of 2017?

13:31   25    A    I believe so.

13:31  1   Q   And that's when -- between December when you contacted

2   anonymously and the March 1st meeting, did you have any

3   face-to-face meetings with DEA?

4   A   Not prior to meeting with them in March, no, sir.

13:32  5   Q   What was your position at Gulfton?

6   A   I was clinic manager.

7   Q   As a part of your duties as clinic manager, did you

8   occasionally take records from Gulfton home?

9   A   Yes.  If it was the accounting records, I was instructed to

13:32  10  shred them.

11          THE COURT:  To what?  To shred them?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Did you have a shredder at the office?

14          THE WITNESS:  I have a shredder at home and there is

13:32  15  one at the office.

16          THE COURT:  Go on.

17          MR. HELFMEYER:  Permission to approach?

18          THE COURT:  You don't have to ask in my court.  That's

19  not the way I try a case.  You can go right on up.

13:32  20          By the way, just for the record, I have tried

21  cases all over the country also, everywhere from Arizona to New

22  York.  I allow attorneys to sit while examining witnesses like

23  we do in Texas state court.  But if you are more comfortable

24  with a podium or standing, standing at your place or moving

13:32  25  around, that's fine.  Okay?

13:33  1        MR. WILLIAMS:  Thank you, Judge.  That's good for the

2  old man.

3        THE COURT:  Off the record.

4  *(Off the record discussion held)*

13:33  5        THE COURT:  Go right ahead.

6  *BY MR. HELFMEYER:*

7  Q  Ma'am, have you had a chance to look at Government's

8  Exhibit 603?

9  A  Yes, sir.

13:33  10  Q  What is Government's Exhibit 603?

11  A  The expense records that are taken at the end of the day at

12  Gulfton Medical Clinic.

13  Q  Are those some of the records that you provided to DEA?

14  A  Yes, sir.

13:34  15  Q  When did you provide those to DEA?

16  A  I believe it was my third meeting with them.

17  Q  So it was after March 1st, that first meeting?

18  A  Yes, sir.

19  Q  And how did you acquire the records that make up

13:34  20  Government's 603?

21  A  I do the expense sheets at the end of the day, and those

22  records are not left at the clinic per instructions of

23  Dr. Craig and Mr. Shane Faithful.

24        MR. HELFMEYER:  Your Honor, can I hand the Court a

13:34  25  copy of the exhibit?

13:34   1          THE COURT:  Sure.

        2          MR. HELFMEYER:  I will walk around.

        3          THE COURT:  By the way, these are admitted just for

        4   the purposes of this hearing.

13:34   5          MR. WILLIAMS:  Yes, Your Honor.

        6          THE COURT:  For that limited purpose.  Is that one

        7   day's expense report, ma'am?

        8          THE WITNESS:  No, sir.  That was during the time I was

        9   at the clinic.

13:34  10          THE COURT:  How long were you at the clinic?

       11          THE WITNESS:  From, I believe it was, March until

       12   December 2016.

       13          THE COURT:  Okay.

       14   *BY MR. ARMSTRONG:*

13:35  15   Q    And to be clear, your meeting with DEA was March of what

       16   year?

       17   A    2017.

       18   Q    So it was after you left the clinic?

       19   A    Yes, sir.

13:35  20   Q    As the Court is looking at the records, there are dates at

       21   the top.  What do those dates indicate?

       22   A    The date that the money was collected for that day and the

       23   amount of money that was collected at the end of the day.

       24   Q    Did you take those records home -- when did you take those

13:35  25   records home?

13:35    1    A    At the end of the day.

2    Q    So there is 60 or so pieces of paper the Court is looking

3    at right now. You took each of those individually home one day

4    at a time?

13:35    5    A    Yes, sir.

6         THE COURT: For the record, they are all consecutively

7    Bates stamped. There are consecutive numbers on them, it looks

8    like. Go on.

9    BY MR. HELFMEYER:

13:35    10    Q    On the day that you left Gulfton for the last time,

11    December 28, 2016, what did you take with you?

12    A    My book bag that I would normally take at the end of the

13    day, my purse. I gave Mr. Faithful his checks that are used

14    for the clinic, the clinic's keys and basically anything that

13:36    15    belonged to the clinic.

16    Q    So your testimony is that throughout the course of your

17    employment, you took some of these records home regularly?

18    A    Yes.

19    Q    Did DEA ever tell you to take records from Gulfton Clinic?

13:36    20    A    No, sir.

21    Q    Had DEA mentioned records of Gulfton Clinic to you prior to

22    you leaving the clinic?

23    A    No, sir.

24         MR. HELFMEYER: For the record, I'm showing the

13:36    25    witness Government's Exhibit 604. It is three pages.

13:36  1  *BY MR. HELFMEYER:*

2  Q   Ma'am, can you take a look at Government's Exhibit 604?

3         Is Government's Exhibit 604 some of the records

4  you provided to DEA?

13:37  5  A   Yes, sir.

6         THE COURT:   Some of the additional records, correct?

7  Ma'am, those were additional records?

8         THE WITNESS:   Yes, sir.

9         THE COURT:   What was the address?   I don't know if it

13:37  10  is on here.   What is the address on Gulfton?   Do you remember

11  the address?

12         THE WITNESS:   I think it is 6306 Gulfton.

13         THE COURT:   Gulfton, corner of what?   What street?

14         THE WITNESS:   It is near Fountain View and Hillcroft.

13:37  15         THE COURT:   All right.   Go on.

16  *BY MR. HELFMEYER:*

17  Q   Government's 604 that the Court has now, when did you take

18  those records home?

19  A   In July.

13:37  20  Q   Of what year?

21  A   2016.

22  Q   Ma'am, what is the last time you went to Gulfton Clinic?

23  A   The day I quit.

24  Q   Has DEA asked you to go back and get records?

13:38  25  A   No, sir.

13:38  1        MR. HELFMEYER:  No further questions.

2            Thank you, Your Honor.

3        MR. WILLIAMS:  May I proceed?

4        THE COURT:  Go right ahead.  Pull the microphone in,

13:38  5   Counsel.  Pull the stand in a little bit.  Okay.  That's fine.

6   Now adjust it.

7                        **CROSS-EXAMINATION**

8   *BY MR. WILLIAMS:*

9   Q   Ms. Phillips, my name is Cornel Williams.  I represent

13:38  10  Shane Faithful.

11  A   Yes, sir.

12  Q   We have never met before, have we?

13  A   I don't recall.

14  Q   So you don't recall or you don't know if you met me before?

13:38  15  A   I don't believe I have ever met you.

16  Q   Fair enough.  Okay.  Now, let's go directly to December 28.

17  Is it your testimony on the 28th of December you anonymously

18  called DEA?

19  A   I called them earlier that day, December 28.

13:39  20  Q   And prior to calling them, you had already made up your

21  mind that you were going to leave that particular clinic; is

22  that correct?

23  A   Yes, sir.

24  Q   And you made up your mind because your hours were being

13:39  25  cut; were they not?

13:39    1    A   No, sir.

2    Q   They were not. Okay. All right. Now, prior to calling

3    DEA, had you talked to anybody about calling DEA regarding this

4    Gulfton Clinic?

13:39    5    A   No, sir.

6    Q   So you woke up that morning and you just decided, I'm going

7    to call DEA on the clinic; is that correct?

8    A   Yes, sir.

9    Q   All right. And you called anonymously and you lied to them

13:39    10    and you told them that you were a friend -- you knew a friend

11    who worked there; is that correct?

12    A   I called them anonymously.

13    Q   All right. And did you pretend to be somebody that you

14    weren't or did you tell them -- I think you just said on direct

13:39    15    examination you called and stated that there was a friend that

16    worked there, and you were calling on their behalf; is that

17    correct?

18    A   I wasn't calling on anyone's --

19         THE COURT: Hold it a second. It will go a lot

13:40    20    easier -- and for the whole trial, also. If the lawyer asks a

21    question that is a yes or no, answer it yes or no. If you

22    can't answer it yes or no, so state, and he will have to

23    rephrase it or make a request for me or move on to another

24    question.

13:40    25         Okay. Ask it again, Counsel.

BY MR. WILLIAMS:

Q   When you called DEA anonymously, you told them that you were calling -- you had a friend that worked at the clinic; is that correct?

A   Yes, sir.

Q   Okay.  And you were calling on behalf of that friend, correct?

A   No, sir.

Q   All right.  So exactly what were the words that you used when you called DEA?  What exactly did you tell them?

A   I don't recall exactly what I said.

Q   All right.  Now, it is your testimony on that particular date, that's the last time that you had communicated with anybody from DEA until you came into their offices on March 1st; is that correct?

A   Yes, sir.

Q   Okay.  Now, on March 1st, you signed an agreement to become a paid confidential informant; is that correct?

A   Yes, sir.

Q   Who was present at that particular meeting?

        THE COURT:  What was the date?

        MR. WILLIAMS:  March 1st, 2017.

        THE COURT:  Got it.

        THE WITNESS:  There were two gentlemen.  One by the name of James.

*BY MR. WILLIAMS:*

Q   Do you know James's last name?

A   No, sir.

Q   Is it the gentleman that just brought you down from the witness room?

A   Two of them brought me down.

Q   The black gentleman?

A   Yes, sir.

Q   African-American?

A   Yes, sir.

THE COURT:  Is that the man?

THE WITNESS:  Yes, sir.

*BY MR. WILLIAMS:*

Q   Who was the other person?

A   I don't recall his name.

Q   Was it a man or was it a woman?

A   It was a man.

Q   All right.  And it's your testimony that on that particular day -- well, let me just ask you this.  Okay?  Whose idea was it for you to become a paid informant?

A   It was no one's idea.

Q   So is it your testimony you showed up and after conversing with them, you signed an agreement on that particular day?

A   Yes, sir.

Q   All right.  And you knew nothing about becoming a paid

13:42    1    informant?

         2    A    No, sir.

         3    Q    Did they bring it to your attention or did you bring it to

         4    their attention that you wanted to be paid to be working as a

13:42    5    confidential source?

         6    A    They brought it to my attention during the third meeting.

         7    Q    During the third meeting?

         8    A    Yes, sir.

         9    Q    Okay.  Now let me just be clear on this.  The third

13:42   10    meeting, meaning the third time that you met with them?

        11    A    Yes, sir.

        12    Q    But you signed the agreement on March 1st; is that correct?

        13    A    Yes, sir.

        14    Q    All right.  So am I to assume then that you met with them

13:42   15    on two other separate occasions prior to March 1st?

        16    A    No, sir.

        17    Q    If, in fact -- I'm just trying to get it clear for myself.

        18    Okay?  You are stating that you signed an agreement on

        19    March 1st; is that correct?

13:43   20    A    I signed an agreement as an informant.  I wasn't aware that

        21    it was being a paid informant.

        22    Q    And you signed the agreement, but did you read the

        23    agreement?

        24          MR. HELFMEYER:  Objection.  Outside the scope of

13:43   25    direct.

13:43   1       MR. WILLIAMS:  This is what she signed.

2       THE COURT:  I'm not saying it is outside the scope.

3   What other objection might you have, Counsel?

4       MR. HELFMEYER:  Asked and answered.

13:43   5       THE COURT:  No.  Have a seat.  If you think of it, I

6   will consider it.

7           Go on.

8   *BY MR. WILLIAMS:*

9   Q    Did you read the document that you signed on March 1st?

13:43   10  A    Yes, sir.

11  Q    And it is your testimony that that was the first time you

12  had met face to face with any DEA agents since calling on the

13  28th of December?

14  A    In March, sir, 2017.

13:44   15  Q    So March 1st, 2017 is the first time you met face to face

16  with anybody?

17  A    Yes, sir.

18  Q    All right.  Were you communicating with anybody verbally

19  prior to March 1st?

13:44   20      THE COURT:  Where?

21  *BY MR. WILLIAMS:*

22  Q    From DEA or any law enforcement?

23  A    After December 28, I communicated with them.

24  Q    And how did you communicate with them?

13:44   25  A    Via telephone.

13:44   1   Q   And how many times did you call them via telephone?

        2   A   I think it was twice, sir.

        3   Q   And who did you speak with on the telephone between

        4   December of 2016 and the time that you signed this agreement on

13:44   5   March 1st of 2017?

        6   A   Would you repeat the question, sir?

        7   Q   Who did you talk to, okay, between December 28th and

        8   March 1st with law enforcement?

        9   A   The gentleman's name was Mike.

13:44  10   Q   Mike.  Okay.  Do you know Mike's last name?

       11   A   No, sir.

       12   Q   Would it be the gentleman sitting in the courtroom here?

       13   A   Yes, sir.

       14   Q   And do you remember the dates that you spoke with him?

13:45  15   A   No, sir.

       16   Q   Okay.  Did you have an occasion to text him any particular

       17   information between the dates of December 28 of 2016 and

       18   March 1st of 2017?

       19   A   Would you repeat the question?

13:45  20   Q   Did you have an occasion to text anybody from law

       21   enforcement anything between December 28th, 2016 and March 1st

       22   of 2017?

       23   A   I don't recall texting anyone.

       24   Q   You don't recall at all?

13:45  25   A   I don't recall.

13:45   1   Q   Does that mean you don't know if you did or you just can't

2   remember if you did or not?

3   A   I can't recall.

4   Q   Okay.  But you can recall that this document, 604, that we

13:45   5   talked about, you took that document in what time?

6           THE COURT:  December.

7           MR. WILLIAMS:  No.  Not December.

8           THE COURT:  Wasn't it December?  Oh, that's when you

9   left the employ.  You took it beforehand?

13:46   10          THE WITNESS:  Yes, sir.

11  BY MR. WILLIAMS:

12  Q   And you took that in July of 2016; did you not?

13  A   The date was on the document.

14          THE COURT:  This says 7/1/16 right at the top.

13:46   15          MR. WILLIAMS:  So, may I have the exhibits just to

16  question her?

17          THE COURT:  Do you have extra copies?

18          MR. HELFMEYER:  They have all been provided.

19          MR. WILLIAMS:  You have provided them.

13:46   20     *(Off the record discussion held)*

21          MR. WILLIAMS:  Could I approach?

22          THE COURT:  Yes, sir.  You need not ask.  Go right on

23  up.

24  BY MR. WILLIAMS:

13:47   25  Q   I show you what has been marked as Government Exhibit 604.

13:47  1  Do you recognize this document?

2       THE COURT:  Do you need some more water there,

3  Counsel?  I see you trying to squeeze it.  Ellen, please.  To

4  the prosecution in the case.

13:48  5       MR. ARMSTRONG:  Thank you, Judge.  It's for the

6  witness.

7       THE COURT:  Pardon me?

8       MR. ARMSTRONG:  It's for the witness, Judge.

9       THE WITNESS:  Yes, sir.

13:48  10       THE COURT:  What is this?  I won't ask you what law

11  school you went to.  I recognize that.

12  *BY MR. WILLIAMS:*

13  Q  And did you prepare this particular document?

14  A  No, sir.  I was out of the country.

13:48  15  Q  You were out of the country at the time that this document

16  was prepared?

17  A  Yes, sir.

18  Q  Who prepared this particular document?

19  A  Olivia Caldwell.

13:48  20  Q  And on what date --

21       MR. HELFMEYER:  Objection.  Relevance.

22       THE COURT:  Why?

23       MR. HELFMEYER:  Whether or not she prepared the

24  document, I don't believe that is relevant, Your Honor.

13:48  25       THE COURT:  What else?

13:48  1      MR. HELFMEYER:  It is also outside the scope of

2    direct.

3         THE COURT:  No.  The bottom line is that it is, what,

4    irrelevant?

13:49  5      MR. HELFMEYER:  Yes, sir.

6         THE COURT:  Overruled to that extent.  I will overrule

7    it.

8    *BY MR. WILLIAMS:*

9    Q    Now, I think you testified on direct examination that you

13:49  10   were instructed to shred these particular documents; were you

11   not?

12   A    Every seven days.

13   Q    Every seven days.  And is there any reason why you did not

14   shred those documents inside of the clinic, because there was a

13:49  15   shredder at the clinic?

16   A    Not this document.

17   Q    What about the expense accounts?

18   A    I shredded a few of them and I started -- I was concerned.

19   Q    You were concerned about what?

13:49  20   A    Because I'm the person who prepared the documents.  I was

21   concerned about shredding them.

22   Q    Okay.  All right.  So you decided not to shred them?  You

23   decided to keep them?

24   A    I was instructed to keep the documents and then shred them

13:49  25   at my discretion.

13:49    1    Q    That's different from what you said.

         2              THE COURT:   They knew you took them home?

         3              THE WITNESS:   They knew I took them home, sir.

         4    *BY MR. WILLIAMS:*

13:50    5    Q    And they knew you took them home and you were instructed to

         6    shred the documents; were you not?

         7    A    Every seven days.

         8    Q    But you did not shred those documents?

         9    A    No, sir.

13:50   10    Q    You kept them; did you not?

