1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS

2                      HOUSTON DIVISION

3

4

5

6  UNITED STATES OF AMERICA    .    4:17-CR-00419

7  VERSUS                  .    HOUSTON, TEXAS

8  GAZELLE CRAIG, D.O, AND     .    JANUARY 29, 2018

9  SHANE FAITHFUL           .    10:26 A.M.

10  . . . . . . . . . . . . . .

11

12

13

14      TRANSCRIPT OF JURY SELECTION AND DAY ONE OF JURY TRIAL
           BEFORE THE HONORABLE DAVID HITTNER

15             UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

*APPEARANCES*

FOR THE GOVERNMENT:

    Scott P. Armstrong
    UNITED STATES DEPARTMENT OF JUSTICE
    1400 New York Avenue Northwest
    Washington, DC  20005

    Devon M. Helfmeyer
    UNITED STATES DEPARTMENT OF JUSTICE
    1000 Louisiana
    Suite 2300
    Houston, Texas  77002

FOR DEFENDANT CRAIG:

    Don E. Lewis
    Attorney at Law
    1717 Saint James Place
    Suite 625
    Houston, Texas  77056

FOR DEFENDANT FAITHFUL:

    Cornel A. Williams
    WILLIAMS AND ASSOCIATES
    1405 Palm Street
    Houston, Texas  77004

OFFICIAL COURT REPORTER:

    Mayra Malone, CSR, RMR, CRR
    U.S. Courthouse
    515 Rusk, Room 8004
    Houston, Texas  77002

Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.

- - - - -

1

2

## INDEX

3     Jury Selection    4

4     Opening Statement by Mr. Armstrong    142

5     Opening Statement by Mr. Williams    150

6     Opening Statement by Mr. Lewis    160

7

8    TONYA GRAHAM

9     Direct Examination by Mr. Helfmeyer    169

10    Cross-Examination by Williams    223

11    Cross-Examination by Mr. Lewis    235

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        *PROCEEDINGS*

2            THE COURT: Good morning, ladies and gentlemen.  I'm

3    Dave Hittner, one of the judges of the United States District

4    Court for the Southern District of Texas.  I want to invite you

5    to the next step on your jury service.

6                How many -- this is the first time in federal

7    court?  All right.  Anybody served on a federal jury before?

8    Number 8 and Number 9.  You are going to find out after I come

9    down and maybe visit with you a little bit that it's not more

10   important than the state court; it's just different.  We are

11   going to talk about some of the differences between the state

12   system and the federal system.  Then I will tell you something

13   about this case.

14                Rather than do it from up here, let me get my

15   microphone, so I can come down there.

16                Now, the first challenge I have is one of the

17   secrets is the judge's robe has a pocket.  The trick is to find

18   the pocket.  Here it is.  Sometimes I have trouble.  It is

19   really hidden.  They hide it from the judges too.

20                I'm going to come down and we are going to do it

21   from down there.

22                Okay.  As we begin, nothing is 100 percent, so I

23   say that 99 percent of the folks that have served on a jury

24   when I have had the opportunity being a state judge and a

25   federal judge found it to be very enlightening, or they enjoyed

their time with us. Hopefully, you will too. We can't do it without you here. The trial by jury is guaranteed by the Constitution, and we are glad to have you here. And I will discuss the differences a little bit between a federal court and state court.

Now, even the judge served on a jury. I was an elected state judge for about eight years and then I came over here 31 years ago. Eight years, I was elected countywide and then I came over here by presidential appointment, nomination by the President, confirmed by the Senate. There were three levels of judges that have that; the U.S. Supreme Court, the U.S. Court of Appeals and the U.S. District Court. So we are sort of known as Article III judges.

Everybody says, Why do you have a lifetime appointment? It is very nice. It sure beats running for office. It goes back to colonial times. When King George was displeased with what his colonial judges were doing here in the colonies, he either fired them or cut off their money.

Well, if you look in the Declaration of Independence, one of the complaints against the King was just that. The control of the colonial judiciary. And when they wrote the U.S. Constitution, they wrote in under Article III that, as far as the federal judges in those three categories, that they would have lifetime appointment and you may not reduce their salary while we are in office. The reason being

10:29   1   is, right from the beginning, to avoid crown influence on the

        2   judiciary.  So that is why I'm most fortunate to be in one of

        3   those categories.

        4            Also, I served on a jury.  If you want to look to

10:30   5   the corner of the jury box, there are my juror badges.  I

        6   served a week and a half on a state jury when I was a state

        7   trial judge.  And then since I have been on the federal court,

        8   I have gone to JP court, justice of the peace court jury

        9   service and City of Houston traffic court.  So we all serve on

10:30   10  a jury.  All right?  We all serve on a jury.  And we are going

        11  to move this case along.

        12           Sometimes the concept of jury service is not too

        13  clear with young people, and we had a case that went on for

        14  quite a while, really quite a while.  And the students

10:30   15  apparently in -- what is it?  I have it right here.  In the

        16  second grade class at Katy Independent School District worried

        17  about their teacher not coming back.  So if you will look over

        18  there to the corner, all the way in that far corner, you see,

        19  sort of, a big white poster.  I got a card from every kid in

10:30   20  the class.  They drew a stick figure of themselves, and I just

        21  blew it up poster size.  That's where the jury room is.  This

        22  is what it says:

        23           It says "Dear Mr. Judge, please let my teacher

        24  come back to school soon.  We really do miss her."  So

10:31   25  everybody serves on jury duty, and we are just glad to have you

all here.

Let's talk about what kind of court this is. This is the highest level of trial court in the federal system. In effect, ancillary to this court, you have got the United States magistrate judges who try suits and they assist the district court. You have got the United States bankruptcy court, and almost every federal agency has their own appellate process within the agency, everything from the Veterans Administration to Social Security to the Energy Administration, and they have administrative law judges assigned there. But they appeal that usually to the one judge federal court. We do a lot of -- especially on Social Security appeals. And then from here, if anybody appeals -- anyhow, this is the last stop we actually have jurors in the box. We are going to continue on up the line.

The country is divided into 12 circuits, appellate circuits. They are called circuit courts, circuit judges. We are in the Fifth Circuit. Texas, Louisiana and Mississippi are in the Fifth Circuit, so all the appeals from those three states go to the United States Court of Appeals for the Fifth Circuit, and they sit in New Orleans. That's where their headquarters are, but the judges come from all three states. We have got about five or six circuit judges right here in the building, but they sit in panels of three. They don't hear any evidence or whatever. What they do, the

transcript of what the trial is -- just like you see Mayra
Malone here, our official court reporter, is taking it down.
They will get a transcript; read the transcript.  The attorneys
make arguments or they file briefs, and then some of them are
allowed to go to New Orleans and actually argue the case to the
three judges.  Then they make their decision.

Now, from there, of course, a case could be
appealed to the United States Supreme Court in Washington;
however, the Supreme Court takes only the cases it wants to
hear, not as a matter of right, like you go up to the court of
appeals.

Each year I call the clerk of the Supreme Court
to find out what their business was for the last year.  In the
last year, the last term, 6,475 cases were appealed to the
United States Supreme Court.  They actually wrote opinions on
just 62 cases.  So they just take cases of major constitutional
import.  Or sometimes the circuits may differ.  For instance,
let's say the Second Circuit, which is New York, Vermont and
Connecticut, decide a case a certain way.  Then almost the
exact type same case is heard on the Ninth Circuit, which takes
in the whole West Coast.  And they decide it a different way,
so that's a conflict of circuits.  So, occasionally, the
Supreme Court will take that case also.  But that's, in effect,
the pecking order, shall we say, of federal courts in the
United States.

10:34    1          Let's talk about the duration -- well, first of
         2   all, let me tell you what my work day is.  My work day when I'm
         3   in trial is 10:00 a.m. to 6:00 p.m.  That allows the jury to
         4   get in after the rush hour and to leave after the rush hour and
10:34    5   still get a full day, like 9:00 to 5:00 in.  From 9:00 to
         6   10:00, I do hearings in other matters.  Of course, in civil and
         7   criminal.  We do both as a federal district court.
         8          We have all seen a lot of trials, such as Law and
         9   Order, Judging Amy, JAG and so forth.  This is a little bit
10:35   10   different.  They have never videotaped, that we know of anyhow,
        11   a case in federal court.  You will notice though, however, I
        12   had the privilege actually of being the judge on the Allen
        13   Stanford financial trial which lasted a long time.  Mr. Madoff
        14   in his case pled guilty, and this was the largest financial
10:35   15   fraud ever tried in the United States, so they upgraded my
        16   little courtroom.
        17          By the way, this is where all the judges usually
        18   begin, all the junior judges, and they move upstairs to the
        19   monster courtroom.  I decided to stay here and I snatched all
10:35   20   the space across this end of -- right in this area and down
        21   this whole side of the building, so I traded it because a
        22   federal judge can bark here just as well as he or she can
        23   upstairs.  And, of course, I had this pole.
        24          When I first got here, I thought, let's move that
10:36   25   pole.  I'm a federal judge, you can do whatever you want.  I

want to get rid of that pole. So they did an engineering study. It's a weight-bearing pole for the whole building. I said, See what you can do with it. They ran a study and it would be at least $250,000 to get big girders across here and just to get rid of that pole. Some of you, I know, are engineering -- in fact, one is a structural engineer. I remember reading the background. And they said they still couldn't guarantee it wouldn't crash in on the eighth floor, so I said, I'll keep it.

But when I did the Stanford trial, they upgraded the courtroom, put in the TV screens, one for the jury at this far end and then for the gallery out here, put the sound system in. For people who are hearing challenged, we have special hearing. They also have -- up there is a TV camera that doesn't go anywhere but down the hall. There were so many people that were around here that we had to have an auxiliary courtroom, so we have a TV camera. But as far as I know, that's all it is. I mean, just for up here on the floor.

You know the old story -- if any of you have been in public relations or in the media, see if you know the answer to this. You are told every microphone is a -- hot mic -- is a live microphone. So anytime you see a microphone, don't assume it's dead. Okay. But, in any event, that's where we are as far as this goes.

Let's talk about the duration of this trial. In

10:37  1  federal court, cases can last any length of time.  Years ago, I

2  had the three City Hall bribery cases here in Houston, all

3  three.  The first one lasted about three and a half months, the

4  second one, two and a half, and the third one, another two

10:37  5  months.

6  My colleague, Judge Werlein, about two years ago,

7  had a case scheduled for five months -- I mean, scheduled for

8  seven months and it ended in the fifth month.  The IBM

9  litigation, civil litigation in New York about 50, 60 years

10:38  10  ago, lasted over a year with the same jury.

11  I will tell you this:  If you are selected on

12  this jury, it will be an extremely short case for federal

13  court.  Testimony will last probably through this week and a

14  little into next, but it's an extremely short case for what we

10:38  15  usually try in the federal system.

16  When I get into some of the details, you will see

17  it's an interesting case and you will learn something.  For

18  instance, the last case I tried was a civil case on the Federal

19  Odometer Act, in other words, selling used cars nationwide,

10:38  20  having rolled back the odometer.  And we had somebody who is

21  the national expert that just did this, and we had two law

22  firms who specialized just in this kind of a case.  It was a

23  civil case.  That was last week.  That's what is interesting

24  about this business.  There is always something new coming in.

10:38  25  I want to talk to you about civil or criminal.

10:38   1   Now, let's assume this is a civil case, like a contract case, a

        2   civil rights case, an odometer case or something like that.

        3   The plaintiff, that's the person who brings the case, must

        4   prove his or her case, each element, by a preponderance of the

10:39   5   credible evidence.  Lawyers use this very often:  Picture the

        6   scales of justice; a slight tipping is the preponderance of the

        7   evidence.

        8           Now, let's assume this may be a criminal case.

        9   If it's a criminal case, then the government must prove its

10:39   10  case against the defendant beyond a reasonable doubt.  That's

        11  not beyond all doubt, not beyond a shadow of a doubt but beyond

        12  a reasonable doubt.

        13          And if this is a civil case or a criminal case, I

        14  will explain to you and give you instructions on what those

10:39   15  different burdens of proof are, depending upon if it is a civil

        16  or criminal case.

        17          As I ask you some questions along the way, I may

        18  even cut you off or just ask a general question because this is

        19  the key.  And let's say -- I know we have some people who are

10:40   20  attorneys.  We have some people in the medical profession or

        21  who have spouses in the medical profession.  I have gone

        22  through all of your juror forms.

        23          The key question is, let's say something comes up

        24  that you have had some sort of experience along the lines.  It

10:40   25  would be:  Would that prohibit you from being fair and

impartial in this case without having heard any of the evidence?  And I always insist, if I do the voir dire, or the attorneys do, that they add that phrase on.  Because, you know, we all have our own background.  I sat as a judge.  I had physicians sitting on medical cases.  I have had engineers sitting on engineering cases.  I have had lawyers sitting on cases.  The thing is:  Would that prohibit you, whatever it is in your background, prohibit you from being fair and impartial in this case, again, without having heard any of the evidence?

Now, I will tell you this.  This is a criminal case.  It's a criminal case.  I do want to tell you at the beginning, I know a lot of you have sat on state court cases.  We're a little bit different here, not that we are any better, again, but we are just a little bit different.  In federal court, the judge alone does the sentencing.  So if this is a criminal case, you will be asked to decide the guilt or innocence of a defendant or the defendants, but you will not then -- once you -- if you reach a guilty verdict, come back in and listen to more testimony on the sentencing aspect.  Sentencing is up to the judge in the federal system.  So it is different than the state system, and it is not any better, any worse; it is different.  By the way, the one exception to that is if there is a federal, what is it, if there is a federal death penalty case.  If there's a death penalty possibility, then the jury comes back in in that case to rule on that.

10:42   1   That's the one case basically where you come back in.

        2           I'm going to read you a brief description of the

        3   case.  Both counsel have agreed on this.  Let me get it.  This

        4   is just a brief overview.  You can see the items that we are

10:42   5   going to be talking about.  It is something really cutting edge

        6   in today's society.  All right?

        7           There are two defendants in this case.  One is a

        8   physician, Dr. Gazelle Craig, and the other defendant,

        9   Mr. Shane Faithful.  The United States, that's the government,

10:42  10   alleges that the defendants ran an illegal pill mill called

       11   Gulfton Community Health Center.

       12           The United States further alleges that the

       13   defendants provided to patients controlled substances,

       14   including opioids and muscle relaxants, through prescriptions

10:43  15   that had no legitimate medical purpose and were outside the

       16   course of medical practice.

       17           The defendants, according to the United States'

       18   allegation -- that's just their allegations; you haven't heard

       19   any evidence -- okay -- charged each patient -- defendants,

10:43  20   according to the U.S., the allegations, charged each patient

       21   approximately 250 to $300 for office visits where they

       22   allegedly received the prescription of an opioid and muscle

       23   relaxant, along with other noncontrolled medications that are

       24   documented in the medical records.  Based on these allegations,

10:43  25   and others, the defendants are charged with -- now, this is

10:43   1   what the defendants are charged with.  Okay?  Each defendant is

2   charged with one count of conspiring to unlawfully distribute

3   controlled substances and three counts of aiding and abetting

4   the unlawful distribution of controlled substances.

10:44   5          Now, what does the defense say?  The defense, the

6   defendants, through their lawyers and themselves, deny these

7   allegations, and they have pleaded not guilty to these charges.

8          Now, let's talk about one thing.  And this is the

9   key thing we are going to talk about before we get into a few

10:44  10   questions for each of you.  All right?  What about burden of

11   proof?  We talked about that.  Burden of proof, beyond a

12   reasonable doubt.  I'm going to use an example that -- not you

13   but maybe somebody you know.  If you have ever been -- I can't

14   put you in a position.  Let's say somebody you know has been

10:44  15   called to traffic court.  Okay?  That's a criminal type of

16   offense.  Okay?  So what does the government -- what does, say,

17   the police officer need to prove?  Well, you need to prove,

18   number one -- let's say that you are in Harris County.  That

19   you were behind that wheel.  That there was a stop sign.  And

10:45  20   according to the officer, for no apparent reason, you cruised

21   right through it.  Unless the government proves each of those

22   items, then they haven't proven it beyond a reasonable doubt.

23   They have to prove it beyond a reasonable doubt.  And, of

24   course, the defendant doesn't have to take the stand.  As some

10:45  25   of you know, they don't have to take the stand.  Now, the

10:45   1   presumption of innocence is guaranteed by the Constitution.

2   Every defendant coming into a criminal case, whether it is

3   traffic court or up here in the district court, has to be

4   presumed to be not guilty until the government proves each and

10:45   5   every element of every offense beyond a reasonable doubt.

6   Does anybody have a problem with that

7   constitutional right?  I'm going to explain it some more.

8   Let's talk possibly about Third World countries.  I have used

9   this for years, 30 some odd years with juries because I really

10:46   10   believe in it.  In some Third World countries, if a person is

11   picked up by the police, they are presumed to be guilty and

12   they have got to prove themselves innocent.  Just think about

13   that.  That has never been the way we try cases in criminal

14   court in criminal courts in the United States.  You are

10:46   15   presumed to be innocent and let the government prove it.

16   Does anybody have a problem with that burden?

17   Okay.  Now, the defendant has no obligation, no

18   requirement to testify.  In fact, their lawyers are under no

19   obligation to ask any questions.  I know that they will, but

10:46   20   they can remain mute.  They don't have to say a thing.  It is

21   up to the government to prove each element of each of those

22   charges beyond a reasonable doubt.

23   Now, you have also heard many times, well, an

24   indictment was handed down against defendant so and so.  Now,

10:47   25   what about that?

10:47  1          By the way, in the federal system -- I think now

       2    also in the state system, but in the federal system, you could

       3    be called up like this and be assigned to a grand jury for 18

       4    months.  So we are picking here a petit jury as compared to a

10:47  5    grand jury.

       6          What does a grand jury do?  It is made up of a

       7    group of folks, usually 23, and you need 16 at least to get an

       8    indictment.  I believe that's still the requirement.  But in

       9    any event, the grand jury assembles and listens only to the

10:47 10    government's evidence.  The defendant is not in there and the

      11    defendant's lawyer is not in there.  Sometimes they don't even

      12    know that's going on.  Okay?  So the grand jury sits and it

      13    hears only the government's side, not anything else.  No

      14    cross-examination.  No nothing.  And based upon what the

10:47 15    government shows, if the grand jury -- and I'm going to

      16    oversimplify this -- feels that there is enough to go to a

      17    trial jury, that's what they do.  So an indictment is no

      18    evidence whatsoever of guilt.  It's the mechanism that gets a

      19    case to trial.

10:48 20          Anyone here have a problem with that, with our

      21    grand jury system?

      22          Has anybody here, by the way, served on a grand

      23    jury.

      24          Yes, ma'am.  You want to stand up just for a

10:48 25    second.  When was that?

10:48   1              PROSPECTIVE JUROR:  When was it?

        2              THE COURT:  Yes.

        3              PROSPECTIVE JUROR:  Years ago.

        4              THE COURT:  Whereabouts?

10:48   5              PROSPECTIVE JUROR:  Here in Houston.

        6              THE COURT:  In state court?

        7              PROSPECTIVE JUROR:  Federal.

        8              THE COURT:  Federal?

        9              PROSPECTIVE JUROR:  Also a district court.  I served

10:48  10   both.

       11              THE COURT:  Okay.  Is there anything about that that

       12   you think would prohibit you from being fair and impartial in

       13   this case without having heard any of the evidence?

       14              PROSPECTIVE JUROR:  No.

10:48  15              THE COURT:  Okay.  Thank you, ma'am.

       16              Now, the last thing -- I think I also told you

       17   about the sentencing.  We have been over that.

       18              We are going to start in right now with some

       19   questions for each one of you.  I'm going to move very quickly.

10:49  20   But let me tell you the deal I make with you is that in federal

       21   court, the judge can mix it up a little more in the courtroom

       22   than they can in state court.  It is just the difference as far

       23   as what the appeals courts have said we can do.  So you are not

       24   going to hear the same question more than once.  And if any

10:49  25   lawyer keeps going on and on, they are going to hear from me.

10:49   1          What else can I promise to you?  They have given

        2    me an approximation of how long their case will take.  Now, we

        3    can't ask if the defendants are even going to put any evidence

        4    on.  Okay?  So I have already set a timing order on both sides,

10:49   5    which you can do in federal civil and criminal cases.  These

        6    are really experienced attorneys, and they will introduce

        7    themselves to you in a moment, but here is what I do.  This is

        8    a chess clock.  I'm serious.  Somebody gets on their feet --

        9    where is it?  Come on, start.  Oh, come on.  I will tell you

10:50  10    this -- who has been messing with this clock?  Well, the

       11    battery is good.  Now it's clear.  You have to press -- I don't

       12    play much chess, but on a chess clock, you have to make sure

       13    someone actually doesn't hit the button.  I'm going to start

       14    this again.  There it is.  One button goes down, someone gets

10:50  15    up and starts talking.  Okay?  The other one gets up and says,

       16    I have an objection, and they start in, I immediately shift it

       17    over.  When their time is up, they are out.  They sit down.  So

       18    that's exactly what you will be hearing.

       19          The deal I have with you is that I have a chess

10:51  20    clock, and it's going to be moving all the time.  The attorneys

       21    will get a sheet each day as to how much time they run.  I will

       22    say by this, that in all 30 some odd years of doing this, I

       23    have had to extend only two attorneys a total of one hour in

       24    all those years.  So generally it works.

10:51  25          With that as a background, I want to go down and

10:51    1    visit just briefly with each of you and to see some of the

2    questions you have. However, the first thing I want to do, you

3    are going to meet the attorneys. They are going to say who

4    they are and introduce their clients or their case agents. So,

10:51    5    remember, the burden of proof is on the government. So they

6    are going to go first and I'm going to introduce them first.

7    I'm just going to say, Counsel for the government, please

8    introduce yourself and everybody at your table.

9          MR. ARMSTRONG: Am I on the clock, Judge?

10:52    10          THE COURT: No. I told you it works. The clock

11    doesn't start 'til the opening stages. Just introduce yourself

12    and your staff, please.

13          MR. ARMSTRONG: Good morning, everyone. My name is

14    Scott Armstrong. I'm a prosecutor from the Department of

10:52    15    Justice. I have the honor and the privilege of representing

16    the United States in this case. I am joined by my trial

17    counsel, Devon Helfmeyer.

18          MR. HELFMEYER: Good morning, ladies and gentlemen.

19          THE COURT: They can't see you behind the pole.

10:52    20          MR. HELFMEYER: Good morning.

21          MR. ARMSTRONG: Also from the Department of Justice is

22    our paralegal specialist, Saba Mortezavi.

23          Joining us at counsel table are the two case

24    agents in this case from the Drug Enforcement Administration.

10:52    25    First, James Gainer.

THE COURT:  Come up here, sir.

CASE AGENT GAINER:  Good morning, everyone.

MR. ARMSTRONG:  Second, Diversion Investigator Michael Mills.

DIVERSION INVESTIGATOR MILLS:  Good morning.

THE COURT:  These are the folks you will be seeing. Does anybody know either the attorneys or any of the case agents from the DEA, Drug Enforcement Administration?

Now, we will hear from defense counsel.  We have two defendants.  We have two attorneys, experienced defense lawyers.  Gentlemen, one at a time, please.

MR. LEWIS:  Good morning.  My name is Don E. Lewis, and I represent the defendant, Gazelle Craig, that's seated right here at the table.

MR. WILLIAMS:  Good morning, ladies and gentlemen --

THE COURT:  Hold it.  Dr. Craig, is she over there? Ask her to come forward.

MR. LEWIS:  This is Dr. Gazelle Craig, and I represent her.  My name is Don Lewis.

MR. WILLIAMS:  And I'm Cornel Williams.  I have the distinct honor this morning to represent Shane Faithful who is accused in this case.

THE COURT:  Mr. Faithful, come on forward.

Does anyone know the defendants or any of their clients, the two clients?

10:54    1              No hands.  Okay.

         2              I'm going to read you a list of witnesses.  These

         3    are government witnesses.  Keep in mind they may not call all

         4    of these witnesses, but I'm going to read off the names and see

10:54    5    if you recognize any of them.  I will tell Mayra, the court

         6    reporter, you can have a list of this later.  These are some of

         7    the possible witnesses or some of the names that are going to

         8    be floating around in this case:  Olivia Caldwell, Gina Garcia,

         9    Steven Gonzalez, Tonya Graham, Debbi Henneke, Michael Mills,

10:54   10    Shametra Morgan, Loren Phillips, Dr. Graves Owen, Cesar

        11    Saldana, Davis Webster, Gerrit Wolfhagen, James Gainer.

        12              Anybody recognize any of those names?

        13              No hands.  Thank you.

        14              One question lawyers sometimes ask and I will

10:55   15    ask:  Does anyone recognize any other member of the jury panel?

        16    Do you know anybody else, aside from when you were visiting

        17    perhaps downstairs?

        18              All right.  Does anyone feel so negative for any

        19    reason against the United States Government that you couldn't

10:55   20    be fair and impartial for the man and woman who are being

        21    accused today?

        22              Has anyone, any of you or anyone of your close

        23    family members or friends been investigated by a federal or

        24    state agency, to your knowledge?  I needed to add that.

10:56   25              Okay.  No hands.

You may hear -- now, you may hear testimony in this case by an individual or individuals who are paid government informers. If you are selected on the jury, you are going to get an instruction from me at the ending of the case. I'm going to read to you a portion of that instruction that you are going to get at the end of the case, but it's dealing with this possibility.

Keep in mind that it is in the past tense because you are going to hear this at the end of the trial, so this is part of the instruction you are probably going to get -- by the way, it comes out of the Fifth Circuit pattern for the attorneys. Okay?

The testimony of one who provides evidence against a defendant as an informer for pay must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by these circumstances, by the witness's interest in the outcome of the case, if any, by prejudice against the defendant or by the benefits that the witness may receive either financially or as a result of being immunized from prosecution.

I'm not sure there is any immunization that goes on, but maybe someone is just not going to be charged. I don't know. Now, this is the key: You should keep in mind that such testimony is always to be received with caution and weighed

10:57   1   with great care.  You should never convict any defendant upon

2   unsupported testimony of such witness unless you believe that

3   testimony beyond a reasonable doubt.

4               After hearing that instruction, is there anyone

10:57   5   here who could not follow that instruction?

6               Thank you.

7               If you are on the jury, you are also going to get

8   an instruction by the end of the case that you are the sole

9   judges of the credibility of the witnesses.  That's really

10:58  10   true.  There are two judges in any case.  I'm the judge of the

11   law, but you are the judges of the facts.  That's what we have

12   a jury for.  So you listen to the facts and then I will give

13   you the law which you should follow.  There is a saying, which

14   is true, as they say, that you are the judges of the facts.

10:58  15   You are the judges of the facts, and the believability and the

16   credibility and what weight to be given to a witness is

17   strictly up to you.

18               Anybody have a problem with this instruction or

19   this rule?

10:58  20               You may also hear from witnesses who are -- you

21   may also hear from a witness, at least one -- we're not

22   referring to the defendant because, remember, there is no

23   obligation that the defendant need to take the stand.  But we

24   assume that you may also -- you may hear from a witness who is

10:59  25   a physician.  Just because a person is a physician, for that

point alone, will you give that person more credibility only
because and for the sole reason that he or she is a physician?

Anybody?

No.

Now I'm going to talk about another group of
witnesses with the same sort of question. You may also hear
from witnesses who are employed by the government, such as law
enforcement and DEA agents. That is Drug Enforcement Agency
[sic] agents. Just because a person works for the government,
for that point alone, will you give that person more
credibility only and for the sole reason that he or she earns
their living as a law enforcement officer?

No hands.

In other words, every witness coming up,
regardless of what they do for a living, has to be weighed.
And that's up to you completely.

Does anyone here have such a problem with the
court system generally that you are unable to listen to the
evidence and render an unbiased verdict?

Some people have problems in civil cases. There
are too many personal injury cases or, in this case, maybe too
many criminal cases, but nobody has a problem relative to that
point? Correct?

No hands.

Does anybody here have religious beliefs that

would prohibit you from standing in judgment of another person?

Have any of you participated in a citizens police academy, police ride-along, explorer program, crime stoppers or similar experience working with the police?

Yes, sir? Want to stand up, please.

PROSPECTIVE JUROR: I'm Number 3, ████

THE COURT: I think it's Number 4.

PROSPECTIVE JUROR: I'm sorry. Number 4.

THE COURT: Credibility of witnesses. Okay. Go on.

PROSPECTIVE JUROR: I was in a police explorer post as a Boy Scout.

THE COURT: Whereabouts?

PROSPECTIVE JUROR: Akron, Ohio.

THE COURT: Akron, Ohio. What agency was it? Was it the sheriff or police department?

PROSPECTIVE JUROR: Akron Police Department.

THE COURT: Did you go on a ride-along?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Okay. Let me ask you this: Is there anything about that that would prohibit you from being fair and impartial in this case without having heard any of the evidence?

PROSPECTIVE JUROR: I don't believe so.

THE COURT: You don't believe so. Can you be fair?

PROSPECTIVE JUROR: Yes, sir.

11:01    1         THE COURT: Okay. Have you, a family member or close

2     friend ever been treated by a physician for chronic pain?

3                Yes, ma'am? You're number what, ma'am?

4         PROSPECTIVE JUROR: Number 21.

11:01    5         THE COURT: Yes, ma'am. Who was it?

6         PROSPECTIVE JUROR: Who was the doctor?

7         THE COURT: No. Who was it that was treated?

8         PROSPECTIVE JUROR: Me. Sorry.

9         THE COURT: How long were you treated for?

11:01   10         PROSPECTIVE JUROR: Six months.

11         THE COURT: Okay. Has that problem passed at this

12    time?

13         PROSPECTIVE JUROR: Yes, sir.

14         THE COURT: Is there anything about that fact that

11:02   15    would prohibit you from being fair and impartial in this case

16    without yet having heard any of the evidence?

17         PROSPECTIVE JUROR: No, sir.

18         THE COURT: Yes, ma'am?

19           Hold it. Everybody is thinking about, the older

11:02   20    you get, you are going to get more hands.

21            Number 27, yes, sir?

22         PROSPECTIVE JUROR: You said a family member?

23         THE COURT: Yes, sir.

24         PROSPECTIVE JUROR: My mother-in-law currently has

11:02   25    advanced lung cancer and she has been treated since October of

last year.

      THE COURT:  Do you know what sort of pain medication she's on?

      PROSPECTIVE JUROR:  Fentanyl, oxycodone, I think.

      THE COURT:  Do you understand that there are valid reasons and if people have pain, they are entitled to be treated by a physician, correct?

      PROSPECTIVE JUROR:  Correct.

      THE COURT:  Is there anything about that that would prohibit you from being fair and impartial in this case without having heard any of the evidence?  Do you have a concern?

      PROSPECTIVE JUROR:  No.

      THE COURT:  Okay.  Is that all right?  You are a little bit --

      PROSPECTIVE JUROR:  No concern.

      THE COURT:  Okay.  Great.  Have a seat.

      Yes, sir?  This is Juror Number?

      PROSPECTIVE JUROR:  Number 10.

      THE COURT:  Yes, sir?

      PROSPECTIVE JUROR:  My former wife had rheumatoid arthritis and was taking a lot of oxycodone.

      THE COURT:  Oxycodone?

      PROSPECTIVE JUROR:  Yes.

      THE COURT:  How long was she on that?

      PROSPECTIVE JUROR:  She has passed away.

THE COURT: She has passed away. To the best of your knowledge, she was on there.

Any negative feelings about that? Did it serve its purposes?

PROSPECTIVE JUROR: Yeah. But she got addicted to it.

THE COURT: She got addicted to it. Then at that point, we will call you up later. Okay. We will call you up later. It's not a negative that you have got to come see the judge, like going to the principal's office. Instead of doing it here, we will talk to you up front later.

Yes, sir? Do you want to stand up, please?

PROSPECTIVE JUROR: My brother-in-law --

THE COURT REPORTER: I cannot hear.

PROSPECTIVE JUROR: -- has been to various doctors for pain.

THE COURT: What sort of ailment does he have?

PROSPECTIVE JUROR: It is headaches. I'm not really sure.

THE COURT: Is he still on the medication?

PROSPECTIVE JUROR: Yes.

THE COURT: How long has he been on it, about?

PROSPECTIVE JUROR: Twelve years.

THE COURT: Twelve years. You know the allegations are in this case writing prescriptions. Is there anything about the facts of this case that you think would prohibit you

11:04    1   from being fair and impartial without having heard any of the

         2   evidence?

         3            PROSPECTIVE JUROR:  No.

         4            THE COURT:  Thank you, sir.

11:04    5                Let's see.  Yes, ma'am.  Number 42?

         6            THE COURT REPORTER:  Judge, I'm sorry.  I can't hear.

         7            PROSPECTIVE JUROR:  I'm sorry.  I'm presently on

         8   medication for chronic pain.  I have been for a number of

         9   years.

11:04   10            THE COURT:  I will tell you what.  If you have been

        11   on, yourself, for chronic pain, let's call this witness up

        12   later so we can move along.

        13                Yes, sir?

        14            PROSPECTIVE JUROR:  My wife, since 2011, she has had

11:04   15   multiple back surgeries due to both congenital issues and an

        16   accident, a pretty horrific accident, so she has been on

        17   oxycodone and muscle relaxers and then there is another one.  I

        18   forget the name of it.

        19            THE COURT:  How long has he been on it?  Ballpark?

11:05   20            PROSPECTIVE JUROR:  Since 2011, the first surgery.

        21            THE COURT:  Is she still on these medications?

        22            PROSPECTIVE JUROR:  Intermittently.

        23            THE COURT:  As needed?

        24            PROSPECTIVE JUROR:  As needed.

11:05   25            THE COURT:  Now, is there anything about that that

11:05  1 would prohibit you from being fair and impartial for these

2 folks without having heard any of the evidence?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Yes, ma'am?  Number 39?  I skipped over

11:05  5 you the first time.

6          PROSPECTIVE JUROR:  No.  I didn't think about it.  My

7 daughter-in-law is -- has congenital back pain and has been on

8 it for years.

9          THE COURT:  For years.  Okay.  We will call you up

11:05  10 later then.

11          Yes?  Ms. 46?  I'm sorry.  I don't have my list

12 with me.  When I get done calling you individually, I will get

13 your name.

14          PROSPECTIVE JUROR:  My grandmother takes oxycodone,

11:06  15 Norco and then my grandfather took morphine when he was in

16 hospice care.

17          THE COURT:  In the hospital?

18          PROSPECTIVE JUROR:  In hospice care.

19          THE COURT:  At home.  How long was he on that?

11:06  20          PROSPECTIVE JUROR:  He was on that for a few months.

21          THE COURT:  Is that kind of the end of life --

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  For the pain?

24          PROSPECTIVE JUROR:  Yes, sir.

11:06  25          THE COURT:  Who was it?  Your grandmother?

11:06    1          PROSPECTIVE JUROR:  Yes, sir.

         2          THE COURT:  What was she on or is on?

         3          PROSPECTIVE JUROR:  Norco.  Previously was on Norco

         4   and muscle relaxants for back pain.

11:06    5          THE COURT:  Is she still on it?

         6          PROSPECTIVE JUROR:  She is not because she is in

         7   kidney failure.

         8          THE COURT:  It had nothing to do then, as far as your

         9   doctors know, the best you know, due to the drugs, is that

11:07   10   correct, as best you know?

        11          PROSPECTIVE JUROR:  I do not know.  I'm sorry.

        12          THE COURT:  Let me ask you this:  You have heard the

        13   facts in this case.  Do you think you can be fair and impartial

        14   in this case without having heard any of the evidence?

11:07   15          PROSPECTIVE JUROR:  Absolutely.  However, I have to go

        16   to the bathroom.

        17          THE COURT:  Go on.

        18          MR. WILLIAMS:  I have got to go too.

        19          THE COURT:  I will tell you what:  What time is it

11:07   20   now?

