1                        UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF TEXAS

2                           HOUSTON DIVISION

3

4

5   UNITED STATES OF AMERICA    .   4:17-CR-00419

6   VERSUS                  .   HOUSTON, TEXAS

7   GAZELLE CRAIG, D.O, AND    .   JANUARY 30, 2018

8   SHANE FAITHFUL          .   11:43 A.M.

9   . . . . . . . . . . . . . .

10

11                          DAY 2
                  TRANSCRIPT OF JURY TRIAL

12          BEFORE THE HONORABLE DAVID HITTNER
             UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *APPEARANCES*

2

   FOR THE GOVERNMENT:
3
        Scott P. Armstrong
4       UNITED STATES DEPARTMENT OF JUSTICE
        1400 New York Avenue Northwest
5       Washington, DC   20005

6       Devon M. Helfmeyer
        UNITED STATES DEPARTMENT OF JUSTICE
7       1000 Louisiana
        Suite 2300
8       Houston, Texas   77002

9  FOR DEFENDANT CRAIG:

10       Don E. Lewis
         Attorney at Law
11       1717 Saint James Place
         Suite 625
12       Houston, Texas   77056

13 FOR DEFENDANT FAITHFUL:

14       Cornel A. Williams
         WILLIAMS AND ASSOCIATES
15       1405 Palm Street
         Houston, Texas   77004

16

17 OFFICIAL COURT REPORTER:

18       Mayra Malone, CSR, RMR, CRR
         U.S. Courthouse
19       515 Rusk, Room 8004
         Houston, Texas   77002

20
   Proceedings recorded by mechanical stenography.   Transcript
21 produced by computer-aided transcription.

22

23                        - - - - -

24

25

1                               **INDEX**

2

3

4

5   TONYA GRAHAM

6       Cross-Examination Continued by Mr. Lewis        255

7       Redirect Examination by Mr. Helfmeyer          280

8       Recross Examination by Mr. Williams            283

9   LOREN PHILLIPS

10      Direct Examination by Mr. Armstrong            286

11      Cross-Examination by Mr. Williams              423

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *PROCEEDINGS*

2          *(Jury present)*

3                    THE COURT:  Do we have our witness on the stand?

4                    MR. HELFMEYER:  She's on the way in.

5                    MR. ARMSTRONG:  Your Honor, purely for planning

6          purposes, do you anticipate us going forward until about 1:00?

7                    THE COURT:  Between 1:00 and 1:10, something like

8          that.  Who is up?

9                    MR. LEWIS:  Your Honor, I think I was questioning her

10         on cross.

11                   THE COURT:  Yes, sir.

12                   MR. LEWIS:  Today, I can project it today, Your Honor.

13         We got that worked out.

14                   THE COURT:  Okay.  Good.  Thanks.

15                   MR. LEWIS:  I need some of the lights out.

16                   THE COURT:  Do you want both sets out or that's okay

17         for now?

18                   MR. LEWIS:  Let me scroll down here.

19                   THE COURT:  Tell me.  If you want the other bank out,

20         we can do that.

21                   MR. LEWIS:  I think the other bank out too.

22                   THE COURT:  All right.

23                   MR. LEWIS:  May I proceed, Judge?

24                   THE COURT:  Yes, sir.

25         ///

11:44  1    **TONYA GRAHAM, PREVIOUSLY SWORN, FURTHER TESTIFIED:**

2                    **CROSS-EXAMINATION CONTINUED**

3    *BY MR. LEWIS:*

4    Q    Good morning, Ms. Graham.

11:44  5    A    Good morning.

6    Q    I want to pick up with you from where we were yesterday.

7    I'm showing you documents that are a part of the Government's

8    Exhibit Number 357.  I think you talked a little bit about this

9    yesterday.  I want to pick up there.  I'm showing you what is

11:44  10   page seven.  Does this document show your name?

11   A    Yes.  My undercover name.

12   Q    Your undercover name?

13   A    Yes.

14   Q    And does it show the date of service?

11:45  15   A    Yes, sir.

16   Q    Did you actually supply that document there?

17   A    I did not.

18   Q    I'm sorry.  Did you actually put the information as far as

19   your name and the date on this document?

11:45  20   A    Yes, sir.

21   Q    Okay.  I'm going to try to make it a little bigger for you.

22            By the way, Ms. Graham, what is your educational

23   background?

24   A    I have a bachelor's degree from Texas Southern University.

11:45  25   I have a master's degree in organizational management from

1   University of Phoenix.  And I have a doctor's degree from North

2   Central University in Prescott Valley, Arizona.

3   Q    Would it be a fair statement that you believe that you are

4   someone that's proficient in reading and writing English?

5   A    Yes.

6   Q    And do you understand the formal and the common meanings

7   for most English words?

8   A    Yes.

9   Q    I want to direct your attention now to the paragraph that's

10  being projected that says "Consent to Treatment and Drug

11  Therapy."

12  A    Yes.

13  Q    Does this paragraph mean that by you signing off on this

14  document that you are consenting to treatment at Gulfton

15  Community Health Center?

16  A    I'm just reading it quickly.

17  Q    Sure.

18  A    Can you ask your question again, please?

19  Q    Does this paragraph indicate that you are consenting to

20  treatment at Gulfton Community Health Center?

21  A    To treat the condition, yes.

22  Q    The paragraph right below it, does this paragraph indicate

23  that the medication that you might receive at Gulfton does have

24  risks of physical dependence and/or addiction?

25  A    The paragraph where it starts, "It has been explained"?

11:47    1    Q    I'm going to try to put the cursor here, starting right

2    here.  From here to here.

3    A    Ask your question again.

4    Q    Does this paragraph indicate that the medications that

11:47    5    might be utilized in treating you at Gulfton has risks of

6    physical dependence and/or addiction?

7    A    Yes, sir.

8    Q    I want to direct your attention now to this paragraph right

9    here where the cursor is.  Do you see that?

11:48   10    A    Yes.

11    Q    Does this paragraph indicate that you will -- you are

12    agreeing to undergo medical -- to undergo medical tests and

13    examinations as part of you being treated at Gulfton?

14    A    That I have been informed.

11:48   15    Q    That you are -- let me ask it differently.  Does this

16    paragraph indicate that you will undergo medical tests and

17    examinations before and during your treatment at Gulfton?

18    A    Well, that's part of it, yes.  But the first part says I

19    have been informed, meaning that I would be informed that I

11:48   20    would undergo medical tests and examinations.

21    Q    Is that your interpretation?

22    A    That is my interpretation.

23    Q    Okay.  So let's go down to this paragraph here that says

24    "For Female Patients Only."  Okay.  Does this paragraph seem to

11:49   25    indicate that there are some conditions that affect you,

*Lewis Cross Continued of Tonya Graham*

11:49 1 because you are female, if you receive treatment at Gulfton?

2 A   Repeat your question, please.

3 Q   Does this paragraph seem to indicate that if you are female

4 that -- there are some considerations regarding your treatment

11:49 5 at Gulfton because you are female?

6 A   Yes.

7 Q   Let's go to the next page.  By the way, this form is out of

8 order from the document that you were actually presented, but I

9 will go through each one of them.

11:50 10                Okay.  I want to direct your attention now to

11 page five at the top.  You see this?

12 A   Yes.

13 Q   Does this paragraph seem to indicate that -- to you that

14 there might be some side effects or risks related to medication

11:50 15 that you might receive at Gulfton?

16 A   Yes.

17 Q   I direct your attention now to this paragraph.  Does this

18 paragraph seem to indicate that the goal of your treatment is

19 to control your chronic pain?

11:50 20 A   Yes.

21 Q   I direct your attention now to this sentence right here.

22 The sentence that says, "I understand and agree to the

23 following."  Do you understand what that sentence means?

24 A   That I understand and agree to the following.

11:51 25 Q   Okay.  So you are representing that you agree that your --

11:51    1   the first sentence here, that your progress will be

2   periodically reviewed?

3   A    Yes.

4   Q    That you will disclose to physicians -- to your physicians

11:51    5   all medications that you have taken?

6   A    Yes.

7   Q    Going forward, that you will use the medications exactly as

8   directed?

9   A    Yes.

11:51   10   Q    That you will use medications exactly -- that's a

11   duplicate.   That you agree not to share to sell or permit

12   others to have your medication?

13   A    Yes.

14   Q    You will not allow or assist in the misuse of the diversion

11:51   15   of medication?

16   A    Yes.

17   Q    I want to go now down to the area that is in bold.   It

18   says, "I will receive."   Do you see that sentence here?

19   A    Yes.

11:52   20   Q    Does that seem to indicate that you are agreeing you will

21   receive medications only from one physician unless it is for an

22   emergency?

23   A    Yes.

24   Q    I'm going to skip through.   Does it also -- the area where

11:52   25   the cursor is located now, does this sentence indicate to you

11:52 1 that you are agreeing to submit to urine and blood screens as a

2 patient at Gulfton?

3 A    Yes.

4 Q    Does this sentence, "I recognize that my chronic pain" --

11:53 5 does that mean that you are representing and agreeing that you

6 recognize chronic pain as a complex medical problem?

7 A    Yes.

8 Q    Do you also see this sentence that says, "I must take the

9 medications."

11:53 10           Do you understand that to say that you will only

11 take these medications, if any, that you are getting from the

12 physician only as instructed by the physician?

13 A    Yes.

14 Q    Do you also see the last sentence here regarding

11:53 15 appointments, saying that you would keep and follow up on all

16 appointments?

17 A    Yes.

18 Q    I'm showing you now what is actually page eight of

19 Government's Exhibit 357.  Do you see the sentence that is

11:54 20 saying, "I certify and agree to the following"?

21 A    Yes.

22 Q    What does that mean to you?

23 A    That I agree and certify to the following.

24 Q    So you understand what that sentence means?

11:54 25 A    Yes.

11:54  1  Q   Okay.  So are you agreeing that you are not currently on

2  any illegal drugs?

3  A   Yes.

4  Q   And you are agreeing that you are not abusing drugs?

11:54  5  A   Yes.

6  Q   You agree that you have never been involved in the sale or

7  illegal possession of drugs?

8  A   Yes.

9  Q   You are agreeing that you are not misusing or diverting

11:54  10  drugs?

11  A   Yes.

12  Q   Number three, does that sentence represent to you that

13  Gulfton is making no guarantes that the treatment or the

14  medication you receive there will cure your pain?

11:55  15  A   Yes.

16  Q   And number four, does it mean to you that you have reviewed

17  the side effects of these drugs and you are aware that there

18  might be side effects related to treatment of your pain?

19  A   Yes.

11:55  20  Q   Going down to this sentence here that is in bold.  It says,

21  "I have read the contents of this document and I understand the

22  risks and alternatives of this treatment.  I have had the

23  opportunity to ask any questions about this treatment."

24              Do you understand what that sentence means?

11:55  25  A   Yes.

11:55 1  Q   What does that sentence mean?

2  A   That I read and understood the form.

3  Q   On this form, is your signature reflected?

4  A   Yes, it is.

11:55 5  Q   And did you supply that signature?

6  A   I did.

7  Q   Did you -- is it also dated?

8  A   Yes.

9  Q   And did you supply the date?

11:56 10  A   Yes.

11  Q   Is that date in your own handwriting?

12  A   I can't definitively say, no.  That does not look like my

13  handwriting, but that is my signature though.

14  Q   But it is possible that you might have also put the date on

11:56 15  this form?

16  A   It is possible.

17  Q   And does it indicate that this form was signed off by the

18  physician, Gazelle Craig?

19  A   Yes.

11:56 20  Q   Were you given this form as part of your intake package at

21  Gulfton?

22  A   That I don't remember.  I received a lot of forms.

23  Q   Is it possible you received this form though?

24  A   It is possible, yes.

11:56 25  Q   And this was one of the forms that you had approximately

11:56    1    two hours to review from the time that you arrived and signed

2    in at Gulfton until the time that you were seen by a doctor?

3    A    If it was in the packet, Yes.

4    Q    I want to go now to page 10. When you were -- when you

11:57    5    entered Gulfton, I think your testimony yesterday is that you

6    did go through a triage process?

7    A    Yes.

8    Q    What does triage mean?

9    A    Triage means, to me, taking vitals.

11:57    10    Q    Okay. Now, as part of that triage, did someone ask you

11    questions?

12    A    Yes.

13    Q    And are the questions -- let's start out at the top. Did

14    someone take your blood pressure?

11:57    15    A    Yes.

16    Q    Did you believe that the blood pressure reflected here was

17    the blood pressure that was taken on that day?

18    A    No. I don't know. I didn't see the reading.

19    Q    But someone did take your blood pressure?

11:57    20    A    Yes.

21    Q    Did you -- did this person that was taking your blood

22    pressure or during this patient encounter, were they asking you

23    questions?

24    A    Yes.

11:58    25    Q    Did they ask you questions about your medical condition or

11:58    1    what your symptoms were?

         2    A    Yes.  What I came there for.

         3    Q    And, of course, it's indicated and documented on this form

         4    that there is a chief complaint here of low back pain.  Do you

11:58    5    remember that?

         6    A    No.

         7    Q    But someone did ask you questions?

         8    A    Yes.

         9    Q    And you were present when they were writing responses on

11:58   10    this form?

        11    A    I was.  Yes.

        12    Q    Okay.  Did someone ask you a question, that you had

        13    medications before?

        14    A    Yes.

11:58   15    Q    Did you report to these individuals what medications that

        16    you have taken before?

        17    A    Yes.

        18    Q    And are those medications reflected on this form?

        19    A    Yes.

11:58   20    Q    And those being Norco and Soma?

        21    A    Yes.

        22    Q    And that's documented on this particular form?

        23    A    Yes, it is.

        24    Q    Did someone ask you if you had a previous physician?

11:59   25    A    Yes.

11:59   1  Q   And what did you tell them regarding your previous

2  physician?

3  A   I told them the name of the previous physician.

4  Q   And that name being?

11:59   5  A   Dr. Williams.

6  Q   And that's also reflected on this form, right?

7  A   Yes.

8  Q   Okay.  Did someone ask you questions regarding all of these

9  things at the bottom of this form?

11:59  10  A   No.

11  Q   You don't remember being asked these questions?

12  A   I was not asked all those questions.

13  Q   Okay.  Now, I want to go now to this form, which looks like

14  it is going to be page 13 of Government's Exhibit 357.  Do you

12:00  15  remember this form?

16  A   Yes, sir.

17  Q   And was this form one of the forms you were given as part

18  of your intake forms after you signed up?

19  A   Yes.

12:00  20  Q   And who filled out this form?

21  A   I filled out this part right here.  I don't see the rest of

22  it.

23  Q   Well, okay, so you filled out everything that is reflected

24  by page 13?

12:00  25  A   If you can scroll down, please.

| | | |
|---|---|---|
| 12:00 | 1 | Q   What about -- |
| | 2 | A   If you can scroll down a little bit for me, please. |
| | 3 | Q   Okay.  Sure.  I can make it smaller. |
| | 4 | A   I can see it.  Yes. |
| 12:00 | 5 | Q   What about page 15? |
| | 6 | A   Yes. |
| | 7 | Q   Page 16? |
| | 8 | A   Yes. |
| | 9 | Q   Page 17? |
| 12:01 | 10 | A   Yes. |
| | 11 | Q   Page 18? |
| | 12 | A   Yes. |
| | 13 | Q   Page 19? |
| | 14 | A   Yes. |
| 12:01 | 15 | Q   Page 20? |
| | 16 | A   Yes. |
| | 17 | Q   So you were the individual that actually placed these |
| | 18 | responses or marks on this form as part of your completing the |
| | 19 | intake documents that you were given? |
| 12:01 | 20 | A   No, sir.  Not all of them.  It wasn't me only. |
| | 21 | Q   You or someone -- or you in response to someone's |
| | 22 | questions? |
| | 23 | A   No, sir. |
| | 24 | Q   Which ones did you not place on the form? |
| 12:02 | 25 | A   If you will scroll back up, down, please. |

12:02    1    Q    Down?

2    A    Yes. Keep going. Where it says "musculoskeletal," I did

3    not check "back pain or joint pain." I checked "muscle spasms

4    and joint stiffness."

12:02    5    Q    Okay. That's fine. This is also one of the forms that you

6    were given to fill out during the two hours you were waiting to

7    see the doctor?

8    A    Yes.

9    Q    Now, yesterday, I think in response to questions, you were

12:02    10    shown prescriptions or copies of prescriptions. One of the

11    copies that you were shown is what is being reflected on

12    page 21 of Government's Exhibit Number 357. Do you recall

13    that?

14    A    Yes, sir.

12:02    15    Q    The first drug that is listed there is Soma. Do you see

16    that?

17    A    Yes.

18    Q    In response to questions, do you see any directions about

19    how to use that drug?

12:03    20    A    No, sir.

21    Q    So I think in response to questions yesterday, you did say

22    no one told you how to take that medication?

23    A    That is correct.

24    Q    Now, what about the -- well, do you know what POTID means?

12:03    25    A    No, sir.

12:03    1    Q    Okay. What about the ibuprofen 800 milligrams, were you

2    told how to take that medication?

3    A    No, sir.

4    Q    Do you see POQD?

12:03    5    A    Yes, sir.

6    Q    On page 21, do you see the prescription for Norco?

7    A    Yes.

8    Q    And were you told how to take that medication?

9    A    No.

12:03    10    Q    Do you see something that you might not understand but

11    might represent one tablet by mouth every four to six hours

12    PRN?

13    A    I recognize the one tab.

14    Q    But do you see some other things to the right of it that

12:04    15    says POQ46 PRN?

16    A    Yes, sir.

17    Q    Did you get these prescriptions filled?

18    A    Yes, I did.

19    Q    Did they put prescription labels on the bottles that they

12:04    20    were dispensing?

21    A    Yes.

22    Q    Did they actually type out instructions regarding how to

23    fill the prescriptions?

24    A    How to fill the prescriptions?

12:04    25    Q    I mean how to take the prescriptions?

12:04    1   A    Yes.

2   Q    Going back to the Soma, do you recall whether the

3   instructions on the Soma was take one tablet three times a day?

4   A    No, sir.

12:04    5   Q    You don't remember reading that on your bottle?

6   A    No, sir.

7   Q    Who actually processes these prescriptions when you take

8   them in to the pharmacy?

9   A    What do you mean?

12:04    10   Q    Who fills them?

11   A    The pharmacist.

12   Q    And the pharmacist goes through the process of producing a

13   prescription label with your name on it, right?

14   A    Yes.

12:05    15   Q    And with directions for use, right?

16   A    Yes.

17   Q    And a quantity inside the container, right?

18   A    Yes.

19   Q    The doctor's name, your address and so on and so forth.  Do

12:05    20   you recall ever seeing this prescription after it was filled by

21   the pharmacist?

22   A    If I saw the prescription after it was filled?  No.

23   Q    Did you -- when I say "prescription," in this case, do you

24   recall seeing -- receiving a prescription bottle with a

12:05    25   prescription label on it that had directions on it about how

12:05   1   you take this medication?

       2   A    Yes.

       3   Q    And would the directions be, one tablet three times a day?

       4   A    I don't remember.

12:05   5   Q    Do you still have it?

       6   A    It's in evidence.

       7   Q    Okay.  As far as ibuprofen, were the directions on that

       8   container be that you take one tablet a day?

       9   A    I don't remember the directions.

12:06  10   Q    But the pharmacist would have interpreted what he believed

      11   the prescription represents and transferred that to the

      12   prescription label that was placed on the prescription

      13   container?

      14        MR. HELFMEYER:  Objection.  Speculation.

12:06  15        THE COURT:  Sustained.

      16        THE WITNESS:  Yes.

      17   *BY MR. LEWIS:*

      18   Q    Okay.  As far as the Norco, do you know if your

      19   prescription label -- or recall whether or not your

12:06  20   prescription label had directions on it of, take one tablet

      21   every four to six hours, as needed?

      22   A    No, sir.

      23   Q    But you won't deny that if that is what the label said,

      24   right?

12:06  25   A    No, sir.

12:06     1    Q    Will you look at page 22? Are you familiar with this

2    document?

3    A    Yes, sir.

4    Q    And what is the document?

12:06     5    A    This is the prescription monitoring report.

6    Q    And what does that mean?

7    A    That means if you have had any controlled substances

8    prescribed to you, it generates a report.

9    Q    And on this report, is this a report regarding

12:07    10    prescriptions that you have had filled as an alias under Tonya

11    Jackson?

12    A    Yes, sir.

13    Q    And does it indicate the date that those prescriptions were

14    filled?

12:07    15    A    Yes, sir.

16    Q    What was the date?

17    A    Filled, April 25, 2017.

18    Q    And what date was that prescription ready?

19    A    April 12, 2017.

12:07    20    Q    And what was it for?

21    A    One was for hydrocodone. The other was carisoprodol.

22    Q    And would that hydrocodone be Norco?

23    A    Yes.

24    Q    So you have taken Norco before or you have gotten

12:07    25    prescriptions for Norco before; have you not?

12:07    1    A    Prescriptions, yes.

         2    Q    On the prescription container for these, it had directions

         3    on how you take it, correct?

         4    A    I'm sorry.  Ask it again.

12:07    5    Q    On the prescription container that you received when you

         6    got this prescription back in April, did it have directions as

         7    to how to take the medication?

         8    A    Yes.

         9    Q    And would the same thing be for Soma?

12:08   10    A    Yes.

        11    Q    The Soma prescription, it had directions.  And, in fact, is

        12    this the document that actually confirms that you were being

        13    seen by Dr. Williams?

        14    A    That's who prescribed it, yes.

12:08   15    Q    That's who prescribed these two drugs?

        16    A    Yes.

        17    Q    On this date?

        18    A    Yes.

        19    Q    So you indicated to Gulfton that you had had these

12:08   20    prescriptions before and in having those prescriptions before,

        21    you have taken them before, right?

        22    A    I didn't personally indicate it to Gulfton.  It was in the

        23    report.

        24    Q    It was in your intake questionnaire about what --

12:08   25    A    I'm sorry?

12:08    1   Q   Was it listed on your intake questionnaire that you had had

2   these prescriptions before?

3   A   Yes.

4   Q   Do you recall -- when you were at Gulfton as part of your

12:09    5   triage before you saw Dr. Craig, did you see any other

6   individuals?

7   A   Yes.

8   Q   Were you interviewed by any other individuals?

9   A   Interviewed meaning?

12:09   10   Q   Did anyone come in to talk to you about your medical

11   condition?

12   A   Yes.

13   Q   How much time did you spend with them?

14   A   With the person who did the blood pressure, a few minutes.

12:09   15   Then there was another lady who said she was a nurse

16   practitioner that was about five months.

17   Q   Did she perform any kind of tests on you?

18   A   She did the -- she told me to bend over and touch my toes.

19   She did the leg raises.  She checked my reflexes.  She checked

12:10   20   my abdomen for liver function and she checked my heart.

21   Q   So she did six different things to you while she interacted

22   with you; is that correct?

23   A   Yes.

24   Q   How long was that interaction?

12:10   25   A   Total, about five minutes.

*Lewis Cross Continued of Tonya Graham*

12:10    1   Q   At least five minutes?

2   A   Yes, sir.

3   Q   And that was done prior to you seeing Dr. Craig; is that

4   correct?

12:10    5   A   Yes.

6   Q   Did that individual after they completed the test tell you

7   that you needed to remain where you were until Dr. Craig came

8   in the room?

9   A   Yes.

12:10   10   Q   Was the results of whatever tests had been performed, were

11   those results available to Dr. Craig when she came in the room

12   to see you?

13   A   I don't know.

14   Q   Was there a patient file in the room with you?

12:11   15   A   Dr. Craig brought in papers, but I don't know what they

16   were.

17   Q   It could have been a patient file that's documenting the

18   examination that you had already had?

19   A   Yes. It could have been, yes.

12:11   20   Q   So your total interaction as far as examinations and people

21   telling you things about your condition in addition to

22   medication, it was a lot longer than 90 seconds, wasn't it?

23   A   No, sir.

24        THE COURT: 90 seconds?

12:11   25        THE WITNESS: No, sir.

12:11 1    MR. LEWIS: Judge, at this time, I would like to play

2 this.

3    *(An audiotape was played)*

4 BY MR. LEWIS:

12:13 5 Q    Special Agent Graham, do you recall having a recording

6 device on you at the time when you were undercover at Gulfton

7 on June 15 of 2017?

8 A    Yes.

9 Q    Did that recording device capture audio relating to your

12:13 10 visit on June 15, 2017?

11 A    Yes.

12 Q    Was that recording device operating during the time that

13 you met with or spoke to medical personnel at Gulfton Community

14 Health Center?

12:13 15 A    Yes.

16 Q    I want you to listen to this and tell me whether or not

17 this is actually documenting audio regarding your interaction

18 at Gulfton.

19    *(An audiotape was played)*

12:14 20 BY MR. LEWIS:

21 Q    Do you recall that portion so far I played -- do you recall

22 that this was part of the audio that you captured while you

23 were at Gulfton?

24 A    Yes, sir.

12:14 25    *(An audiotape continued to be played)*

12:14 1 *BY MR. LEWIS:*

   2 Q What is going on here, Agent Graham?  Do you recall what

   3 was going on at this point?

   4 A Yes, I do.

12:15 5 Q What was going on?

   6 A The lady who came in with the hijab who said she was a

   7 nurse practitioner was having me do leg raises at this point.

   8 Q Those are exercises being administered to you?

   9 A Yes.

12:15 10 Q Is the deep tendon reflex test being performed at this

   11 point on you?

   12 A A tendon reflex test?

   13 Q Yes.

   14 A All I know was it was reflexes.

12:15 15 Q A reflex test?

   16 A Yes, sir.

   17 Q Okay.  Do you recall what is going on at this point, Agent

   18 Graham?

   19 A She is checking my abdomen.

12:16 20 Q Do you recall what is going on now, Agent Graham?

   21 A She is examining my heart, and I sat up.

   22 Q Was that you speaking and telling the provider at this

   23 point that you had some discomfort?

   24 A Yes.  Some stiffness, yes.

12:17 25 Q Did the provider ask you if you had high blood pressure?

12:17 | 1 | A    Yes, she did.

2 | Q    Did the provider ask you if you had swelling in your legs?

3 | A    Yes.

4 | Q    Did the provider actually examine your legs?

12:17 | 5 | A    Yes.

6 | Q    Is that you talking now?

7 | A    Yes, it is.

8 | Q    Is the individual discussing medication with you at this

9 | point?

12:17 | 10 | A    She is saying the names, yes.

11 | Q    Did the individual tell you to do some stretching

12 | exercises?

13 | A    Yes.

14 | Q    Did the individual ask you if you had any more questions?

12:18 | 15 | A    Yes.

16 | Q    Now, what did the individual tell you?

17 | A    Stay in the room.  The doctor will be in shortly.

18 | Q    Up until this point, you hadn't seen Dr. Craig, right?

19 | A    That is correct.

12:18 | 20 | Q    But certain things had happened to you related to your

21 | complaint or your reason for going to Gulfton?  As far as

22 | examinations, certain things had already happened to you?

23 | A    Yes.

24 | Q    How long did you remain in the room before you saw

12:19 | 25 | Dr. Craig?

12:19   1   A   For about 25 minutes.

2   Q   About 25 minutes.  Okay.  I want to skip ahead now.

3       *(An audiotape was played)*

4   *BY MR. LEWIS:*

12:20   5   Q   Is that Dr. Craig entering the room now after 25 minutes?

6   A   Yes, sir.

7   Q   Did Dr. Craig ask you if you had back pain?

8   A   She said, You have had back pain since March?

9   Q   You said yes, it happened as a result of an automobile

12:20   10   accident, right?

11   A   Yes.

12       *(An audiotape continued to be played)*

13   *BY MR. LEWIS:*

14   Q   At this point is Dr. Craig also asking you to perform some

12:21   15   type of tests or examinations?

16   A   Yes.

17   Q   And your encounter or the time you spent at Gulfton, it was

18   a lot longer than 90 seconds, wasn't it, Ms. Graham?

19   A   Altogether, yes.

12:22   20   Q   At the time you were at Gulfton, I think you testified

21   yesterday you believed there were some crew leaders.  You

22   referred to individuals as crew leaders.  Do you remember that

23   testimony?

24   A   Yes, sir.

12:22   25   Q   And did you perform any arrests of anything -- of anybody

12:22  1  that you suspected was a crew leader?

2  A    That day, no.

3  Q    Did you approach anyone?

4  A    No.  I'm an undercover.  I don't break my role.

12:22  5  Q    Did you report it to one of your peers, or whatever, that

6  you believed somebody was there acting as a crew leaders?

7  A    No.  They know crew leaders are there.

8  Q    Did you call Agent Mills?

9  A    No.  He is a diversion investigator, but no, sir.

12:23  10  Q    As far as you know, were any crew leaders or facilitators

11  arrested in regards to this --

12        MR. HELFMEYER:  Objection to relevance, Your Honor.

13        THE COURT:  What is the relevance, Counsel?

14        MR. LEWIS:  She has given testimony that she knew crew

12:23  15  leaders.

16        THE COURT:  Stand up.

17        MR. LEWIS:  I'm sorry, Judge.

18        THE COURT:  Yes, sir.  Go on.

19        MR. LEWIS:  Agent Graham has given testimony that she

12:23  20  did identify crew leaders there as part of her testimony on

21  cross-examination.