        11    A    Yes, sir.

        12    Q    Did you keep all the expense reports that you allegedly

        13    prepared while you were working there?

        14    A    Please rephrase your question, sir.

13:50   15    Q    Did you maintain all of the particular expense accounts

        16    that you allegedly prepared while you were working for Gulfton?

        17    A    I didn't allegedly prepare them.   I prepared them.

        18    Q    Did you keep all of the particular expense reports that you

        19    prepared?

13:50   20    A    Not all of them.   In the beginning, I did shred them.

        21    Q    Okay.   And when did you start not shredding these

        22    particular documents?

        23    A    I don't recall, sir.

        24    Q    Okay.   So you became concerned about what?   What was your

13:51   25    concern for not shredding the documents?

13:51  1   A   Well, it was documents that was -- let me back up.  These

2   were documents that had the expense accounts, receipts attached

3   to them.  And I was concerned of the fact that I'm the person

4   who is preparing these documents and if they are shredded,

13:51  5   there is no record of them.

6   Q   Okay.  But you were told by your superiors to shred these

7   documents; were you not?

8   A   Yes, sir.

9   Q   So you were being insubordinate, weren't you?

13:51  10   A   No, sir.

11   Q   You did not follow the instructions of the person who told

12   you to shred them, who was your immediate supervisor?

13   A   I was concerned that I was --

14   Q   That's not my question.

13:52  15       THE COURT:  We don't have a jury in the box.  Let the

16   record reflect this.  What I'm looking for, my understanding

17   is, was the witness acting as an instrument of the government

18   at the time she took the documents from Gulfton?  Okay.

19       MR. WILLIAMS:  Yes, sir, Your Honor.

13:52  20       THE COURT:  I'm talking to the government.  Okay.  I'm

21   not trying anybody's case, but this is -- nobody is in the jury

22   box.  Now, if it goes beyond that, I'm not going to get up and

23   object, but if you feel you need to, I will consider it and I'm

24   not rushing.  We have the whole rest of the day.  We are not in

13:52  25   any rush for time.  Okay?  A lot of this stuff could be

applicable during trial, but my understanding from reading this narrow issue is at the time she took the documents from Gulfton, was she working for the government?

So, now, if the government wants to get up now and object -- not at the moment. I'm going to allow them to go forward.

Now, I'm not running the government's case. If you think that you don't need to object, don't. Okay? But that's what I'm looking at, and don't take it from me. It's your case. It is not my case. That goes for the defense either. I'm not jumping in on either side, but that's my understanding for this nonjury hearing on a suppression hearing.

Counsel, go right ahead.

MR. WILLIAMS:  Thank you, Your Honor.

*BY MR. WILLIAMS:*

Q   So, you kept all of these documents, even though you were told to shred them; is that correct?

A   I kept expense reports.

THE COURT:  The ones that you turned over to the government, right?

THE WITNESS:  I kept those.

THE COURT:  You kept them. You were ordered to shred them within seven days, correct?

THE WITNESS:  Yes, sir.

*Williams Cross of Loren Phillips*

13:53   1    THE COURT:  And you did not, correct?

2    THE WITNESS:  Yes, sir.

3    THE COURT:  When you talked to the DEA, you didn't

4    give them your name?  You were calling, you said, on behalf of

13:53   5    a friend; is that correct?

6    THE WITNESS:  Correct, sir.

7    THE COURT:  Got it.

8    *BY MR. WILLIAMS:*

9    Q    Now, after you called the DEA, you began speaking to people

13:53   10   from law enforcement after you first called them; is that

11   correct?

12   MR. HELFMEYER:  Objection.  Vague.

13   THE COURT:  Overruled.

14   *BY MR. WILLIAMS:*

13:54   15   Q    Once you spoke to DEA on the 28th of December, you began to

16   speak with other members from DEA some time after that, between

17   that time and the time that you signed your agreement on

18   March 1st; is that correct?

19   A    I started speaking to them at the beginning of the year.

13:54   20   THE COURT:  After January 1st, after the new year,

21   right?

22   THE WITNESS:  Yes, sir.

23   THE COURT:  Is that what you said?

24   THE WITNESS:  Yes, sir.

13:54   25   *BY MR. WILLIAMS:*

13:54  1  Q   Can you recall the first date that you spoke to anybody

2  from DEA or any other law enforcement?

3  A   No, sir.

4  Q   All right.  Did you provide any other intelligence for DEA

13:54  5  or law enforcement between the time that you called DEA on

6  December 28th and the time that you signed your agreement on

7  March 1st?

8      MR. HELFMEYER:  Objection, Your Honor.  Outside the

9  scope of this hearing.

13:55  10     THE COURT:  Overruled.  I will allow him to ask that

11  question.

12     THE WITNESS:  I don't understand your question.

13  *BY MR. WILLIAMS:*

14  Q   My question is simple.

13:55  15     THE COURT:  Are these the only documents that you

16  handed up so far?  That's 603 and 604.  Were those the

17  documents that you provided to the DEA?

18     THE WITNESS:  Yes, sir.

19     THE COURT:  Anything else?

13:55  20     THE WITNESS:  There were other documents --

21     THE COURT:  That's what was asked.  What was asked,

22  aside from these documents, after you left the clinic, did you

23  turn any over, aside from those two?

24     THE WITNESS:  I turned over some other documents after

13:55  25  meeting them.

THE COURT:  In March?

THE WITNESS:  In March.

THE COURT:  Or February?

THE WITNESS:  I think it was towards the end of March because I met with them three times.

THE COURT:  Before you turned over anything?

THE WITNESS:  Yes.

THE COURT:  Those weren't these two, correct, these two sets?  It was 604 and, what is it, 603?  There were some other documents you turned over later; is that correct?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  That's what she said.

Do you want to make an objection?

MR. HELFMEYER:  I wanted to help the Court out if you had a question but --

THE COURT:  Go right ahead, Counsel.

BY MR. WILLIAMS:

Q   Just so I'm clear, March 1st, you signed an agreement; is that correct?

A   Yes, sir.

Q   That was the first time you met with them first face to face?

A   Yes, sir.

Q   When was the next time that you met with DEA after you signed that agreement?

13:56    1    A    I don't recall.

2    MR. HELFMEYER:  Objection.  Outside the scope of this

3    hearing.

4    THE COURT:  Overruled.

13:56    5    *BY MR. WILLIAMS:*

6    Q    You don't recall the date?

7    A    No, sir.

8    Q    But that would have been the second time that you met with

9    them?

13:56    10    A    Yes, sir.

11    Q    And the third time is the time that you turned over

12    documents; is that correct?

13    A    I believe it was after the third time.

14    THE COURT:  After the third time?

13:56    15    THE WITNESS:  Yes, sir.

16    *BY MR. WILLIAMS:*

17    Q    And you can't recall when that third time was, either?

18    A    No, sir.

19    Q    Isn't it true that you turned documents over twice to DEA,

13:57    20    once in March and once in June of 2017?

21    A    I don't recall, sir.

22    Q    Can you recall which particular documents you turned over

23    to DEA in March versus what you turned over in June?

24    A    No, sir.

13:57    25    Q    Okay.  But you had had extensive conversations with DEA

13:57    1    agents prior to turning over any of these particular documents,

2    didn't you?

3    A    I had conversations with them after March, yes, sir.

4    Q    After March, you talked about a particular case; did you

13:57    5    not?  You talked about what went on in the particular clinic;

6    is that correct?

7    A    We talked about the documents.

8    Q    Okay.  And when did you first tell DEA you had these

9    documents?

13:57    10    A    I believe it was after our third meeting.

11    Q    After your third meeting.  Okay.  Now, once you signed the

12    agreement to become a paid informant, who informed you that you

13    would be getting paid for your work?

14        MR. HELFMEYER:  Objection.  Outside the scope of this

13:58    15    hearing.

16        THE COURT:  Sustained.

17    *BY MR. WILLIAMS:*

18    Q    Were you paid -- when was the first time you got paid after

19    you signed this agreement?

13:58    20        MR. HELFMEYER:  Same objection.

21        THE COURT:  I didn't catch the question.  Could you

22    read it back, please?

23        *(The record was read as requested)*

24        THE COURT:  Objection is?

13:58    25        MR. HELFMEYER:  Outside the scope of this hearing.

13:58    1          THE COURT:  Sustained.

2    *BY MR. WILLIAMS:*

3    Q    Is it fair to say that you didn't turn over any documents

4    until you were paid?

13:58    5    A    Rephrase your question.

6    Q    Isn't it safe to say that you --

7          MR. HELFMEYER:  Same objection.

8          THE COURT:  Overruled.

9    *BY MR. WILLIAMS:*

13:58   10    Q    You did not turn over any of these documents until you

11    received compensation from the government?

12    A    That isn't true.

13    Q    Okay.  Can you recall what date that you received your

14    first payment from the government?

13:58   15    A    I don't recall the date.

16          THE COURT:  When did you turn over the documents, 604

17    and 603, the two that we talked about?  When did you turn those

18    over?

19          THE WITNESS:  It was after my third meeting with them.

13:59   20          THE COURT:  So after March?

21          THE WITNESS:  My third meeting.

22          THE COURT:  After March?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  And on December 28, is that the day you

13:59   25    quit the clinic?

13:59  1    THE WITNESS:  Yes, sir.

2    THE COURT:  You had all these in your possession well

3  before the time you quit?

4    THE WITNESS:  Yes, sir.

13:59  5    MR. WILLIAMS:  May I approach, Your Honor?

6    THE COURT:  Yes, sir.

7  BY MR. WILLIAMS:

8  Q    I would like for you to take a look at that particular

9  document, specifically at the bottom.

14:00  10  A    March 22.

11  Q    Does that refresh your memory as to when you were paid by

12  the government?

13  A    It does.

14  Q    All right.  So tell this Court when you were first paid by

14:00  15  the government, the first time you were paid from the

16  government?

17  A    March 22.

18  Q    That was approximately three weeks from the time you signed

19  your agreement; is that correct?

14:00  20  A    Yes, sir.

21  Q    And at that particular time, you hadn't turned over any of

22  these documents, had you?

23  A    No, sir.

24  Q    Okay.  Let's talk about, since you didn't know that you

14:00  25  were going to be a paid informant, were you surprised that

14:00    1    somebody paid you --

2    MR. HELFMEYER:  Objection.

3    THE COURT:  Sustained.  What we are looking at is

4    right here.  Was this witness acting as an instrument of the

14:00    5    government at the time she took the documents from Gulfton?

6    That's all we are doing here.

7    MR. HELFMEYER:  Yes, sir, Your Honor.

8    *BY MR. WILLIAMS:*

9    Q    As to other documents that you took from when you left the

14:01   10    particular clinic, did you take a laptop that belonged to the

11    clinic?

12    A    No, sir.

13    Q    You did not?

14    A    No, sir.

14:01   15    Q    So all of the particular documents that you gave the

16    government came from loose documents that you had in your

17    possession that you had taken from the clinic prior to calling

18    DEA; is that correct?

19    A    Rephrase the question.

14:01   20    THE COURT:  That was pretty clear.  That's exactly

21    what we are here on.  Would you read the question back, please?

22    *(The record was read as requested)*

23    THE WITNESS:  Yes, sir.

24    *BY MR. WILLIAMS:*

14:02   25    Q    And it is your testimony that these documents -- Document

14:02  1  604, that wasn't an expense report, was it?

2      MR. HELFMEYER:  Objection.  Outside the scope of this

3  hearing.

4      THE COURT:  Sustained.

14:02  5  *BY MR. WILLIAMS:*

6  Q  Document 604 --

7      MR. HELFMEYER:  I believe the objection was sustained.

8      MR. WILLIAMS:  Okay.  I'm going to go into something

9  else.

14:02  10  *BY MR. WILLIAMS:*

11  Q  I think you testified that you took these expense reports

12  because you were concerned about not having any backup data; is

13  that correct?

14  A  No, sir.

14:03  15  Q  Why did you take Document 604 home?  Did you have the same

16  concerns?  It wasn't supposed to shredded, was it?

17  A  I need to see the document.  This document was attached to

18  the expense report.

19  Q  This was attached to the expense report?

14:03  20  A  Yes, sir.

21  Q  Was it stapled or was it --

22  A  It was stapled.

23      THE COURT:  I'm going to stop this for one moment.  I

24  made a decision here also on something else.  Not to crimp

14:03  25  anybody's style, but as visitors from, what is it, from

14:03    1    Washington, you are probably aware the Fifth Circuit is the

2    lead circuit basically in timing orders in civil and criminal

3    cases.  I don't know if I mentioned it to you when you were

4    here last time.  I did that on the whole Stanford case.  I'm

14:04    5    getting a feeling here the safest thing to do is issue a timing

6    order in this case.  Ellen, the estimate of time for trial was?

7         THE CASE MANAGER:  Five days.

8         THE COURT:  I cannot ask the defense.  I will do it

9    just like I do in other criminal cases.  I cannot ask them if

14:04   10    they are going to put a case on and how long it will take.  If

11    they elect to put a case on, I will issue a subsequent timing

12    order, which I will strictly enforce.

13         What I need you to do, I need it before you get

14    out of here today.  You can talk to one another.  It can be in

14:04   15    rough form.  You can dictate it.  I need to know the best

16    estimate you have for all of your witnesses, okay, on direct

17    examination and for redirect.

18         I also need -- once they see that, once you do

19    that and tell them, you are going to exchange it.  I want to

14:05   20    see how much time they feel they need for cross-examination of

21    those witnesses on cross or recross, if necessary.

22         Then I will issue a timing order because I don't

23    want to be jumping either side during trial.  That way, I will

24    see what time you estimate.  I have been around for a while

14:05   25    also.  I will give you then a gross time.  The easiest way to

14:05  1  figure out every witness you have and how much time he or

2  she -- what you think you will have an direct and any redirect

3  and then I see how much time they want, anticipate for cross.

4  Then I will access time and literally -- I don't know if you

14:05  5  have seen it or not, but I have got the clock.  I will go

6  strictly by the time.  I may find in here of my records exactly

7  what the Stanford sheets looked like so you can see what

8  happened.  If they elect to put a witness on, witnesses on, we

9  will do the same thing, so it will be under a timing order for

14:06  10  the second half of the case if the defense desires to proceed.

11  But it is going to take too long and I don't want to keep

12  jumping in.  And certainly with a jury I'm not going to start

13  making the comments that I am now, even though the feds can do

14  more than state court as far as commenting on a case.  I'm just

14:06  15  letting you know.  If you have any support personnel that may

16  be thinking about that, let's do it today so you are not

17  sandbagged by me, let's say, on Monday by saying, Is that all

18  the time we have?  We will get it all done today.  Back on the

19  record.  I mean, continue with the exam, please.

14:06  20          MR. WILLIAMS:  Thank you, Your Honor.

21  *BY MR. WILLIAMS:*

22  Q    So what other documents did you take prior to -- take home

23  that you turned over to the government prior to quitting

24  Gulfton?

14:07  25  A    I'm sorry.  Ask your question again.

Q    What other documents, recordings or any particular evidence did you take from Gulfton prior to leaving?

A    I don't recall each document.  I was instructed by my employers to hold on to certain papers, certain documents with no instructions on how long to hold on to those documents.  So the documents were boxed.

Q    Am I to take from that that you took a box of documents?

A    No.  I boxed them at my house because they were in my way.

Q    And did you turn over all those particular documents to the government?

A    Yes, sir.

Q    And you turned them over on one particular day; did you not?

A    I don't recall.

Q    And when you turned those particular documents over, who did you give them to?

A    I don't recall which agent.

Q    Other than the particular documents you have seen here today, the expense records and Exhibit 604, this appointment deal, to your recollection, what else did you turn over?

A    I don't recall, sir.

Q    So these are the only two documents that you can recall turning over to the government at that particular time?

A    I haven't worked at Gulfton since 2016 and I started turning over documents almost a year ago.

14:08  1    MR. WILLIAMS:  Okay.  That's fair enough.

2         No further questions.

3         THE COURT:  Anything further?

4         MR. HELFMEYER:  One more topic, Yes, Your Honor.

14:09  5              **REDIRECT EXAMINATION**

6    *BY MR. HELFMEYER:*

7    Q   You testified that it was all loose documents that you gave

8    to DEA?

9         MR. WILLIAMS:  Judge, that's not what she testified

14:09  10   to.

11        THE COURT:  Rephrase it.

12   *BY MR. HELFMEYER:*

13   Q   Did you also provide a video to DEA?

14   A   Yes, sir.

14:09  15  Q   So there was one video and then documents?

16   A   Yes, sir.

17   Q   What video was it?

18   A   It was a video of a meeting that we had with Mr. Faithful.

19   Q   When did you turn it over?

14:09  20  A   It was last year.  I don't remember the exact --

21        THE COURT:  When was the video taken?  When?

22        THE WITNESS:  It was during the time we were employed

23   with him.

24   *BY MR. HELFMEYER:*

14:09  25  Q   Did you take the video, ma'am?