        21          THE COURT REPORTER:  11:07.

        22          THE COURT:  Let's do this.  Kidding aside.  If anybody

        23   needs to use -- we have time.  We are going to get this done

        24   and get the jury selected.  It is moving along quickly.  If we

11:08   25   need to take a break, there are two lavatories right behind

this wall and there is another group of them all the way down at the end of the hall and turn left. I usually don't take a break, but if you have had a lot of coffee or whatever downstairs. Let's see, it is now 10 after, let's take a -- with this many people -- a 15-minute break and we will get back underway and wrap it up. Okay. So if you want to, you can stand. If you want to stay around here, you like the atmosphere of a courtroom. Nobody is excused from jury duty, and don't talk about this case, please.

*(Court recessed at 11:08 a.m.)*

*(Court resumed at 11:27 a.m.)*

THE COURT: I have got only one or two more general questions and then we will quickly go down the line and visit, if we can just briefly, with each one of you and see if there is something I want to ask and then we can move on.

All right. We are going to move quickly. We talked about chronic pain. Correct.

The next one is: Has anybody been affected or have a family member or close friend who you believe has been affected by the so-called opioid, what is it, epidemic?

Yes, sir? Number 42, the opioid epidemic?

Number 43, yes, ma'am? I'm going to get everybody's name, but we will call you up later.

Juror 42 is being called up already. That is ███████████ and ███████████ Correct? Got that?

11:28 1      PROSPECTIVE JUROR:  Number 3.

2      PROSPECTIVE JUROR:  Number 21.

3      THE COURT:  21.  Okay.  Thank you.

4      PROSPECTIVE JUROR:  Can I go back to the previous

11:28 5  question?  Because then we had the whole bathroom thing.

6      THE COURT:  What is that?  Stand up, if you would

7  please, ma'am.

8      PROSPECTIVE JUROR:  I was diagnosed with fibromyalgia

9  back in 2002, but I don't take anything for it.  Nothing.  And

11:28 10  then I have chronic migraines, for which I take a beta blocker.

11      THE COURT:  Would anything about that prohibit you

12  from being fair and impartial in this case?

13      PROSPECTIVE JUROR:  No, sir.

14      THE COURT:  Okay.  Thank you.  That was ▮▮▮▮▮▮▮

11:29 15      Has anyone here ever been prescribed hydrocodone,

16  which is also known as Vicodin.  And what else?

17      MR. WILLIAMS:  Norco.

18      THE COURT:  Let the record reflect that about one

19  half, at least, of the jurors raised their hands and now I ask

11:29 20  you this:  Is there anything, because you have taken that

21  medication, that would prevent you from being fair and

22  impartial in this case without having heard any of the evidence

23  and both sides -- nobody would be on the short end of your

24  having that background.  Anybody?

11:29 25      All right.  Has anyone here had any negative

11:29   1   experience with -- and the name is carisoprodol but generally

        2   known as Soma, or any other muscle relaxer -- let me ask you

        3   this first:  Has anyone here ever taken Soma?

        4               Your number, please?

11:29   5               Keep in mind, I think half the people raised

        6   their hand just for that.

        7               I'm going to ask you again, Ma'am, is there

        8   anything about that that would prohibit you from being fair and

        9   impartial in this case without having heard any of the

11:30  10   evidence?

       11               PROSPECTIVE JUROR:  No.

       12               THE COURT:  Thank you, ma'am.

       13               THE COURT REPORTER:  I didn't see her number.

       14               PROSPECTIVE JUROR:  I'm 28.

11:30  15               THE COURT:  Have you or a family member or close

       16   friend ever worked at a pain management clinic?

       17               Okay.  Yes, sir?  You are going to be coming up

       18   and visiting with us.  Thank you, sir.

       19               All right.  Yes, ma'am?  Let me get -- that's

11:30  20   █████████?

       21               PROSPECTIVE JUROR:  My mother works in a pain

       22   management clinic.

       23               THE COURT:  She works at a pain management clinic?

       24   How long has she worked at that clinic?

11:30  25               PROSPECTIVE JUROR:  Over 15 years.

11:30    1          THE COURT:  Okay.  We will call you up later also,

         2    okay.  Juror Number 26.

         3                Yes, sir?

         4          PROSPECTIVE JUROR:  My wife is a physician and she

11:30    5    deals with a lot of that at the VA clinic.

         6          THE COURT:  I see that she is a physician and she does

         7    some pain management work.  I will call you down.  I will visit

         8    with you as we go down the individuals.  I had it all marked

         9    here ahead of time.  Thank you.

11:31   10          PROSPECTIVE JUROR:  Thank you.

        11          THE COURT:  I'm going to broaden this out.  Have you

        12    or family member or close friend ever worked in a medical

        13    clinic?  I'm going to do go down quickly.  We will start, what,

        14    is it Juror Number 2?  Yes, ma'am?  What sort of a clinic?

11:31   15          PROSPECTIVE JUROR:  Cardiology office.

        16          THE COURT:  Cardiology.  Okay.  Yes?

        17          PROSPECTIVE JUROR:  I worked at several hospitals in

        18    the business office.

        19          THE COURT:  The business office.  Thank you.  Hold it.

11:31   20    Are you getting the numbers?

        21          UNIDENTIFIED SPEAKER:  Yes, sir.

        22          THE COURT:  This is Number 12.  Yes, ma'am.

        23          PROSPECTIVE JUROR:  I worked in a hospital.

        24          THE COURT:  What area, please?

11:32   25          PROSPECTIVE JUROR:  Early 1990s, I was a certified

1  nursing assistant and last couple years, sterile processing.

2  THE COURT:  Okay.  Yes, sir?  Number 13?

3  PROSPECTIVE JUROR:  My mother, my mother-in-law and

4  two aunts work as nurses.

5  THE COURT:  Whereabouts?  Any of them deal with pain

6  management?

7  PROSPECTIVE JUROR:  They worked there a long time ago,

8  at least 15 years ago.

9  THE COURT:  Fifteen years ago.  Did you visit with

10  them about their job?

11  PROSPECTIVE JUROR:  No.  Not really.

12  THE COURT:  I'm going to ask that general question as

13  to everyone who stood up.  Yes, sir?

14  PROSPECTIVE JUROR:  My sister is a physician.

15  THE COURT:  What sort of physician?

16  PROSPECTIVE JUROR:  She is a family practice doctor.

17  THE COURT:  Okay.  Does she do pain management?

18  PROSPECTIVE JUROR:  I imagine she does.

19  THE COURT:  Did you ever discuss that with her?

20  PROSPECTIVE JUROR:  No.

21  THE COURT:  Okay.  Yes, sir?

22  PROSPECTIVE JUROR:  My wife's ex-husband was a

23  vascular surgeon.  She worked in his office as a nurse.

24  PROSPECTIVE JUROR:  My mother works at a headache and

25  pain management clinic.

THE COURT: We talked about that. Yes, ma'am?

PROSPECTIVE JUROR: This may not qualify, but I'm a veterinary practice manager.

THE COURT: I saw that. I was going to ask you that.

PROSPECTIVE JUROR: I'm Number 29.

PROSPECTIVE JUROR: My brother is a physical therapist.

THE COURT: Okay. He doesn't prescribe, does he, as far as you know?

PROSPECTIVE JUROR: No.

THE COURT: Does he deal with pain measurement? Are you sure? Do you know?

PROSPECTIVE JUROR: Sometimes he is referred to patients with chronic pain, but he doesn't do anything other than PT on them.

THE COURT: Yes, sir?

PROSPECTIVE JUROR: My sister is a physician assistant.

THE COURT: And what sort of practice does she work with?

PROSPECTIVE JUROR: Number 24, I haven't the slightest idea, to be perfectly honest.

THE COURT: Thank you very much. What a brother, right? Yes, sir?

PROSPECTIVE JUROR: Number 6. I have a sister that --

11:33  1  she gives dialysis treatments.

2          THE COURT:  Okay.  Anybody else?

3                Yes, sir?  Number 40?

4          PROSPECTIVE JUROR:  My father is an internist and my

11:33  5  mom works in his office.

6          THE COURT:  What sort of -- general medicine?

7          PROSPECTIVE JUROR:  Yes.  Mostly diabetics.

8          THE COURT:  Most diabetics.

9                Ma'am, you need to stand up so everybody can

11:34  10  hear.  Yes?  This is Number 45.  Yes?

11          PROSPECTIVE JUROR:  I worked as a counselor in an

12  abortion facility.

13          THE COURT:  All right.  Thank you.

14                Yes, ma'am?  Number 36?

11:34  15          PROSPECTIVE JUROR:  Over 20 years ago, I was a CNA at

16  St. Luke's Hospital.

17          THE COURT:  CNA, certified nursing assistant.

18          PROSPECTIVE JUROR:  Yes.  And my daughter is a recent

19  grad, and she's a nurse right now.

11:34  20          THE COURT:  Yes, ma'am?

21          PROSPECTIVE JUROR:  I'm a registered nurse.

22          THE COURT:  You are coming up later, or not?

23          PROSPECTIVE JUROR:  No, sir.

24          THE COURT:  Not yet.  Talk to me about it, Number 46.

11:34  25  Well, what sort of, do you have any specialty?

11:34  1          PROSPECTIVE JUROR:  Emergency.

       2          THE COURT:  Okay.  Emergency medicine.  Whereabouts?

       3          PROSPECTIVE JUROR:  In the Bryan/College Station area

       4  and then I'm also an educator.

11:34  5          THE COURT:  Okay.  Thank you.  Yes, ma'am?  Number 30?

       6          PROSPECTIVE JUROR:  I'm a counselor with my church, so

       7  I get a lot of clients that come in, but I don't do any

       8  prescriptions.

       9          THE COURT:  Yes, sir?  This is number?

11:35 10          PROSPECTIVE JUROR:  Number 16.  My brother and father

      11  both worked for DMC in an administrative capacity.  My mother

      12  was an x-ray tech in an ER.  My sister and her husband are both

      13  veterinarians.

      14          THE COURT:  Thank you.  We have some folks --

11:35 15          PROSPECTIVE JUROR:  With the Veterans Administration.

      16          THE COURT:  I'm going to ask a general question.

      17  Everybody that raised their hands -- except there are a couple

      18  we have coming forward, that I ask you to come forward based

      19  upon that general question.  All right.  As to those who raised

11:35 20  their hands, except for the ones that said we will talk to you

      21  later, is there anything about the background that you have or

      22  your relative has that would prohibit you, you feel, from being

      23  fair and impartial in this case without having heard any of the

      24  evidence?

11:35 25          No hands from those folks, but we will call the

ones that we have designated.

Okay?  Earlier, I told you a little bit about this case.  Does anyone know or has anyone seen anything about this particular case in the media, to the best of your recollection, this particular case?

Number 27, we will call you up later, if you think you may have.  We'll talk to you later.

MR. ARMSTRONG:  Was that Number 27, Your Honor?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Yes, Number 27.  This is the last question and then I'm going to go down briefly, by the way, and talk with each juror quickly, individually, so you can get a feel for each individual.

Okay.  Some of the evidence in this case may include undercover audio and/or video recordings concerning parties in this case.

Does anyone feel that just the use of such technology would prohibit you from being fair and impartial to both sides as a juror in this case?

There are no hands.

I'm now going to go down quickly, so I will visit briefly with everyone and then we will start visiting up at the bench.

Okay.  Juror Number 1, ███████ medical sales. What sort of sales are you in, sir?

PROSPECTIVE JUROR:  Histology and pathology.

THE COURT:  Say that again.

PROSPECTIVE JUROR:  Histology and pathology.

THE COURT:  Histology, that's blood, isn't it?

PROSPECTIVE JUROR:  No, it's biopsy tissue.

THE COURT:  Okay.  And you have a bachelor's of science in genetics.  Did you study anything about pain management?

PROSPECTIVE JUROR:  None at all.

THE COURT:  In any part of your profession, do you get into that at all?

PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Okay.  Thank you.  ▓▓▓▓▓▓▓▓?

PROSPECTIVE JUROR:  ▓▓▓▓▓▓ yes.

THE COURT:  I see you put down type of work "nonapplicable."  Have you ever worked outside the home?

PROSPECTIVE JUROR:  Yes.

THE COURT:  At that time what, did you do, please?

PROSPECTIVE JUROR:  Cardiologist's office.

THE COURT:  Cardiologist's office?

PROSPECTIVE JUROR:  Yes.  Mostly.

THE COURT:  Who is the cardiologist?

PROSPECTIVE JUROR:  Dr. Nasser in The Woodlands, Texas.

THE COURT:  All right.  Thank you.

11:38   1          ████████    let's see, even though you may be

2    coming up later, I just want to briefly go down these matters.

3    Okay.  Business development, loan officer and security.  One

4    child is in security, it looks like, correct?  What sort of --

11:38   5    is that police or private security or what is that?

6          PROSPECTIVE JUROR:  I'm not sure I understand what I

7    put there.

8          THE COURT:  In other words, you stated here, right,

9    ████████right?

11:38   10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Children, you have male, 41; female, 34;

12    male 31.  Grown children's type of work, is it landscaping?

13          PROSPECTIVE JUROR:  My son is on parole.

14          THE COURT:  Oh, okay.  All right.  That's security.

11:39   15          ████████    what sort of technology?  I see you

16    are a software engineer.

17          PROSPECTIVE JUROR:  Oil and gas and manufacturing.

18          THE COURT:  And you have a brother who is in the

19    police department in Akron, Ohio?

11:39   20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  Do you ever discuss the business with

22    them?

23          PROSPECTIVE JUROR:  Very rarely.

24          THE COURT:  Do you know what position he is in in the

11:39   25    police department?

11:39    1          PROSPECTIVE JUROR:  He was a prison guard for a while

         2    and he was a beat cop.

         3          THE COURT:  Have you ever talked about the so-called

         4    opioid epidemic with him?

11:39    5          PROSPECTIVE JUROR:  No, sir, I have not.

         6          THE COURT:  All right.  Thank you.

         7          ██████████  it says you are an IT manager,

         8    correct?

         9          PROSPECTIVE JUROR:  Yes, sir.

11:39   10          THE COURT:  For who, sir?

        11          PROSPECTIVE JUROR:  I am currently unemployed and

        12    starting a new job next week.

        13          THE COURT:  Okay.  The VA, we talked about, you have a

        14    spouse that is a physician, correct?

11:39   15          PROSPECTIVE JUROR:  Yes, sir.

        16          THE COURT:  Did we discuss what sort of --

        17          PROSPECTIVE JUROR:  She is an internist working at VA

        18    Medical Center where she deals with all sorts of issues.

        19          THE COURT:  Deals with what?

11:40   20          PROSPECTIVE JUROR:  Different type of cases with all

        21    the veterans.

        22          THE COURT:  Okay.  So she is -- is she board

        23    certified?

        24          PROSPECTIVE JUROR:  Yes.

11:40   25          THE COURT:  And in what, internal medicine?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Any subspecialty?

PROSPECTIVE JUROR:  No.

THE COURT:  So she is doing general medicine, correct?

PROSPECTIVE JUROR:  Correct.

THE COURT:  I see that you have an MBA and a master of science.  What specialty?

PROSPECTIVE JUROR:  Master of science in information systems and computer information and MBA was in general business.

THE COURT:  Okay.  Thank you.

██████████ you have been with Gallery Furniture 19 years.  Is that correct?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  It says down here that you got, what is it, health and physical education, you got your degree in that.  Correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Has that been a while back?

PROSPECTIVE JUROR:  Yes.

THE COURT:  I guess --

PROSPECTIVE JUROR:  I graduated in 1972.

THE COURT:  Okay.  No concept of an opioid problem at that point as far as -- did you study any of that in school?

PROSPECTIVE JUROR:  No.

11:41   1        THE COURT:  Now I did see that you did serve on a

        2   murder case jury.  Correct?

        3        PROSPECTIVE JUROR:  Yes, sir.

        4        THE COURT:  Was a verdict reached?  Not what it was,

11:41   5   but was a verdict reached?

        6        PROSPECTIVE JUROR:  Yes.

        7        THE COURT:  Okay.  Thank you.

        8             █████████?

        9        PROSPECTIVE JUROR:  Yes.

11:41  10        THE COURT:  Let's see.  You were on a case concerning

       11   drug dealing, correct?

       12        PROSPECTIVE JUROR:  Yes.

       13        THE COURT:  How long ago was that?

       14        PROSPECTIVE JUROR:  About seven years ago.

11:41  15        THE COURT:  Seven years ago.  What court was it in?

       16        PROSPECTIVE JUROR:  It was in state court.

       17        THE COURT:  State, court district court?  Or county

       18   court?  I will not go into too much detail.

       19             Was a verdict reached in that case?

11:41  20        PROSPECTIVE JUROR:  Yes, sir, it was.

       21        THE COURT:  Okay.  Were you the presiding juror?  Were

       22   you the foreman of the juror?

       23        PROSPECTIVE JUROR:  No, I was not.

       24        THE COURT:  Okay.  Thank you.

11:42  25             ██████████ I know you are going to come up and

visit with us.

PROSPECTIVE JUROR:  No.

THE COURT:  She says no, not me.  Do you want to visit?  Let's see if we can find something to visit about.  University of Houston, Counseling, MED.  What is that?

PROSPECTIVE JUROR:  Master of education.

THE COURT:  Of education.  Okay.  And you have been with, what, HISD for 35 years?

PROSPECTIVE JUROR:  I'm retired.

THE COURT:  Okay.  Thank you.

████████?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  You were on a criminal case down here.  You did serve on a criminal case.  What sort of a criminal case?  Do you remember?

PROSPECTIVE JUROR:  It was 25 years ago.

THE COURT:  What did they charge the guy with?

PROSPECTIVE JUROR:  I believe it was murder.

THE COURT:  Okay.  Was there -- I see you reached a verdict.  Were you the foreman of the jury?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay.  Thank you.

████████  I see we are going to visit with you later.  Okay.  So we will keep moving.

████████  are you coming up later to visit with

11:43 1  us?  No.  Well, okay.  Do you want to?  I had to ask.

2  Let's see.  What is CSA?

3  PROSPECTIVE JUROR:  It's a customer service agent, but

4  I just got changed to account manager.

11:43 5  THE COURT:  Okay.  In what sort of a business?

6  PROSPECTIVE JUROR:  Insurance broker.

7  THE COURT:  You have somebody who was -- was it you

8  who were employed by the Department of Criminal Justice?

9  Somebody was a correctional officer and a parole officer?

11:43 10  PROSPECTIVE JUROR:  My husband.

11  THE COURT:  How long was he with them?

12  PROSPECTIVE JUROR:  It was before we were married.

13  I'm not sure.

14  THE COURT:  How long ago was that?

11:44 15  PROSPECTIVE JUROR:  At least 13 years ago.

16  THE COURT:  That you know of?

17  PROSPECTIVE JUROR:  Yeah.

18  THE COURT:  All right.  Thank you.

19  ████████████?

11:44 20  PROSPECTIVE JUROR:  Yes.

21  THE COURT:  I will tell you what.  If you are coming

22  up to visit with me later, as I get to you, let me know because

23  I won't go into those areas.

24  Ballard Aluminum, is that the family -- Ballard

11:44 25  Aluminum, is that the family business?

11:44  1           PROSPECTIVE JUROR:  Yes.  My husband and I own it.

2           THE COURT:  Let me ask you this:  I see you got a

3  degree and studied sterile processing at HCC.  What is that?

4           PROSPECTIVE JUROR:  We sterilize surgical instruments.

11:44  5           THE COURT:  Okay.  And let's see.  Anything to do

6  with -- what sort of -- do you go in the surgical suite and

7  consult with doctors or anything?

8           PROSPECTIVE JUROR:  No, I didn't.  Some areas did, but

9  my area, I didn't.

11:44  10          THE COURT:  Okay.  Thank you.

11          ██████  what is VAM?  Is that Veterans

12  Administration?

13           PROSPECTIVE JUROR:  It's the company I work for.

14           THE COURT:  What does it do?  You are an engineer.  I

11:45  15  see you got an ME.  You got a mechanical engineering degree.

16  What do you?

17           PROSPECTIVE JUROR:  I'm a mechanical engineer with VAM

18  U.S.A.  We do oil and gas pipe connections.

19           THE COURT:  I see you went to Columbia.  How did you

11:45  20  get down here?

21           PROSPECTIVE JUROR:  I'm from Houston originally.

22           THE COURT:  So you went up to Columbia?

23           PROSPECTIVE JUROR:  I went up to New York and didn't

24  like it.

11:45  25          THE COURT:  I grew up in that area.  I have a sign

that says, "I may not have been born here, but I got here as
quick as I could."  Every time I see all that snow, I don't
miss that at all.  But we do have some water problems down here
occasionally.  It comes in uninvited.

██████████ you are in human resources.  What is
NOV?

PROSPECTIVE JUROR:  National Oilwell Varco.

THE COURT:  Oh, sure.

PROSPECTIVE JUROR:  Oil and gas company.

THE COURT:  And you have a bachelor's of
communication.  You have been with them five years.  Did you
work anywhere before that?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Whereabouts?

PROSPECTIVE JUROR:  Apache Corporation, another oil
and gas company.

THE COURT:  You were not impressed with Apache, I
guess?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you very much.

██████████ Molina Healthcare, as an analyst,
what exactly do you?

PROSPECTIVE JUROR:  I'm a knowledge management
analyst.

THE COURT:  What is that?

11:46   1          PROSPECTIVE JUROR:  I oversee the strategy and

        2   structure and how we organize the information that we give to

        3   our customer service agents.

        4          THE COURT:  Okay.  And capital -- have you been a

11:46   5   witness in court?  Yes, capital facility fee dispute.  What was

        6   that about?

        7          PROSPECTIVE JUROR:  A developer sued the city I worked

        8   for because they paid a fee that they claimed nobody else paid.

        9          THE COURT:  All right.  ████████  software engineer.

11:46  10   Correct?

       11          PROSPECTIVE JUROR:  Yes.

       12          THE COURT:  You have a degree in mathematics and

       13   psychology?

       14          PROSPECTIVE JUROR:  Yes.

11:47  15          THE COURT:  Brother and father each worked for the

       16   VMAC?

       17          PROSPECTIVE JUROR:  That's what I brought up earlier,

       18   the VMAC.

       19          THE COURT:  I don't think we are calling you up later,

11:47  20   are we?

       21          PROSPECTIVE JUROR:  No.

       22          THE COURT:  Did we decide?

       23          PROSPECTIVE JUROR:  No.

       24          THE COURT:  That is what?

11:47  25          PROSPECTIVE JUROR:  Veterans Administration Medical

11:47  1  Center.

2  THE COURT: Are they all in an administrative

3  capacity?

4  PROSPECTIVE JUROR: That's right.

11:47  5  THE COURT: Okay. Thank you.

6  I'm on the second page here. That's encouraging.

7  You know what they all say -- I get some of these cases that

8  last years. They say, How do you handle a case like this? You

9  know how you handle it. It is like eating an elephant, one

11:47  10  bite at a time. You take one bite and before you know it, I'll

11  be done and then we will ask some questions and take a lunch

12  break.

13  So now, yes, sir, ████████████████?

14  PROSPECTIVE JUROR: Yes.

11:48  15  THE COURT: Yes, sir? What do you do for Halliburton

16  exactly?

17  PROSPECTIVE JUROR: I'm a technology manager. I

18  manage a group of about 30 people.

19  THE COURT: And you did serve in the Navy, correct,

11:48  20  the Swedish Navy?

21  PROSPECTIVE JUROR: Yes.

22  THE COURT: For a couple years?

23  PROSPECTIVE JUROR: Yeah.

24  THE COURT: What was your MOS -- your military

11:48  25  specialty?

11:48    1          PROSPECTIVE JUROR:  Electrical engineering.

2          THE COURT:  Electrical engineering.  Okay.  Thank you.

3          PROSPECTIVE JUROR:  My son wrote a position paper on

4 opioid crisis.

11:48    5          THE COURT:  Mark him down.  We are going to get our

6 naval officer up there.  Thank you for letting us know.  We

7 might as well go into it.

8          Ms. Johnson, you are at the McGovern, what is

9 that, Memorial -- the museum?  Isn't that the museum?

11:48   10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Are you the president?

12          PROSPECTIVE JUROR:  I'm the president and CEO.

13          THE COURT:  Is that the volunteer position or the

14 professional?

11:49   15          PROSPECTIVE JUROR:  The professional.

16          THE COURT:  So you are the COO, the chief operating

17 officer?

18          PROSPECTIVE JUROR:  I'm the CEO.

19          THE COURT:  And the CEO.  Okay.  What is your

11:49   20 background?  Any background in medicine?  I see that you have

21 some hospital administration?  Is that it?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  What is U of H?  Hospital?

24          PROSPECTIVE JUROR:  Hospitality manager.

11:49   25          THE COURT:  Ah, hospitality manager -- it ran out of

11:49    1    words.  Okay.  Hospitality manager.  Is this the first medical

         2    facility or the first medical-oriented facility that you have?

         3              PROSPECTIVE JUROR:  Yes.  That's correct.

         4              THE COURT:  Does the opioid epidemic or that sort of

11:49    5    thing come up in your business?

         6              PROSPECTIVE JUROR:  No.

         7              THE COURT:  All right.  Thanks.

         8              ██████████    Harris Healthcare System, correct?

         9              PROSPECTIVE JUROR:  Yes.

11:49   10              THE COURT:  What is Harris Healthcare Systems?

        11              PROSPECTIVE JUROR:  It used to be Harris County --

        12              THE COURT:  It used to be the Harris County Hospital

        13    District?

        14              PROSPECTIVE JUROR:  Yes.

11:50   15              THE COURT:  You have been with them 22 years.  What do

        16    you do as an AIP analyst?

        17              PROSPECTIVE JUROR:  AP analyst.

        18              THE COURT:  What is that?

        19              PROSPECTIVE JUROR:  Pay the bills for the district.

11:50   20              THE COURT:  Pay the bills?

        21              PROSPECTIVE JUROR:  Yes.

        22              THE COURT:  For the district.  Do you get any hands-on

        23    with any, sort of, patients or whatever?

        24              PROSPECTIVE JUROR:  No.

11:50   25              THE COURT:  All right.  Thank you.

11:50    1                    ███████████ remember, if you are coming up

2   later, let me know. Marketing manager. What is SemaSys?

3          PROSPECTIVE JUROR: It's point of purchase display

4   company, retail merchandising, that kind of thing.

11:50    5          THE COURT: You have a BBA. All right. Thank you.

6                    ████████████ you are coming up to visit a little

7   bit later? Right?

8          PROSPECTIVE JUROR: I think so.

9          THE COURT: Well, we need to write down Number 21. Is

11:50   10   she coming up later? Yes.

11             I see that you also have been a witness in court.

12   Correct?

13          PROSPECTIVE JUROR: Yes, sir.

14          THE COURT: And we will call you up about that also.

11:51   15   Remind me everybody, if you would, make note of that, that is

16   one area I want to go into also.

17            Thank you. We will call you up in a little bit.

18                ██████?

19          PROSPECTIVE JUROR: Yes.

11:51   20          THE COURT: You are a respiratory therapist. You have

21   a child who is a respiratory therapist and another one who is

22   an attorney. Right?

23          PROSPECTIVE JUROR: Yes.

24          THE COURT: Let's talk about the respiratory

11:51   25   therapist. What sort of practice does he or she have?

11:51 1          PROSPECTIVE JUROR:  He's in California.

2          THE COURT:  In California?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Does he get into anything with the opioids

11:51 5    as far as I know?

6          PROSPECTIVE JUROR:  That I do not know.

7          THE COURT:  Who is the attorney?

8          PROSPECTIVE JUROR:  My daughter, one of my daughters.

9          THE COURT:  Her name?

11:51 10         PROSPECTIVE JUROR:  Allison.

11         THE COURT:  What kind of an attorney is she, aside

12   from a good one?

13         PROSPECTIVE JUROR:  Family practice.

14         THE COURT:  Family practice.  So she does a lot of

11:51 15   family law work?

16         PROSPECTIVE JUROR:  Uh-huh.

17         THE COURT:  Divorce?

18         PROSPECTIVE JUROR:  And things like that.

19         THE COURT:  Does she work on her own or is she with a

11:52 20   firm?

21         PROSPECTIVE JUROR:  No.  On her own.

22         THE COURT:  That's an interesting practice.  At one

23   time, I was board certified in family law.  It's an interesting

24   practice.  You get a lot of calls at night though, which is

11:52 25   good.  Thank you so much.

11:52    1          PROSPECTIVE JUROR:  Yes, sir.

         2          THE COURT:  ███████████  what is Entelligence, with

         3  an E?

         4          PROSPECTIVE JUROR:  We do basically IT staffing.

11:52    5          THE COURT:  IT staffing.  But you have human resource

         6  developer.  Is that human resources or is that something

         7  different?

         8          PROSPECTIVE JUROR:  It's basically the same thing.

         9  That's what my degree was in.

11:52   10          THE COURT:  Yeah.  I understand that.  You have been

        11  with them less than a year.  Before that, did you work outside

        12  the home?

        13          PROSPECTIVE JUROR:  I was working for a different

        14  staffing agency for about five years.

11:52   15          THE COURT:  Okay.  Thanks.

        16          ████████████  NASA Space Center.  Cost/price

        17  analyst.  What do you do?  What exactly do you do?

        18          PROSPECTIVE JUROR:  I support a position with

        19  proposals that will get into various government contracts,

11:53   20  station center, that kind of thing?

        21          THE COURT:  Do you do a lot of contract work?

        22          PROSPECTIVE JUROR:  Yeah.  Just contract work.

        23          THE COURT:  Okay.  Thank you.

        24          ████████████  are we calling you up?

11:53   25          PROSPECTIVE JUROR:  No, sir.

11:53 1    THE COURT:  Your daughter is a nurse and your son is

2  an engineer.  Let's talk about your daughter being a nurse.

3  What sort of nurse is she?

4        PROSPECTIVE JUROR:  She actually hasn't started any

11:53 5  practice yet.  She has got three little boys.

6        THE COURT:  So she has a nursing degree, but she is

7  not working outside the home at this time?

8        PROSPECTIVE JUROR:  That's correct.

9        THE COURT:  Is she -- and your spouse is a retired

11:53 10 nurse?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  What sort of nurse was she when she was

13 active?

14        PROSPECTIVE JUROR:  She worked with her husband in the

11:53 15 office for a vascular surgeon and she also went to hospice at

16 the end of her career.

17        THE COURT:  Okay.  Aside from just where they work, do

18 you have any other personal knowledge as to any kind of drugs

19 or the opioid epidemic or anything through them?

11:54 20        PROSPECTIVE JUROR:  No, sir.

21        THE COURT:  Okay.  Thank you.

22        ███████████  you are coming up later?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  Not yet?  I thought I had a whole bunch of

11:54 25 people.  Maybe it is on the left over here.  Procurement

11:54    1    specialist, Bellicum Pharmaceuticals.  What sort of

2    pharmaceuticals do you work with?

3    PROSPECTIVE JUROR:  It's a clinical stage-one cancer

4    research company.

11:54    5    THE COURT:  Okay.  And let's see.  You got a

6    bachelor's of science in business, right, and also an MBA?  But

7    it is nothing to do with the medical aspect?

8    PROSPECTIVE JUROR:  Neither of my degrees, no.

9    THE COURT:  Okay.  Do you do anything concerning

11:54    10    prescribing drugs or drugs or so forth like that?

11    PROSPECTIVE JUROR:  I do buy raw materials to

12    manufacture drugs for cancer patients.

13    THE COURT:  That's it?

14    PROSPECTIVE JUROR:  Yes, sir.

11:55    15    THE COURT:  ███████  I think we are going to call

16    you up.  Accounting manager at Center Point Energy.  Yes, we

17    will talk to you in a moment.

18    ██████  Mustang Engineering, what sort of an

19    operation is that?

11:55    20    PROSPECTIVE JUROR:  It does engineering.

21    THE COURT:  What sort of engineering?

22    PROSPECTIVE JUROR:  I don't know.  I was an admin

23    secretary for all the administrative group.  I never paid much

24    attention to that.

11:55    25    THE COURT:  You got a, what is it, one child who is in

1  licensing for pharmacists?

2         PROSPECTIVE JUROR:  Uh-huh.

3         THE COURT:  Who is that?

4         PROSPECTIVE JUROR:  My daughter Brandy.

5         THE COURT:  What is her degree in?  I'm sure you paid

6  for it.

7         PROSPECTIVE JUROR:  I know I did.

8         THE COURT:  Yeah, I know about that.

9         PROSPECTIVE JUROR:  I'm not sure.  It has been too

10 many years ago.

11        THE COURT:  What does she do right now?

12        PROSPECTIVE JUROR:  She still works for the same

13 company, for the Pharmacy Board, and she has two children.

14        THE COURT:  What does she do for the Pharmacy Board?

15        PROSPECTIVE JUROR:  She was licensing the pharmacists.

16        THE COURT:  Do you ever discuss that with her, what

17 goes into her decisions as to whether someone should be

18 licensed or what should be done in the business?

19        PROSPECTIVE JUROR:  Years ago we did, but since the

20 grandkids came up, no.

21        THE COURT:  Does she live here?

22        PROSPECTIVE JUROR:  No.  She lives in Austin, Obelia

23 area.

24        THE COURT:  Have you discussed the opioid epidemic or

25 any problems concerning that with her?

11:56　　1　　　　　　PROSPECTIVE JUROR:  She is very aware of it.

　　　　2　　　　　　THE COURT:  I'm talking about with you?

　　　　3　　　　　　PROSPECTIVE JUROR:  Oh, with me?

　　　　4　　　　　　THE COURT:  Yeah.  Do you discuss that problem with

11:56　　5　　her at all?

　　　　6　　　　　　PROSPECTIVE JUROR:  With my daughter?

　　　　7　　　　　　THE COURT:  That's correct.

　　　　8　　　　　　PROSPECTIVE JUROR:  Yes.

　　　　9　　　　　　THE COURT:  Aside from that, is there anything you

11:56　　10　　feel would prohibit you from being fair and impartial to these

　　　　11　　folks, both sides, without having heard any of the evidence?

　　　　12　　　　　　PROSPECTIVE JUROR:  No.

　　　　13　　　　　　THE COURT:  Okay.  Thank you.

　　　　14　　　　　　PROSPECTIVE JUROR:  You're welcome.

11:56　　15　　　　　　THE COURT:  ████████  this says Panther Creek Pet

　　　　16　　Clinic.  Where is Panther Creek?

　　　　17　　　　　　PROSPECTIVE JUROR:  It's in The Woodlands.

　　　　18　　　　　　THE COURT:  You deal with things other than panthers?

　　　　19　　You never can tell.  I have been doing this for too long.  I'm

11:57　　20　　telling you.

　　　　21　　　　　　PROSPECTIVE JUROR:  I manage two small animal

　　　　22　　companion hospitals in The Woodlands.

　　　　23　　　　　　THE COURT:  Animal companion hospital, what does that

　　　　24　　mean?

11:57　　25　　　　　　PROSPECTIVE JUROR:  Dogs and cats.

11:57  1    THE COURT: You do it in the management area? Is that

2    correct?

3    PROSPECTIVE JUROR: Yes, sir.

4    THE COURT: Okay. Thank you so much.

11:57  5    By the way, you saw me make that comment. I have

6    learned all sorts of stuff in my years. In fact, we have had

7    people who have Ph.D.'s in bagging, Ph.D.'s in swimming pools.

8    I have had a master's degree in bus driving, all in major

9    cases, so everybody has a place.

11:57  10   In fact, I will visit you -- we will move on

11   quickly, but the reason why I'm such a believer in the jury

12   system is on that huge Stanford case, it ended up to be over

13   $10 billion in financial fraud. We had a Ph.D. in physics

14   sitting right next to a woman who was a retired hairdresser in

11:58  15   a rural county. That's what the jury system is all about. It

16   is really is. I'm telling you, I always use that as an example

17   because I'm a firm believer in that and only when people come

18   from a cross section of the community can the system work.

19   With that, we are going to move on.

11:58  20   THE COURT REPORTER: Judge, can I move it over to that

21   side of the courtroom?