22        THE COURT:  Read the question back, please.  That

23  would be the easiest way to do it.

24        *(The record was read as requested)*

12:23  25        THE COURT:  You are objecting, correct, Counsel?

1    MR. HELFMEYER:  Yes, Your Honor.

2    THE COURT:  Overruled.  To your knowledge.

3    THE WITNESS:  Can you ask the question again?

4    THE COURT:  Yeah.  Were any of the crew leaders

5  arrested, to your knowledge?

6    THE WITNESS:  No, Your Honor.

7    THE COURT:  Okay.  Go on.

8    MR. LEWIS:  Pass the witness, Judge.

9    THE COURT:  Thank you.

10    All right.  Government, please.

11            **REDIRECT EXAMINATION**

12  *BY MR. HELFMEYER:*

13  Q    Special Agent Graham --

14    THE COURT:  Do you want the lights up?

15    MR. HELFMEYER:  I'm going to use it, but we need to

16  transfer.

17    THE COURT:  What do we need to do?  Get your computer?

18    MR. HELFMEYER:  Yes, sir.

19    THE COURT:  Hang on one second.  Let me get your

20  computer working.  Is that it?

21    MR. HELFMEYER:  I believe so, Your Honor.  Thank you.

22  *BY MR. HELFMEYER:*

23  Q    Special Agent Graham, Mr. Williams asked you yesterday

24  afternoon whether it was your opinion that the masses of people

25  going in at 7:30 were going to Gulfton clinic.  Is your opinion

12:24  1  based on the facts you learned during your investigation?

2  A   Yes.

3  Q   Did you learn during your investigation that Gulfton opened

4  at 7:30?

12:25  5  A   Yes.

6  Q   Was there anything from your investigation that led you to

7  believe that other places in that building were opening at

8  7:30?

9  A   No.

12:25  10  Q   What else is in that building?  A family dentist office?

11  A   Yes.

12  Q   Did anything from your investigation reveal that the family

13  dentist office also opened at 7:30?

14  A   No.  They opened at 9:00.

12:25  15  Q   All these people flooding in at 7:30, were they going to

16  the family dentist office?

17  A   No, sir.

18  Q   Mr. Lewis asked you yesterday about a strength test.  What

19  is a strength test?

12:25  20  A   That to me is like someone -- you have to squeeze their

21  hand to check their strength or you do positive, negative

22  energy, push against the arms.

23  Q   Did Dr. Craig perform a strength test?

24  A   No.

12:25  25  Q   Did anyone?

12:25    1    A    No.

2    Q    If we could turn to Government's Exhibit Number 357, page

3    four, regarding the insurance portion.

4           Mr. Lewis had pointed out that you left this

12:26    5    information blank about insurance.  Special Agent Graham, did

6    you have an option of paying with insurance at Gulfton?

7    A    No.

8    Q    Did they take insurance?

9    A    No.

12:26    10   Q    What was the only option for paying?

11   A    Cash.

12   Q    We can turn now to Government's Exhibit Number 357, page

13   five.  We spent a good amount of time on cross-examination

14   talking about this form.  It's four pages, Special Agent

12:26    15   Graham.  You testified yesterday that you didn't read these

16   documents while you were at Gulfton; is that right?

17   A    Yes.

18   Q    Did Dr. Craig take any steps to determine whether you had

19   read this document?

12:26    20   A    No.

21   Q    Did she go through with you any of the things that are

22   listed on the four pages that you went through with Mr. Lewis?

23   A    No.

24   Q    If we could go to one part that you spoke with Mr. Lewis

12:27    25   about, "it has been explained to me."  Could you read that

12:27  1  first, "it has," starting there?

2  A   "It has been explained to me that these medications include

3  opioid, narcotic drugs, which can be harmful if taken without

4  medical supervision."

12:27  5  Q   Was that explained to you?

6  A   No.

7  Q   Did Dr. Craig explain anything to you?

8  A   No.

9  Q   Did anything from your day at Gulfton lead you to believe

12:27  10  that the papers that are in this form are anything more than

11  paper?

12  A   No.

13  Q   Special Agent Graham, did you report anywhere that you were

14  suffering from lower back pain on your form?

12:28  15  A   No.

16  Q   The part that was checked, you said you didn't check that?

17  A   No, I did not.

18  Q   Were you suffering from lower back pain that day?

19  A   No.

12:28  20      MR. HELFMEYER:  No further questions for this witness.

21      THE COURT:  Anything further?

22      MR. WILLIAMS:  Just a couple.  Could we turn the

23  lights on?

24                    **RECROSS EXAMINATION**

12:28  25  *BY MR. WILLIAMS:*

12:28  1   Q    Tell me how many businesses were in that -- how many other

2   businesses were in that particular clinic, in that particular

3   building?

4   A    Two, sir.

12:28  5   Q    What were those?

6   A    The dental office and the Gulfton medical clinic.

7            THE COURT:  What is Gulfton medical clinic?

8            THE WITNESS:  That's the clinic where Dr. Craig was

9   that I went to receive.

12:28  10           THE COURT:  Those are the two businesses?

11           THE WITNESS:  Yes, sir.

12   *BY MR. WILLIAMS:*

13   Q    In fact, there was an OBGYN office in that building?

14   A    That I don't know.

12:28  15   Q    So it is possible it is more than two places in that

16   building; is that correct?

17   A    Based on my investigation, it was just those two, sir.

18   Q    But you can't say for certain that there was just only

19   those two; is that correct?

12:29  20           MR. HELFMEYER:  Objection.  Asked and answered.

21           THE COURT:  Sustained.

22   *BY MR. WILLIAMS:*

23   Q    And during your investigation, did you ever have the

24   occasion to go to the dental office?

12:29  25   A    No.

12:29   1   Q   So you don't know what time it actually opened, even though

2   they may have had hours on the particular door?

3   A   As part of the open source database checks when we do our

4   investigative --

12:29   5   Q   Simply because you saw something in the database that says

6   one thing doesn't, in fact, mean that it is actually operated

7   that way; is that correct?

8           MR. HELFMEYER:  Objection.  Speculation.

9           THE COURT:  Sustained.  Rephrase it if you want.

12:29  10   *BY MR. WILLIAMS:*

11   Q   So you don't know if the database actually reflects the

12   time that they were actually there, do you?

13   A   Based on my investigations, yes.

14   Q   Okay.  And how many times were you out there?

12:29  15   A   Several times.

16   Q   Several times.  Okay.  And how many times did you go inside

17   the building?

18   A   Two times.

19   Q   And obviously the time that you went in on 6/15, you did

12:30  20   not go to the dental clinic, did you?

21   A   Correct.

22   Q   It would have been one particular time and you weren't

23   there at 7:30 that morning to see if, in fact, that dental

24   office was open or not, were you?

12:30  25   A   Say that again.

12:30   1  Q   You weren't there on the other day at 7:30 in the morning

        2  to see if, in fact, that dental office was open, were you?

        3  A   That's correct.

        4          MR. WILLIAMS:  No further questions.

12:30   5          THE COURT:  Mr. Lewis, anything further?

        6          MR. LEWIS:  Nothing further.

        7          THE COURT:  Thank you, ma'am.  You are excused.  You

        8  are free to leave.  You may remain in the courtroom if you

        9  like.

12:30  10          THE WITNESS:  Thank you, Your Honor.

       11          THE COURT:  Call your next witness.

       12          MR. ARMSTRONG:  The United States calls Loren

       13  Phillips.

       14              May we move this back a little bit?

12:30  15          THE COURT:  Sure.  Go on.

       16              Raise your right hand to be sworn.

       17      *(Witness sworn)*

       18          THE COURT:  Have a seat, please.

       19              All right.  Go ahead.

12:31  20          **LOREN PHILLIPS, DULY SWORN, TESTIFIED:**

       21              **DIRECT EXAMINATION**

       22  *BY MR. ARMSTRONG:*

       23  Q   Good morning, ma'am.

       24  A   Good morning.

12:31  25  Q   Please introduce yourself to the jury.

12:31   1   A   My name is Loren Phillips.

2   Q   And just for the record --

3        THE COURT:  Pull the mic in.  Go on.

4   *BY MR. ARMSTRONG:*

12:32   5   Q   Just for the record, ma'am, how do you spell your name?

6   A   L-O-R-E-N, Phillips, P-H-I-L-L-I-P-S.

7   Q   Ms. Phillips, where are you from?

8   A   New Orleans, Louisiana.

9   Q   Where did you grow up?

12:32  10   A   New Orleans, Louisiana.

11   Q   At some point, did you move to Houston?

12   A   In 2005.

13   Q   Why did you move to Houston?

14   A   It was prior to Katrina and I was engaged to be married.

12:32  15   Q   Where have you lived ever since?

16   A   Houston, Texas.

17   Q   After you moved to Houston, did you find work?

18   A   Immediately, yes, I did.

19   Q   What did you do for work, just very generally?

12:32  20   A   I worked for R and B, and I worked for River Oaks Imaging.

21   Q   Generally speaking, what are those establishments or

22   businesses?

23   A   R and B is clothing retailer and River Oak Imaging is a MRI

24   clinic.

12:32  25   Q   At some point after you moved to Houston, did you meet

1   someone named Shane Faithful?

2   A   Yes, sir.

3   Q   Generally speaking, when did you first meet Shane Faithful?

4   A   In 2008.

5   Q   And tell the jury how you first met him.

6   A   I was working at R and B and Mr. Faithful was shopping for

7   a female friend of his and I assisted him.

8   Q   What kind of assistance did you give him?

9   A   Clothing assistance.

10   Q   Did you guys stay in contact after that first time?

11   A   Yes, sir.

12   Q   How did that happen?

13   A   Mr. Faithful asked for my phone number.

14   Q   Did you give him the phone number?

15   A   Yes, sir.

16   Q   And did you guys talk after that first time you met?

17   A   Not immediately.  He called a couple times to see how I was

18   doing and I told him I was fine.

19   Q   After that point, did you guys have a chance to meet again?

20   A   Yes, sir.

21   Q   And generally speaking, did you guys become friends

22   afterwards?

23   A   We became friends.

24   Q   Did you do activities together?

25   A   Just go out to eat.

1 Q   Would you socialize?

2 A   Just socializing.

3 Q   Do you see Mr. Faithful here today?

4 A   Yes, sir.

5 Q   And can you please identify where he is sitting and what he

6 is wearing?

7 A   He is in a charcoal gray suit with light gray shirt and

8 black tie.

9       MR. ARMSTRONG:  Your Honor, let the record reflect an

10 in-court identification of Mr. Faithful.

11       THE COURT:  The record will so reflect.

12 *BY MR. ARMSTRONG:*

13 Q   At some point, did you start to work with Mr. Faithful?

14 A   Yes, sir.

15 Q   When was that?

16 A   In 2015.

17       THE COURT:  Where?  At the clinic?

18       THE WITNESS:  No.  It was helping him with a clinic

19 called Esthetico, which was a facial and weight loss clinic.

20 *BY MR. ARMSTRONG:*

21 Q   How did that come about that you started to work for

22 Mr. Faithful?

23 A   He asked me if I was interested in working in that

24 particular clinic, and I was looking for employment.  And I

25 said yes.

12:34  1   Q    So you needed a job?

2   A    Yes, sir.

3   Q    He offered you a job?

4   A    Yes, sir.

12:34  5   Q    And generally speaking, when did you start working for him?

6   A    I think it was November, October, November 2015.

7   Q    And generally speaking, what did you do for him at this

8   first position?

9   A    Basically monitor one of the owners of that particular

12:35  10   clinic and assist her in interviewing suppliers for skin care

11   products.

12   Q    How long were you in that position for?

13   A    Until January of 2016.

14   Q    Are you familiar with the place called Gulfton Community

12:35  15   Health Center?

16   A    Yes, sir.

17   Q    What kind of business is Gulfton?

18   A    Pain management.

19   Q    Where is it located?

12:35  20   A    6306 Gulfton Avenue, Suite 101.

21   Q    What city is that in?

22   A    Houston, Texas, sir.

23        MR. ARMSTRONG:   If we could dim the lights over the

24   projector, please, Judge.  And, Ms. Mortezavi, pull up

12:35  25   Government Exhibit Number 361, page one.

*BY MR. ARMSTRONG:*

Q   Ma'am, what are we looking at?

A   The outside of Gulfton clinic.

Q   Could anyone just walk in to Gulfton?

A   They are usually escorted by someone else.

THE COURT:  From where?  From outside or at the gate?

THE WITNESS:  Outside the gate.

THE COURT:  Outside the gate?

THE WITNESS:  Yes.  They come in in cars with facilitators.

*BY MR. ARMSTRONG:*

Q   We will get there.  But is there a gate around Gulfton?

A   Yes, there is.

Q   Is the gate open during business hours?

A   Yes.

Q   Is it closed when it is not in business?

A   It's locked.

Q   Did you work at Gulfton?

A   Yes, sir.

Q   When did you start working at Gulfton?

A   I believe it was February 2016.

Q   And how did you get that position?

A   Mr. Faithful asked me if I would manage the clinic temporarily.

Q   Did you agree?

12:36  1   A    Yes, sir.

2   Q    What were some of your responsibilities?

3        THE COURT:  You were the manager at one time?

4        THE WITNESS:  Yes, sir.

12:37  5   *BY MR. ARMSTRONG:*

6   Q    Tell the jury what some of your responsibilities were.

7   A    I would open the clinic in the morning, make sure that the

8   staff had everything that they need, update them on what was

9   going on with the clinic.  Any instructions that Mr. Faithful

12:37  10  or Dr. Craig may have given to me, I would forward to them.

11  Q    How many days a week did you work there?

12  A    Five days a week.

13  Q    Generally speaking, what were your hours?

14  A    They would vary from 7:30 sometimes to 5:00, 7:30 to 7:00

12:37  15  sometimes.

16  Q    Did you stop working at Gulfton at some point?

17  A    Yes, sir.

18  Q    When was that?

19  A    In December of 2016.

12:37  20  Q    So you worked, generally speaking, from March or

21  February 2016 through December 2016?

22  A    Yes, sir.

23  Q    So a period of about how long?

24  A    That would be about 10 months.

12:37  25  Q    Were you paid when you worked there?

*Armstrong  Direct of Loren Phillips*

12:38  1   A   Yes, sir.

2   Q   How were you paid?

3   A   Sometimes in checks, sometimes in cash.

4   Q   How much were you paid?

12:38  5   A   I was paid weekly 1,040.

6   Q   How many days a week was Gulfton open?

7   A   Five days a week.

8   Q   Was it open the whole time that you were there during that

9   eight or nine months?

12:38  10  A   Sometimes we would go two weeks without being opened.

11  Sometimes three weeks.  It depends.

12  Q   Do you know why it was closed?

13  A   Dr. Craig and Mr. Faithful had business somewhere else.

14  Q   So there were periods, weeks on end where the gates were

12:38  15  closed and no one was coming in?

16  A   Yes, sir.

17  Q   If Gulfton was open, generally speaking, what were its

18  hours?

19  A   7:30 in the morning until about 4:00, 5:00, depending on

12:39  20  when the last patient was seen.

21  Q   Did patients actually come to Gulfton?

22  A   Yes, sir.

23  Q   On the high end, how many patients came to Gulfton each

24  day?

12:39  25  A   About 60.

12:39   1   Q   On the low end, about how many patients came to Gulfton

2   each day?

3   A   About 15.

4   Q   Are you able to give the jury a ballpark average of the

12:39   5   number of patients, generally speaking, each day?

6   A   Thirty-five to 40.

7   Q   Was it just you working by yourself at Gulfton?

8   A   There were four medical assistants.

9   Q   Anybody else?

12:39   10   A   Two doctor's assistants and Dr. Craig and two security

11   guards in the beginning.  And when it started becoming more

12   dangerous, about four.

13   Q   So there was a doctor at Gulfton?

14   A   Yes, sir.

12:39   15   Q   And who was the doctor at Gulfton?

16   A   Dr. Gazelle Craig.

17   Q   Were there any other doctors at Gulfton during the entire

18   time you worked there?

19   A   No, sir.

12:40   20   Q   Do you see Dr. Craig here today?

21   A   Yes, sir.

22   Q   Could you please identify her for the record?

23   A   She is in a dark blue suit and a red blouse.

24        MR. ARMSTRONG:  Let the record reflect the in-court

12:40   25   identification of Dr. Craig.

12:40  1      THE COURT:  The record will so reflect.

2  BY MR. ARMSTRONG:

3  Q   Did Dr. Craig see patients at Gulfton?

4  A   When she wasn't sick.

12:40  5  Q   But if she was there, was she seeing patients?

6  A   There was a good two-week or three-week period when she was

7  there she didn't actually see patients.

8  Q   Did Dr. Craig write prescriptions?

9  A   During those times, yes, sir.

12:40  10  Q   During the eight months that you were there, did Dr. Craig

11  write prescriptions?

12  A   Yes, sir.

13  Q   What kind of drugs did she prescribe?

14  A   Norco and Soma, ibuprofen and biofreeze.

12:41  15  Q   Let's talk about Norco first.  Is that also known as

16  hydrocodone?

17  A   Yes, sir.

18  Q   What kind of drug is that?

19  A   It's an opioid.

12:41  20  Q   Is it a controlled substance?

21  A   Yes, sir.

22  Q   And you mentioned a drug called Soma.

23  A   Soma.

24  Q   Is there another name for that?

12:41  25  A   I can't pronounce it.

12:41   1   Q   Something like carisoprodol?

        2   A   Yes, sir.

        3   Q   What kind of drug is that?

        4   A   That's for muscle spasms.

12:41   5   Q   And do you believe it's a controlled substance, as well?

        6   A   Yes, sir.

        7   Q   When patients got prescriptions, did patients get

        8   prescriptions for both hydrocodone and Soma or just one?

        9   A   Both.

12:41  10   Q   Over the time that you were there, did Dr. Craig prescribe

       11   other controlled substances besides hydrocodone and Soma?

       12   A   I don't recall.

       13   Q   Do you believe that she did or not?

       14       MR. WILLIAMS:  Objection, Judge.  She says she can't

12:41  15   recall.

       16       THE COURT:  I can't hear you, sir.

       17       MR. WILLIAMS:  Asked and answered, Judge.  She said

       18   she can't recall.

       19       THE COURT:  Sustained.

12:42  20   *BY MR. ARMSTRONG:*

       21   Q   Generally speaking, about how many prescriptions for

       22   hydrocodone would Dr. Craig give out each day?

       23   A   Depending on the patients, if it was 30 patients, 30

       24   prescriptions.

12:42  25   Q   And generally speaking, by your own example, how many

12:42   1   patients would then get a Soma prescription, as well?

2   A   If it was 30 patients, 30 prescriptions.

3   Q   So Dr. Craig would prescribe patients both hydrocodone and

4   Soma?

12:42   5   A   Yes, sir.

6   Q   When Gulfton was opened, was Mr. Faithful there?

7   A   In the evenings, to collect his money.

8   Q   Generally speaking, when would he show up?

9   A   After all of the patients had gone.

12:42   10   Q   Did he tell you why he showed up late in the evenings?

11   A   He didn't want to see the patients.

12          THE COURT:  I can't hear you.

13          THE WITNESS:  He didn't want to see the patients.

14   *BY MR. ARMSTRONG:*

12:43   15   Q   Is that what he told you?

16   A   Yes, sir.

17   Q   Did he explain why he didn't want to see the patients?

18   A   No, sir.

19   Q   Were there security cameras at Gulfton?

12:43   20   A   Yes, sir.

21   Q   About how many?

22   A   I would say in every corner of the clinic except

23   Dr. Craig's office and restrooms.

24   Q   Did they actually make recordings?

12:43   25   A   I don't know if they were recording, but Mr. Faithful would

12:43   1   monitor --

2              THE COURT:  Yes?

3              MR. WILLIAMS:  She said she doesn't know.  She can't

4   answer.

12:43   5              THE COURT:  Sustained.

6   *BY MR. ARMSTRONG:*

7   Q   Do you know if these cameras broadcast anywhere?

8   A   Mr. Faithful's tablet.  He would monitor Dr. Craig's

9   office.

12:43  10              MR. WILLIAMS:  Objection.  She has no way to know if

11   anybody is monitoring that, Judge.  That would be outside her

12   knowledge.

13              THE COURT:  Overruled.

14   *BY MR. ARMSTRONG:*

12:43  15   Q   Would the surveillance cameras broadcast anywhere?

16   A   In Dr. Craig's office, there was a monitor.  We could see

17   them in our office.  And Mr. Faithful would call in and tell us

18   he could see what we were doing and would question certain

19   activities in the clinic.

12:44  20   Q   So Mr. Faithful wouldn't be there, but he would call and

21   say what, for example?

22   A   "Why is that person there?"

23              MR. WILLIAMS:  Objection, Judge.  Unless he is asking

24   a specific question as to what he was saying and a specific

12:44  25   period of time, she is speculating and giving the jury

12:44   1   information that she doesn't know about.

2   THE COURT:  Overruled.

3   *BY MR. ARMSTRONG:*

4   Q   So Mr. Faithful was not there.  Would he sometimes call

12:44   5   you?

6   A   He would call to speak to me and then he would ask --

7   MR. WILLIAMS:  Objection.  Nonresponsive, Judge.

8   THE COURT:  Overruled.  Let's go.

9   *BY MR. ARMSTRONG:*

12:44   10   Q   Would Mr. Faithful sometimes call you when he wasn't there?

11   THE COURT:  Yes or no?

12   THE WITNESS:  Yes, sir.

13   THE COURT:  Next question.

14   *BY MR. ARMSTRONG:*

12:44   15   Q   Would he sometimes give you instructions about what was

16   going on in the clinic?

17   A   Yes, sir.

18   Q   What was your understanding of how he knew what was going

19   on in the clinic if he wasn't there?

12:44   20   A   He was monitoring the cameras from his tablet.

21   Q   Did Gulfton make money?

22   A   Yes, sir.

23   Q   How did Gulfton make money?

24   A   Through cash payments from the patients that were coming

12:45   25   in.

12:45  1  Q   About how much would each patient pay?

2  A   On average, about 300 to 340.

3  Q   Who set those prices?

4  A   Mr. Faithful.

12:45  5  Q   How would these patients pay this 300, 350?  What form of

6  payment?

7  A   Cash.

8  Q   Credit card?

9  A   No.

12:45  10  Q   Check?

11  A   No, sir.

12  Q   Cash only?

13  A   Cash only.

14  Q   After paying, would the patient receive anything from

12:45  15  Gulfton?

16  A   They would come back to triage.  They would be triaged and

17  then the doctor's assistants would see them.  Then Dr. Craig

18  would see them, and they would receive their prescriptions.

19  Q   Prescriptions for what?

12:46  20  A   Norco and Soma.

21  Q   Both drugs?

22  A   Yes, sir.

23  Q   On the same visit?

24  A   Yes, sir.

12:46  25  Q   Generally speaking, how much cash did Gulfton take in each

12:46   1   day?

2   A    It depends on the number of patients in the --

3        THE COURT:  Approximately?

4        THE WITNESS:  About 15,000.

12:46   5        THE COURT:  A day?

6        THE WITNESS:  A day.

7        THE COURT:  All right.

8   *BY MR. ARMSTRONG:*

9   Q    Sometimes higher?  Sometimes lower?

12:46   10   A    Yes, sir.

11   Q    What happened to all that cash?

12   A    Expenses would be paid, whatever the expenses are for that

13   day, for supplies, paper, gloves.  And then money would be

14   split between Dr. Craig and Shane Faithful.

12:46   15   Q    How did they split up all that cash?

16   A    I would divide it between both of them and put it in an

17   envelope and give Dr. Craig her portion and explain to her what

18   the expense sheet was and give Mr. Faithful his portion and

19   explain to him what the expense sheet was.

12:47   20   Q    How often did that process where you were dividing the cash

21   between Mr. Faithful and Dr. Craig happen?

22   A    Five days a week.

23   Q    Every single day it was open?

24   A    Yes, sir.

12:47   25   Q    Now, you were the manager at Gulfton, correct?

12:47  1    A    Yes, sir.

2    Q    Did Gulfton have rules?

3    A    Patients weren't allowed to use their telephones.

4              MR. WILLIAMS:  Objection, Judge.

12:47  5              THE COURT:  Sustained.  That's a yes or no answer.

6              THE WITNESS:  Yes, sir.

7    *BY MR. ARMSTRONG:*

8    Q    Who made the rules at Gulfton?

9    A    Mr. Faithful.

12:47  10   Q    Could you make your own rules?

11   A    No, sir.

12   Q    Generally speaking, what kind of rules were at Gulfton?

13   A    Patients weren't allowed to use their telephones in the

14   clinic.

12:47  15   Q    So were there rules about what you can do?

16   A    No.

17   Q    Were there rules about what patients can do?

18             THE COURT:  Can do?  Let's get moving.

19             THE WITNESS:   Cannot?

12:48  20   *BY MR. ARMSTRONG:*

21   Q    Can or cannot do?

22   A    They could not use their cell phones.

23   Q    Whose rule was that?

24   A    Mr. Faithful's.

12:48  25   Q    Who decided whether employees were hired or not?

12:48   1   A   Mr. Faithful.

2   Q   Who decided whether employees were fired?

3   A   Mr. Faithful and Dr. Craig.

4   Q   Who decided what employees were paid?

12:48   5   A   Mr. Faithful and Dr. Craig.

6   Q   Who was the boss at Gulfton?

7   A   Mr. Faithful and Dr. Craig.

8   Q   What kind of boss was Mr. Faithful?

9   A   It depends on the intake that day.

12:48   10   Q   What was the attitude towards money over the time that you

11   were working there?

12   A   It was important.

13   Q   How important?

14   A   Important enough for you to lose your job.

12:48   15       THE COURT:  If what?

16       MR. WILLIAMS:  Objection.  Leading, Judge.

17       THE COURT:  Overruled.

18       THE WITNESS:  If enough patients didn't come in, we

19   were held responsible for it.

12:48   20   *BY MR. ARMSTRONG:*

21   Q   Who held you responsible?

22   A   Mr. Faithful.

23       MR. ARMSTRONG:  I want to play Government Exhibit

24   Number 504.  It's the first 15 seconds, please, Ms. Mortezavi.

12:49   25   Court's indulgence while we set it up.

12:49   1    *(A videotape, Government's Exhibit Number 504, was played)*

2    BY MR. ARMSTRONG:

3    Q   We will play the rest of the recording, but let's set the

4    scene for the jury.  Who is speaking in this video?

12:49   5    A   Mr. Faithful.

6    Q   Where is he?

7    A   We were in the clinic having a meeting.

8    Q   Who else is there?

9    A   All of the MAs and myself.

12:49  10    Q   Generally speaking, if you remember, when was this video

11    taken?

12    A   I believe it was in November.

13    Q   November of what year, ma'am?

14    A   2016.

12:50  15    Q   Did you take the video yourself?

16    A   One of my co-workers did and gave it to me.

17    Q   But you were there?

18    A   Yes, sir.

19    Q   And does this video -- does this audio accurately reflect

12:50  20    what was said?

21    A   There was more after that quote.

22         MR. ARMSTRONG:  Let's play through 140, Ms. Mortezavi,

23    please.

24         *(A videotape, Government's Exhibit Number 504, continued to*

12:50  25    *be played)*

12:51   1   BY MR. ARMSTRONG:

2   Q   Ms. Phillips, did you hear Mr. Faithful say it was not a

3   democracy?

4   A   Yes, sir.

12:51   5   Q   What did you take it to mean?

6   A   That our opinions didn't matter.

7   Q   Did you hear Mr. Faithful say, I run the F'g show?

8   A   Yes, sir.

9   Q   Is that true?

12:52   10   A   Yes, sir.

11   Q   Who ran the show at Gulfton?

12        MR. WILLIAMS:  Objection.  Asked and answered.

13        THE COURT:  Overruled.

14        THE WITNESS:  Mr. Faithful.

12:52   15   BY MR. ARMSTRONG:

16   Q   Did he make that clear to every single person at Gulfton?

17   A   Yes, sir.

18   Q   How clear did he make it?

19   A   He would fire certain people as an example to show us.

12:52   20   Q   Did you hear Mr. Faithful say, What I say goes, regardless

21   of whether you agree or disagree?

22   A   Yes, sir.

23   Q   Is that true?

24   A   Yes, sir.

12:52   25   Q   Did you hear Mr. Faithful say, I'm not going to tolerate

12:52  1  insubordination?

2  A    Yes, sir.

3  Q    Is that true?

4  A    Yes, sir.

12:52  5  Q    What did you take him to mean?

6  A    We couldn't question him.

7  Q    Did you hear Mr. Faithful say, I will shake down your ass

8  as quick as hell?

9  A    Yes, sir.

12:53  10  Q    What did you take that to mean?

11  A    I will fire you.

12  Q    If what?

13  A    If you are insubordinate.

14  Q    To who?

12:53  15  A    To him.

16      MR. ARMSTRONG:  Play it further, Ms. Mortezavi.

17      *(A videotape, Government's Exhibit Number 504, continued to*

18  *be played)*

19  *BY MR. ARMSTRONG:*

12:54  20  Q    Did you hear Mr. Faithful say, When the final say-so comes

21  down, that's it?