14:09  1  A    No, sir.

2  Q    Who sent it?

3  A    One of the other employees that worked at the clinic, and

4  last year, I asked her to send it to me.

14:10  5  Q    Did you ask her to send it to you after you had signed up

6  with DEA?

7  A    Yes, sir.

8  Q    And after you had left Gulfton?

9  A    After I was finished with Gulfton.

14:10  10        MR. HELFMEYER:  No further questions.

11        THE COURT:  Go right ahead.

12                    **RECROSS-EXAMINATION**

13  *BY MR. WILLIAMS:*

14  Q    Who was this particular person that you obtained this video

14:10  15  from?

16        MR. HELFMEYER:  Outside the scope of --

17        THE COURT:  Overruled.

18  *BY MR. WILLIAMS:*

19  Q    What is the name of the person that you obtained this video

14:10  20  from?

21  A    Olivia Caldwell.

22  Q    And why did you request her to send that video to you?

23        MR. HELFMEYER:  Objection.  Outside the scope of this

24  hearing.  That video isn't the subject of the suppression.

14:10  25        THE COURT:  Pardon me?

14:10   1          MR. HELFMEYER:  The video is not subject to the motion

2     to suppress.

3          MR. WILLIAMS:  It can be now, Judge.  She said she

4     did -- at the time that she was an agent, she requested it.

14:10   5          THE COURT:  But they are not -- we are talking about

6     these two exhibits.  Explain it to me.

7          MR. WILLIAMS:  I believe that particular video is on

8     the government's exhibit list.

9          THE COURT:  Okay.  How do you get it in, then?

14:11   10    Mr. Helfmeyer, just respond.

11         MR. HELFMEYER:  How do we get it in?

12         THE COURT:  Why is it not applicable to this hearing?

13         MR. HELFMEYER:  She is not the one that recorded it.

14    They don't have a reasonable expectation of privacy because it

14:11   15    was taken inside the office.  It was a recording during a

16    meeting.  It is not listed in the motion to suppress evidence

17    either.

18         MR. WILLIAMS:  Judge, it has just come to my attention

19    as to who took the particular video.

14:11   20         THE COURT:  Is this the first time it came to his

21    attention?

22         MR. HELFMEYER:  It has been provided in discovery from

23    the beginning of the case.

24         MR. WILLIAMS:  That is true, Your Honor.  However, I

14:11   25    had no way of knowing that the video was actually taken by

14:11   1   somebody else, turned over to her, then subsequently given to

2   the government.

3           MR. HELFMEYER:  I'm not sure how that is relevant to

4   our suppression hearing.

14:12   5           THE COURT:  It is not relevant to this hearing.  You

6   can discuss it when and if they try to use it.  It is not here

7   right in front of us.  That's all I'm taking.

8               Anything further, Counsel?

9           MR. HELFMEYER:  No.

14:12   10           THE COURT:  Anything further?

11                   **RECROSS-EXAMINATION**

12   *BY MR. WILLIAMS:*

13   Q   In addition to speaking to Olivia Caldwell to obtain

14   information that you didn't prepare, did you speak to anybody

14:12   15   else to obtain records once you signed your confidentiality

16   agreement to obtain documents or any other evidence that you

17   subsequently turned over to the government?

18           MR. HELFMEYER:  Objection.  Outside the scope of

19   redirect.

14:12   20           THE COURT:  Sustained.

21   *BY MR. WILLIAMS:*

22   Q   Were there any other documents that you had in your

23   possession that were obtained after you signed an agreement to

24   become a paid informant?

14:13   25           MR. HELFMEYER:  Outside the scope of redirect, Your

14:13  1   Honor.

2   THE COURT:  Sustained.  It is too broad also.

3   *BY MR. WILLIAMS:*

4   Q   Do you recall all the documents that you took from the

14:13  5   government -- I mean, that you took from Gulfton?  Do you

6   recall all of the documents that you took from Gulfton?

7   THE COURT:  Took from the government?

8   MR. WILLIAMS:  No.  Gulfton, the clinic.

9   MR. HELFMEYER:  Again, Your Honor, this is outside the

14:13  10  scope of the redirect.

11  THE COURT:  Overruled.  We will get it all done in the

12  suppression hearing.  You may answer the question if you can.

13  THE WITNESS:  Would you repeat the question?

14  *BY MR. WILLIAMS:*

14:13  15  Q   Can you recall how many documents you turned over to the

16  government that you took from the clinic prior to leaving the

17  clinic?

18  A   No, sir.

19  Q   Were there numerous documents or were there just these few

14:14  20  that we are questioning you on today?

21  A   I don't recall.

22  Q   So you have no idea as to how many documents you turned

23  over to the government?

24  A   I don't recall.

14:14  25  Q   But you said you boxed them all up.  Okay?  Was it a big

box?  Was it a small box?  Was it a folder?  I'm just trying to
get some idea as to how many documents there were.

MR. HELFMEYER:  Objection.  Outside the scope --

THE COURT:  Overruled.  I will allow him to ask that.
How much was it?  Was it a big pile of documents, a few more, a
banker's box, a redwell folder or what?

THE WITNESS:  They weren't filled up in the box.  It
was just stuff I took out of my book bag because I needed to
use the book bag.  I was taking a trip.  And I put those inside
of a box.

THE COURT:  Who did you give them to?  The government?

THE WITNESS:  I gave them to the government.

THE COURT:  When?

THE WITNESS:  After meeting them.

THE COURT:  After meeting them for the first time?

THE WITNESS:  Yes, sir.

MR. WILLIAMS:  No further questions, Judge.

MR. HELFMEYER:  Can the witness be excused?

THE COURT:  Yes.  Call your next witness.

MR. HELFMEYER:  The United States is not going to call
any other witnesses.

THE COURT:  Arguments, please?  Defense, it is your
judgment.

MR. WILLIAMS:  Judge, I would like to call the agent
and I would like to call the agent who she talked to first, and

14:15   1   I would like to call the agent who signed the particular

2   agreement.

3          THE COURT:  Make it short and to the point.  Call your

4   witness.

14:15   5          MR. WILLIAMS:  I will call James Gainer, Your Honor.

6          THE COURT:  Raise your right hand to be sworn.

7      *(Witness sworn)*

8                **JAMES GAINER, DULY SWORN, TESTIFIED:**

9                        **DIRECT EXAMINATION**

14:16  10   *BY MR. WILLIAMS:*

11   Q   Would you state your name for the Court, please?

12   A   James Gainer.

13   Q   And how are you employed?

14   A   Drug Enforcement Administration.

14:16  15   Q   We would like to bring your attention to Loren Phillips.

16   You are familiar with her; are you not?

17   A   I am.

18   Q   Were you present when she first called DEA?

19   A   Not when she called.

14:16  20   Q   Do you know who took that call?

21   A   I do.

22   Q   Who took that call?

23   A   Michael Mills.

24   Q   After he took that particular call, was there any other

14:16  25   conversation between Ms. Phillips and any other law enforcement

14:16　　1　between the date that she called and March 1st of 2017?

2　A　The only call I am aware of is maybe to schedule her coming

3　in.

4　Q　And can you recall when she came in?

14:17　　5　A　Yes.

6　Q　What date did she first come in?

7　A　Without seeing the report, I believe it was the end of

8　January.

9　Q　All right.  And did you prepare a memorandum of the meeting

14:17　　10　that you had with her?

11　A　I don't know if I wrote that first one.  I know I have

12　written reports about her, but I don't know if I wrote that

13　first one.

14　Q　Okay.  That's fair.  Now, were you present when she signed

14:17　　15　her confidential source agreement to become a paid informant

16　for the government?

17　A　I was.

18　Q　And whose idea was it for her to become a paid informant?

19　　　　　MR. HELFMEYER:  Objection.  Outside the scope of this

14:17　　20　hearing.

21　　　　　THE COURT:  Sustained.

22　　　　　MR. WILLIAMS:  All right.

23　*BY MR. WILLIAMS:*

24　Q　And to your recollection, there was no other communications

14:17　　25　between DEA and Ms. Phillips from the time that she first

14:18    1   called until the time that she signed the agreement?

         2          MR. HELFMEYER:  Asked and answered.

         3          THE COURT:  Sustained.

         4   *BY MR. WILLIAMS:*

14:18    5   Q   Now, were you present when she delivered documents to your

         6   office?

         7   A   I was.

         8   Q   And on how many occasions did she deliver documents to your

         9   office?

14:18   10   A   I believe two occasions.

        11   Q   Was there a DEA6 taken on those particular dates as to what

        12   documents were produced by her?

        13   A   I don't recall exactly what was written.

        14   Q   I'm sorry?

14:18   15   A   There should be a 6 on when she came by, but I don't recall

        16   when it was written.

        17   Q   Now, if and when she provided documents, did you prepare a

        18   receipt of each particular document that she turned over to

        19   you?

14:18   20   A   I did not.

        21   Q   Did anybody prepare those, a receipt showing which

        22   particular documents were turned over?

        23          MR. HELFMEYER:  Objection.  Outside the scope of this

        24   hearing.

14:18   25          THE COURT:  Overruled.

14:19    1    THE WITNESS:  I don't recall.

2    *BY MR. WILLIAMS:*

3    Q    Okay.  Usually when your agency releases documents, you get

4    a receipt from somebody showing which documents they were?

14:19    5    MR. HELFMEYER:  Objection.  Relevance.

6    THE COURT:  Is there any question as to what she

7    turned over, pursuant to this hearing?

8    MR. WILLIAMS:  There is.  The only thing --

9    THE COURT:  All right.  Go on then.  Overrule the

14:19    10    objection.

11    *BY MR. WILLIAMS:*

12    Q    Did anybody make a -- give her a receipt of the documents

13    and the things that she turned over to DEA?

14    A    No.

14:19    15    Q    So there is no record of what she turned over to DEA?

16    A    I don't believe so.

17    Q    How many times did she turn over documents to DEA?

18    A    Two times that I'm aware of.

19    Q    Okay.  All right.  And there is nowhere anywhere that shows

14:19    20    a receipt of what documents she actually turned over to y'all?

21    A    The documents were electronic.

22    Q    So, electronic -- what do you mean by the documents were

23    electronic?

24    A    Thumb drive.

14:20    25    Q    So she gave you the documents on a thumb drive?

14:20    1    A    That's correct.

2    Q    She did not produce loose documents to you?

3    A    Later, later, she did.

4    Q    Wait a minute. Let's start from the first time. Can you

14:20    5    recall the first time that she turned over documents?

6    A    I can.

7    Q    What month was that?

8    A    Without seeing a report, I can't tell you the exact month.

9    It was after some meetings.

14:20    10    Q    And the first time, to your recollection, she turned over a

11    thumb drive; is that correct?

12    A    I believe so.

13    Q    And then there was a second time. I believe it was June

14    of '17 that she turned over other particular documents; is that

14:20    15    correct?

16    A    Without seeing a report, that sounds about the timeframe.

17    Q    And there was no record made of what she turned over; is

18    that correct?

19    A    Not that I'm aware of.

14:21    20    Q    And that would have been loose documents or a thumb drive?

21    A    I believe it was a thumb drive.

22    Q    So it is your recollection that every time she turned

23    things over to you, it was a thumb drive; is that correct?

24    A    I know I have seen the documents, but when they were

14:21    25    actually given to us, I believe they were already electronic.

14:21  1    Q   Okay.  So your recollection tells you that each time you

2    received documents from Loren Phillips, they were in a thumb

3    drive?

4    A   I believe so.

14:21  5    Q   To your recollection, when she produced these particular

6    documents, she didn't bring in a box of documents, did she?

7    A   I don't recall a box.

8    Q   All right.  And you don't know if that thumb drive of

9    documents that she brought in has been turned over to the

14:22  10   defense counsel, or not, do you?

11   A   I'm unaware of that.

12        MR. WILLIAMS:  No further questions from this witness,

13   Your Honor.

14        THE COURT:  Go on.

14:22  15                    **CROSS-EXAMINATION**

16   *BY MR. HELFMEYER:*

17   Q   Special Agent Gainer, you were one of the DEA agents

18   instructing Ms. Phillips to provide a thumb drive of the

19   documents; is that right?

14:22  20   A   Correct.

21   Q   You asked her to scan them in so you didn't have a bunch of

22   loose documents?

23   A   Correct.

24        MR. HELFMEYER:  No further questions.

14:22  25        THE COURT:  Anything further?

**REDIRECT EXAMINATION**

*BY MR. WILLIAMS:*

Q    Am I to take it that she never brought you loose documents? She brought you a thumb drive?

A    I don't recall if we had the loose documents in our office. I knew about the documents, but she eventually brought a thumb drive.

Q    Let me just ask you:  Were you present when she brought these documents?

A    Yes.

Q    On both occasions?

A    I believe so.

Q    And there is no record where she brought the documents, is there?

            MR. HELFMEYER:  Objection.  Asked and answered.

            THE COURT:  Overruled.  I will allow him to go into it again if he wants.

*BY MR. WILLIAMS:*

Q    So there is no record of these particular loose documents; is that correct?

A    Correct.

Q    And there is nothing indicated in your DEA6s that she brought these particular documents, is there?

A    I'm not aware if I wrote the 6, but not that I'm aware of.

Q    You have reviewed most of the DEA6s on Loren Phillips; have

14:23  1  you not?

    2  A    I have.

    3  Q    To your recollection, is there anywhere in these DEA6s

    4  where it is indicated that she brought those documents to you?

14:23  5  A    Not to my recollection.

    6  Q    It is indicated that you all went over a couple of those

    7  documents regarding, I think it was the -- some documents that

    8  were sent to the Oregon Medical Board.  I think there were two

    9  letters.  Do you recall those?

14:24  10  A    I don't recall.

    11  Q    All right.  Good enough.  Usually in your DEA6s, you don't

    12  indicate any particular documents that were produced, or thumb

    13  drives?

    14          MR. HELFMEYER:  Objection.  This is outside the scope

14:24  15  of cross.

    16          THE COURT:  Sustained.  We have been over this

    17  already.

    18          MR. WILLIAMS:  Fair enough.  No further questions.

    19          THE COURT:  Anything further?

14:24  20          MR. HELFMEYER:  No, Your Honor.

    21          THE COURT:  Thank you, sir.  You may step down.  You

    22  are excused.

    23              Call your next witness.

    24          MR. WILLIAMS:  I would call Mr. Mills, please.

14:25  25          THE COURT:  Yes, sir.  Raise your right hand to be

14:25   1   sworn.

2       *(Witness sworn)*

3           THE COURT:  After we get through with this witness, we

4   will take a break.  We have been in session about an hour and a

14:25   5   half almost, and we have to take a break about, what, 3:30.  We

6   have got plenty of time.  Go on.

7                    **MICHAEL MILLS, DULY SWORN, TESTIFIED:**

8                         **DIRECT EXAMINATION**

9   *BY MR. WILLIAMS:*

14:25   10  Q    State your name for the record, please.

11  A    My name is Michael Mills, M-I-L-L-S.

12  Q    Mr. Mills, you received the anonymous phone call from what

13  we know now to be Loren Phillips; is that correct?

14  A    Yes.

14:25   15  Q    You were on the desk at that particular time?

16  A    It was at my desk, yes, sir.

17  Q    And what was told to you during that particular

18  conversation?

19  A    I answered the phone.  It was a duty phone call.  I

14:26   20  answered the phone and a female had stated that she had

21  information regarding a clinic, wanted to remain anonymous.

22  That is not uncommon.  We get those often.

23  Q    That's not my question.  What was the conversation?

24  A    So the conversation took place, and she stated she wanted

14:26   25  to be anonymous and said she had information regarding a clinic

14:26  1  on Gulfton.  I asked what the address was, and she gave me a

2  rough address.  I had already known of the clinic and I had

3  already opened an investigation on the clinic.

4  Q   That's not my question.

14:26  5       THE COURT:  All right.  Answer only the question.

6       THE WITNESS:  Yes, Your Honor.  I was just going

7  through the whole conversation.

8       THE COURT:  Go ahead.  Let's make it short and to the

9  point.  Question?

14:26  10 *BY MR. WILLIAMS:*

11 Q   The question is:  What did she tell you?

12 A   That she had a friend who was quitting the clinic and

13 wanted to report information regarding the clinic.

14 Q   Okay.  And you have subsequently come to know that that was

14:27  15 a lie in terms of a friend?  It was actually her; is that

16 correct?

17 A   I have learned that the friend was the same person as the

18 person that called me.

19 Q   Okay.  Once that conversation happened, when was the first

14:27  20 time that you had a face to face -- you or anybody else from

21 law enforcement had a face to face with Loren Phillips?

22 A   An actual face to face would have been in February.  In

23 February.

24 Q   Can you recall what date in February?

14:27  25 A   No, sir, I cannot.

14:27  1   Q    What year was that?

2   A    2017.

3   Q    So it is your testimony that in February of 2017, you

4   met -- did you meet with Loren Phillips at that particular

14:27  5   time?