22   THE COURT: Everything now is computerized. As Mayra

23   takes down what is going on, the words themselves come up on

24   the screen so -- and we also can get transcripts -- it used to

11:59  25   take transcripts -- if the lawyers wanted daily copy in big

11:59   1   cases, either civil or criminal, they have to have a court

        2   reporter come in for a half hour, take it, leave, go and

        3   dictate it and get it typed up.  Now a rough copy can be, what,

        4   about 15, 20 minutes after a day.  They can run a rough copy of

11:59   5   all the testimony.  It may not have everything spelled

        6   correctly.  But, Counsel, if you want to, you can step around

        7   here.

        8           Okay.  We are to Number 30.  We're moving

        9   quickly.

11:59  10           PROSPECTIVE JUROR:  I wish.

       11           THE COURT:  ███████████.  Or should I say Reverend?  I

       12   know you are a minister also.

       13           Okay.  You work for Sweetwater Financial

       14   Advisors?  Correct?

12:00  15           PROSPECTIVE JUROR:  Yes.

       16           THE COURT:  What did you do in that capacity?

       17           PROSPECTIVE JUROR:  Office manager.

       18           THE COURT:  What sort of business is that?

       19           PROSPECTIVE JUROR:  Financial advisor.

12:00  20           THE COURT:  As far as your church service, what do you

       21   do there, please?

       22           PROSPECTIVE JUROR:  I am the assistant pastor and then

       23   I do counseling.

       24           THE COURT:  During your counseling, have you dealt

12:00  25   with parents or youngsters that have been affected by the

12:00   1   opioid crisis?

        2           PROSPECTIVE JUROR:  No.  Drug addiction.

        3           THE COURT:  Drug addiction?  What sort of drugs?

        4   Cocaine?  Marijuana?  Heroin?

12:00   5           PROSPECTIVE JUROR:  Marijuana.

        6           THE COURT:  Meth?

        7           PROSPECTIVE JUROR:  No.  Meth yet.  My son though is

        8   meth addicted.

        9           THE COURT:  I will tell you what.  Why don't we call

12:00  10   you up so we can visit?  Number 30, we will call you up.

       11           ██████████  what is that Smart Shop?  What sort

       12   of a business is that?

       13           PROSPECTIVE JUROR:  It's a grocery store.

       14           THE COURT:  You have been with them, what, one year?

12:01  15           PROSPECTIVE JUROR:  Yes, sir.

       16           THE COURT:  Okay.  The Northside High School, you went

       17   up there.  Did you take any specialization in high school?

       18           PROSPECTIVE JUROR:  No, sir.

       19           THE COURT:  Got a general degree.  Is this the first

12:01  20   job outside of school or did you work somewhere else?

       21           PROSPECTIVE JUROR:  I used to work somewhere else.  I

       22   used to work at Kroger Company.

       23           THE COURT:  At Kroger?

       24           PROSPECTIVE JUROR:  In the warehouse.

12:01  25           THE COURT:  In the warehouse.  Okay.  Thank you.

12:01  1                    ██████████?

       2            PROSPECTIVE JUROR:  Yes.

       3            THE COURT:  You left employer blank, but then you

       4    wrote in "piano teacher."  And you majored in music, correct?

12:01  5            PROSPECTIVE JUROR:  It has been a long time.

       6            THE COURT:  You majored in what instrument?

       7            PROSPECTIVE JUROR:  Actually, I majored in vocal

       8    performance.

       9            THE COURT:  Vocal performance.  Have you ever sung

12:01  10   professionally?

       11           PROSPECTIVE JUROR:  I wanted to, but then I had kids.

       12           THE COURT:  I also wanted to play for the Brooklyn

       13   Dodgers but never got there.  I grew up in Brooklyn with the

       14   Brooklyn Dodgers, even met Jackie Robinson as a kid.  It is

12:02  15   really something else.  I was so excited when the Astros

       16   finally won.  In '55, Brooklyn won its only World Series in

       17   their history and then they moved to LA.  That's a useless act.

       18               Let's see you have a spouse that's -- your

       19   husband is a pediatrician?

12:02  20           PROSPECTIVE JUROR:  Yes.

       21           THE COURT:  We didn't say we would call you up?

       22   Right?

       23           PROSPECTIVE JUROR:  No.  They are kids.  They don't

       24   have chronic pain, I mean, from what he tells me.

12:02  25           THE COURT:  Not yet.  Not that they know of yet.

Let's put it that way.

PROSPECTIVE JUROR:  They are kids.

THE COURT:  Has he dealt with anything relative to the pain management problem or concern that they have nowadays?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Thank you, ma'am.

██████████  you are a pilot.  What sort of plane do you fly?  Are you a private pilot?

PROSPECTIVE JUROR:  It's a Gulfstream 550.

THE COURT:  How long have you been in the pilot business?

PROSPECTIVE JUROR:  Forty-five years.

THE COURT:  I see you were a captain in the U.S. Air Force?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  What sort of planes did you fly in the Air Force?

PROSPECTIVE JUROR:  It is like a 707.  It was a reconnaissance aircraft, a four-engine jet.

THE COURT:  Four-engine jet?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  The reason why I ask that, you may fly them, but the Hercules -- you know what that is -- the C-130, that's what I jumped out of in the military.

PROSPECTIVE JUROR:  Oh, yeah.

12:03 1    THE COURT:  People would say, You are nuts.  They fly

2   the plane.  I don't know why anyone would want to jump out of

3   them.

4          In jump school, it is a three-year course -- a

12:03 5   three-month course -- a three-week course.  It gets shorter and

6   shorter.  The first week, they separated the men from the boys.

7   The second week they separated the boys from the idiots.  And

8   the third week, the idiots jump out of the airplanes.  I don't

9   know if I have had any residual effect, but we always had full

12:04 10  respect because we used to get a briefing from the Air Force

11  every time before we went up.

12          We were in a -- you were a witness in court.  Is

13  that a discrimination case, corporate discrimination?

14          PROSPECTIVE JUROR:  Yes, sir, it was.  Couple things:

12:04 15  My sister died of a drug overdose 10 years ago.

16          THE COURT:  I think we probably ought to visit with

17  you.

18          PROSPECTIVE JUROR:  A couple things --

19          THE COURT:  If there is anything else, we can talk

12:04 20  about it when we get up there.  It is the safest thing to do.

21  Thank you, sir.

22          ███████?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  What do you do with the City of Houston?

12:04 25  PROSPECTIVE JUROR:  I work at the Houston Airport

Systems.

    THE COURT:  The Airport Systems?

    PROSPECTIVE JUROR:  Yes.

    THE COURT:  Doing what, sir?

    PROSPECTIVE JUROR:  Communication.

    THE COURT:  You don't take care of the captain's aircraft?  You don't know?

    PROSPECTIVE JUROR:  If they have an emergency, we will handle it on the ground.

    THE COURT:  All right.  Thank you, sir.

    ███████ you are with, what is it, Dr. Pepper, Snapple?  Correct?

    PROSPECTIVE JUROR:  Yes, sir.

    THE COURT:  I heard something on the radio this morning.  Did one of them buy the other?  Is there some sort of a merging?

    PROSPECTIVE JUROR:  There might have been a merger.  I don't know.

    THE COURT:  There was something about that on.  What was it?  I'm not dreaming, right?  Somebody is agreeing with me?

    PROSPECTIVE JUROR:  One was bought out.

    THE COURT:  One bought out the other.  Okay.

    What do you do there, sir?

    PROSPECTIVE JUROR:  Reset specialist.

12:05  1       THE COURT:  What specifically do you do?

2       PROSPECTIVE JUROR:  I'm in charge of setting up, I

3   guess, new accounts that Dr. Pepper has and I set it according

4   to a certain diagram.

12:05  5       THE COURT:  Okay.  Thanks so much.

6       ███████████ -- remember, if you are coming up,

7   let me know.  You have one child who is a nurse, and you are a

8   nurse yourself, correct?

9       PROSPECTIVE JUROR:  No.  I'm not a nurse.

12:06  10      THE COURT:  HCC, Stephen F. Austin.

11      PROSPECTIVE JUROR:  That's where I went to college,

12  but I did not finish.

13      THE COURT:  Oh, okay.  I see.  And you have a daughter

14  who is a student nurse?

12:06  15      PROSPECTIVE JUROR:  She is currently a -- she is a

16  nurse.  She graduated.

17      THE COURT:  At the VA Hospital?

18      PROSPECTIVE JUROR:  No, sir.  She worked at the VA but

19  she is a graduate.  She has been working for six months now and

12:06  20  she works at Texas Children's Hospital.

21      THE COURT:  What area is she assigned to?

22      PROSPECTIVE JUROR:  Cardiovascular ICU.

23      THE COURT:  Well, since you have a background in

24  nursing, and certainly your daughter, have you -- do you have

12:06  25  any opinions relative to the opioid problem that would affect

your ability to be fair and impartial in this case without
having heard any of the evidence?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  You're welcome.

THE COURT:  ███████ Shell Exploration and
Production, what do you do?  You say energy trading and
products.  What do you trade?

PROSPECTIVE JUROR:  I used to trade.  Now I do
acquisitions and integration.

THE COURT:  Integration, what does that mean?

PROSPECTIVE JUROR:  So when we buy a company, I make
sure that they conform to the way that we have to manage them
at Shell.

THE COURT: All right.  Thank you.  I knew I had a
structural engineer here.  ███████ see what I'm talking
about?  They wouldn't allow me to take that pole down.

PROSPECTIVE JUROR:  I think that's a good idea.

THE COURT:  Actually, you have a BSME.  Your
bachelor's is in mechanical and then structural engineering, a
master of science in civil engineering?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Now, what is it?  Government, somebody at
the Texas Attorney General's Office as an attorney.  Who is
that?

12:07    1          PROSPECTIVE JUROR:  My wife.

         2          THE COURT:  Wife.  Okay.  Is she still working there?

         3          PROSPECTIVE JUROR:  No.  She worked there for about

         4    nine months, I think.

12:08    5          THE COURT:  What division was she assigned to?

         6          PROSPECTIVE JUROR:  I'm not even sure.  I don't

         7    remember.

         8          THE COURT:  Okay.  Nothing relative to the criminal

         9    matter or health matters as far as you know?

12:08   10          PROSPECTIVE JUROR:  No.

        11          THE COURT:  Okay.  Thank you.

        12                     █████████  Social Security Administration.

        13          PROSPECTIVE JUROR:  Yes.

        14          THE COURT:  What area specifically do you work in?

12:08   15          PROSPECTIVE JUROR:  Supplemental Security Income, the

        16    SSI.

        17          THE COURT:  What about speech pathology?  Do you have

        18    a child in speech pathology?

        19          PROSPECTIVE JUROR:  Yes.  I have a daughter.

12:08   20          THE COURT:  It is sort of in health care.  Does she

        21    have her own practice or does she practice --

        22          PROSPECTIVE JUROR:  She works for an agency in Austin.

        23          THE COURT:  Also, I see you served on a criminal case,

        24    a robbery and an assault and a verdict was reached.  Were you

12:08   25    the presiding juror?

12:08  1          PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  Okay.  Thank you.

3          ███████████  you are an attorney, sir?

4          PROSPECTIVE JUROR:  I am, Your Honor.

12:08  5          THE COURT:  Okay.  What type of a practice do you

6  have?

7          PROSPECTIVE JUROR:  We mostly do hail insurance

8  litigation.

9          THE COURT:  What?

12:09  10          PROSPECTIVE JUROR:  Hail insurance litigation.

11          THE COURT:  You graduated, what is it, St. Mary's?

12  What year?

13          PROSPECTIVE JUROR:  2003 from law school.

14          THE COURT:  2003 from law school.

12:09  15          PROSPECTIVE JUROR:  And grad school.

16          THE COURT:  So you don't do any criminal law at all?

17          PROSPECTIVE JUROR:  No, Your Honor.  I did when I was

18  a baby lawyer but not now.

19          THE COURT:  What sort of practice did you have when

12:09  20  you first started out?

21          PROSPECTIVE JUROR:  Anything that walked in the door,

22  Your Honor.

23          THE COURT:  I remember those days.  Thank you, sir.

24          Let's see, ████████  you are also an attorney?

12:09  25          PROSPECTIVE JUROR:  Yes, sir.

1          THE COURT:  The firm that you are with is?

2          PROSPECTIVE JUROR:  Ware Jackson.

3          THE COURT:  You have been with them -- is that 11

4     years?  Did you practice in another firm prior to that?

5          PROSPECTIVE JUROR:  I think I have been with them

6     about seven and four, before that at Cozen O'Connor.

7          THE COURT:  What sort of practice do you have?

8          PROSPECTIVE JUROR:  General litigation.

9          THE COURT:  General litigation.  Do you do any

10    criminal law work?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  Do you do any healthcare work with

13    providers or with any insurance companies, to the best of your

14    knowledge?

15         PROSPECTIVE JUROR:  Not that I can think of.

16         THE COURT:  Okay.  Thank you.

17              ███████████  we are going to talk to you later,

18    correct?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Let me see if there is anything.  You have

21    some experience as a respiratory therapist.  You have had some

22    experience there?  Is that correct?

23         PROSPECTIVE JUROR:  On mine?

24         THE COURT:  Yes.

25         PROSPECTIVE JUROR:  Yes.

THE COURT: We will talk to you.

█████████ what sort of an operation is Triple Tap Ventures?

PROSPECTIVE JUROR: We manage the Alamo Draft House.

THE COURT: How many of those restaurants do you have?

PROSPECTIVE JUROR: Three.

THE COURT: Are they all local here?

PROSPECTIVE JUROR: Lubbock, El Paso and Houston.

THE COURT: All right. Thank you.

█████████ yes, sir? Chevron Trading, what do you do in trading?

PROSPECTIVE JUROR: I was both natural gas and later on crude oil, domestic and foreign.

THE COURT: You had some interesting -- you were on a traffic case, including bail jumping or two separate cases.

PROSPECTIVE JUROR: Yes.

THE COURT: It was two separate cases?

PROSPECTIVE JUROR: There was two separate cases.

THE COURT: On either one of those, were you the foreman of the jury?

PROSPECTIVE JUROR: I was.

THE COURT: You were in both of them or one of them?

PROSPECTIVE JUROR: No. On the -- it was on the bail jumping.

THE COURT: Okay. Thank you.

12:11   1                    ███████████    you are a retired teacher.  What

2    subject did you teach?

3                    PROSPECTIVE JUROR:  English.

4                    THE COURT:  Whereabouts?

12:11   5                    PROSPECTIVE JUROR:  In Toledo, Ohio.

6                    THE COURT:  Your son is a diplomat, correct, with the

7    State Department?

8                    PROSPECTIVE JUROR:  He was, but he just quit his -- he

9    is an expert on counterterrorism and sanctions, and he worked

12:12  10    between the White House and the UN.  But he quit his job two

11    weeks ago and now -- he just started Monday -- he is the vice

12    president of a company called Pharma.

13                    THE COURT:  Is that a drug company?

14                    PROSPECTIVE JUROR:  It's a conglomeration of drug

12:12  15    companies, and his job is to advocate for intellectual property

16    at the UN.

17                    THE COURT:  Intellectual property at the UN.  Does he

18    do anything as far as you know with anything concerning the

19    opioids?

12:12  20                    PROSPECTIVE JUROR:  No, no, no.  It's general -- the

21    possession -- the importance of intellectual property.

22                    THE COURT:  What sort of degree does he have?

23                    PROSPECTIVE JUROR:  He has a master's from the Woodrow

24    Wilson School.

12:12  25                    THE COURT:  Princeton.  What about undergraduate?

12:12    1          PROSPECTIVE JUROR:  Ohio State.

         2          THE COURT:  Okay.  Thank you so much.  ███████

         3   are we going to visit later?

         4          PROSPECTIVE JUROR:  No, I don't think so.

12:12    5          THE COURT:  I talked to you a lot here.

         6               Medical education, is there anything else you

         7   need to talk to us about?

         8          PROSPECTIVE JUROR:  I don't think so.

         9          THE COURT:  Have we covered everything about your

12:13   10   medical education?  And you have got a bachelor's degree in

        11   biomedical science.  Does that any of that have to do with

        12   drugs, opioids, any kind of narcotics, any kind of -- you tell

        13   me.

        14          PROSPECTIVE JUROR:  As a nurse, I have administered

12:13   15   them.

        16          THE COURT:  You administered them.  Okay.  How long

        17   were you a practicing nurse?

        18          PROSPECTIVE JUROR:  I just quit hospital in November.

        19          THE COURT:  Okay.  What sort of -- what was your

12:13   20   specialty, generally?

        21          PROSPECTIVE JUROR:  Emergency.

        22          THE COURT:  Did you see people coming in with

        23   overdoses?

        24          PROSPECTIVE JUROR:  Yes, sir.

12:13   25          THE COURT:  Did you treat them?

12:13  1          PROSPECTIVE JUROR:  Yes, sir.

       2          THE COURT:  Is there anything about that that would

       3   prohibit you from being fair and impartial in this case without

       4   having heard any of the evidence?

12:13  5          PROSPECTIVE JUROR:  No, sir.

       6          THE COURT:  Okay.  Thank you.

       7          ███████████  you are a network engineer for Rowan.

       8   What kind of a company is Rowan?

       9          PROSPECTIVE JUROR:  Oil and gas.

12:14 10          THE COURT:  Oil and gas.  You have been with them 12

      11   years.  Were you employed at another company before that?

      12          PROSPECTIVE JUROR:  Cisco Systems.

      13          THE COURT:  Okay.  And it says, what is it, you have a

      14   bachelor's of science of, what is it, range management?

12:14 15          PROSPECTIVE JUROR:  Yes.

      16          THE COURT:  What is that, sir?

      17          PROSPECTIVE JUROR:  Maintaining a safari park.

      18          THE COURT:  Pardon me?

      19          PROSPECTIVE JUROR:  Safari park, like a nature

12:14 20   reserve.

      21          THE COURT:  Oh, okay.  It looks like you had two

      22   different interesting careers.

      23          PROSPECTIVE JUROR:  Yes.

      24          THE COURT:  Ladies and gentlemen, I'm going to give

12:14 25   you a schedule of what we will be doing in just a moment.  I'm

12:14 1    going up and I'm going to go back to my desk and go talk to the

2    attorneys, and we will set a schedule.

3           Okay. Thank you so much. We have moved along

4    very quickly for this size of a panel.

12:16 5    *(At the bench)*

6           THE COURT: What do you think we ought to do? Should

7    we let them go except for the people I want to talk to and give

8    them general instructions about not talking at the lunch break

9    and so forth, and we will give them enough time that it is not

12:16 10    going to penalize the people that have to come up and talk with

11    us? Anybody have a problem with that?

12           MR. ARMSTRONG: No.

13           THE COURT: Anything else we need to go into?

14           MR. LEWIS: I think we had one person that didn't

12:16 15    answer the question.

16           THE COURT: We'll get to that one in a moment. Who

17    was that?

18           While we are doing it, let's see if I have a

19    question and I want to call somebody up that I didn't

12:16 20    designate.

21           MR. LEWIS: On Juror 41, I had a question. He

22    indicated that he or someone he knew had been treated for

23    chronic pain for 12 years and taking medication for that, but

24    he never indicated what meds.

12:17 25           THE COURT: Okay. We will call him up for that one

12:17    1    quick question.  We have got to move quickly here.

         2              Step down, gentlemen.

         3         *(Open court)*

         4              THE COURT:  We are going to do something unique, here.

12:17    5    By the way, we do need to see ██████ also.  So put yourself

         6    down.  We need to talk with you just briefly about one thing

         7    that came up.  I just talked to the attorneys.  That's the only

         8    thing additional we have.

         9              Ellen, do you have a list of numbers?

12:17   10              I'm going to give you -- we are going to take a

        11    lunch break at this time.  It is going to be a little longer

        12    than usual because this is what we are going to do:  We are

        13    going to announce the people who I need to speak to.  We are

        14    going to move quickly, okay, but you are coming up and visiting

12:17   15    up here.  And we will do that during the lunch break.

        16              The rest of you can go and we will give plenty of

        17    time for even the ones coming up here to take a full lunch

        18    break.  I think that is the fairest thing to do rather than

        19    having all of you sit there while we talk to one at a time.

12:18   20              We will read off the numbers in a moment as to

        21    who we need to talk to.  I assure you it is going to go quick.

        22    It went quickly down the line, but the attorneys may have a

        23    question or two.

        24              I'm going to go give you some general

12:18   25    instructions.  We are going to take a lunch break.  During the

12:18   1   lunch break, you are not to discuss this case with anyone,

2   including with each other.  When you get back here after the

3   lunch break, we will announce who is on the jury and we are

4   going to get right --

12:18   5       *(Off the record discussion)*

6           THE COURT:  Okay.  So when we come back here, we will

7   start the case, opening statements and get right into the

8   evidence on this case, so we are going to move pretty quickly.

9   We have everybody who raised their hands or whatever, had a

12:19   10  concern.  I'm going to ask you one last question, keeping in

11  mind this is an extremely short case for federal court, if

12  there is anything -- hang on, behind the pole, where I can see

13  everybody.  Okay.  Wait a second.

14          Now, that's why I try to sit on an angle.  If

12:19   15  there is anything else I haven't asked or hasn't been brought

16  up that you think would affect your ability to sit on this

17  jury, please raise your hand.  Okay.

18          Now, let's explain what will happen.  After we

19  get everybody's information, after we talk to everybody -- we

12:19   20  have your names on sheets.  Okay.  The government has the same

21  names as the defendants.  Once -- they can make strikes for

22  whatever reason they want.  My case manager will put both the

23  government sheet and the defense sheet side by side.  She will

24  go down it with a ruler and the first 14 names that have no

12:20   25  strike on the government sheet or the defense sheet forms the

12:20  1    jury.

2         So if you go home and tell somebody that you have

3    been selected to serve on a jury, no, it's a matter of

4    elimination, not a matter of selection.  So they wanted

12:20  5    somebody off worse than having you on.  Sorry for that.  You

6    can say you have been selected, but that's how the system

7    works; state court, federal court, civil and criminal.

8         So we are going to take a break, but let me tell

9    you that you are not excused from jury duty.  Why do I say

12:20  10   that?  In my experience -- for instance, a voir dire like

11   this -- we have fellow attorneys that practice in both.  A voir

12   dire like this can take a whole day or maybe longer on the

13   state system.

14        We started at what time, Ellen?  10:00, no,

12:21  15   10:15?  And what time is it now?  It is 12:15, so we moved

16   along pretty quickly.  But in any event, you are not excused

17   from jury duty.

18        In state court, I was doing mostly civil cases.

19   We took a break because they went on and on because the judge

12:21  20   has got to let you do more voir dire in state court.  One juror

21   went outside and said he had enough of this damn jury duty.  He

22   went to work.  We knew where he worked.  And there we had

23   sheriffs instead of marshals.  We have U.S. Marshals here in

24   this case.  But, anyhow, we called his name.  He wasn't there.

12:21  25   Now, we knew where he worked.  Some of you that may remember a

12:21  1  few of the, shall we say, more senior members of the panel,

2  when I was down in state court, closer to Allen's Landing -- if

3  you go down where the train is now on Main Street, there were

4  two types of stores basically in the old days down there.  You

12:21  5  had, what is it, you had shoe stores and pawn shops, P-A-W-N.

6  That's what you had basically.  Why do I spell pawn out?  I had

7  been on the federal court about 10 years ago and one of the

8  court reporters came and said, "When you give that talk to the

9  jury about pawnshops, how do you spell that?"  Oh, my God, all

12:22  10  of the transcripts going up to the circuit had P-O-R-N on it,

11  so I spell it out.  But, anyhow, he was a salesman there, so I

12  told the sheriff, I told the deputies, Go out and get him.

13  Give him the full business with the raid jackets.  They went

14  out with the sirens going and the lights.  They pull up in

12:22  15  front of the shoe store, and he is fitting a woman with a pair

16  of shoes.  They go and they nail him, they cuff him and they

17  bring them back.  Now he comes right back in front of the same

18  panel because the voir dire kept going on, and they knew he had

19  some money in his pocket.  I sentenced him -- I held him in

12:23  20  contempt and I said, "I sentence you to a $100 fine and three

21  days in the county jail."  Oh, boy, I had his attention,

22  together with the other members of the jury, of course.  But we

23  knew he had the money, so he went down and paid it and they

24  brought him back up.  I gave him three days in the jail.  But

12:23  25  as an alternative, for the next seven business days, at 9:00

a.m. and at 12:00 noon to report to that central jury room over there and listen to those juror lectures over and over again.

If you have been on state jury duty, for the last 20 years, at least, they use a videotape. But back then, it was our opportunity, if we were the jury judge, to visit with 400 jurors in the morning and 400 in the afternoon. And these were all voters. So you would get a combination of orientation and campaign lecture. So he listened to that for 14 times. I know we won't have any problem here.

The only other problem I had, it was a gorgeous day out and one juror was missing when we came back. I talked to everybody else. They saw him in the tunnel, and so I sent the marshals out to look for the guy. Make a long story short, they found him dead asleep in the sun out in Tranquility Park. Those are the two problems. I know we won't have that here.

Those of you not familiar with the federal area, we have a really good cafeteria on the first floor. If you want to go outside for your lunch, you go across Smith Street and anything on the street, but you go into the lobby of the Bank of America building. It's that red brick building with kind of the gothic spires on it. There is an escalator going down, and you look up and there is the entrance to the whole downtown tunnel system right there.

Now, I want to talk to my case manager and the attorneys for about 30 seconds to determine how much time we

12:24  1  need and how much time to give you for lunch and not to

2  prejudice the other folks that are going to have to wait around

3  a little bit.

4          Okay.  Ellen, gentlemen, come on up.  Off the

12:25  5  record.

6      *(Off the record discussion)*

7          THE COURT:  Ladies and gentlemen, these are the

8  folks -- check your numbers, Number 10 included.  You have got

9  your number and check these numbers.  These are the ones we

12:26  10  will have to talk to just briefly after everybody else leaves.

11          Go on.

12          Ellen, what numbers?

13          THE CASE MANAGER:  Juror Number 3.

14          THE COURT:  If you would, raise your hand at the time.

12:26  15          THE CASE MANAGER:  Juror Number 10, 17, 21, 26, 27,

16  30, 33, 39, 41, 42, 43, Number 12 and Number 37.

17          THE COURT:  Okay.  We are going to take you in

18  sequence.  Now, those of you, we are going to take a break

19  which is longer than usual.  I don't want you having to wait

12:27  20  outside.  And, keep in mind, the lawyers and the staff have to

21  take a break also.  I assure you, once we take the lunch break,

22  you will come back in, we will determine who is on the jury at

23  that time.  We will have all the strikes made and so we will

24  proceed real quick when you get back in.  So we are going to

12:27  25  ask the folks who raised their hands to remain in the

12:27  1    courtroom.  It sounds like a long time, but the attorneys are

2    going to have to make their strikes and do everything before

3    you get back up.  Then Ellen has to arrange all the paperwork.

4    It is going to be a little longer than usual, but we need to

12:27  5    hear each of you up here, the questions we have or whatever.

6    So I apologize.  No break is even going to come close.  Usually

7    the lunch break is an hour and a quarter, which allows you to

8    get out for lunch and to go through security back and forth.

9    We will take a little bit longer because I have so many fellow

12:28  10   jurors that have to come up and then they need to take a break.

11              So we are going to get back in -- it is now

12   12:30.  We are going to ask the jurors to be back outside this

13   courtroom ready to be re-seated at 2:30.  We are not going to

14   be goofing off during that time.  We are going to be talking to

12:28  15   jurors.  We are going to be making the strikes, getting all the

16   paperwork done.  I just don't want you to get back and have all

17   of you at that time waiting in the hallway until we get it

18   done.  I assure you after that you are not going to have that

19   long.

12:28  20              I will say this also.  Since it is a timing

21   order, whenever jurors will go into the jury room, we have to

22   talk about something, the clock is on.  I make notes with each

23   witness, and I also write in red what goes on when you are out

24   in the jury room, when you are out of the courtroom, so later

12:29  25   on I come visit with you and tell you what went on.

12:29  1        I apologize for the length of it.  Thank you for

2  your cooperation.  We couldn't do it without you.

3        So, aside from those individuals who we need to

4  talk to, everybody please be back outside this room at 2:30.

12:29  5  We will see you at that time, and we are going to get right

6  into the other jurors as soon as they leave.

7     *(At the bench)*

8        THE COURT:  Why don't you come on up here?  Ellen will

9  take them in numerical order.  Okay?  What we are going to do,

12:29  10  gentlemen, we are going to have the jurors come up here.  They

11  will step in that corner.  They will come up here and then we

12  will come forward after that.  But come on up for now.

13        Number 3, is this the one that raised her hand

14  late or not?

12:30  15        MR. ARMSTRONG:  This is the juror who raised her

16  hand --

17        THE COURT:  Hold it a second.  I think we have another

18  customer coming up.  Have we got one more?

19        Step back a little bit, but when they come up

12:30  20  here, that's the microphone.

21        What is this one?

22        MR. ARMSTRONG:  Your Honor, this is the juror who

23  raised her hand about the opioid epidemic.  She says she has an

24  issue.

12:30  25        THE COURT:  An issue.  Okay.

1    *(Open court)*

2    THE COURT:  Ms. Brown, please, Number 3.

3    *(At the bench)*

4    MR. LEWIS:  She also mentioned that she has a relative

5  on parole.

6    *(Open court)*

7    THE COURT:  We are going to take people in numerical

8  order.  If anybody has to use the facilities, you are welcome

9  to do so, but we need the lower numbers to remain here so we

10  can get right in sequence.

11    *(Prospective Juror 3 approached the bench)*

12    *(At the bench)*

13    THE COURT:  Yes, ma'am?  You said you had some sort of

14  a concern and you wanted to discuss the opioid epidemic.

15    PROSPECTIVE JUROR:  Right.

16    THE COURT:  This is your microphone.  Step back about

17  a half a foot.

18    Counsel, come on in around this way.

19    Yes, ma'am?

20    PROSPECTIVE JUROR:  My ex-son-in-law, he has abused

21  hydrocodone.  My daughter was on hydrocodone, managing some

22  disease, Crohn's disease, along with rheumatoid arthritis, and

23  she was taking some injection type things.  Bottom line is that

24  he stole it; he would take it from her.

25    THE COURT:  You have a concern about being fair and

12:31 1  impartial on this kind of a case?

2     PROSPECTIVE JUROR: Yes.

3     THE COURT: Any questions?

4     MR. ARMSTRONG: No.

12:32 5    MR. LEWIS: No questions.

6     MR. WILLIAMS: No questions.

7     THE COURT: Thank you, ma'am. You are free to leave

8  and come back at 2:30.

9   *(Prospective Juror Number 3 departed the bench)*

12:32 10  *(At the bench)*

11     THE COURT: Do we have any challenges?

12     MR. ARMSTRONG: The United States makes a challenge

13  for cause.

14     MR. WILLIAMS: No objection.

12:32 15    THE COURT: Move in. I don't want them to see me with

16  a pen. Because if they see me with a pen, I will end up with a

17  run on the panel.

18      Number 3 is struck for cause. Correct?

19     MR. ARMSTRONG: Correct.

12:32 20    MR. WILLIAMS: Correct.

21     THE COURT: Next one, Ellen?

22     THE CASE MANAGER: Number 10?

23     THE COURT: What is Number 10?

24     THE CASE MANAGER: Wife is addicted to oxycodone.

12:32 25  *(Open court)*

12:32   1      THE COURT: Come on up, sir.

2      *(Prospective Juror 10 approached the bench)*

3      *(At the bench)*

4      THE COURT: What was it that you wanted to visit with

12:33   5  us about?

6      PROSPECTIVE JUROR: Well, my former wife had

7  rheumatoid arthritis and she is also a medical doctor. She did

8  a pain survey in Arizona. She was a radiation oncologist. She

9  went to Sloan Kettering Pain Clinic in New York City, but

12:33  10  eventually, you know, she died, passed away. But I think she

11  was addicted at the end to her own medical condition.

12      THE COURT: Okay. Questions?

13      MR. ARMSTRONG: Did that experience -- would anything

14  about that experience give you difficulty being fair and

12:33  15  impartial in this case?

16      PROSPECTIVE JUROR: I think I could be fair and

17  impartial, but it has obviously impacted me.

18      MR. WILLIAMS: I don't mean to be pushy with that, but

19  we need to be clear.

12:33  20      THE COURT: I can't hear you.

21      MR. WILLIAMS: I don't mean to be pushy about my

22  question, but we need you to be either one side or the other.

23  Either you can or you can't.

24      THE COURT: Do you have any problem in this kind of a

12:33  25  case?

12:34   1          MR. WILLIAMS:  In this kind of a case when you know

2    there is going to be -- you heard about the facts --

3          PROSPECTIVE JUROR:  It's one of these things that I

4    can be fair and impartial for everything, you know, so I'm

12:34   5    going to tell you I think I can be fair and impartial, but I

6    want to be honest with you guys about my experiences and my

7    background.

8          THE COURT:  Any further questions?

9              No further questions.  Thank you, sir.  You may

12:34  10    step down.

11        *(Prospective Juror Number 10 departed the bench)*

12          THE COURT:  Do we have any challenges on Number 10?

13          MR. ARMSTRONG:  No, Judge.

14          MR. WILLIAMS:  Challenge for cause, Judge.

12:34  15          THE COURT:  Why?  Just get the reason in the record.

16          MR. WILLIAMS:  Judge, I believe he is saying he thinks

17    he can be fair and impartial, but he has had experience with

18    opioid use directly with his wife that has caused --

19          THE COURT:  And even during his last statement, there

12:34  20    was a "but."

21              Move in closer, please.  This is number what?

22          MR. ARMSTRONG:  Number 10.

23          THE COURT:  Number 10 is struck for cause.

24              Next one?

12:35  25        *(Open court)*

`12:35` 1        THE COURT:  Number 12?

2        *(Prospective Juror 12 approached the bench)*

3        *(At the bench)*

4        PROSPECTIVE JUROR:  Mine has nothing to do with

`12:35` 5   opioid, but it has to do with the way I answered the question

6   on my application.

7        THE COURT:  Yes, ma'am.

8        PROSPECTIVE JUROR:  I guess -- I was arrested, so I

9   guess I was unclear about the deferred adjudication.

`12:35` 10       THE COURT:  Sure.  How long ago?

11       PROSPECTIVE JUROR:  1990, '91.

12       THE COURT:  For what?

13       PROSPECTIVE JUROR:  Shoplifting.

14       THE COURT:  That was misdemeanor court?

`12:35` 15       PROSPECTIVE JUROR:  Yes.

16       THE COURT:  And you served what?  Deferred

17  adjudication?

18       PROSPECTIVE JUROR:  Uh-huh.

19       THE COURT:  Any questions?

`12:35` 20       MR. ARMSTRONG:  Do you think the prosecutors treated

21  you fairly or unfairly in that case?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  They didn't treat fairly?

24       PROSPECTIVE JUROR:  I thought you said unfairly.  They

`12:35` 25  treated me fairly.

12:35   1          THE COURT:  Any questions?

2          MR. WILLIAMS:  Is there anything about that experience

3   that would cause you to be biased for one side or the other in

4   sitting on this particular jury?

12:35   5          PROSPECTIVE JUROR:  No, sir.

6          THE COURT:  Thank you, ma'am.

7          PROSPECTIVE JUROR:  Thank you.

8      *(Prospective Juror Number 12 departed the bench)*

9          THE COURT:  Any challenge on Number 12?

12:36   10          MR. ARMSTRONG:  No.

11          MR. WILLIAMS:  No, Judge.

12          THE COURT:  Who is next, Ellen?

13          THE CASE MANAGER:  Number 17.

14      *(Open court)*

12:36   15          THE COURT:  Number 17, we are not ready.  We have got

16   to find your sheet in here.

17      *(Pause)*

18          THE COURT:  Now, come on up, sir.

19      *(Prospective Juror 17 approached the bench)*

12:36   20      *(At the bench)*

21          THE COURT:  You said that -- I believe your son wrote

22   a paper.

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  What school?