22  A    Yes, sir.

23  Q    What did you take him to mean?

24  A    The final decision was his.

12:55  25      *(A videotape, Government's Exhibit Number 504, continued to*

*be played)*

BY MR. ARMSTRONG:

Q   Ms. Phillips, did you hear Mr. Faithful say, Once she's in jeopardy and she says I'm not coming to work, guess who is not making paycheck?

A   Yes, sir.

Q   Who was he talking about?

A   Dr. Craig.

Q   What did you take him to mean?

A   If she decides she is not going to come in tomorrow, we are not going to be paid.

Q   How did that work?

A   We wouldn't get paid if she decides she is not going to come in that day.

Q   So Dr. Craig had to be there for Gulfton to make money?

A   Yes, sir.

Q   Any doubt who the boss was at Gulfton?

A   There was no doubt.

        MR. ARMSTRONG:  Would this be a good time for a break or should I keep going?

        THE COURT:  Why don't we go on for -- we started a few minutes late.  Let's go on for another five, 10 minutes and then we will take an hour and five minutes for lunch, but let's get more in if we can.

        MR. ARMSTRONG:  Certainly, Judge.

12:57   1    BY MR. ARMSTRONG:

2    Q   Ms. Phillips, you were at Gulfton for about eight, nine

3    months, right?

4        THE COURT: Raise your voice, please.

12:57   5        MR. ARMSTRONG: Thank you, Judge.

6    BY MR. ARMSTRONG:

7    Q   Did you have any concerns about Gulfton's practices when

8    you were working there?

9    A   Yes, sir.

12:57   10    Q   What were some of the concerns that you had?

11    A   The fact that the patients weren't paying for their visits;

12    that other people were paying for the visits.

13    Q   Who was paying for the patient's visits?

14    A   Facilitators.

12:58   15    Q   Did you have any concerns about the prescriptions and the

16    drugs themselves that were being prescribed at Gulfton?

17        MR. WILLIAMS: Leading.

18        THE COURT: Sustained. Don't lead the witness.

19    BY MR. ARMSTRONG:

12:58   20    Q   What concerns, if any, did you have about the drugs being

21    prescribed at Gulfton?

22    A   I just thought it was a lot.

23    Q   Anything about the nature of the drugs themselves?

24        MR. WILLIAMS: Objection. Leading, Judge.

12:58   25        THE COURT: Sustained.

12:58   1  *BY MR. ARMSTRONG:*

2  Q   What, if anything, about the nature of the drugs themselves

3  gave you any concern?

4  A   I knew they were opioids.

12:58   5         THE COURT:  I can't hear you.

6         THE WITNESS:  I knew they were opioids.

7         THE COURT:  Okay.

8  *BY MR. ARMSTRONG:*

9  Q   Did you report some of these concerns to anyone at some

12:58   10  point?

11  A   Yes, sir.

12  Q   Who did you report your concerns to?

13  A   The DEA.

14  Q   When did you first reach out to DEA?

12:59   15  A   December 2016.

16  Q   How did you reach out to them?

17  A   I called them.

18  Q   Generally speaking, what happened?

19  A   I asked them what did I need to do in order to report a

12:59   20  clinic that I felt had bad practices and the agent told me --

21         MR. WILLIAMS:  Objection.  Hearsay.

22         THE COURT:  Sustained to some extent.  You can get

23  around that.  As a result of your, what is it, your

24  conversation with the DEA, what, if anything, did you do?

12:59   25         THE WITNESS:  Well, I knew I was already quitting and

I had documents at home, so I reached out to them and gave them

the documents.

THE COURT:  Reached out to who?

THE WITNESS:  To DEA.

MR. ARMSTRONG:  Thank you, Judge.  We will get to

that.

*BY MR. ARMSTRONG:*

Q    So when you first made contact, did you go over to DEA in

person or did you call them?

A    I called them.

Q    Did you tell them your name?

A    Not in the beginning.

Q    What did you tell them?

A    I told them that I was calling on behalf of a friend.

Q    Why did you do that?

A    I was afraid.

Q    Afraid of what?

A    I didn't know what the consequences were going to be for

Mr. Faithful or the facilitators.

Q    When you called DEA to make this report, were you still

working at Gulfton?

A    Yes, sir.

Q    How soon after you made this call did you quit Gulfton?

A    That evening.

Q    At some point did you meet with the DEA agents in person

13:00  1  face to face?

2  A    Yes, sir.

3  Q    And what year did you meet with the DEA agents?

4  A    In March 2017.

13:01  5  Q    Where did you meet them?

6  A    At their office.

7  Q    Who did you meet?

8  A    I met with Mike and James.

9  Q    The two individuals at the table?

13:01  10  A    Yes, sir.

11  Q    Special Gainer and Diversion Agent Mills?

12  A    Yes, sir.

13  Q    You met with them a few times?

14  A    Yes, sir.

13:01  15  Q    In what months did you meet with them?

16  A    I think it was twice in March.  And then I don't recall the

17  other time.  I think June was another month.

18  Q    So you met with the agents a few times?

19  A    Yes, sir.

13:01  20  Q    Did you give them information?

21  A    Yes, sir.

22  Q    What kind of information did you give them?

23  A    Expense reports, just all of the documents that I was

24  instructed to hold on to by my employers.

13:01  25  Q    So did you actually talk about some of Gulfton's practices,

13:01  1  as well?

2  A    Yes, sir.

3  Q    And did you tell agents about some of the practices that

4  you observed?

13:02  5           MR. WILLIAMS:  Judge, leading.

6           THE COURT:  Overruled.  I will allow him a little bit

7  of leading, but that doesn't mean you shouldn't get up and

8  object.  Go on.

9  *BY MR. ARMSTRONG:*

13:02  10  Q    And so you meet with agents a few times, right?

11  A    Yes, sir.

12  Q    Did they give you anything?

13  A    Yes, sir.

14  Q    What did they give you?

13:02  15  A    They gave me $3,000.

16  Q    Did they give you more money along the way, as well?

17  A    Yes, sir.

18  Q    About how much money did you receive from the agents for

19  the information you provided?

13:02  20  A    I think it was like 5,000, or something like that.

21  Q    How many payments did you receive?

22  A    I believe two.

23  Q    When was the last payment you received from the agents?

24           THE COURT:  When?

13:02  25           MR. ARMSTRONG:  Yes.

13:03  1          THE WITNESS:  I believe -- I think it was June 2017,
       2  June or July 2017.
       3  *BY MR. ARMSTRONG:*
       4  Q    Have you received any payments between July 2017 and today?
13:03  5  A    No, sir.
       6  Q    Do you think that there is a possibility that you might get
       7  money in the future?
       8  A    I believe so.
       9  Q    Did the agents discuss with you the possibility of a
13:03  10 reward?
       11 A    Yes, sir.
       12 Q    What was your understanding of that reward?
       13 A    It was just a possibility that I might receive --
       14          THE COURT:  A reward for what?  You say "a reward."
13:03  15 For what?  In other words, I don't want to put words in your
       16 mouth.  You said "a reward."
       17          MR. ARMSTRONG:  She is going to get to it, Your Honor.
       18          THE COURT:  Go on.
       19 *BY MR. ARMSTRONG:*
13:03  20 Q    What was your understanding of what the reward was for,
       21 Ms. Phillips?
       22 A    For what was recouped from Mr. Faithful and Dr. Craig.
       23 Q    Did they tell you why you would be getting this reward?
       24 A    If I assisted as an informant.
13:04  25 Q    Did they tell you how much money you would receive, if any?

13:04   1   A   No, sir.

2   Q   Sitting here today, do you know how much money you may or

3   may not receive in the future?

4   A   Just a percentage.

13:04   5   Q   Do you know a dollar amount?

6   A   No, sir.

7   Q   Who decides, if anyone, whether you get this money?

8   A   DEA.

9   Q   Do I decide if you get this money?

13:04   10   A   No, sir.

11   Q   What about Mr. Helfmeyer?

12   A   No, sir.

13   Q   Does anyone from the Department of Justice decide if you

14   get this money as far as you know?

13:04   15   A   Not that I know of.

16   Q   Have you been given anything for your testimony here today?

17   A   No, sir.

18   Q   Have I made you any promises?

19   A   No, sir.

13:04   20   Q   Has Mr. Helfmeyer made you any promises?

21   A   No, sir.

22   Q   Have the agents made you any promises?

23   A   No, sir.

24   Q   What is your only responsibility here today?

13:05   25   A   To tell the truth.

13:05    1        MR. WILLIAMS:  Objection, Judge.

         2        THE COURT:  Go on.  Make your objection.

         3        MR. WILLIAMS:  Objection.  Leading as to what her

         4    responsibility is.

13:05    5        THE COURT:  Overruled.  You may answer.

         6        THE WITNESS:  To tell the truth.

         7        MR. ARMSTRONG:  Should we keep going?

         8        THE COURT:  No.  That's a good time.  I will stop the

         9    clock.

13:05   10        All right.  Ladies and gentlemen, we will take a

        11    break.  It is now about seven minutes after 1:00, according to

        12    the clock up here.

        13        We will see you back, ready to resume, at 2:15.

        14    See you back at 2:15.

13:05   15        *(Jury not present)*

        16        *(Court recessed at 1:06 p.m.)*

        17        *(Court resumed at 2:19 p.m.)*

        18        *(Jury present)*

        19        THE COURT:  Counsel, go right ahead.

14:20   20        MR. ARMSTRONG:  May I proceed, Judge?

        21        THE COURT:  Yes.

        22    *BY MR. ARMSTRONG:*

        23    Q   Ms. Phillips, good afternoon.

        24    A   Good afternoon.

14:20   25    Q   When we last talked, we were talking about your contacts

14:20    1    with DEA and the money that you received, right?

2    A    Yes, sir.

3    Q    I want to shift gears a little bit and what I want to do

4    now is talk about the actual operations of Gulfton.  All right?

14:20    5    A    Okay.

6    Q    So you mentioned this earlier.  What time did Gulfton on

7    most days open?

8    A    7:30.

9    Q    And were you there when it actually opened up?

14:21    10    A    Yes, sir.

11    Q    What time did patients start arriving?

12    A    They were usually there before I got there.

13    Q    How many patients would be there before you even got there?

14    A    It depends, because they were traveling in cars with other

14:21    15    people, so it might be four to a car.  It could be anywhere

16    from 15 to 20 patients.

17    Q    Four patients in one car?

18    A    Four patients to a car.

19    Q    So when the patients arrive, where do they go?

14:21    20    A    They would wait in the parking lot until I unlocked the

21    door and said it was okay for them to come in.

22    Q    Would they actually come inside Gulfton?

23    A    Yes, sir.

24    Q    Where would they go when they first came in?

14:22    25    A    In the parking lot.

14:22  1  Q   I'm sorry.  Where inside Gulfton would they go when they

2  first came in?

3  A   The waiting area.

4  Q   Did all of these patients have appointments at 7:30?

14:22  5  A   No, sir.

6  Q   How do you figure out who goes first?

7  A   Whoever arrived first.

8  Q   How do you figure that out?

9  A   Usually the security guard would tell me which cars arrived

14:22  10  and hand me the IDs.

11      MR. WILLIAMS:  Objection as to what the security guard

12  would tell her.

13      THE COURT:  Overruled.

14  *BY MR. ARMSTRONG:*

14:22  15  Q   You may continue.

16  A   The security guard would tell me which cars arrived first

17  with those particular patients, and the IDs would be handed

18  over to me and then they would be numbered.

19  Q   What IDs are you talking about?

14:22  20  A   The patients' IDs.

21  Q   Who would have the patients' IDs?

22  A   The driver.

23  Q   The driver of what?

24  A   The cars.

14:22  25  Q   Would that be a facilitator or somebody else?

14:22  1   A    The facilitators.

2   Q    Who gets the IDs?

3   A    The facilitators hand the IDs over to one of the MAs or

4   myself.

14:23  5   Q    What did you do with them?

6   A    Number them according to the way they were given to me and

7   then we DPS'd them.

8   Q    So you established the order in which patients were going

9   to come through the clinic?

14:23  10   A    Yes, sir.

11   Q    Was that an orderly process or not?

12   A    I don't understand.  Will you rephrase it?

13   Q    So there was an order for the patients, right?

14   A    Yes, sir.

14:23  15   Q    Did some patients try to cut the order?

16   A    Yes, sir.

17   Q    What happened?

18        THE COURT:  What do you mean by "cut the order"?

19   *BY MR. ARMSTRONG:*

14:23  20   Q    Did some patients try to jump ahead of other patients?

21   A    Yes, sir.

22   Q    How did that work?

23   A    Sometimes they would get into arguments saying who was

24   first, arguing about which patient was first.  And then we

14:23  25   would allow security to try and control it.

14:23 1  Q   So you have a bunch of IDs for any number of patients?

2  A   Yes, sir.

3  Q   What happens next?

4  A   Then we DPS them.  Once they have been DPS'd, we locate the

14:24 5  charts of those particular patients.  If it is a new patient,

6  we create a new chart for them.  Once the charts are placed in

7  order, then the MAs would triage them.

8  Q   That was a lot of information and let's try to break it

9  down into little pieces.  You mentioned first DPS?

14:24 10  A   Yes, sir.

11  Q   What does that mean?

12  A   That is the system in which we find out whether or not a

13  patient has had prescriptions, or that particular prescription

14  before.

14:24 15  Q   So on a base level, what does DPS tell you about the

16  patient?

17  A   Their prescription history.

18  Q   What kind of prescription history?

19  A   Their opioid prescription history or their narcotic

14:24 20  prescription history.

21  Q   So does the DPS tell you if the patient received a

22  prescription for a controlled substance?

23  A   Yes.

24  Q   Does it also tell you who prescribed that drug?

14:25 25  A   It gives us the information on the physician, the pharmacy

14:25    1    and the patient's information.

2    Q    How do you check that information?

3    A    Through the DPS system, we print up a copy of it, and one

4    of the MAs or myself would go through that information.  And if

14:25    5    we see that this patient has been to a clinic or to a physician

6    within a 28- or 30-day timeframe, then usually that patient is

7    rejected.

8    Q    We will talk about that.  So the DPS, is it available

9    online?

14:25    10    A    No.  It's is only available through Dr. Craig's ID and her

11    password.

12    Q    You checked through a computer?

13    A    Yes, sir.

14    Q    And you get a report for each patient?

14:25    15    A    Yes, sir.

16    Q    Why did you run DPS?

17    A    Because we were instructed by Mr. Faithful to do so.

18    Q    Did he tell you why you had to run the DPS?

19    A    To protect Dr. Craig's license.

14:26    20    Q    Did you put the DPS anywhere?

21    A    Inside the patient's chart.

22    Q    Why did you do that?

23    A    Because we were instructed to do so.

24    Q    Who instructed you to do that?

14:26    25    A    Mr. Faithful.

14:26   1   Q   Did he tell you why?

2   A   In case the Medical Board comes in, it's there.

3   Q   What is there?

4   A   The DPS.  I'm sorry.

14:26   5        THE COURT:  You say what's there?  Wasn't that your

6   question?

7        MR. ARMSTRONG:  Yes.  She said the DPS.

8        THE COURT:  Okay.

9   *BY MR. ARMSTRONG:*

14:26  10   Q   The DPS history?

11   A   Yes, sir.

12   Q   For each patient?

13   A   Yes, sir.

14   Q   So did the patient have to have this DPS history to be seen

14:26  15   by Dr. Craig?

16   A   If the system was operating, yes, sir.

17   Q   So if the system was operating, the patient had to have DPS

18   history to be seen by Dr. Craig?

19   A   Yes, sir.

14:26  20   Q   Would some patients come in and not have a DPS history?

21   A   I think sometimes we would recommend that they go to

22   another doctor, at least see that doctor prior to coming back

23   to Gulfton.

24   Q   So some patients came in and there is nothing in the DPS

14:27  25   history?

14:27  1   A    Yes, sir.

2   Q    What happens to those patients?

3   A    They are told to go and get DPS history from another

4   doctor.

14:27  5   Q    Are they seen at the clinic?

6   A    Sometimes, but sometimes not.

7   Q    Did they receive a prescription?

8   A    Yes, sir.

9   Q    You mentioned this before.  A term called, was it, doctor

14:27  10  shopper?

11  A    Yes, sir.

12  Q    Are you familiar with that term?

13  A    Yes, sir.

14  Q    Generally speaking, what is your understanding of a doctor

14:27  15  shopper?

16  A    It is when a patient has received a particular medication

17  before from another doctor, and they continued to go to

18  different doctors to receive that prescription.

19  Q    Does it have to be within a certain period?

14:28  20  A    Within a 28-day period.

21  Q    So according to your understanding, a doctor shopper is

22  someone who sees a couple doctors all within the same 28-day

23  period?

24  A    Yes, sir.

14:28  25  Q    And do they receive anything from those doctors within that

14:28   1   28-day period?

2   A   They usually receive Norco or Soma.

3   Q   Now, do you all see doctor shoppers?

4   A   We usually didn't see them.  They were suspended.

14:28   5   Q   So if you guys flagged someone as a doctor shopper, could

6   that patient get a prescription?

7   A   No, sir.

8   Q   Whose rule was that?

9   A   Mr. Faithful's.

14:28   10   Q   So could you all tell from the DPS history for sure whether

11   someone had seen another doctor and received opioids or not?

12   A   Most of the time, yes.  There have been times when we may

13   have missed it and Dr. Craig caught it, but it turned into a

14   big problem.

14:29   15   Q   So the DPS history tells you the name of the doctor who

16   prescribed these same drugs to the patient earlier?

17   A   Yes, sir.

18   Q   Did you all ever request the records of that previous

19   doctor who prescribed these drugs before?

14:29   20   A   No, sir.

21   Q   Ever?

22   A   No, sir.

23   Q   Do you know why that was?

24   A   We were never told to do so.

14:29   25   Q   So a patient comes in.  They have DPS history.  What

14:29  1  happens next?

2  A    Then that patient is called to the window to pay for their

3  visit.

4  Q    How much does a patient have to pay for their visit?

14:30  5  A    Anywhere from 300 to 340.

6  Q    Who set those prices?

7  A    Mr. Faithful.

8  Q    Did the prices go up and down?

9  A    Yes, sir.

14:30  10  Q    How often did they go up and down?

11  A    Depending on if another clinic closed or opened.

12  Q    Who told you that?

13  A    Mr. Faithful.

14  Q    What did he explain to you about other clinics opening and

14:30  15  closing and the effect on the prices at Gulfton?

16  A    If a clinic closed, that means there will be more patients

17  at the clinic.  We could charge -- the demand would change.

18  Then we could change the price.

19  Q    If another clinic closes, what happens to the prices at

14:30  20  Gulfton?

21  A    The prices will go up.

22  Q    And if another clinic opens, what happens to the prices at

23  Gulfton?

24  A    Then it would probably change by an increment of $20.

14:30  25  Q    Who set the increments?

14:30   1   A   Mr. Faithful.

2   Q   Now, did a patient have to pay before they even saw the

3   doctor?

4   A   Yes, sir.

14:30   5   Q   Why was that?

6   A   That was the rules set by Mr. Faithful.

7   Q   Who did the patients give the money to?

8   A   To me.

9       MR. ARMSTRONG:  Let's pull up, please, Government

14:31   10   Exhibit Number 510, Ms. Mortezavi.

11   *BY MR. ARMSTRONG:*

12   Q   Ma'am, I'm going to show you a video that you haven't seen

13   before --

14       THE COURT:  Slow down, please.

14:31   15   *BY MR. ARMSTRONG:*

16   Q   I'm going to show you a video you have not seen before.  It

17   is just to set the scene and orient the jury as to where you

18   were in the clinic on those days.  All right?

19   A   Yes, sir.

14:31   20       MR. ARMSTRONG:  It is already in evidence.  It is

21   Government Exhibit Number 510.  Just play that, Ms. Mortezavi,

22   when you have a chance.  Just the first 15 seconds or so 14.

23       *(A videotape, Government's Exhibit 510, was played)*

24   *BY MR. ARMSTRONG:*

14:31   25   Q   Where are we walking into?

14:31   1   A   Gulfton clinic.

2   Q   What is that?

3   A   The waiting area.

4   Q   What is that window right there?

14:32   5   A   That's the reception area.  That's the window where I would

6   work.

7   Q   How often were you at that window?

8   A   All day, every day.

9   Q   And what did the window look out into?

14:32   10   A   The waiting area.

11   Q   What kind of money were you allowed to take at Gulfton?

12   A   Cash.

13   Q   Were you allowed to take credit cards?

14   A   No, sir.

14:32   15   Q   Were you allowed to take checks?

16   A   No, sir.

17   Q   Were you allowed to take insurance?

18   A   No, sir.

19   Q   Were you allowed to take Medicaid?

14:32   20   A   No, sir.

21   Q   How about Medicare?

22   A   No, sir.

23   Q   Did some patients actually try to pay with insurance?

24   A   They would ask if we accept insurance.

14:32   25   Q   What would you tell those patients?

14:32  1   A   No.

2   Q   Why did you turn them away?

3   A   Because that was Mr. Faithful's rules.

4   Q   Did you guys even have a credit card machine?

14:32  5   A   No, sir.

6   Q   So what was the only method of payment at Gulfton?

7   A   Cash.

8   Q   Whose rule was that?

9   A   Mr. Faithful and Dr. Craig's.

14:33  10  Q   Who paid this cash?

11  A   The patients that came into the clinic.

12  Q   Sometimes did somebody pay for the patients?

13          MR. WILLIAMS:  Objection, Judge.  That's leading.

14          THE WITNESS:  Yes, sir.

14:33  15          THE COURT:  Sustained.

16  *BY MR. ARMSTRONG:*

17  Q   Who, if anyone else, also paid for the patients?

18  A   The facilitators.

19  Q   How would a facilitator pay for a patient?

14:33  20  A   In cash.

21  Q   Where would the facilitator pay for the patient?

22  A   Sometimes they would try to do it in the waiting area.

23  Most of the time, it was in the lobby.

24  Q   Did the facilitators actually give money to you?

14:33  25  A   Sometimes.

14:33   1   Q   And where would they do that?

2   A   In the waiting area.

3   Q   How many patients would a facilitator pay for?

4   A   Four at a time.  Sometimes two.

14:34   5   Q   Were there any rules about letting facilitators pay for

6   patients?

7   A   Yes, sir.

8   Q   What were the rules?

9   A   They are not to pay for them in the waiting area.

14:34   10   Q   Whose rule was that?

11   A   Mr. Faithful's.

12   Q   Did you try to stop some facilitators from paying for

13   patients?

14   A   All the time.

14:34   15   Q   Were you successful?

16   A   No, sir.

17   Q   How come?

18   A   It was just their demeanor.

19   Q   What about their demeanor made it hard to stop them from

14:34   20   paying for patients?

21   A   They didn't care.  They just had a street mentality, so

22   they didn't care.

23   Q   So we are going to skip forward ahead of the process.

24   Facilitator pays for the patient?

14:35   25   A   Yes, sir.

14:35    1   Q   A little bit down the line, does the patient receive

2   anything from Dr. Craig?

3   A   Yes, sir.

4   Q   What do they receive down the line from Dr. Craig?

14:35    5   A   Prescriptions.

6   Q   Who, if anyone, would the patient then give the

7   prescription to?

8   A   The facilitator.

9   Q   Where would that happen?

14:35   10   A   Sometimes in the lobby.  Sometimes in the waiting area.

11   Q   Did you actually see that happen?

12   A   Yes, sir.

13   Q   How many times a day would that happen?

14   A   Sometimes twice a day.  Depends.

14:35   15   Q   Would the patient give the prescription to the same

16   facilitator who paid for them or a different one?

17   A   The same facilitator who paid.

18   Q   What was your impression of what was going on when you saw

19   this?

14:36   20   A   That the prescriptions belonged to the facilitator and not

21   the patient.

22   Q   The term "facilitator" we have been talking about, whose

23   term is that?

24   A   It is a term Mr. Faithful created.

14:36   25   Q   Did anybody else use this term?

14:36  1    A    We all did.

2    Q    If you could call these facilitators your own term, how

3    would you describe them to the jury?

4    A    Drug dealers.

14:36  5         THE COURT:  Pardon me?  I didn't hear you.

6         THE WITNESS:  Drug dealers, Your Honor.

7    *BY MR. ARMSTRONG:*

8    Q    In any given week, how many different facilitators would

9    come to Gulfton?

14:36  10   A    There might be five per day, like 25.  Depends.

11   Q    Did some come more often than others?

12   A    Yes, sir.

13   Q    Did some of these facilitators have nicknames?

14   A    Yes, sir.

14:37  15   Q    Generally speaking, on any given day, how many patients

16   would be brought to Gulfton by these facilitators?

17   A    It could be four per patient -- I mean, four per

18   facilitator, two per facilitator.  It depends.

19   Q    In total, what would be the high number of patients brought

14:37  20   by the facilitators altogether on a given day?

21   A    I would say about 75 percent of the patients were brought

22   by facilitators per day.

23   Q    Do you keep a log of when these facilitators were scheduled

24   to come to Gulfton?

14:37  25   A    Yes, sir.

14:37  1  Q   I'm going to approach with Government Exhibit Number 317.

2  I'm handing you, ma'am, Government Exhibit Number 317.  Do you

3  recognize it?

4  A   Yes, sir.

14:37  5  Q   What is it?

6  A   It is the appointment book for the facilitators.

7  Q   Who made that appointment book?

8  A   There was one there before I got there, and this is the one

9  that I purchased.

14:38  10  Q   And what kind of information would you put in that book?

11  A   The patient's information that the facilitators gave us, or

12  the number of patients that each one would bring.

13  Q   How often would you put those entries into that book?

14  A   Every day.

14:38  15  Q   So we are going to go through some of these pages, ma'am,

16  but I want to do it on the screen to make it clear.

17       MR. ARMSTRONG:  Let's go to page 41 of Government

18  Exhibit Number 317.  And if we could please dim the lights for

19  the screen, Your Honor.  Are they all off?

14:39  20       THE COURT:  No.

21       MR. ARMSTRONG:  I mean all of them.

22       THE COURT:  Hang on.  All of my light turners are out

23  of here.

24    *(Pause)*

14:39  25       THE COURT:  Is that what you had in mind?

14:39   1       MR. ARMSTRONG:  Thank you, Judge.

2           Ms. Mortezavi, if we could please highlight

3   "Kiwi" at the top left corner.

4   *BY MR. ARMSTRONG:*

14:39   5   Q   Ma'am, what does that entry mean, Kiwi, with the lines next

6   to it?

7   A   Those are the number of patients that he was bringing.

8   Q   Who is Kiwi?

9   A   A facilitator.

14:39   10  Q   So how many patients did Kiwi bring to Gulfton on this

11  date?

12  A   Six.

13  Q   Can you see what date it is?

14  A   I can't see the date.  April 24.

14:39   15      MR. ARMSTRONG:  Ms. Mortezavi, zoom out please and

16  pull up just the bottom half of this document.

17  *BY MR. ARMSTRONG:*

18  Q   Do you see that text in the middle that says "Uncle

19  Ronnie"?

14:40   20  A   Yes, sir.

21  Q   Who is Uncle Ronnie?

22  A   A facilitator.

23  Q   What are those marks underneath Uncle Ronnie's name?

24  A   Three patients.

14:40   25  Q   What does that mean?

14:40   1   A    Three patients that he brought with him.

2   Q    To where?

3   A    To Gulfton.

4   Q    And if we see the last entry at the bottom, what does that

14:40   5   say in the same column?

6   A    Monk.

7   Q    Who is that?

8   A    A facilitator.

9   Q    What does that mean, Monk, with three lines next to it?

14:40   10   A    Three patients.

11   Q    More often than that, did these patients get prescriptions

12   that were brought by the facilitators?

13   A    Yes, sir.

14   Q    Most of the time or some of the time?

14:40   15   A    Most of the time.

16          MR. ARMSTRONG:  Let's go to page 48 of Government

17   Exhibit Number 317.

18   *BY MR. ARMSTRONG:*

19   Q    Is this another page from the notebook in Government 317

14:40   20   that you maintained and kept at Gulfton?

21   A    Yes, sir.

22          MR. ARMSTRONG:  Ms. Mortezavi, please pull up the

23   first column.

24   *BY MR. ARMSTRONG:*

14:41   25   Q    What is the date on this entry, ma'am?

14:41   1   A    May 16.

2              MR. ARMSTRONG:  And Ms. Mortezavi, please highlight

3       the text starting with Tasha and all the way down.

4       *BY MR. ARMSTRONG:*

14:41   5   Q    We see a bunch of different names here.  What are all of

6       those names?

7       A    Names of facilitators.

8       Q    We see a bunch of numbers next to every single one of these

9       names.  What do those numbers represent?

14:41  10   A    Their patients.

11   Q    Is that Uncle Ronnie again?

12   A    Yes, sir.

13   Q    So Uncle Ronnie is back again at the clinic with two more

14       patients?

14:41  15   A    Yes, sir.

16   Q    Is that Kiwi underneath?

17   A    Yes, sir.

18   Q    How many patients did Kiwi bring to Gulfton on this day?

19   A    Two.

14:41  20   Q    How about the person named Kool?  Who is Kool?

21   A    A facilitator.

22              THE COURT:  I can't hear you, please.

23              THE WITNESS:  A facilitator.

24   *BY MR. ARMSTRONG:*

14:42  25   Q    How many patients did Kool bring to Gulfton on that day?

14:42  1  A   Two.