6   A    It was a brief face to face to know who the person was,

7   gather information before any debriefings could have been done.

8   Q    Okay.  And how long did that meeting take?

9   A    Five minutes maybe.

14:28  10  Q    Where was that meeting?

11  A    DEA.

12  Q    Okay.  Was that a DEA6 taken regarding that?

13  A    No, sir.

14  Q    And the next time that you actually met and sat down with

14:28  15  her was March 1st; is that correct?

16  A    Yes, sir.

17  Q    As to these particular documents, do you know when they

18  were produced by Loren Phillips to the government?

19  A    It was on the third visit, I believe.

14:28  20  Q    Now, explain for this Court what would be the third visit.

21  A    To the best of my recollection, I believe it was the end of

22  March or the beginning of April when we received documents for

23  the first time.

24  Q    Okay.  And when you say the third time, I just want -- for

14:28  25  clarification, the first time would have been February when you

14:29  1  met with her briefly; is that correct?

2  A   No, sir.  I wouldn't count that as the first time.

3  Q   So the first time would have been March 1st when she signed

4  the agreement?

14:29  5  A   Yes, sir.

6  Q   The second time would have been sometime in March?

7  A   Yes, sir.

8  Q   Later in March.  Okay.  And the third time would have been

9  late March or early April; is that correct?

14:29  10  A   To the best of my knowledge, yes, sir.  I believe it was

11  the third visit.

12  Q   Okay.  And were you present when these documents were

13  produced?

14  A   I was.

14:29  15  Q   And how were they produced?  In what form?

16  A   Loose.

17  Q   They were loose documents?

18  A   Yes, sir.

19  Q   And how many documents were there?

14:29  20  A   I don't know an actual number of how many there were.

21  Q   Who were these documents turned over to?

22  A   To me.

23  Q   And you didn't make an inventory of those documents?

24  A   No, sir.  We wouldn't inventory documents from someone

14:29  25  providing intelligence.

14:29   1   Q   At that particular time, was there a thumb drive that was

2   produced also?

3   A   Not at that time, no, I don't believe so.

4   Q   All right.   There was a second time that she produced

14:30   5   documents; was there not?

6   A   That's correct.

7   Q   And that would have been sometime in June, correct?

8   A   Yes, sir.

9   Q   And did you inventory those particular documents?

14:30   10   A   No, sir.

11   Q   So there are no records of any of those documents other

12   than what you produced here for trial, to DEA, of that at all?

13   There are no inventory of what the documents were, when they

14   were received, et cetera, et cetera?

14:30   15   A   There is no inventory of what each document is, no, sir.

16   Q   And how many documents were there?

17   A   I don't know the number, the count, the number of

18   documents.

19   Q   Have these documents since been Bates stamped and made part

14:31   20   of the discovery?

21   A   I produced the discovery to the prosecutors and then they

22   provide discovery.

23   Q   So you don't know?

24   A   I provided all the discovery from DEA to the prosecutors.

14:31   25   Q   My question is:   Was all of these particular records that

14:31  1   she produced provided to the government as discovery?

2   A    Was all the documents provided to the government for

3   discovery?

4   Q    Yes.

14:31  5   A    Yes, sir.

6   Q    So every document that she produced, okay, was provided to

7   the government for discovery?

8   A    Yes, sir.

9   Q    And -- but we can't tell what was actually turned over

14:31  10  because there is no record of it, is there?

11  A    I wouldn't say that.

12  Q    All right.  How can you be certain that every document she

13  gave you, if you didn't make a record of it, was turned over to

14  the government?

14:31  15       THE WITNESS:  Because -- if I may, Your Honor?  The

16  first visit was loose documents that was later scanned onto a

17  thumb drive.  The second visit was also just a thumb drive, no

18  loose documents.  Both thumb drives have been copied and

19  provided to the government for discovery.

14:32  20  BY MR. WILLIAMS:

21  Q    So, am I to take from that particular testimony that all of

22  the particular documents that she produced are somewhere on a

23  thumb drive; is that correct?

24       MR. HELFMEYER:  Objection.  Outside the scope of this

14:32  25  hearing.

14:32   1          MR. WILLIAMS:  We're talking about these documents.

2          THE COURT:  It's gone on and on.  I will allow him to

3   answer.

4          THE WITNESS:  Could you ask me one more time?

14:32   5   *BY MR. WILLIAMS:*

6   Q   Am I to take from that answer that all of the particular

7   documents that she produced are on a thumb drive?

8   A   Yes, sir.

9   Q   Is it one thumb drive or two?

14:32  10   A   I would say two, maybe three, but I'm not sure.  It is two

11   or three.

12   Q   Okay.  Fair enough.  And what happened to these original

13   documents?  Where are these original documents that she

14   produced to you?

14:33  15   A   The second thumb drive was returned.

16   Q   I'm talking about the original documents that she brought

17   to you that you scanned?

18   A   You are talking about from the first visit?

19   Q   Yes.

14:33  20   A   The first visit, the documents were scanned on a thumb

21   drive, and we took possession of the thumb drive and made a

22   copy of it.  I believe the originals are either with

23   Ms. Phillips or we still have them.

24   Q   So you really don't know where they are?

14:33  25   A   I know the copy that I was provided, I have that.

Q   Okay.  And the copy that you have is on a thumb drive?

A   Yes, sir.

Q   But you have no idea as to where the originals are?

MR. HELFMEYER:  Objection, Your Honor.  This is way outside the scope of this hearing.

MR. WILLIAMS:  Judge, if they are talking about documents she turned over and nobody can produce where the documents are --

THE COURT:  Overruled.  Overrule the objection.

Do you have any idea where those documents are?

THE WITNESS:  They are either in two places, Your Honor.

THE COURT:  Let me ask the government.  We are here today on two sets of documents, 604 and 603; is that correct?  Is that it?  Or are there more than that?  That's all that was handed up.

MR. ARMSTRONG:  Judge, two issues.  There are what we have marked as trial exhibits.  That's 603 and 604.

THE COURT:  That's all you have marked for trial exhibits?

MR. ARMSTRONG:  Yes, Judge.

THE COURT:  And that's it?  And that is where the motion to suppress is aimed at, right?

MR. ARMSTRONG:  Yes, Judge.  There is also one video --

14:34   1          THE COURT:  Let me ask you this:  As officers of the

        2    Court, have all the exhibits and all the information and all of

        3    this been made available to the defense in this case?

        4          MR. ARMSTRONG:  Judge, we have repeated ad nauseam --

14:34   5          THE COURT:  Yes or no?

        6          MR. ARMSTRONG:  -- that everything has been made

        7    available to Mr. Williams and Mr. Lewis in this case.

        8          THE COURT:  That's correct.  Have they taken advantage

        9    of it?  Have they come and scanned it all and looked at

14:34  10    everything?

       11          MR. ARMSTRONG:  That's for them to answer, Judge.

       12          THE COURT:  No.  I'm asking you, as far as you know,

       13    it was available if they wanted to come and check it out?  Is

       14    that correct?

14:35  15          MR. ARMSTRONG:  As far as I know, they have not come

       16    to DEA to look at evidence, but it has been made available to

       17    them.  But, Your Honor, just to put a fine point on this

       18    because I want to be very clear that we are on the straight

       19    line with the Court.  The originals that were provided by

14:35  20    Ms. Phillips are also available to Mr. Williams and Mr. Lewis.

       21          THE COURT:  Have they been available if they requested

       22    them up to this point?

       23          MR. ARMSTRONG:  They have not requested them up to

       24    this point.

14:35  25          THE COURT:  They have not requested them?

14:35    1          MR. ARMSTRONG:  Yes.

         2          THE COURT:  All right.  Thank you.

         3  *BY MR. WILLIAMS:*

         4  Q   Now, these particular documents were nowhere listed in your

14:35    5  DEA6?

         6          MR. HELFMEYER:  Objection.  Outside the scope.

         7          THE COURT:  Sustained.

         8  *BY MR. WILLIAMS:*

         9  Q   And were you told at the time that you interviewed

14:36   10  Ms. Phillips why she was in possession of these particular

        11  records?

        12          MR. HELFMEYER:  Objection.  Outside the scope of this

        13  particular hearing.

        14          THE COURT:  Sustained.

14:36   15  *BY MR. WILLIAMS:*

        16  Q   Other than the February 5 -- I'm sorry -- the meeting with

        17  her in February, all other meetings with her, there was a DEA6

        18  that reflected --

        19          MR. HELFMEYER:  Objection.  Outside the scope --

14:36   20          THE COURT:  Sustained.

        21          MR. WILLIAMS:  No further questions, Judge.

        22          THE COURT:  Thank you.  Step down.  Unless you have

        23  any more questions?

        24          Step down, sir.  Call your next witness.

14:37   25          MR. WILLIAMS:  I have no further witnesses, Your

Honor.

THE COURT: I will make my ruling on that, together with all the other rulings on all the evidence and everything else. I'm also going to be asking you -- I'm going to determine whether or not you will do all the voir dire or I will do it. I'm going to make that determination and let you know that.

The first thing I want to do when I leave -- okay -- here is the timing order, and this goes on for days and days, as you can see, in the Stanford case. It will give you some idea -- you will get a report every day on how many minutes you've used, hours and minutes, every day.

Up at the top, you will see the time that I allocated to each side. That I haven't done yet with you because I haven't seen your estimate. But also, since it is a criminal case, it will only be the government that will get the time. Then when we determined that there was a defense case going on with Stanford, that's what the last sheet is, then I issued a separate order just for the defense testimony.

I will tell you this: I have done these for years. You are experienced trial lawyers, but I will not give you any additional time aside from the time that I mention to you.

Ellen, when I leave, do come forward and take a look at all of this. Everything is documented. In fact, it

was so long I actually had to run, what do you call it, adding
machine tapes. Okay. So you will get it to the minute every
day, but we will need that before we leave today and you will
either have it today or very first thing on Monday before we
start our voir dire.

Ellen, we are calling -- we have a full criminal
panel set to come. Right?

All right. If you would, do take a look at this,
it is now 12:41. I'm sorry. 2:41. Let's take a break until
five minutes until 3:00. No, no, 10 minutes until 3:00. We
will take a 15-minute break. Wait a second. I'm not a
mathematician. Is that correct, Ellen? At five minutes -- 10
minutes to 3:00.

All right, gentlemen. I get challenged. A
suppression hearing is a piece of cake aside from figuring out
how much time we have to take a break.

See you back and then we will keep going.

*(Off the record discussion)*

THE COURT: Yes, sir?

MR. ARMSTRONG: For our purposes, our estimate to you
is just our questions, irrespective of their cross?

THE COURT: No. Your questions and what you
anticipate redirect would be.

MR. ARMSTRONG: Perfect.

THE COURT: In other words, how much you need with

14:40   1  each witness, and then total up that time.  Then I will give

        2  you a total time and then you can use it however you want.

        3          MR. ARMSTRONG:  Are you going to give us what we ask

        4  for?

14:40   5          THE COURT:  Not necessarily.

        6      *(Court recessed at 2:40 p.m.)*

        7      *(Court resumed at 3:00 p.m.)*

        8          THE COURT:  Objections to government exhibits:  The

        9  defense has an objection to Exhibit 1, the Texas Medical Board

15:00  10  complaint against Defendant Craig.

       11              What is your objection, Counsel, and why?

       12          MR. LEWIS:  Your Honor, my objection to that is that

       13  these allegations are not relevant for the purposes of this

       14  hearing and that this is a complaint -- at this point, they are

15:00  15  based on allegations regarding the Defendant Craig, these

       16  allegations.  She has not had an opportunity to defend herself

       17  against these allegations.

       18          THE COURT:  Well, when was it filed?

       19          MR. LEWIS:  It was filed prior to -- in 2016, prior to

15:01  20  July 10 of 2017.  It was filed in 2016.  I don't know the exact

       21  day.

       22          THE COURT:  Was there any hearings held?  Did she

       23  request any hearings?

       24          MR. LEWIS:  We were not at the point -- this

15:01  25  particular complaint had not gotten to the point of the

administrative hearing.  It was only filed.  And as far as the
hearing date, hearings had been scheduled, but they were after
July 10th of 2017.

THE COURT:  All right.  What is your response?  How do
you get around that?

MR. ARMSTRONG:  Thank you, Judge.  We are not offering
this in the least for proof of the matter asserted.  We are
offering it solely for notice.  In October --

THE COURT:  Hold it.  I just want you to see -- I
haven't ruled on it yet.  I'm going to hear it.  Okay?  Okay?
That's the word.  Can you read up at the top in my own
handwriting the word "notice"?  Okay?  I did it on my own.  So
that's the question I have.  Now, tell me about that.

MR. ARMSTRONG:  Judge, she is on notice that her --

THE COURT:  Say that again.

MR. ARMSTRONG:  She is on notice that her prescribing
habits fall so far below the standard of care that a complaint
was filed against her.  We are not going into the merits.  We
are just introducing the document itself to put her on notice.

THE COURT:  Now, we don't know whether she is going to
take the stand or not.  All right?  Is that admissible in your
case in chief or as a rebuttal to that coming up?

MR. ARMSTRONG:  Admissible in our case in chief
because this notice was filed against her on August 31, 2016,
right in the middle of the charged conspiracy.  So for eight

15:02   1   months afterwards, even nine months, she continued to prescribe

2   hundreds and thousands of prescriptions for the same two drugs

3   that are the subject of this notice.

4   MR. LEWIS:  May I respond, Judge?

15:03   5   THE COURT:  Yes, sir.

6   MR. LEWIS:  To pick up where he left off, her position

7   is she is defending herself against those allegations regarding

8   the prescribing of these drugs because the prescribing of these

9   drugs were medically necessary for the patients that are part

15:03   10   of the complaint that was filed in August of 2016.  We have not

11   had an opportunity to have that hearing.  We will --

12   THE COURT:  When was it scheduled?

13   MR. LEWIS:  It is not scheduled.  The way that these

14   hearings are done in the administrative court, Judge, is that

15:03   15   the complaint is filed, the parties go through discovery and

16   other steps regarding the litigation and then the final hearing

17   on the merits is scheduled at a later date.

18   THE COURT:  What preliminary matters had you attended

19   to in the interim, however?  Are you representing her in that

15:03   20   one?

21   MR. LEWIS:  I am representing her.  We filed a

22   response to this complaint, which was a denial of the

23   allegations.  And I think at that point, there has not been any

24   other thing by the Texas Medical Board or Dr. Craig regarding

15:04   25   processing that complaint.

15:04   1          THE COURT:  Response?

        2          MR. ARMSTRONG:  Judge, I don't know if that's

        3   accurate.  I believe that her license is, in fact, suspended.

        4          THE COURT:  Is it suspended?  Is her license suspended

15:04   5   now?  Yes or no?

        6          MR. LEWIS:  Her license is suspended today, but not as

        7   a result of this complaint.

        8          THE COURT:  As a result of what?

        9          MR. LEWIS:  On July 10, 2017 is when Dr. Craig was

15:04   10  indicted for the charges that she is before this Court.  It is

        11  alleged by the Texas Medical Board that Dr. Craig issued

        12  prescriptions for drugs that she was not permitted to issue

        13  prescriptions for as a result of the bond conditions that she

        14  was given after she was indicted.  That has not been litigated

15:04   15  either.  Dr. Craig has denied those allegations.  The medical

        16  board, even though she is denying those allegations -- well,

        17  let me also say this:  That hearing did not go forward because

        18  Dr. Craig had been indicted, and of, course, Dr. Craig takes

        19  advantage of the fact that she has a right against

15:05   20  self-incrimination while that process is going on.

        21          The Medical Board took the position though that

        22  even though they are willing to abate that hearing, they are

        23  going to go forward and temporarily suspend her license because

        24  their rules and regulations provide for that.

15:05   25          MR. ARMSTRONG:  Your Honor, this is all so far field.

15:05　　1　　　　　THE COURT:  I want to hear it.  It may be to you but

　　　　2　　not to me.  Let's talk about it.

　　　　3　　　　　MR. ARMSTRONG:  Absolutely, Judge.  You hit the nail

　　　　4　　on the head, Your Honor.  We are offering this solely for

15:05　　5　　notice.

　　　　6　　　　　THE COURT:  Of what?

　　　　7　　　　　MR. ARMSTRONG:  That she was on notice that her

　　　　8　　prescribing practices for the two drugs charged in the

　　　　9　　indictment fell below the standard of care and poses a risk,

15:05　　10　　not only to the patients, but also to the public at large.  We

　　　　11　　are not going to offer any evidence whatsoever as to the

　　　　12　　outcome of the complaint.

　　　　13　　　　　THE COURT:  We don't have any outcome yet.

　　　　14　　　　　MR. ARMSTRONG:  Exactly.

15:06　　15　　　　　THE COURT:  Also, how about the suspension?  Are you

　　　　16　　going to go into the license --

　　　　17　　　　　MR. ARMSTRONG:  No, Judge.  Solely for notice

　　　　18　　purposes.  This indictment was found.  It was found at her

　　　　19　　residence and it was also found at the clinic.