12:36   25          PROSPECTIVE JUROR:  So my son is 13.  He is going to

12:36   1   Beckendorff Junior High, but my sister-in-law, she is a family

2   physician in Malaysia and she is also setting policy and things

3   like that.  So we did a lot of interviewing with him on how she

4   is trying to change the policy in Malaysia for this.  And she

12:37   5   is also coordinating for the doctors in Malaysia, so she has

6   done a lot of work and it is something we discussed quite a bit

7   about this.

8        THE COURT:  What was your son -- you said in junior

9   high school?

12:37   10       PROSPECTIVE JUROR:  Yes.

11       THE COURT:  What grade did he get on it?

12       PROSPECTIVE JUROR:  He got a high grade.  He did a

13   video on it and a paper on it.

14       THE COURT:  Was it about the opioid project?

12:37   15       PROSPECTIVE JUROR:  Yes.

16       THE COURT:  Questions?

17       MR. ARMSTRONG:  What was your son's position on the

18   opioid problem?

19       PROSPECTIVE JUROR:  He was -- my sister in law's

12:37   20   position is really strong about the problem and they are trying

21   to change that.  That was the basis of his paper.

22       MR. ARMSTRONG:  During that process, did you learn

23   anything that would cause you or lead you to not be fair or

24   impartial in this case?

12:37   25       PROSPECTIVE JUROR:  I guess I learned more than I want

12:37   1    to know about it, but it is definitely a problem as I see it.

2    THE COURT: Questions?

3    MR. LEWIS: Let me be clear. You say your son's

4    position was they were against the use of opioids?

12:38   5    PROSPECTIVE JUROR: Yes. Use or the way that it was

6    easily available to people. That was part of what they want to

7    change in Malaysia.

8    MR. LEWIS: Do you think your son's position would

9    also reflect your position?

12:38  10    PROSPECTIVE JUROR: I helped him on his paper with

11    regard to his position.

12    MR. ARMSTRONG: That was in Malaysia, not the United

13    States?

14    PROSPECTIVE JUROR: Right.

12:38  15    THE COURT: Thank you.

16    *(Prospective Juror Number 17 departed the bench)*

17    THE COURT: Do we have a challenge on Number 17?

18    MR. WILLIAMS: Yes.

19    THE COURT: On what grounds?

12:38  20    MR. LEWIS: On the grounds that he has a

21    predisposition regarding his position --

22    THE COURT: Which he did say.

23    Anything further from the government?

24    MR. ARMSTRONG: Nothing further.

12:38  25    THE COURT: This is Number 17. Okay. Number 17 is

1  struck for cause.

2       Who is next?

3       THE CASE MANAGER:  Number 21.

4  *(Open court)*

5       THE COURT:  Come on up, ma'am, Number 21.

6  *(Prospective Juror 21 approached the bench)*

7  *(At the bench)*

8       THE COURT:  Yes, ma'am.  Right there is your

9  microphone.  Yes?  What is your concern?

10      PROSPECTIVE JUROR:  Oh, you said something about me

11 testifying in court, and I had a cousin whose son died from

12 heroin overdose.

13      THE COURT:  Questions?  Follow up?

14      MR. ARMSTRONG:  Just to be clear, have you been

15 treated for chronic pain yourself?

16      PROSPECTIVE JUROR:  Oh, yes, I did.

17      MR. ARMSTRONG:  And what was your experience in that?

18      PROSPECTIVE JUROR:  I took medicine and I had some

19 injections and I got off the medicine.

20      MR. ARMSTRONG:  What medicines were you taking?

21      PROSPECTIVE JUROR:  Tramadol and there was a muscle

22 relaxer.  I can't remember what the name of it was.

23      MR. ARMSTRONG:  Would your experience taking those

24 medications lead you to not be fair and impartial in this case?

25      PROSPECTIVE JUROR:  No, sir, it wouldn't.

12:40  1        THE COURT:  Could you be fair?

2        PROSPECTIVE JUROR:  I could be fair.

3        THE COURT:  Okay.  Questions?

4        MR. LEWIS:  Do you believe that the medications that

12:40  5 you were prescribed by the doctor were indicated for your

6 chronic pain conditions?

7        PROSPECTIVE JUROR:  Say that again.

8        MR. LEWIS:  Do you believe that the medications that

9 were prescribed for your chronic pain symptoms were

12:40  10 indicated -- they should have been used by the doctor that was

11 treating you?

12        PROSPECTIVE JUROR:  Yes.  It was the correct

13 medication, yes.

14        THE COURT:  Thank you, ma'am.  You may step down.

12:40  15   *(Prospective Juror Number 21 departed the bench)*

16        THE COURT:  Number 21, any challenge?

17        MR. HELFMEYER:  Your Honor, she also mentioned that

18 she testified against her doctor in an insurance fraud case.

19 Did the Court want to inquire into that?

12:40  20        THE COURT:  Yeah.

21   *(Open court)*

22        THE COURT:  Ma'am, one more question.  Like Columbo,

23 you know one more thing.

24   *(Prospective Juror 21 re-approached the bench)*

12:40  25   *(At the bench)*

12:41    1      THE COURT:  I see here that you were a witness in

2   court.  Is that correct?

3      PROSPECTIVE JUROR:  Yes, sir.

4      THE COURT:  What was that about?

12:41    5      PROSPECTIVE JUROR:  It was Interferon, and he was -- I

6   don't know all the charges, but he was giving double dosages of

7   Interferon to his patients.  So I testified that I was there to

8   get those treatments, and I think there was some, like, mail

9   fraud.  I can't remember.  He also put a hit out on an FBI

12:41   10   agent.

11      THE COURT:  Very nice doctor.

12      PROSPECTIVE JUROR:  That was like a real complicated

13   deal.

14      THE COURT:  Anything about that or the medical

12:41   15   profession that would prohibit you from being fair and

16   impartial in this case without having heard any of the

17   evidence?

18      PROSPECTIVE JUROR:  No, sir, it wouldn't.

19      THE COURT:  Anything further?

12:41   20      MR. LEWIS:  No, Your Honor.

21      THE COURT:  Thank you, ma'am.  Sorry.  Now you can

22   head out the door.

23     *(Prospective Juror Number 21 departed the bench)*

24      THE COURT:  Anything further on this lady?

12:41   25      THE CASE MANAGER:  Number 23 has a work trip.

12:42 1    *(Open court)*

2    THE COURT:   █████████?

3    *(Prospective Juror 23 approached the bench)*

4    *(At the bench)*

12:42 5    THE COURT:  There is your microphone.  What is your

6  concern?

7    PROSPECTIVE JUROR:  So next Wednesday --

8    THE COURT:  This Wednesday?

9    PROSPECTIVE JUROR:  Not this coming Wednesday, a week

12:42 10  from Wednesday, I have a work trip that I can't reschedule.

11    THE COURT:  Where are you going?

12    PROSPECTIVE JUROR:  To California, Sunnyvale.

13    THE COURT:  What is it about?

14    PROSPECTIVE JUROR:  It's meeting with the director

12:42 15  over the PS team for one of the regions that I support.

16    THE COURT:  What is PS team?

17    PROSPECTIVE JUROR:  Professional services.  I'm an

18  account manager, so my account is with Med Op, so we have

19  quarterly meetings where we meet with the directors.  And that

12:42 20  one is scheduled for that time.

21    THE COURT:  If this goes into next week, you have a

22  problem?

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  Question?

12:42 25    MR. ARMSTRONG:  No questions.

*Jury Selection*

12:42    1          THE COURT:  Any questions?

         2          MR. WILLIAMS:  No questions.

         3          THE COURT:  Thank you, ma'am.

         4      *(Prospective Juror Number 23 departed the bench)*

12:43    5          MR. WILLIAMS:  Can you agree?

         6          THE COURT:  Can you all agree?

         7          MR. ARMSTRONG:  I can agree.

         8          THE COURT:  We have plenty of jurors anyhow.

         9              Number 23 is excused.

12:43   10              Who is next?

        11          THE CASE MANAGER:  Number 26.  Her mother works in

        12  pain management.

        13      *(Open court)*

        14          THE COURT:  Number 26, come on up.

12:43   15      *(Prospective Juror 26 approached the bench)*

        16      *(At the bench)*

        17          THE COURT:  Yes, ma'am?  Step back about half a step.

        18  That way, everybody can hear.

        19              We called you up here because you have a parent

12:43   20  that works in a pain management clinic?

        21          PROSPECTIVE JUROR:  Yes.  My mother.

        22          THE COURT:  What is her -- is she a physician?

        23          PROSPECTIVE JUROR:  No, no, no.  She was a

        24  receptionist for several years and now she does insurance work.

12:43   25          THE COURT:  Who's the doctor?

12:43  1  PROSPECTIVE JUROR:  It's several doctors.  It's at

2  least two doctors.

3  THE COURT:  Do you know their names?

4  PROSPECTIVE JUROR:  Oh, yeah, I do.  Definitely.

12:44  5  Dr. Ponder and Doctor -- and the other one I'm not familiar

6  with.  But one of them I do know.

7  THE COURT:  Where is the practice?

8  PROSPECTIVE JUROR:  In Louisiana.

9  THE COURT:  In Louisiana?

12:44  10  PROSPECTIVE JUROR:  Yes, sir.

11  THE COURT:  Does she talk to you about her business?

12  PROSPECTIVE JUROR:  Yes.

13  THE COURT:  She does?

14  PROSPECTIVE JUROR:  And I used to babysit for the

12:44  15  doctor as well when I was an undergraduate.

16  THE COURT:  Does it involve opioids at all?

17  PROSPECTIVE JUROR:  I know they prescribe it when

18  necessary.

19  THE COURT:  What do you think about that?  Do you

12:44  20  think it should be prescribed in the appropriate situation?

21  PROSPECTIVE JUROR:  Yes, sir.

22  THE COURT:  And your mother works in that office?

23  PROSPECTIVE JUROR:  Yes, sir.

24  THE COURT:  How long has she worked there for?

12:44  25  MR. ARMSTRONG:  Fifteen years plus.

12:44    1        THE COURT: Any reason why you can't be fair and

2    impartial in this case?

3        PROSPECTIVE JUROR: No.

4        MR. WILLIAMS: No questions.

12:44    5        THE COURT: Okay. Thank you, ma'am.

6        PROSPECTIVE JUROR: Thank you.

7      *(Prospective Juror Number 26 departed the bench)*

8        THE COURT: Who is the next one?

9        THE CASE MANAGER: Number 27, he read about it in the

12:45    10    media.

11      *(Open court)*

12        THE COURT: Come on up, sir.

13      *(Prospective Juror 27 approached the bench)*

14      *(At the bench)*

12:45    15        THE COURT: Yes, sir. I understand you saw something

16    you feel about this case in the media?

17        PROSPECTIVE JUROR: I was reading an article in the

18    *Houston Chronicle.*

19        THE COURT: What was it that you read?

12:45    20        PROSPECTIVE JUROR: About some physicians prescribing

21    prescriptions in the area that this was mentioned.

22        THE COURT: Do you think it was --

23        PROSPECTIVE JUROR: I don't recall the specific

24    physician's name, but the article sounds kind of familiar to

12:45    25    this.

12:45  1    THE COURT:  Questions?

2    MR. ARMSTRONG:  Any reason why you can't be fair and

3  impartial?

4    PROSPECTIVE JUROR:  I don't think so.  I mean, the

12:45  5  only other thing is since my mother-in-law -- we have done a

6  lot of research on fentanyl and all the other products and all

7  of this just to see what the reactions are in all of this and

8  that sort of thing and not being familiar with those products

9  before and, you know, what the impact is on individuals and

12:46  10  that sort of thing.

11    THE COURT:  Do you feel you can be fair and impartial

12  in this case?

13    PROSPECTIVE JUROR:  I think I could be, yes.

14    THE COURT:  Questions?

12:46  15    MR. WILLIAMS:  We don't want you to think, sir.

16    PROSPECTIVE JUROR:  I understand.  And the other thing

17  that is, kind of, clouding my mind is I just happened to read

18  two books on the opioid crisis.  They were both novels, but

19  they were -- the central theme was the drug crisis.

12:46  20    THE COURT:  You feel this might not be the best case

21  for you?

22    PROSPECTIVE JUROR:  Possibly not.  And then the other

23  question I had was -- since my mother-in-law is in an

24  end-of-life situation and if I end up being a juror and

12:46  25  something happens to her, what happens, say, if something

happens tomorrow?

THE COURT:  Where is she located?

PROSPECTIVE JUROR:  In Baytown.

THE COURT:  Well, in that case, we would make some arrangements, if you were on the jury, if something happens. Questions?

MR. ARMSTRONG:  Nothing, Judge.

MR. WILLIAMS:  Anything regard the article that you read that would cause you to be biased against the doctor that you read about, if it ends up being this particular person?

PROSPECTIVE JUROR:  No.  Because I have no -- the name -- I don't even recall the name.

THE COURT:  Okay.  Thank you, sir.

*(Prospective Juror Number 27 departed the bench)*

THE COURT:  Government, any challenge?

MR. ARMSTRONG:  No, Judge.

THE COURT:  Defense?

MR. LEWIS:  Yes.  Challenge for cause.

THE COURT:  Why?

MR. LEWIS:  I do believe that he has indicated to the Court that his recent reading of materials have influenced his opinions regarding opioids and the use of opioids.

THE COURT:  I'm not sure he said influence but he learned a lot about them.

MR. LEWIS:  He has taken positions, and those

12:47  1  positions would be inconsistent with him serving as a juror, or

2  potentially inconsistent with him serving as a qualified juror

3  on this panel.

4      THE COURT:  He also stated he has someone in the

12:48  5  end-of-life hospice and he expressed a concern about

6  continuing.  Even though we are going to seat 14 jurors, I

7  think -- we have others and we are all right as far as jurors

8  go.  So based upon that, I will excuse Number 27.

9      Who is next?

12:48  10     THE CASE MANAGER:  Number 30, her son is addicted to

11  meth.

12  *(Open court)*

13     THE COURT:  Number 30, do you want to come on up?

14  *(Prospective Juror 30 approached the bench)*

12:48  15  *(At the bench)*

16     THE COURT:  Here is your microphone right there.

17      Okay.  I understand you had a youngster who may

18  be having a health problem.

19     PROSPECTIVE JUROR:  He is not young.  He is 42.

12:48  20     THE COURT:  Pardon?

21     PROSPECTIVE JUROR:  Forty-two.  His whole life.

22     THE COURT:  Addicted to what?

23     PROSPECTIVE JUROR:  To meth.

24     THE COURT:  Methamphetamine?

12:48  25     PROSPECTIVE JUROR:  Yes.

12:48  1    THE COURT:  This is not methamphetamines.  Okay.  I'm

2    going to let the attorneys jump in.

3    MR. ARMSTRONG:  Thank you, Judge.

4    Has your son had any run-ins with law

12:49  5    enforcement?

6    PROSPECTIVE JUROR:  Yes.  He is in prison.

7    MR. ARMSTRONG:  He's in for what?

8    PROSPECTIVE JUROR:  For the drugs.  He was caught with

9    them.

12:49  10   MR. ARMSTRONG:  Was he arrested and charged with just

11   possession or distributing?

12   PROSPECTIVE JUROR:  I don't know.  It's a felony.

13   THE COURT:  Is that in state court?

14   PROSPECTIVE JUROR:  Yes.

12:49  15   THE COURT:  Here?

16   PROSPECTIVE JUROR:  No.

17   THE COURT:  Whereabouts?

18   PROSPECTIVE JUROR:  Arizona.

19   THE COURT:  Questions?

12:49  20   MR. ARMSTRONG:  Do you feel like he was treated fairly

21   or unfairly?

22   PROSPECTIVE JUROR:  Yes.  He was treated fairly.

23   MR. WILLIAMS:  Ma'am, as a result of your son having

24   these problems with meth, has it clouded your opinion one way

12:49  25   or another regarding any drug usage, whether it is legal or

12:49  1    illegal?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  So you feel if it was an appropriate case

4    for pain medication, that there is a need for that to be

12:49  5    prescribed?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Keep going.

8           MR. WILLIAMS:  Okay.  So I lost my train of thought.

9    So basically what you are telling me is that the incident with

12:50  10   your son won't influence you one way or the other?

11          PROSPECTIVE JUROR:  No.

12          MR. WILLIAMS:  In terms of being a juror?

13          PROSPECTIVE JUROR:  No.

14          MR. WILLIAMS:  No further questions.

12:50  15          THE COURT:  Thank you, ma'am.

16      *(Prospective Juror Number 30 departed the bench)*

17          THE COURT:  Any objections?

18          MR. ARMSTRONG:  No, sir.

19          MR. WILLIAMS:  No, Your Honor.

12:50  20          THE COURT:  Next one?

21          THE CASE MANAGER:  Number 33, his sister died of an

22   overdose.

23      *(Prospective Juror 33 approached the bench)*

24      *(At the bench)*

12:50  25          THE COURT:  I understand you had a family member that

12:50  1  had an unfortunate situation relative to drugs of some sort?

2      PROSPECTIVE JUROR:  I had a sister -- about 10 years

3  ago, she died of a drug overdose.

4      THE COURT:  What sort of drugs?

12:50  5      PROSPECTIVE JUROR:  She was a pill popper.  From the

6  time she was in high school, she had pills from every one of

7  her kids and then she had doctors prescribing pills and she

8  just took them all her life.

9      THE COURT:  What sort of pills?

12:51  10      PROSPECTIVE JUROR:  I have no idea.

11      THE COURT:  Pain pills?

12      PROSPECTIVE JUROR:  You know, she had back surgery and

13  I'm sure she had some pain pills with that.

14      THE COURT:  Any questions?

12:51  15      MR. ARMSTRONG:  Any reason you can't be fair and

16  impartial in this case that involves maybe those same drugs?

17      PROSPECTIVE JUROR:  I think I can be fair and

18  impartial.  I have a question.  I worked with the DEA.  They

19  came to me about three years ago and wanted a surveillance

12:51  20  camera on my property, and I let them do it.

21      THE COURT:  Who were they surveilling?  A drug

22  operation?

23      PROSPECTIVE JUROR:  Yes.  A drug operation.  But I

24  never found out what happened.  They did it about six months

12:51  25  and left.

12:51  1    MR. ARMSTRONG:  Do you have any negative feelings

2    about the DEA based on that experience?

3         PROSPECTIVE JUROR:  No.  I think it was a good deal.

4         MR. WILLIAMS:  As a result of your allowing the DEA to

12:51  5    do some surveillance on your particular property, okay, did

6    they tell you what the investigation was regarding?

7         PROSPECTIVE JUROR:  They just said it was a house that

8    was doing some drug dealing, and it was across the street.

9         MR. WILLIAMS:  And because they were able to use your

12:51  10   particular property, did they tell you the end result of what

11   they --

12        PROSPECTIVE JUROR:  No.  I never found out anything.

13   I never heard in the paper or anything.

14        MR. WILLIAMS:  As to your sister, you said she was a

12:52  15   pill popper and you knew she had some pain issues?

16        PROSPECTIVE JUROR:  Yes.  She had pain all her life.

17   She had seven operations on her back.

18        MR. WILLIAMS:  And she ultimately became addicted to

19   these particular opioids, did she not?

12:52  20        PROSPECTIVE JUROR:  I don't know what they were.  They

21   were painkillers.  I'm not about addicted.  She was doing it

22   before she had pain.  She was addicted her whole life before

23   that.

24        MR. WILLIAMS:  Would that experience influence you one

12:52  25   way or the other regarding your feelings regarding pain pills?

12:52  1        PROSPECTIVE JUROR:  No.

2        MR. LEWIS:  Do you believe that the physicians that

3   prescribed drugs to your sister had a role in causing your

4   sister's death?

12:52  5        PROSPECTIVE JUROR:  No.  She was getting pills from

6   everywhere.

7        MR. LEWIS:  Do you believe that the prescriptions from

8   the doctors that she was getting -- in order for her to get the

9   pills, that the doctor had a role in providing those pills to

12:53  10  her that caused her death?

11       PROSPECTIVE JUROR:  I don't think so, but I don't

12  know.  I don't know what she was taking, you know, I mean --

13  and I don't know ultimately what she died of.  It was just some

14  kind of pills.

12:53  15       THE COURT:  Okay.  Thank you, sir.

16       *(Prospective Juror Number 33 departed the bench)*

17       THE COURT:  Do we have a challenge on Number 33?

18            Government?

19       MR. ARMSTRONG:  Nothing from the government.

12:53  20       MR. LEWIS:  Yes.  Challenge for cause on the fact that

21  I believe the experience with his sister, even though he is not

22  sure what the role of the doctors was, is a problem that does

23  not qualify him to be fair and impartial as it relates to this

24  particular case.

12:53  25       MR. ARMSTRONG:  Judge, he expressly said that he had

12:53   1   no reservations --

2         THE COURT:  I understand -- go on.  I'm sorry.

3   Anything else?

4         MR. WILLIAMS:  And, Judge, his association with DEA to

12:53   5   participate -- this case is going to include some surveillance,

6   and I think that is going to sway his thinking as to what is

7   going on, Judge.

8         THE COURT:  I understand the defense objections, but

9   he answered every question correctly, so I'm going to have to

12:54  10   overrule the challenge on this one.

11              Next?

12         THE CASE MANAGER:  Number 37, the catchall.

13   *(Open court)*

14         THE COURT:  Number 37, yes, ma'am.  Come on up.

12:54  15   *(Prospective Juror 37 approached the bench)*

16   *(At the bench)*

17         THE COURT:  Did you want to talk to us?

18         PROSPECTIVE JUROR:  I did, yes.  I just wanted to let

19   you know I'm in the middle of two transactions right now for

12:54  20   Shell.  I do mergers and acquisitions.  One of them closes this

21   week and so I have to take a trip to Chicago.

22         THE COURT:  Well, did you tell them downstairs at the

23   jury -- where it asked any inability to serve as a juror, and

24   you said no on your juror sheet.

12:54  25         PROSPECTIVE JUROR:  The other one is my husband

12:54  1   travels for a living -- travels for work, as well, and so next

2   week he is going to be out of town and I have to take care of

3   my son.

4        THE COURT:  Do you work outside the home?

12:55  5        PROSPECTIVE JUROR:  I do.  I work for Shell.

6        THE COURT:  Are you going to take time off from work

7   and stay home?

8        PROSPECTIVE JUROR:  No, no, no.  I have to pick him up

9   from school at the end of the day.

12:55  10        THE COURT:  What time is that?

11        PROSPECTIVE JUROR:  I have to pick him up before 6:00.

12        THE COURT:  Questions?  Any questions?

13        MR. WILLIAMS:  No questions.

14        *(Prospective Juror Number 37 departed the bench)*

12:55  15        MR. WILLIAMS:  I think we should agree to release her.

16        THE COURT:  I'm not sure we are getting the straight

17   skinny here, but she said all the correct reasons for getting

18   off jury duty and she is probably someone we don't want on the

19   jury.  I think we have all been around enough to know to let

12:55  20   them go.

21        MR. WILLIAMS:  If they have to find a reason.

22        THE COURT:  Yeah.  Throw everything up on the wall and

23   something is going to stick and maybe the judge will go along

24   with you.

12:55  25        Who is next?

12:55  1    THE CASE MANAGER:  Number 39, her daughter had chronic

2  pain.

3    *(Open court)*

4    THE COURT:  Number 39, come on up.

12:56  5    *(Prospective Juror 39 approached the bench)*

6    *(At the bench)*

7    THE COURT:  Yes, ma'am?  You said you have a

8  daughter-in-law with chronic pain, right?

9    PROSPECTIVE JUROR:  Yes.

12:56  10    THE COURT:  Step back a little bit.

11    What is she taking for that?  Do you know?

12    PROSPECTIVE JUROR:  I know she takes hydrocodone and

13  she takes something else, but I'm not really sure what it is.

14    THE COURT:  Does she live here in --

12:56  15    PROSPECTIVE JUROR:  She lives in Bentonville,

16  Arkansas.

17    THE COURT:  In Arkansas.  Do you see her often?

18    PROSPECTIVE JUROR:  I see her about every quarter.

19    THE COURT:  Do you know if this medication was

12:56  20  prescribed by a physician for her?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  How long has she had the problem?

23    PROSPECTIVE JUROR:  She has had the problem for about

24  15 years.

12:56  25    THE COURT:  Fifteen years.  She is doing all right?

12:56   1          PROSPECTIVE JUROR:  Yes.

        2          THE COURT:  Has she overdosed anytime as far as you

        3   know?

        4          PROSPECTIVE JUROR:  No.

12:56   5          THE COURT:  All right.  Questions?

        6          MR. ARMSTRONG:  How long has she been taking

        7   hydrocodone for, ma'am?

        8          PROSPECTIVE JUROR:  Probably about 15 years.

        9          MR. ARMSTRONG:  Did she try any other treatments

12:56  10   before taking hydrocodone?

       11          PROSPECTIVE JUROR:  I don't know about that.

       12          MR. ARMSTRONG:  Any reason why you can't be fair and

       13   impartial in this case?

       14          PROSPECTIVE JUROR:  Sir?

12:57  15          MR. ARMSTRONG:  Any reason why you can't be fair and

       16   impartial in this case?

       17          PROSPECTIVE JUROR:  No, sir.

       18          THE COURT:  Questions?

       19          MR. WILLIAMS:  No questions.

12:57  20          THE COURT:  Thank you, ma'am.

       21          PROSPECTIVE JUROR:  I have something else to add

       22   though.

       23          THE COURT:  What have you got?

       24          PROSPECTIVE JUROR:  I work for Social Security, but in

12:57  25   my office, I'm the one that they refer the social security, the

12:57 1 SSI frauds to the OIG, and I work with the OIG agents on that.

2 But I thought you ought to know it.

3 THE COURT:  All right.  Thank you.

4 PROSPECTIVE JUROR:  Thank you.

12:57 5 *(Prospective Juror Number 39 departed the bench)*

6 THE COURT:  Any challenge on 39?

7 MR. ARMSTRONG:  No, Judge.

8 MR. WILLIAMS:  No.

9 THE COURT:  Next one?

12:57 10 THE CASE MANAGER:  Number 41, you stopped him from

11 saying something.

12 *(Open court)*

13 THE COURT:  Yes, sir.  Come on up.

14 *(Prospective Juror 41 approached the bench)*

12:57 15 *(At the bench)*

16 THE COURT:  I think we cut you off when you were

17 saying something and we said we would talk to you later, right?

18 PROSPECTIVE JUROR:  No.

19 MR. ARMSTRONG:  If I may, I believe your

12:57 20 brother-in-law has chronic pain?

21 PROSPECTIVE JUROR:  Yes.

22 MR. ARMSTRONG:  Does he take any drugs for that?

23 PROSPECTIVE JUROR:  I think he takes a lot of drugs

24 for that.  I don't know the extent of it.

12:58 25 THE COURT:  Does he live here?

12:58  1    PROSPECTIVE JUROR:  He lives in North Carolina.

2    THE COURT:  Go on.

3    MR. ARMSTRONG:  Has he had any bad experiences with

4  chronic pain?

12:58  5    PROSPECTIVE JUROR:  I don't know what is associated

6  with the treatments and what is associated with the underlying

7  issues.  He has had -- from the age of 17 -- he is almost 30 --

8  he has continuously had treatment.  I honestly try to stay out

9  of it.  It's my brother-in-law so --

12:58  10    THE COURT:  All right.  We all understand, one way or

11  the other.

12    PROSPECTIVE JUROR:  I don't want to learn too much

13  about it.

14    THE COURT:  Okay.  Questions?

12:58  15    MR. LEWIS:  Do you know anything about -- have any

16  opinions about the appropriateness of the doctors that are

17  prescribing these medications for your brother-in-law?

18    PROSPECTIVE JUROR:  No, sir.

19    THE COURT:  Do you know whether or not he obtains all

12:59  20  of these prescriptions by -- all these medications by

21  prescriptions that's issued by the doctor?

22    PROSPECTIVE JUROR:  I believe he does, yes.

23    THE COURT:  Thank you, sir.

24    *(Prospective Juror Number 41 departed the bench)*

12:59  25    THE COURT:  Any challenge?

12:59 1        MR. ARMSTRONG:  No, Judge.

2        THE COURT:  Okay.  Next?

3        THE CASE MANAGER:  Number 42, she has someone with a

4    drug addiction.

12:59 5    *(Open court)*

6        THE COURT:  Yes, ma'am.  Come on up, Number 42.

7    *(Prospective Juror 42 approached the bench)*

8    *(At the bench)*

9        THE COURT:  Do you want to visit with us?

12:59 10        PROSPECTIVE JUROR:  Okay.

11        THE COURT:  What are the concerns that you had or was

12    it the concerns that I had?

13        PROSPECTIVE JUROR:  You asked me if I had known people

14    that had problems with addiction.

12:59 15        THE COURT:  Right.

16        PROSPECTIVE JUROR:  Yes, I have.  And then also I'm on

17    pain medication.

18        THE COURT:  Yourself?

19        PROSPECTIVE JUROR:  Yes.

12:59 20        THE COURT:  For what?

21        PROSPECTIVE JUROR:  For chronic sciatic.

22        THE COURT:  How long have you been on that medicine?

23        PROSPECTIVE JUROR:  Almost twenty years.

24        THE COURT:  And what medications are you on?

13:00 25        PROSPECTIVE JUROR:  Right now I'm just on the hydra --

13:00    1    it's a different name now.  Oxy --

2            THE COURT:  Oxycodone?

3            PROSPECTIVE JUROR:  That's it.

4            THE COURT:  Questions?

13:00    5            MR. ARMSTRONG:  Have you ever been prescribed a

6    combination of a muscle relaxant with the opioid?

7            PROSPECTIVE JUROR:  Yes.  I tend not to do that.  I

8    try to take as little as possible just to go through the day,

9    but I don't -- I'm real sensitive to different drugs like

13:00   10    Insess (phonetic) and stuff like that so we try not to mix

11    anything.

12            MR. ARMSTRONG:  Have you had any good or bad

13    experiences that would sway you from being fair and impartial

14    in this case?

13:00   15            PROSPECTIVE JUROR:  Not really, no.

16            THE COURT:  Questions?

17            MR. WILLIAMS:  No questions.

18            MR. LEWIS:  No questions.

19            THE COURT:  Thank you, ma'am.

13:00   20       *(Prospective Juror Number 42 departed the bench)*

21            THE COURT:  Any challenge on 42?

22            MR. ARMSTRONG:  No, Judge.

23            MR. LEWIS:  No, Judge.

24            THE COURT:  Next?

13:00   25            THE CASE MANAGER:  Number 48, she raised her hand on

13:00　　1　　the opioid epidemic question.

2　　　　　　THE COURT:　She raised her hand on the opioid

3　　epidemic.　We'll get her thoughts up here.

4　　　　*(Prospective Juror 48 approached the bench)*

13:01　　5　　　　　　THE COURT:　There is your microphone right there.

6　　Yes, ma'am.　You raised your hand relative to some thoughts on

7　　the opioid epidemic?

8　　　　　　PROSPECTIVE JUROR:　My ex-husband is an addict.

9　　　　　　THE COURT:　How long were you married to him?

13:01　　10　　　　　PROSPECTIVE JUROR:　Six years.

11　　　　　　THE COURT:　What sort of drug was he on?

12　　　　　　PROSPECTIVE JUROR:　Anything he could get his hands

13　　on.

14　　　　　　THE COURT:　Okay.　Where is he now?

13:01　　15　　　　　PROSPECTIVE JUROR:　I don't --

16　　　　　　THE COURT:　And you don't want to know.

17　　　　　　PROSPECTIVE JUROR:　We have a child together, so

18　　minimal contact.

19　　　　　　THE COURT:　Yes.

13:01　　20　　　　　PROSPECTIVE JUROR:　I just evicted him from the house

21　　that he was renting, which I own, so he is kind of couch

22　　surfing, I guess.

23　　　　　　THE COURT:　Thank you.　Questions?

24　　　　　　MR. ARMSTRONG:　Because of this experience, any reason

13:01　　25　　you can't be fair and impartial in this case?

13:01  1     PROSPECTIVE JUROR:  No, not necessarily.  The only

2     concern I have is, I'm a diabetic so I wear a medical device.

3     And I can silence it for the most part, but once I hit a

4     critical low number, it will start beeping.

13:02  5     THE COURT:  Any time it starts beeping, we will take a

6     break.  I have had people --

7     PROSPECTIVE JUROR:  I'm getting close.  I can monitor

8     it on my watch.

9     THE COURT:  You can do it on your own, take the

13:02  10    medication?

11    PROSPECTIVE JUROR:  Yes.  I can keep, like, some candy

12    in my pocket.

13    THE COURT:  Any questions?

14    MR. ARMSTRONG:  No, Judge.

13:02  15    MR. WILLIAMS:  No, Judge.

16    MR. LEWIS:  Do you know if your ex-husband acquired

17    these medications by prescription from his doctor?

18    PROSPECTIVE JUROR:  Most of them, no.  He stole them

19    from his mother who had a congenital back, degenerative back

13:02  20    disease or something.  And then he started abusing Adderall,

21    which he did get by prescription from his primary care doctor.

22    MR. LEWIS:  Do you believe his doctor or any of his

23    doctors had a role in causing his addiction?

24    PROSPECTIVE JUROR:  No.  It was him.

13:02  25    THE COURT:  It was him?

13:02  1      PROSPECTIVE JUROR:  It was him.

2      THE COURT:  Okay.  Thank you.  Thank you, ma'am.

3      *(Prospective Juror Number 48 departed the bench)*

4      THE COURT:  Any challenges on 43 (sic)?  Government?

13:03  5      MR. ARMSTRONG:  No, Judge.

6      THE COURT:  Defense?

7      MR. LEWIS:  No, Judge.

8      THE CASE MANAGER:  Next is Number 44.

9      *(Prospective Juror 44 approached the bench)*

13:03  10     THE COURT:  Yes, sir?  Step back about half a step.

11     There it is.  There is your microphone.  There it is.

12     PROSPECTIVE JUROR:  I wanted to talk to you because

13     things are evolving much quicker than I thought they would.  As

14     I indicated earlier, my wife has had several back surgeries and

13:03  15     she has gone to a neurosurgeon who is saying she has got a

16     critical situation near the base of her spine.  And he said, I

17     want to do surgery ASAP.  What is ASAP?  When the insurance

18     kicks in and says, well, we want a second opinion, so when is

19     the second opinion?  We thought several weeks.  It's tomorrow.

13:03  20     So not only is it tomorrow, but the doctor said, "The minute

21     you get the results from tomorrow, call back to the first

22     doctor because we want to schedule you."  Is that three days or

23     10 days?

24     THE COURT:  Any questions?

13:04  25     MR. ARMSTRONG:  No, Judge.

13:04   1       THE COURT:  Any questions?

2       MR. LEWIS:  No, Judge.

3       THE COURT:  Thank you, sir.

4       *(Prospective Juror Number 44 departed the bench)*

13:04   5       THE COURT:  Dismissed by agreement, Number 44.  Who is

6    the last one?

7       THE CASE MANAGER:  Number 47, his brother has a

8    substance abuse problem.

9       *(Open court)*

13:04  10       THE COURT:  Okay.  Come on up, sir.  Sorry you had to

11   wait so long, but you still have plenty of time for lunch.

12       *(Prospective Juror 47 approached the bench)*

13       *(At the bench)*

14       THE COURT:  This is Number 47.

13:04  15           You say your brother has a substance abuse

16   problem?

17       PROSPECTIVE JUROR:  Yes.

18       THE COURT:  Okay.  What sort of problem?

19       THE COURT REPORTER:  I'm sorry.  I can't hear.

13:04  20       THE COURT:  This is the microphone.  You can speak up

21   a little bit because there are no jurors in the room.

22       PROSPECTIVE JUROR:  He does meth and anything else

23   that can get him high.

24       THE COURT:  Get him high?

13:04  25       PROSPECTIVE JUROR:  Yes.

13:04  1        THE COURT:  How long has he been on the stuff?

2        PROSPECTIVE JUROR:  At least 12 plus years.

3        THE COURT:  What?

4        PROSPECTIVE JUROR:  Twelve years at least.

13:05  5        THE COURT:  Does he use hydrocodone or any kind of

6  painkillers?