2       MR. ARMSTRONG:  Ms. Mortezavi, zoom out of this column

3  and highlight the middle column, the bottom half, please.

4  *BY MR. ARMSTRONG:*

14:42  5  Q   We see a bunch of names that are circled.  Do you see that,

6  ma'am?

7  A   Yes, sir.

8       MR. ARMSTRONG:  Let's highlight the names that are

9  circled, please.

14:42  10 *BY MR. ARMSTRONG:*

11 Q   What is that first name, John Hill?

12 A   A facilitator.

13 Q   How many patients did Mr. Hill bring to Gulfton on this

14 day?

14:42  15 A   Two.

16 Q   Does that say Monkey Man?

17 A   Yes, sir.

18 Q   Who is Monkey Man?

19 A   A facilitator.

14:42  20 Q   How many patients did Monkey Man bring to Gulfton on this

21 date?

22 A   Three.

23 Q   What about Black?  Who is Black?

24 A   A facilitator.

14:42  25 Q   How many patients did Black bring to Gulfton on this date?

14:42  1  A    Three.

2  Q    What is that last name?

3  A    Dre.

4  Q    Who is Dre?

14:43  5  A    A facilitator.

6  Q    How many patients did Dre bring to Gulfton on this date?

7  A    Four.

8         MR. ARMSTRONG:  If we can zoom out, please,

9  Ms. Mortezavi, and highlight, please, just going across on the

14:43  10  third column in the same area where the text is already

11  highlighted.

12  *BY MR. ARMSTRONG:*

13  Q    So here is another entry for another day, right?

14  A    Yes, sir.

14:43  15  Q    So is Dre back with more patients?

16  A    Yes, sir.

17  Q    How many patients is Dre now back with?

18  A    Four.

19  Q    The name Tasha, who is that?

14:43  20  A    A facilitator.

21  Q    How many patients did Tasha bring on this date?

22  A    Four.

23  Q    If we can see the last name, who is the last name on this

24  list?

14:43  25  A    Black.

14:43   1   Q   How many patients was Black bringing to Gulfton on this

2   date?

3   A   Three.

4           MR. ARMSTRONG:   Jump to page 52, Ms. Mortezavi, and

14:44   5   pull up the first column, please.

6           Let me back up.   If I'm going too fast, I

7   apologize.

8   *BY MR. ARMSTRONG:*

9   Q   Ma'am, what is the date of this entry?

14:44  10   A   May 30.

11          MR. ARMSTRONG:   Please pull up the first column,

12   please.

13   *BY MR. ARMSTRONG:*

14   Q   You see a bunch of names here.   What is that name, D

14:44  15   something?

16   A   Doo.

17   Q   Who is Doo?

18   A   A facilitator.

19   Q   How many patients did Doo bring to Gulfton?

14:44  20   A   Three.

21   Q   Who is the name under Doo?

22   A   Tywoo.

23   Q   Who is Tywoo?

24   A   A facilitator.

14:44  25   Q   How many patients did Tywoo bring to Gulfton on May 30th?

14:44    1    A    Three.

2              MR. ARMSTRONG:  Ms. Mortezavi, please zoom out and go

3         right there.  Thank you.

4         *BY MR. ARMSTRONG:*

14:44    5    Q    We see the same names again at the top.  Third line down,

6         whose name is that?

7    A    Doo.

8    Q    So Doo is back again?

9    A    Yes, sir.

14:45   10    Q    How many patients is Doo now coming with to Gulfton?

11   A    Four.

12   Q    And whose name is next to Doo?

13   A    Monk.

14   Q    How many patients is Monk coming with on this date?

14:45   15   A    Five.

16              MR. ARMSTRONG:  Let's jump to page 53, Ms. Mortezavi.

17        *BY MR. ARMSTRONG:*

18   Q    What is the date of this entry, ma'am?

19   A    June 5th.

14:45   20             MR. HELFMEYER:  If we can please highlight just

21        probably the top half of the first column, Ms. Mortezavi.

22        *BY MR. ARMSTRONG:*

23   Q    Third name down, who is that?

24   A    Tywoo.

14:45   25   Q    What did Tywoo do at the clinic?

14:45   1   A   He brought some patients, but we don't have the number.

2   Q   Was he a facilitator or not?

3   A   Yes, sir.

4   Q   And whose name is under Tywoo?

14:45   5   A   Kool.

6   Q   What does that number three mean next to Kool?

7   A   Three patients.

8   Q   Who brought three patients to Gulfton on that date?

9   A   Kool.

14:46   10       MR. ARMSTRONG:  Let's go to page 54, Ms. Mortezavi.

11   *BY MR. ARMSTRONG:*

12   Q   Ma'am, what is the date of this entry?

13   A   June 6th.

14       MR. ARMSTRONG:  Please highlight the last column on

14:46   15   the right, Ms. Mortezavi.

16   *BY MR. ARMSTRONG:*

17   Q   Ma'am, what are all of these entries with all of these

18   names and all of these numbers?

19   A   Facilitators and their patients.

14:46   20   Q   Some of the names?  The second name down, who is that?

21   A   Tasha.

22   Q   I'm sorry.  The third name down?

23   A   Kool.

24   Q   Kool is back again with how many patients?

14:46   25   A   Three.

14:46   1   Q   Is Doo back again, as well?

2   A   Yes, sir.

3   Q   How many patients is Doo now bringing?

4   A   Four.

14:46   5   Q   How about the last three names?  Who is first?

6   A   Patricia, Black, Tasha.

7   Q   All right.  Let's see if we can add up all of these

8   numbers.  Were all of these names on here facilitators?

9   A   Yes, sir.

14:47   10   Q   By my count, we have two, five, four.  So far that's 11.

11   Give me the benefit of the doubt.  Black has three, 12.  Tasha

12   has four, 16.  Dre has four, 24.  Wilbert has four, 28.  Kiki

13   has four, 32.  Shay has four, 36.

14                Is that Charles?

14:47   15   A   Yes, sir.

16   Q   Charles has four.  Is that about 40 patients?

17   A   Yes, sir.

18   Q   All going where?

19   A   To Gulfton.

14:47   20   Q   All brought by who?

21   A   Facilitators.

22   Q   All on the same day?

23   A   Yes, sir.

24   Q   Ma'am, I just have a few more of these I want to go over

14:47   25   with you.

14:47   1              I want to approach with Government Exhibit Number

2       318.  Ma'am, do you recognize that document?

3       A    It's an appointment book.

4       Q    Did you make entries in that book?

14:48   5       A    Yes, sir.

6       Q    Did other people working at Gulfton also make entries in

7       that book?

8       A    The MAs.

9       Q    Flip through it just to get familiar with it.

14:49  10       A    The appointment book.

11       Q    Ma'am, these appointment books, Government Exhibit Number

12       317 and 318, I will represent to you that these were found at

13       Gulfton.  Did you keep copies of these notebooks?

14       A    I didn't have copies of these.  The appointment books like

14:49  15       this were left at Gulfton.

16              MR. ARMSTRONG:  Ms. Mortezavi, if we can go to page

17       eight of 318.

18       *BY MR. ARMSTRONG:*

19       Q    Ma'am, before we zoom in, what are the dates of these four

14:49  20       dates in this appointment book?

21       A    I can't see.  Okay.  June 28, 2016, the 29th, 2016,

22       June 30th, 2016.

23       Q    Generally speaking, what kind of information is recorded on

24       this page?

14:50  25       A    Patient's information on this one, along with the

14:50   1   facilitators.

2   Q    Did you actually make this page?

3   A    Some of the handwriting is mine and some belonged to some

4   of the other MAs.

14:50   5           MR. ARMSTRONG:  Ms. Mortezavi, if we can please pull

6   up the column Wednesday, 6/29/16.

7   BY MR. ARMSTRONG:

8   Q    We see some familiar markings, right?

9   A    Yes, sir.

14:50   10   Q    Do we see names?

11   A    EG and Uncle Ronnie.

12   Q    Where do you see Uncle Ronnie?

13   A    The second one from the top.

14   Q    What is that four next to Uncle Ronnie mean?

14:50   15   A    The number of patients.

16   Q    Brought by who?

17   A    By Uncle Ronnie.

18   Q    Where was Uncle Ronnie taking four patients that day?

19   A    Gulfton.

14:51   20   Q    For what?

21   A    For treatment and prescriptions.

22   Q    Written by who?

23   A    Oh, by Dr. Craig.  I'm sorry.

24           MR. ARMSTRONG:  Ms. Mortezavi, if we can please pull

14:51   25   up the middle entry, starting with Cherry going down to Shay,

14:51    1   two to four on the log.

         2   BY MR. ARMSTRONG:

         3   Q    Cherry, who is Cherry?

         4   A    A facilitator.

14:51    5   Q    How many patients did Cherry bring to Gulfton on this date?

         6   A    Two.

         7   Q    How do you know that?

         8   A    Because that is my handwriting.

         9   Q    Kool, that name is familiar now, isn't it?

14:51   10   A    Yes, sir.

        11   Q    How many patients did Kool bring to Gulfton on this date?

        12   A    Four.

        13   Q    What about four lines down, Shay/Dre, what does that mean?

        14   A    They are sharing patients.

14:51   15   Q    Who is sharing patients?

        16   A    Shay and Dre.

        17   Q    Where are thee taking these patients?

        18   A    To Gulfton.

        19   Q    How many?

14:52   20   A    Four.

        21        MR. ARMSTRONG:  Ms. Mortezavi, please go to page 12 of

        22   Government Exhibit Number 318.

        23             Court's indulgence?

        24        *(Pause)*

14:52   25        MR. ARMSTRONG:  If we can pull up the entries --

1   *BY MR. ARMSTRONG:*

2   Q   Let me ask you this, first, ma'am, what are the dates of

3   the entries on this page?

4   A   August 3, 2016, August 4, 2016, August 5, 2016 and

5   August 8, 2016.

6          MR. ARMSTRONG:  Ms. Mortezavi, pull up the entries for

7   August 5th and 8th.

8   *BY MR. ARMSTRONG:*

9   Q   Whose name is third down on August 5th?

10  A   Kool.

11  Q   Does Kool come back to the clinic on 8/8?

12  A   Yes, sir.

13  Q   How do you know that?

14  A   Because his name is up there and it is my handwriting.

15  Q   Who is that person, Tywoo, up at the top again?

16  A   Facilitator.

17  Q   Tywoo is back?

18  A   Yes, sir.

19  Q   Who is Tywoo bringing on this date?

20  A   Patients.

21         MR. ARMSTRONG:  Ms. Mortezavi, please pull up 318 at

22  page 50.  We need to flip this one around, unfortunately.

23         If you can't do it, we will go old school on the

24  Elmo.  Thank you, Ms. Mortezavi.

25  *BY MR. ARMSTRONG:*

14:53  1   Q    What are the dates on this entry?

2   A    September 12, September 13, September 14, September 15.

3        MR. ARMSTRONG:  Ms. Mortezavi, please zoom in on the

4   13th through the 15th, the first couple lines on each column,

14:54  5   please.

6   *BY MR. ARMSTRONG:*

7   Q    Does Tywoo come to the clinic on September 13?

8   A    Yes, sir.

9   Q    How can you tell that?

14:54  10  A    That's my handwriting.

11  Q    And did Tywoo bring anyone to the clinic on 9/13?

12  A    Two.

13  Q    Two what?

14  A    Patients.

14:54  15  Q    Did Tywoo come back a couple days later?

16  A    Yes, sir.

17  Q    How can you tell that?

18  A    He is there on September 15.

19  Q    Tywoo is back at the clinic again?

14:54  20  A    Yes, sir.

21  Q    Is he getting treated himself?

22  A    I don't recall.

23       MR. ARMSTRONG:  If we can please go to Government

24  Exhibit Number 318 at page 52, please, Ms. Mortezavi, and pull

14:54  25  up 09/20.

14:54  1  *BY MR. ARMSTRONG:*

2  Q    Ma'am, what information is in this column?

3  A    The names of the facilitators and their patients.

4  Q    On what date?

14:54  5  A    September 20.

6  Q    So Kiwi, we have seen that name before, right?

7  A    Yes, sir.

8  Q    What does that entry mean, Kiwi, two?

9  A    Two patients.

14:55  10  Q    Who is bringing two patients to Gulfton that day?

11  A    Kiwi, the facilitator.

12  Q    Is Tywoo back at Gulfton on 9/20?

13  A    Yes, sir.

14  Q    He is there three times in the span of a week?

14:55  15  A    Yes, sir.

16  Q    And how many patients does Tywoo now bring in on 9/30?

17  A    Three.

18  Q    How do you see that?

19  A    That's my handwriting.

14:55  20       MR. ARMSTRONG:  Ms. Mortezavi, please take that down.

21  *BY MR. ARMSTRONG:*

22  Q    Let's get back.  A patient pays --

23       MR. ARMSTRONG:  If we can turn the lights on, Your

24  Honor, please.

14:56  25  *BY MR. ARMSTRONG:*

14:56  1  Q  So a patient had a DPS, right, and the patient has paid?

2  A  Yes, sir.

3  Q  What happens next?

4  A  After the patient has paid, they get triaged.

14:56  5  Q  Do they have to do anything before they get triaged?

6  A  They have to pay first.

7  Q  Do they have to sign in?

8  A  They sign in after they pay.

9  Q  Okay.  Where do they sign in?

14:56  10  A  At the front window.

11  Q  Who is at the front window?

12  A  I am.

13  Q  Do you have to sign anything, sign a log anywhere?

14  A  There is a sign-in sheet.  All patients sign in on that

14:56  15  after they pay.

16  Q  Every day?

17  A  Every day.

18  Q  How do they sign in?

19  A  Would you rephrase that?

14:56  20  Q  Of course.  What information do they put into the sign-in

21  sheet?

22  A  Their name and phone number.

23  Q  Why do you make sign-in sheets?

24  A  So I could go over it at the end of the day with

14:57  25  Mr. Faithful and we can keep track of the order of the

14:57  1    patients, keep track of the order that the patients arrived.

2    And I could go over the information at the end of the day with

3    Mr. Faithful.

4    Q   Did he ever ask how many patients came to the clinic on

14:57  5    this date?

6    A   I didn't hear you.

7    Q   Would he ever ask how many patients came to the clinic on

8    any given day?

9    A   Yes, sir.

14:57  10   Q   Would you sometimes provide him the sign-in sheet by way of

11   explanation?

12   A   Yes, sir.

13   Q   Now I'm going to hand you a big, fat binder.  That is

14   Government Exhibit Number 314.

14:57  15         THE COURT:  Ladies and gentlemen, all the exhibits

16   moved into evidence you will have back with you in the jury

17   room so you can look through them if you desire.  Everything

18   admitted into evidence will go back with you eventually.

19   *BY MR. ARMSTRONG:*

14:57  20   Q   Ma'am, what is Government Exhibit Number 314?

21   A   It says 2016 sign-in sheets.

22   Q   Open it up and take a look at it, please.

23   A   Okay.

24   Q   Are you familiar with that document?

14:58  25   A   Yes.  Some of them are sign-in sheets after I left.

14:58    1    Q    And what information does that binder hold?  Look through

2    the pages very generally.

3    A    The patient's name, whether or not they are follow up or

4    new and the time of arrival.

14:58    5            MR. ARMSTRONG:  What we are going to do is the same

6    process again where we look at some of the entries in

7    Government Exhibit Number 314, this binder, on the projector.

8            Ms. Mortezavi, if you could please pull up

9    Government Exhibit 314 at 211.

14:59    10            Your Honor, I apologize, if we could hit the

11    lights again.

12    *BY MR. ARMSTRONG:*

13    Q    First of all, what is this document?

14    A    That's the clinic sign-in sheet.

14:59    15    Q    What is the date of this sign-in sheet?

16    A    June 21, 2016.

17            MR. ARMSTRONG:  Ms. Mortezavi, if you can pull up the

18    next one, side by side, 211 and 212, please.

19    *BY MR. ARMSTRONG:*

14:59    20    Q    Ma'am, we see a bunch of information on this page.  We will

21    walk through it step by step.

22            First off, what is the column of information on

23    the left?

24    A    The patient's name.

15:00    25    Q    And are the patient names reflected on this sign-in sheet?

15:00  1  A    Yes, sir.

2  Q    How do you know that?

3  A    Because they are signed in.

4  Q    So number one, for example, what is the next name to number

15:00  5  one?

6  A    Benny.

7  Q    Who is that?

8  A    A patient.

9  Q    And so we see a bunch of rows, one, two, three, four, five,

15:00  10  six, going all the way through 40.  What is the name of each

11  one of these rows?

12  A    Patient name, new or follow up, and the time.

13  Q    So how many patients signed in at Gulfton on 6/21/16?

14  A    Forty.

15:00  15       MR. ARMSTRONG:  If we could please pull up,

16  Ms. Mortezavi, 314 at 214.

17  *BY MR. ARMSTRONG:*

18  Q    And, ma'am, what is the entry on the top right-hand corner?

19  What date?

15:01  20  A    June 21, 2016.

21       MR. ARMSTRONG:  Ms. Mortezavi, please pull up the text

22  at the bottom.

23  *BY MR. ARMSTRONG:*

24  Q    Ma'am, what does that say?

15:01  25  A    Number 13, Keisha Prince, Uncle Ronnie's replacement.

15:01   1   Q   What does that mean?

2   A   There was a problem with patient number 13.  They would

3   have to be replaced with a different patient.

4   Q   Who would replace the patient?

15:01   5   A   We would replace the patient for the facilitator.

6   Q   Who is the facilitator in this entry?

7   A   Uncle Ronnie.

8        MR. ARMSTRONG:  Ms. Mortezavi, if we can pull up

9   Government Exhibit 314, pages 279 next to 280.

15:02   10   *BY MR. ARMSTRONG:*

11   Q   All right.  Ma'am, what is this information here?

12   A   Sign-in sheet.

13   Q   Does this generally reflect more patients signing in on

14   this date?

15:02   15   A   Yes, sir.

16   Q   What is the date of this sign-in sheet?

17   A   June 29, 2016.

18   Q   You can actually see it in the top left-hand corner of

19   Government Exhibit 314 at 279.  Do you see that, ma'am?

15:02   20   A   Yes, sir.

21   Q   What date is that?

22   A   June 29, 2016.

23   Q   How many patients came to Gulfton on June 29th?

24   A   Forty.

15:02   25   Q   How can you tell that?

15:02   1   A    From the second to last numbers, the number 40, and the

2   patients signed in.

3           MR. ARMSTRONG:  All right.  And, Ms. Mortezavi, if you

4   can please pull up the text in between rows 12 through 15.

15:03   5   BY MR. ARMSTRONG:

6   Q    Ma'am, what does that say?  It is written over some other

7   words.

8   A    "Tywoo credit."  I can't see the rest of it.

9           MR. ARMSTRONG:  Take both pages, Ms. Mortezavi, and

15:03   10   blow up that page right there.

11   BY MR. ARMSTRONG:

12   Q    What does that say?

13   A    "Tywoo credit for patient on June 28, 1:30, patient on

14   phone in office."

15:03   15   Q    What does all that information mean?

16   A    If a patient was caught on the phone in the office,

17   Dr. Craig wouldn't see them, so the patient would receive

18   credit for it, their patient.  So he would receive half of his

19   money back, but only on a credit card, like an appointment

15:04   20   card, so it's a credit.

21   Q    Who is actually getting money back because the patient was

22   caught on the phone?

23   A    The facilitator.

24   Q    And in this case, who is the facilitator?

15:04   25   A    Tywoo.

15:04   1  Q    So Tywoo is getting money back because his patient was

       2  caught on the phone?

       3  A    Yes, sir.

       4  Q    How much money did Tywoo get back on this date?

15:04   5  A    130.

       6  Q    Why was he given back 130 instead of some different amount?

       7  A    Because the patient went through triage.  The patient saw

       8  the doctor's assistants.  And they signed in already, so that

       9  money couldn't be given back.

15:04  10  Q    Is Tywoo getting a full refund or a partial?

      11  A    Partial.

      12  Q    The partial refund is how much?

      13  A    130.

      14       MR. ARMSTRONG:  Ms. Mortezavi, if we can please go to

15:04  15  Government Exhibit Number 314 at 299.

      16  *BY MR. ARMSTRONG:*

      17  Q    Ma'am, what is this document here?

      18  A    Appointment sheet.

      19  Q    What date?

15:05  20  A    July 1st, 2016.

      21  Q    Again, patient names, right?

      22  A    Yes, sir.

      23       MR. ARMSTRONG:  Ms. Mortezavi, please pull up -- take

      24  down the one on the right, please, Ms. Mortezavi.

15:05  25  *BY MR. ARMSTRONG:*

15:05   1   Q   Ma'am, we have got two pages, 299 and 300, right?

        2   A   Yes, sir.

        3   Q   How many patients came to Gulfton on 7/1/16?

        4   A   Forty.

15:05   5   Q   And were all of these patients seen or not?  Can you tell?

        6   A    If they signed in, that means the money was collected.  So

        7   I can only assume they were seen.  On July 1st, I was out of

        8   the country.

        9   Q    What do those Xs mean across each of the numbers?

15:06  10           MR. WILLIAMS:  Objection.  She is claiming she is out

       11   of the country on this date.  She can't interpret anything that

       12   happened on that particular date.

       13           THE COURT:  Overruled.

       14           MR. ARMSTRONG:  Thank you.

15:06  15           THE COURT:  Do you know what those Xs are on each of

       16   those positions?

       17           THE WITNESS:  Yes, sir.  That means the patient was

       18   already seen.

       19           THE COURT:  How do you know that?

15:06  20           THE WITNESS:  Because it is a rule that was already in

       21   there.

       22           MR. ARMSTRONG:  Thank you, Judge.

       23           THE COURT:  Now you may ask the question.

       24           MR. ARMSTRONG:  Ms. Mortezavi, please pull up --

15:06  25           THE COURT:  Hold it.  Is that one day, July 1st?

15:06    1          THE WITNESS:  Yes, sir.

2          THE COURT:  How many patients were in that day?  Does

3     anybody have a tally on that?

4          MR. ARMSTRONG:  It says 40 right there.

15:06    5          THE COURT:  So 40 in one day?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Was that an average day or a heavy day?

8          THE WITNESS:  Sometimes, Your Honor, it may be 45 to

9     50.  It fluctuates.

15:07   10          MR. ARMSTRONG:  Thank you, Judge.

11               Ms. Mortezavi, please pull up the text starting

12    around box eight through box 12, going all the way across.

13    Thank you.

14    *BY MR. ARMSTRONG:*

15:07   15    Q    What does that say?  50 percent off Brayland?

16    A    That's a credit.

17    Q    Who is Brayland?

18    A    A facilitator.

19    Q    What is Brayland getting 50 percent off of?

15:07   20    A    There must have been a problem with one of his patients so

21    he was receiving credit.

22          THE COURT:  Go on.

23          MR. WILLIAMS:  Speculation as to what it must have

24    been.  She doesn't know.  She wasn't there that day.

15:07   25          MR. ARMSTRONG:  Rephrase it, Counsel.

15:07  1  BY MR. ARMSTRONG:

2  Q   Ma'am, you testified about how before you would write down

3  money going back to facilitators?

4  A   Yes, sir.

15:07  5  Q   Is that your impression of this right here?

6  A   Yes, sir.  That's the only reason it would give money back,

7  if there was a problem with a patient.

8  Q   Who was the money going back to?

9  A   The facilitator.

15:08  10        MR. ARMSTRONG:  Ms. Mortezavi, Government Exhibit

11  Number 314 at 315, please.

12  BY MR. ARMSTRONG:

13  Q   Were you back at Gulfton on 7/12?

14  A   Yes, sir.

15:08  15        MR. ARMSTRONG:  Ms. Mortezavi, please pull up 315 next

16  to 316 side by side.

17  BY MR. ARMSTRONG:

18  Q   Ma'am, how many patients came to Gulfton on 7/12/16?

19  A   Thirty-four.

15:08  20  Q   And are there lines through each one of the patient's names

21  or next to them?

22  A   Yes, sir.

23  Q   What do those lines mean?

24  A   Sometimes we write the lines that the patient received

15:09  25  their prescription, so we can keep track of them, or if the

15:09     1  patient was seen.

          2          MR. ARMSTRONG:  All right.  Now, Ms. Mortezavi, if you

          3  can please focus on number six and seven going all the way

          4  across.

15:09     5  *BY MR. ARMSTRONG:*

          6  Q   Ma'am, if you can see -- if not, we will blow it up -- what

          7  does that text say all the way at the end?

          8          THE COURT:  End of what?

          9          MR. ARMSTRONG:  The column.  Thank you, Judge.

15:09    10          THE WITNESS:  I can't see it.

         11          MR. ARMSTRONG:  Ms. Mortezavi, zoom out and we will

         12  try it again.

         13          THE WITNESS:  I'm trying to understand the

         14  handwriting.  "Rep bringing patient."

15:09    15          THE COURT:  What is it?

         16  *BY MR. ARMSTRONG:*

         17  Q   Not sure?

         18  A   No.

         19          MR. ARMSTRONG:  Ms. Mortezavi, pull up Government

15:10    20  Exhibit Number 314 at 318.

         21  *BY MR. ARMSTRONG:*

         22  Q   What is this card?

         23  A   A replacement.

         24  Q   First off, what does that say, replacement number seven?

15:10    25  A   They were replacing the patient on that particular day.

15:10   1   Q   Who was replacing the patient on that particular day?

2   A   Dr. Craig and Shane Faithful replaced this patient.  Well,

3   he had a patient replaced.

4           THE COURT:  What does that mean "replacement"?

15:10   5           THE WITNESS:  If there wa a problem with a particular

6   patient, Your Honor, that patient had to be replaced.

7           THE COURT:  What do you mean by "replaced"?

8           THE WITNESS:  Instead of giving them cash back, they

9   would allow them to bring another patient in.  So they would

15:10  10   actually replace the patient that wasn't seen.

11           THE COURT:  So they could keep -- the facilitator

12   could keep the money but needed to bring a patient back or they

13   would not get paid for it on that subsequent trip?

14           THE WITNESS:  Exactly.

15:11  15           THE COURT:  Go on.

16           MR. ARMSTRONG:  Thank you, Judge.

17           THE COURT:  Who would note that?

18           THE WITNESS:  Either one of us, myself or one of the

19   young ladies at the front window.

15:11  20   BY MR. ARMSTRONG:

21   Q   Who is getting -- basically this is a credit?

22   A   Yes, sir.

23   Q   Who is getting the credit on 7/12/16?

24   A   Kool.

15:11  25   Q   Who is Kool?

15:11　1　A　A facilitator.

2　Q　What is he getting a credit for?

3　A　His patient wasn't seen, so he received the money to bring

4　another patient in.

15:11　5　Q　You wouldn't give them money back, but you'd basically give

6　them a coupon to use again?

7　A　A credit.

8　Q　Whose initials are in that top right corner?

9　A　Dr. Craig's.

15:11　10　Q　How do you know that?

11　A　Because we would bring the cards to her to sign.

12　　　　THE COURT:  Do you recognize her handwriting, her

13　initials?

14　　　　THE WITNESS:  Those are her initials.

15:11　15　*BY MR. ARMSTRONG:*

16　Q　Why did you have Dr. Craig sign replacement cards like

17　this?

18　A　Because at the end of the day, to show Mr. Faithful where

19　the money went and that we weren't just giving credit out to

15:12　20　facilitators.

21　　　　MR. ARMSTRONG:  Ms. Mortezavi, Government Exhibit

22　Number 202 at page one, please.

23　*BY MR. ARMSTRONG:*

24　Q　Ma'am, I will represent to you that this document was found

15:12　25　at Mr. Faithful's house.  What is this document?

15:12   1        MR. WILLIAMS:  Objection, Judge.

2        THE WITNESS:  Sign-in sheet.

3        THE COURT:  Sorry.  Hold it, sir.

4        MR. WILLIAMS:  Objection as to what he has represented

15:12   5   to this person, where it is found.  He knows it is improper.

6   He needs to ask about the particular document and let it be

7   that.  He is testifying for this particular witness and he

8   knows that's improper, Judge.

9        MR. ARMSTRONG:  I will link it up, Judge.

15:12  10        THE COURT:  Wake it up?

11        MR. ARMSTRONG:  Link it up.

12        THE COURT:  What does wake it up mean?

13        MR. ARMSTRONG:  Link it up with the agent afterwards.

14        MR. WILLIAMS:  Judge, if that is where they found it,

15:12  15   that's for the agent.  For him to say in front of this jury

16   what he represents to be is improper, and he knows it is

17   improper, Judge.

18        THE COURT:  What is your response?

19        MR. ARMSTRONG:  It is not improper, Judge.

15:13  20        THE COURT:  Are you telling me as an officer of the

21   Court that your question will be linked up without objection

22   when another witness takes the stand?

23        MR. ARMSTRONG:  100 percent.

24        MR. WILLIAMS:  Which is fair, Judge.  He understands

15:13  25   the rules will allow that.  But for him to, in front of this

15:13  1  jury, represent to them that it's true to this particular jury

2  is totally improper and he knows it.

3        THE COURT:  Next question, Counsel.

4        MR. WILLIAMS:  I ask that that question be stricken

15:13  5  from the record.

6        THE COURT:  Denied.  But the jury is so instructed

7  that if this is not linked up through another witness, I will

8  order it struck and I will admonish the attorney at that time.