15:06　　20　　　　　THE COURT:  All right.  I got it.  Okay?  Hang on one

　　　　21　　second.  I just want to get down here.  I will have the rulings

　　　　22　　certainly before you leave today, what you need to have, of

　　　　23　　course.

　　　　24　　　　　The next one is data from the Texas Department of

15:06　　25　　Public Safety counting the number of prescriptions issued by

15:06  1   the defense.  That's the objection to Exhibits 700, 701 and

2   702.  How many exhibits do you have?  I asked you that.

3          MR. ARMSTRONG:  I think we have, ballpark, around 100.

4          THE COURT:  All right.  Go on.

15:07  5          MR. LEWIS:  Judge, I think, if I'm looking at the

6   objections that I filed, I did have objection to Exhibit

7   Number 2.

8          THE COURT:  I'm coming to that.  I have got that next

9   one.  That's the envelope seized.

15:07  10          MR. LEWIS:  I didn't know you were skipping over and

11  going forward.

12          THE COURT:  Maybe I'm out of sequence, but let's go.

13  In my list here, it is the next one in.  You got it from the

14  Texas Department of Public Safety touting the number of

15:07  15  prescriptions issued by Defendant Craig.

16          MR. LEWIS:  May I respond, Judge?

17          THE COURT:  Yes.

18          MR. LEWIS:  That is Exhibits 700 through 702, which is

19  actually a printout of Dr. Craig's prescribing history that is

15:07  20  produced by the Texas Department of Public Safety.  The Texas

21  Department of Public Safety produces what is called a doctor's

22  dispensing report, and it reflects prescriptions for controlled

23  substances that they have in their database.  There are a

24  little bit over 18,000 patients that's involved --

15:08  25          THE COURT:  What's the bottom line?

15:08   1        MR. LEWIS:  The bottom line is the -- there is only --

        2        THE COURT:  I hear Defendant Craig objects on the

        3   basis of relevance.

        4        MR. LEWIS:  As far as the rest of the patients that

15:08   5   are part of this, there is no medical records that were

        6   reviewed by their expert.  There is no medical records related

        7   to over 18,000 patients that we even reviewed to determine

        8   whether or not Dr. Craig had a medical necessity in --

        9        THE COURT:  Have you looked at those records?

15:08  10        MR. LEWIS:  I have looked at the ones involving this

       11   case, yes, I have.

       12        THE COURT:  Have all the others been available?

       13        MR. ARMSTRONG:  Yes, Judge.

       14        THE COURT:  Have you gone through the others?

15:08  15        MR. LEWIS:  That's only one portion of my -- I have

       16   gone through the prescribing history.  One of the other

       17   objections is that the prescribing history in itself is

       18   inaccurate because the prescribing history that has been

       19   provided to the government is inaccurate because it also

15:09  20   reflects forgeries on there that should not --

       21        THE COURT:  How do you know they are forgeries?

       22        MR. LEWIS:  One of the things that I filed, I just

       23   filed in reference to the exhibit --

       24        THE COURT:  I didn't see it then, did I?

15:09  25        MR. LEWIS:  Yes, sir.  I filed an amended exhibit

list.

THE COURT: An exhibit list or exhibit objections?

MR. LEWIS: Well, it actually goes to this objection. I have provided the Court some travel documents relating to Dr. Craig's travel when she was clearly not even in the state as it relates to working at Gulfton or anyplace else. There are --

THE COURT: Hold it a second. I'm looking at Exhibits 700, 701 and 702.

MR. LEWIS: That is correct.

THE COURT: Let me ask you this: How are you getting the travel documents in? Are you going to get them in?

MR. LEWIS: Through Dr. Craig.

THE COURT: You don't have to put your witness on. I didn't mean to ask you if you are putting your witness on. Okay. It's been told to me that the defendant is going to take the stand. Okay? So I didn't ask. I'm just going to say I asked in the abstract, because we know in a criminal case, I'm not asking whether she was going to take it. It's not relevant to me at this time. However, she's going to come on and contest that. Take a look again. What do you -- how are you getting those in? How do you get them in?

MR. ARMSTRONG: The PNP data?

THE COURT: How do you get in Exhibits 700, 701 and 702?

MR. ARMSTRONG:  Your Honor, we have produced to

2   defense business records affidavits that are self

3   authenticating from the Texas Department of Public Safety.

4           THE COURT:  Now, that's the admission, but he says

they are not relevant.  How are they relevant?

6           MR. ARMSTRONG:  They are 100 percent relevant because

7   an expert is going to testify that any practitioner has a host

8   of drugs that are available to them to prescribe.  They can

9   prescribe any number of opioids, and the evidence is going to

show based on the PNP data that Dr. Craig wrote 99 percent of

11  her prescriptions of which there are over 30,000 for two drugs.

12          THE COURT:  Okay.  I got it.  Response?

13          MR. LEWIS:  Response is Dr. Craig worked at a pain

14  management clinic.  There's only certain drugs that are

utilized in the treatment of pain --

16          THE COURT:  I have had piles of these pain management

17  cases.

18          MR. LEWIS:  And pain management, because of pain

19  management, there is a medical necessity to actually prescribe

these drugs for the patients' chief complaints.  This is not a

21  clinic where the individuals are coming in for some type of

22  pediatric care, or something like that, so you will not see any

23  prescriptions like that.  You will see prescriptions that are

24  consistent with treating a pain management patient and --

THE COURT:  I got it.  Go on.  I understand.  And you

object though to these three documents, correct, sir?

MR. LEWIS:  I have -- for the assistance of the Court, I produced three pages from 701 -- actually, it is from 701 that actually shows that there are prescriptions reflected by the government's exhibit that are -- that is consistent with being forgeries because they are actually shown on here for dates that Dr. Craig was not even --

THE COURT:  Does that go to the weight or the admissibility, the relevance or the admissibility?

MR. LEWIS:  I think it goes to both.  I think it goes to both regarding the accuracy of that.  Because I think that if the jury sees the entire prescribing history -- and, of course, the probative value of the entire prescribing history is certainly outweighed by the potential prejudicial impact that it might have, especially if the government is claiming she wrote over 30,000 prescriptions that were illegitimate. And we certainly are expecting to show that the prescriptions that she wrote, they were -- especially the ones for these 30 patients that's part of this case was based on the patient's chief complaint.  It was based on the documentation in the patient's file and it was based on treating that patient within the standard of care that Dr. Craig should have been acting on.

THE COURT:  Let's go to the next one: envelopes seized during search warrant of Craig's residence.  Object to the lack of proper foundation on the basis of relevance.

15:13 1         What's your response?

2         MR. ARMSTRONG:  Judge, these are relevant.  They show

3 her involvement in the scheme, and they show her financial

4 motive.  What the envelopes are, they are a manila envelope

15:14 5 with the date written on the corner and the dollar amount.

6 Inside each one of these envelopes is a stack of cash, about

7 $5,000.  They recovered $39,000 in cash at her residence.  All

8 of this cash was from one of these envelopes.

9         THE COURT:  Response?

15:14 10         MR. LEWIS:  Response is these are envelopes.  We don't

11 know why the money was actually in those envelopes.  I don't

12 think that there is any supporting evidence to this point as to

13 the money that was in the envelopes, the names on the

14 envelopes.  There are pictures of these envelopes.  All we have

15:14 15 is the picture of the envelope.

16         THE COURT:  Next one, Exhibit 3, photographs taken

17 during the search of Defendant Craig's residence, object as

18 lacking proper foundation on the basis of relevance.

19         How do you get around that?  Have you got

15:14 20 somebody to prove up the photo that was taken at the time?

21         MR. ARMSTRONG:  Absolutely, Judge.

22         THE COURT:  Was it the photographer him or herself?

23         MR. ARMSTRONG:  No, Judge.  It was a search agent who

24 participated in the search.

15:15 25         THE COURT:  That's what I mean.  Someone will testify

15:15   1   that was true and accurate of what it looked like at the time?

2   How do you get around that?

3        MR. LEWIS:  There is -- numbers of these pictures are

4   not pictures that are accurately depicting the scene.  They are

15:15   5   pictures that are depicting a staged scene that was created by

6   the agents.

7        THE COURT:  They were staged?

8        MR. LEWIS:  The pictures were clearly staged because

9   you would have objects here, like money, and then you will have

15:15  10   something laying beside those objects, but that was not how

11   these objects were found.  And the picture that is taken is the

12   money and then possibly a purse or something like that.  Okay?

13   And that's not how these items were actually discovered.

14        THE COURT:  What if they say that's the way it was,

15:15  15   then you are going to need testimony or cross-examination that

16   it wasn't like that, correct?

17        MR. LEWIS:  Absolutely, Judge.

18        THE COURT:  How do you -- if they lay that foundation,

19   taken at the time and it was what the room looked like, and you

15:16  20   say that it wasn't, I guess you can cross-examine whoever you

21   are talking to.  But does that stop the foundation from being

22   laid and it coming in, subject to your objection?

23        MR. LEWIS:  Judge, I don't know what the relevance is

24   of showing money and then a handbag laying next to it.

15:16  25   Certainly -- and the defendant's testimony will be -- is that,

15:16  1  no, that is not how these items were found in my house.

2  THE COURT: Okay. I have got it.

3  Next one, Exhibits 402 and 403 relating to an

4  audit by the Texas Medical Board. The defendant objects on the

15:16  5  basis of authenticity and lacking proper foundation. What?

6  MR. ARMSTRONG: Your Honor, there was an audit done

7  after a Texas Medical Board visit to Gulfton. The visit itself

8  was, I believe, in September of 2015. What happened was the

9  auditors from the Texas Medical Board took patient files and

15:16  10  they took prescriptions.

11  After the fact, they added up the number of

12  patients for whom they had files on and the prescriptions

13  written, and their conclusion was that 99 percent of the

14  patients that were seen got a prescription and 99 percent of

15:17  15  those patients all got the same prescription. It's absolutely

16  relevant and it's --

17  THE COURT: Who is going to be testifying as to that?

18  MR. ARMSTRONG: A Texas Medical Board investigator.

19  THE COURT: Okay. Your response?

15:17  20  MR. LEWIS: My response regarding that is that I'm not

21  sure -- based on my review of the government's witness list,

22  they list a Texas Medical Board individual by the name of Debbi

23  Henneke, who is an agent of the Texas Medical Board. It is my

24  understanding that Debbi Henneke was not the individual that

15:17  25  created the 402 and 403. It is my understanding those were

15:17    1    created by an individual named Mary Chapman, who also worked

2    for the Texas Medical Board and was present at the clinic back

3    in 2015 when these records were acquired.

4            THE COURT: Response?

15:18    5            MR. ARMSTRONG: Yes, Judge. Ms. Chapman is no longer

6    with the Texas Medical Board. We had Ms. Henneke go through

7    and doublecheck.

8            THE COURT: Where is she?

9            MR. ARMSTRONG: I don't know, Judge.

15:18    10            THE COURT: Are you going to have her as a witness?

11    How are you going to get these in? How are you going to get

12    that in evidence?

13            MR. ARMSTRONG: Ms. Henneke is going to testify that

14    although she did not originally create this evidence, she went

15:18    15    back and doublechecked it line by line.

16            THE COURT: All right. I got it. I got it.

17    Defendant Faithful's objections to the government's exhibit

18    list, okay, now we are down to Exhibit 206, the Texas Medical

19    Board complaint against the defendant. That's the same as

15:18    20    Exhibit Number 1. Right?

21            MR. WILLIAMS: It is.

22            THE COURT: I will rule on that together. Same as

23    that one.

24             Okay. Various photographs taken during the

15:18    25    search of Faithful's residence. Again, 403, inaccurate

15:19    1    depictions, correct?

2         MR. WILLIAMS:  Absolutely, Judge.  I think that's a

3    bunch of guns that have been put on a particular bed.  They

4    obviously didn't find them that way, Judge.  They put them out

15:19    5    there that way.  The next photos were, I think, a bunch of

6    watches that they put together.  These watches weren't like

7    that.  They staged all of this.  He can respond to that.

8         THE COURT:  What is the relevance of the guns?

9         MR. ARMSTRONG:  Judge, the Fifth Circuit and other

15:19    10    circuits are clear that guns are tools of the trade.  What

11    these defendants were, which is --

12         THE COURT:  So what the best case on that one?  That

13    is the first time I have heard that, not that I disagree with

14    it.  It's the first time I have heard it.

15:19    15         MR. ARMSTRONG:  Absolutely, Judge.

16         THE COURT:  What are the cases on that?

17         MR. ARMSTRONG:  The Court's indulgence.  Your Honor,

18    in our filing ECF Number 56 --

19         THE COURT:  Document 56?

15:19    20         MR. ARMSTRONG:  Yes, Judge, we had an omnibus response

21    to all of defendants' objections.

22         THE COURT:  Go on.

23         MR. ARMSTRONG:  Specifically as to the firearms.

24         THE COURT:  Yes.

15:20    25         MR. ARMSTRONG:  United States versus Perez.  It's a

15:20   1   short cite.  Court's indulgence.  United States versus Perez,

        2   648 F. 2d 219 at 224, Fifth Circuit 1991, that guns are tools

        3   of the trade for common drug dealers, like these defendants

        4   were.

15:20   5               And United States versus Molina-Perez,

        6   595 F. 3d 854, both cited in our response.  That is a Fifth

        7   Circuit case saying the same thing, Judge.

        8               MR. WILLIAMS:  Your Honor, if I may --

        9               THE COURT:  Hang on a second.  We are dealing with

15:21  10   their photos here of guns, right?

       11               MR. ARMSTRONG:  Yes.

       12               THE COURT:  We talked about the gun.  We don't have to

       13   go any further in it.  What about the watches?

       14               MR. ARMSTRONG:  Motive and --

15:21  15               THE COURT:  Like what?

       16               MR. ARMSTRONG:  Motive to commit these crimes where

       17   you are dealing with cash.  You need to finance your luxurious

       18   lifestyle.

       19               MR. WILLIAMS:  Judge, there is no value placed on

15:21  20   these.  There is no way they can prove in any type of way --

       21               THE COURT:  Hang on.  I'm going to keep going.  What

       22   else?  Are those the only two photographs you have a concern

       23   with?

       24               MR. WILLIAMS:  No.  There is money that's in evidence

15:21  25   bags, Judge.  They obviously didn't find it like that.  It is

15:21   1   in an evidence bag.

2              MR. ARMSTRONG:  Your Honor?

3              THE COURT:  What?

4              MR. ARMSTRONG:  Of course, we are never going to

15:21   5   represent to the Court or the jury that the evidence was found

6   in this way.  What we are going to describe is that the agents

7   searched Mr. Faithful's residence, and they found cash all

8   throughout his residence.  And it totaled up to about $140,000.

9   They took all this cash, put it in one place for evidentiary

15:22  10   value, took a picture of it for recordkeeping.  That is how we

11   are going to present it.

12             MR. WILLIAMS:  The evidentiary value has no merit to

13   that, Judge.  Because when you take the picture, you don't know

14   how much money that is.

15:22  15             THE COURT:  Anybody can testify as to how much?  It

16   was $140,000?

17             MR. ARMSTRONG:  Yes, Judge.  Mr. Mills made the

18   deposit and he will testify as to what the count was.

19             MR. WILLIAMS:  But that doesn't mean that is what was

15:22  20   in that particular picture at that particular time, Judge.  I

21   don't have a problem if they want to say they found the money,

22   but what evidentiary factor does this have other than to try to

23   prejudice the jury?  That's all it is about.

24             MR. ARMSTRONG:  Judge, it is not undue prejudice.  It

15:22  25   is the facts.  All this cash was found in the house.  This cash

15:22  1   was tied to the clinic.

2          THE COURT:  Go on.  What else have you got?

3          MR. WILLIAMS:  I think there is a gun on the steps of

4   his residence.

15:23  5          THE COURT:  Go on.

6          MR. WILLIAMS:  There is a drawer with evidence bags on

7   top of it.  It is obviously staged, Judge.  I mean, they didn't

8   find the evidence that way.  The same with this.  It looks like

9   they pulled the drawer out and they put things on top of it and

15:23  10  took pictures.  It is not an accurate depiction of the scene as

11  they found it at the time that they went in.  There is another

12  gun here.  There appears to be a gun found in a --

13         THE COURT:  How many guns did they find in this house?

14         MR. WILLIAMS:  They found five guns and they found

15:23  15  two, I think, rifles.

16         THE COURT:  AR15s?  It looked like automatic or

17  semi-automatic.

18         MR. WILLIAMS:  They were all -- I don't know what

19  types of guns they were, but they were legal to have, Judge.

15:23  20  They were not illegal weapons.

21         THE COURT:  I saw some that just from this distance

22  that look like ARs.

23         MR. WILLIAMS:  It is a legal weapon to have.  You can

24  have this gun in your home, Judge.