7        PROSPECTIVE JUROR:  I know meth is one of them.

8        THE COURT:  Okay.  Has he had any medical conditions

9  that brought this on or just an unfortunate addiction?

13:05  10        PROSPECTIVE JUROR:  Just an addiction problem.

11        THE COURT:  Questions?

12        MR. ARMSTRONG:  Any reason why you can't be fair and

13  impartial in this case?

14        PROSPECTIVE JUROR:  I could try based on the --

13:05  15        THE COURT:  Put it this way.  Only you know.  Only you

16  know.  Is this the right kind of case for you?  Only you can

17  tell us.

18        PROSPECTIVE JUROR:  I may be impartial.  I will try to

19  be based on the data that I have.

13:05  20        THE COURT:  Questions?

21        MR. WILLIAMS:  Sir, we don't mean to badger you

22  regarding this, but we need to be clear that you can be fair to

23  both particular sides.  If there is anything about this that

24  would cause you to hesitate about being fair on either side, we

13:05  25  need to know that at this point.

13:05  1          Does your brother's addiction cause you any

2    problems serving on this particular jury?

3          PROSPECTIVE JUROR:  No.  I can try to be impartial and

4    fair.

13:06  5          MR. WILLIAMS:  I know you say you will try to be --

6          THE COURT:  Are you having a concern because of the

7    background of your family?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  All right.  Thank you, sir.  Thank you so

13:06  10   much.  We will see you later.

11         *(Prospective Juror Number 47 departed the bench)*

12         THE COURT:  Step back a little.

13              Any challenge on Number 47?

14         MR. WILLIAMS:  Yes.

13:06  15         THE COURT:  Why?

16         MR. WILLIAMS:  He has a concern about being fair.

17         THE COURT:  Government's position?

18         MR. ARMSTRONG:  No objection.

19         THE COURT:  No objection.  That is 47 is gone for

13:06  20   cause.

21              Ellen, get all of your sheets out and let's go

22   down and see where we are.  This is a long one.  This is the

23   longest I have had in a long time, but I think we got ourselves

24   a good jury.  It was clean.

13:06  25         MR. ARMSTRONG:  Thank you, Judge.

13:06    1        *(Open court)*

         2             THE COURT:  Let's look at your sheets, everybody.  My

         3    case manager is going to call off the numbers.  Let me go down

         4    my sheet also.

13:07    5             These are the ones excused for cause, right,

         6    Ellen?  Okay.  Go on.

         7             THE CASE MANAGER:  Number 3.

         8             THE COURT:  I'm going to repeat it.  3.

         9             THE CASE MANAGER:  10.

13:07   10             THE COURT:  10.

        11             THE CASE MANAGER:  17.

        12             THE COURT:  17.

        13             THE CASE MANAGER:  23.

        14             THE COURT:  23.

13:07   15             THE CASE MANAGER:  27.

        16             THE COURT:  27.

        17             THE CASE MANAGER:  37.

        18             THE COURT:  37.

        19             THE CASE MANAGER:  44.

13:07   20             THE COURT:  44.

        21             THE CASE MANAGER:  And 47.

        22             THE COURT:  And 47.  All right.  Now, as you know,

        23    initially with the agreement we had with the blind draw, Number

        24    32 was initially in the panel.  Correct?  Number 32, if there

13:07   25    were no strikes, Number 32.  With the strikes down below or

13:07 1 above, where does it take us to get 12 persons on the jury?

2 THE CASE MANAGER: Twelve. Or are we doing the blind

3 draw?

4 THE COURT: We are doing the blind draw. We have 14.

13:08 5 Number 32 is in the panel, right, with the blind draw.

6 Twenty-eight, plus four, that's 32, but we are going to go

7 seven and 11 strikes, so we are going up to 32. Number 32 is

8 in the panel initially.

9 Let's see how many people below have been struck

13:08 10 where the number goes. Number 3. Right? Number 3, 10, 17,

11 23, 27. So 27 below, right? So how many is that did I call

12 out?

13 MR. ARMSTRONG: Five.

14 THE CASE MANAGER: Five.

13:08 15 THE COURT: So we add five to that. 37 is in the

16 panel, but Number 37 is a strike. Correct? So now Number 38

17 is in the panel. Correct? Now, we have how many total jurors?

18 THE CASE MANAGER: Forty-seven.

19 THE COURT: There are 47 total, so 38 to 47, that's

13:09 20 nine. Right? How many though on the remaining time we have

21 strikes? Forty-three? One? Two? Two. That's 47. So 45

22 could potentially -- and that would be -- that would be six,

23 three and three. Correct? All right. It's up to you. You

24 will each have seven and 11 strikes through Number 38, but if

13:09 25 you want extra strikes, each side could get an additional

13:09     1    three.  You don't have to take them.  It's strictly up to you,

2    in which case you will strike all the way through the end,

3    knowing who has already been struck all the way down.  It's

4    strictly up to you.

13:09     5          For three additional strikes per side, what about

6    the government?  What is your position?

7          MR. ARMSTRONG:  I'm sorry.  My confusion.  We

8    potentially have 10 strikes through 38?

9          THE COURT:  Pardon me?  No.  It's 38 now.  You have

13:10    10    got six and 10 and 38 is in the panel with the basics that you

11    would have.  Ordinarily, you would have to be 32.  Right?  With

12    all the strikes here, Number 38 is in the panel for seven and

13    11 strikes, seven on one side and 11 on the other.  So 38 is

14    now in the panel.  If you want to go all the way through to the

13:10    15    end, keeping in mind that we have a few others knocked out,

16    then each side can get three to even out the numbers.

17          MR. ARMSTRONG:  Either way is fine, Judge.

18          THE COURT:  Either way?

19          MR. ARMSTRONG:  Either way is fine.

13:10    20          THE COURT:  Defense, what is your preference?

21          MR. WILLIAMS:  One second, Your Honor.

22    *(Pause)*

23          MR. WILLIAMS:  We would like to take the additional

24    three, Judge.

13:11    25          THE COURT:  An additional three strikes.  All right.

Let's make sure of the numbers. Okay? 38 is in the panel. I want to work through this. 38 is in the panel, which leaves us seven possibilities. No. 38, 39, 40, yeah. That's nine extra strikes. Ordinarily, it would be nine extra strikes; however, between 38 and 47, we have how many strikes? Two more struck, so that brings down that you don't have nine, you would have seven, but we have to balance it off. Right? We have three and three. You have to get an even number. So at this point then -- don't forget Number 47 is one that was struck. So up and down your list -- hang on.

*(Off the record discussion held)*

THE COURT: You strike up and down the whole panel making sure you don't touch these guys who are already out. Okay?

MR. ARMSTRONG: Yes, Judge.

THE COURT: I just want to make sure the math is right. There are your extra strikes. Three extra each.

It is now 1:14 and they are getting back in at what time? 2:30. That was about right because we need to take an hour and 15-minute break. Make your strikes. Okay. You can stay here. One group can use the jury room, if you would like. And the other can do it out here. You don't know who is striking. Some courts will put you -- up in the east somewhere, they will put you in and make each of you take your peremptory strikes one after the other so there are no double

13:13  1   strikes.  We don't work it this way.  You just cross through

2   either, what is it, 11 or 14 names.  Government, you can cross

3   through 11.

4      MR. ARMSTRONG:  Ten.

13:13  5      THE COURT:  No.  Ten.  I'm sorry 10 and 14.

6   Government gets 10; defense gets 14.

7       Once you do that, just lay your sheets facedown

8   on Ellen's desk and then take a break.  We will need them not

9   later than 2:15.  So if you want to take time or you want to

13:13  10  take a lunch break or talk about it over lunch, it doesn't

11  matter, but we need all of your strikes on the desk -- and, of

12  course, sign them so we know who is making the strikes -- not

13  later than 2:15.

14      Any questions from the government?

13:13  15     MR. ARMSTRONG:  None, Judge.

16     THE COURT:  Any from the defense?

17     MR. LEWIS:  No, Judge.

18     MR. WILLIAMS:  No, Judge.

19     THE COURT:  It's a little bit different, but I think

13:14  20  we have got ourselves a good panel.  Hopefully, we do.

21      See you back at 2:30 and we need your information

22  by 2:15.

23    *(Court recessed at 1:15 p.m.)*

24    *(Court resumed at 2:35 p.m.)*

14:35  25    *(Jury not present)*

14:35  1    THE COURT:  I understand you want to bring something

2    up.  Just tell me about it.

3    MR. WILLIAMS:  Judge, after our hearing on Friday, I

4    received some other documents from the government.  These were

14:36  5    exhibits that -- some of them I had and some I haven't had.

6    THE COURT:  Some you haven't had.  I want to hear

7    about that in a moment.  Go on.

8    Excuse me.  Tell the jury we will be with them in

9    a few minutes.  We are in here and we will see them in about

14:36  10   five minutes.  Thank you.

11   Go on.

12   MR. WILLIAMS:  After the particular hearing, I

13   requested the alleged thumb drive that the witness testified to

14   that she produced the documents on.  Okay.  On Saturday, I went

14:36  15   down to look at the particular documents --

16   THE COURT:  For the first time?

17   MR. WILLIAMS:  Yes.  The evidence that they had.

18   Okay.

19   THE COURT:  How come you went -- but you had never

14:36  20   seen these before ever?  Excuse me.  Had you ever seen those

21   before, ever?

22   MR. WILLIAMS:  Some of those documents I had and some

23   of them I had not.

24   THE COURT:  Which ones had you not?

14:36  25   MR. WILLIAMS:  Those were the documents that I

received Friday evening, so as a result, I wanted to come down

and look at the original particular documents that were part of

the trial exhibits. Okay. I go down. I was told at that

particular time that Ms. Phillips brought the documents in.

They told her to go back and put them on a thumb drive. She

brought the thumb drive back. They downloaded the particular

thumb drive, but she didn't leave the original -- I mean, the

original documents, the loose documents that she testified to.

I asked the agent at that particular time, When

did you get these documents back if, in fact, she produced a

thumb drive that you downloaded? He said, I can't tell you

when, but it was sometime between --

THE COURT: Who told you that?

MR. WILLIAMS: Diversion Officer Mills.

THE COURT: Who?

MR. WILLIAMS: Diversion Officer Mills.

THE COURT: All right.

MR. WILLIAMS: So out of an abundance of caution, I

would like to receive the actual thumb drive that they claim

she had.

Now, I was told that they gave -- after they

downloaded it, they gave the thumb drive back to her. And I

would like the government to produce those. Okay? Because I

want to compare those particular documents to see if they are

the same documents that have been Bates stamped and is trying

14:38   1   to be used in the particular evidence by the government in this
        2   particular trial.
        3           THE COURT:  Okay.  Response?
        4           MR. ARMSTRONG:  Your Honor, we are not --
14:38   5           THE COURT:  Make it short and to the point.
        6           MR. ARMSTRONG:  Judge, we are not producing any of
        7   these supposedly new documents in our case in chief.  That
        8   issue in our view is entirely moot.  Mr. Williams is making
        9   some argument about some thumb drive.  We have both the scanned
14:38   10  copies and the hard copies.  The scanned copies were produced
        11  weeks ago and the hard copies have been available --
        12          THE COURT:  You produced all of those documents when?
        13          MR. ARMSTRONG:  Weeks ago.  And the hard copies have
        14  been at DEA --
14:38   15          THE COURT:  Slow down.
        16          MR. ARMSTRONG:  I'm sorry.  And the hard copies have
        17  been at DEA since Ms. Phillips gave them, which was before
        18  indictment.
        19          THE COURT:  Has he ever come down and looked at them?
14:38   20  Come to your place?
        21          MR. ARMSTRONG:  Not that I can recall, Judge, except
        22  for this last Saturday.
        23          THE COURT:  Last Saturday, which was after the court
        24  hearing we had on Friday?
14:38   25          MR. ARMSTRONG:  Yes.

14:38    1              THE COURT:  So what is your response?

         2              MR. ARMSTRONG:  Judge, I quite frankly don't even

         3     understand his objection.

         4              THE COURT:  He needs to get it in the record.  You

14:39    5     have that in the record.

         6              MR. WILLIAMS:  My objection is this, Judge, if there

         7     is a thumb drive that this witness brought with documents on

         8     it, okay, there is no way for me to know what was on that

         9     particular thumb drive unless they produce the thumb drive.

14:39   10              THE COURT:  Do you have the thumb drive?

        11              MR. ARMSTRONG:  It's not in our possession.

        12              THE COURT:  Who has it?  Who has got it?

        13              MR. ARMSTRONG:  I assume that it was given back to

        14     Lorin Phillips who has it.

14:39   15              MR. WILLIAMS:  And that's my concern, Judge.

        16              MR. ARMSTRONG:  But, Judge, the documents

        17     themselves --

        18              THE COURT:  Go on.

        19              MR. ARMSTRONG:  The documents themselves, we have the

14:39   20     scanned copies and we have the hard copies.

        21              THE COURT:  Are they the same thing that was on the

        22     thumb drive?

        23              MR. ARMSTRONG:  Yes.

        24              MR. WILLIAMS:  Until we have the thumb drive, how do

14:39   25     we know that, Judge?

14:39   1          MR. ARMSTRONG:  Judge, she is going to testify, These

     2  are the documents that I saved.  And she is going to lay the

     3  foundation on the stand.

     4          THE COURT:  Does she have the thumb drive?

14:39   5          MR. ARMSTRONG:  We haven't asked her, Judge.  We are

     6  not going to chase Mr. Williams down this rabbit hole.

     7          THE COURT:  Say that again.

     8          MR. ARMSTRONG:  We have refused so far to chase

     9  Mr. Williams down this rabbit hole.

14:39  10          THE COURT:  The first thing you do is get the thumb

    11  drive, if she has it.  If she doesn't have it, then that's it.

    12  And you can't do anything else.  But at least inquire, is it

    13  still in existence.  Right?  Hold it.  I don't need to know

    14  right now.  You tell me.  You find out if it is still in

14:40  15  existence.  Whether I will order it produced or not, I don't

    16  know, but let's see first if it is in existence.  If it is not

    17  in existence anymore, or the witness can't find it, there is

    18  nothing else we can do because you made your point.  But if it

    19  is in existence, let me decide at that time.

14:40  20          MR. ARMSTRONG:  Thank you, Judge.

    21          THE COURT:  All right.  Let's call the jury in.

    22      *(The venire panel enters)*

    23          THE COURT:  Before we begin, as far as the defense

    24  goes, as far as total time goes, you will be sharing that time.

14:42  25  Is that correct?  Rather than keep records of each of you, when

each of you run out, you can't share.

MR. WILLIAMS: That makes sense, Judge. We will share.

THE COURT: Okay. Got it. Ellen? She is about -- ladies and gentlemen, as Ellen calls your name, please come forward. The first seven of you will be in the front row; the next seven in the back row.

Go right ahead.

THE CASE MANAGER: Juror Number 5, █████████; Juror Number 6, █████████; Juror Number 11, █████████; Juror Number 12, █████████; Juror Number 13, █████████; Juror Number 14, █████████; Juror Number 15, ██████ ██████; Juror Number 18, █████████; Juror Number 20, █████████; Juror Number 22, █████████; Juror Number 24, █████████; Juror Number 29, █████████; Juror Number 31, █████████; Juror Number 34, ██████ ████.

THE COURT: Just so the jury has an idea, everybody on the left side, everybody, was in consideration. Just because you were a certain number didn't mean it was cut off there. By the agreement of the parties and allocating additional strikes, everyone here had a shot to get on the jury, but it was just the first 14 names that had no strike on either side.

Ladies and gentlemen, those of you that have not been selected, I certainly want to thank you for your service.

14:44  1  Hopefully, you have gained a bit of an insight into how the
       2  system works in your short visit with us.

       3          This now completes this portion of your jury
       4  service, but don't forget, you need to check on the telephone
14:45  5  to see if there are any other assignments.  Thank you and good
       6  afternoon.  You may leave the building.

       7      *(Venire panel departs)*

       8          THE COURT:  Ladies and gentlemen, please stand, raise
       9  your right hand and take the jurors' oath.

14:45  10     *(Juror panel sworn)*

       11         THE COURT:  Ladies and gentlemen, I'm sure the first
       12  thing on your mind is how long are you going to be with us.  We
       13  estimate the case will take us into next week, but, again, they
       14  are on the clock.  That's all I can promise to you.  When the
14:46  15  time is up, I have allocated what I think is a reasonable time
       16  and after that time, they sit down.  Each day they will get a
       17  printout.  You will see me keeping notes on this yellow sheet.

       18         This is another criminal case that took a lot
       19  longer -- will be taking a lot longer than this one.  These are
14:46  20  what they look out.  They will get a printout every day to the
       21  minute as to how much time they have used.  When the time is
       22  up, they sit down and that's it.  Okay.  So that's the best I
       23  can do at this point.  I have analyzed the case and so have
       24  they and they have a certain amount of time.

14:46  25         We operate on the following schedule.  We begin

at 10:00 a.m. in the morning and we adjourn at 6:00 p.m. in the afternoon.

The only difference is that on Tuesday, tomorrow, we begin at 11:30, okay, instead of 10:00 a.m. And go until 6:00 p.m. in the evening. Aside from that, we are 10:00 to 6:00 every day, except for Tuesdays when we begin at 11:30.

We also take a break mid-morning and mid-afternoon. Basically, you can count on us taking a break every hour and a half as the time goes along. The only definite time is the starting time. We try to get underway right at that point. Again, if anybody needs to take a break, the attorneys -- if you are up, if you are doing the direct examination or cross-examination, the parties, the witnesses, what is it, the jury, if anybody needs to take a break at any time, let me know. We can always take a 10-minute break. No big deal. Okay. So we will leave that up to you.

And if you have any special dietary needs -- I think one juror may or may not have -- you are free to have a snack while you are in the jury box. I know we had years ago, what was it, Mr. James, on a case that lasted a lot longer than this. He had a back problem, so we put him on the end and Mr. James, when he felt he had to stretch, got up and paced back and forth and retook his seat. We will get everything done.

Also, a little bit of a background, in the

14:48    1    Stanford case, we had 14 jurors but at the last minute, they

2    decided they wanted 15 jurors, so if anybody got sick or

3    whatever.  So we didn't have time to put an extra couple seats

4    in the jury box.  We got a La-Z-Boy and stuck it right there on

14:48    5    the end.  We can be flexible and we want to do what will help

6    the jury as it goes around.  That's all right though.  We gave

7    the first guy -- he could sit there and if he didn't like being

8    in the La-Z-Boy after the first day, what we would arrange is a

9    juror would move one seat each day.  After he got through that

14:48   10    first day, he stayed there the whole time.

11              Let's see.  Also, you will note that there are 14

12    of you in the jury box.  This case will be decided by 12 of

13    you.  However, with the agreement of the attorneys, we do it

14    this way.  Everybody is a fully-qualified juror.  No one is

14:49   15    designated right now as an alternate just because you are

16    sitting in a certain seat.

17              At the end of the case, after I have given you

18    the instruction and the attorneys have summed up, all 14 names

19    will be put in a box, and Ellen will walk over to one of the

14:49   20    jurors who will reach in and pull two names at random.  So that

21    way, you are all fully qualified, and you won't know who the

22    alternates are until the very last minute.  And it is not

23    because you are sitting in a certain seat that you are an

24    alternate and you won't deliberate because you know you are in

14:49   25    that category.  It will be decided by 12 jurors, but we won't

know that until the very end, just before you walk in to start deliberating.

I do permit you to take notes but keep in mind, if I want anything read back, I'm going to ask the court reporter and not for your notes. Your notes are only secondary to your own recollection. Always rely on your own recollection, but certainly you may use the notes for what purpose you feel is proper. You are free to take notes in this case.

I think I mentioned to you, if there is a finding of guilty -- and we don't know. If there is, again, it is solely the province of the judge relative to any kind of a sentence. Although when you get back to deliberate after the case is over, I will come back and tell you all of that if you have an interest. Because we will sit and talk for at least an hour after each case and go over my notes and your questions.

You have taken an oath which states you are going to decide this case based upon the evidence and the evidence alone. I want to talk to you about that at this time. First of all, we don't want you to decide who you like and dislike and decide the case accordingly. Therefore, you will have no contact with anyone related to the case, including attorneys, parties or witnesses. Of course, you may say good morning or good afternoon to them as you pass them in the hall, but you may say nothing further.

Also, you are not to extend any favors or accept any favors, however slight, to or from anyone related in this case. You are not to make any private investigation concerning this case. You are not to talk to your own doctor, your own lawyer or anyone else you think would have expert knowledge. Simply listen to the case as it is presented to you on the witness stand and make up your mind based upon that evidence and that evidence alone.

About 10 years ago, all the feds in the country started giving instructions like this: No Google research, no texting or tweeting or anything else about this case. You need to listen in fairness to the parties to the evidence as presented to you from the witness stand and make up your mind based upon that evidence and that evidence alone.

If you have any problem during the course of the trial, please let a member of the staff know. Should you be delayed in arriving at the courtroom for any reason, you need to give us a call because we can't do anything without all 14 of you here. If you have a medical emergency, a car breakdown or something, give us a call during your first break. Ellen will give you all of that information.

If at any time you can't hear, let me know. Raise your hand, say, Could you speak up? And I will have the witness speak up and/or pull that microphone in closer.

When you return from each break -- when we take a

14:52  1 | break, you will be in the jury room.  If it is for two or three

2 | minutes, you will be in there.  We will be doing things.  I

3 | will note down what it is and the clock will be going.  If we

4 | take our ordinary breaks or it is going to last a little

14:53  5 | longer, when you get through with your break, you reassemble in

6 | the jury room and then you come back in and take the same

7 | places you are in now.  Ellen will, the first time, line

8 | everybody up in the sequence you are in now.  Everybody remain

9 | standing until everybody is in place and then we will all be

14:53  10 | seated at the same time.

11 | Also, as you are aware, the federal courthouse is

12 | a smoke-free facility and certainly you are free to smoke,

13 | should you desire, outside the building during any of the

14 | extended breaks.

14:53  15 | Keep in mind if you would that, what is it, both

16 | sides have waited a while to get to trial.  When we're done,

17 | like I'm done, I go to the next case.  The attorneys are done,

18 | they go on to their next case.  You go home, go back to work

19 | and so forth.  But for the parties, the government and for the

14:54  20 | defendants, this is their only day in court.  This is it.  And

21 | that's what the whole system is about, a cross section of the

22 | community listening to the facts and then deciding the facts

23 | based upon the law that the judge lays out for you in the jury

24 | charge.

14:54  25 | I hope you are going to enjoy the case.  I have

found in all of my cases I learn something about different aspects of human society in every single civil and criminal case.

The last thing I have here is something I haven't done, but I started getting questions all the time when I get back in there about who these folks are. You have met some of them. We have an official court reporter. Okay. We have my case manager who moves the cases, files all the pleadings in this case and other cases and so forth. I have two full-time lawyers with me. They are with me for two years. One comes on and one comes off each year. They are top law students. You will see two to my right. I have historically had between 2- and 300 applicants for one slot a year from people around the country. They are a hell of a lot smarter than the judge, but at least I can run the show, or at least I let everybody think that I do. Ellen has been with me long enough -- she is grinning. Sometimes she calls the shots; sometimes she doesn't. But, anyhow, that's the folks. We also have each semester four law students currently in law school from one of the three local law schools. We have one of our interns there and we have three others. We have young women who are also interns for this semester, and you will see them from time to time, depending upon their school and their classes.

All right. The first thing we are going to do is we have opening statements. And the clock is going on. An

opening statement is nothing more than what the attorneys anticipate the evidence will show. So if we get an objection, I object, he is arguing his case, I will consider that to see where the boundaries are, what they anticipate the evidence will show. And keep in mind, there is never an obligation for any defendant to take the stand, to put on any evidence or even for the lawyers to ask questions, which I'm sure they will. But that's the presumption of innocence. The presumption of innocence never shifts. It is always on the government until they prove, if they can, each element beyond a reasonable doubt.

Now, we will start the clock. The government has the burden of proof, so they go first, and then we will hear from the defense.

I know you have requested, what, about 20 minutes a side?

MR. ARMSTRONG: Yes, Judge.

THE COURT: Whatever you need, we will keep track of the time.

Counsel, go right ahead.

MR. ARMSTRONG: Thank you, Judge.

THE COURT: Yes, sir.

MR. ARMSTRONG: Ladies and gentlemen, good afternoon. You have before you two defendants in this case. The evidence is going to show that these defendants were drug dealers. The

*Opening Statement by Mr. Armstrong*

only difference between these two defendants and the common, familiar drug dealer on the street is that one defendant wore scrubs and the other pretended to be the administrator of a medical clinic.

So, who are these defendants? First is Dr. Gazelle Craig. Dr. Craig is a physician here in Texas, and she was the only physician at a supposed pain management clinic called Gulfton. She had one job at Gulfton: To see patients and write prescriptions. And, boy, was she good at her job. In a little more than two and a half years, she wrote over 30,000 prescriptions for two drugs: Hydrocodone, an opioid, a drug called carisoprodol, or Soma. It's a muscle relaxer. Together, these two drugs are a dangerous drug cocktail. These drugs taken together are abused to get high, and these drugs are sold on the street for cash. Dr. Craig wrote prescription after prescription after prescription for this dangerous drug cocktail, and she did so for one reason: Cash. You are going to see, she is a doctor in name only.

The other defendant is Shane Faithful. Mr. Faithful, not a doctor, but he ran Gulfton. He set the rules, and he charged each patient about $300 to get this prescription for these drugs. And he ran a tight ship. It was his way or the highway. He cared about volume. He cared about the number of patients coming in, the prescriptions going out and the piles of cash stacking up. Together, these two

defendants, these partners in crime, dumped millions, millions

of these drugs onto the streets of Houston.  They didn't care

about the risks that these drugs posed to the patients.  They

didn't care about the risks that these drugs posed to the

public.  They cared about one thing:  Lining their pockets with

cash.

Let's talk about their medical clinic.  There was

absolutely nothing medical about it.  It was a pill mill.  It

was a front where they churned through patients, burned through

prescription pads and stacked up cash.  You are going to see

their operations defied all common sense.

Each morning, the gates of Gulfton opened up

around 7:30, and the clinic was flooded with patients.  Cars

were coming through like a drive-through McDonald's.  Many

patients came to people called "facilitators."  What is a

facilitator?  It is just code, code for other drug dealers who

brought two, three, four, five patients to the clinic in the

morning, dropped them off, then took them prescriptions

afterwards.

Armed security guards roamed all around Gulfton,

and they enforced the defendant's rules, all of which were set

up to avoid getting busted.

Rule number one:  No patient can have a cell

phone or even a book bag in the clinic.  If you were caught on

your phone, you were thrown out.  That rule, you will see, had

one purpose, to make law enforcement's job harder.  After all,
it's a lot harder to get busted for running a pill mill if you
aren't caught on tape doing it.  But you are going to hear that
sometimes Dr. Craig, she bent the rules.  If she caught a
patient on their phone, for example, she wouldn't throw them
out.  She would just cut the prescription.  She would just
prescribe them fewer opioids as punishment.  Absolute craziness
and not even close to real medicine.

Rule number two:  You had to have something
called DPS history.  Long story short, DPS history is just some
record that some other doctor at some point prescribed you
these drugs.  You will see how defendants used this DPS history
to cover their tracks, to weed out the obvious addicts, the
people who would draw the attention of law enforcement.

Rule number three:  Patients had to pay up.  Each
patient had to pay about $300 to get this dangerous drug
cocktail from Dr. Craig, but there was one catch.  You had to
pay cash.  No credit card.  No insurance.  Cash only.

You are going to hear, you are going to see that
many patients didn't even pay for themselves.  The facilitators
would pay upfront for two, three, four, five patients all at
the same time and take the prescriptions afterwards to do with
it what they wanted.

Let's talk about the medical visit, the medical
part of the patients.  Upwards of 60 patients were crammed into

15:03  1  the waiting room, filling out questionnaires.

2  Are you in pain?  Yes, of course, I am.  Have you

3  been in pain for a long time?  A very long time.  What makes

4  your pain feel better?  Medications.  What makes your pain feel

15:03  5  worse?  Medications.

6  Then the patients were called into the exam room

7  for some follow-up, for a quick exam:  Does it hurt here?  Oh,

8  yes, of course.  How about there?  Yes, absolutely.  Can you

9  touch your toes for me?  And then in strolls Dr. Craig.

15:04  10  You are going to see that Dr. Craig spent as

11  little as 45 seconds with patients before prescribing this

12  dangerous drug cocktail.  Forty-five seconds, not even close to

13  real medicine.  Each day this process repeated itself, over and

14  over and over again.  Each day upwards of 60 patients come to

15:04  15  the clinic, paid in cash.  Each day, upwards of 60 patients got

16  this dangerous drug cocktail.  And each day, Dr. Craig writes

17  all of these different patients the same prescription for the

18  same two drugs.

19  Ladies and gentlemen, the defendants' business

15:05  20  was booming.  With the help of facilitators, their waiting room

21  was at maximum capacity, and there was a line out the door to

22  get in.  Defendants were stuffing their pockets with 20 bills,

23  $100 bills, up to $20,000 a day, a day.

24  At the end of the day, they took all the cash,

15:05  25  and they would divide it 50/50, pay a few expenses, 1,000 bucks

15:06    1    here, 1,000 bucks there, one cash envelope for Dr. Craig, one

2    cash envelope for Shane Faithful.  Let's do it again tomorrow.

3                Ladies and gentlemen, that's a very high level

4    overview of the case, the evidence that you are going to hear.

15:06    5                How are we going to prove it to you?  In a number

6    of ways.  First, you are going to hear from witnesses.  You are

7    going to hear from an insider, the office manager and she is

8    going to give you that insider's view of the defendants'

9    illegal pill mill.

15:06   10                You are going to hear from two individuals who

11    posed as patients.  Each paid about $300 cash; each got the

12    same prescription.  Both were treated more like customers than

13    actual patients.

14                You are going to hear from a real doctor, an

15:07   15    expert in pain management, and he is going to talk about

16    something called the standard of care.  The standard of care is

17    just basic requirements, something that all doctors have to

18    follow before prescribing these dangerous drugs.  Common sense

19    requirements such as:  Make sure that you get the records about

15:07   20    the patient's condition and their prior treatment and prior

21    medical history before you prescribe these dangerous drugs and

22    let's try something else that is less dangerous than opioids.

23    Let's do yoga, swimming, physical therapy, stretching, weights.

24    You name it.  Don't just dive off the deep end of opioid

15:07   25    treatment.  He is going to tell you Dr. Craig didn't even come

15:07  1    close to practicing medicine.

2           What else are you going to see?  You are going to

3    see documents.  Agents searched three locations in this case.

4    They searched the clinic.  They searched the house of

15:08  5    Mr. Faithful and they searched the house of Dr. Craig.  At each

6    location they found documents and they found piles of cash.

7    You are going to see the defendants' fingerprints are all over

8    the pill mill.

9           You are also going to see patient files.  The

15:08  10   patient files just give the appearance of actual medical work

11   and medical treatment.

12          You will also hear recordings, audio and visual.

13   You will see firsthand the patients flooding into the clinic

14   and the cars coming through like a drive-through.  And you are

15:08  15   going to see the seconds, the seconds, that Dr. Craig spent

16   with patients before prescribing these dangerous drugs.

17          You are also going to see the prescriptions

18   themselves.  You are going to see the 13,000 or so

19   prescriptions for the muscle relaxer and about 18,000

15:09  20   prescriptions for hydrocodone.  Together, those prescriptions

21   added up to about a few million pills.

22          You are going to see that Dr. Craig

23   wrote 99 percent of all her prescriptions of that dangerous

24   drug cocktail; how that's the hallmark, the hallmark, the

15:09  25   shining star of a pill mill.

15:09   1   You are also going to hear from two people called
        2   confidential human sources.  A confidential human source is
        3   just someone who worked with DEA and assisted in their
        4   investigation.  The first confidential human source is the
15:09   5   office worker, the insider.  She initially worked with DEA and
        6   gave them information, and she was paid for that information.
        7   She also stands in line to receive a reward, up to $40,000 for
        8   that information.  How much she gets, not guaranteed.  Whether
        9   she gets a reward, not guaranteed.  But what is guaranteed is
15:10   10  that whatever award she gets is separate and independent from
        11  what happens in this case.

        12   You are also going to hear from a confidential
        13  human source who made some recordings in this case, and he did
        14  so because he got busted for running his own pill mill and he
15:10   15  started working with DEA for a chance, a chance at a lighter
        16  sentence.

        17   Ladies and gentlemen, you are going to hear from
        18  witnesses and you are going to see the documents, patient
        19  files, the recordings and the prescriptions.  All of this
15:10   20  evidence is going to show one thing:  The defendants' operation
        21  was illegal, they knew it and they are guilty of all charges.

        22   Thank you.

        23   THE COURT:  All right.  Defense, please?

        24   For your information, you used 14 minutes.

15:11   25  MR. ARMSTRONG:  Thank you, Judge.

*Opening Statement by Mr. Williams*

15:11    1          MR. WILLIAMS:  Ladies and gentlemen of the jury, what
         2    you are about to hear is how the government does business once
         3    they target you for criminal investigation.  We believe the
         4    evidence will show that in April of 2015, DEA agents targeted
15:11    5    the clinic that was run by my client Shane Faithful and
         6    Dr. Gazelle Craig.

         7          They received a tip that something was going on
         8    wrong.  Okay?  Now, thereafter, they came out to the particular
         9    clinic.  I believe that was in September 2015.  They came out
15:12   10    to the clinic.  These two investigators right here,
        11    Investigator Mills and Investigator Gainer, along with people
        12    from the Texas Medical Board.  They came out to question what
        13    was going on in the particular clinic.

        14          After speaking to Shane Faithful, they concluded
15:12   15    that what he was telling them was not correct.  They spoke to
        16    Dr. Craig and decided, well, let's run what we call a
        17    prescription history showing how many scripts were written in a
        18    particular period of time.  That particular history was run,
        19    and they discovered that approximately 3,000 dosages -- I'm
15:12   20    sorry -- 300,000 dosages of hydrocodone had been prescribed
        21    over a six-month period of time.  That period of time being
        22    from January 2015 until approximately end of May 2015.

        23          Once they received that particular investigation,
        24    when they came out to talk to them, they requested certain
15:13   25    files, which Dr. Craig gave them particular files.  You will

15:13   1   see after that from that particular time, from September
        2   of 2015 until approximately October of 2016, very little
        3   happened.  Mind you, when they came out in September of 2015,
        4   they came out to just do an investigation and to look at the
15:13   5   particular records.  They looked at those particular records.

        6           Now, mind you, these are what they call the
        7   diversion agents, DEA Diversion.  Their job is to make sure
        8   drugs don't hit the streets illegally.  But for a whole year,
        9   nothing happened.  Nothing happened.  They subpoenaed some bank
15:14  10   records, got some records regarding the clinic.  They did very
       11   little.  Very little.

       12           Then in December 2016, they received a phone call
       13   from a person posing to be somebody that they were not.  That
       14   person end up being Lorin Phillips.

15:14  15           Now, he talked about insider information.  Loren
       16   Phillips, she was the person that assisted Shane Faithful for
       17   some eight months before he decided to allow her to work in the
       18   particular clinic.  From the best of the records I have seen,
       19   she started working in April and May of 2016 and she worked
15:15  20   there the whole particular time, okay, from May of 2016 until
       21   December of 2016.

       22           During that particular time, Mr. Faithful had
       23   problems with her.  She was insubordinate.  Okay.  He found out
       24   she was doing things against the clinic's policies, things like
15:15  25   dealing with these facilitators that we just heard about.

15:15  1          Now, we believe the evidence will show that once

2    she called DEA in December of 2016 posing to be somebody else,

3    she met with DEA one time in February of 2017.

4          Now, March 1st, 2017, she comes in and signs an

15:15  5    agreement with DEA.  That was signed by this agent here,

6    Mr. Gainer, and his supervisor, to become a paid informant to

7    provide information.

8          Now, mind you the date that she left, she took

9    with her several documents.  She stole the particular documents

15:16  10    out of the particular clinic.  She kept them in her possession.