9  However, in order to speed it up, rather than have this witness

15:13  10  go out and then have them come back and pick up, if the

11  predicate can be laid, meaning set with another witness, the

12  attorney says it, I will allow him to go forward at this time.

13        Go on.

14        MR. ARMSTRONG:  Thank you, Judge.

15:14  15  *BY MR. ARMSTRONG:*

16  Q   Government Exhibit Number 202, what is this document?

17  A   A sign-in sheet.

18  Q   For what date?

19  A   June 30, 2016.

15:14  20        MR. ARMSTRONG:  And, Ms. Mortezavi, if you can please

21  pull up page two of this document.

22  *BY MR. ARMSTRONG:*

23  Q   How many patients came to Gulfton on 6/30/2016?

24  A   Forty.

15:14  25  Q   Did Mr. Faithful sometimes receive documents like this?

15:14    1   A    Yes, sir.

2   Q    And would he take them out of the clinic?

3   A    They were attached to his money at the end of the day.

4   Q    All right.  So let's go back to the process.  So far we

15:14    5   have gotten through the patient gives the ID, the DPS check is

6   run, the patient pays, right?

7   A    Yes, sir.

8   Q    And they sign in?

9   A    Yes, sir.

15:15   10   Q    Does the patient have to fill out any paperwork?

11   A    Yes, sir.

12        MR. ARMSTRONG:  Ms. Mortezavi, please pull up

13   Government Exhibit Number 357 at page 13.

14   *BY MR. ARMSTRONG:*

15:15   15   Q    Just flipping from those pages, page 13 to about page 20,

16   are you familiar with these pages?

17   A    Yes, sir.

18   Q    Now, what are these pages generally?

19   A    New patient evaluation forms.

15:15   20   Q    Who is supposed to fill out those pages?

21   A    The patient.

22   Q    What kind of information goes into these pages?

23   A    Their address, phone number, date of birth and health

24   history.

15:16   25   Q    Did you observe patients filling out these pages?

15:16  1    A    Yes.   Some of them couldn't fill it out.

       2    Q    Do some patients get help filling out these pages from

       3    anyone?

       4              MR. WILLIAMS:  Objection.  Leading.

15:16  5              THE COURT:  Overruled.

       6              THE WITNESS:  Yes, sir.

       7    *BY MR. ARMSTRONG:*

       8    Q    Who would help the patients fill out these pages?

       9    A    A facilitator or another patient.

15:16  10   Q    And how would the facilitator help the patient fill out

       11   these pages?

       12   A    He would sit next to them and fill it out.

       13   Q    Where would that happen?

       14   A    In the clinic.

15:16  15   Q    Where in the clinic?

       16              THE COURT:  In the waiting room or what?

       17              THE WITNESS:  In the waiting area.

       18   *BY MR. ARMSTRONG:*

       19   Q    How many patients generally on any given day are in this

15:16  20   waiting room?

       21              THE COURT:  How many patients or how many people?

       22              MR. ARMSTRONG:  Thank you, Judge.

       23   *BY MR. ARMSTRONG:*

       24   Q    How many people?

15:16  25   A    In the waiting area, maybe 20, because it couldn't hold all

15:16  1   of the patients at the same time.  Some would stand outside in

2   the lobby and some against the wall.

3               THE COURT:  Where?  Against --

4               THE WITNESS:  Against the wall inside and outside the

15:17  5   clinic.

6               THE COURT:  In the waiting area?

7               THE WITNESS:  Yes, Your Honor.

8   *BY MR. ARMSTRONG:*

9   Q   Were the patients sitting or standing in the waiting room?

15:17  10              THE COURT:  She said both.  Next.

11  *BY MR. ARMSTRONG:*

12  Q   Were there chairs?

13  A   Yes, sir.

14              THE COURT:  If it filled up, there were about, what,

15:17  15  20 chairs?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  And if they were filled up, some were

18  standing and some were out in the hall, right?

19              THE WITNESS:  Yes, Your Honor.

15:17  20              THE COURT:  Go on.

21  *BY MR. ARMSTRONG:*

22  Q   Was there a TV in there?

23  A   Yes, sir.

24  Q   Was it a quiet place or was it loud?

15:17  25  A   Noisy.

15:17   1   Q   Were there a certain number of people who were allowed in
        2   the waiting room?
        3   A   Yes, sir.
        4   Q   Would there sometimes be a line to get into the waiting
15:17   5   room?
        6   A   Yes, sir.
        7   Q   Who would be in the line to get into the waiting room?
        8   A   The patients.  And sometimes the facilitators would stand
        9   with them.
15:17  10   Q   Where was this line?
       11   A   In the middle of the waiting area and sometimes in the
       12   lobby.
       13   Q   Would there be any security guards in the waiting room?
       14   A   Yes, sir.
15:18  15   Q   How many?
       16   A   One.
       17   Q   Were there other security guards at Gulfton?
       18   A   Yes, sir.
       19   Q   How many?
15:18  20   A   About four.
       21   Q   Where would they be?
       22   A   One at Dr. Craig's door and one in the parking lot and one
       23   in the area -- the area where the staff was.
       24   Q   So about four or five other security guards?
15:18  25   A   Yes, sir.

15:18  1    Q    Were they armed or unarmed?

2    A    Armed.

3    Q    What were they armed with?

4    A    Guns.

15:18  5    Q    What kind of guns?

6    A    I don't know.

7    Q    Pistols or big guns?

8    A    Pistols.

9    Q    Now, in this waiting room, could patients just pass the

15:18  10   time on their phones?

11   A    They weren't allowed to be on their phones.

12   Q    Why not?

13   A    Because Mr. Faithful said so.

14        MR. WILLIAMS:  Objection.  Withdraw it, Judge.

15:19  15        THE COURT:  Okay.  Go on.

16   *BY MR. ARMSTRONG:*

17   Q    Why weren't the patients allowed to be on their phones in

18   the waiting room?

19   A    Because they weren't allowed to use them.  Mr. Faithful

15:19  20   said so.

21   Q    What was Mr. Faithful -- did Mr. Faithful have a rule about

22   patients having phones in the clinic?

23   A    To avoid taking pictures or recording.

24   Q    Did he tell you why he had this rule?

15:19  25   A    You don't question him.

15:19  1  Q   You don't question who?

2  A   Mr. Faithful.

3  Q   Were some patients caught on their phones?

4  A   Yes, sir.

15:19  5  Q   What would happen to those patients?

6  A   They would be asked to leave or if they got -- if they had

7  already seen the triage nurse, then we would have to speak with

8  the facilitator to give them a credit back.

9  Q   So some patients, if they are on the phone, they are thrown

15:20  10  out?

11  A   Yes.

12  Q   Other patients, if they were on the phone and they had a

13  facilitator, what would happen to them?

14  A   We would have speak with the facilitator.

15:20  15  Q   What, if anything, is given to the facilitator if a patient

16  is caught on the phone?

17  A   The card with the signature on it.

18  Q   Would the facilitator get money back or no?

19  A   No.  He only received a credit.

15:20  20  Q   Who would receive the credit?

21  A   The facilitator.

22  Q   And how, if at all, could the facilitator use that credit

23  going forward?

24  A   When he brings another patient, it goes towards the cost of

15:20  25  the visit.

15:20  1  Q   And who decides, if anyone, what is going to happen if the

2  patient gets caught on their phone, for example?

3  A   Mr. Faithful.

4  Q   Explain to the jury how that happens.

15:20  5  A   I would have to call him and explain to him that the

6  patient was caught on the phone and how do we move forward.

7  And he would explain to me what amount they could receive back,

8  if any.

9  Q   Who could receive back?

15:21  10  A   The facilitator.

11  Q   So who would make the call about whether the facilitator

12  would get money back?

13  A   Mr. Faithful.

14  Q   Now, did it sometimes happen where Dr. Craig would see

15:21  15  patients on their phone?

16  A   Yes, sir.

17  Q   What happened in those circumstances?

18  A   She would walk out of the room.

19  Q   What, if anything, would Dr. Craig do to a patient that she

15:21  20  caught on the phone?

21  A   She would tell us that she is not going to see that

22  particular patient, and to call Shane.

23  Q   What, if anything, would she do to that patient's

24  prescription?

15:21  25  A   Sometimes she would cut the prescription if she decided to

15:21    1   see that particular patient.

         2   Q    What does that mean, "cut the prescription"?

         3   A    The number that would be dispensed.

         4   Q    The number of what?

15:22    5   A    Norco, Soma.

         6        THE COURT:  What would she do?  Would she destroy,

         7   tear up the prescription?

         8        THE WITNESS:  No, sir.  No, Your Honor.

         9        THE COURT:  Do you know why?

15:22   10        THE WITNESS:  No.  She would actually cut the

        11   prescription, the number that is dispensed, Your Honor.

        12        THE COURT:  Okay.

        13   *BY MR. ARMSTRONG:*

        14   Q    If, for example, the patient was supposed to get 120 pills

15:22   15   and Dr. Craig caught the patient on the phone, what would

        16   happen to the number of pills the patient was supposed to be

        17   get?

        18   A    It would maybe be cut to 115.

        19   Q    Would Dr. Craig explain to you what would happen to the

15:22   20   patient's prescription?

        21   A    No.  That decision was made solely by Dr. Craig.

        22   Q    Would she tell you that this person's prescription is cut

        23   or not?

        24   A    Yes.

15:22   25   Q    And why did you need to know that information?

15:22  1  A   In case the facilitator came back to the window, because we

2  would have to explain it to them.

3  Q   Did some patients react to having the number of pills they

4  were supposed to receive be cut by Dr. Craig?

15:23  5  A   Sometimes, but, I mean, it wasn't their money so...

6  Q   Would some patients get angry?

7  A   Some would get upset.

8  Q   How would the facilitators react when you told them that

9  the patient's prescription was cut?

15:23  10  A   We have had some threaten us.  Some would hit the window.

11            THE COURT:  What window?

12            THE WITNESS:  The reception window, Your Honor.

13            THE COURT:  Okay.

14            THE WITNESS:  Yell at us, curse at us, threaten us.

15:23  15  *BY MR. ARMSTRONG:*

16  Q   So a patient leaves the waiting room -- let me back up.

17            So a patient is in the waiting room.  Does the

18  patient ever leave the waiting room?

19  A   Yes, sir.

15:23  20  Q   Where in the clinic would the patient go once they leave

21  the waiting room?

22  A   Outside.

23  Q   If the patient was going to be seen, where would they go?

24  A   Into the examining rooms.

15:24  25  Q   Something called triage?

15:24 1   A   Triage.

2   Q   What is triage?

3   A   Triage is where they take the blood pressure, do an

4 evaluation of the patient, do the weight of the patient and

15:24 5 prepare the documents for Dr. Craig.

6   Q   Was there any pressure for the individuals to do triage

7 quickly?

8   A   Yes, sir.

9   Q   What was the pressure to do triage quickly?

15:24 10   A   A patient shouldn't be in triage no more than five minutes.

11   Q   Was that a rule in the clinic?

12   A   Basically, yes, sir.

13   Q   Whose rule was that?

14   A   Mr. Faithful's.

15:24 15   Q   Is Mr. Faithful a doctor?

16   A   No, sir.

17   Q   Is Mr. Faithful a nurse?

18   A   No, sir.

19   Q   Who was deciding how long triage should take or should not

15:24 20 take?

21   A   Mr. Faithful makes the decisions.

22   Q   After triage, who does the patient see?

23   A   The doctor's assistants.

24   Q   After that, who does the patient see?

15:25 25   A   Dr. Craig.

15:25   1   Q   After the patient sees Dr. Craig, what do they receive?

2   A   Go back to the waiting area until she has evaluated the

3   chart and written the prescription.

4   Q   The prescription for what?

15:25   5   A   Norco and Soma.

6   Q   Would she write a prescription for Norco and Soma in one

7   prescription?  Or would she write two prescriptions?

8   A   Two prescriptions.

9   Q   What would one prescription be?

15:25   10   A   Norco.

11   Q   What would the other prescription be?

12   A   Soma, biofreeze and ibuprofen.

13   Q   All these patients received the same two prescriptions?

14   A   Yes, sir.

15:25   15   Q   The same drugs?

16   A   Yes, sir.

17   Q   Who wrote the prescriptions?

18   A   Dr. Craig.

19   Q   Who signed the prescriptions?

15:25   20   A   Dr. Craig.

21   Q   Every single one?

22   A   Yes, sir.

23   Q   Did you sign for her ever?

24   A   No.  I have written them before.

15:25   25   Q   Did anyone else sign for prescriptions for her the whole

15:26    1   time you were there?

2   A   Kara Burgess signed the Soma.

3   Q   In her own name?

4   A   Yes, sir.

15:26    5   Q   So after the patient is signed and filled out, who is it

6   given to?

7   A   To the patient.

8   Q   And then who would the patient sometimes give the

9   prescription to?

15:26   10   A   The facilitator.

11   Q   Did you talk to Mr. Faithful about that?

12   A   He was aware.

13        MR. WILLIAMS:   That's nonresponsive, Judge.   He asked

14   did she talk to him about it.

15:26   15        THE COURT:   Ask it again.

16   *BY MR. ARMSTRONG:*

17   Q   What rule, if any, did Mr. Faithful about whether a patient

18   could give a prescription to a facilitator in the clinic?

19   A   He didn't want them to give it to them in the lobby.

15:26   20   Q   How do you know that?

21   A   Because he said so.

22   Q   What did you do in response to that instruction?

23   A   I followed his instructions.

24   Q   Were you able to stop patients from giving prescriptions to

15:27   25   facilitators?

15:27  1   A    No, sir.

      2   Q    Why not?

      3   A    They would just do it.  There was no way of stopping them.

      4   Q    How often did this happen where a patient would give a

15:27  5   prescription to a facilitator?

      6   A    It depends.  Sometimes twice a day.  It depends.

      7        THE COURT:  Pull in that microphone a little bit,

      8   ma'am.  Go on.

      9   BY MR. ARMSTRONG:

15:27  10  Q    The whole time you worked at Gulfton, did anybody tell you,

     11   you know what, we are not going to take facilitators' business

     12   anymore?

     13   A    No, sir.

     14        MR. WILLIAMS:  Objection, Judge, as to what somebody

15:27  15  else said.  Improper question.

     16        THE COURT:  Overruled.

     17   BY MR. ARMSTRONG:

     18   Q    Did the facilitators give anything to patients?

     19   A    (No response.)

15:27  20  Q    Let me rephrase.  Did you ever see facilitators give

     21   anything to patients?

     22        THE COURT:  What?

     23        MR. ARMSTRONG:  Give anything.

     24        THE COURT:  To a patient?

15:27  25        MR. ARMSTRONG:  Yes, Judge.

15:28  1          THE WITNESS:  Like $20 or bus fare.

2    *BY MR. ARMSTRONG:*

3    Q   Were there any rules in the clinic about whether

4    facilitators could give anything to patients?

15:28  5    A   No, sir.

6    Q   Was there any pressure to have patients come to the clinic?

7          MR. WILLIAMS:  Objection.  Leading.

8          THE COURT:  Overruled.

9          THE WITNESS:  Yes, sir.

15:28  10   *BY MR. ARMSTRONG:*

11   Q   Who put pressure on you to make sure patients come to the

12   clinic?

13   A   Mr. Faithful.

14   Q   How did he pressure you to have patients come to the

15:28  15   clinic?

16   A   We would have to -- not myself, but I would have to

17   instruct the MAs to make phone calls, 120 phone calls for each

18   MA per day.

19   Q   And whose instructions were those?

15:29  20   A   Mr. Faithful's.

21   Q   How many MAs do you have at any given point in the clinic

22   at the time when you were there?

23   A   Four.

24   Q   And how many patients would have the MAs have to call?

15:29  25   A   120 each.

15:29   1   Q   Who told you to do that?

2   A   Mr. Faithful.

3   Q   Did he tell you why?

4   A   He just said that would basically guarantee, because we

15:29   5   can't rely on the number of patients that a facilitator would

6   bring.

7   Q   How would the MAs figure out how to call the patients?

8   A   They would just randomly pull charts from the wall.

9   Q   And they would call how many patients each day?

15:29   10   A   120.

11   Q   When did this process start?

12   A   I don't recall.

13   Q   Did you keep a log of the number of patients you guys would

14   call each day?

15:30   15   A   Yes, sir.

16   Q   Why did you do that?

17   A   Because I would have to show proof to Mr. Faithful at the

18   end of the day.

19       THE COURT:  Proof of what?

15:30   20       THE WITNESS:  That the patients were called.

21   *BY MR. ARMSTRONG:*

22   Q   Ma'am, I showed you Government Exhibit Number 313 already,

23   I believe.  I'm handing you Government Exhibit Number 313.

24   Flip through these pages and tell me if you recognize this,

15:30   25   please.

A    The call list.

Q    Do you recognize Government Exhibit Number 313?

A    Yes, sir.

Q    What is it?

A    It's the call list that MAs would use to call patients.

Q    Are there a bunch of pages in there?

A    Yes, sir.

Q    What is the information in those pages?

A    The patient's name, phone number and the date.

Q    Who put that information on those pages?

A    The MAs.

Q    How often did you do it?

A    Every day.

        MR. ARMSTRONG:  Government Exhibit Number 313 at 94, please, Ms. Mortezavi.

*BY MR. ARMSTRONG:*

Q    Ma'am, what is this document that we are looking at on the screen?

A    Call lists.

Q    For what date?

A    October 14, 2016.

Q    And what are the list of names on the left?

A    The patients.

Q    Were these patients called or not called on this date?

A    They were called.

15:32  1  Q   How do you know that?

2  A   The initials at the top are Erica Hayes, who was an MA, and

3  she would put her notes to the right.

4  Q   We see how many names on this page, page four?

15:33  5  A   Twenty.

6      MR. ARMSTRONG:  Ninety-four.  My apologies.

7  Ms. Mortezavi, go to page 95 please.

8  *BY MR. ARMSTRONG:*

9  Q   How many names on this page?

15:33  10  A   Forty.

11  Q   And what is written in the bottom right-hand corner of this

12  page?

13  A   Two of three.

14  Q   What does that mean?

15:33  15  A   That's the second page of three pages.

16      MR. ARMSTRONG:  Then the last page, page 96, please,

17  Ms. Mortezavi.

18  *BY MR. ARMSTRONG:*

19  Q   What is this page?

15:33  20  A   Call lists.

21  Q   How many patients?

22  A   Sixty.

23  Q   Sixty in total for this date?

24  A   Yes, sir.

15:33  25      MR. ARMSTRONG:  Back to page 94, please,

1    Ms. Mortezavi.

2    *BY MR. ARMSTRONG:*

3    Q    Top of the page, what does that say?

4    A    "Call back.  60 patients called.  One appointment made."

5    Q    What does that say right above that, above the "Gulfton

6    Community Health Center"?

7    A    "Sixty patients called.  One appointment."

8    Q    What does that mean?

9    A    That means one appointment was made out of the 60 calls.

10        MR. ARMSTRONG:  Ms. Mortezavi, let's please go to

11   Government Exhibit Number 313 at 123 and next to that, 124.

12   *BY MR. ARMSTRONG:*

13   Q    Ma'am, what are these two pages?

14   A    Call lists.

15   Q    For what date?

16   A    October 18, 2016.

17   Q    And how many patients were called on October 18, 2016?

18   A    Sixty.

19   Q    Let's see.  Let's break it down.  On page 123, there are

20   about, what, 20 names?

21   A    This goes all the way to 60 right there.  That is 20, 40.

22   Q    So 40 names called on this date from these two pages?

23   A    Yes, sir.

24        MR. ARMSTRONG:  Okay.  So, Ms. Mortezavi, if you will

25   please pull up the last column under "title."

15:35   1   BY MR. ARMSTRONG:

2   Q   The first one says, "not working, left voice mail."  Right?

3   A   Yes, sir.

4   Q   What does that mean?

15:35   5   A   The phone was out of order, no answer, LVM.  She left voice

6   mail on the patient's phone number.

7   Q   We see "not in service"?

8   A   Yes, sir.

9   Q   Then we see "wrong number"?

15:35   10   A   Yes, sir.  And "call back".

11   Q   Not in service?  Not in service?

12   A   Not in service.

13   Q   So where are these numbers coming from again?

14   A   Out of the patients' files.

15:36   15   Q   Was it your impression that the numbers in the patients'

16   files were right numbers or wrong numbers?

17   A   Right numbers.

18       MR. ARMSTRONG:  Ms. Mortezavi, if you can please go to

19   Government Exhibit Number 313 at page 216.

15:36   20   BY MR. ARMSTRONG:

21   Q   Ma'am, I'm not going to flip through all of these pages.

22   What is the date of this document?

23   A   December 14, 2016.

24   Q   Where do you see that?

15:36   25   A   At the top under Erica Hayes's initials.

15:36   1   Q   What is this document again?

2   A   Patient call lists.

3   Q   Who made the calls?

4   A   Erica Hays.

15:36   5   Q   How many calls did Erica Hayes make on 12/14/16?

6   A   One hundred.

7   Q   How do you know that?

8   A   She noted it at the top.

9   Q   How many appointments did she get from making these 100

15:37   10   calls?

11   A   Three.

12   Q   And at whose instruction was she making all of these calls?

13   A   Mr. Faithful's.

14   Q   Generally speaking, were these calls successful or

15:37   15   unsuccessful in actually getting appointments?

16         MR. WILLIAMS:  Objection, Judge.  The fact she didn't

17   make the calls, she wouldn't know.

18         THE COURT:  Overruled.

19   *BY MR. ARMSTRONG:*

15:37   20   Q   Generally speaking, were these calls successful or

21   unsuccessful?

22   A   Unsuccessful.

23   Q   Why was that?

24   A   Because only three appointments were made.

15:37   25         THE COURT:  I can't hear you.

15:37  1        THE WITNESS:  Because only three appointments were

2  made.

3        THE COURT:  Why?  Any idea?  You made some of these

4  calls, right?

15:37  5        THE WITNESS:  No, sir.

6        THE COURT:  Did you make any of the calls?

7        THE WITNESS:  I made a couple of them.

8        THE COURT:  Because one before you said you were

9  making some calls.  In your experience, when you call around

15:37  10  and talk to these folks, you say apparently they don't come in,

11  right?

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  Do you know why, generally, what responses

14  you get or the phone number is no good or what?

15:38  15        THE WITNESS:  Because they didn't have phones.

16        THE COURT:  In other words, a lot of the folks don't

17  have phones?  Those are not really phone numbers?

18        THE WITNESS:  No, sir.

19        THE COURT:  All right.  Go on.

15:38  20  BY MR. ARMSTRONG:

21  Q    Did you report the lack of success to anybody?

22  A    Yes, Your Honor -- yes, sir.

23  Q    And who did you report the lack of success in these calls

24  to?

15:38  25  A    Mr. Faithful.

15:38  1  Q   How did he react?

   2  A   He didn't care.  Just continue doing it.

   3  Q   Continue doing what?

   4  A   Making the calls.

15:38  5  Q   Did he tell staff that anything would happen if they didn't

   6  get more appointments from making these calls?

   7          MR. WILLIAMS:  Objection.  Leading.

   8          THE COURT:  Overruled.

   9          THE WITNESS:  We would get fired.

15:38  10  *BY MR. ARMSTRONG:*

   11  Q   Ma'am, let's talk about the clinic.  Did you do physical

   12  therapy at the clinic?

   13  A   No, sir.

   14  Q   Did you have any physical therapy equipment?

15:39  15  A   Little Sunbeam massage chairs.

   16  Q   We will talk about those a little bit later.  Did you have

   17  any, like, ropes?

   18  A   No, sir.

   19  Q   Did you have any medicine balls?

15:39  20  A   No, sir.

   21  Q   Did you have an x-ray machine?

   22  A   No, sir.

   23  Q   Did you have canes?

   24  A   No, sir.

15:39  25  Q   Crutches?

15:39    1   A   No, sir.

         2   Q   Did you have a bike?

         3   A   No, sir.

         4   Q   Like a stationary bike?

15:39    5   A   No, sir.

         6   Q   Did you guys have an elliptical?

         7   A   No, sir.

         8   Q   Do you know what that is?

         9   A   Yes, sir.

15:39   10   Q   One of those gym machines where you go back and forth?

        11   A   Yes, sir.

        12   Q   Did you guys have treadmills?

        13   A   No, sir.

        14   Q   Did you have weights?

15:39   15   A   No, sir.

        16   Q   Did you have any exercise bands or anything?

        17   A   No, sir.

        18   Q   Did you have any space at all to exercise?

        19   A   No, sir.

15:39   20   Q   Any space at all to do physical therapy?

        21   A   No, sir.

        22   Q   Did you guys have an ultrasound machine?

        23   A   No, sir.

        24   Q   Did you have medical supplies at all?

15:40   25   A   Gloves, alcohol, cotton balls.

15:40   1   Q   Did you guys have massage chairs?

2   A   The portable ones that you connect to a chair.

3           MR. ARMSTRONG:  Okay.  Let's pull up Government

4   Exhibit 361 at page three, please.

15:40   5   *BY MR. ARMSTRONG:*

6   Q   What is the jury looking at?

7   A   The chairs in the secondary waiting room in Gulfton.

8   Q   What kind of chairs?

9   A   The waiting chairs with the attachable massage pads.

15:40  10   Q   So those were your guy's massage chairs?

11   A   Yes, sir.

12   Q   Did you buy them from a medical supplier?

13   A   Amazon.

14   Q   Amazon?

15:40  15   A   Yes, sir.

16   Q   Is Mr. Faithful an Amazon Prime Member?

17           MR. WILLIAMS:  Objection to relevance, Judge.

18           THE COURT:  What was the question?

19           MR. ARMSTRONG:  Was Mr. Faithful an Amazon Prime

15:41  20   Member?

21           THE COURT:  Sustain the objection.

22   *BY MR. ARMSTRONG:*

23   Q   Now, how do you select these chairs over other ones?

24   A   I showed them to Mr. Faithful and he approved them.

15:41  25   Q   How did you decide to pick those as opposed to some other

15:41   1   ones?

2   A   They were replacing the ones they had before.

3   Q   But who actually picked those chairs?

4   A   They had some just like that in the clinic before and I

15:41   5   located the same ones.

6   Q   Were those chairs expensive or cheap?

7   A   I think they were, like, $29 each.

8   Q   So you guys didn't have a bunch of equipment.  We ran

9   through the list, but you did have security cameras?

15:41   10   A   Yes, sir.

11   Q   How many security cameras did you have?

12   A   There was one in --

13   THE COURT:  I think she said three at one time.  Is

14   that about right?

15:42   15   THE WITNESS:  No, Your Honor.

16   THE COURT:  More than that?

17   THE WITNESS:  Yes, sir.

18   THE COURT:  How many?

19   THE WITNESS:  There was one in every room except

15:42   20   Dr. Craig's office and the bathroom.

21   *BY MR. ARMSTRONG:*

22   Q   Were these cameras cheap or expensive, if you know?

23   A   They were expensive.

24   Q   Do you know how much they cost?

15:42   25   A   Approximately 1100.

15:42   1      MR. ARMSTRONG:  Government Exhibit Number 357 at nine,

2   please.

3   *BY MR. ARMSTRONG:*

4   Q   Ma'am, do you recognize this form?

15:42   5   A   Yes, sir.

6   Q   What is this form?

7   A   It's the HIPAA consent form.

8   Q   All right.  Was this form actually in patient files?

9   A   Yes, yes, sir.

15:42   10      MR. ARMSTRONG:  And, Ms. Mortezavi, please zoom out.

11   *BY MR. ARMSTRONG:*

12   Q   There is a bunch of information on this page.  Generally

13   speaking, what is the information on this page?

14   A   Could you make it a little bigger?

15:43   15   Q   Sure.

16   A   Patient's doctor, the city, the phone number, the contact

17   information, the patient's previous physician, their personal

18   information and Social Security number, date of birth and

19   allowing medical records to be requested.

15:43   20   Q   So is this document a release of medical records?

21   A   Yes, sir.

22   Q   How often did you all actually send this document out?

23   A   We didn't.

24   Q   Didn't send it out to get records?

15:43   25   A   No, sir.

15:43   1   Q   So how did you all get medical records from previous

2   doctors about the patient's medical condition?

3   A   We didn't.

4       MR. ARMSTRONG:   Government Exhibit Number 357 at four,

15:43   5   please.

6   *BY MR. ARMSTRONG:*

7   Q   Ma'am, what is this document?

8   A   Insurance information.

9   Q   All right.   Was this page also in patient files?

15:44   10   A   Yes, sir.

11   Q   You see in the middle, insurance information and

12   information for that?

13   A   Yes, sir.

14   Q   Did you guys actually take insurance?

15:44   15   A   No, sir.

16   Q   Do you know why you had this on the form then?

17   A   I don't know.   It was just a part of the package.

18   Q   But you didn't take insurance?

19   A   No, sir.

15:44   20   Q   Whose rule was that?

21   A   Mr. Faithful's.

22   Q   Did you guys do things called urine tests?

23   A   We started doing those, like, in August, I believe.

24   Q   August.   Okay.   How about from when you started in

15:44   25   March 2016?

15:44   1   A   February, March.

2   Q   February, March 2016 all the way through August, did you

3   guys do your own tests then?

4   A   No, sir.

15:45   5   Q   Nobody got urine tested?