15:23  25         THE COURT:  What about that?  Do you need to get the

1    guns in?  You just said you need to get the guns in.

2    MR. ARMSTRONG:  We are not going to introduce the

3    actual guns themselves.  Yes, these guns were found at the

4    house.  Here is a photo depicting the guns that were found at

5    the house.  And we will concede that the guns were found all

6    throughout the house, and we put them in one place for ease of

7    photography.

8    MR. WILLIAMS:  So it is staged, Judge.

9    MR. ARMSTRONG:  It goes to weight.

10   THE COURT:  Now --

11   MR. WILLIAMS:  I think there is another picture with

12   the gun and the money all bundled up on a particular bed.

13   These are all staged, Judge.  It's just --

14   THE COURT:  I'm going to keep going.  I will rule on

15   these before you leave today.

16   How about the audio recording?  You say it is

17   inaudible?

18   MR. WILLIAMS:  It is inaudible, Judge.

19   THE COURT:  Do you have a transcript that you are

20   using?

21   MR. WILLIAMS:  Well, there is a transcript that

22   somebody from the government has made.

23   THE COURT:  It may take me a while, but in this thing

24   here, I have all the law that I need on transcripts.  Just give

25   me a moment.  I have one for English transcripts and one for

15:25  1  Spanish transcripts.  So give me a second.

2            MR. WILLIAMS:  These were in English, Judge.

3            THE COURT:  These were in English?

4            MR. WILLIAMS:  Yes.

15:25  5            THE COURT:  Let's see.  I have one in English and one

6  in Spanish.  Let me, as they say, refresh my recollection on

7  this.  These are the instructions that I give to the jury

8  depending upon the language and what they hear.  Here it is,

9  inaudibility of tapes.  I have been around here too long.  Just

15:26  10  let me read it.  Okay?

11            MR. WILLIAMS:  Yes, sir, Your Honor.

12       *(Pause)*

13            THE COURT:  That's what I thought.  Now, you have the

14  audio here with you so I can listen?

15:26  15            MR. ARMSTRONG:  I certainly hope we have it.  We have

16  it all --

17            THE COURT:  Is it all audio?  No video?  Is it or

18  audio and video?

19            MR. ARMSTRONG:  All audio.

15:27  20            THE COURT:  Let me hear -- let's see if it's

21  inaudible.  Play some of it for me.  Will you?  What are we

22  playing?  And don't play me just the best parts.  Okay?  I

23  mean, play the one that they are complaining about.  You ought

24  to know -- do you have the portions?

15:27  25            MR. WILLIAMS:  No, I do not.  It is 501, Judge.

15:27   1       MR. ARMSTRONG:  Can I give you some context, Your

2  Honor?

3       THE COURT:  Yeah.

4       MR. ARMSTRONG:  So the agents went in with an

15:27   5  undercover audio device.

6       THE COURT:  I know.  It has happened before.  I have

7  also had one taken next to an air conditioning unit that

8  drowned out most it.  Also, a lot in the three city hall

9  bribery trials tried by the public integrity unit of your

15:27  10  department years ago, what is it, in the early, mid '90s.  And

11  that was taken -- it is tough to take an audio through a wall

12  and sometimes it's difficult also if it is in a restaurant with

13  dishes clanging and rattling.  All of us have been through

14  those before.  Yes, lay some -- what is your initial

15:27  15  discussion?

16       MR. ARMSTRONG:  So what we are going to be offering at

17  trial primarily is the office visit with Dr. Craig, and Your

18  Honor is going to hear that this office visit is about 50

19  seconds.

15:28  20       THE COURT:  Well, let's hear the 50 seconds then.

21  That makes it easy.  When you play it, pull that microphone

22  down to your sound and that will pick it right up.

23           If you want to work on it for a second, but I do

24  want to hear it.

15:28  25       MR. ARMSTRONG:  Court's indulgence.

15:28   1          MR. LEWIS:  In light of what Mr. Armstrong said, Your

        2   Honor, the portion that is allegedly audible is 50 seconds but

        3   the entire recording is 30 minutes.

        4          THE COURT:  You are going to play how much of it?

15:28   5          MR. ARMSTRONG:  Judge, our position is that --

        6          THE COURT:  How much are you going to play?

        7          MR. ARMSTRONG:  I'm trying to recall.  So there were

        8   two parts that will be relevant.  The foreign medical

        9   graduate --

15:29  10          THE COURT:  Foreign medical graduate?

       11          MR. ARMSTRONG:  Their visit --

       12          THE COURT:  FMG?

       13          MR. ARMSTRONG:  Exactly.

       14          THE COURT:  I know some medicine.  Okay?  The foreign

15:29  15   medical graduate, what does that person have to do with this?

       16   Is it a licensed doctor?

       17          MR. ARMSTRONG:  Certainly not.  But we are not going

       18   to go there, I don't believe.  So clearly what we are trying to

       19   do is to show that the office visit with Dr. Craig from start

15:29  20   to finish was 50 seconds before she prescribed these dangerous

       21   drugs.

       22          THE COURT:  All right.  For both of the excerpts?

       23   What are you going to do with the rest of it?  Are you going to

       24   play the whole thing, all 30 minutes of the tape?  Yes or no?

15:29  25          MR. ARMSTRONG:  No, Judge.

1   THE COURT:  How much time are you going to play total?

2  How many excerpts?

3       MR. HELFMEYER:  It's two excerpts, but one is chopped

4  into two files.

5   THE COURT:  Say that again.

6       MR. HELFMEYER:  Two excerpts.

7       THE COURT:  That's the one where you had a change on

8  the recording?  What sort of a device do you use?  Did you use

9  a transmitter or self-contained unit?

10      MR. HELFMEYER:  Self-contained unit.

11      THE COURT:  Sometimes I have had them with signal from

12  a receiver into a truck outside.

13      MR. HELFMEYER:  Self-contained unit.

14      THE COURT:  Self-contained unit.

15      MR. HELFMEYER:  It is about three minutes total.

16      THE COURT:  All right.  Let's hear it.

17      MR. HELFMEYER:  This is from June 15th of 2017.  500

18  is from May 16, 2017.

19      THE COURT:  You need more volume.  Or I need more

20  volume.

21      MR. ARMSTRONG:  Judge, this is the office visit with

22  Dr. Craig and Mr. Webster that's charged in Count Three of the

23  indictment.

24      THE COURT:  Hold it.  Mr. Webster charged in, what,

25  Count Three of what?

15:31  1      MR. ARMSTRONG:  Of the indictment, the prescription to

2  Mr. Webster.

3      THE COURT:  All right.  Let me hear it as best I can.

4  You are going to have to get it anyhow for the jury if I let it

15:31  5  in.

6      *(Audiotape played)*

7      THE COURT:  Hold it a second.  Anybody want to gather

8  around?  Let me get over there and listen.

9      MR. HELFMEYER:  We can bring it up to the bench.

15:32  10      THE COURT:  Oh, no.  Just leave all your stuff there.

11      MR. HELFMEYER:  It is going to be through speakers at

12  trial.

13      THE COURT:  You can do it at trial.  We're not talking

14  trial.

15:32  15      Anybody in the back want to come hear it?  You

16  are welcome to come on up.  Come on, if you want to hear it.

17  Let's just see what it sounds like.

18      *(Audiotape played)*

19      THE COURT:  Where is the other segment?  You say you

15:33  20  have another segment?

21      THE COURT REPORTER:  Judge, is this on the record?

22      THE COURT:  Just say we are over here listening.

23      *(Audiotape continues to be played)*

24      MR. WILLIAMS:  I can hear that one, Judge.  I don't

15:35  25  know why we need a transcript of that, if I can hear it, as old

as I am.

        THE COURT:  Let's talk about them one at a time.
Okay?  Let's talk about the first segment.  Okay?  You need it
in to show the length of time?  And you are talking about there
was a transcript ready?  That is what was scrolling up from the
bottom, correct?

        MR. ARMSTRONG:  Correct, Judge.

        THE COURT:  Okay.  Now, with the second one, are you
going to offer the second one?

        MR. ARMSTRONG:  Absolutely.

        MR. LEWIS:  It just cut off, Judge.

        THE COURT:  I'm not sitting as a juror.  Okay.  Does
the second one help you?

        MR. ARMSTRONG:  Absolutely.

        THE COURT:  You can take it two ways as to what was
said on there.  Okay?  It was a lot clearer.  And, again, I'm
not trying this case, so the question -- you want to get the
second one in also, correct?

        MR. ARMSTRONG:  Judge, the length of time for the
second one is equally appalling.

        THE COURT:  Sure.  Well, everything is relative.

        MR. ARMSTRONG:  True.

        THE COURT:  Including what was said on there.  You are
going to have to balance it.  I mean, I will rule.  And if I
rule in your favor, it's coming in and it may help you or it

15:36  1   may not help you.

2               By the way, no one was here when I was doing our

3   charge conference.  When we do a charge conference, first of

4   all, don't assume I'm leaning one way or another.  There is one

15:36  5   attorney that at least has been here before.  That's a gross

6   misreading of where I'm coming from.  Perceived hostility is

7   only when I'm trying to get the background to understand it.

8   But what happens in a charge conference, very often, in other

9   words, a plaintiff -- let's say a plaintiff wants something in.

15:37  10   Defense counsel says, I object because of A, B, C and D.  And I

11   will turn around to the plaintiff's lawyer and say, Do you

12   still want that in?  If he is right, that could blow your case

13   out.  Okay?  If you want it, I may give it.  I'm playing one

14   off the other.  You reach points at various stages in all kinds

15:37  15   of trials when, do you need it?  If you need it, I'll give it,

16   but if they are right, it will either help them or it is so

17   wrong, it will knock you out.  I'm not saying that this is one

18   like that, but I just sit and listen to it.  It was not in

19   context of the whole trial.  So the bottom line is, you are

15:37  20   asking that both come in, correct, with the translations?

21               MR. ARMSTRONG:  Yes, Judge.

22               THE COURT:  I mean, with the transcripts.  What is

23   your response?

24               MR. WILLIAMS:  My response is, Judge, as to the first

15:37  25   one, it's inaudible.  My position is this:  It is for the jury

1    to determine if they can hear that or not.  Why should we rely

2    upon the government's witness to say, This is what was actually

3    said.  Why is their hearing more in depth than anybody else's?

4    The jury ought to be able to hear that for themselves.

5         The second one is definitely audible.  You can

6    hear that --

7         THE COURT:  There are a whole line of cases here in

8    the Fifth Circuit on this point, a whole lot of cases as to

9    what is partially audible.  Does that make it inadmissible per

10   se?  Or does it go to the weight rather than the admissibility?

11   There is a whole string of cases on it.

12        MR. ARMSTRONG:  Your Honor --

13        THE COURT:  Let me hear what the government position

14   is.  You think it needs to get in?  You need to get it in?

15        MR. ARMSTRONG:  Your Honor, as we cited in Document

16   Number 56, United States versus Chaney, a Fifth Circuit case

17   from 2008, and Chaney instructs that the Fifth Circuit has,

18   quote, unquote, consistently held that both poor quality and

19   partial unintelligibility do not render tapes inadmissible

20   unless the inadmissible -- the unintelligible portions are so

21   substantial as to render the whole recording untrustworthy.

22   That is clearly not the case here.

23        THE COURT:  And your position is that it was

24   completely untrustworthy and inaudible, correct?

25        MR. WILLIAMS:  Absolutely.

THE COURT: All right. I just want to get everybody's position down for appellate purposes. Okay?

Audio recording Exhibit 500, 502 and 504, is that what we dealt with so far?

MR. WILLIAMS: I think one was a continuation of the other.

THE COURT: In other words, the first one we heard, was that Exhibit 500?

MR. HELFMEYER: Yes, Your Honor.

THE COURT: Okay. The second one that we heard, is that 501, 502 and 504?

MR. HELFMEYER: 501 is broken up into A and B.

THE COURT: Go on.

MR. HELFMEYER: We heard part of A because what happens is --

THE COURT: What about all of these others?

MR. HELFMEYER: 502, 501 and 502 -- 504 is a video of the defendant, Mr. Faithful, that was recorded by --

THE COURT: Hold it then. It says audio recordings. So there is no 502?

*(Sotto voce discussion held between attorneys)*

MR. WILLIAMS: 500 was one audio. That's the one that was inaudible. 501 and 502 are in two parts. That one goes from one part to the other, and we don't know if it skips or not. We don't know if it is the whole particular transcript.

15:40   1        THE COURT:  Well, let me ask you this.  I'm asking the

        2   government.  That doesn't mean they can't object to it.  Is

        3   anything left out or is it continuous?

        4        MR. ARMSTRONG:  We are going to have a witness testify

15:41   5   by virtue of the equipment itself, it cuts off automatically

        6   and there is no omission or alteration of the video.

        7        THE COURT:  All right.  Go on.  Now, what is 504?

        8        MR. ARMSTRONG:  504 is a video that is mostly audio,

        9   because the video is black, of Mr. Faithful giving instructions

15:41  10   to employees in the clinic.

       11        MR. WILLIAMS:  That's 504?

       12        MR. ARMSTRONG:  Yes.

       13        MR. WILLIAMS:  I don't think I made an objection to

       14   it.  If I did, I will withdraw it.  Did I make an objection to

15:41  15   504?

       16        MR. ARMSTRONG:  Yes.

       17        THE COURT:  The video is 503, the visit to Gulfton.

       18   That's 503.  But no objection to 504?

       19        MR. WILLIAMS:  No objection to that.

15:41  20        THE COURT:  Okay.  Thank you, sir.  It is marked out.

       21   Okay.  Exhibit 503, audio, video recording, a visit to Gulfton.

       22   Faithful objects on the basis there is a delay in the audio and

       23   video?  What is it?  It's not synchronized?

       24        MR. WILLIAMS:  It is not.  It goes.  It stops and

15:42  25   starts.  It stops and starts.

15:42  1          THE COURT:  Okay.  What is the response?

       2          MR. ARMSTRONG:  I'm not going to lay user error at

       3     Mr. Williams's feet, but our copy works fine.  We will be happy

       4     to play it for the judge.

15:42  5          MR. WILLIAMS:  If I hear it and it is continuous as to

       6     what they have, I will withdraw my objection, Judge.

       7          THE COURT:  I'm just going to put 503 withdrawn, but

       8     take a look at it.  If you want to renew it before they play

       9     it, I will consider it.  Right now I am going to put it as WD,

15:42 10     withdrawn.

      11          The last one, Exhibits 603 and 604 expense

      12     sheets?

      13          MR. WILLIAMS:  Those go to the motion to suppress,

      14     Judge, that we had.

15:42 15          THE COURT:  That's it.  That what I have got.

      16          Were there any motions in limine?  I didn't see

      17     any.  I don't see any and they have to be according to -- I'm

      18     looking at the local rules, the criminal local rules, 55.2A and

      19     55.2B.  I don't see anything filed on the motions in limine.  I

15:43 20     don't see any.

      21          MR. ARMSTRONG:  That's correct.

      22          MR. WILLIAMS:  Judge, I think I don't object -- the

      23     only thing I worry about is an agent or somebody who goes into

      24     other things that aren't facts.

15:43 25          THE COURT:  You just jump up.

MR. WILLIAMS:  Absolutely.

THE COURT:  All right.  What I'm going to do is this:
I'm going to go out and rule on all of this.  I want to see
what your timing -- if you have that timing information.

MR. ARMSTRONG:  Your Honor, could we have just maybe a
few minutes to confer?  Because we need to map it out and we
want to give you accurate projections.  Do you need it today?

THE COURT:  If you want to -- hold it.  Since you are
going to do basically cross-examination, we can hold it until
Monday.  We can hold it until Monday because we are going to
have a voir dire and then initial and then you have got opening
statements.  And we could do it that way, if that is easier.

Ellen, do you have to give them -- I think you
have enough guidelines -- that's what we did in the other case.

All right.  Yes.  You tell me how much time you
want realistically for your -- for every witness, including
direct and redirect.  Then I need anticipated time for their
witnesses on cross.  And then I will allot the time to each
one.

MR. HELFMEYER:  You want it witness by witness or just
gross time?

THE COURT:  Ordinarily, if I do this months ahead, I
have it by witness, but what it needs to be is added up.  It is
always added up by you and you give me a gross time.  I don't
hold you -- let's say witness A you say will take an hour and

15:45   1   15 minutes.  I don't care if you take three hours with them,

2   but if you go an hour and 15 minutes, that's one hour and 15

3   minutes.  The next one -- I need gross time.  That's the only

4   number I need is the gross hours you will need for direct and

15:45   5   cross on your part of the case, not on the defense.  If you

6   elect to call -- you said you would.  I'm not holding you to

7   that because I can't.

8           At the end, we will say, Do you desire to call

9   any witnesses?  If so, you need to be right ready with those

15:45   10   numbers for them, and I will add up the time.

11           All right.  It is 3:47.  We will take a 15-minute

12   break and I will get all these to you and then we will go into

13   how I pick a case as far as jury selection goes and voir dire

14   and so forth.