11    Didn't tell DEA nothing about that.  Now, after she met with

12    them in what we call an initial debriefing -- a debriefing is

13    simply where you sit down with the government and tell them

14    everything you know about everything they ask you.  She signs

15:16  15    her agreement.  She meets with them a second time and gives

16    them information.  On the 22nd of March, 2017, she allegedly

17    brings documents to DEA.  She brings documents to DEA.

18          Now, you will find nowhere in the DEA records,

19    which they keep records of every time you talk to them -- they

15:17  20    prepare what we call a DEA6.  What that is is a memorial of

21    what we talked about while we were there.  You will find

22    nothing in their records where she produced records to them.

23    Nothing, but you will find that on the same date, there is a

24    document whereby DEA paid her $3,000.  They paid her $3,000.

15:17  25          Now, I believe the evidence will show and

15:17    1    testimony from this particular witness stand that once she

         2    brought these documents, they told her, Well, they are loose

         3    documents.  Go put them on a thumb drive and bring the drive

         4    back to us.  Okay?  Nowhere in anything the DEA has will it

15:17    5    show there is a record of these particular documents.

         6           I believe the testimony is going to show from

         7    these particular agents that she brought the thumb drive in.  I

         8    believe the evidence is going to show that they took the

         9    evidence, downloaded the thumb drive and miraculously gave the

15:18   10    thumb drive back to the person who brought it without

        11    documenting anything.

        12           I believe the evidence will show that in June she

        13    produced other documents.  Okay?  Another thumb drive.  I

        14    believe that evidence is going to come from this particular

15:18   15    agency.  You will see nowhere in the DEA6s where they had noted

        16    any of this evidence.  I believe the evidence is going to come

        17    from Diversion Agent Mills that once she produced the first

        18    thumb drive, then she turns around and brings the loose

        19    documents back.  I haven't figured that out.  I still haven't.

15:19   20           Now, there were certain protocols in place with

        21    the particular clinic.  One of them -- one of the particular

        22    rules were you have to check DPS records to see if there was a

        23    prescribing history before you can even prescribe these drugs.

        24    You will hear from their expert that --

15:19   25           THE COURT:  Speak up a bit, Counsel.  You don't need

15:19  1  the microphone but just speak up a little bit.

2       MR. WILLIAMS:  Yes, sir.

3       You will hear that these protocols are set up and

4  you will hear the expert tell you these protocols are set up to

15:19  5  make sure that patients aren't doctor shopping and patients

6  aren't getting prescriptions too soon.

7       February 17, DEA sends undercover persons into

8  the clinic attempting to get prescriptions.  Both of these

9  particular people were turned away because the protocol that

15:20  10  they had set in place at the clinic worked.  They turned them

11  away.

12       March of the same year, they decided, let's go

13  get Davis Webster.  Now, Davis Webster is the convicted felon

14  he is talking about.  Davis Webster has pled guilty in this

15:20  15  same courthouse of being involved with an illegal pain clinic.

16  The evidence will show that Davis Webster has been a

17  confidential informant for DEA since 2006.  They used him on

18  several occasions.  So they had to go get the best people that

19  they had to come in and try to infiltrate this particular pain

15:20  20  clinic because the two people they had before couldn't get the

21  scripts because the protocol was set up to prevent people

22  getting scripts that weren't eligible to get the particular

23  prescriptions.

24       Now, the evidence will show he goes in in

15:21  25  March 2017.  Because of his experience in dealing with these

15:21   1   particular matters, he was able to convince Dr. Craig to write

2   a script for him.  Okay?  He put all of the modalities down

3   which fit a person who actually needed these particular

4   scripts, and she wrote him a legitimate script.  He takes the

15:21   5   script and turns it over to him.

6           Now, his stake in this outcome is he is in the

7   federal penitentiary.  He will tell you from the witness stand

8   that he is cooperating in an effort --

9           THE COURT:  I can't hear you, sir.

15:21   10          MR. WILLIAMS:  He is cooperating in an effort to

11  reduce the time that he is looking at.  Okay?  Mind you, he

12  pled guilty in November of 2016.  He is still awaiting

13  sentencing right now.  What he does for them will determine

14  what his sentence is going to be.  He is going to come in and

15:22   15  tell you, well, I'm not promised anything.  I'm just promising

16  to tell the truth.  But if you look at the evidence

17  objectively, the only reason he is doing this is because he is

18  a convicted felon attempting to reduce the time that his judge

19  will potentially give him at his sentencing.  His sentencing

15:22   20  will be set sometime after he testifies.

21          Now, after he made the recording in March, he

22  goes back in May.  Okay?  This time, though, when he goes back,

23  he has to bring x-rays to verify his injuries and everything

24  else.  And he goes back, brings the x-ray and gets another

15:22   25  prescription.

15:22   1     The next month they sent in another diversion

2   officer who is with the task force.  Her name is Tanya Graham.

3   You will hear evidence from her that she went in wired with

4   cameras to get a prescription from Dr. Craig.  She was

15:23   5   successful in getting a prescription.  What you hear from this

6   evidence is that three times they went in and couldn't get

7   scripts and three times they did get scripts.  So obviously the

8   protocol that is there is working.

9     Now, the government finally decides, well, let's

15:23  10   file charges.  I think we have got enough evidence to file

11   charges.  July 10, 2017, they run search warrants on the clinic

12   and they run search warrants on Dr. Craig's residence and

13   Mr. Faithful's residence.  They seized items from there, and

14   they take the items that they paid for from Loren Phillips.

15:24  15   And that's the particular evidence that they want you to rely

16   upon in convicting these two individuals here.

17     What you have here is testimony from paid

18   informants and testimony from convicted felons who are

19   attempting to reduce their sentences and testimony from

15:24  20   employees who, when they came in to talk to these particular

21   employees, Olivia Caldwell, Shametra Morgan and Gina Garcia, on

22   the date that they ran the search warrants, they took recorded

23   statements from them.  And when you listen to these particular

24   statements, you will hear at that particular time nobody is

15:24  25   saying that there is anything wrong with the clinic.

15:24   1          So what happens?  A paid informant, Lorin

2    Phillips, who knows these people, was going to inform them

3    about what was going on in the clinic:  This is wrong, this is

4    wrong, this is wrong.

15:25   5          Okay.  Now, when they speak to Olivia Caldwell

6    and Shametra Morgan again in October, now their stories change.

7    They made tapes of those particular stories and particular

8    interviews.

9          Now, you will hear evidence from these

15:25  10    investigators that most of the time when you do interviews, you

11    don't record them.  You don't record them.  You just take notes

12    and what we thought they said.  Now, if you use your common

13    sense, you will be able to know if you really want to know what

14    somebody said in the days of automation that we have here, all

15:25  15    you have got to do is pull your phone out.  You can record

16    anytime, anywhere that you want, but you are not going to have

17    those.  And they do that in order to give you what their

18    interpretation is of what a person says.

19          Now, what you won't have here is evidence from

15:26  20    interviews of any of these people who got these scripts other

21    than Webster Davis and Tonya Graham, who is an agent.  They

22    didn't get scripts.  The so-called insiders that Mr. Armstrong

23    is referring to will tell you, a lot of these people appeared

24    to be needing these scripts.  Okay.  All right.  You will hear

15:26  25    evidence that they set up surveillance on this particular

clinic on several different occasions, taking license plate
numbers, helicopters following people from the clinic,
elsewhere. Okay. But they never arrest anybody because their
focus was never on anybody but these particular people here.

You will hear evidence from these so-called
insiders about how they manipulated the facilitators for their
own gain. They'll tell you they interviewed them. They will
tell you, oh, I knew this guy, I knew this guy, these were the
facilitators. But the problem you will have with all of this
is while they were working there, nobody called them. Lorin
Phillips is going to tell you she called these people the day
she was forced out of the clinic for insubordination. You will
hear a tape that was allegedly made by Ms. Olivia Caldwell in a
meeting when Shane Faithful is talking to the clinic about,
you're not doing your jobs and if you are not doing your jobs,
we are going to have to get rid of you. You will hear evidence
from all of the particular people in there that nothing was
wrong. And then after they got poisoned by Lorin Phillips, now
they want to become witnesses.

I will submit to you that you will hear expert
testimony from Graves Owens. Mr. Owens is a paid expert from
the government. That's all he does. You will hear evidence
from him that he is an ex-anesthesiologist who ran a pain
clinic. The problem we are going to have with him is he hasn't
practiced medicine in five years. They will tell you all he

does is goes around and testifies for the government in cases,
saying how bad these opioids are.  And even worse, he will tell
you he looks at patient charts and tells you what she is doing
wrong.  However, he didn't interview any particular patient.
It is real easy to play Monday morning quarterback.  On Sunday,
we just go back and look at the film and say, We didn't do this
correct.  But the problem with any of y'all, you all need to
check your paper as a doctor and I haven't seen you personally.
This is the evidence that the government is going to present to
you.

And then I anticipate you will hear from these
particular agents.  You will hear about what they did.  And I
anticipate them telling you that everything they did, they had
to do it because they had to get to these people.

Think about it.  This case is going to turn upon
the evidence of paid informants, convicted felons and
disgruntled employees.  The evidence they will present to you
is not going to rise to the level that we use that the judge
told you about in voir dire, beyond a reasonable doubt.

After you hear this evidence, you will have
plenty of doubt all over this evidence, and we are going to ask
you to find Shane Faithful not guilty.

THE COURT:  Counsel?

MR. LEWIS:  Judge, if I could use the podium, I would
like to use the podium.  Is it okay if I stand over there?

15:30 1    THE COURT: I will tell you this: That you have used

2  18, almost 19 minutes.

3    MR. WILLIAMS: That's fine. I had 20.

4    MR. LEWIS: I'm going to be a little shorter than

15:30 5  that.

6   *(Off the record discussion held)*

7    THE COURT: By the way, you will see that some of the

8  attorneys may sit when they examine witnesses. Some of them

9  may stand. Some of them use the podium. Historically in

15:31 10  federal court, everybody uses a podium and some judges have a

11  rule, you can't get more than one arm's length away from the

12  podium.

13    As far as I'm concerned, they can sit like they

14  do in state court. They can stand at their place. They can

15:31 15  move up and back or use the podium. Whatever their preference

16  is is fine.

17    Counsel, it's all yours. I stopped the clock

18  for 30 seconds. Go on.

19    MR. LEWIS: As I told you earlier during the voir dire

15:32 20  process, my name is Don Lewis, and I represent Gazelle Craig in

21  this case, who is the medical doctor that is being accused in

22  this case.

23    Let me start out by saying this: I hope that all

24  of you as jurors today remember every word that Mr. Armstrong

15:32 25  stated, everything that he represented to you. Because the

15:32    1    judge has told you -- and you will know again in this case --

2    that this case is about proof. It's not about conjecture.

3    It's not about idle words. And Mr. Armstrong, remember what he

4    said as it relates to the activities for Dr. Craig, for

15:32    5    Mr. Faithful, for the clinic, for the drugs, for the report,

6    and for the activities that brings us into court today

7    regarding Gulfton Community Health Center.

8          The evidence will show that Dr. Craig is a

9    licensed physician in the state of Texas and she was only one

15:33    10    of the medical providers at Gulfton Community Health Center.

11    They had other health providers there that are referred to as

12    mid-level health providers. You probably have heard of

13    physician assistants. You probably have heard of nurse

14    practitioners. Both of these individuals also issue

15:33    15    prescriptions in treatment of patients. She was not the only

16    doctor that was connected to Gulfton Community Health Center.

17          As part of treating the patients at Gulfton,

18    remember what Mr. Armstrong said. He said she only prescribed

19    two drugs. She issued prescriptions for controlled substances

15:34    20    and noncontrolled substances in treating these patients. Both

21    the controlled and the noncontrolled substances have been

22    determined by the FDA, the CDC, the manufacturers for treating

23    the patient's condition that she determined that this patient

24    was suffering from. These are all recognized authorities that

15:34    25    health providers use to determine what type of medication you

are going to utilize in order to treat your patient.

She not only determined that these medications were indicated for the patient's condition, she also determined that these medications were medically necessary for the patient's condition.

When Mr. Armstrong speaks of a pill mill, a pill mill is a clinic where you come into the clinic, you pay money after you see the doctor and you leave with prescriptions. That's not what happened at Gulfton Community Health Center. These individuals were examined. They were assessed. And they were followed up or counseled regarding what was going on with them medically that brought them to this clinic. Those things are not characteristics of a pill mill. Those things are characteristic of a clinic that is attempting to render rational and necessary medical treatment.

The evidence will show that as medical director for Gulfton, Dr. Craig implemented clinical protocols to screen individuals that were seeking medication for the purposes of abuse or diversion. You just heard Mr. Williams tell you the attempts that were made at this clinic that were unsuccessful, and they were unsuccessful in large part because Dr. Craig had protocols in place that if individuals did not satisfy certain things about their requests for treatment, they were not even seen by the doctor. In fact, you will hear one of the individuals that did not get medication that was sent in by the

government to get medication, Dr. Craig told this individual,

No, I cannot treat you. If you -- because you don't have the

criteria to satisfy the protocol, you need to seek care

somewhere else. Will a pill mill do that? A pill mill is

about making as much money as you can for whoever wants to give

it to you.

There would be no reason to do that if you are a

pill mill. She made a rational referral to this patient and

said, I can't help you; maybe someone else can.

The evidence will show that that happened at

Gulfton. That that happened more than once. In fact, it

screened hundreds of individuals from receiving treatment and

care from Gulfton.

The evidence will show that Dr. Craig performed

appropriate physical assessments, lumbar and musculoskeletal

examinations and neurological examinations for patients at

Gulfton in order to arrive at a forensic diagnosis for each

patient she treated. You will hear these terms again because

the government's expert, Dr. Graves Owen, is going to bring

these things up about what is the appropriate things that a

provider must do within the standard of care in order to treat

a patient that is complaining of issues related to chronic

pain.

One of the reports that I expect that the

government will tender into evidence will have these things in

Dr. Owen's report as things that he used in order to determine

if the standard of care is being met as it relates to patients.

The evidence will show, as Mr. Williams has said,

at least three informants, undercover agents attempted to come

into Gulfton to obtain medication, and they were turned down.

And these are people that know what to say.  They know how to

do it.  But they could not get treatment because the protocols

and the other safeguards were in place at this clinic that

prevented them from getting care.  We have record of that.  And

the failure of them to obtain prescriptions from Dr. Craig is

persuasive evidence that this clinic did not act as a pill mill

because that's not what pill mills do.  They don't go out of

their way not to make money.

One of the things that was said -- and I will

submit to you as it relates to Dr. Owens, what Mr. Armstrong

said, he is a real doctor.  He's not like Dr. Craig.  He's a

real doctor.  I'm not sure what that means because Dr. Owens

doesn't have a medical practice.  He hadn't operated a medical

practice for some time now.  Dr. Owens based his opinion solely

on review of the records.  As Mr. Williams stated, he is a

Monday morning quarterback.  And very important, Dr. Owens is

getting paid for his testimony.  And I'm not saying that

disqualifies him as a witness, but as a juror, it certainly

should put in your mind whether or not him getting paid has a

potential effect on his motive and also his potential bias.

*Opening Statement by Mr. Lewis*

15:42   1          The evidence will show in addition to medication

2   management at Gulfton Community Health Center, other treatments

3   were utilized for treating these patients; massage therapy,

4   patient education, stretching and exercise and referrals to

15:42   5   chiropractic care.  And this is all documented in the medical

6   records that you will review.  The uses of any of those is not

7   consistent of a clinic being a pill mill.

8          As Mr. Williams has stated, you are going to hear

9   evidence from the government and the government's witnesses

15:42   10   that should give you some pause or some doubt in this case as

11   to whether or not this evidence is credible, whether or not

12   it's authentic.

13          You, as the jury, is the judge of the

14   credibility, and I submit to you that you should do that, judge

15:43   15   whether or not this information is credible or authentic.  A

16   large part of the evidence that the government will be asking

17   you to use to find Dr. Craig guilty was provided by paid

18   government informants; one particularly that left Gulfton

19   because of her employee misconduct, not because she believed

15:43   20   the clinic was doing anything wrong.

21          There is no way that I can give you an overview

22   of all the things that you are getting ready to hear and all

23   the evidence that I believe that you will see that's lacking in

24   credibility, authenticity and trustworthiness.

15:44   25          After you have considered this incompetent and

15:44   1   flawed evidence, I assert that you will determine that

2   Dr. Craig did not commit the offenses for which she is charged

3   and return a verdict of not guilty.

4           Thank you.

15:44   5           THE COURT:  Ladies and gentlemen, we have been in

6   session -- we said we would get back in about 2:30.  We got in

7   and were doing matters out here.  It is now about 3:45.

8           Do you want to take a break now or go right on to

9   the first witness and we will go on for about another half

15:44  10  hour?  You call it.

11          A JUROR:  Keep going.

12          THE COURT:  Got it.  Call your first witness.

13          MR. HELFMEYER:  United States calls Special Agent

14  Tonya Graham.

15:45  15          MR. WILLIAMS:  May we invoke the Rule?

16          THE COURT:  Yes.  As soon as the witness comes in.

17          MR. WILLIAMS:  May we approach briefly?

18          THE COURT:  All right.  Come on up.

19      *(At the bench)*

15:45  20          THE COURT:  Yes?

21          MR. WILLIAMS:  Just for the record, I would like to

22  invoke the challenge that I had --

23          THE COURT:  Go on?

24          MR. WILLIAMS:  -- the challenge that we gave on Friday

15:45  25  whereas two witnesses from the government are sitting at the

particular table.  Judge, what we found out on Friday is it is

clear that they cover each other when the Rules are not

invoked.  One agent testified to one thing and the other agent

came behind him and cleaned it up.  Judge, we have a real

concern here with both of them sitting here, hearing each

other's testimony, being able to come back and talk to

witnesses.

THE COURT:  Overruled.

MR. ARMSTRONG:  We would also like to invoke the Rule

as to any potential defense witnesses.

MR. WILLIAMS:  If they come in, I will notice them.

THE COURT:  Thank you.

*(Open court)*

THE COURT:  Everyone who anticipates being called as a

witness in this case that's in the courtroom, please stand at

this time, anybody to be called as a witness in this case.

Raise your right hand and be sworn, please.

*(Witnesses sworn)*

THE COURT:  I have made a ruling.

Ma'am, you can take your seat up here.

I have invoked what they call "the Rule."  I have

stopped the clock, by the way.  I don't go until you start

going.  Okay.  It is Rule concerning sequestration of

witnesses.  Actually, the origin goes way back to biblical

times.  I'm not a biblical scholar, but someone researched it.

If you are interested, we will talk about it later.  Okay?  But it means that everyone who is not a party to the lawsuit must remain out in the hall and remain there until he or she is called as a witness.  And they are not to discuss the case with anyone, and so forth, but they may discuss it with each other.  Okay.  I have sworn in three witnesses.  We have a witness on the stand and I'm designating -- I've agreed to designate two case agents to be the government's agents and also we have the two defendants who are in.

Anybody else who comes in who will be testifying will be put under the Rule.  Either the attorneys will notify them about it or I will actually swear them in and tell them.  So now everyone has been put under the Rule.  I guess once you are done, you will be released from the Rule, but they are not to discuss this case with anyone; that they are under the Rule, except they may only discuss it with any of the attorneys in this case, and they can visit with each other until they testify.  The exemption is case agents who I'm -- I agreed to designate both as government representatives and you have got the two defendants.

So right now, we are ready to proceed with the first witness.  Go right ahead, sir.

MR. HELFMEYER:  Thank you, Your Honor.  For the record, I just showed defense counsel Exhibits 319 and 361, page four.

15:48    1    **TONYA GRAHAM, DULY SWORN, TESTIFIED:**

         2              **DIRECT EXAMINATION**

         3    *BY MR. HELFMEYER:*

         4    Q    Good afternoon, ma'am.  Would you please introduce yourself

15:48    5    to the jury?

         6    A    Good afternoon.  My name is Tonya Graham.

         7    Q    What do you do for a living?

         8    A    I'm a special agent with Drug Enforcement Administration.

         9    Q    How long have you been doing that?

15:49   10    A    Since August of 2002.

        11    Q    Any other law enforcement experience?

        12    A    Prior to DEA, I was a uniformed division officer with

        13    United States Secret Service.

        14    Q    Did you do protection detail?

15:49   15    A    Yes.  For the President, Vice President, dignitaries.

        16    Q    How long were you with the Secret Service?

        17    A    Approximately three years.

        18    Q    In your current position in the Drug Enforcement

        19    Administration, are you assigned to a squad?

15:49   20    A    I'm assigned to the Tactical Diversion Squad.

        21    Q    What kind of cases do you investigate in the Tactical

        22    Diversion Squad?

        23    A    We enforce the controlled substance laws of the United

        24    States, but we emphasize pharmaceuticals, mainly opioids.

15:49   25    Q    You said Tactical Diversion Squad.  What is diversion?

15:49  1  A    Diversion is when drugs are prescribed to a person and that

2  person transfers the drugs to another person for illicit use.

3  Q    And how does that happen?

4  A    That happens where a person goes to a doctor.  They are

15:49  5  prescribed drugs, prescriptions, drugs.  They go to the

6  pharmacy.  They get the prescriptions filled and they, in turn,

7  transfer the drugs over to a middle person, and then that

8  person sells them on the street.

9  Q    As part of your work with DEA, do you investigate pill

15:50  10  mills?

11  A    Yes, I do.

12  Q    And what is a pill mill?

13  A    A pill mill is a place where a doctor, inappropriately on a

14  daily basis, prescribes a high volume of powerful prescription

15:50  15  drugs for cash.

16  Q    What kind of investigative tools does your squad have for

17  investigating diversion?

18  A    Some of the tools we utilize are surveillance.  We utilize

19  undercovers.  We utilize database checks, data analysis and

15:50  20  open source checks.

21            THE COURT:  What is open source checks?

22            THE WITNESS:  Open source, such as we will do a Google

23  check or something like that, or the driver's license.

24            THE COURT:  Okay.

15:50  25  *BY MR. HELFMEYER:*

*Helfmeyer Direct of Tonya Graham*

15:50  1  Q   Who are the subjects of your investigations with DEA?

2  A   With DEA, we investigate doctors, nurse practitioners,

3  physician assistants, clinic owners, clinics, pharmacies and

4  pharmacy owners.

15:51  5  Q   In this case, what was the name of the clinic that you and

6  your squad were investigating?

7  A   Gulfton.

8  Q   Generally, what part of Houston is that in?

9  A   59 and the Hillcroft area.

15:51  10  Q   And that is in Houston, Texas?

11  A   Yes, sir.

12  Q   What was your involvement in this case, in the

13  investigation?

14  A   My involvement in the investigation, I was an undercover

15:51  15  agent.

16  Q   Are you familiar with the surveillance that your squad used

17  against Gulfton?

18  A   Yes.

19  Q   What kind of surveillance did you use?

15:51  20  A   It's electronic surveillance, also known as a pole camera.

21          THE COURT:  A what camera?

22          THE WITNESS:  A pole camera.

23          THE COURT:  Pole camera?

24          THE WITNESS:  Yes, Your Honor.

15:51  25          THE COURT:  That's a camera up on a pole, literally?

15:51   1          THE WITNESS:  Yes.  It can be on a pole, Yes, Your

2   Honor.

3   *BY MR. HELFMEYER:*

4   Q   As part of your team's investigation into the Gulfton

15:51   5   Clinic, you installed a pole camera?

6   A   Yes.

7   Q   I would like to play a few clips from the pole camera for

8   the jury if we can lower the lights.  For the record, we are

9   playing Government's Exhibit 507.

15:51   10          Special Agent Graham, what is the date on this

11   recording?

12          THE COURT:  Is that -- I will tell you what.  Let's

13   get the other set of lights off.

14      *(A videotape, Government's Exhibit Number 507, was played)*

15:52   15   *BY MR. HELFMEYER:*

16   Q   What is the jury looking at?

17   A   They're looking at a side view of the Gulfton Medical

18   Clinic on the date of June 19, 2017.

19   Q   What time is that?

15:52   20   A   7:26 a.m.

21   Q   We are going to back it up a second.  What is the jury

22   going to see?

23   A   The jury --

24          MR. WILLIAMS:  Objection, Judge.  The jury will be

15:52   25   able to see it for themselves.  She doesn't have to testify as

15:52    1    to what they see.

2        THE COURT: Overruled. By the way, the final

3    interpretation of video or audio or transcripts is strictly up

4    to the jury, if you agree that that is what it shows, but I

15:53    5    will allow them to describe to you what they feel it is in

6    their experience. You were there -- were you there? You were

7    involved in getting that pole camera put in?

8        THE WITNESS: I observed the footage, Your Honor.

9        THE COURT: All right. Go on.

15:53    10    *BY MR. HELFMEYER:*

11    Q    What is the jury going to see?

12    A    The jury is going to see the gate open, and there is going

13    to be an influx, a high volume of people, foot traffic and

14    vehicle traffic.

15:53    15    Q    What time was this starting?

16    A    7:25 a.m.

17    Q    During your investigation, did you learn what time Gulfton

18    opened?

19    A    Yes, at approximately 7:30 a.m.

15:53    20    Q    What is the jury looking at right now, if you can explain

21    for the record?

22    A    The gate has just opened, and there is a large volume of

23    foot traffic and vehicular traffic entering into the parking

24    lot.

15:53    25        THE COURT: What time does it open in the morning?

15:53  1        THE WITNESS:  At approximately 7:30, Your Honor.

2        THE COURT:  Okay.  The gate has just opened; is that

3    correct?

4        THE WITNESS:  Yes, Your Honor.

15:54  5  *BY MR. HELFMEYER:*

6  Q    What is the jury looking at right now?

7  A    A 15-passenger van going inside the parking lot.

8        MR. HELFMEYER:  I would like to move to Government's

9    Exhibit 508.

15:54  10      *(A videotape, Government's Exhibit Number 508, was played)*

11       THE COURT:  I see the clock going back to the same

12   time in the morning.

13       THE WITNESS:  The time is 7:17 a.m.

14       THE COURT:  On the next day?  Or the same day?

15:55  15  *BY MR. HELFMEYER:*

16  Q    If you can read the date for the record.

17  A    The date is June 29, 2017.

18       THE COURT:  What do we see before then?

19       MR. HELFMEYER:  The first date, Your Honor, what the

15:55  20   special agent testified to, is June 19th, 2017.

21       THE COURT:  Okay.  Go on.

22  *BY MR. HELFMEYER:*

23  Q    What is the jury going to see in this video?

24  A    They are going to see the gate open and then people started

15:55  25   to line up around the fence.  When the gate opened, the foot

15:55  1    traffic and the vehicle traffic, there is going to be an influx

2    going into the parking lot.

3    Q    Did you see multiple people get out of the car that was

4    parked in front of the gate right there?

15:56  5    A    Yes.

6    Q    What is the jury looking at?

7    A    The jury is looking at a large volume of people going in in

8    vehicles, and then a person here looks like they are on some

9    type of walker or some type of assistance.

15:57  10   Q    Have you been able to count the number of cars the jury has

11   seen driving through?

12   A    There have been approximately 30 cars.

13   Q    For the record, the video stopped.  What time did it stop?

14   A    7:23 a.m.

15:58  15          MR. HELFMEYER:  We are going to next play Government's

16   Exhibit 509.

17        *(A videotape, Government's Exhibit 509, was played)*

18   *BY MR. HELFMEYER:*

19   Q    What is the date that Special Agent Gainer selected?

15:58  20          THE COURT:  Pull the mic in, please.

21          MR. HELFMEYER:  My apologies.

22   *BY MR. HELFMEYER:*

23   Q    What is the date that Special Agent Gainer selected?

24   A    July 7, 2017.

15:58  25          THE COURT:  What is that?  A week later?

15:58   1       THE WITNESS:  Yes, Your Honor.

2       THE COURT:  Approximately.  All right.  Go on.

3   BY MR. HELFMEYER:

4   Q   What time is it?

15:59   5   A   7:31 a.m.

6   Q   It looks like there is some glare on the video.  Is that

7   what the jury is seeing?

8   A   Yes.  It is from the sun.

9   Q   What else is the jury seeing right now?

15:59  10   A   A high volume of vehicular traffic because the gate just

11   opened.

12       THE COURT:  The gate had just opened.  This time it

13   was 7:30?  Is that correct?

14       THE WITNESS:  Yes, Your Honor.

15:59  15   BY MR. HELFMEYER:

16   Q   And what is the jury looking at right now on the right part

17   of the screen?

18   A   There are people lined up on the sidewalk, and they are

19   walking into the parking lot.

16:01  20   Q   The recording has stopped.  Can you read the time into the

21   record?

22   A   7:36 a.m.

23   Q   Were you able to count the number of cars that went in on

24   July 7?

16:01  25   A   Yes.  There was another approximately 30 vehicles.

16:01  1   Q   You testified earlier, Special Agent Graham, that one of

2   your roles in this investigation was to go undercover; is that

3   right?

4   A   Yes.

16:01  5   Q   What does it mean to go undercover?

6   A   It means to go undercover as a law enforcement person

7   goes -- takes on a fictitious identity and goes undercover into

8   an organization to gather evidence.

9           THE COURT:  Counsel, turn the lights back on?  You

16:01  10  call it.  Yes or no?  Are you going to go on to more?

11          MR. HELFMEYER:  I'm going to another one.

12          THE COURT:  No problem.  Just leave it the way it is.

13  *BY MR. HELFMEYER:*

14  Q   I want to turn your attention to June 15 of 2017.  Did you

16:01  15  visit Gulfton Clinic that day?

16  A   Yes, I did.

17  Q   Why did you go to Gulfton Clinic that day?

18  A   I went there as an undercover agent.

19  Q   What was the purpose of the visit?

16:01  20  A   The purpose of the visit going undercover was to obtain a

21  prescription from Dr. Craig.

22  Q   Did you take any recording devices with you?

23  A   Yes, I did.

24  Q   Audio, video or both?

16:02  25  A   Both.

16:02  1  Q   Why did you take multiple recording devices?

2  A   Multiple recording devices, for officer safety as well as

3  if the battery runs out, I still can record.

4  Q   What time did you first arrive at Gulfton Clinic on June 15

16:02  5  of 2017?

6  A   The first time I arrived was approximately 9:55 in the

7  morning.

8  Q   And have you reviewed the video that captured your visit to

9  Gulfton?

16:02  10  A   Yes.

11  Q   Does it fairly and accurately depict your trip to Gulfton?

12  A   Yes.

13       MR. HELFMEYER:  At this time the government would

14  publish Government's 503.

16:02  15    *(A videotape, Government's Exhibit 503, was played)*

16  *BY MR. HELFMEYER:*

17  Q   Special Agent Graham, if you can help instruct the jury as

18  to what they are looking at.

19       MR. HELFMEYER:  Go ahead and push play, Ms. Mortezavi.

16:02  20       THE WITNESS:  I have just parked the car.  I'm getting

21  out.  There are people sitting in vehicles, standing around

22  vehicles.  You can smell marijuana in the air.

23       MR. WILLIAMS:  Judge, objection.  Nobody asked her

24  what she smelled.

16:03  25       THE COURT:  Sustained.  Go on.

*Helfmeyer Direct of Tonya Graham*

16:03    1    *BY MR. HELFMEYER:*

2    Q    Special Agent Graham, where are you at this point?

3    A    I'm in the back parking lot walking towards the front.

4    Q    So the pole camera that we were looking at earlier would

16:03    5    have been to the right?

6    A    Yes.  That is my voice.  I was calling out the license

7    plate of a black Corvette.

8         MR. WILLIAMS:  Objection.  Nonresponsive.  Nobody

9    asked her a question.

16:04   10         THE COURT:  Overruled.  Go on.

11    *BY MR. HELFMEYER:*

12    Q    For the record, the time stamp says 85838.  You testified

13    you arrived around 9:55.  Is the timestamp about an hour off?

14    A    Yes, it is.

16:04   15    Q    When you stepped out of your car and you were in the back

16    parking lot, did you notice any odors?

17    A    Yes.

18    Q    What odors did you notice?

19    A    I smelled marijuana.

16:04   20    Q    How do you know what marijuana smells like?

21    A    It is a distinctive smell when you are smoking it as

22    opposed to it in the original form.

23    Q    Did it smell like smoke or original form marijuana?

24    A    Smoking.

16:04   25    Q    What is the jury looking at right now?

16:04 1  A   I just walked into the clinic, into the building.  There is

2  approximately 30 people in that open area.  There's a line.

3  That's the door.  There is people sitting on the floor, lying

4  on the floor, standing along the hallway, waiting.

16:05 5  Q   When you opened the door in the video, I heard an oh.  Who

6  was that?

7  A   That was me.  I was surprised.  I didn't realize there were

8  that many people in there.

9  Q   And you had said you read off the license plate of that

16:05 10  black Corvette.  Why did you read off the license plate of

11  that --

12         MR. WILLIAMS:  Objection.  Leading.

13         THE COURT:  Overruled.

14  *BY MR. HELFMEYER:*

16:05 15  Q   Why did you read off the license plate?

16  A   Based on our investigation, we knew that Shane Faithful

17  drove a black Corvette, and I was reading off the license plate

18  to surveillance personnel.

19  Q   It looks like there is a sign in the doorway that the jury

16:05 20  is looking at right next to a gentleman.  What does that sign

21  say?

22  A   It says "No Cell Phones."

23         MR. HELFMEYER:  The video is at 8:59:30, for the

24  record.

16:06 25  *BY MR. HELFMEYER:*

16:06    1    Q    There was a gentleman speaking at the door. Who was he?

2    A    That was an armed security guy.

3    Q    How do you know he was armed?

4    A    I saw a weapon on his right side and he was in uniform.

16:06    5    Q    What did he say?

6    A    He said, "Have your IDs out and ready."

7    Q    It looks like you turned around at that point. What

8    happened?

9    A    Yes. Because I forgot my undercover ID in my purse.

16:07   10        MR. HELFMEYER: And I would like to fast forward, for

11    the record, to time stamp 9:03.

12    *BY MR. HELFMEYER:*

13    Q    So what happens when you walk out the door?

14    A    When I walk out the door, I get in my vehicle and I drive

16:07   15    to a neutral location. And I retrieve my undercover ID and I

16    come back.

17    Q    If you can explain to the jury what this is you are

18    recording.

19    A    They are seeing me driving down the street, approaching --

16:07   20    I'm on Gulfton and I'm approaching the parking lot for Gulfton

21    Medical Clinic. Then I'm pulling in.

22    Q    Is that the same gate that the jury was able to see from

23    the pole camera footage?

24    A    Yes, it is.

16:07   25    Q    So this is the view of you coming into the back parking

16:07  1  lot?

2  A   Yes, it is.

3  Q   What did he say?

4  A   He said, "No cell phones."

16:08  5      MR. HELFMEYER:  We can stop it here.  Thank you.

6  *BY MR. HELFMEYER:*

7  Q   What is the jury looking at now?  Where are you?

8  A   I am inside the clinic in the front waiting area.  There is

9  approximately 30 people on the inside.  There are signs posted

16:09  10 on the walls.  That's the only restroom that's in there for

11  people to use.  And that open door to the back, that's a cipher

12  lock that's leading to the back office areas.

13  Q   The cipher door lock is where the nice person is; is that

14  correct?

16:09  15 A   That's correct.

16      MR. HELFMEYER:  For the record, I'm showing the

17  witness Government 319.

18  *BY MR. HELFMEYER:*

19  Q   If you could take a look at those, as well as Government

16:09  20 361.4.  You mentioned signs on the walls inside the clinic.

21  Did the signs have a general theme?

22  A   Yes.

23  Q   What was the general theme?

24  A   No phones, no electronics, things of that nature.

16:09  25 Q   The two exhibits that I handed up, the four pages, were

16:09  1  those signs that were on the walls at Gulfton when you were

2  there?

3  A   Yes, they were.

4        MR. HELFMEYER:   For the record, I'm going to publish

16:10  5  the exhibits to the jury.

6  *BY MR. HELFMEYER:*

7  Q   Can you read what it says there?

8  A   "No book bags or large purses allowed, male or female.   No

9  exceptions."