6   A   No, sir.

7   Q   In August, you did start urine tests?

8   A   Yes, sir.

9   Q   And did the patients give specimens?

15:45  10   A   Just urine specimens, yes, sir.

11   Q   Were the specimens refrigerated?

12   A   No, sir.

13   Q   Where were the specimens kept?

14   A   In a storage room.

15:45  15   Q   Was the storage room cold or anything?

16   A   No, sir.

17   Q   Just a room in the back?

18   A   Yes, sir.

19   Q   How many specimens would be in this room in the back?

15:45  20   A   There might be 200.

21   Q   How big were these specimens?

22   A   About the size of this cup.

23   Q   And how long would these specimens sit in this back room

24   that is not refrigerated for?

15:45  25   A   Sometimes two weeks.

15:45   1   Q   Did anybody test these specimens?

2   A   After the two weeks, yes.

3   Q   Who tested it?

4   A   Mr. Pouncey.

15:46   5   Q   Did you think, based on your observations, that these tests

6   were real or a joke?

7   A   I didn't know you could hold urine that long.

8   Q   What happened -- were there any results of these tests?

9   A   Yes, sir.

15:46   10   Q   What did you do with the results?

11   A   Put them in a cabinet.

12   Q   How long was Mr. Pouncey testing the specimens for?

13   A   A few months.

14   Q   Did you keep testing the specimens the entire time you were

15:46   15   there?

16   A   No.  I think we stopped, like, in October.

17   Q   Why did you stop in October?

18   A   Because we weren't getting results.

19   Q   After you stopped, did you hire some other company to test

15:47   20   urine for patients?

21   A   No, sir.

22   Q   After October, was urine being tested?

23   A   No, sir.

24   Q   We are at the end of the day in the clinic, not the real

15:47   25   world, is there money coming in?  Let me rephrase.  Is money

*Armstrong   Direct of Loren Phillips*

15:47   1   coming into the clinic, say, it is 4:00?

2   A    If there is a patient that's coming in late, yes, sir.

3   Q    Let me rephrase.  That was a bad question.

4            At the end of the day, where is all the money?

15:47   5   A    In a drawer in the front of a clinic.

6   Q    Is it just like a loose drawer?  Is there a lock on it?

7   A    There are two padlocks.

8   Q    Did you open it up?

9   A    I open it up at the end of the day once the last patient

15:48  10   has been seen.

11            THE COURT:  How does it get in there?  Does it unlock

12   each and every time?  Through a slot or what?

13            THE WITNESS:  Through a slot, Your Honor.

14            THE COURT:  The cash?

15:48  15            THE WITNESS:  Yes, sir.

16   *BY MR. ARMSTRONG:*

17   Q    You drop the cash in the slot.  It is padlocked.  At the

18   end of the day, what do you do with it?

19   A    I unlock it and I do the counting in the back of the room.

15:48  20   Q    What do you mean by that, you unlock and count it in the

21   back room?  What do you take in the back room?

22   A    I take the money inside of a container.  I carry the

23   container to the back room, and I use the money machine to

24   count it.  And I start doing the accounting on it, accounting

15:48  25   sheets.

15:48  1  Q   Is anybody watching you?

2  A   I asked security to come in with me.

3  Q   And would you count the money?

4  A   Yes, sir.

15:48  5  Q   The cash?

6  A   Yes, sir.

7  Q   What was the highest number you can remember for cash on

8  any given day?

9  A   21,000.

15:48  10  Q   The lowest?

11  A   8,000.

12  Q   All cash?

13  A   Yes, sir.

14  Q   What denominations?

15:49  15  A   Usually 20s and 100s.

16  Q   How long would it take you to count up all that money?

17  A   About an hour.

18  Q   At some point, did you get some help doing it?

19  A   Sometimes I would have one of the MAs come and help me.

15:49  20  Q   Did you buy a machine to help you count it?

21  A   Yes, sir.

22       MR. ARMSTRONG:   Government Exhibit Number 361 at six,

23  please.

24  *BY MR. ARMSTRONG:*

15:49  25  Q   Ma'am, what is this?

A    The money-counting machine.

Q    What would you put in that machine?

A    The money collected from the patients.

Q    What would it do for you?

A    Assist me in adding up the denominations.

Q    So you dropped a big stack of cash in the top, what happens to it?

A    It comes out through the bottom and then it reads the number of 20s, number of 100s collected.

Q    Did you buy that machine yourself?

A    With Mr. Faithful's permission.

Q    Do you know how much it cost?

A    I believe it was, like, 350.

THE COURT:  350?

THE WITNESS:  Yes, Your Honor.

BY MR. ARMSTRONG:

Q    Did you get it off Amazon or somewhere else?

MR. WILLIAMS:  Objection.  Relevancy.

THE COURT:  Overruled.

THE WITNESS:  Office Depot.

THE COURT:  On that point, we are going to take a break.  We got back in about 2:15, 2:20.  It is almost five minutes to 4:00, almost.

Let's take a break to 4:10.  See you back, ready to resume, at 4:10.

*Armstrong  Direct of Loren Phillips*

15:51  1    (Court recessed at 3:51 p.m.)

2    (Court resumed at 4:15 p.m.)

3         MR. ARMSTRONG:  Ms. Phillips, we are back on the

4    record, resuming your testimony.

16:15  5              Ms. Mortezavi, please pull up Government Exhibit

6    Number 604 and go to page three, please.

7    BY MR. ARMSTRONG:

8    Q   All right.  Now, what is the document at the top of this

9    page?

16:15 10   A   A facilitator's credit.

11              THE COURT:  You need to speak up, please.

12              THE WITNESS:  Facilitator's credit.

13   BY MR. ARMSTRONG:

14   Q   What is the date of this credit?

16:15 15   A   July 1st, 2016.

16   Q   And that was a date you were not in the country, correct?

17   A   Yes, sir.

18   Q   But was it the regular practice of Gulfton to make

19   appointment cards like this?

16:16 20   A   Yes, sir.

21   Q   How often did you make appointment cards like this when

22   credits were issued?

23   A   All the time.

24   Q   Whose initials are in the right-hand corner?

16:16 25   A   Dr. Craig's.

16:16   1   Q   And how do you know that?

2   A   Those are her initials and she signs off on all the

3   credits.

4   Q   You are familiar with her initials?

16:16   5   A   Yes, sir.

6   Q   Do those appear to be her initials?

7   A   Yes, sir.

8   Q   Who is getting the credit on this document?

9   A   Titus.

16:16   10   Q   Who is Titus?

11   A   A facilitator.

12   Q   Is Titus getting a full or half credit?

13   A   A full exchange.

14   Q   All right.  And if we can look at the notes on the bottom,

16:16   15   I will ask you some questions about it and then we will be

16   done.

17               Who actually wrote the bottom?

18   A   Olivia Caldwell.

19   Q   Who is Olivia?

16:16   20   A   An MA.

21   Q   Where?

22   A   At the clinic.

23           THE COURT:  MA is what again?

24           THE WITNESS:  Medical assistant.

16:17   25           THE COURT:  Is that like a PA?

16:17  1        THE WITNESS:  No, sir.

2        THE COURT:  Or just a medical assistant?

3        THE WITNESS:  Medical assistant.

4        THE COURT:  No advanced training as far as you know?

16:17  5        THE WITNESS:  They are trained but --

6        THE COURT:  Like a PA or nurse practitioner?

7        THE WITNESS:  No, sir.

8        THE COURT:  Neither one.  Okay.  Go ahead.

9   *BY MR. ARMSTRONG:*

16:17  10  Q    So how do you know that Olivia wrote that if you weren't

11  there?

12  A    She was the manager while I was out of the country.

13  Q    Are you familiar with Olivia's handwriting?

14  A    Yes, very much.

16:17  15  Q    Is that Olivia's handwriting?

16  A    Yes, sir.

17  Q    Let's read it.  Please read the first sentence.

18  A    "Patient was irate.  Wouldn't respond to MA."

19  Q    What does that mean?

16:17  20  A    The patient wouldn't respond to the medical assistant who

21  was triaging them.

22  Q    Continue, please.

23  A    "Doc told Meeko he had to go."

24  Q    What does that mean?

16:17  25  A    The doctor told Meeko, who was one of the MAs at the time,

16:17   1   that the patient needed to leave.

2   Q   Was Meeko an MA or a security guard?

3   A   MA.

4   Q   Next entry, please.

16:18   5   A   "Facilitator was given a full exchange per Dr. Craig."

6   Q   What does that mean?

7   A   With Dr. Craig's permission, the facilitator was given a

8   credit.

9   Q   And what, if anything, tells you that Dr. Craig gave her

16:18   10   permission on this document for the credit to the facilitator?

11   A   She signed off on it.

12   Q   Where?

13   A   At the bottom right.

14   Q   Of what?

16:18   15   A   The card, the appointment card.

16   Q   Okay.  What does the last line of this document say?

17   A   "Doc told Toya to get him out of here and he was escorted

18   off of the property."

19   Q   Who is "he"?

16:18   20   A   The patient was escorted off the property by security.

21       MR. ARMSTRONG:  Thank you, ma'am.  You can take that

22   down.

23   *BY MR. ARMSTRONG:*

24   Q   Let's talk about the process of counting the money.  Do you

16:18   25   make a document to record the money in and the money going out?

16:18    1    A    Yes, sir.

2    Q    What is that document called?

3    A    An expense sheet.

4    Q    What kind of information is on the expense sheet?

16:19    5    A    The expenses for the day and the credits for that day.

6    Q    How often did you make an expense sheet?

7    A    Every day.

8    Q    And did the expense sheet reflect information from that

9    day's expenses and money coming in?

16:19    10    A    Yes, sir.

11    Q    And you made it yourself?

12    A    Yes, sir.

13    Q    Did that expense sheet detail how money was divided?

14    A    Yes, sir.

16:19    15    Q    And how was money, in fact, divided?

16    A    It was divided between Dr. Craig and Mr. Faithful.

17    Q    So after you divide the money, how do you actually give the

18    money to Dr. Craig and Mr. Faithful?

19    A    I put them in yellow envelopes and I attach a copy of the

16:19    20    expense sheet.

21    Q    What actually goes in the envelope?

22    A    Cash.

23    Q    How much cash?

24    A    It depends on how much was collected that day.

16:19    25    Q    So if you get, say, for example, $10,000, how do you divide

16:19   1   it up between Dr. Craig and Mr. Faithful?

2   A   I take 1,000 out for Mr. Faithful's company and then I

3   split the 9,000 between the two of them.

4   Q   And how would you physically split the money?

16:20   5   A   I would divide the cash, 4,500 for Mr. Faithful, 4,500 for

6   Dr. Craig, and then put them in separate envelopes and then

7   mark the envelopes and attach a copy of the expense sheet.

8   Q   So you would make copies of the expense sheets?

9   A   Yes, sir.

16:20   10   Q   Who kept the original?

11   A   I kept the original.

12   Q   Okay.  And you made copies at the office or you made it at

13   your home?  How did you make the copies?

14   A   I made the copies in the office.

16:20   15   Q   When you gave the envelope with the cash, what document did

16   you give to Mr. Faithful?

17   A   The cash and the envelope and a copy of the expense sheet.

18   Q   And when you gave the cash to Dr. Craig, what document did

19   you give to Dr. Craig, if any, with the cash?

16:20   20   A   The cash, the envelope and the expense sheet.

21   Q   Did you write anything on the envelope?

22   A   The amount, the date and their names.

23   Q   And how often did you repeat this process?

24   A   Every day.

16:21   25   Q   You actually personally gave the envelopes to Mr. Faithful?

16:21    1    A    Yes, sir.

2    Q    Did you personally give the envelopes to Dr. Craig?

3    A    Yes, sir.

4    Q    Was there a safe in Gulfton, as well?

16:21    5    A    Yes, sir.

6       MR. ARMSTRONG:  Government Exhibit Number 361, page

7    eight.

8    BY MR. ARMSTRONG:

9    Q    What is that document?

16:21    10    A    That's the safe that's in a closet in Dr. Craig's office.

11    Q    What went inside that safe?

12    A    If Mr. Faithful was out of the country and I didn't want to

13    take the money with me and I couldn't get to the bank in time,

14    it would go in that safe.

16:21    15       MR. ARMSTRONG:  Page nine, please.

16    BY MR. ARMSTRONG:

17    Q    Is that the inside of the safe?

18    A    Yes, sir.

19    Q    Would you ever give Dr. Craig's money to Mr. Faithful?

16:22    20    A    I had only done it maybe once or twice.

21    Q    Would you ever give Mr. Faithful's money to anybody?

22    A    To Dr. Craig.

23    Q    Would you ever take copies of these expense reports home?

24    A    Yes, sir.

16:22    25    Q    Why would you do that?

16:22  1   A   Because I was instructed to hold on to them.

2   Q   Instructed by whom?

3   A   Mr. Faithful and Dr. Craig.

4   Q   What instructions did you receive?

16:22  5   A   Hold on to them for a week and then shred them.

6   Q   Shred what?

7   A   Shred the expense sheet.

8   Q   Did you shred all the expense sheets?

9   A   No, sir.

16:23  10  Q   How come?

11  A   I didn't feel comfortable.

12  Q   With what?

13  A   Shredding them because I created them.

14  Q   So did you keep some of them yourself?

16:23  15  A   Yes, sir.

16  Q   Did you keep some of these expense sheets over the time you

17  worked at Gulfton?

18  A   Yes, sir.

19  Q   And did you provide expense sheets to DEA agents in this

16:23  20  case?

21  A   Yes, sir.

22  Q   Did you provide them hard copies of the expense sheets?

23  A   Hard copies.  And I scanned them at my house.

24      MR. ARMSTRONG:  Your Honor, this is for demonstrative

16:23  25  purposes only, for identification, Government Exhibit Number --

16:23   1    THE COURT:  It's for demonstrative purposes only,

2    correct?

3    MR. ARMSTRONG:  Yes.

4    THE COURT:  What have you got there?

16:23   5  *BY MR. ARMSTRONG:*

6  Q    Ma'am, do you recognize this document -- this bag?

7  A    Yes.  It's a bag that I purchased from the 99-cent store.

8  Q    Please open it up for us, please.

9  A    Okay.

16:24   10  Q    Are there documents inside that bag?

11  A    Yes, sir.

12  Q    And is there a rubber band around the documents?

13  A    Yes, sir.

14  Q    And can you take the rubber band off, please?  Are you

16:24   15  familiar with those documents inside that bag?

16  A    Yes, sir.

17  Q    Flip through and tell the jury what those documents are.

18  A    The daily accounting expense sheets.

19  Q    Are those documents you kept in your house or somewhere

16:24   20  else?

21  A    I kept them at home in my book bag.

22  Q    And who did you give those documents to?

23  A    The agents.

24  Q    Did you give them that bag or did you give them to them in

16:24   25  some other way?

16:24  1   A   I gave them to them on the zip flash drive, and I folded

2   them up and put them inside this bag.

3   Q   You gave them two copies?  You gave them hard copies and

4   electronic copies?

16:25  5   A   Yes, sir.

6           MR. WILLIAMS:  Your Honor, may I view those particular

7   documents?

8           THE COURT:  Sir?

9           MR. WILLIAMS:  May I view those particular documents?

16:25  10          THE COURT:  Sure.  If you want to take a look at them.

11          MR. LEWIS:  Your Honor, may I accompany him?

12          MR. ARMSTRONG:  Out of our time?

13          THE COURT:  No.  I stopped the clock.

14          MR. ARMSTRONG:  They are the originals?

16:25  15          THE WITNESS:  Yes, sir.

16          MR. WILLIAMS:  I will look at them.  Hard copies or

17   originals?

18          THE WITNESS:  These are the originals.

19   *BY MR. ARMSTRONG:*

16:25  20   Q   Are there other documents stapled to these hard copies as

21   well?

22   A   Receipts, the credits, the patient credits.

23   Q   Generally speaking, how many expense sheets?  You don't

24   know?  So did you make a copy of the expense sheets that are in

16:26  25   this hard copy blue bag?

16:26   1   A   I scanned those at home.

2   Q   What did you scan?

3   A   The expense sheets and the cards.

4   Q   Who did you give the scanned copies to?

16:26   5   A   The agents.

6   Q   And how did you give them the scanned copies?

7   A   In hand on the flash drive.

8   Q   And you also gave them these hard copies?

9   A   Yes, sir.

16:26   10       MR. WILLIAMS:  Judge, is it possible I can view them

11   while he is cross-examining?

12       MR. ARMSTRONG:  May we approach?

13       THE COURT:  No.  Keep going.  At this time the request

14   is denied.  When it comes your time, if you need time to look

16:27   15   at it, fine.  I suggest you keep moving.

16       MR. ARMSTRONG:  Thank you, Judge.

17           All right.  Government Exhibit Number 603 at

18   four, please.

19   *BY MR. ARMSTRONG:*

16:27   20   Q   Ma'am, what is this document?

21       MR. ARMSTRONG:  Judge, hit the lights, please.

22       THE WITNESS:  That's the expense report.

23   *BY MR. ARMSTRONG:*

24   Q   All right.  Expense report for what organization?

16:27   25   A   Gulfton Community clinic.

16:27  1  Q   What is the title at the top of this expense report?

2  A   It says "expense report" and it says company name, but I

3  couldn't put the company name per Mr. Faithful's request.

4  Q   So you just had a blank expense report?

16:27  5  A   Yes, sir.

6  Q   All right.  What is the date of this expense report?

7  A   August 2nd, 2016.

8  Q   And how many patients came to Gulfton on this date?

9  A   Thirty-one.

16:28  10  Q   And how much cash is taken in on this date?

11  A   9,920.

12  Q   Will you take my word, that is about 320 for each paint?

13  A   You would have to divide the 31 into 91 and it tells you.

14  Q   I will represent to you that that is $320 per patient.

16:28  15  Does that sound right to you?

16  A   Yes, sir.

17  Q   And that 9,920, what does that number represent?

18  A   Where is that, sir?

19  Q   In the top right.

16:28  20  A   That is the amount that was collected.  The total.

21  Q   The total what?

22  A   Cash that was collected at the end of the day.

23         MR. ARMSTRONG:  All right.  And then let's look

24  through those line items below.  Starting from the top, the

16:28  25  date, Ms. Mortezavi, lower.

*Armstrong   Direct of Loren Phillips*

1   BY MR. ARMSTRONG:

2   Q    What is that first entry?

3   A    Francisco.

4   Q    Minus what?

16:28  5   A    He owed Shane $200.

6   Q    What does it say underneath that?

7   A    No.  I'm sorry.  Francisco was paid $200.

8   Q    Is that money that is coming in or money going out of the

9   total?

16:29  10   A    Going out.

11   Q    All right.  What is the line underneath that?

12   A    Tywoo, the facilitator, patient number 14.

13   Q    So the same Tywoo we saw all over the logs?

14   A    Yes, sir.

16:29  15   Q    And is that money going to Tywoo or coming from Tywoo?

16   A    Going out.

17   Q    Is Tywoo getting a credit?

18   A    He used his credit that day.

19   Q    How much was Tywoo's credit?

16:29  20   A    320.

21   Q    Okay.  And what is the number underneath?

22   A    Number 36, Wilbert.

23   Q    What does that mean?

24   A    He is a facilitator.  He used his credit that day.

16:29  25   Q    Is that cash that you otherwise would get except for the

16:29  1  facilitator using the credit?

2  A   Yes, sir.

3  Q   And what is the total number of expenses?

4  A   1,160.

16:30  5      MR. ARMSTRONG:  Ms. Mortezavi, please zoom out.

6  *BY MR. ARMSTRONG:*

7  Q   So, did you subtract any number from any other number to

8  get a total?

9  A   I subtracted the 1,160 from 9,920.

16:30  10  Q   What is the sum?

11  A   Could you make it larger, please?  8,760.

12  Q   And how is that money divided?

13  A   Into two.

14  Q   Who got one half?  Who got the other half?

16:30  15  A   Dr. Craig got one half and Mr. Faithful got the other half.

16  Q   How much did each one of those people get?

17  A   4,380.

18      MR. ARMSTRONG:  Would you zoom out, please,

19  Ms. Mortezavi.

16:30  20  *BY MR. ARMSTRONG:*

21  Q   You see in the bottom right-hand corner there is an

22  appointment card?

23  A   Yes, sir.

24  Q   Who is the appointment card for?

16:30  25  A   Tywoo.

16:30    1    Q   What does that card represent?

2    A   That's a credit that was given to a facilitator on the --

3    if you can make it larger, please -- the day before.

4    Q   That same Tywoo guy?

16:31    5    A   Yes, sir.

6    Q   That same facilitator?

7    A   Yes, sir.

8    Q   And what does that card represent?

9    A   A patient had to be exchanged.

16:31    10    Q   Was money coming in from Tywoo or was money going to Tywoo?

11    A   Money came in from him earlier on another expense sheet,

12    but for this date, it was going out.

13    Q   So Tywoo was using his credit?

14    A   He used his credit.

16:31    15       MR. ARMSTRONG:  Government Exhibit Number 603 at

16    eight, please.

17    *BY MR. ARMSTRONG:*

18    Q   Ma'am, what is this document?

19    A   It's an expense sheet for the clinic.

16:31    20    Q   Which date?

21    A   November 7, 2016.

22    Q   How many patients came into the clinic on this date?

23    A   Fifty-six.

24    Q   All right.  And how much cash came into the clinic on this

16:31    25    date?

16:31  1   A   17,920.

2   Q   I will represent to you that that math is about $320 for

3   each patient.  Does that sound right?

4   A   Yes, sir.

16:32  5   Q   17,920, is that -- what kind of money is that?

6   A   Cash.

7   Q   How is it divided?

8   A   Once expenses are taken out, it is divided by two.

9   Q   Are the expenses, the one, two, three, four, five --

16:32  10   A   Yes, sir.

11   Q   Four lines --

12   A   The fifth line is the total expense.

13   Q   The total expenses add up to what?

14   A   1,260.

16:32  15   Q   What is the difference between the expenses and the money

16   taken in?

17   A   $16,659.47.

18   Q   Was that money divided?

19   A   Yes, sir.

16:32  20   Q   How was it divided?

21   A   By two.

22   Q   Who got each half?

23   A   Dr. Craig got one half and Mr. Faithful got the other half.

24   Q   All right.  And so on this date, how much money did

16:32  25   Dr. Craig get?

16:32    1    A    Can you make it larger?  $8,320.73.

         2    Q    On this date, how much did Mr. Faithful get on this date?

         3    A    $8,320.73.

         4         MR. ARMSTRONG:  Government Exhibit 603 at 30, please.

16:33    5    BY MR. ARMSTRONG:

         6    Q    How was that money paid?

         7    A    In cash.

         8    Q    Ma'am, what is this document?

         9    A    It's an expense report for the clinic.

16:33   10    Q    What is the date?

        11    A    December 1st, 2016.

        12    Q    How many patients were seen?

        13    A    Forty-six.

        14    Q    How much money came in?

16:33   15    A    15,640.

        16    Q    How was the money divided?

        17    A    By two.

        18    Q    Who got one half?

        19    A    Dr. Craig got one half and Mr. Faithful received the other

16:33   20    half.

        21    Q    How much did each one of them get?

        22    A    $7,215.

        23    Q    I want to focus on the text in between the two boxes next

        24    to items.  Can you please read that for the jury?

16:34   25    A    "Patient number 22 was replaced by patient number 32 for

16:34   1   talking on his phone in the exam room."

2           THE COURT:  Speak up.

3           THE WITNESS:  "Patient number 22 was replaced by

4   patient number 32 for talking on his phone in examining room.

16:34   5   Patient refused to get off his phone."

6           Could you make it larger?

7           MR. ARMSTRONG:  That's as big as it goes.

8   Unfortunately.  I'm sorry.

9           THE WITNESS:  And then it has the date at the end of

16:34  10   it.

11           MR. ARMSTRONG:  Mr. Mortezavi, can we please pull up

12   Government Exhibit Number 603 at 30, next to Government Exhibit

13   Number 603 at 31.

14           Ms. Mortezavi, please rotate page 31 of

16:35  15   Government Exhibit Number 603.  Please zoom in on the text of

16   page 331.

17   BY MR. ARMSTRONG:

18   Q   Ma'am, what is that document?

19   A   That is the credit for patient number 32.

16:35  20   Q   On what date?

21   A   11/28/2016.

22   Q   Who did the credit go to?

23   A   I don't see the name.

24   Q   Did the credit go to the patient or somebody else?

16:35  25   A   It went to the facilitator.

16:35  1   Q   Whose initials are in the top right-hand corner of the

2   appointment card?

3   A   Dr. Craig's.

4   Q   How do you know that?

16:35  5   A   She always signed.  We are not allowed to sign them.

6   Q   Always signs what?

7   A   The credit cards.

8   Q   Credit cards, not meaning in the traditional sense?

9   A   The credit to the patient.  Or to the facilitator, I should

16:36  10  say.

11          MR. ARMSTRONG:  Government Exhibit Number 603 at 51,

12  please.  Actually, we can move past this.  Government Exhibit

13  Number 603 at 100.  And if we can put this next to page

14  Government Exhibit Number 603 at 101, please.

16:36  15  *BY MR. ARMSTRONG:*

16  Q   If we can please focus on the one on the left, please,

17  first, Government Exhibit 603 at 100.  How many patients came

18  to the clinic on this date?

19  A   Forty-nine.

16:36  20  Q   What date is that?

21  A   September 29, 2016.

22  Q   How much money came into the clinic?

23  A   15,680.

24  Q   How do you know that?

16:36  25  A   Because of the number up at the top.

16:36    1    Q    Is that -- what kind of money is that?

         2    A    Cash.

         3    Q    How is that cash money divided?

         4    A    Once expenses are subtracted, it is divided by two.

16:37    5    Q    Who got one half?

         6    A    Mr. Faithful received one half and Dr. Craig received the

         7    other.

         8    Q    How much did each one receive?

         9    A    7,180.

16:37   10    Q    How did they receive it?

        11    A    In cash.

        12    Q    Looking at the document on the right -- before we get

        13    there, can you read the second line of Government Exhibit

        14    Number 603 at page 100?

16:37   15    A    "Patient replacement number 21 for patient number 47."

        16    Q    What does that mean?

        17    A    The patient had to be replaced.  It's not noted why, but

        18    the patient belonged to a facilitator, so it had to be noted

        19    that the facilitator didn't receive their cash back but they

16:37   20    received a credit.

        21    Q    And what is the document at page 101 of 603?

        22    A    That's the credit.

        23    Q    Which facilitator was it?

        24    A    Keke.

16:38   25    Q    What did Keke receive back on 9/29/2016?

16:38   1   A   A card.

2   Q   What does the card give Keke?

3   A   It gives her credit for her patient.

4   Q   Who is Keke?

16:38   5   A   A facilitator.

6   Q   Did someone have to sign off on Keke getting this money

7   back?

8   A   Dr. Craig.

9   Q   And did she?

16:38   10   A   Yes, sir.

11   Q   How do you know that?

12   A   Her initials are at the top.

13       MR. ARMSTRONG:   Government Exhibit Number 201 at one,

14   please.

16:38   15   *BY MR. ARMSTRONG:*

16   Q   Ma'am, what is this document?

17   A   It's an expense report.

18   Q   For what date?

19   A   June 28, 2016.

16:38   20   Q   How much money came into the clinic on this date?

21   A   8,840.

22   Q   What kind of money is that?

23   A   Cash.

24   Q   How is it divided?

16:39   25   A   By two.

16:39   1   Q   Who got one half?

2   A   Mr. Faithful received one half and Dr. Craig received the

3   other.

4   Q   How much did Mr. Faithful receive?

16:39   5   A   He received 3,000 at the top and then at the bottom, they

6   each received 2,800.20.

7   Q   Each being who?

8   A   Mr. Faithful and Dr. Craig.

9       MR. ARMSTRONG:  All right.  And if we can please go to

16:39   10  page two of this exhibit, Ms. Mortezavi, and if we can please

11  go --

12  *BY MR. ARMSTRONG:*

13  Q   What is this document?

14  A   Sign-in sheet.

16:39   15  Q   For what date?

16  A   June 28, 2016.

17      MR. ARMSTRONG:  Ms. Mortezavi, if we can please pull

18  up page two next to page three of Government Exhibit

19  Number 201.

16:39   20  *BY MR. ARMSTRONG:*

21  Q   How many patients came to the clinic on this date?

22  A   Thirty-three.

23      MR. ARMSTRONG:  And, Ms. Mortezavi, if we can please

24  have page two of Government Exhibit Number 201 next to page --

16:40   25  I'm sorry.  Ms. Mortezavi, zooming out, Government Exhibit

Number 201.   Please focus on page two.

Ms. Mortezavi, please pull up the middle part of the page, please, and go from about number eight to about number 16.

*BY MR. ARMSTRONG:*

Q   What is that entry on the right?

A   The patient was on the telephone, so Tywoo received a credit of 130.

Q   Whose patient was on the phone?

A   Tywoo's.

Q   We have talked about this already.   How did you divide the cash?   Did you put it in anything?

A   I put it in a yellow envelope with their names, the amount, the date.   I handed it to Dr. Craig and Mr. Faithful, if he was in town.

MR. ARMSTRONG:   If he can please look at Government Exhibit Number Exhibit 2.

*BY MR. ARMSTRONG:*

Q   I'm handing you six documents.   Do you recognize these documents?