15:45   15           I need to ask you this, and I'll do it off the

16   record.  Off the record.

17       *(Off the record discussion held)*

18           THE COURT:  What I plan to do, we will go at 10:00 in

19   the morning.  Depending upon who does the voir dire, I will

15:46   20   allow you a certain amount of time.  I don't think I will be

21   doing it.  I think as long as I feel that you are not going to

22   blow a jury panel because over here, you can't call on them

23   like state court.  As you know, in state court, if it's a

24   mistrial, you can go get another group because you have 400

15:47   25   jurors in the morning and 400 in the afternoon.  We don't have

a jury pool.  We take from 14 counties.  So there is no way if we blow a panel.  So my confidence is the lawyers are not going to blow the panel.  I'll do it myself.  A lot of young lawyers don't realize that the general rule in federal court is the judge does all the voir dire.  Off the record.

*(Off the record discussion held)*

MR. ARMSTRONG:  Your Honor, before we go on to voir dire, we do have several objections to Mr. Lewis's proposed voir dire.  Do we want to take those up now or later?

THE COURT:  If so, we need to take that up before you do the voir dire.  Aside from that, I don't hold you to those questions, but if there are some things that you don't want to go into, we need to do it when I come back.  Okay?  We will take 15 minutes.  I'm not getting the time with the clock.  We will see you in 15 minutes.

*(Court recessed at 3:50 p.m.)*

*(Court resumed at 4:26 p.m.)*

THE COURT:  These are the rulings:  The motion to compel disclosure of exculpatory evidence is denied.  Defendant's motion to suppress illegally seized evidence, that's denied.

My understanding is I need to make some findings rather than have a separate order.  I will do it at this time.

Based upon the testimony and evidence presented to the Court, the Court finds that Loren Phillips was not

16:27  1   acting as an instrument of the government at the time she

2   seized the documents from Gulfton contained in Exhibits 603

3   and 604.  The Court therefore finds there was no Fourth

4   Amendment violation as to Exhibit 603 and 604.  And defendants'

16:27  5   motion to suppress is denied.

6          All right.  Now we are going on to Craig's

7   objections to the government's exhibits.  You objected to

8   Exhibit Number 1, and that's the, what is it, that's the notice

9   to the Medical Board.  That objection is sustained.  It's out.

16:27  10  If you can show it later on to be relevant, I will reconsider

11  it.

12         Your objections to Exhibits 700, 701, 702, the

13  data from the Department of Texas Public Safety, the objection

14  is overruled.

16:28  15         The next one, envelope seized, that's Exhibit

16  Number 2, objection overruled.

17         Exhibit Number 3, various photographs during the

18  search of Craig's residence, overruled.  Exhibits relating to

19  an audit by the Texas Medical Board, that's overruled.

16:28  20         Defendant Faithful's objections:  Faithful

21  objects to nine exhibits, beginning with the Texas Medical

22  Board complaint against Craig.  That's sustained.  Again, I'm

23  sustaining that object.

24         Exhibit 802, in part -- and it's in part -- the

16:28  25  various photographs taken during the search of Faithful's

16:29    1    residence, that is sustained. If there are other photos and a
         2    few others that you want to get in, I will consider it on an
         3    item-by-item basis, but across the board right now, from what I
         4    have seen, the objection is sustained.

16:29    5                Exhibit 500, objection, the audio recording, is
         6    overruled. Objections to 501 and 502, recordings, that's
         7    overruled. Exhibit 503, the objection is withdrawn. And the
         8    objections to 603 and 604 are overruled.

         9                Now, I have gone down and I looked at the
16:29   10    codefendants' proposed voir dire questions. Looking at these
        11    questions -- and I don't mean this in a negative way. This is
        12    basically how you voir dire in state court: How do you feel,
        13    what do you think about the term, you know, presumed to be
        14    innocent until proven guilty? Therefore, in this case, I am
16:30   15    changing the ruling. I will do the entire voir dire in this
        16    case. I will work up the questions the government and the
        17    defendant have, and I will do the entire voir dire in this
        18    case.

        19                This is how I try a case, so let's start talking
16:30   20    about that. All right. As far as the voir dire goes, I will
        21    be doing that. If someone raises their hand and it looks like
        22    it is taking too much time and that it might tank the rest of
        23    the panel, I will call them up here after I'm done there and
        24    then invite you up to ask questions at that time, but I'm going
16:31   25    to ask the general questions. I will only ask to bring someone

forward if they get to an answer, yes, anybody here in this place, you know, have yourself, your friend, family member, you know, who had an involvement with the opioid crisis, to the extent that you feel you couldn't be fair and impartial in this trial without having heard any of the evidence.

What I may ask, Is there anybody in that category? See if they raise their hands. And then I will ask a second question. You can make notes if you want with the hands raised. The next thing is, I'll say, all right, of those hands that are raised, is there anything about that that would prohibit you from being fair and impartial in this case without having heard any of the evidence?

Very often in these kind of cases, they will raise their hands, like they may have lost a child or they may have someone going under some of these problems, and they will come forward. But I'm not going to ask the whole group and then start asking them one at a time because, in any event, the voir dire -- by the way, the history I have is the voir dire I have will take a lot longer than the time I probably would have allotted you each to do it. And I'm not saying that in any boastful way, but I have seen it over and over again. I mean, I give you a half hour or 35, 40 minutes, and I'm going to take generally an hour, hour and a half sometimes going down with each of them.

I try to get each juror to stand up for one or

16:32   1     two questions so you can get a feel for them.

2           The juror questionnaires will be up here for you

3      30 minutes before the jury is called up, so come up with a

4      highlighter so you can start highlighting people that you might

16:32   5     want to strike. I'm not going to call anybody up later on

6      unless there is something on the sheet that I spot, like -- and

7      we try to weed them out ahead of time as to scheduling.

8           By the way, I sit 14 on the panel.

9           Now let's talk about this method of striking

16:33   10     alternates. This is done in some jurisdictions, and I have

11     done this routinely. I will tell you how I do this.

12     Ordinarily -- let me get a pad. Ordinarily, in a criminal

13     case, as you know, there is the first 32 that are in play.

14     Following that, the government gets six strikes; the defense

16:33   15     gets 10. All right. Now, we put 14 on the jury and -- Ellen,

16     doublecheck on this right. We have six and we have 10. Right?

17     And that's 16. Then we have 14 -- no, we have 12 on the panel,

18     on this lower one, right? So that is 32.

19        *(Off the record discussion)*

16:34   20     THE COURT: All right. Ride with me on this because

21     it's a little bit different. All right. You have 12 on the

22     base panel. Out of the base panel, you need to make six

23     strikes for the government and 10 for the defense. So, in

24     effect, initially, 28 is in the panel; however, I always seat

16:34   25     two alternates. So with each of you getting one additional

strike, that means 32 will be in the panel, but you must take your alternate strike on those last four.

The way I do it is this: I will give the defendant -- the government seven full strikes. The defense gets 11 full strikes. And you can take those seven and 11 up and down the entire panel, even going into Number 32. But that means everyone is a fully-qualified juror. So they are all sitting there and Number 13 and 14, they are thinking from the beginning, they are alternates. I know, if you have tried cases, they all know it. But doing it this way, they are all fully qualified. I think you know what's coming. And then what I do at the end of the trial, I put all 14 names in -- where is it? Have you got that green container? All 14 names are put in there. You get to check and make sure all the jurors are in there.

Then at the end of everything, just before they start, we walk over to one juror who reaches in and pulls two names out at random. I have done it, and that way, you get extra strikes that you are not restricted to the last four. You can take them up and back. Even though I can do this, I'm going to ask: Any objection by the government?

MR. ARMSTRONG: No, Judge.

THE COURT: Any objection by the defense?

MR. WILLIAMS: No objection, but I have a question, Your Honor.

16:36   1          THE COURT:  Yes, sir?

        2          MR. WILLIAMS:  In terms of challenges for cause, how

        3   does the Court --

        4          THE COURT:  We will talk about that.

16:36   5              All right.  Now, challenges for cause, that's

        6   after I get -- I'm not going to call people up that don't

        7   respond to things or set up an alarm.  All right?  If I see

        8   something on the questionnaire -- we will go through them ahead

        9   of time also -- I will highlight it.  When we get up here, it

16:36  10   is only the people who raise their hands and I didn't want to

       11   go into with them up here.  But if there is some smoking gun in

       12   there that I miss, I will allow you to point it out and maybe

       13   call them up afterwards, but I'm not guaranteeing to do that.

       14   Okay?  But that is basically -- most of the people that have

16:37  15   got a problem raise their hand, or we will target it ahead of

       16   time.  They say, I need to take frequent bathroom breaks.

       17   Well, I can talk to them up there or say, We go an hour and a

       18   half, which we do, before we take a break.  We can take a break

       19   anytime.  I know a couple of you have noted down a concern.

16:37  20   Anybody have a concern with that?  If they raise their hand,

       21   then, sure, we will bring them up here, not to embarrass them

       22   in front of the jury.

       23              Okay.  The same thing, if they get too involved

       24   in medical matters, I will call them up here.

16:37  25              I will go through all of the burden of proof,

16:37  1    civil cases and criminal cases and then the presumption of

2    innocence, the whole concept of what an indictment is and the

3    business about sentencing, that they don't do the sentencing in

4    federal courts like they do in the state courts.  In Texas

16:38  5    state court, if you are found guilty, then the jury comes back

6    in and you have that.

7              Oh, here's the last thing.  This is also a little

8    bit different.

9              Ellen, how many are we calling?

16:38  10         THE CASE MANAGER:  Forty-seven.

11         THE COURT:  Okay.  We are calling 47 jurors.  Let's

12   say 32 is in the panel.  Let's say we work our way -- we start

13   talking to people and we have seven people who are excused for

14   cause.  All right?  That brings it to 39 that will be in the

16:39  15   panel where you must make your seven and 11 strikes.  If we

16   have -- that means that there is, what is it, eight jurors

17   still left over.  All right.  Because it cuts off at 39 after

18   excusing seven.  I will ask you, do you want to take -- do you

19   want additional strikes?  In this scenario, four and four each

16:39  20   more, or in the proportion of six to 10, or whatever, to take

21   additional strikes.  That's up to you.

22              Anybody says no, blows it, meaning, I will ask

23   the defense, Do you want more strikes?  How many more?  You can

24   have up to four more strikes.  The government, Do you want four

16:39  25   more strikes?  If anybody disagrees, then we go back just to

16:39   1   the 39.  So, in effect, you can look and see who is left out
        2   there, but that is always a possibility with me.  They get more
        3   strikes, basically in the same proportion of the 10 to six.
        4           What else do you want to talk about?  Now is the
16:39   5   time.
        6           MR. ARMSTRONG:  Your Honor, we have filed an exhibit
        7   list and invoke Rule 55.
        8           THE COURT:  What is 55?
        9           MR. ARMSTRONG:  Rule 55 as to the authenticity and the
16:40  10   nonhearsay objections.  Is it safe to assume that all of the
       11   other exhibits that we noticed up are now in?
       12           THE COURT:  Okay.  What do you want to do?
       13           MR. ARMSTRONG:  We move to admit at this point.
       14           THE COURT:  Any objections?  I have ruled on the other
16:40  15   exhibits, because that's what we do ordinarily now.  Aside from
       16   the Court's rulings that have knocked out different exhibits,
       17   okay, anything else?
       18           MR. WILLIAMS:  Judge, in lieu of how many there are,
       19   okay, if I find something else that -- like, for example,
16:40  20   with 604, there are some writings in there that are hearsay as
       21   to who did it.  We don't know who actually created this
       22   particular document.  She is claiming she didn't, but if the
       23   witness testifies to something other than that it is not her,
       24   can I move to strike certain things at that particular time?
16:41  25           THE COURT:  You can, but I'm going to admit now --

16:41  1  aside from the rulings of the Court, all of the government's

2  exhibits and all of the defense exhibits, if any, are admitted

3  into evidence.  However, if there is a smoking gun that you

4  have overlooked, I will consider it during trial, but now

16:41  5  everything is admitted except for the ones I have not admitted,

6  so you don't have to offer them each time.

7  MR. ARMSTRONG:  Your Honor, not to make things more

8  difficult, we would object on hearsay grounds and authenticity

9  grounds as to defendants' objections unless, of course, she

16:41  10  testifies.

11  THE COURT:  Say that again.

12  MR. ARMSTRONG:  We would object on authenticity

13  grounds and hearsay grounds to defendants' objections, unless,

14  of course, she testifies.

16:41  15  THE COURT:  I don't understand.

16  MR. ARMSTRONG:  Defendants' exhibits, I believe they

17  marked 10 exhibits or so, to not invoke the rule, and so we

18  will object if they are offered at the time.

19  THE COURT:  Nothing comes in later.  You mean no

16:41  20  surprises?  Is that what you mean?  I don't understand.

21  MR. ARMSTRONG:  So Your Honor just said that defense

22  exhibits are now admitted.

23  THE COURT:  If any that they have, that are already

24  identified and exchanged.  That's what we are talking about.

16:42  25  MR. ARMSTRONG:  Correct.  So are you hearing

16:42 1  objections on defense exhibits or not?

2        THE COURT:  Do you have any objections to their

3  exhibits?

4        MR. ARMSTRONG:  Yes, Judge.

16:42 5        THE COURT:  How many?  All of them?

6        MR. ARMSTRONG:  Yes, all of them, because they are

7  hearsay and they are not authentic documents.

8        THE COURT:  Okay.

9        MR. LEWIS:  I think what he is referring to is I have

16:42 10  tendered a CV for my client regarding her education and

11  experience.  I have tendered proof of continued education

12  credits that she obtained since becoming a doctor.  I have

13  tendered --

14        THE COURT:  By the way, I have been consistent since

16:42 15  state court.  I don't allow CVs in.  I don't allow any kind of

16  -- anything about an expert or a witness unless they are on the

17  stand.  Then they can testify as to the background, but

18  routinely even on expert witnesses, no CVs, nothing comes in.

19  You prove it up through whoever is on the stand.

16:43 20        MR. LEWIS:  That was the intention actually.

21        THE COURT:  You know, you can go through the resume.

22  I mean, you can go through and talk about it, but the document

23  does not come in.  It has never come in with me.  It is not

24  that I'm changing for this particular case or on timing or

16:43 25  whatever.  Why don't we do this?  All the government's exhibits

16:43  1   are admitted into evidence.  Defense exhibits I will consider

2   on an item-by-item basis just like you do in state court.  He

3   has got 10 exhibits or something.  I will consider it like we

4   do in state court, if he identifies something and offers it in,

16:43  5   so no defense exhibits are in.  They can be offered during

6   trial, but you are free to object like you would in a state

7   proceeding, maybe some other federal courts.  Usually it's

8   done.  Everything is in.  We do it ahead of time.  We will make

9   that exception.  Okay?

16:43  10          MR. LEWIS:  That's fine.  We can work with that.

11          THE COURT:  Okay.

12          MR. WILLIAMS:  One other thing, Your Honor?

13          THE COURT:  Yes, sir?

14          MR. WILLIAMS:  As to government's witness list, I have

16:44  15   spoken to Assistant United States Attorney Armstrong, and it

16   appears that he intends to have two witnesses, two agents at

17   the particular table, and I would like for the Court to rule on

18   that because one --

19          THE COURT:  Okay.  What is your response?

16:44  20          MR. ARMSTRONG:  Judge, we have two lead case agents.

21   One is DEA Diversion Mills.  The other is DEA Special Agent

22   Mr. Gainer.  We would request that both be allowed to be

23   exempted from the rule on witnesses.

24          THE COURT:  Any objection?

16:44  25          MR. WILLIAMS:  Yes, Your Honor.

16:44    1        THE COURT:  What is it, please?

         2        MR. WILLIAMS:  I think the government is entitled to

         3    one agent at the table at a time, and I plan on calling them

         4    both in lieu of what I have heard today in the motion to

16:44    5    suppress.  And I think, you know, it's not fair to my client to

         6    have both of them sit there listening to testimony from

         7    government witnesses and be able to respond to those.

         8        THE COURT:  Will they be at the table for the entire

         9    trial?

16:45   10        MR. ARMSTRONG:  Yes, Judge.

        11        THE COURT:  The entire trial?

        12        MR. ARMSTRONG:  Yes, Judge.

        13        THE COURT:  Overrule the objection.  I will allow it

        14    in.  I have been consistent in that over the years.

16:45   15        MR. WILLIAMS:  One other thing.

        16        THE COURT:  Yes, sir?

        17        MR. WILLIAMS:  I have gotten a witness list from the

        18    government, and it doesn't include Special Agent Gainer who has

        19    testified here.  I'm obviously going to have to call him.  I

16:45   20    don't know if I have to subpoena him to testify or if he is

        21    going to be here.

        22        THE COURT:  Will you produce him, if requested?

        23        MR. ARMSTRONG:  Judge, that decision is, I think,

        24    above my pay grade.