16:10  10  Q   Read these other two --

11  A   "All electronic devices must be powered off, including

12  Bluetooth, headphones, etcetera.   You will be escorted off the

13  premises.   No exceptions.   Absolutely no cell phones allowed in

14  this clinic.   Cell phones must be turned off.   No cell phones.

16:10  15  No exceptions."

16  Q   How many chairs were in the waiting room?

17  A   Thirty.

18  Q   You said there were approximately 30 people in there, as

19  well?

16:11  20  A   Yes.

21  Q   Were people in the waiting room allowed to stand up?

22  A   They were not allowed to stand.

23  Q   How do you know that?

24  A   The security guy at the door -- after I checked in the

16:11  25  first time, there was no chairs.   I stood.   He said, You have

16:11   1   to --

        2           MR. WILLIAMS:  Objection as to what somebody else

        3   said.  Judge, that's hearsay.

        4           THE COURT:  How do you get around that, if you can?

16:11   5           MR. HELFMEYER:  Statements of an agent, Your Honor.

        6           MR. WILLIAMS:  That's not the statement of an agent.

        7   She is talking about what the guard said, Judge.

        8           THE COURT:  Sustained.

        9   *BY MR. HELFMEYER:*

16:11   10  Q   Let's play the video.  What does the sign say right there,

        11  the capacity for the room?

        12  A   It said there were 23 seats.

        13  Q   For the record, we stopped at 9:07:21.  You had an exchange

        14  with somebody at the front desk.  What happened?

16:14   15  A   Yes.  I stepped up and I gave my ID.  She informed me that

        16  she --

        17          MR. WILLIAMS:  Objection as to what somebody else has

        18  said.

        19          THE COURT:  Overruled.  How do you get around that?

16:14   20          MR. HELFMEYER:  She is an agent of the defendants.  It

        21  is not offered for its truth.

        22          THE COURT:  What is it offered for?

        23          MR. HELFMEYER:  What she said, the effect on the

        24  listener, Your Honor.

16:14   25          MR. WILLIAMS:  If she said it, Judge, what else could

16:14  1  it be offered for other than what she said?

2       THE COURT:  Overrule the objection for that limited

3  purpose.  Go on.

4  *BY MR. HELFMEYER:*

16:14  5  Q  What did she say?

6  A  She told me that she doesn't know if I will be able to be

7  seen today.  That they are almost at capacity.

8  Q  Do you know who was person was that you spoke to?

9  A  Shametra Morgan.

16:14  10  Q  What was the atmosphere of the waiting room?

11  A  The general atmosphere of the waiting room, there was a lot

12  of people.  Some of them looked like they were homeless,

13  dressed in pajama pants, flip-flops.  They had tattoos of stars

14  on their hands, their neck, their head.

16:15  15  *BY MR. HELFMEYER:*

16  Q  Special Agent Graham, for the record, it stopped at

17  9:07:50.

18       What is the jury looking at in the upper

19  left-hand corner of the screen?

16:15  20  A  There are two surveillance cameras.

21  Q  How many surveillance cameras were in the outside waiting

22  room?

23  A  Those two surveillance cameras and another one in the far

24  right-hand corner.

16:16  25  Q  So a total of three in the waiting room?

16:16    1    A    Yes, that I observed.

2    Q    Earlier on in the video, the jury saw an armed security

3    guard.  Did you count how many security guards there were in

4    total?

16:16    5    A    Yes.  That day there were a total of six armed security

6    guards, five in uniform and one in plainclothes.

7    Q    And were they all armed?

8    A    Yes.

9    Q    When you say there was one in plain clothes, how do you

16:16    10    know he was a security guard?

11    A    From previous surveillance operations, I knew he was a

12    security guard as well as it seemed like to me he was the head

13    of security because he was instructing everybody.

14    Q    If we looked at the player it would show there was only a

16:16    15    few minutes left on the recording.  Did something happen to the

16    video recorder?

17    A    The battery went out.

18    Q    Thank you.  So you are sitting in the waiting room, Special

19    Agent Graham.  Did you eventually get called back up to the

16:17    20    counter?

21    A    I go up to the counter --

22         THE COURT:  Yes or no?  That's a yes or no question.

23    Did you get called up to the counter?

24         THE WITNESS:  Yes, Your Honor.

16:17    25    *BY MR. HELFMEYER:*

16:17   1   Q   What happened when you got called back up to the counter?

2   A   I got called back up to the counter, and I was told that I

3   would be seen --

4            MR. WILLIAMS:  Objection, again, Your Honor.

16:17   5            THE COURT:  Overruled.

6            THE WITNESS:   I was told I was going to be seen and

7   that I needed to sign my name on line 57 and to fill out the

8   new patient packet.

9   *BY MR. HELFMEYER:*

16:17   10   Q   Did you pay at that point?

11   A   Yes, I did.

12   Q   How much did you pay?

13   A   $270.

14   Q   Are you sure it is $270?

16:17   15   A   Yes.

16   Q   At any point, did you write a report of investigation in

17   this case?

18   A   Yes, I did.

19   Q   Did you say anything inconsistent with that?

16:17   20   A   Yes, I did.

21   Q   What did you put in that report?

22   A   I put it was $280.

23   Q   But the truth is that it was $270?

24   A   Yes.  It was.  270.

16:17   25   Q   How did you pay the $270?

16:17  1  A   In cash.

2  Q   Was there an option for how you could pay?

3  A   No.

4  Q   Could you have paid with a credit card?

16:17  5  A   No, sir.

6  Q   What about insurance?

7  A   No, sir.

8  Q   You said you signed in when you paid right next to what

9  patient number?

16:18  10  A   Fifty-seven.

11        MR. HELFMEYER:  And if we could publish Government

12  Exhibit 315, page 32.

13  *BY MR. HELFMEYER:*

14  Q   Do you see your sign-in anywhere on this, on Government

16:18  15  Exhibit 315?

16  A   Number 57.

17  Q   I see that it says Tonya Jackson.  That's not your name,

18  right?

19  A   That is correct.

16:18  20  Q   Why did you write down Tonya Jackson?

21  A   That's my undercover name.

22  Q   Why do you have to use a different name?

23  A   For officer safety and so I won't be recognized.

24        THE COURT:  All right.  I think we are going to take

16:18  25  our first break at this time.  We will take a little bit longer

16:18   1   because Ellen has got to come in and visit with you.

2           We will take a break.  It is now 4:20.  We are

3   going to get back in at 4:40 and go right on until 6:00.  Ellen

4   will have a chance to visit with you and then you will take a

16:19   5   break.  She needs to give you some information, so that should

6   be plenty of time to get a break.  We'll see you at that time.

7   You can follow the marshal into the jury room, please.

8       *(Court recessed at 4:19 p.m.)*

9       *(Court resumed at 4:46 p.m.)*

16:46  10           THE COURT:  You want the lights done the same way?

11           MR. HELFMEYER:  Yes, Your Honor.

12           THE COURT:  Let's turn that bank out and this bank

13   out.

14           MR. HELFMEYER:  I will try to keep the jurors awake,

16:46  15   Your Honor.

16           THE COURT:  You are doing fine.  Keeping judge awake

17   is about half of the concern you ought to have.  Go on.

18   *BY MR. HELFMEYER:*

19   Q   Special Agent Graham, you testified that your undercover

16:46  20   name is Tonya Jackson and you are number 57, right?

21   A   Yes.

22   Q   Did it appear there were at least 56 other people at the

23   clinic that morning?

24   A   Yes.

16:46  25   Q   You testified a moment ago that the cost was $270 for the

16:46 | 1 | office visit?

2 | A   Yes.

3 | Q   Why had you written 280 in your report?

4 | A   It was a typo.

16:47 | 5 | Q   Can you describe the other people in the waiting room at

6 | the clinic?

7 | A   The other people in the waiting room, there were men and

8 | women of all races.  Some looked homeless.  Some looked like

9 | they just rolled out of bed with pajama pants and flip-flops,

16:47 | 10 | tank tops.  They had tattoos a star on their neck, their

11 | arms, their head.  And it smelled of marijuana.

12 | Q   Were there people waiting in the waiting room that were

13 | obviously not patients?

14 |       MR. WILLIAMS:  Objection, Judge.  She would have no

16:47 | 15 | idea --

16 |       THE COURT:  Sustained as to the form of the question.

17 | *BY MR. HELFMEYER:*

18 | Q   Did you notice any behavior that was inconsistent with

19 | someone being a patient?

16:47 | 20 | A   Yes, I did.

21 | Q   What did you notice?

22 | A   I noticed other people from the outside coming in, helping

23 | people fill out their paperwork.

24 | Q   Can you explain that a little more to the jury when you say

16:48 | 25 | people coming from the outside?

16:48    1    A    Yes.  The crew leaders --

         2         MR. WILLIAMS:  Objection.  Speculation as to what

         3    normally happens.

         4         THE COURT:  Lay some predicate before you go into

16:48    5    this.  Okay.

         6    *BY MR. HELFMEYER:*

         7    Q    Special Agent Graham, are you familiar with the inner

         8    workings of pill mills?

         9    A    Yes, I am.

16:48   10    Q    And how are you familiar with that?

        11    A    I'm familiar with that based on my training and experience

        12    working with the Tactical Diversion Squad.

        13    Q    Did you make observations in this case that --

        14         THE COURT:  Did you make some observations in this

16:48   15    case?  Yes or no?

        16    *BY MR. HELFMEYER:*

        17    Q    Did you make observations in this case?

        18    A    Yes.

        19         THE COURT:  Next question.

16:48   20    *BY MR. HELFMEYER:*

        21    Q    Did you make observations in this case that --

        22         THE COURT:  No.  Don't lead her.  Just ask her.

        23    *BY MR. HELFMEYER:*

        24    Q    Were your observations in this case consistent with what

16:48   25    you have seen elsewhere?

16:48  1  A   Yes.

2  Q   What did you notice?

3  A   I noticed crew leaders, which are other people that come

4  from the outside and help people fill out their paperwork.

16:48  5  Q   And what are crew leaders?

6  A   Crew leader is a person that brings several people to the

7  clinic, pays for their doctor's visit, pays to get their

8  pharmacy prescription filled, in exchange for the drugs to be

9  sold on the street for a profit.

16:49  10  Q   In your trip to Gulfton, did you see any money changing

11  hands?

12  A   No.

13  Q   Did you see the people that you are calling crew leaders

14  filling out paperwork for patients?

16:49  15  A   Yes.

16  Q   How long were you in the waiting room?

17  A   I was there for a long time.

18  Q   A couple hours?

19  A   Yes.

16:49  20  Q   The whole time you were sitting in a chair?

21  A   Yes.

22  Q   Could you describe the chairs in the waiting room to the

23  jury?

24  A   It is a very slim chair, very uncomfortable.  My thighs was

16:49  25  touching the people sitting next to me.

16:49  1  Q    Did the chair have armrests?

2  A    No.

3  Q    Was it more or less comfortable than the chair that you are

4  sitting in?

16:49  5  A    This chair is very comfortable.  That chair was

6  uncomfortable.

7  Q    During the couple hours you spent waiting in the Gulfton

8  waiting room, did you hear any patients complaining of pain?

9       MR. WILLIAMS:  Objection, Judge, as to what somebody

16:50  10  else said.

11       THE COURT:  Say it again.  Don't answer the question.

12  Repeat the question.

13       MR. HELFMEYER:  I asked the special agent if she heard

14  anyone complaining of pain.  It would be a statement of present

16:50  15  sense.

16       THE COURT:  Overruled.

17  *BY MR. HELFMEYER:*

18  Q    Special Agent, did you hear anyone complaining of pain?

19  A    No.

16:50  20  Q    Did you hear anyone complaining?

21  A    Yes.

22  Q    What were they complaining about?

23       MR. WILLIAMS:  Objection.

24       THE COURT:  How do you get around that?  Is this part

16:50  25  of her criminal investigation or what?

16:50  1      MR. HELFMEYER:  It is part of her criminal

2  investigation, Your Honor, but it is also present sense

3  impression, what people are complaining of, their current state

4  of mind.

16:50  5      THE COURT:  Overrule the objection.

6  *BY MR. HELFMEYER:*

7  Q   What were the people in the waiting room complaining about,

8  Special Agent Graham?

9  A   They were complaining about it was taking too long to get

16:50  10  their prescriptions and be seen by the doctor.

11  Q   Did you see either of the defendants while you were at

12  Gulfton?

13  A   Yes.

14  Q   Who did you see?

16:50  15  A   I saw Dr. Craig and Mr. Faithful.

16  Q   When did you see Dr. Craig?

17  A   I saw Dr. Craig after I initially entered the clinic and I

18  took a seat.  I saw -- after the plainclothes security

19  gentleman came from the back talking on a two-way radio, he

16:51  20  went outside.  And I looked over my shoulder out of the window,

21  and he was escorting Dr. Craig in.  She was wearing yellow

22  scrubs and had a black backpack on wheels.

23  Q   Did you see her come into the clinic?

24  A   Yes, I did.

16:51  25  Q   You said that was after you arrived at the clinic?

16:51  1   A    That is correct.

2   Q    So it was after 10:00 a.m. on June 15th?

3   A    Yes.

4   Q    You testified that you saw Mr. Faithful, as well?

16:51  5   A    Yes.

6   Q    Where did you see him?

7   A    I saw Mr. Faithful in the back room where the patient files

8   are kept, where I gave the money to Shametra Morgan.

9   Q    Did you see him when you first went up to pay?

16:51  10  A    I saw him when I first went up to pay.  He was off to my

11  right.  I could not observe what he was doing.

12           The second time I saw him is when I went back to

13  have my vitals taken.

14  Q    We will get into that in a second.

16:52  15           When you went back to have your vitals taken,

16  what was Mr. Faithful doing?

17  A    He was walking out of the office there where you paid your

18  money.

19  Q    Do you remember if he was carrying anything?

16:52  20  A    He was carrying a black Oakley backpack.

21  Q    While you were in the waiting room, did you see anyone get

22  caught using a cell phone?

23  A    Yes, I did.  I observed the plainclothes security guy come

24  from the back and stop by a patient and say "Hey, I saw you on

16:52  25  your phone.  Give me your phone."

16:52   1       MR. WILLIAMS:  Objection, Judge, again as to what

2   somebody else is saying.

3       THE COURT:  Read the question back, please.

4   *(The record was read as requested)*

16:52   5       THE COURT:  Overruled.  That's a yes or no.

6   *BY MR. HELFMEYER:*

7   Q   Special Agent Graham, did you see anyone get caught using a

8   cell phone?

9   A   Yes.

16:52   10   Q   What happened when that person got caught?

11   A   I observed the plainclothes security guy come up and tell a

12   person that he observed him --

13       MR. WILLIAMS:  Objection.

14       THE COURT:  Sustained as to what he said.

16:53   15       MR. HELFMEYER:  It is not offered as for the truth.

16       THE COURT:  I understand that.  You don't need that.

17   Somebody was using a cell phone, right?

18       THE WITNESS:  Yes, Your Honor.

19       THE COURT:  As a result of the cell phone, did the

16:53   20   guard take some action?

21       THE WITNESS:  Yes, Your Honor.

22       THE COURT:  What was that action?

23       THE WITNESS:  The guard --

24       THE COURT:  Without saying what he said, what

16:53   25   happened?

16:53  1    THE WITNESS:  He took the phone.

2    THE COURT:  Go on.  Next question.  Easy to get around

3  that.

4  *BY MR. HELFMEYER:*

16:53  5  Q    Was your name eventually called to go back, Special Agent

6  Graham?

7  A    Yes.

8  Q    What happened?

9  A    I went to the back.

16:53  10  Q    Can you describe the back area?

11  A    It was a waiting room, another waiting room, smaller, with

12  10 chairs.

13  Q    Were there armed security guards there, as well?

14  A    Yes.

16:53  15  Q    Were they all in uniform?

16  A    Yes.

17  Q    What happened in the back waiting room, did you get called

18  by somebody else?

19  A    Yes.

16:53  20  Q    What happened then?

21  A    I went to the room to be triaged.

22  Q    What happened at the triage?

23  A    I stood on the scales, bathroom type small square scales.

24  I had my weight taken.  Then I sat in the chair.  The medical

16:54  25  assistant put the blood pressure cuff on, took my blood

16:54   1   pressure.  Then I took the blood pressure cuff off at the end

2   while she sat behind the desk.

3   Q   When you say a bathroom type scale, was it the one with the

4   slide or you just stand on it on the ground?

16:54   5   A   You stand on it.  It is just on the ground.

6   Q   While you were meeting with the person you identified as

7   the medical assistant, was he or she filling out a form?

8   A   Yes.

9   Q   What happened at the end of that triage after your vitals

16:54   10   were taken?

11   A   I was told to go to the front waiting area.

12   Q   Did anything happen in the front waiting area?  Did you see

13   any other security guards?

14   A   Yes.  I saw the plainclothes security guard walk from the

16:54   15   back, and he swiped the top of the door, the cipher door, and

16   swiped along the side of it.

17   Q   Can you make the motion that he made for the jury?  You say

18   swipe.  That can mean a lot of different things.

19   A   He swiped across the top of the door frame and then along

16:55   20   the side.

21   Q   And when he swiped the top of the door and along the side,

22   did he make any statements?

23   A   Yes, he did.

24         THE COURT:  Who is it that did that?

16:55   25         MR. HELFMEYER:  The security guard, Your Honor.

16:55    1    THE COURT: All right. What is the purpose?

2    MR. HELFMEYER: Your Honor, he is an agent of the

3    defendants, which will be brought out in future testimony, but

4    also it's not offered for its truth. It is his statement, Your

16:55    5    Honor.

6    THE COURT: That is still hearsay.

7    MR. HELFMEYER: Not if it is --

8    THE COURT: Up to a point. Hang on a second.

9    Was this part of your criminal investigation. Is

16:55    10    that correct?

11    THE WITNESS: Yes, Your Honor.

12    THE COURT: Overrule the objection. Go on.

13    *BY MR. HELFMEYER:*

14    Q   What did the plainclothes clothes security guard say?

16:55    15    A   As he swiped across the top and the side of the door frame,

16    he stated as he looked back at us sitting there, he said, I'm

17    looking for bugs and things -- stuff like that. When he didn't

18    find any, he walked through the door and looked back and said,

19    "That's the way that I like it."

16:56    20    Q   After you went back to the front waiting room, did you get

21    called again?

22    A   Yes.

23    Q   And what happened when you got called?

24    A   I went back to the waiting room in the back waiting area.

16:56    25    Q   Did you eventually go to an exam room?

16:56    1    A    Yes, I did.

2    Q    Who did you see in the exam room first?

3    A    She said she was a nurse practitioner. She was a female

4    that wore a hijab.

16:56    5    Q    Did this woman who said she was a nurse practitioner do any

6    exercises with you?

7    A    No exercises. She -- no.

8    Q    What did she do with you?

9    A    She told me to bend over and touch my toes. Then she had

16:56    10    me to lay on the table and she did leg raises. She checked my

11    reflexes.

12    Q    Sorry. When you say reflexes, is that with a little

13    hammer?

14    A    Yes, sir.

16:56    15    Q    What else did she do?

16    A    She also checked my abdomen. She said she was checking for

17    my liver function, and she checked my heart.

18    Q    Did she drug test you? Did she draw any blood?

19    A    No, sir.

16:57    20    Q    After the woman left who identified herself as a nurse

21    practitioner, did you leave or stay in that exam room?

22    A    I stayed in the room.

23    Q    How long did you stay in the exam room?

24    A    Approximately 25 minutes.

16:57    25    Q    What happened after 25 minutes?

16:57   1   A   Dr. Craig came into the room.

2   Q   How did you know it was Dr. Craig?

3   A   She walked in and introduced herself to me.

4   Q   Do you see Dr. Craig in court today?

16:57   5   A   Yes, I do.

6   Q   Can you identify her by an article of clothing for the

7   jury?

8   A   She is wearing a gray suit and a purple blouse.

9           MR. HELFMEYER:  For the record, the witness has

16:57   10   identified the defendant.

11           THE COURT:  The record will so reflect.

12   *BY MR. HELFMEYER:*

13   Q   You testified that the video device you were using

14   malfunctioned or ran out of batteries?

16:57   15   A   Ran out of batteries.

16   Q   Did you have an audio recording device?

17   A   Yes.

18   Q   Have you had a chance to review that audio recording of

19   your interaction with Dr. Craig?

16:57   20   A   Yes.

21   Q   Does it fairly and accurately depict your interaction with

22   Dr. Craig?

23   A   Yes.

24           MR. HELFMEYER:  The government would like to play

16:58   25   Government's Exhibit 501A.  For the record, there is an

16:58   1   unofficial transcript.

2        THE COURT:  Just go on.

3        *(A videotape, Government's Exhibit Number 501S, was played)*

4        THE COURT:  Hold it a second.  Stop it.

16:58   5        Remember, we talked about this before.  We need

6   more volume out of it.  All right.  Go on.

7   *BY MR. HELFMEYER:*

8   Q    Special Agent Graham, the recording just stopped.  Do you

9   know why that is?

17:00   10  A    Yes.

11  Q    Why is that?

12  A    After the recording to break it down, it just breaks it up

13  into tracks.

14  Q    It was 30 minutes and 10 seconds, is that consistent?

17:00   15  A    Yes.

16  Q    So it breaks it up into 30-minute tracks?

17  A    Yes.

18  Q    Does it stop recording or just start a new track?

19  A    It continues recording.

17:00   20  Q    So there should be no gap in the recording?

21  A    That is correct, yes.

22       MR. HELFMEYER:  For the record, we would like to play

23  Government's 501B.

24       THE COURT:  Is it a continuation of the prior one?

17:01   25       MR. HELFMEYER:  Yes.

17:01    1          THE COURT:  Based on the testimony, go on.

         2          *(A videotape, Government's Exhibit Number 501B, was played)*

         3    *BY MR. HELFMEYER:*

         4    Q    Special Agent Graham, how long was your total encounter

17:01    5    with Dr. Craig?

         6    A    Ninety-one seconds.

         7    Q    At the beginning of Dr. Craig's examination, you discussed

         8    the car accident from 2015.  Is that what you had reported as

         9    the origin of your pain?

17:01   10    A    No.

        11    Q    What did you report?

        12    A    Neck spasms and shoulder.

        13    Q    But from back to 2015?

        14    A    Yes.  2015.

17:01   15    Q    Did Dr. Craig ask you how you had managed the pain from

        16    that accident in 2015?

        17    A    No.

        18    Q    Did she ask you whether you had taken any narcotics to

        19    treat pain in 2015?

17:02   20    A    No.

        21    Q    Did she ask you how your current pain compares to pain in

        22    2015?

        23    A    No.

        24    Q    Did she ask you any questions about past pain?

17:02   25    A    No.

17:02    1    Q    Any questions about past treatment?

2    A    No.

3    Q    Did she ask you any questions about whether you had tried

4    any other treatment than narcotics for your pain?

17:02    5    A    No.

6    Q    From the recording, it sounded like she jumped right into

7    the X-rays. Did she say why there was an x-ray requirement?

8    A    No.

9    Q    At the end of the first recording and into the second one,

17:02    10    it sounded like an exercise was being done. What did Dr. Craig

11    have you do?

12    A    Bend over and touch my toes.

13    Q    Is it any more complicated than that?

14    A    No.

17:02    15    Q    Did Dr. Craig touch you in way?

16    A    Yes.

17    Q    What did she say?

18    A    She touched my back more like you are pointing with a

19    finger, just pointing, but not with any manipulation or care.

17:03    20    Q    Was it like a massage?

21    A    No.

22    Q    When you say "pointing," one finger or the whole hand?

23    A    One finger.

24    Q    Where did she touch you?

17:03    25    A    Lower back.

17:03　　1　Q　Did she have you do any other exercises?

2　A　No.

3　Q　Had you reported lower back pain as a complaint?

4　A　No.

17:03　　5　Q　So the entirety of her examination was asking you to bend

6　over and touch your toes?

7　A　Yes.

8　Q　What was your reported reason, your chief complaint in

9　visiting Gulfton?

17:03　10　A　It was neck pain and shoulder spasm.

11　Q　Did Dr. Craig touch your shoulders?

12　A　No.

13　Q　Did she touch your neck?

14　A　No.

17:03　15　Q　For the record, during the break, I showed defense counsel

16　Government Exhibit 357, which I'm showing to the jury right

17　now.  Do you know what Government's 357 is?

18　A　My patient record.

19　Q　And I would like to go through a little bit of your patient

17:04　20　record with the jury.

21　　　　　THE COURT:  Are you going to put it on the screen?

22　　　　　MR. HELFMEYER:  We have it on the screen, Your Honor.

23　　　　　THE COURT:  Go right ahead.

24　*BY MR. HELFMEYER:*

17:04　25　Q　I want to move to page nine of Government's Exhibit 357.

17:04   1  Do you recognize this form?

2  A    Yes.

3  Q    What is it?

4  A    It's the HIPAA release form to release medical records.

17:04   5           THE COURT:   HIPAA is what?  You say "HIPAA release."

6  What is HIPAA, if you know?

7           THE WITNESS:   It is just a form to authorize someone

8  to get your medical records.

9  *BY MR. HELFMEYER:*

17:04  10  Q    Is this the form you would fill out for Dr. Craig or

11  Gulfton to get records from the previous doctor?

12  A    Yes.

13  Q    What doctor, clinic or hospital did you indicate you were

14  giving permission for Gulfton to get records from?

17:04  15  A    None.

16  Q    Did Dr. Craig ask you to write anything down?

17  A    No.

18  Q    What records were you allowing Dr. Craig and Gulfton to

19  request from the previous doctor or physician?

17:05  20  A    Nothing.

21  Q    Did Dr. Craig ask you to fill that out just so she could

22  request records from your previous provider?

23  A    No.

24  Q    Did anyone discuss with you requesting your previous

17:05  25  medical records?

17:05    1   A   No.

2   Q   I would like to move to page 13, if we can, of Government

3   Exhibit 357.

4        Special Agent Graham, did you fill out page 13 of

17:05   5   Government's 357?

6   A   Yes, I did.

7   Q   What did you put down as your chief complaint?

8   A   Neck muscle spasms.

9   Q   I see that you didn't mark down "lower back pain." Was

17:05   10   that on purpose?

11   A   Yes, it was.

12   Q   Why was that?

13   A   Because normally lower back pain is the chief complaint

14   people come in with. I wanted to do something else.

17:06   15   Q   Did Dr. Craig and other people at Gulfton assume you had

16   lower back pain?

17        MR. WILLIAMS: Objection as to what somebody else

18   assumed, Judge.

19        MR. HELFMEYER: I can rephrase the question.

17:06   20        THE COURT: Please.

21   *BY MR. HELFMEYER:*

22   Q   Did Dr. Craig or the other people at Gulfton clinic ask you

23   questions about lower back pain?

24   A   Yes.

17:06   25   Q   In the upper -- in the right-hand corner, it says "primary

17:06    1    care physician."  Who did you put down as your primary care

2    physician?

3    A    No one.

4    Q    Was that on purpose?

17:06    5    A    Yes, it was.

6    Q    Did Dr. Craig ask you who your primary care physician was?

7    A    No.

8    Q    Did anyone else?

9    A    No.

17:06    10    Q    Did Dr. Craig ask you any questions about your previous

11    treatment for pain?

12    A    No.

13    Q    I want to move to page two of Government's Exhibit 357.

14          Special Agent Graham, are you familiar with what

17:07    15    is on the screen in front of the jurors?

16    A    Yes, I am.

17    Q    What is on the screen in front of the jurors?

18    A    It is the prescription monitoring program report.

19    Q    What is that?  What is a prescription monitoring program

17:07    20    report?

21    A    It is a report that's dispensed -- anytime a controlled

22    substance is prescribed and the prescription is filled, an

23    agent writes a report.

24    Q    So the report would reflect filled prescriptions; is that

17:07    25    correct?

17:07   1   A   Yes.

        2   Q   Who maintains it?

        3   A   The Board of Pharmacy right now, yes.

        4   Q   When was this report run?

17:07   5   A   This report was run on June 15, 2017.

        6   Q   Was that the day you went to Gulfton?

        7   A   Yes.

        8   Q   Who was the report run for?

        9   A   Tonya Jackson.

17:08  10   Q   And that was your undercover identity?

       11   A   Yes.

       12   Q   What prescription is reflected in this report?  What does

       13   this report say?

       14   A   That I have had two prescriptions, controlled substance

17:08  15   prescriptions prescribed to me.

       16   Q   How do we know that?

       17   A   Based on the prescriptions section.

       18   Q   When was the prescription written?

       19   A   April 12, 2017.

17:08  20   Q   And let's do them one by one.  What was the first

       21   prescription written on April 12?

       22   A   Hydrocodone.

       23   Q   Does that go by any other name?

       24   A   Norco.

17:08  25          THE COURT:  What else?  Hydrocodone, that's it?

17:08   1      THE WITNESS:  That's the main name I know.  The street

2   name is Norco.

3      THE COURT:  Street name?

4      THE WITNESS:  Norco is what they call it.

17:08   5      THE COURT:  Go on.

6   BY MR. HELFMEYER:

7   Q   Was there another prescription?  Did you get another

8   prescription in April?

9   A   Yes.

17:09  10   Q   What was that for?

11   A   Carisoprodol.

12   Q   What is carisoprodol called?

13   A   Soma.

14   Q   Regarding the hydrocodone prescription from April of 2017,

17:09  15   what was the quantity?

16   A   Hydrocodone, quantity, 90.

17   Q   And for Soma?

18   A   Sixty.

19   Q   I would like to go back to page 19 of Government's

17:09  20   Exhibit 357.  If we can highlight the portion -- there is a

21   portion on there that refers to illegal drug use towards the

22   bottom, I believe.

23      Special Agent Graham, did you answer whether you

24   had a history of illegal drug use?

17:10  25   A   Yes.  I said nothing.

17:10  1  Q   Was that an answer?

2  A   Yes.  I didn't mark anything.

3  Q   Was that on purpose?

4  A   Yes.

17:10  5  Q   Did anyone follow up on your empty answer on the

6  questionnaire?

7  A   No.

8  Q   Did Dr. Craig talk to you about the dangers of mixing

9  hydrocodone, Soma and illegal drugs?

17:10  10  A   No.

11  Q   Did Dr. Craig mention any dangers of the drugs she was

12  prescribing?

13  A   No.

14  Q   Did she warn you of side effects?

17:10  15  A   No.

16  Q   Did she offer you any advice on how to take hydrocodone and

17  Soma?

18  A   No.

19  Q   Did she tell you why she was prescribing Norco?

17:10  20  A   No.

21  Q   Did she tell you why she was prescribing Soma?

22  A   No.

23  Q   Did she say why Norco over some other pain medicine?

24  A   No.

17:10  25  Q   Did she offer you any advice at all?

17:10  1    A    No.

       2    Q    Did she ask you if you had any questions?

       3    A    No.

       4    Q    I would like to move to a different part of your patient

17:11  5    file, page 12 of Government Exhibit 357.

       6              Special Agent Graham, did you fill this form out?

       7    A    No.

       8    Q    Who signed at the bottom?

       9    A    Gazelle Craig, DO.

17:11  10   Q    And I didn't ask you earlier but was Dr. Craig writing

       11   anything while you were with her for 91 seconds?

       12   A    Yes.

       13   Q    I would like to zoom in on the plan section.  In the upper

       14   right-hand corner it says "Labs."  Did Dr. Craig draw any

17:11  15   blood?

       16   A    No.

       17   Q    Did anyone?

       18   A    No.

       19   Q    Did Dr. Craig tell you to get blood work done?

17:11  20   A    No.

       21   Q    Did Dr. Craig mention anything about labs or blood work?

       22   A    No.

       23   Q    Moving down a little bit to the complimentary and

       24   alternative medicine as it shows there, did Dr. Craig tell you

17:12  25   to use a massage chair over the next 30 days?

17:12    1    A    No.

2    Q    That is up a little bit from the area that's highlighted,

3    for the record.

4                Did Dr. Craig tell you to use a hot or cold pack

17:12    5    over the next 30 days?

6    A    No.

7    Q    Did Dr. Craig tell you to do anything other than take the

8    narcotics you were prescribed?

9    A    No.

17:12   10    Q    Moving down to the complimentary and alternative medicines

11    today's section, what is checked off?

12    A    Massage chair.

13    Q    Did you sit in a massage chair on June 15 of 2017?

14    A    No.

17:12   15    Q    Did you see a massage chair?

16    A    No.

17    Q    While you were at Gulfton, did you see an exercise bike?

18    A    No.

19    Q    A tread mill?

17:12   20    A    No.

21    Q    An elliptical?

22    A    No.

23    Q    What is a TENS unit?  Do you know?

24    A    A TENS unit is a device that gives, like, electrodes to

17:12   25    stimulate your back, your muscles.

17:12  1  Q   Did you see a TENS unit while you were at Gulfton?

       2  A   No.

       3  Q   If we can move down a little bit on the page to the

       4  rationale portion, can you read the second thing that's checked

17:13  5  regarding the activities of daily living?

       6  A   Allows patients to perform ADLs.

       7  Q   Did Dr. Craig tell you -- I'm sorry.  Did you tell

       8  Dr. Craig that your pain was affecting your ability to perform

       9  activities of daily living?

17:13  10 A   No.

       11 Q   Did Dr. Craig say she was performing --

       12      THE COURT REPORTER:  I'm sorry.  Can you repeat your

       13 question?

       14 *BY MR. HELFMEYER:*

17:13  15 Q   Did Dr. Craig tell you that she was prescribing you

       16 narcotics to aid your ability to perform activities of daily

       17 living?

       18 A   No.

       19 Q   What is the third one down?

17:13  20 A   "Allows patient to have meaningful relationships."

       21 Q   Did you tell Dr. Craig that your pain was affecting your

       22 ability to have meaningful relationships?

       23 A   No.

       24 Q   Did she tell you she was prescribing you narcotics to help

17:14  25 you in having meaningful relationships?

17:14   1   A   No.

2   Q   Over to the right, did you tell Dr. Craig that your pain

3   was preventing you from seeking or maintaining employment?

4   A   No.

17:14   5   Q   Did Dr. Craig say that she was prescribing you narcotics to

6   aid your ability to maintain and seek employment?

7   A   No.

8   Q   Did Dr. Craig discuss any of these rationales with you?

9   A   No.

17:14   10   Q   If we can zoom in on the discussion and education portion.

11        The first one, if you could read that first

12   phrase before the comma.

13   A   "The patient and caregiver reviewed self-help tools."

14   Q   Special Agent Graham, who was your caregiver?

17:14   15   A   It is not annotated.  I don't have one.

16   Q   Did Dr. Craig give you care?

17   A   No.

18   Q   What did she give you?

19   A   A prescription.

17:15   20   Q   Can you read the second item that's checked off?

21   A   "The caregiver explained to the patient the risks of using

22   other drugs or ETOH with the prescribed medication and that

23   doing so would not only be dangerous but could result in

24   termination of treatment with this provider.  The patient

17:15   25   expresses understanding."

17:15  1  Q   Did Dr. Craig explain that to you?

2  A   No.

3  Q   Did you express understanding of that?

4  A   No.

17:15  5  Q   If we can go to the final one and you can read that first

6  sentence.

7  A   "The patient agrees not to divert or abuse medicine."

8  Q   Did you tell Dr. Craig that you would not divert the

9  medicine?

17:15  10  A   No.

11  Q   What is diversion again, for the jury?

12  A   Diversion is when drugs are prescribed to a person and that

13  person transfers the drugs to another person for illicit use.

14  Q   Can you read the next sentence?

17:15  15  A   "The patient verbalizes understanding that all pain meds

16  are prescribed with the objective of pain relief and

17  improvement in patient's physical and psychosocial function."

18  Q   Did you verbalize that understanding?

19  A   No.

17:16  20  Q   Can you read the third sentence?

21  A   "The patient was counseled on proper use of the prescribed

22  medications and reviewed the opioid and pain contract,

23  including the need for future urine drug screens, including

24  ETOH and pill counts, for the assurance of the patient's safety

17:16  25  and compliance."