A   Yes, sir.

Q   Let's focus on Government Exhibit 2 on this first envelope. What name is written on the envelope?

A   Dr. Craig as doc.

Q   Who wrote "doc" on this envelope?

16:42   1   A   I did.

2   Q   What went inside this envelope?

3   A   Cash.

4   Q   Cash for what?

16:42   5   A   For the patients that were seen in the clinic that day.

6   Q   What was the date of this envelope?

7   A   November 21, 2016.

8   Q   How much cash did Dr. Craig get on this date?

9   A   $7,234.94.

16:42   10   Q   Where did you actually write the date and the amount on the

11   envelope?

12   A   On the inside of the envelope.

13   Q   And who did you give the envelope to?

14   A   Dr. Craig.

16:42   15   Q   How often did you repeat this process?

16   A   Every day.

17   Q   So how much money -- I may have asked you this.  How much

18   money did Dr. Craig get on 11/21/2016?

19   A   $7,234.94.

16:42   20   Q   Is that written in the top right-hand corner of Exhibit

21   Number 2?

22   A   Yes, sir.

23   Q   Let's do one more.  Ma'am, whose name is written on this?

24   A   Doc.

16:43   25   Q   And how do you know that?

16:43   1   A   Because I wrote it.

2   Q   What went inside this envelope, if anything?

3   A   Cash.

4   Q   Cash from what?

16:43   5   A   From the patients' visits that day.

6   Q   How much cash went into this envelope?

7   A   $6,650.99.

8   Q   For what date?

9   A   October 27, 2016.

16:43   10   Q   And how do you know that?

11   A   Because I put it in there.

12   Q   Where?

13   A   Inside the envelope.

14   Q   I'm sorry.  Where did you put that information --

16:43   15       THE COURT:  Slow down, please.

16       THE WITNESS:  On the outside -- I'm sorry --on the

17   inside of the envelope.

18   *BY MR. ARMSTRONG:*

19   Q   On the top?

16:43   20   A   Yes, sir.

21   Q   So you wrote the date?

22   A   Yes, sir.

23   Q   And you wrote the amount?

24   A   The amount.

16:43   25   Q   And what went inside?

16:43  1   A   Cash.

       2   Q   Who did you give this envelope to?

       3   A   Dr. Craig.

       4   Q   Are there other envelopes?

16:43  5   A   The same.

       6   Q   They reflect the same procedure?

       7   A   Yes, sir.

       8       MR. ARMSTRONG:  Government Exhibit Number 207.

       9   BY MR. ARMSTRONG:

16:44  10  Q   Did Mr. Faithful ever carry his money out of the clinic?

       11  A   Yes, sir.

       12  Q   How did he carry it out of the clinic?

       13  A   On his person or in a bag.

       14  Q   I'm handing you what has been marked as Government Exhibit

16:44  15  Number 207.  Do you recognize this?

       16  A   No, sir.

       17  Q   You don't recognize this bag?

       18  A   No.  He had a different bag.

       19      MR. ARMSTRONG:  Okay.  Government Exhibit Number 204.

16:44  20  BY MR. ARMSTRONG:

       21  Q   Now I'm handing you Government Exhibit Number 204, five

       22  envelopes.  Do you recognize these envelopes?

       23  A   Yes, sir.

       24  Q   And how do you recognize these envelopes?

16:45  25  A   Because they are envelopes that I prepared for Mr. Faithful

16:45  1    and Dr. Craig.

2    Q    What went inside these envelopes, if anything?

3    A    Cash.

4    Q    Cash for what?

16:45  5    A    Collected for the patients for that day.

6    Q    Whose name is on this envelope?

7    A    Shane.

8    Q    And who wrote the name "Shane" on this envelope?

9    A    I did.

16:45  10    Q    What went inside this specific envelope?

11    A    Cash.

12    Q    How much cash?

13    A    8,329 -- $8,329.73.

14    Q    For what date?

16:46  15    A    November 7, 2016.

16    Q    And how are you able to recall those figures?

17    A    Because I wrote them.

18    Q    Where did you write them?

19    A    On the inside of the envelope.

16:46  20    Q    You would repeat this process how often?

21    A    Every day.

22    Q    Whose name is on this envelope?

23    A    Dr. Craig.

24    Q    What went inside it?

16:46  25    A    Cash.

16:46   1   Q   Cash from what?

2   A   That was collected from the clinic.

3       MR. ARMSTRONG:  Government Exhibit Number 603 at 33,

4   please.  This is the last exhibit.  If we could please have the

16:46   5   lights off, please.

6   *BY MR. ARMSTRONG:*

7   Q   Ma'am, do you recognize this document?

8   A   Yes, I do.

9   Q   What is this document?

16:47   10   A   It's an expense report.

11   Q   From what day?

12   A   November 22, 2016.

13   Q   How many patients came to Gulfton on this day?

14       THE COURT:  Slow down, please.

16:47   15       THE WITNESS:  Fifty-nine.

16   *BY MR. ARMSTRONG:*

17   Q   And how much money was taken in on November 22, 2016?

18   A   20,060.

19   Q   How do you know that?

16:47   20   A   Because I wrote it.

21   Q   Will you accept my word that is about $340 for each

22   patient?

23   A   Yes, sir.

24   Q   340 times 59, I will represent to you is $2,060 (sic).

16:47   25   Does that sound about right to you?

16:47 1   A   Yes, sir.

2   Q   Was this money divided?

3   A   After the expenses are taken out.

4   Q   And where are the expenses on this sheet?

16:47 5   A   The total expenses?

6   Q   How much are the total expenses?

7   A   $2,123.45.

8   Q   What is the money less expenses?

9   A   $17,936.55.

16:48 10  Q   How is that money divided?

11  A   By two.

12  Q   Who got one half?

13  A   Dr. Craig received one half.  Mr. Faithful received the

14  other.

16:48 15  Q   How did they receive this money?

16  A   In cash.

17  Q   This is very particular.  It says $8,968.27.  Did you

18  actually put the cents in the bag?

19  A   Yes, sir.

16:48 20  Q   Did Dr. Craig ever react when you gave her cents in a bag

21  like this?

22  A   She laughed.

23  Q   That was funny?

24  A   She thought it was funny.

16:48 25          MR. ARMSTRONG:  No further questions.

16:48  1       THE COURT: Okay. Pass the witness. Thank you.

2              **CROSS-EXAMINATION**

3  *BY MR. WILLIAMS:*

4  Q  Ms. Phillips, we have met before; have we not?

16:49  5  A  I don't recall, sir.

6  Q  You don't recall me asking you questions last Friday

7  sitting in that witness chair?

8  A  Yes, sir.

9  Q  We met last Friday; did we not?

16:49  10  A  You asked me the same question last week.

11  Q  So last week you hadn't met me, okay, but Friday, you did

12  meet me; is that correct?

13  A  Yes, sir.

14  Q  All right. Now, you started working at this clinic

16:49  15  approximately February, March of 2016; is that correct?

16  A  Yes, sir.

17  Q  And you worked there for some 10 months; is that correct?

18  A  Yes, sir.

19  Q  And while you were there, you had extensive interactions

16:49  20  with what you call facilitators. They are also known as

21  runners. You referred to them as drug dealers, didn't you?

22  A  Yes, sir.

23  Q  Okay. And you took money from these particular people; did

24  you not?

16:50  25  A  I accepted the money from the patients.

16:50 1   Q   And there was a rule at the clinic that you weren't

2   supposed to accept money from these particular facilitators; is

3   that correct?

4   A   Would you rephrase that question?

16:50 5   Q   You took money from these facilitators, and one of the

6   rules from the clinic was you are not to take money from the

7   facilitators?

8   A   No, I did not, sir.

9   Q   So you never took money from a facilitator at all?

16:50 10   A   I accepted money from patients.

11   Q   Okay.  So you only accepted from patients only?

12   A   Yes, sir.

13   Q   So if you only accepted money from patients, why would you

14   give the credit to the facilitator?

16:50 15   A   Because I was instructed to do so, sir.

16   Q   Okay.  So you were instructed by whom?

17   A   Mr. Faithful.

18   Q   Okay.  So now, and you did this for all the particular time

19   you were there; is that correct?

16:51 20   A   Yes, sir.

21   Q   Okay.  And then in December, you had a come-to-Jesus

22   meeting with yourself, and you decided you wanted to call DEA

23   yourself; is that correct?

24   A   No, sir.

16:51 25   Q   But you did call DEA in December; is that correct?

16:51   1   A   I didn't have a come-to-Jesus meeting, no, sir.

2   Q   That's not my question.  You did call DEA in December of

3   2016?

4   A   Yes, I did, sir.

16:51   5   Q   And you lied as to who you were when you talked to DEA,

6   didn't you?

7   A   I asked a question on behalf of a friend because I was

8   afraid, sir.

9   Q   Okay.  All right.  So you told them that you were calling

16:51   10   on behalf of a friend; is that correct?

11   A   Yes, sir.

12   Q   That was a lie, wasn't it?  Because you weren't asking on

13   behalf of a friend, you were asking on your own behalf; were

14   you not?

16:51   15   A   Yes, sir.

16   Q   Okay.  Now, you allowed the conduct to go on for 10 months

17   before you decided to do anything about it; is that correct?

18   A   No, sir.

19   Q   So what did you do in March of 2016 about what was going on

16:52   20   in this clinic?

21   A   I worked at the clinic.

22   Q   And you worked in the clinic April, May, June, July,

23   August, September, October, November and December before you

24   decided you wanted to do something and call DEA; is that

16:52   25   correct?

16:52   1   A   I contacted DEA in December, yes, sir.

2   Q   And that was some 10 months after you had began your

3   employment?

4   A   Yes, sir.

16:52   5   Q   Okay.  Now, when you talked to somebody on the phone, you

6   eventually found out that it was Special Agent Mills; is that

7   correct?

8   A   Yes, sir.

9   Q   After you spoke to him that particular day, when did you

16:52   10   contact him again by phone or by text?

11   A   I believe it was in January.

12   Q   Okay.  All right.  So in January, you began texting with

13   him; did you not?

14   A   I believe so.

16:53   15   Q   Okay.  All right.  And you were given the cell phone number

16   of Mr. Gainer and Mr. Mills; is that correct?

17   A   I don't recall what date it was.

18   Q   Okay.  But my question was:  You were given their cell

19   phone numbers; were you not?

16:53   20   A   Yes, sir.

21   Q   And y'all would often contact each other by text?

22   A   Yes, sir.

23   Q   But you never had -- you had your first meeting with them

24   in February of 2017; is that correct?

16:53   25   A   I don't recall the date, sir.

16:53  1  Q   Okay.  Once you met with them in February, it was decided

2  at some point that you could potentially be a paid informant

3  for DEA; is that correct?

4  A   No, sir.

16:54  5  Q   Okay.  Who inquired about you becoming a paid informant?

6  Was it you or was it somebody else?

7  A   It wasn't an inquiry, sir.

8  Q   How did it come up for you to get paid for providing

9  information to the government?

16:54  10  A   That was after a couple meetings, sir.

11  Q   In those particular meetings, you had conversations; did

12  you not?

13  A   I'm not understanding the question.

14  Q   My question to you is:  At some point you decided to become

16:54  15  a paid informant for DEA?

16  A   After a few meetings, yes, I did.

17  Q   And during those particular meetings, somebody discussed

18  that; did they not?  You discussed it with somebody?

19  A   They informed me.

16:54  20  Q   They informed you?  So you didn't inquire as to if you

21  could get paid for providing information, did you?

22  A   No, sir.

23  Q   That came from the government; did it not?

24  A   I had information, yes, sir.

16:54  25  Q   Okay.  And the information came from these particular

16:54  1   gentlemen sitting here; did it not?

2   A   I'm not understanding the question.

3   Q   My question is simple.  These people informed you that you

4   could get paid for being an informant; did they not?

16:55  5   A   After a couple meetings, sir.

6   Q   That is simply my question.  And after a couple meetings,

7   you decided this is something that you wanted to do; is that

8   correct?

9   A   I decided that -- could you express that again, please?

16:55  10  Q   It is real simple.  It is very simple.  At some point after

11  speaking to these particular gentlemen, you decided that you

12  could sign up to get paid for being an informant for DEA?

13  A   Yes, sir.

14  Q   Okay.  Now, and you went in on March 1st?

16:55  15  A   Yes, sir.

16  Q   And you signed an agreement; did you not?

17  A   I believe that was the date.

18          MR. WILLIAMS:  Okay.  Could you pull up Exhibit 602?

19  Would you scroll down, please?  That particular document there.

16:56  20  Okay?

21  *BY MR. WILLIAMS:*

22  Q   Now, is that your signature on this document?

23  A   Yes, sir.

24  Q   Okay.  And what date is that signature that you signed it?

16:56  25  A   March 1st.

16:56   1   Q   And there is another signature below yours, right below

2   yours; is that correct?  3/10/17?

3   A   Yes, sir.

4   Q   Do you know whose signature that is, the top one?

16:56   5   A   No, sir.

6   Q   There is a controlling investigator, another signature

7   there; is that correct?

8   A   Yes, sir.

9   Q   All right.  And this is the actual date that you signed to

16:57   10  become a paid informant for DEA; is that correct?

11  A   On March 1st.

12  Q   Okay.  And that was the first meeting face to face that you

13  had with these particular gentlemen, isn't it?

14  A   Yes, sir.

16:57   15  Q   Okay.  All right.  So there were conversations that you had

16  prior to showing up on that particular date about becoming a

17  paid informant; were they not?

18  A   No, sir.

19  Q   So is it your testimony then that on that particular day

16:57   20  was the first time that it was ever mentioned to you about

21  becoming a paid informant?

22  A   Rephrase the question.

23  Q   My question to you is:  On that particular day was the

24  first time that you ever discussed with anybody about becoming

16:57   25  a paid informant?

16:57  1  A   It wasn't -- I don't recall it being discussed that day.

2  Q   Did you read the document before you signed it?

3  A   I did.

4  Q   Did you know --

16:57  5  A   But not all of it.

6  Q   That means somebody told you what the essence of the

7  document was.

8  A   No, sir.

9  Q   So what was your understanding on this date?  What were you

16:58  10  signing?

11  A   That I was going to provide information, and there was a

12  possibility I may have to go to court.

13  Q   But nothing about getting paid?

14  A   I don't recall, sir.

16:58  15  Q   So, if you weren't going to get paid, why would you just

16  sign the document?

17  A   Because I was signing the document under the impression

18  that the information that I was providing was true.

19  Q   Okay.  So you signed this document believing that what this

16:58  20  document was saying is that you are going to tell the truth?

21  A   That's not what I said, sir.

22  Q   Okay.  I'm trying to figure out exactly what your answer

23  is.  When you signed this document, what was your understanding

24  as to what you were signing?

16:58  25  A   That I was going to become an informant and that the

16:58  1  information that I would provide was true.

2  Q   Okay.  And as a result of providing that particular

3  information, you were to get paid; were you not?

4  A   I don't recall that, sir.

16:59  5  Q   Did you subsequently get paid?

6  A   I did get paid, sir.

7  Q   Can you recall the date that you did get paid?

8  A   I don't recall the date, the exact date.

9       MR. WILLIAMS:  Okay.  Let's go down the page.  Keep

16:59  10  going.  Is that the last page of that particular document?

11  Okay.  That's the last page.

12  *BY MR. WILLIAMS:*

13  Q   So after you signed the initial document, okay, you signed

14  subsequent documents to continue to become a -- to continue to

16:59  15  be a paid informant for DEA; did you not?

16  A   Yes, sir.

17  Q   Okay.  And when you -- how many subsequent agreements did

18  you sign after you signed the first one?

19  A   I believe one more.

17:00  20  Q   Okay.  So there was the March 1st document; is that

21  correct?

22  A   Yes, sir.

23       MR. WILLIAMS:  Scroll back up to March 1st, to that

24  signature.  Would you scroll down for me, please, sir?  Stop

17:00  25  there.

1   *BY MR. WILLIAMS:*

2   Q   Then in June, you signed another agreement; is that

3   correct?

4   A   That's the date on it, yes, sir.

5   Q   All right.  And it's the same agreement; is it not?

6   A   I would have to have the agreement in front of me, sir.

7   Q   Let me just provide you the agreement.

8        MR. WILLIAMS:  Your Honor, can you turn the lights on,

9   please, so she can see this agreement?

10       THE COURT:  Hold on a second.  Let me just see these.

11       MR. WILLIAMS:  Thank you, Your Honor.

12  *BY MR. WILLIAMS:*

13  Q   This is the beginning of the particular document.  This is

14  the document that you signed?

15  A   These are all the pages?

16  Q   These are all the pages that you signed on --

17  A   Is this page with this page?

18  Q   Yes, ma'am, it is.

19  A   Those are my initials.

20  Q   And those are the dates that -- what date did you sign it?

21  A   March 1st.

22  Q   Okay.  And this is the agreement that says the same thing.

23  What date did you sign this?

24  A   Can you put these together like those were?  Page one?  I

25  don't see a date on here that would reference this one.

17:02  1   Q   Okay.  Maybe I have them out of order.

2   A   These are the last pages.  These are the first ones.  And

3   these are copies of the same thing.

4   Q   So that's the same thing.  All right.  Now, this goes with

17:03  5   this.

6   A   This is July 1st.  That was June 16th.  How would June come

7   after July?

8   Q   My position is you signed the agreement to be an informant

9   from July through September in June; is that correct?

17:03  10  A   I don't recall.

11  Q   You don't recall.  But you know you signed these

12  agreements; did you not?

13  A   Only the ones that I said I did.  I don't know what the

14  other ones are.

17:03  15  Q   Let's talk about your compensation.  Can you recall when

16  you first got paid for becoming a confidential source?

17  A   I believe it was the end of March.

18  Q   Look at this particular document.  Does it refresh your

19  memory as to when you got paid?

17:04  20  A   I said the end of March.  That's what I said.

21  Q   What date does that say?

22  A   I can't read it.

23  Q   What date is that right here?

24  A   That's not where my signature is.  I can't read the part

17:04  25  where my signature is, sir.

17:04  1  Q   But there is a date next to where the agent signed; is

2  there not?

3  A   March 22.

4  Q   How much is that amount?

17:04  5  A   3,000.

6  Q   And is that correct in terms of the money that you got on

7  March 22?

8  A   According to the date.

9  Q   Do you remember what you got?

17:04  10  A   I said the amount, sir.

11  Q   My question is:  Can you remember the first amount that you

12  got?

13  A   I just said it, 3,000.

14  Q   And then you subsequently got another amount.  How much was

17:04  15  that?

16  A   In June?

17  Q   Yes, ma'am.

18  A   I think it is 1,000.

19  Q   And then you subsequently had another amount; did you not?

17:05  20  A   In July.

21  Q   And explain to this jury how much that amount was.

22  A   1,500.

23  Q   So you received $3,000 on March 22.  Let's talk about that

24  particular date.

17:05  25  A   Yes, sir.

17:05   1   Q   March 22, you came into DEA's office and you provided

2   documents; did you not?

3   A   Yes, sir.

4   Q   And on that particular date, how did you bring those

17:05   5   documents to DEA?

6   THE COURT:  What kind of a container?

7   MR. WILLIAMS:  Yes.

8   THE WITNESS:  I don't recall.  It was almost a year

9   ago.

17:05   10   *BY MR. WILLIAMS:*

11   Q   Did you recall testifying last week that you brought those

12   documents into DEA's office in a box?

13   A   I said I took them out of a box and brought them.  I didn't

14   say I brought the entire box.

17:05   15   THE COURT:  Did you bring the box or not?

16   THE WITNESS:  I didn't, sir, Your Honor.

17   *BY MR. WILLIAMS:*

18   Q   So you brought loose documents to DEA; did you not?

19   A   I don't recall, sir, but I know I didn't bring a box.

17:06   20   Q   You did not bring a box.  Okay.  Do you know what medium

21   that you brought these documents in?  Were they loose documents

22   or were they on a thumb drive?

23   A   A flash drive.

24   Q   A flash drive?

17:06   25   A   I brought some to them on flash drives.

17:06    1    Q    When you first provided documents --

         2         THE COURT:  The first time you provided any documents,

         3    was it just paper or with a flash drive, thumb drive?  Both?

         4         THE WITNESS:  It may have been a flash drive, Your

17:06    5    Honor, because I gave them -- allowed them to see the papers

         6    and then I copied them on to a flash drive.

         7         THE COURT:  After that?

         8         THE WITNESS:  Yes, sir.

         9         THE COURT:  You showed it to them and you took them

17:07   10    back home and copied them to a thumb drive?

        11         THE WITNESS:  Yes, Your Honor.

        12         THE COURT:  And you copied them?

        13         THE WITNESS:  Yes, Your Honor.

        14         THE COURT:  A copy machine of some sort?

17:07   15         THE WITNESS:  I have a printer that allows me to scan

        16    documents on to a flash drive at home.

        17    *BY MR. WILLIAMS:*

        18    Q    So you took the original documents that you initially

        19    brought to DEA, and you took them home after you left on

17:07   20    March 22; is that correct?

        21    A    I don't remember the date, sir.

        22    Q    But you do remember when you first produced the documents,

        23    you brought them to DEA as loose documents?

        24    A    I believe so, sir.

17:07   25    Q    And then after that, you were instructed to take them back

17:07   1   and scan them in; is that correct?

2   A   I wasn't instructed to do anything, sir.

3   Q   So what made you scan these particular documents in as

4   opposed to leaving these documents with DEA on March 22?

17:07   5   A   It was just my personal decision.

6   Q   So you refused to give them those documents on that day?

7   A   I didn't refuse to do anything, sir.

8   Q   You just decided on your own, I will take these documents

9   home and put them on a flash drive?

17:08   10   A   Yes, sir.

11   Q   When you came in on March 22, were those the original

12   documents that you had, that you had created?

13   A   I don't remember bringing those documents on the 22nd.

14   Q   Okay.

17:08   15          MR. ARMSTRONG:   These are the exhibits that we

16   referenced in the demonstrative exhibit, also in Government

17   Exhibit Number 603.

18          THE COURT:   Okay.

19   *BY MR. WILLIAMS:*

17:09   20   Q   Are these the documents that you initially brought to DEA

21   when you first provided documents?

22   A   I don't recall.   I brought them different documents.   It

23   wasn't all -- just these.

24   Q   Are these the documents that you reference as being

17:09   25   original expense reports?

17:09   1   A    Yes, sir.

2   Q    And it is your testimony that all these documents are

3   actually original documents?  They are not copies?

4   A    One may have been a copy, but the other ones are original

17:09   5   documents because they had receipts attached to them.

6   Q    But these -- you are telling this jury that this particular

7   document you are representing to be an original?

8   A    This is an original.

9   Q    And not a copy of anything?

17:09   10   A    They are all from copy machines.  I would handwrite them.

11   This is original and this is original ink and everything on

12   here.

13   Q    This is an original document?

14   A    Yes, sir.

17:10   15           MR. WILLIAMS:  Your Honor, may we approach?

16           MR. ARMSTRONG:  With counsel?

17           THE COURT:  Yes.

18       *(At the bench)*

19           THE COURT:  Yes, sir?

17:10   20           MR. WILLIAMS:  Judge, these are the documents I have

21   been talking about.  They are purporting them to be originals.

22   They are copies.  They are not original documents.

23           THE COURT:  That goes to the weight, not to the

24   admissibility.

17:10   25           MR. LEWIS:  It goes to the admissibility.  They are

17:10  1  already in evidence.

2  THE COURT:  That's the point you want to make.  This

3  is an original.  Go for it.  I will allow you to do that.

4  MR. WILLIAMS:  Can I publish these to the jury?

17:10  5  THE COURT:  All right.

6  *(Open court)*

7  MR. WILLIAMS:  Your Honor, at this time I would like

8  to publish these.

9  *BY MR. WILLIAMS:*

17:11  10  Q  Again, before I ask that, you are purporting that these are

11  original documents?  These are not copies?

12  A  These were the documents that were used at the end of the

13  day.  These are originals.

14  Q  These are not copies?  They are the actual originals?

17:11  15  A  The copies were given to Mr. Faithful and Dr. Craig.

16  Q  You are purporting to the jury this is an original

17  document?

18  A  That's an original document that you have in your hand.

19  MR. WILLIAMS:  Judge, at this time I would like to

17:11  20  publish these documents to the jury.

21  *BY MR. WILLIAMS:*

22  Q  Now, while the jury is looking at those, where is the thumb

23  drive that you put these particular documents on?

24  A  I gave them to DEA and I was told --

17:12  25  THE COURT:  Hold it.  You gave them to DEA and then

what?

THE WITNESS:  And then I was told that they were given back to me so --

THE COURT:  They?

THE WITNESS:  The thumb drives were given back to me.

THE COURT:  Did you leave those originals with the DEA?

THE WITNESS:  The original documents I left with the DEA.

THE COURT:  Go on.

BY MR. WILLIAMS:

Q   So do you know where that thumb drive is now?

A   I would have to look for it in my house.

Q   All right.  So it's your testimony that you brought these documents to DEA; is that correct?  Initially, you brought these documents the first time you came in?

A   I'm sorry.  Repeat your question.

THE COURT:  The first time you went, you brought all those documents; right?  Is that correct?  Yes or no?

THE WITNESS:  No.

THE COURT:  All right then.

BY MR. WILLIAMS:

Q   So the first time you brought documents, those weren't the documents?

A   No, sir.

17:13   1          THE COURT:  What did you bring the first time?

2          THE WITNESS:  It was different documents of the clinic

3    and then I brought those.

4          THE COURT:  On a subsequent trip?

17:13   5          THE WITNESS:  Yes, sir.

6    *BY MR. WILLIAMS:*

7    Q    You can't recall when you brought those documents?

8    A    No, sir.  It was over a year ago.

9    Q    And you can't recall when you went back and scanned them?

17:13  10    A    Onto the flash drive?

11    Q    That's correct.

12    A    It was last year.

13    Q    But you don't know when last year?

14    A    I didn't keep a diary of it, no, sir.

17:13  15    Q    And you can't recall when you produced other flash drives

16    after you produced these particular documents?

17    A    On my different visits with the DEA, I presented them with

18    evidence.

19    Q    And you can't remember because you met with DEA so many

17:13  20    times; did you not?

21    A    I don't know how many times I met with them.

22    Q    But there were a lot of times; were there not?

23    A    I didn't document the visits, sir.

24    Q    Okay.  That's fair.  After you left your employment at

17:14  25    Gulfton, did you ever have an opportunity to go back to that

17:14  1   clinic for any purpose?

2   A   I had no desire to.  No.

3   Q   That's not my question.  Do you go back or did you not?

4   A   No, sir.  No.

17:14  5   Q   Were you ever asked to go back up there in your capacity as

6   an undercover source?

7   A   No, sir.

8   Q   How much -- can you recall visiting DEA on March 27 of

9   2017?  Do you recall having a face to face?

17:15  10  A   I don't recall.

11  Q   Can you recall having a face-to-face interview with DEA on

12  May 2nd of '17?

13  A   I don't recall the dates.  I know I have met with them a

14  lot of times, but I don't recall the dates because I didn't

17:15  15  document them.

16  Q   Okay.  That's fair.  But you met with them on several

17  occasions; did you not?

18  A   I met with them a number of times.

19  Q   And you provided other information by text message; did you

17:15  20  not?

21  A   I did.

22  Q   Okay.  Now, will you take a look at this particular

23  document?  Do you recognize that text?

24  A   Yes, sir.

17:16  25  Q   Does that refresh your memory as to the date you first went

17:16  1   to DEA?

2   A    February 8.

3   Q    Okay.  On that particular date, who did you meet with?

4   A    I believe it was Mike and James.

17:16  5   Q    Okay.  All right.  And you had a subsequent meeting -- a

6   subsequent contact with them on February 15; did you not?

7   A    Repeat your question.

8   Q    You had a subsequent text with them on February 15?

9   A    A text message.

17:17  10  Q    All right.  And in that particular text message, you were

11  providing information to Mike and James; were you not?

12  A    I would have to see which phone number it is.

13  Q    Okay.  After reading this, do you know if, in fact, that is

14  the information that you provided or not?

17:17  15  A    I believe so.

16  Q    You believe so.  Okay.  And you believe that you were

17  giving information regarding some of the security guards that

18  were working there; is that correct?

19  A    One in particular.

17:17  20  Q    And that was on February 15 of 2017; is that correct?

21  A    That's the date, yes.  2017.

22  Q    That's correct.  Now, did you have occasion to text him

23  again on Tuesday, February 21, about meeting?

24  A    I believe that is a minute.

17:19  25  Q    What date was that?

17:19 1    A    February 21.

2    Q    Prior to that, did you give them information about where

3    Shane Faithful lived?

4    A    In February 2007.

17:19 5    Q    Did you send a picture to them or did they send a picture

6    to you confirming that this is where he lives?

7    A    I don't recall.

8    Q    Do you recognize what is in those particular pictures?

9    A    Houses.

17:19 10   Q    Okay.  Do you recognize the particular residences at all?

11   A    I would have to see the address.

12   Q    Okay.  What date was that?

13   A    February 9.

14   Q    It was obviously a text between you and one of the agents

17:19 15   on that particular day; is that correct?