16:45   25        THE COURT:  Get him back in and I will swear him in

16:45  1   right now.  No, I mean, I'm serious.  That will take it off

2   your back.  Okay.  I will swear him in right now if you can

3   tell me as an officer of the Court that if he needs him, that

4   he will be available.  Otherwise, he has the right to subpoena

16:45  5   him, but the easiest thing would be just to swear him in now

6   and put him under the rule.

7            MR. ARMSTRONG:  If Your Honor will require us to make

8   him available upon Mr. Williams's request, then, of course, we

9   will make him available.

16:46  10            THE COURT:  There is your answer.

11            MR. WILLIAMS:  I am requesting him now.  Will the

12   Court swear him in now?

13            THE COURT:  No, I don't need to swear him in.  An

14   officer of the Court said he will be here, and that's it.  It

16:46  15   is on the record.

16                 Okay.  What else?

17            MR. ARMSTRONG:  Your Honor, I believe that Government

18   Exhibit 208, which Mr. Williams did object to and you sustained

19   some objections, has a number of photographs.  Am I correct

16:46  20   that your ruling was just as to the photographs that --

21            THE COURT:  What I'm doing is the ones that I saw, I

22   sustained.  If you have others that are more benign and not in

23   effect set up -- I'm not allowing the guns in.  I understand

24   they get in sometimes.  I'm just balancing it out in this case.

16:46  25            MR. ARMSTRONG:  I think Mr. Williams's objections were

16:46   1   to the collections or the aggregate photographs.  For example,

2   all of the guns, all of the money in one place.  Can we

3   introduce those items separately?

4           THE COURT:  Separate guns?

16:46   5           MR. ARMSTRONG:  Yes.

6           THE COURT:  No.

7           MR. ARMSTRONG:  What about the cash?

8           THE COURT:  Not the way it was there.  If you can show

9   cash around the house, that's one thing, but not, as you say --

16:46   10   I don't mean this in a negative way -- in a staged way.  We

11   have all seen the scenes after they have come through, and I

12   have also seen a lot of the ones from the police where the

13   drawer is open and you can actually see the gun in there or in

14   the vehicle where the butt of the gun is sticking out and they

16:47   15   can see it.  I'm aware -- we have all been that route before.

16   But, yeah, if it is something that they found in the house at

17   the time.  If there is any question about it, just approach the

18   bench ahead of time and I will rule.

19           MR. ARMSTRONG:  Not to belabor the point --

16:47   20           THE COURT:  No, look.  We've got time.  All right.

21   Let's do it now.

22           MR. ARMSTRONG:  Is it your ruling that guns per se are

23   out?

24           THE COURT:  Right now, yes.

16:47   25           MR. ARMSTRONG:  Even as to Defendant Craig, as well?

1          THE COURT:  I didn't say that.

2          MR. ARMSTRONG:  As to Defendant Faithful?

3          THE COURT:  That's correct.  The ones that I saw with

4   all of the weaponry laid out and there's another one sitting on

5   the stairs and then all of the watches.  Okay?  Yeah, that's

6   out.  If it's the way it was when you get in there, I will

7   consider it.

8          MR. ARMSTRONG:  Okay.

9          THE COURT:  That's basically what I had in mind

10  because that's what I said.  It is partially -- they are out,

11  but it's partial.  If you get others that come in without

12  objection or even over objection, you know where my boundary

13  is.

14         MR. WILLIAMS:  As to transcripts, Your Honor, I don't

15  know if you ruled on the --

16         THE COURT:  I think we ruled on them, but as far as --

17  I said they are in with the transcripts.  I will, if you want,

18  give that instruction to the jury, if you want.  I can tell you

19  exactly what it is.  Where they don't have to believe -- they

20  are to listen and determine themselves and not be unduly bound

21  by the transcripts.

22              I have admitted the transcripts with a limited

23  and secondary purpose of aiding you in following the content of

24  the conversation, as you listen to the tape recordings, and

25  also to aid you in identifying the speakers.  However, you are

specifically instructed whether the transcripts correctly or
incorrectly reflect the content of the conversations and so
forth, I will give them that instruction.

      MR. ARMSTRONG:  Related question, Your Honor?

      THE COURT:  Yeah.

      MR. ARMSTRONG:  The transcripts themselves, will they
be introduced as a demonstrative or will you allow them to go
back to the jury room as exhibits?

      MR. WILLIAMS:  I think at that point they would have
heard them through evidence.

      THE COURT:  I don't send transcripts back.

      MR. ARMSTRONG:  Demonstrative only?

      THE COURT:  That's correct.  You can have that
scrolling coming up on the bottom.  When we did that in the
city hall, it was relatively new.  No one had seen it before,
the scrolling up from the bottom.  So we are dating ourselves,
Ellen.

       I need two things Monday.  I need a statement of
the case, a joint statement of the case.  Simple.  Okay?  The
government contends that A, B, C, D and E, just barebones but
enough to let the jury know what's coming.  That defendant such
and such, a physician, and Mr. So and So, the office manager,
whatever he was there, are accused of this, this, this and
this.  Usually they say to which the defendants plead not
guilty to all counts.  But you need to get together and just

16:50    1    see what you want me to tell -- I need to tell them enough to

         2    where they will start thinking as to what the case is but not

         3    give them a full description of what is coming.  I'm looking at

         4    about five, six short lines, paragraph, something like this,

16:51    5    just set out the basic allegations of the plaintiff are four

         6    counts, but do it in lay language.  And, ladies and gentlemen,

         7    to all of these counts, the defendants plead not guilty.  And

         8    then I will go in and talk to them about the burden of proof

         9    and I will go through what an indictment is.  It is no proof of

16:51   10    guilt and the defendant is never there.  It is just the

        11    government's case.  I will go through all of that.

        12         MR. WILLIAMS:  Would the Court expect the defense to

        13    actually give their version of what the case is?

        14         THE COURT:  No.  What their allegations are, then if

16:51   15    you want to, without arguing the full defense, if they want to

        16    put a few lines in there, that's fine.  They say, The

        17    defendants deny all of the allegations, specifically this,

        18    this.  Just make it benign enough so I can get in there and not

        19    take a whole day with the voir dire, because I don't.

16:52   20         Ellen, what do you figure?  The last voir dire on

        21    that last case?  Was it an hour and something?

        22         THE CASE MANAGER:  Yes, sir.

        23         THE COURT:  It took well over an hour, an hour and a

        24    half, whatever it was.  I will see how far we need to get, if I

16:52   25    need to go to 47 individuals, and have them stand up.  It looks

16:52   1   like there is a possibility that there may be extras.  I will

        2   at least get everybody to stand up.  I can move pretty quickly.

        3   Even if it's, Mr. So and So, I see you work for Brown & Root.

        4   Well, thanks.  Have a seat.  If there is nothing else that

16:52   5   jumps out at me.  My staff and I will go through all of those.

        6           Ellen, we need to get them up here early.  Okay?

        7   There are 47 we are going to have to go through and highlight

        8   them myself.  This is what I'm going to do internally to see if

        9   there are any smoking guns right there.

16:52  10           What else?

       11           MR. ARMSTRONG:  The conference check, do you want us

       12   to submit names to you?

       13           THE COURT:  For what?

       14           MR. ARMSTRONG:  Potential witnesses, does anyone know

16:53  15   me, for example?

       16           THE COURT:  Yes.  I need a witness list.  I'll say,

       17   Everybody may not be called, but these are some of the

       18   witnesses or names that may show up, over and over again saying

       19   that there is no obligation for the defendant to put any

16:53  20   witnesses on, even to ask any questions at all.  That's how I

       21   usually say it.  I'm sure they will.  And I go with the

       22   presumption of evidence -- I mean, the presumption of guilt.

       23           MR. WILLIAMS:  Presumption of guilt?

       24           THE COURT:  No.  Presumption of innocence.  It's a

16:53  25   long day.

16:53  1      MR. WILLIAMS:  We understand.

2      THE COURT:  We have been in trial now how many weeks

3   in a row?  About eight or nine weeks right in a row.  A lot of

4   the cases I tried -- I think, what, of the last seven, eight,

16:53  5   right, all but two were from other judges.  I take cases from

6   other judges just to try them because that is all I want to do

7   is try cases.  I will do writing and publishing, but that's all

8   I want to do.

9          Okay.  What else do you want to talk about?

16:54  10      MR. ARMSTRONG:  Your Honor, opening statement.  I

11   predict probably 20 minutes?

12      THE COURT:  There you go.  Opening statement, with me,

13   an opening is statement is nothing more than what you think the

14   evidence will show, and it is coming out of your time.  Yes.

16:54  15   The opening statement is the only thing that comes out of your

16   time.  The voir dire doesn't because I will be doing it, and it

17   would not anyhow.  Your summation does not.  The jury charge

18   conference does not.  But the opening does.  So we are going to

19   be talking about that.  We can do it right now.

16:54  20          Anybody want to go with less than a unanimous

21   verdict.  What does the defense say?

22      MR. WILLIAMS:  Absolutely not.

23      THE COURT:  That's what I figured.  I always ask that

24   in a civil case also, but I always ask the defense first.

16:54  25          Opening statement, with me, it is nothing more

16:54   1   than what you feel the evidence will show.  Even in the monster

2   cases, I say, Let's get on and start the evidence.

3               Okay.  With that as a background, how much does

4   the government want as an opening statement?

16:55   5           MR. ARMSTRONG:  Twenty minutes max.

6           THE COURT:  Twenty minutes.  How about you?

7           MR. WILLIAMS:  Twenty minutes is good.

8           THE COURT:  That's fine.

9           MR. LEWIS:  Is that each or total?

16:55  10           THE COURT:  Yeah.  Total time.  It's not going to be

11   one.

12           MR. WILLIAMS:  Can we have 15 minutes each?

13           THE COURT:  Yes.  That is not going to hurt.  Is 20

14   minutes okay for you?  Or do you want longer?

16:55  15           MR. ARMSTRONG:  Absolute max.  My guess is it will

16   probably be around 15.

17           THE COURT:  Okay.  I assume the defendants are going

18   to strike together?

19           MR. WILLIAMS:  Yes, we will.

16:55  20           THE COURT:  Let's see.  You need not ask permission to

21   approach a witness in my court.  You have free range of the

22   court.  You can examine witnesses, sitting, like they do in

23   state court, standing in your place.  You can stand and put

24   your papers on the overhead.  We have a podium that I will be

16:55  25   using and then you can pull it dead center.  It is right behind

16:55 1  the pole, the big podium behind the pole.  You can pull it dead

2  center or put it on the corner of the jury box, whatever you

3  prefer.  You have free range of the courtroom.  You will have a

4  lapel mic if you want to.  If you don't want to be welded to a

16:56 5  microphone anywhere, I will give you a lapel mic.

6  This Court, kidding aside, was upgraded, what,

7  Ellen, a couple hundred thousand dollars for that Stanford

8  case.  I selected the jury in the huge courtroom upstairs.  I

9  don't know if you are familiar with our ceremonial courtrooms.

16:56 10  They're really huge.

11  MR. ARMSTRONG:  Judge Hoyt's chambers?

12  THE COURT:  Pardon me?

13  MR. ARMSTRONG:  Judge Hoyt's chambers?

14  THE COURT:  Judge who?

16:56 15  MR. ARMSTRONG:  Hoyt.

16  THE COURT:  Hoyt, yes.  And then I moved it down here.

17  That's why we got those screens put up on the pole.  We have

18  people who are hearing challenged.  We have the special hearing

19  aids, that's what those things are for.  The court reporter can

16:56 20  hear what goes on here.  When we have a bench conference, when

21  we do the challenges for cause up here, we mute every

22  microphone except the back one.  There is a screen that comes

23  down out of the ceiling.  We have got a control panel here.

24  This is the courtroom that most junior judges had

16:57 25  historically started in.  I just stayed here, but I have the

16:57    1    best -- I have the most office space in the whole building.  It

2    goes across the back and this whole side of the building.  So

3    I'm still under design code, even as a senior judge.  I'm used

4    to the pole.  I had a pole in state court.  Anyhow, so that's

16:57    5    the reason -- and then I moved the big trials and move right

6    down here.

7                MR. ARMSTRONG:  Does Your Honor have any preference as

8    to where we address the jury for opening statement?

9                THE COURT:  No.  It doesn't matter to me.

16:57   10                MR. LEWIS:  As far as configuration, Judge, I see

11   there are three tables here.  We have two defendants.

12                THE COURT:  You can be at the same table or separate,

13   whatever you want.  If you have anything like computers, I have

14   computer controls for all three tables.  If you have anything

16:58   15   on, what is it, on your computer or the overhead, the same

16   thing.  I just hit a button and it turns on the overhead

17   projector.

18                MR. ARMSTRONG:  So the projector will be in the corner

19   to Your Honor's left?

16:58   20                THE COURT:  Yes.  Let's see.  The screen comes down

21   out of here.  If you use the pad, I suggest do it on this part,

22   this end down here where at least I can see it.  Okay.  Yeah.

23   They don't have individual screens.

24                MR. ARMSTRONG:  Is that a screen too?

16:58   25                THE COURT:  Yes.  In other words, what goes on here

will be on those screens. It is also on your individual

consoles, on mine and on everybody else's screen. That was

literally set up for that one case.

            MR. LEWIS: Including these screens on this --

            THE COURT: Oh, yes. The screen on the pole because

that way the jurors at the end can easily see if they have

trouble.

            Also, as you see, I can turn off lights if you

have something on the overhead, to make sure it is not just

drowned out, so we do it that way. I have a switch just for

that thing.

            MR. ARMSTRONG: Nobody falls asleep?

            THE COURT: I won't say that. No, not with these

lawyers, but, occasionally, yes, on some. What was the one we

had? We had our UCC case, a contested case under the Uniform

Commercial Code. I'm not saying -- let's put it this way: An

old judge told me years ago, I know you are experienced -- I

think it was Judge Stovall. He said, Hittner, I know you are

experienced when you learn to sleep with your eyes open. It is

not good when the judge doses off.

            Any other housekeeping?

            MR. WILLIAMS: Nothing further for Defendant Faithful.

            MR. LEWIS: Or from Craig.

            MR. ARMSTRONG: Your Honor, we have to test the

electronics, but we will do that on our own time.

17:00 1    THE COURT:  Please.  By the way, do we have anything

2    Monday morning before I get here?  The only thing is I try my

3    cases from 10:00 a.m. to 6:00 p.m.  Because that way, the jury

4    comes in after the rush hour and they leave after the rush

17:00 5    hour, so that's my full day.  Instead of 9:00 to 5:00, I go

6    10:00 to 6:00.  The only change is that only on Tuesday we

7    begin at 11:30 instead of 10:00 a.m.  If you have any witnesses

8    on Tuesday, we begin at 11:30.  Aside from that, we go straight

9    through, and we take a break about every hour and a half.

17:00 10    Anybody needs to take a break for any reason,

11    just let me know.  I tell the same thing to the jury.  We can

12    always take a 10-minute break if anybody needs to take a break.

13    MR. LEWIS:  Your Honor, will we be allowed to leave

14    materials here overnight?

17:00 15    THE COURT:  Oh, yeah.  Absolutely.  What else?

16    MR. ARMSTRONG:  Nothing further, Judge.

17    THE COURT:  Anything else?  I always say this, if you

18    can settle the case over the weekend, do it.  If you can't --

19    don't point a finger at one or the other.  But I just saying, I

17:01 20    always say that in criminal and civil cases.  I'm here to try

21    the case and we will get it tried.  We will let you know the

22    timeframe.  You give me a reasonable time.  I have been around

23    for a while.  And in all of my years, 30 some odd of doing

24    this -- how many, Ellen?  There were two, right, two cases I

17:01 25    had to give extra time.  One was an airline crash case where I

17:01  1   gave them an extra 20 minutes, and then there was that railroad

2   tariff case.  You talk about -- I couldn't fall asleep.  It was

3   nonjury.  This place was covered with books, connecting tracks

4   around the country, I mean, from one train to another.  We had

17:01  5   an intervenor.  I had no idea what was his position was.  He

6   was an intervenor and he got a half hour.  So it has been about

7   an hour extra time in all of these years.  Lawyers will do it

8   within the bounds, and I have been around.  But you can do it.

9   Whatever the time is, lawyers can narrow it down.

17:02  10              Anything further from the government?

11          MR. ARMSTRONG:  No, Judge.

12          THE COURT:  Anything further from the defense?

13          MR. LEWIS:  No, Your Honor.

14          MR. WILLIAMS:  No, Your Honor.

17:02  15          THE COURT:  All right.  We will see you Monday, ready

16   to go.

17      *(Court adjourned at 5:03 p.m.)*

18                      * * * *

19      I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled cause.

21

22   Date: February 19, 2018

23

24   */s/ Mayra Malone*
     ----------------------------------------
     Mayra Malone, CSR, RMR, CRR

25   Official Court Reporter