17:16  1    Q    Did Dr. Craig counsel you on how to use the narcotics?

       2    A    No.

       3    Q    Can you read the next sentence, starting with, "The patient

       4    was counseled"?

17:16  5    A    "The patient was counseled about their chronic medical

       6    condition and its relationship to anxiety and depression."

       7    Q    Did Dr. Craig counsel you on how your pain was affecting

       8    your anxiety?

       9    A    No.

17:16  10   Q    Did she perform any, kind of, neurological exam on you?

       11   A    No.

       12   Q    Anything about your emotions?

       13   A    No.

       14   Q    Can you read the next sentence, starting with "reviewed"?

17:17  15   A    "Reviewed with the patient treatment plan, along with his

       16   goals and limitations, especially emphasizing the risks,

       17   benefits and side effects from the medications and procedures,

       18   including aspects of slow versus abrupt discontinuation and

       19   withdrawal."

17:17  20   Q    Did Dr. Craig review the treatment plan with you?

       21   A    No.

       22   Q    Whose signature is on the bottom of the page?

       23   A    Gazelle Craig, DO.

       24   Q    After your 91 seconds with Dr. Craig, what did you do?

17:17  25   A    I was told to go back -- I went to the front.

17:17  1  Q   And did you receive anything at the front?

2  A   Prescription.

3  Q   Did you fill that prescription?

4  A   Yes, I did.

17:17  5  Q   What did you get when you filled the prescription?

6  A   I got hydrocodone, Soma, Biofreeze and some ibuprofen.

7           THE COURT:  What?

8           THE WITNESS:  Ibuprofen.

9  *BY MR. HELFMEYER:*

17:17  10  Q   I would like to go to page 21 of Government's Exhibit 357.

11           Are these the prescriptions that Dr. Craig

12  prescribed to you on June 15, 2017?

13  A   Yes.

14  Q   Before you received these prescriptions, had Dr. Craig told

17:18  15  you what she was prescribing you?

16  A   No.

17  Q   Let's take a look at the top prescription, the one on the

18  left.  What did Dr. Craig prescribe to you?

19  A   Soma, 350 milligrams, 70 count; Biofreeze gel, one tube;

17:18  20  and ibuprofen, 800 milligrams, 30 count.

21  Q   Special Agent Graham, do you know what Soma treats?

22  A   Muscle spasms.

23  Q   Did Dr. Craig tell you that that is what Soma treats?

24  A   No.

17:18  25  Q   You know what that is because you are a DEA agent?

17:18    1    A    Yes.

2    Q    What about Biofreeze gel?  Did Dr. Craig tell you what

3    Biofreeze gel treats?

4    A    No.

17:18    5    Q    Did you know you were going to be prescribed Biofreeze gel

6    before you received a prescription?

7    A    No.

8    Q    Did she give you any instruction about how to use or apply

9    the Biofreeze gel?

17:19    10    A    No.

11    Q    The ibuprofen, did Dr. Craig tell you whether you were

12    supposed to take the ibuprofen with the other narcotics she had

13    prescribed or only when the pain was less?

14    A    No.

17:19    15    Q    Did she give you any advice on how to take these drugs?

16    A    No.

17    Q    The first drug that's listed, Soma, do you know what the

18    true name of Soma is?

19    A    Carisoprodol.

17:19    20    Q    Is that a controlled substance?

21    A    Yes, it is.

22    Q    What date were these three items prescribed?

23    A    June 15, 2017.

24    Q    Was that the date that you saw Dr. Craig?

17:19    25    A    Yes.

17:19 1 Q Who signed that prescription?

2 A Gazelle Craig, DO.

3 Q Let's go to the second prescription, over to the left.

4   THE COURT:  To the right.

17:19 5   MR. HELFMEYER:  Thank you, Your Honor.

6   THE COURT:  Go on.

7 *BY MR. HELFMEYER:*

8 Q On the prescription on the left, who is that prescription

9 written for?

17:20 10 A Tonya Jackson.

11 Q And that was your undercover name?

12 A Yes.

13 Q Over to the right -- thank you, Your Honor -- the second

14 prescription, who is it written for?

17:20 15 A Tonya Jackson.

16 Q When was it written?

17 A It was written on June 15, 2017.

18 Q That was the same date that you saw Dr. Craig?

19 A Yes.

17:20 20 Q What did she prescribe you?

21 A Norco 10/325 milligrams.

22 Q How many?

23 A One hundred.

24 Q One hundred?

17:20 25 A Yes.

17:20  1  Q   What does the 10/325 mean?

       2  A   The strength.

       3  Q   So it is 10 milligrams of Norco?

       4  A   Yes.

17:20  5  Q   And how many pills?

       6  A   One hundred.

       7  Q   I want to go back to something we talked about --

       8      THE COURT:  How often -- does it say on here how often

       9  you were supposed to take it?

17:20 10      THE WITNESS:  No.

      11      THE COURT:  Go on.

      12  BY MR. HELFMEYER:

      13  Q   You testified about your previous prescription that was in

      14  the DPS computer printout.

17:21 15  A   Yes.

      16  Q   Do you remember what that -- how many pills that doctor had

      17  prescribed for you?

      18  A   Yes.

      19  Q   How many was that?

17:21 20  A   It was 60 Soma and 90 Norco.

      21      MR. HELFMEYER:  Can we go back to page 22 of

      22  Government's Exhibit 357?

      23  BY MR. HELFMEYER:

      24  Q   So 90 hydrocodone and 60 carisoprodol?

17:21 25  A   Yes.

17:21  1  Q   And the hydrocodone is Norco?

2  A   Yes.

3  Q   And carisoprodol is what?

4  A   Soma.

17:21  5  Q   How much did Dr. Craig prescribe you on June 15?

6  A   One hundred count hydrocodone and 70 count carisoprodol.

7  Q   Did she tell you why she had increased the pills?

8  A   No.

9  Q   Did you tell Dr. Craig that the pills that this doctor

17:21  10  prescribed for you were insufficient to treat your pain?

11  A   No.

12  Q   Did she ask?

13  A   No.

14      MR. HELFMEYER:  If we can go back to the prescription

17:22  15  for -- the Norco prescription.

16  *BY MR. HELFMEYER:*

17  Q   Special Agent Graham, how are you supposed to take Norco?

18  A   It says one tab and that's all I know, on the prescription.

19  Q   Were you supposed to take it with food?

17:22  20  A   I don't know.

21  Q   Did she tell you?

22  A   No.

23  Q   Were you allowed to operate heavy machinery or drive while

24  you took Norco?

17:22  25  A   I don't know.

17:22   1   Q   Mixed with Soma, would that affect?

2   A   I don't know.

3   Q   Did she tell you anything about that?

4   A   No.

17:22   5   Q   Special Agent Graham, who signed this prescription?

6   A   Gazelle Craig, DO.

7          MR. HELFMEYER:   No further questions.

8                Thank you, Your Honor.

9          THE COURT:   Pass the witness.

17:22   10         MR. WILLIAMS:   Can we turn the lights on?

11         THE COURT:   You want them on?

12         MR. WILLIAMS:   Turn them all on.

13                **CROSS-EXAMINATION**

14   *BY MR. WILLIAMS:*

17:23   15   Q   Special Agent Graham, I'm Cornel Williams.   We met before;

16   have we not?

17   A   Yes.

18   Q   Explain to the jury where we met.

19   A   We met in another case.

17:23   20   Q   In the other case, was Davis Webster part of that

21   particular case?

22   A   Yes.

23   Q   Now, we went through this particular video; did we not?

24   A   I'm sorry?

17:23   25   Q   We went through the video showing when the gates opened,

17:23 1 correct?

2 A Yes.

3 Q Do you know who opened those gates?

4 A No, I do not.

17:23 5 Q You don't know if the person who opened the gate was a

6 person of the building itself or if a person that worked for

7 the clinic, do you?

8 A No.

9 Q You don't know the cars that went in, 30 something cars

17:23 10 that went in, where they were going, do you?

11 A To park.

12 Q Okay. So they parked, but you don't know after they got

13 out of the cars if they went in this clinic or went somewhere

14 else in the building, do you?

17:24 15 A No.

16 Q Now, I think you said that you were instrumental in

17 installing this particular camera?

18 A No.

19 Q All right. When was that camera installed? Do you know?

17:24 20 A The camera was installed in February of 2017.

21 Q Do you know which date?

22 A The particular date, no.

23 Q And you don't know who installed it, do you?

24 A No.

17:24 25 Q Now, so as to the people -- the cars that are going in, you

17:24   1   don't know who these people are, do you?

2   A    No.

3   Q    You can't testify that they went into this particular

4   clinic or if they went somewhere else in the building, can you?

17:25   5   A    No.

6   Q    And you can't testify as to if, in fact, they went into

7   this particular clinic and got prescriptions, can you?

8   A    No.

9   Q    So I think you made mention of this 15-passenger van.  You

17:25   10  don't know how many people got out of that van, do you?

11  A    No.

12  Q    So basically what you are trying to do for this jury is

13  draw the inference that all these people were going into the

14  clinic; isn't that correct?

17:25   15  A    Can you repeat the question?

16  Q    So basically what you are trying to do with this jury is

17  draw an inference that all of these people were going into this

18  clinic?

19  A    That all of the people are going to the clinic, yes.

17:25   20  Q    That's correct?

21  A    Yes.

22  Q    But you can't say that, can you, because you don't know?

23  You have no personal knowledge of that, do you?

24  A    Personal, no.

17:25   25  Q    So you are just speculating for this jury, aren't you?

17:25  1   A   Based on my observations.

2   Q   Okay.  And, of course, it's just your opinion; is that

3   correct?

4   A   Just my opinion?

17:26  5   Q   As to where these people were going, as to all the cars, if

6   they were going into the clinic, you are speculating, aren't

7   you?

8   A   Based on my observation, that's what I'm saying, yes.

9   Q   Now, regarding the video, I think you testified as to

17:26  10  people in the particular clinic, what they had on, the tattoos,

11  the crew leaders, etcetera, etcetera.  You couldn't testify as

12  to any of these people needed pain medications or not, can you?

13       THE COURT:  I can't hear you.

14  *BY MR. WILLIAMS:*

17:26  15  Q   Whether these people needed pain medication or not, can

16  you?

17  A   I'm sorry.  Could you repeat the question?

18  Q   You can't testify if any of those people sitting in that

19  lobby needed pain medication or not, can you?

17:27  20  A   No.

21  Q   I think you testified you smelled marijuana in the parking

22  lot; is that correct?

23  A   Yes.

24  Q   And, of course, you don't know where the marijuana smoke

17:27  25  came from, who was smoking marijuana, whether it was people in

17:27   1   the clinic or outside?

2   A    I smelled it in the clinic, as well.

3   Q    But nobody was smoking marijuana inside the clinic?

4   A    No.

17:27   5   Q    What you smelled was somebody who had possibly been smoking

6   marijuana and you smelt the aroma of marijuana inside the

7   clinic?

8   A    Yes.

9   Q    Off of somebody else's person; is that correct?

17:27  10   A    Yes.

11   Q    You don't know if that person was being treated or not, do

12   you?

13   A    They were sitting in the waiting room next to me.

14   Q    But you don't know if they went in and got a script or not,

17:27  15   do you?

16   A    No.

17   Q    I believe you testified you didn't see anybody standing in

18   that video because there were only so many chairs; is that

19   correct?

17:28  20   A    Once you went inside, you could not stand.

21   Q    But you saw somebody standing at the counter; did you not?

22   A    Standing at the counter?

23   Q    In that video.

24   A    What do you mean?

17:28  25   Q    What somebody standing at the particular counter in that

17:28  1  video?

2  A    They stand at the counter when they are called up to pay or

3  to talk to the person.  That's the only standing allowed.

4  Q    Okay.  And nobody said that.  That's just what you saw?

17:28  5  A    No.  The security guard said, No standing.  You had to have

6  a seat or go outside and wait.

7  Q    And you could hear that on that particular video, can't

8  you?

9  A    Yes.

17:28  10  Q    Okay.  Then you gave a characterization as to what these

11  people looked like, what they had on; is that correct?

12  A    Yes.

13  Q    And in your estimation, you were basically saying that they

14  looked like poor people; is that correct?

17:29  15  A    No.

16  Q    Okay.  What were you getting at when you were saying it

17  looks like they had on flip-flops and had gold grills, had

18  stars?  What were you getting at when you were testifying to

19  this jury?  What were you trying to -- what picture are you

17:29  20  trying to paint for this jury with that?

21  A    I was just making an observation of the people in the

22  waiting area with me.

23  Q    That is very insignificant as to if, in fact, these people

24  were getting illegal prescriptions or not, isn't it?

17:29  25  A    Can you repeat your question?

17:29  1  Q   That is insignificant as to if these people got

2  prescriptions or not, isn't it?

3  A   No.

4  Q   Okay.  You said there were a total of five -- I'm sorry --

17:29  5  of six -- well, five people in uniform and one in plain

6  clothes; is that correct?

7  A   Security.

8  Q   Okay.  And you prepared a DEA6 in relationship to the

9  events that happened on that particular day; did you not?

17:30  10  A   Yes.

11  Q   Explain to the jury what an DEA6 is.

12  A   It's a report of events that took place.

13  Q   You reviewed that report before you testified today?

14  A   Yes.

17:30  15  Q   And you keep this report so when you testify later, if you

16  have to testify later, you can refresh your memory as to what

17  happened; is that correct?

18  A   Yes.

19  Q   Okay.  And because this happened June 15 and that's been

17:30  20  quite some time; is that correct?

21  A   Yes.

22  Q   And that's why you reviewed this this morning before

23  testifying; is that correct?

24  A   Not this morning.

17:30  25  Q   But you reviewed it recently to refresh your memory as to

17:30    1    the events that occurred on that particular day?

2    A    Yes. I have reviewed the report.

3    Q    All right. Now, on the dates of the particular video, were

4    you present for surveillance on those dates?

17:30    5    A    Some of the days.

6    Q    Okay. Which days were you present and which days were you

7    not present?

8    A    I can't say which ones.

9    Q    Okay. All right. But it would be somewhere in your DEA6s;

17:31    10    would it not be?

11    A    Not in my report, no, sir.

12    Q    If you were present, it wouldn't be in the report?

13    A    It would report in the report if I was there, yes.

14    Q    Have you reviewed those reports prior to testifying?

17:31    15        THE COURT: Slow down, please.

16    *BY MR. WILLIAMS:*

17    Q    Have you reviewed those reports prior to testifying here

18    today in court?

19    A    No.

17:31    20    Q    So you can't say if you were actually present on any of

21    these days other than June 15 of 2017; is that correct?

22    A    When you do surveillance for the --

23    Q    Not my question. My question is: You can't tell this jury

24    if you were present on 6/29/17 or any other date of those

17:31    25    videos that were shown to the jury?

17:31  1  A  Physically, no, I cannot say.

2  Q  All right.  And you stated that you made a mistake in your

3  DEA6 as to the amount of money that was paid that particular

4  day; is that correct?

17:32  5  A  Yes, I did.

6  Q  And what was that mistake again?

7  A  Instead of $280, it was $270 for the visit.

8  Q  All right.  That's fair.  Also, you made another mistake

9  when you went into the clinic and you didn't take your

17:32  10  identification; is that correct?

11  A  That was an oversight, yes.

12  Q  So you had to go back to the car to get your fake ID

13  because it wasn't a real ID, was it?

14  A  It is a real ID, just with a fictitious undercover name.

17:32  15  Q  As a DEA agent, you are allowed to have that fake ID,

16  aren't you?

17  A  Yes, I am.

18  Q  Because your whole idea when you go in is to deceive the

19  people as to who you are for security purposes?

17:33  20       MR. HELFMEYER:  Objection.  Argumentative.

21       THE COURT:  Sustained as to the form of the question.

22  *BY MR. WILLIAMS:*

23  Q  Because when you go in, you don't want to reveal your real

24  identity, do you?

17:33  25  A  No.

17:33  1  Q   Okay.  Now, you mentioned something called crew leaders,

2  correct?

3  A   Yes.

4  Q   And which people in that video can you affirmatively

17:33  5  identify as being a crew leader?

6  A   I cannot.

7  Q   So when you testified to that to this jury, you were

8  speculating that that is what they were?

9  A   No.

17:33  10  Q   The person who you affirmatively identified as helping

11  someone else fill out information, you don't know who that

12  person was, do you?

13  A   No.

14  Q   You did not note that on your DEA6, did you?

17:34  15  A   Yes, I did.

16  Q   You noted you saw that, but you don't know if that is the

17  father, the brother, the relative of the person who is in the

18  clinic, do you?

19  A   No, I do not.

17:34  20  Q   So you are speculating they are actually a crew leader,

21  aren't you?

22  A   No, sir.

23  Q   Explain to this jury how you can affirmatively say that

24  person is a crew leader if, in fact, you don't know who they

17:34  25  are.

17:34 1 A    When the person was filling out the paperwork, the crew

2 leader was showing them where to mark off where their pain

3 hurts.  I would think if the patient was being treated, they

4 would know where their pain is.

17:34 5 Q    Did you note that in your DEA6?

6 A    I did.

7 Q    When you went in to see a particular doctor, you saw them

8 for about a minute and a half; is that correct?

9 A    Yes.  Ninety-one seconds.

17:35 10 Q    And shortly thereafter, the tape cut off, didn't it?

11 A    No.

12 Q    So did the tape keep running after that?  Or is that just

13 what the prosecutor played?

14 A    No.  I think you are mistaking two different things.

17:35 15 Q    All right.  My question is this:  The tape stopped when you

16 went out of the particular room; is that correct?

17 A    No.

18 Q    So the tape continued to run?

19 A    Yes.

17:35 20 Q    So there is other video or there is other audio after you

21 left out of the room with Dr. Craig?

22 A    Yes, sir.

23 Q    And how long did that audio go?

24 A    That I do not know.  Not much longer.

17:36 25 Q    And when you say "not much longer," where did you go after

17:36  1  you left the particular room with Dr. Craig?

2  A    I went to the front waiting area.

3  Q    Did the device turn off or did you deactivate it?

4  A    Neither while I was there.  It was still going.

17:36  5  Q    While you were sitting out front, the device was still

6  going?

7  A    Yes.

8  Q    Okay.  Did it go long enough in order for it to record you

9  picking up the prescription, the audio for you getting your

17:37  10  prescription?

11  A    When I walked up to the counter and the prescription was

12  given to me, yes.

13  Q    So it was shortly thereafter when you came out that you got

14  the prescription and you left; is that correct?

17:37  15  A    Yes.

16  Q    And where is the remaining audio of that -- well, I guess

17  what I'm getting to, we only played a portion of that

18  particular tape; did we not?

19  A    Yes.

17:37  20  Q    The government did.

21  A    Yes.

22          MR. WILLIAMS:  I will pass this witness.

23          THE COURT:  Counsel?  Microphone, sir.

24          MR. LEWIS:  Sorry, Judge.

17:38  25          THE COURT:  You can pull it in a little bit.

17:38  1  **CROSS-EXAMINATION**

2  *BY MR. LEWIS:*

3  Q   Good afternoon, Ms. Graham.

4  A   Good afternoon.

17:38  5  Q   My name is Don Lewis, and I represent Dr. Craig.  I would

6  like to ask you a couple follow-up questions to your testimony.

7  A   Yes, sir.

8  Q   Do you know what a flexion test is?

9  A   Can you repeat that?

17:38  10  Q   Do you know what a flexion test is?

11  A   No, sir.

12  Q   Do you know what a straight leg raise is?

13  A   No, sir.

14  Q   Do you know what a reflex test is?

17:39  15  A   Yes.

16  Q   What is a reflex test?

17  A   When I sit on the exam table and they take the little

18  hammer and hit your knee and check for your reflexes.

19  Q   Do you know what a strength test is?

17:39  20  A   Yes.

21  Q   And what is that?

22  A   Testing the strength in your extremities.

23  Q   Do you know how that is performed?

24  A   Sometimes it is performed by squeezing your hand or they

17:39  25  will tell you to stand still and you push towards their hand,

17:39  1   like positive, negative energy.

2   Q   On the day -- on June 15th, 2017, did you receive a flexion

3   test?

4   A   I don't know what that is.

17:39  5   Q   That's right.  You don't know what that is.  All right.

6   I'm going to need to take you to your patient records.

7   Specifically, I would like to start on page four.

8            THE COURT:  Do you need the unit, sir?

9            MR. LEWIS:  I was hoping they could project page four.

17:40  10           THE COURT:  Hang on a second.  Is it on your computer?

11           MR. LEWIS:  It is on my computer.

12           THE COURT:  Hang on one second.  I can lock in your

13   computer.  I believe this is it.  It's either that one or this

14   one.

17:40  15           Did you check this out with Ellen ahead of time

16   for compatibility?

17           MR. LEWIS:  I did not.

18           THE COURT:  Is this on your computer?

19           MR. LEWIS:  This is my personal computer.

17:40  20           THE COURT:  It's not the system?

21           MR. LEWIS:  No.

22           THE COURT:  There is a way to lock into it but you

23   can't do it now.  If you want to use the overhead projector,

24   you are certainly free to do so.

17:41  25           MR. LEWIS:  May I approach to get the hard copy?

17:41    1       THE COURT:  Sure.  Sure.  It will take about 30

2    seconds to lock in.  That's probably it.  If you want to try a

3    document, we will make sure it works.  There it goes.  Okay.

4            Let me ask you this:  Do you want the light out

17:41    5    or is that sufficient for you?

6            MR. LEWIS:  I think that's going to be sufficient,

7    Judge.

8            THE COURT:  Go right ahead.

9    *BY MR. LEWIS:*

17:42   10    Q   Ms. Graham, are you familiar with the document that is

11    being depicted on the screen?

12            THE COURT:  You can zoom in some if you want to.

13            MR. LEWIS:  I can see it.

14            THE COURT:  Go ahead and show him where the button is.

17:42   15    *BY MR. LEWIS:*

16    Q   Ms. Graham, are you familiar with the document that's being

17    depicted by the overhead here?

18    A   Yes, sir.

19    Q   And what is that document?

17:42   20    A   That's a new patient form that I filled out.

21    Q   Is this a document that you filled out?

22    A   Yes.

23    Q   Was this document filled out on the date of your visit to

24    Gulfton that your testimony has covered?

17:42   25    A   Yes, sir.

17:42   1   Q   At the bottom of this form, do you see a signature depicted

2   there?

3   A   Yes.

4   Q   And do you see the date that that signature was added?

17:43   5   A   Yes.

6   Q   Okay.  Let's look at this form a little bit.  Does this

7   form ask you whether or not you have insurance?

8   A   Yes, it does.

9   Q   And did you indicate if you had insurance?

17:43   10   A   I did not.

11   Q   Does this form ask you other information regarding whether

12   or not you had a friend, a relative to contact in the event of

13   an emergency?

14   A   What is your question, sir?

17:43   15   Q   Does this form ask you information or questions to provide

16   the name of a friend or relative in the event of an emergency?

17   A   Yes, it did.

18   Q   Did you fill out that information?

19   A   I did not.

17:43   20   Q   Why did you not fill out that information?

21   A   I did it on purpose.

22   Q   And what does that mean?  You did it on purpose?

23   A   Yes.  That I wanted to see if the documents were going to

24   be read and I was going to be asked about it.

17:44   25   Q   On the date of your visit of 6/15, you on purpose also

17:44   1   indicated that you didn't have insurance?

2   A   Yes.

3   Q   Because you indicated that you didn't have insurance, would

4   it be fair for the clinic to assume that you were paying in

17:44   5   cash for this visit?

6   A   Yes.

7   Q   I'm showing you now another page of your patient record.   I

8   will try to pull it down a little bit.

9           Are you familiar with this document?

17:45   10   A   No, sir.  Can you pull it back some, please?

11   Q   Can you take a look at it and see if you are familiar with

12   this document?

13   A   Can you pull it out and let me see the entire document,

14   please?

17:45   15       MR. LEWIS:  I'm trying not to remove it from the file

16   for fear that it will get out of order.

17       THE COURT:  Is that making it smaller or bigger?

18       MR. LEWIS:  Smaller.

19       THE COURT:  We need the light out.  It will be much

17:45   20   better for you if you are going to be using that.  All right?

21   Zoom it in exactly where you want it.  Or if you want the whole

22   thing, that's it.  There it is.

23   *BY MR. LEWIS:*

24   Q   First, Ms. Graham, are you familiar with the document

17:46   25   that's being shown on the overhead now?

17:46   1   A   I can't honestly say because -- can you push it up some so

        2   I can see -- I don't know which document it is.  Is there more

        3   at the bottom?  Is there a title on it?

        4   Q   There is no title on it other than what you are seeing on

17:46   5   the screen now, which is fuzzy now.

        6   A   Okay.

        7           MR. LEWIS:  Judge, if I can see the USB --

        8           THE COURT:  If you want to zoom it in a little bit

        9   more, it will clear up.  There it goes.  Move it a little bit

17:47  10   more.  That's fine.  Move it up and down.  But can everybody at

       11   least see that?  Yes, the jury says they can see it.

       12   *BY MR. LEWIS:*

       13   Q   Now, can you more or less take a minute and just take a

       14   look at this document and see if this is the document that you

17:47  15   were presented as part of your new patient intake packet?

       16           THE COURT:  At the bottom, is there a signature?

       17           MR. LEWIS:  Not on this particular document.

       18           THE WITNESS:  I don't know.  I can't say.

       19   *BY MR. LEWIS:*

17:47  20   Q   So you don't remember seeing this document?

       21   A   I don't remember.

       22   Q   But would it be fair to assume that if it is part of the

       23   file --

       24           THE COURT:  What file?

17:47  25           MR. LEWIS:  The government's file that has been

17:47  1  entered into evidence, this would be a document that you should

2  have seen on 6/15/2017.

3           MR. HELFMEYER:  I'm objecting to characterization that

4  it was the government's file.  This was the file that was

17:47  5  seized from the clinic.

6           THE COURT:  Seized from the clinic.

7           MR. LEWIS:  I misspoke.  The government's exhibit.

8           THE COURT:  While we are talking, was it in the file

9  for this patient in the clinic?

17:48  10          MR. HELFMEYER:  Yes, Your Honor.

11          THE COURT:  Now, we have it narrowed down.  But you

12  don't remember perhaps seeing that?  Or do you remember?

13          THE WITNESS:  I can't say.  I need to see it together.

14          THE COURT:  There it is.

17:48  15          THE WITNESS:  There is more to it.

16          THE COURT:  Are there more pages, you mean?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Is there a second page?

19          MR. LEWIS:  Yes.  There is a second page.  Judge, I

17:48  20  think I am just going to take it out.  And if I can approach

21  the witness and maybe she can see all of it.

22          THE COURT:  All right.  By the way, tomorrow talk to

23  the case manager and see if she can plug in your system in here

24  or at least get the IT people up here to give you a hand.

17:48  25          MR. LEWIS:  I will.  May I approach, Judge?

17:48  1          THE COURT:  You needn't ask permission.  Go right up.

2             That's another thing.  You are going to have

3 attorneys requesting permission to approach a witness, which is

4 usual in federal courts.  It doesn't matter to me, unless they

17:49  5 start badgering the witness, then we will hear from the other

6 side.  And I will back them off.

7             Assuming you don't badger the witness, show her

8 what you have got.

9 BY MR. LEWIS:

17:49  10 Q   Ms. Graham, could you take a look at the document that I

11 was asking you some questions of?  Just take a minute to look

12 at all -- I think it is four pages there.

13 A   (Compliance.)

14 Q   Do you recall being presented this information when you

17:49  15 went to Gulfton on June 15, 2017?

16 A   I don't know if it was in the new patient packet, but there

17 were several packets of paper.  But it was in there.

18          THE COURT:  The question is:  Do you recall seeing

19 that at the time?

17:50  20          THE WITNESS:  Yes.  At some point in time, yes.

21 BY MR. LEWIS:

22 Q   Did you read it?

23 A   No, I did not.

24 Q   Why did you not read it?

17:50  25 A   It wasn't important.

17:50 1  Q   So it wasn't important to you -- as part of this, these

2  four pages, can you tell me what the first line on this page,

3  page three says?

4  A   "Informed consent and pain management agreement as required

17:50 5  by the Texas Medical Board.  Reference, Texas Administrative

6  Code, Title M22, Part 9, Chapter 170."

7  Q   Does it appear this is a document you should read and you

8  should sign or consent to this document as being a new patient

9  at Gulfton?

17:51 10 A   Yes.

11 Q   And you are saying you didn't read it?

12 A   That is correct.  I skimmed over it.

13 Q   Okay.  Let's read it now.

14 A   Okay.

17:51 15     THE COURT:  Not the whole thing.

16 *BY MR. LEWIS:*

17 Q   Not the whole thing.  Does this document refer to whether

18 or not you are consenting to treatment at Gulfton clinic?

19 A   It says "Consent to treatment and/or drug therapy."

17:51 20 Q   Does page one of this document seem to indicate side

21 effects of the medication that you might receive at Gulfton

22 Clinic?

23 A   It says "I understand that the most common side effects

24 that could occur in the use of drugs."

17:51 25 Q   And does it seem to list side effects related to the drug

17:51  1  therapy that you might receive at Gulfton Clinic?

2  A   Yes.

3  Q   Is it specific as to specific side effects?

4  A   Included but not limited to, yes.

17:52  5  Q   And what are some of the side effects that it's listing?

6  A   Constipation, nausea, excessive drowsiness, itching,

7  urinary retention.

8  Q   So did you not believe that it was important for you to

9  understand that there might be side effects related to any

17:52  10  medication?

11  A   No.  Because I'm not a real patient.

12  Q   That's a good question.  So a real patient though, it's

13  important for them to read this -- these type documents?

14  A   Yes.

17:52  15  Q   And as far as Gulfton was concerned that day, did Gulfton

16  believe that you were a real patient?

17  A   Yes.

18  Q   So someone at Gulfton assumed that you read this document?

19  A   They assumed, yes.

17:53  20  Q   Does this document also cover a contract that you are

21  making with the clinic in the event that you are prescribed

22  medication?

23  A   A contract?

24  Q   Well, I will ask it another way.  Does this document seem

17:53  25  to indicate that it's an agreement that is required by the

17:53   1   Texas Medical Board?

2   A    I don't understand your question.

3   Q    Again, what does the first sentence on page three say?

4   A    "Informed consent and patient pain management agreement as

17:53   5   required by the Texas Medical Board, Reference, Texas

6   Administrative Code, Title M22 Part 9, Chapter 170."

7   Q    Does it appear that this is something that's required by

8   the Texas Medical Board, which is an agency that --

9           MR. HELFMEYER:  Objection to Counsel testifying.

17:54   10          THE COURT:  What?

11          MR. HELFMEYER:  Counsel is testifying.

12          THE COURT:  Sustained.  You can lead because it is the

13   other side's witness.  But as to the form of the question,

14   sustained.

17:54   15          MR. LEWIS:  I will ask a better question, Judge.

16   *BY MR. LEWIS:*

17   Q    Does it appear this document is required by the Texas

18   Medical Board?

19   A    Yes.

17:54   20   Q    And it does appear that it is required in the treatment of

21   a pain patient?

22   A    Yes.

23   Q    And did you sign this document?

24   A    Yes.

17:54   25   Q    And did you sign it on the date that you received treatment

17:54  1   at the Gulfton Community Health Center?

2   A   Yes.

3   Q   Could you look at the last page of this paperwork that I

4   just received -- that I just gave you.  What does the title of

17:54  5   this document appear to be?

6   A   "HIPAA complaint release of patient medical information

7   authorization form."

8   Q   Are you aware of what HIPAA is?

9   A   It's requirements you have -- as a patient you have to

17:55  10  allow your medical records to be released, to be released to

11  someone else.

12  Q   Does HIPAA also regulate third parties that might receive

13  the medical information related to someone else?

14  A   I don't know.

17:55  15  Q   You don't know.  Does HIPAA require Gulfton clinic not to

16  release your information to anyone that's not authorized to get

17  that medication -- I mean that information?

18  A   I don't know.

19  Q   So would HIPAA regulate the release of your information to

17:55  20  someone else in the clinic?

21  A   If I give them authorization, yes.

22  Q   But without that authorization, HIPAA would restrict them

23  from doing that?

24  A   Yes.

17:56  25  Q   Okay.  Does HIPAA cover -- in releasing your information,

17:56   1   does HIPAA cover your identity?

     2   A    I don't know.

     3   Q    So you are not aware of whether or not HIPAA covers release

     4   of medical information as it relates to your identity?

17:56   5   A    Your identity would be in the medical records.

     6   Q    Okay.  And also in your medical records, would it be

     7   medical conditions?

     8   A    Yes.

     9   Q    Now, can you -- would you be able to record or document

17:56  10   someone's identity using your cell phone?

    11   A    Can you ask the question again, please?

    12   Q    Would you be able to record or document another party's

    13   identity by the use of your cell phone?

    14   A    Their identity, meaning their picture?

17:57  15   Q    Could you take their picture?

    16   A    With my cell phone, yes.

    17   Q    Could you take their picture inside the clinic?

    18   A    Yes.

    19   Q    Could you take Dr. Craig's picture inside the clinic?

17:57  20   A    Yes.

    21   Q    And if you took a patient's picture inside the clinic and

    22   they didn't give you authorization, would that be a violation

    23   of HIPAA?

    24   A    No.

17:57  25   Q    So you don't believe that that would be a violation of

17:57  1  HIPAA to take someone's picture and release it to a third

2  party?

3         THE COURT:  You mean a violation of that specific law?

4  *BY MR. LEWIS:*

17:57  5  Q   Of the HIPAA law.

6  A   No.

7  Q   So that's your understanding?

8  A   Yes.  I'm confused, but yes.

9  Q   Could you take a picture of someone else's HIPAA record and

17:58  10  release it to a third party?

11  A   No.

12  Q   Would that be a violation of HIPAA?

13  A   Yes.

14  Q   Would it be possible for you to take pictures of an

17:58  15  individual's patient record while you were at the clinic with

16  your cell phone?

17  A   Can you ask the question again?  I don't understand.

18  Q   Is it possible for you to take the picture of another

19  patient's patient record?

17:58  20         THE COURT:  At the clinic?  While you were there at

21  the clinic, did you have access to those records?

22         THE WITNESS:  No, I did not.

23  *BY MR. LEWIS:*

24  Q   Did you see patient records?

17:58  25  A   I saw people filling out their packet.

17:58   1   Q   Did you see any patient records behind the counter when you

2   walked up to the counter?

3   A   They were in folders.

4           THE COURT:   They were in folders?

17:58   5           THE WITNESS:   Yes.   They were in folders.

6   *BY MR. LEWIS:*

7   Q   Could you determine whether or not there were names on

8   those patient records?

9   A   No, I could not.

17:58  10   Q   Did they have any outside markings on them at all?

11   A   Not that I could see.

12   Q   But you could see them; is that correct?

13   A   Yes.

14   Q   And you could have taken a picture of them with your cell

17:59  15   phone?

16   A   No.

17   Q   Why couldn't you have taken a picture with your cell phone?

18   A   Because cell phones are not allowed.   When you are at the

19   counter, you can't just have your phone right there.   You can

17:59  20   have your phone.   You just can't be on it.

21   Q    If you had your cell phone, if a patient had their phone,

22   could they have taken a picture through the window at the

23   counter of the patient files?

24   A   Yes.

17:59  25           THE COURT:   All right.   At that point -- we always

1  adjourn between 6:00 and 6:05.  I think we reached a time to

2  turn the lights on there.  We are going to complete our

3  testimony for today.  It is moving right along.  And, remember,

4  tomorrow is the only morning we get underway at 11:30.  We will

5  go a full day and we will start tomorrow at 11:30.

6          Thank you, ladies and gentlemen.  See you

7  tomorrow at 11:30.  We will stand adjourned.

8      *(Court adjourned at 6:00 p.m.)*

9                * * * *

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled cause.

12

13  Date: February 23, 2018

14

15               */s/ Mayra Malone*
             ----------------------------------------

16               Mayra Malone, CSR, RMR, CRR
             Official Court Reporter

17

18

19

20

21

22

23

24

25