16   A    All of this is after my employment.

17   Q    After your employment where?

18   A    At Gulfton.

19   Q    At Gulfton.  Fair enough.  Okay.  So it is fair to say that

17:19 20   starting February, you were providing Intel to DEA prior to

21   signing the agreement; were you not?

22   A    I don't recall that.

23   Q    But you can recall speaking to these gentleman on several

24   occasions?  Can you not?

17:20 25   A    That's correct.

1  Q   Whatever they asked you about, you would provide; is that

2  correct?

3  A   They didn't ask me.  I volunteered.

4  Q   They didn't ask.  As a result of volunteering, you were

5  paid for some of the information that you provided; is that

6  correct?

7  A   I was asked to become an informant.

8  Q   Okay.  And you decided that this is what --

9  A   This is what I wanted to do.

10  Q   Fair enough.  Now, as a result, you also stand to get a

11  percentage of the moneys that were recovered when search

12  warrants were ran on Shane Faithful's house and Dr. Craig's

13  house?

14  A   That wasn't what I was told.

15  Q   What is your understanding?

16  A   I was told that there is a possibility of a reward.

17  Q   Okay.  And how much of a reward?  Do you know?

18  A   I don't know, sir.

19  Q   Do you know how much money was actually recovered?

20  A   I don't know, sir.

21  Q   Do you know what percentage of that that you may possibly

22  get?

23  A   I don't know the exact number, sir.

24  Q   You don't know the exact number, but you don't know the

25  percentage either?

17:21   1   A   I think it was like 10 percent.

2   Q   You think it was 10 percent.  Okay.  Take a look at that,

3   please, just to refresh your memory.

4   A   I don't know what this is.

17:21   5   Q   I understand.  I just ask you to take a look at it.

6   A   What am I looking at?

7   Q   If you will look at it, I will ask you the questions.

8   A   Information about an investigation prior to me working at

9   Gulfton.  It says 2015.

17:23   10   Q   Okay.  Now, after reading this, does this refresh your

11   recollection as to what you may be entitled to for cooperating

12   in this particular matter, what percentage of funds you may be

13   entitled to?  Does this refresh your recollection as to that?

14   A   The percentage.

17:23   15   Q   Yes.

16   A   But I wasn't aware of what they recovered, sir.

17   Q   My question is:  Does it refresh your recollection as to

18   the percentage that you may be in line to get?

19   A   The possibility of the percentage?

17:23   20   Q   That's correct.  And how much is it?

21   A   It's 20 percent.

22   Q   Not 10; is that correct?

23   A   Yes, sir.

24   Q   Okay.  And, of course, you are unaware of what was

17:24   25   recovered from that particular search warrant, or are you?

17:24  1  A   No, sir.  I read it online just like everyone else when

2  they were arrested.

3  Q   What did you read online?

4  A   That they were arrested.

17:24  5  Q   And was there an amount of money that was seized that you

6  read online?

7  A   No, sir.

8  Q   You read that online, and actually you didn't have to read

9  it online because you were informed the day that they arrested

17:24  10  these two people, weren't you?

11  A   No, sir.

12  Q   I ask you to take a look at this particular text message.

13  A   Which side is theirs and which side is the other one?

14  Q   This would be this.

17:25  15  A   I mean who is what?

16  Q   One would be the agent and one would be you.

17  A   Which one is me?

18  Q   You can't tell from looking at the document?  Would you

19  have known that the clinic was shut down on that particular

17:25  20  day?

21  A   Not from them.  They didn't call me and tell me anything.

22  Q   But you received a text, did you not, that the clinic was

23  shut down?

24  A   No.  I sent the text.

17:25  25  Q   So you sent the text stating that the clinic was shut down?

17:25  1    A    I was not aware.  I got a call from one of my co-workers,

2    former co-workers.  And then I read it online.  I sent this

3    text.  They didn't text me and inform me of anything.

4    Q    That's fair enough.  After the clinic was shut down, you

17:26  5    provided information to the agents regarding the people that

6    worked inside the clinic; did you not?

7    A    What do you mean?

8    Q    Specifically, you told them who -- you gave them

9    information as to Olivia; did you not?

17:26  10   A    I told them about the employees when I first started

11   working with them.

12   Q    And did you talk to them again after the clinic got shut

13   down and provide information as to Olivia's name and number,

14   et cetera, et cetera?

17:26  15   A    They had that information, yes, sir.

16   Q    And you continued -- oh, let me ask you this:  Did you have

17   an occasion to make some recordings on behalf of DEA while

18   working --

19   A    I did.

17:27  20   Q    And how many recordings did you make?

21   A    I don't recall.

22   Q    And who did you record?

23   A    I recall Mr. Pouncey.

24   Q    Okay.  Who else?

17:27  25   A    I believe Olivia.

17:27 1 Q  And who else?

2 A  I don't recall the other ones, sir.

3 Q  But you did make more than two recordings; did you not?

4 A  Possibly, yes.

17:27 5 Q  But your memory is a little fuzzy as to that, isn't it?

6 A  No.  It is not fuzzy, sir.

7 Q  But you just can't recall at this time?

8 A  Whenever someone called me, I recorded it.  And I don't

9 recall.

17:27 10 Q  Who provided the recorder to you?

11 A  The DEA.

12 Q  Okay.  All right.  And how long did you have this

13 recording, this recorder?

14 A  This is January.  I think maybe the beginning of January of

17:28 15 this year or December of last year.

16 Q  Okay.  If it was December of last year, then are you

17 telling this jury that the recordings you made were made this

18 month?

19 A  I said either I returned the recorder to them either

17:28 20 December of last year, 2017, or January this year, which we are

21 still in, 2018.  I don't recall because it is not my property.

22 Q  Fair.  When did you receive that particular recorder?

23 A  Sometime last year.

24 Q  Okay.  You can't recall the month, can you?

17:28 25 A  No, sir.

17:28   1   Q   Okay.  Fair enough.  And after the clinic was shut down,

2   you were in communication with DEA every month; is that

3   correct?  If the clinic was shut down in --

4   A   Yes, sir.

17:29   5   Q   Okay.  Good enough.  Okay.  Now, can you recall sending

6   them a text regarding the documents, those financial documents

7   that we just looked at?

8   A   I would have to see the text.

9   Q   Yes, ma'am.  I will provide it for you.

17:29   10   A   Let me see the date, please.  Yes.

11   Q   Okay.  Do you remember sending that particular text?

12   A   Yes, I do.

13   Q   And what did you text DEA on that particular day?  What did

14   you text them?

17:30   15   A   May I have it in front of me?

16   Q   Yes, you may.

17   A   The DEA had the expense reports that I had given them

18   earlier in 2017.  At this point when Mr. Faithful and Dr. Craig

19   were arrested, I didn't want them to know where the documents

17:30   20   came from out of here.

21   Q   So you suggested that DEA tell them that DEA -- that DEA

22   tell the doctor and Shane that they came to your house and

23   removed the accounting records and subpoenaed you; is that

24   correct?

17:31   25   A   No, sir.  That's not what I said.

17:31 1 Q   All right.  Then let me let you look at it again.  Do you

2 want to read it verbatim?

3 A   I didn't suggest it.  I said I believe if Shane and

4 Dr. Craig are told that the DEA.  I didn't say who would tell

17:31 5 them that.  I said if they are told that the DEA came to my

6 house to remove the documents and the subpoena, they might

7 rethink going to trial.

8 Q   So you are suggesting the DEA to lie on your behalf?

9 A   No.  I did not, sir.  That's not what I said.  I said if

17:31 10 they were told that.  I didn't say did if the DEA tell them

11 that or anyone else.  I said if they were told that.

12 Q   But you are suggesting something that's not true; is that

13 correct?

14 A   No.  I didn't say tell them that.  I said if someone told

17:31 15 them that, they would believe it or they may rethink going to

16 trial.  I didn't say if the DEA tell them that or an attorney

17 tell them that, sir.

18 Q   So who would you suggest would tell them that?

19 A   I wouldn't suggest anyone.  It was just --

17:32 20 Q   Just a thought?

21 A   No.  Not a thought.  A hypothetical statement.

22 Q   All right.  Fair.  And you are suggesting to this jury that

23 all of these particular expense sheets are actual original

24 documents and not copies?

17:32 25 A   Those are documents that I handwritten.  Dr. Craig had a

17:32  1    copy with her money at the end of the day.  Mr. Faithful had a

2    copy with his money at the end of the day.  And they all

3    collate with that particular document right there.  You can get

4    an expert to come in.  It's ink.  It's not photocopy.

17:32  5    Q    Sure.  And this -- you are telling the jury that these are

6    original documents?

7    A    Those are original documents.

8    Q    Thank you.  Let's talk about these facilitators.  While you

9    were there, you had several opportunities to interact with

17:33  10    these facilitators every day; did you not?

11    A    We all did.

12    Q    All right.  But I'm not asking about anybody else.  I'm

13    asking about you.

14    A    Yes, sir.

17:33  15    Q    Okay.  Now, you became quite familiar with them; did you

16    not?

17    A    I would see them every day.

18    Q    You would see them every day.  And there was a rule at the

19    clinic that no facilitators were supposed to be inside the

17:33  20    clinic, wasn't there?

21    A    Yes.

22    Q    Okay.  And there was armed security at that clinic; was

23    there not?

24    A    Yes, sir.

17:33  25    Q    Did you ever inform this armed security that these

17:33  1  facilitators should leave the particular premise?

2  A   Myself and Mr. Faithful informed them.

3  Q   Okay.  But it didn't work?  Because obviously you continued

4  to see them; did you not?

17:33  5  A   Because they were allowed to come in.

6  Q   So.  In other words, the armed security were not doing

7  their jobs?

8  A   Yes, sir.

9  Q   Okay.  Did you ever inform Mr. Faithful about that?

17:34  10  A   Mr. Faithful informed security what he saw.

11  Q   Okay.  That's not my question.  Did you ever inform

12  Mr. Faithful about that?

13  A   Daily.

14  Q   So you would tell him that daily and because the security

17:34  15  did not do their jobs, you continued to interact with these

16  facilitators?

17  A   Basically if there was a problem in the clinic, sir,

18  because I'm the manager, I would have to express to them, this

19  is the reason you are receiving a credit and you are not

17:34  20  getting your cash back.  This is the reason that is going on,

21  because I was the manager, so I had no choice but --

22  THE COURT:  You had to --

23  THE WITNESS:  I had to interact with them, Your Honor.

24  *BY MR. WILLIAMS:*

17:34  25  Q   But the rule was no facilitator should pay for the

*Williams Cross of Loren Phillips*

17:34  1  patients, no money exchanged.  That was the rule; was it not?

2  A   No.  Money should be exchanged inside of the lobby.

3  Q   Okay.  The rule was no money to be exchanged inside of the

4  particular clinic; is that correct?

17:35  5  A   Inside the lobby.

6  Q   Which implies that if there was money to be exchanged, it

7  had to be outside; is that correct?

8  A   Yes, sir.

9       THE COURT:  Where outside?

17:35  10      THE WITNESS:  Just outside of camera view.

11  BY MR. WILLIAMS:

12  Q   That would have been outside of the clinic because the

13  cameras were inside of the clinic; is that correct?

14  A   There are actually cameras inside the lobby.  Mr. Faithful

17:35  15  doesn't have access to those cameras.

16  Q   Okay.  So that particular rule was never enforced by you?

17  A   It was enforced by me daily, but these are grown men.

18  Q   And there is nothing you could have done about it?

19  A   How?

17:35  20  Q   Yes or no?  There is nothing you could have done about it?

21  A   Nothing.

22  Q   Good enough.  So then you became very familiar with these

23  facilitators; did you not?

24  A   Sometimes they pulled at me and grabbed at me.  One

17:36  25  actually pulled me onto his lap.  I told Mr. Faithful.  He did

17:36   1   nothing.

2   Q   Who was that who pulled you onto his lap?

3   A   Mr. Hill.

4   Q   Mr. Hill.  Okay.  Let's talk about Mr. Hill.  His name is

17:36   5   John Hill; is that correct?

6   A   Yes, sir.

7   Q   And what type of relationship did you have with Mr. Hill?

8   A   I would interact with him when he came.

9   Q   And you knew he was an facilitator?

17:36   10   A   I interact with all of them.

11   Q   That's not my question.  Did you know he was a facilitator?

12   A   Yes, sir.

13   Q   All right.  And you knew a bunch of these facilitators; did

14   you not?

17:36   15   A   I didn't know them, like, personally know them.  I know

16   them from seeing them at the clinic.

17   Q   Okay.  And you knew enough to call them by their

18   nicknames and their real names; did you not?

19   A   John Hill didn't have a nickname.

17:37   20   Q   That's fair.  And the information you gave to DEA, you gave

21   all of these particular facilitators' real names, if you knew

22   them, and nicknames, if you didn't know the real names?

23   A   I gave them the sticky notes that were at the clinic.

24   Q   That's not my question.  My question was:  Did you give

17:37   25   them the real name if you knew the real name?

A    I gave them the information that the facilitator wrote down.

Q    Did you ever speak to Olivia Caldwell after you left the particular clinic?

A    Yes, I did.

Q    On how many occasions?

A    I don't recall, sir.

Q    Did you talk weekly?  Monthly?

A    She would call and talk to me maybe -- I don't recall the number.

Q    Okay.  All right.  And after speaking to DEA, you gave them her information, did you not, her telephone number?

A    Yes, I did.

Q    And did you provide -- did you tell DEA that Olivia knew some of -- one of Olivia's cousins was a facilitator?

A    I don't recall saying that, sir.

Q    Did you ever tell DEA that you knew that this person was a drug dealer because they knew Olivia and Olivia relayed that information to you?

A    I don't recall that, sir.

Q    All right.

A    May I say something?

Q    When I ask you a question, yes.

        THE COURT:  If you want to clarify it later on, when you are taken on direct examination, the attorney for the

17:39   1   government will be able to clear it up.  Okay?

2       THE WITNESS:  Thank you, Your Honor.

3   *BY MR. WILLIAMS:*

4   Q   Once you received your third payment from DEA, did you ever

17:39   5   request any other moneys from them?

6   A   It wasn't the third payment.  May I see what you are

7   talking about, sir?

8   Q   No, ma'am.  My question to you is simple:  After you

9   received the last payment that you have testified to of $1,500

17:39   10  in July, did you ever request any other payments from DEA?

11  A   I requested what I was promised.

12  Q   And what were you promised?

13  A   That I might receive something.

14  Q   And what --

17:40   15  A   No particular amount.

16  Q   No particular amount, but you asked for the particular

17  money.  You were trying to get some money from DEA; were you

18  not?

19  A   I wanted the money, yes.

17:40   20  Q   All right.  And you can't remember when you asked for the

21  money though?

22  A   Last year.

23  Q   Okay.  All right.  Have you asked for the money this year,

24  in 2018?

17:40   25  A   I don't recall asking for anything this year, sir.

17:40   1   Q   All right.  So that means you haven't asked for anything
        2   this year?  Or you can't recall?
        3   A   I didn't ask for anything this year.  I don't recall asking
        4   for anything.
17:40   5   Q   But you still want the money, don't you?
        6   A   Yes, I do.
        7   Q   And you know that testifying here today may influence
        8   whether you get the money or not?
        9   A   No, sir.
17:40  10   Q   You don't believe that, but you want the money?
       11   A   No.
       12   Q   Okay.  So you don't want the money?
       13   A   I do want the money, but I don't believe that.
       14   Q   Okay.  Now, let's talk about your appointment book.  All
17:41  15   those entities -- I think you said that you purchased that
       16   appointment book for 2016; did you not?
       17   A   We ordered it.
       18   Q   Okay.  And you kept a log of the facilitators in there; is
       19   that correct?
17:41  20   A   The clinic did.
       21   Q   All right.  And when you left, you did not take that book
       22   with you, did you?
       23   A   No, sir.  It wasn't my property.
       24   Q   All right.  But those expense reports weren't your property
17:41  25   either, were they?

17:41  1  A   I was informed by Mr. Faithful and Dr. Craig to keep those.

       2  Q   For how long?

       3  A   For a week.

       4  Q   And then do what?

17:42  5  A   Shred them.

       6  Q   Did you do that?

       7  A   No, sir.

       8  Q   So you were being insubordinate then because you weren't

       9  following their instructions, were you?

17:42 10  A   I wouldn't call it insubordination, sir.

      11  Q   You considered it a plan for yourself in case you need

      12  them?

      13  A   No, sir.

      14  Q   You just decided you just wanted to keep them?

17:42 15  A   My handwriting was on it and I wanted to keep them.

      16  Q   Your handwriting was on -- in the --

      17  A   But I wrote those documents out.  The expense sheets were

      18  created on behalf of me for Dr. Craig and Mr. Faithful, so I

      19  kept them.

17:42 20  Q   On behalf of you, but they did not belong to you, did they?

      21  A   Mr. Faithful and Dr. Craig had --

      22  Q   My question is:  Did they belong to you or did they belong

      23  to the clinic?

      24  A   They didn't belong to anyone if I was told to shred them.

17:42 25  Q   Okay.  But you did them in your course and scope of

17:43  1  employment at the particular clinic?

2  A   Would you rephrase the question?

3  Q   You created them while you were at the particular clinic?

4  A   Yes, sir.

17:43  5  Q   Okay.  When you left the clinic, those documents should

6  have stayed at the clinic or you should have returned them;

7  isn't that correct?

8  A   They were already at my house.

9  Q   But you never thought to return them to the clinic since

17:43  10  you didn't work there anymore?

11  A   No.  I discontinued my association with the clinic.

12  Q   You kept these and called DEA and decided that you wanted

13  to become a paid informant, didn't you?

14  A   No, sir.

17:44  15  Q   I need you to look at this particular exhibit.

16        MR. ARMSTRONG:  What is it?

17        MR. WILLIAMS:  He is pulling it up now.  I think it is

18  one of the -- it is 603.

19  *BY MR. WILLIAMS:*

17:45  20  Q   Have you had an opportunity to review this?

21  A   Briefly.

22  Q   Was this one of the documents that you tendered to the DEA?

23  A   I don't know, sir.

24  Q   You don't know?

17:46  25  A   I mean, those are all expense sheets, so I don't know if

17:46  1   they were -- where this one was.

2   Q    But this -- let me ask you this.

3   A    Yes, sir.

4   Q    On the bottom of this, what does this particular writing

17:46  5   right here say?

6   A    It's a template.

7   Q    No.  Where it says "DOJ," would you read that?

8   A    "DOJ Gulfton."

9   Q    What does it say?

17:46  10  A    "DOJ Gulfton and CS83."

11  Q    Eighty-three.  Do you know what that language means?

12  A    What language, sir?

13  Q    The language that I just asked you to read, the DOJ Gulfton

14  CS00083?

17:47  15  A    Department of Justice.

16           THE COURT:  Pardon me?

17           THE WITNESS:  Department of Justice.

18  *BY MR. WILLIAMS:*

19  Q    Then it says "Gulfton."  Is that correct?

17:47  20  A    Yes.

21  Q    Then it says "CS."  Is that correct?

22  A    Yes, sir.

23  Q    And if I purport to you the CS means confidential source,

24  you would have been the confidential source who provided this

17:47  25  document; would you not?

17:47   1    A    Yes, sir.

2    Q    Now, in looking at this document and you can't see it

3    there --

4        MR. WILLIAMS: And I think, Judge, I would like to

17:47   5    publish it for the jury because I think it's not clear unless

6    we have got a better copy.

7        THE WITNESS: May I see it?

8        THE COURT: You have to turn the lights on. All

9    right. Go on.

17:47   10    *BY MR. WILLIAMS:*

11    Q    What is different about this document than all the other

12    particular expense reports that the government is --

13    A    This is a copy, which means Mr. Faithful may have had the

14    original.

17:47   15    Q    Okay. All right. But this is a copy. But you gave them

16    this particular copy. What would be different on this than the

17    other particular documents?

18    A    They would have the receipts and everything else attached

19    to it.

17:48   20        THE COURT: Hold it. One at a time, please.

21    *BY MR. WILLIAMS:*

22    Q    I'm not talking about the receipts. I'm talking about the

23    actual document itself. What is different on this document

24    than the other documents?

17:48   25    A    The date.

17:48   1   Q   Does it show Shane Faithful and Dr. Craig when it says the

2   moneys that were divvied up?

3   A   No.

4           MR. WILLIAMS:   May I publish this document?

17:48   5           THE COURT:   Sure.   What exhibit is that just so we

6   have a record of it?

7           MR. LEWIS:   It is Government Exhibit Number 603,

8   page 70, Your Honor.

9           THE COURT:   Okay.

17:49   10           MR. LEWIS:   It is Bates stamped with 00083.

11           MR. ARMSTRONG:   I have to disclose to them that this

12   is an authentic document.   I don't know what it is.

13           MR. WILLIAMS:   It's the same document that's in

14   your --

17:49   15           THE COURT:   Do you have any objection?

16           MR. ARMSTRONG:   Not at this time.

17           THE COURT:   All right.   Go on.

18   *BY MR. WILLIAMS:*

19   Q   Now that particular document doesn't have the names of

17:49   20   Shane Faithful and Dr. Craig on it, does it?   Let's go to

21   page 72.

22           THE COURT:   I can knock off half the lights.   Hold it.

23   You have the jury looking at it.

24             Keep going, Counsel.

17:49   25           MR. WILLIAMS:   Yes, sir.

THE WITNESS: Can you find that one?

*BY MR. WILLIAMS:*

Q   That's the document I just showed you.  That's the best we have.  That is the one you allegedly gave to them when you provided them with the expense accounts.

A   Can you scroll down?  Some of them have --

THE COURT: What was the question?

THE WITNESS: I don't understand the question.

THE COURT: What is the question?

*BY MR. WILLIAMS:*

Q   The question is:  Does this have the name of Shane Faithful and Dr. Craig on it?

A   No.  Not all of them will.

Q   That's my question to you.  This document does not?

A   Yeah.  But it is still their expense report.

Q   Okay.  That's fine.  So some of them may have had it on there and some of them may not have had them on there?

A   Exactly.

Q   Every one that you prepared though and that you turned over the government, that the government has shown thus far to this jury have both their names on it; is that correct?

A   I wrote their names on there, sir.

Q   I understand that.  My question is:  This one is different from the other in that regard?  That's my only question.

A   Yes, sir.

17:50 1 Q   All right.   And at any time that you met with DEA and they

2 spoke to you, did they record your conversation?

3 A   I believe a couple times.

4 Q   You believe a couple times?

17:51 5 A   Yeah.

6 Q   Do you know?

7 A   I don't know.

8 Q   You don't know.   Okay.   And every time that you met with

9 them in person, did somebody take notes memorializing the

17:51 10 conversation between you and DEA?

11 A   Yes, sir.

12 Q   And that should have happened every time that you met with

13 them, is that correct, face to face?

14        MR. ARMSTRONG:   Objection.

17:52 15        THE COURT:   Stand up, please.

16        MR. ARMSTRONG:   Speculation as to what DOJ's policies

17 are.

18        THE COURT:   Rephrase it, Counsel.

19 *BY MR. WILLIAMS:*

17:52 20 Q   Okay.   To your recollection, every time you met with DEA,

21 somebody took notes when you met face to face?

22 A   I don't think so.

23 Q   You don't think so?

24 A   No.   I don't remember someone taking notes every time I met

17:52 25 with them.

17:52    1    Q    You have never met with them when it was just you and one

2    agent? There was always two agents when you met face to face?

3    A    I believe so.

4    Q    Did you see anybody taking notes every time you met face to

17:52    5    face?

6    A    I don't recall, sir.

7    Q    You don't recall. Do you recall ever seeing them take

8    notes at any time when you met face to face?

9    A    I think maybe one -- I don't remember the exact number, and

17:52    10    I don't remember if anyone was taking notes.

11    Q    Okay. Now, prior to DEA closing this particular clinic,

12    did you provide information to DEA regarding if Shane Faithful

13    had a safe in his house?

14    A    I did.

17:53    15    Q    Okay. All right. And you told them exactly where that

16    was; did you not?

17    A    I told them where I thought it might be.

18    Q    And you did that because you have been to Shane Faithful's

19    house, haven't you?

17:53    20    A    I have never been in his bedroom.

21    Q    That's not my question. My question is: Have you been to

22    his house?

23    A    Yes, I have. One time.

24    Q    All right. So you have been there only one time?

17:53    25    A    Yes, sir.

17:53  1  Q   And you provided DEA information based upon going to his

2  house one time as to where you thought his safe may be?

3  A   It wasn't visible when I got there, so I just said where it

4  might be.

17:53  5  Q   Okay.  All right.  And did you ever have an occasion to

6  speak to other personnel from Gulfton clinic after the clinic

7  was shut down?

8  A   Yes, sir.

9  Q   And who did you speak to?

17:54  10  A   I spoke with Ms. Morgan.  She called to wish me a happy

11  holiday.

12  Q   Okay.  Who else did you speak to?

13  A   Mr. Pouncey.

14  Q   Okay.  Who else did you speak to?

17:54  15  A   Ms. Hayes texted me once.

16  Q   That's not my question.  Who did you speak to verbally?

17  Let me ask you this:  Did you speak to Remi?

18  A   Yes, I did.

19  Q   Did you speak to his wife?

17:54  20  A   No.  Just Remi.

21  Q   And you spoke to Olivia?

22  A   Yes, sir.

23  Q   When you spoke to them, you talked to them about the clinic

24  being closed; did you not?

17:54  25  A   They mentioned it.  That they had found out about the

17:54  1   clinic being closed, yes.

2   Q    All right.  Did you record those conversations?

3   A    I believe I recorded Remi's conversation.

4   Q    Is that the only conversation that you recorded from the

17:55  5   employees of Gulfton after the clinic had been shut down?

6   A    Olivia.

7   Q    Do you know a Davis Webster?

8   A    Who is Davis Webster?

9   Q    My question to you is:  Do you know a Davis Webster?  Yes

17:55  10   or no?

11   A    Not unless he has a nickname or something, no.

12   Q    Okay.  Fair enough.  Did you have an occasion to visit

13   Gulfton clinic on March 10 of 2017?

14   A    No, sir.

17:56  15   Q    All right.  When you spoke to Olivia, did you tell her that

16   DEA wanted to speak to her?

17   A    No, sir.

18   Q    When you spoke to any of these witnesses, former employees

19   of Gulfton, did you inform any of them that they should speak

17:56  20   to DEA?

21   A    No, sir.

22   Q    You spoke to them and then you told DEA that you had spoken

23   to them and the gist of the conversations that you had with

24   them; is that correct?

17:56  25   A    Yes, sir.

17:56  1  Q   And you did that in an attempt to figure out who might --

2  which ex-employees might talk to DEA?

3  A   That wasn't my reason.

4  Q   Okay.  What was your reason for talking to them then?

17:56  5  A   I was just informing them of my conversation.

6  Q   Which conversation?

7  A   With Olivia.

8  Q   Okay.  All right.  So in preparing to testify here today,

9  how many times did you meet with Mr. Armstrong?

17:57  10  A   I think four or five.

11  Q   Okay.  And when was the last time you met with him prior to

12  today?

13  A   I think it was last Monday.

14  Q   Last Monday.  Now, you testified in court last Friday; is

17:57  15  that correct?

16  A   Yes, sir.

17  Q   Did you meet with him in court prior to -- did you meet

18  with him prior to testifying in court last week?

19  A   I came here and they were here.

17:58  20  Q   Did you speak to him prior to testifying?

21  A   Last Monday.

22  Q   Okay.  So you spoke to him last Monday?

23  A   Yes, sir.

24  Q   Prior to testifying Friday?

17:58  25  A   Yes, sir.

17:58    1  Q   Have you seen any of these people at this particular table

2  since last Friday prior to yesterday?

3           THE COURT:  Have you seen them or visited with them?

4           THE WITNESS:  No.  Other than arriving here and they

17:58    5  are here already.

6  BY MR. WILLIAMS:

7  Q   Okay.  That's fair.  So prior to last Monday -- well, how

8  long did you meet with Mr. Armstrong Monday of last week?

9  A   I think it was four hours, and then I became ill.

17:58   10  Q   Four hours?

11  A   I think it was four hours.

12  Q   You went over all this testimony that you just gave this

13  particular jury that he asked you questions about; did you not?

14  A   Rephrase your question.

17:58   15  Q   You went over all the testimony that you testified to today

16  when he asked you these particular questions?  You went over

17  that testimony; did you not?

18  A   I'm not understanding your question, sir.

19  Q   Did you all talk about the questions that he was going to

17:59   20  ask you here today in court?

21  A   We went over possible questions that might be asked by him

22  and by you.

23           MR. WILLIAMS:  Okay.  Fair enough.

24           THE COURT:  At that point, we are a little bit passed

17:59   25  6:00 in the evening, and it is time to adjourn for the day.

17:59  1          MR. WILLIAMS:  Thank you, Your Honor.

2          THE COURT:  I will stop the clock.

3                  Ladies and gentlemen, we are right on course with

4     the time.  So we will see you back, ready to resume, tomorrow

17:59  5     at 10:00 a.m.  Thank you and good afternoon.

6          *(Court adjourned at 5:59 p.m.)*

7                               * * * *

8      I certify that the foregoing is a correct transcript from

9     the record of proceedings in the above-entitled cause.

10

11    Date: February 27, 2018

12
                      */s/ Mayra Malone*
13                    ----------------------------------------
                      Mayra Malone, CSR, RMR, CRR
14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25