1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4   UNITED STATES OF AMERICA          .
                                      .  Criminal Action
5   VERSUS                            .  No. H-17-CR-419
                                      .
6   GAZELLE CRAIG, D.O., and          .  Houston, Texas
    SHANE FAITHFUL,                   .  March 19, 2018
7                                     .  3:55 p.m.
                   Defendants.        .
8   . . . . . . . . . . . . . . . . . . .

9
              TRANSCRIPT OF PROCEEDINGS
10
       BEFORE THE HONORABLE DAVID HITTNER AND A JURY
11
                   DAY 1 OF 9
12
    APPEARANCES:
13
    FOR THE UNITED STATES OF AMERICA:
14
            Mr. Scott Philip Armstrong
15          Assistant United States Attorney
            UNITED STATES DEPARTMENT OF JUSTICE
16          1400 New York Avenue, NW
            Washington, DC  20005
17          202.355.5704
            scott.armstrong@usdoj.gov
18
            Mr. Devon Morel Helfmeyer
19          Assistant United States Attorney
            UNITED STATES DEPARTMENT OF JUSTICE
20          1000 Louisiana
            Suite 2300
21          Houston, Texas  77002
            713.567.9513
22          devon.helfmeyer@usdoj.gov

23

24
          PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25     TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

1                          APPEARANCES

2                          (continued)

3  FOR THE DEFENDANT GAZELLE CRAIG, D.O.:

4           Mr. Don E. Lewis
            ATTORNEY AT LAW
5           1717 St. James Place
            Suite 625
6           Houston, Texas  77056
            713.622.0318
7           lewisfirm@aol.com

8  FOR THE DEFENDANT SHANE FAITHFUL:

9           Mr. Cornel A. Williams
            CORNEL A. WILLIAMS & ASSOCIATES
10          1405 Palm Street
            Houston, Texas  77004
11          713.520.5153
            FAX:  713.524.4528
12          willassoc@aol.com

13

14

15  COURT REPORTER:

16          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8007A
17          Houston, Texas  77002
            713.250.5582

18

19

20

21

22

23

24

25

```
1                           INDEX

2                                              Page

3  GOVERNMENT'S OPENING STATEMENT BY MR. ARMSTRONG     11
   DEFENDANT SHANE FAITHFUL'S OPENING STATEMENT
4      BY MR. WILLIAMS                                 23
   DEFENDANT GAZELLE CRAIG, D.O.'s OPENING STATEMENT
5      BY MR. LEWIS                                    38

6

7

8

9                    INDEX OF WITNESSES

10 FOR THE GOVERNMENT:

11 TONYA GRAHAM

12     DIRECT EXAMINATION BY MR. HELFMEYER             46

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         PROCEEDINGS

2                        March 19, 2018

3      (A jury was duly impaneled and sworn.)

4           THE COURT:  Thank you.  Be seated.

5                Ladies and gentlemen, I'm sure the first thing on

6  your mind is how long are you going to be with us.  As I said,

7  the testimony in the case should last into next week; but we

8  will move as quickly as we can.

9                We operate on the following schedule:  We begin

10 at 10:00 a.m., and we adjourn at 6:00 p.m.  The only change to

11 that is every Tuesday we get underway at 11:30.  So, we begin at

12 10:00 a.m. every day; but tomorrow is Tuesday, we'll begin at

13 11:30.  And we'll give you a schedule for the following week

14 should there be any changes or tweaking of the schedule.

15                We take a lunch break about 1:00 in the afternoon

16 until 2:15; and we also take a mid-morning break, mid-afternoon

17 break; but basically, we take a break every hour and half as the

18 time goes on.  All those times except for the starting times are

19 accurate subject to some fluctuation; but we do get underway, as

20 best we can, at 10:00 a.m.

21                Also, I will tell you that if sometimes I need to

22 talk to the attorneys without the jury present, the clock is

23 going.  The clock is going.  So, they have a certain amount of

24 time; and when the time is up, they sit down and they're out of

25 time.

1             As we had discussed before, the Government has

2  its own time; and the defense are pooling their hours.  They've

3  agreed to that.  In other words, so, there will be one column

4  for the Government, one column for the defense.

5             I do permit you to take notes, but the only notes

6  that I'm going to ask to be read back are the court reporter's

7  and not yours.  So, this is strictly for your own recollection;

8  and if your memory should differ from what the notes are, you're

9  -- well, you're directed to rely on your own memory.  That's the

10 key.  But certainly, you're free to take notes, should you

11 desire.

12            Also, I did mention to you and I mentioned to

13 every jury orientation in the federal system only the judge does

14 the sentencing.  You should not consider anything on the issue

15 of sentencing.

16            You'll also notice that there are 14 of you in

17 that jury box.  This case will be decided by 12 with the

18 concurrence of the attorneys -- and I've gotten positive

19 feedback over the years -- that there are no alternates because

20 you're sitting in a certain seat.  There are no alternates.  14

21 of you are fully qualified.

22            At the end of the trial after all the summation

23 of the attorneys, after I've given you the instructions and you

24 read through them, then all 14 names will be put in a small box;

25 and Ellen will go over to one of the jurors who will reach in

1 and pull two names at random. So, in effect, there are now 14
2 qualified jurors. We won't know who the two alternates are and
3 the 12 who will be remaining until the very end just before you
4 go in to start your deliberations.
5             You've taken an oath which states you're going to
6 decide this case based upon the evidence and the evidence alone.
7 Therefore, we don't want you to decide who you like and who you
8 dislike and decide the case accordingly. Of course, you may say
9 good afternoon or -- good morning or good afternoon as you pass
10 them in the hallway; but you may say nothing further; and you
11 may not extend any favors or accept any favors, however slight,
12 to or from anyone involved in this case.
13             When you get home this evening, I'm sure friends
14 and family will be asking have you been selected to serve on a
15 jury. Of course, you may tell them that you have and you can
16 tell them it's a criminal case; but you may say nothing else
17 because, if you do, it might affect your thinking in this case
18 and all you need to rely on is the evidence you get from that
19 witness stand.
20             So, therefore, you'll not discuss this case with
21 anyone, including each other, until the whole case is completed,
22 you have the Court's instructions, you hear the summation of the
23 attorneys, and I direct the final 12 to commence deliberations.
24             Also, do not make any private investigation
25 concerning this case. Don't talk to your own doctor, your own

1  lawyer, or anyone else you think might have expert knowledge.

2  Simply listen to the testimony as it's presented on the witness

3  stand and make up your minds based upon that evidence and that

4  evidence alone.

5              I always mention to juries the last four or five

6  years that out of Washington they take a poll of all the federal

7  trial judges; and we've added the following to almost all the

8  instructions given nationwide.  Okay.  You're not to do any

9  independent research concerning this case.  You're not to use

10  Google research, no texting, no tweeting, or whatever else the

11  young people do these days.  Simply listen to the evidence

12  that's presented to you in the court.

13              Now, once the case is over, I come and visit with

14  each jury for at least an hour.  I'll answer any question that

15  you have, any prior history of the case, what went on when you

16  were out of the room.  Because you'll see I'll be keeping a

17  notepad myself.  I keep just track of witnesses; and if there is

18  something I think the jury might be interested in later, you'll

19  see me pick up a red pen.  So, there are some entries; and

20  that's what I'll fill you in on when the case is over and you've

21  reached a verdict.

22              If you have any problem during the course of the

23  trial, please let a member of our staff know.  Should you be

24  delayed in getting here in the morning for any reason, you need

25  to give us a call because we can't do anything without all 14 of

1  you here.  Something like a car breakdown or a medical

2  emergency, we need to attend to that and so do you.  But we need

3  to know about it because we can't go forward without all of you

4  here.

5                We take breaks, as they say, about every hour and

6  a half.  If anyone, the attorneys, the parties, the witnesses,

7  my court staff, or the jury, needs to take a break at any time

8  for whatever reason, let us know.  We can always take a

9  ten-minute break.  Happens in all trials, and there is no

10  embarrassment factor here.  We're all living as family for the

11  next, you know, court days.  If anybody needs to take a break

12  for whatever reason, let us know.

13                By the way, that reminds me.  During -- even

14  during the openings which I apologize for ahead of time, I may

15  have to take a two-minute call from the chief judge.  And I'm

16  meeting -- I'm going to have you remain here.  I'm not going to

17  get trapped back there.

18                So, I apologize in advance if I have to interrupt

19  the counsel.  I'll stop the trial, take the call, and then get

20  right back into it, okay, meaning if I know there's a jury here,

21  there's no way I'm going to get trapped on the phone back in my

22  office.

23                If at any time you can't hear or if you have

24  trouble hearing, raise your hand, let me know; and I'll get the

25  attention of the marshal; and he'll let me know.  We'll pull the

1 microphone in or ask a witness to speak up. But you'll see
2 witnesses, as they come in here, try to move that witness seat
3 forward. It doesn't move. So, we have to move the microphone
4 or they have to speak up.
5          When you take breaks, you're certainly free to go
6 outside of the jury room unless we say it's only going to be
7 about two or three minutes; and then, you'll gather again in the
8 jury room. Ellen will have you lined up in the same sequence
9 that you're sitting. We'll all remain standing until everybody
10 is in their place; and then, you can have the seats; and we'll
11 continue on.
12          As you will note, the Federal Courthouse is a
13 smoke-free facility. Certainly, you may do so, if you desire,
14 during the extended breaks outside of the building. Once
15 again -- I think I mentioned this before -- we'll go back after
16 the case is over. The attorneys go back to -- go on to their
17 next case. You go back to your employment and, what is it, I
18 call my next case.
19          But for the parties involved, the Government as a
20 party and the two individual Defendants, this is their day in
21 court. That's what the whole system is about, putting -- a
22 contested fact issue in a civil case, what does the contract
23 mean or something like that. In a criminal case, guilty or not
24 guilty. If there's a disagreement, what do we do? We put it to
25 a cross-section of the community. Listen to the facts and then

1  go in and then decide the facts based upon the law.

2          We also get questions over the years who are all

3  the folks here.  I'll mention that to you.  Ellen is my case

4  manager.  You'll probably have some interaction with her.  She

5  stepped out.  We have our official court reporter.  I have two

6  law clerks, what is it, Jeremy is one, Lora is the other.  She's

7  back in the office looking up some stuff.  But they are graduate

8  lawyers, and we're in the middle now of looking to hire for the,

9  what, the 2019 term?

10          THE LAW CLERK:  Yes, sir.

11          THE COURT:  We have historically between two and 300

12  applications for one slot a year.  They're on a two-year term.

13  So, one comes off and one comes on each year.

14          I also have four law student interns who are here

15  for a semester for credit.  Okay.  We have Eddie across the

16  room.  He's one of the law students, but we have a total of

17  four.  And depending upon their classes, you'll see different

18  young people on the wall -- I shouldn't say on the wall -- but

19  seated on the far side of the courtroom.  And they're observing

20  for school grades and so forth.  That's what we have.

21          Now, the next thing we're going to do is an

22  opening statement.  Now, an opening statement is nothing more

23  than what the attorneys feel the evidence will show, what will

24  the evidence show in their mind.  If they get out of that narrow

25  channel, you may hear the other lawyers getting up and saying,

1  "Judge, I object.  They're arguing the case to the jury."  See,
2  that's -- that's for later.  That's the summation.  Here, what
3  they anticipate the evidence will show.
4              Now, throughout this whole thing, remember, the
5  burden is on the Government.  The Defendant has no obligation to
6  make any statement at all, certainly not to take the stand if
7  they desire not to; but I know the attorneys for the parties,
8  they'll have plenty of questions for everybody on
9  cross-examination.
10             So, the clock is about to start.  So, again, the
11 Government's got the burden of proof.  They're going to go
12 first.  Each side -- I've given the Government 30 minutes and a
13 total of 40 minutes for the defense, 20 minutes and 20 minutes.
14 So, that's what we're going to start out on.
15             And again, I apologize ahead of time to counsel.
16 If I have to take a break, it will be a short break; and I'll be
17 right back; and we'll keep the jury in place.  We're going
18 straight on with that.
19             All right.  So, at this time, Plaintiff -- I mean
20 -- Plaintiff?  Government, please proceed.
21         MR. ARMSTRONG:  Thank you, your Honor.
22             Ladies and gentlemen, good afternoon.  You have
23 before you two Defendants in this case, and the evidence is
24 going to show that these Defendants were drug dealers.  The only
25 difference between these Defendants and the common familiar drug

1  dealer on the street is that one Defendant wore scrubs and the

2  other Defendant pretended to be the administrator of a medical

3  clinic.

4            So, who are these Defendants?  The first

5  Defendant is Gazelle Craig.  She was the only physician at a

6  supposed pain management clinic called Gulfton.  She had one job

7  at Gulfton:  write prescriptions.  And boy, was she good at her

8  job.  In a little more than two and a half years, she wrote over

9  30,000 prescriptions, 30,000 prescriptions for two drugs,

10  hydrocodone, which is an opioid, and a drug called carisoprodol.

11  It's a muscle relaxant.

12            These two drugs, when prescribed together, are

13  taken by people to get high.  These two drugs, when prescribed

14  together, have zero legitimate medical purpose.  These two

15  drugs, when prescribed together, are sold by other drug dealers

16  on the street.

17            Ladies and gentlemen, you're going to see in this

18  case that Defendant Craig knew for a fact that her prescriptions

19  ended up in the hands of drug dealers.  What did she do?  She

20  kept signing prescription after prescription after prescription.

21  Why?  For the money.  Every prescription that went out the door,

22  $300 came in.  Cash.  Each time, every single time.

23            You're going to see in this case that Defendant

24  Craig sold her medical license for money.  For the money, she

25  wrote prescriptions when she knew there was no real or

1  legitimate medical reason to do so.  For the money, she wrote

2  all of her different patients the same prescription for those

3  two drugs.  For the money, she wrote prescriptions for pills for

4  drug dealers to sell on the street.

5              Who is the other Defendant?  The other Defendant

6  is Shane Faithful.  He set the rules at the operation.  You're

7  going to hear he ran the show.  You're going to see Defendants'

8  operation was flooded with people, brought there by other drug

9  dealers.

10             These drug dealers had a special name, a code

11  name.  They were called facilitators.  And to manage the flood

12  of people brought to the operation by facilitators, by other

13  drug dealers, Defendant Faithful set a number of rules to make

14  sure the place ran smoothly.  All these rules had a common

15  thread going across them.

16             Number one, don't get busted.  Number two, keep

17  the people coming in.  Number three, keep the prescriptions

18  going out the door.  Number four, piles of cash stacking up.

19             You're going to see in this case Defendants were

20  partners in crime.  Together they dumped millions -- millions of

21  pills onto the streets of Houston.  They didn't care about the

22  risks that these drugs posed to the patients.  They didn't care

23  about the risks that these drugs posed to the community.  All

24  they cared about was stacking up their money.

25             But you're going to see also Defendants were

1  smart.  They didn't sell their prescriptions on the street

2  corner.  They didn't sell their prescriptions at somebody's

3  house.  That's a sure fire way to get busted.  So, what did they

4  do?  How did they hide their crimes?

5            They set up a medical clinic.  They put a big

6  sign on top of it:  Gulfton Community Health Center.  They hid

7  in plain sight.  A medical clinic was the perfect disguise.  It

8  was the perfect cover.  It was the perfect way to pretend that

9  their drug dealing was something else, something legitimate.

10 But you're going to see in this case the rot behind the

11 disguise.  You're going to see the Defendants' operation was

12 rotten to the core.

13           Each morning the gates opened up at Gulfton at

14 about 7:30; and it was flooded with patients, up to 60 people a

15 day.  Cars come in like a drive-through McDonald's.  How does

16 that happen?  Again, the facilitators.  These facilitators,

17 these other drug dealers, would bring two, three, four, five

18 people in the morning, drop them off, pay $300 for each person

19 to get the same prescription from Defendant Craig.

20           And then, once all those people got the

21 prescriptions, facilitators would take them -- take them to the

22 pharmacy, turn those prescriptions into pills, and sell them on

23 the street.  You're going to see in this case that Defendants'

24 true customers were these facilitators, these other drug

25 dealers.

1          Armed security guards roamed all around Gulfton.

2   These armed guards enforced the Defendants' rules, all of which

3   again were set up to avoid getting busted.  Rule number one, no

4   one can have a cell phone or a bag inside the clinic.  If you

5   were caught on your cell phone, you were thrown out.  You're

6   going to see this rule had one purpose:  to make law

7   enforcement's job harder.  After all, with a cell phone, anyone

8   can record anything at any time.

9          You're going to see Defendants couldn't take that

10  risk.  The quickest way to get busted is to get caught on tape.

11  So, they banned cell phones but not just cell phones.  Anything

12  that could be -- that could possibly be used as a recording

13  device, headphones, Bluetooth, banned.

14          Rule Number 2 -- let me back up.  You're going to

15  hear that sometimes Defendant Craig, she would bend the rules.

16  Sometimes she would catch a person on their cell phone, and she

17  wouldn't necessarily throw them out.  What she would do, she

18  would prescribe that person fewer opioids.  For being on the

19  phone, that person would get five or ten fewer opioids.

20          Think about that for a second.  There is zero

21  legitimate medical purpose for doing that.  You're going to see

22  in the real world a person either needs the pills or they don't;

23  and that decision should be made on your medical condition, not

24  whether you're on the phone.

25          But Defendant Craig, she knew the fix was in.

1 You're going to see she knew the prescriptions weren't real.

2 She knew the patients weren't real, and she knew the diagnoses

3 weren't real. She knew that the prescriptions didn't belong to

4 the patient, they belonged to the facilitator who brought the

5 person there.

6 Rule Number 2, everyone had to have this thing

7 called DPS history or PMP history. Long story short, that's

8 just some record that some other person prescribed you opioids

9 at some point. You're going to see Defendants used this to

10 cover their tracks. They used it to weed out people called

11 doctor shoppers, people who received a bunch of prescriptions

12 all within 30 days.

13 You're going to see Defendants didn't need to

14 take the risk in giving a prescription to a doctor shopper

15 because they were making money hand over fist with these

16 facilitators.

17 Rule Number 3, you had to pay up. You're going

18 to see that Defendants charged about $300 for every prescription

19 to go out the door, but there was a catch. No insurance, no

20 credit card; cash only. And you're going to see most people

21 didn't even pay for their own prescriptions. The facilitators

22 would pay for two, three, four, five patients up front all at

23 once. Once they got the prescriptions, they would take them.

24 You're going to see that the prescriptions belonged to the

25 facilitators, the other drug dealers, who paid for them.

1              You're also going to see that the people that the

2 facilitators brought to the Defendants' operation had to play

3 the game, as well.  You're going to see these people had to say

4 the magic words, the words that would hide Defendants' crimes,

5 the words that would pretend like drug dealing is just medicine.

6              What were these magic words?  You had up to 60

7 people all in a waiting room all filling out questionnaires.

8              "Are you in pain?"

9              "Yeah, I'm in pain."

10              "Have you been in pain for a long time?"

11              "Yeah, a very long time."

12              "How did your pain start?"

13              "A car accident."

14              "What makes your pain feel better?"

15              "Hydrocodone."

16              "What makes your pain feel worse?"

17              "No hydrocodone."

18              And you're going to see that once these people

19 said these magic words, they were escorted to an examination

20 room where the show went on.  Oh, it looks like you can't do

21 this.  You can't do that.

22              "You know what?  I think you have chronic lower

23 back pain, right?"

24              "Right."

25              "You know what?  You have muscle spasms, too,

1  right?"

2            "Right."

3            And in strolls Dr. Craig.  You're going to see

4  Defendants didn't want you to see what actually happened in

5  their clinic.  You're going to see why they had that rule about

6  no cell phones.  They didn't want you to see what actually

7  happened.

8            You're going to see Defendant Craig spending 45

9  seconds, 45 seconds, with people before giving them

10 prescriptions for these dangerous addictive drugs.  45 seconds.

11 About enough time to come in; introduce herself; say, "Hey, are

12 you in pain?"  Hear those magic words, make some small talk, and

13 walk out.  45 seconds.  And there will be a prescription waiting

14 for that person at the front desk.  You're going to see it

15 wasn't even close to real medicine.

16            Ladies and gentlemen, Defendants' operation was

17 booming.  Their business was booming.  With the help of

18 facilitators, up to 60 people a day came there each day every

19 day.  There was a line out the door to get in.

20            Now, are you going to see that people just loved

21 the care and attention that Dr. Craig provided in 45 seconds?

22 No.  You're going to see the Defendants were handing out golden

23 tickets to facilitators, golden tickets to other drug dealers.

24 All a facilitator had to do was pay $300 cash, and that money

25 purchased them a prescription.  They can then take that

1  prescription to the pharmacy, turn it into pills, and sell it on
2  the street for far more than $300.

3         At the end of the day, Defendants would take all
4  the facilitators' money, all that cash; and they would divide it
5  up.  One cash envelope to Defendant Craig; one cash envelope to
6  Mr. Faithful.  Each day, every day that process repeated itself:
7  Those two Defendants splitting all the facilitators' cash.

8         So, ladies and gentlemen, that's an outline of
9  our case.  What are you going to hear and see?  You're going to
10  see witness testimony and you're going to see documents.  You're
11  going to hear from witnesses who are going to tell you all about
12  the Defendants' corrupt deal with these facilitators, all about
13  that deal where facilitators handed over piles of cash to
14  Defendants.  In exchange, Defendants handed back piles of
15  prescriptions for pills to sell on the street.

16         You're also going to hear from a physician, a
17  physician who practiced in Texas here for 20 years.  He's going
18  to talk to you about something called the standard of care, the
19  standard of care.  Why is that important?  Why is the standard
20  of care important?  Because you're going to hear the one thing
21  we have to prove to you is that Defendants' prescriptions were
22  not -- were not for a legitimate medical purpose or they were
23  outside the scope of professional practice.

24         Keep those two terms in the back of your mind
25  throughout this trial; and you're going to see that giving

1 prescriptions to drug dealers so they can sell those pills on

2 the street is not for a legitimate medical purpose; and it's

3 outside the scope of professional practice.  That's a

4 no-brainer.

5          But we're going to prove that same thing to you

6 in a different way.  You're going to hear about every physician

7 has to follow the standard of care before prescribing these

8 dangerous addictive opioids; and if you don't, your prescription

9 does not have a legitimate medical purpose.

10          So, what did Defendant Craig do?  She threw that

11 standard of care out the window.  She blew off the common sense

12 rules that every single physician has to follow before

13 prescribing these drugs.

14          What are some of these rules?  Number 1, get all

15 of the patient's medical records about their injury and about

16 their condition.  How were they injured?  How had their injury

17 gotten better or worse?  What treatment have they done?  Has it

18 been good or bad?  Has it helped or not?  Common sense things.

19 Defendant made zero effort to get these records.  She just

20 prescribed, prescribed, prescribed.

21          Rule Number 2 -- Step Number 2, don't just dump

22 -- don't just jump into the deep end of opioid treatment.  Try a

23 less risky treatment first, things that don't carry the

24 potential for abuse or harm to the patient, things like physical

25 therapy, exercise, swimming, yoga, over-the-counter medications

1 like Advil.  Again, you're going to see Defendant made zero

2 effort, zero effort, to try these things.  She just prescribed,

3 prescribed, prescribed.

4            And ladies and gentlemen, you might hear some

5 attacks in this case, as well.  You might hear some attacks on

6 someone who was a former office worker.  This person was a

7 confidential human source.  They provided -- a person, I should

8 say.  That person provided information to DEA, information that

9 was critical in helping bust the Defendants' operation; and for

10 that information, she was paid.

11           And she also stands to receive a reward, about

12 $40,000, for providing that information that was critical to

13 helping to bust the Defendants' operation.  Whether she gets

14 that amount, not guaranteed.  What amount she gets, not

15 guaranteed.

16           What is guaranteed, that has zero to do with her

17 testimony you're going to hear on the stand.  You may also hear

18 an attack on the physician who talks about the standard of care.

19 Evaluate for yourself whether that attack has any merit

20 whatsoever.

21           You may hear an attack on the DEA.  The DEA

22 didn't write down the specific date on which the confidential

23 human source provided them documents.  That's a mistake.

24 They'll own it.  Evaluate for yourself whether that mistake has

25 any merit or if it is just a distraction to take your eye off

1  the ball, to take your eyes off the facts.

2            You may hear an attack on someone who got a

3  prescription in this case, and he made recordings, and he made

4  recordings after he was busted for running his own drug dealing

5  operation in the disguise of a medical clinic.  Why did he do

6  that?  Because he was hoping for leniency.  He's hoping for a

7  shot at a lighter sentence.  What will his sentence be?  Not

8  guaranteed.  To get that, we need to see what he wants.  It's

9  not guaranteed.

10           Ladies and gentlemen, I ask one thing of you.  I

11  want you to listen to the testimony on the stand.  I want you to

12  scrutinize it because, when you do, you'll see that it is

13  supported -- supported by all the other evidence in this case;

14  and this evidence is not going to come in all at once.

15           It's going to come in pieces.  There are going to

16  be several witnesses in this case.  No one witness will be able

17  to give you everything at once.  And once you hear all the

18  evidence, all the witness testimony, all the documents, you're

19  going to have one clear picture:  that Defendants were dealing

20  drugs and they were hiding behind a medical clinic.

21           Defendants were selling prescriptions that had no

22  legitimate medical purpose.  And after you hear that evidence,

23  after all the evidence is done and completed, I'll have an

24  opportunity to come back to you; and we'll ask you to return a

25  verdict.  We'll ask you to say that the Defendants are guilty as

1    charged.

2              Thank you.

3              THE COURT:  Thank you.

4              We'll now hear from the defense.

5              MR. WILLIAMS:  May I proceed, your Honor?

6              THE COURT:  Yes, sir.

7              MR. WILLIAMS:  Ladies and gentlemen of the jury,

8    you've just gotten a synopsis of what the Government thinks they

9    have to prove in this particular case.  The problem is you don't

10   have the details.

11             Now, they've done a very good job in his opening

12   argument attempting to distract you from what this evidence is

13   going to really be, okay?  You have to pay close attention as to

14   who provides this particular evidence.  He gave you a synopsis

15   of lots of things; but I want to give you a synopsis of what we

16   believe the testimony is going to show, their witnesses, all

17   right?

18             As the judge told you, we don't have to prove a

19   thing.  He talked to you about us attacking these particular

20   people.  We're going to attack them because their credibility is

21   zero.  Let's just start with this.  This is a witness list that

22   I got.  Let's just talk about this, okay?

23             We anticipate from their witness list that

24   Special Agent Tonya Graham will testify.  Tonya Graham is a DEA

25   agent.  She's going to testify that she went to see Dr. Gazelle

1    Craig.  When she went in, she had a wire.  She recorded certain

2    things.  But pay close attention, very close attention about

3    what was not recorded.  You won't hear that.

4                You're going to hear what they talked with the

5    doctor about, okay?  And the whole tape is there for you to

6    hear.  But I submit to you-all they're not going to play the

7    whole tape for you.  They're going to give you bits and pieces

8    of the tape as to the conversation between Tonya Graham and

9    Dr. Craig, okay?  That's what you're going to see.  They're

10   going to try to show you what they want you to see while hiding

11   what they don't want you to see, all right?

12               Let's talk about this witness list.  I'm going to

13   go down this witness list and some of the people that I think

14   are going to be in this particular case.  In my opinion, I

15   believe that the Government's main witness is going to be a

16   person by the name of Loren Phillips.

17               Ms. Phillips was employed by this particular

18   clinic.  She had met Shane Faithful.  She had worked for Shane

19   Faithful as his personal assistant prior to becoming an employee

20   at the clinic.  While she was at the clinic, certain protocol

21   was set up that Mr. Armstrong has told you about, okay?  Certain

22   protocols.

23               Their job -- the jobs of the employees of the

24   clinic was to follow the particular protocol, see the particular

25   patients, make sure everything was run in a legitimate manner,

okay?  The doctor does the medicine, all right?

Now, the evidence is going to show that Ms. Loren Phillips is going to tell you from that witness stand right there that she worked there for approximately ten months.  She's making approximately four to $5,000 a month from the clinic.  What she's not going to tell you is the extra money she was making violated the rules of the clinic, okay?

Mr. Armstrong has told you about these so-called facilitators.  I submit to you right now there's not going to be not a one, not a one, facilitator to testify from this particular witness stand.  He's telling you all this because he wants you to fill in the particular gaps, okay?  What I see on this particular deal here, not a one.  I'm talking about facilitators, but they don't want you to fill in the blanks for them.  Instead, because somebody else claimed that that's what they did, that's what they actually did.

Now, let's get back to Loren Phillips.  28 December, 2016, she's going to testify she calls DEA and lied to them right up front.  She's going to tell you I'm calling to report a clinic that my cousin works for, my sister works for, or somebody works for and I just want to report what's going on here.  Lying from the beginning, okay?

We're going to announce to you that she's correct.  After I attack her, it's going to be real clear to you-all what really, really happened, okay?  But let's talk

1   about what she's going to testify.  She calls the particular

2   DEA.  They meet with her once in February; meet with her again

3   in March, March 1st, 2017.  He meets with her.

4                   At the time she meets with him, she signs an

5   agreement with the Government to become a paid informant.  They

6   have to pay her for the information that she's going to bring to

7   them, all right?  Now, meets with them again later in March,

8   March 10th, I believe, 2017.  They talk again.  Meets with them

9   again on the third occasion, March 22, 2017.  And on that

10  particular day, lo and behold, she brings documents to the DEA.

11                  Now, Mr. Armstrong talked to you about the

12  attacks, okay?  Obviously, we're going to attack what's going

13  on.  There's protocol when you bring evidence to DEA.  And I

14  submit to you that this protocol hadn't been followed, okay?

15  He's given it to you up front to lessen the blow of the attacks

16  that they're going to get because they didn't do it right.

17                  Now, 22nd of March, she comes in.  They give her

18  $3500.  She brings them evidence.  She brings them evidence from

19  the clinic that are copies of things that she wants you to

20  believe are actual original documents that she stole from the

21  clinic.  She stole them.  Remember, she quit December of '16.

22  She brings these documents to the DEA March of '17.  All right?

23                  Now, all of you got a job.  All of you work

24  somewhere.  When you leave the job, what are you supposed to do

25  with the things that belong to your job?  Do you take them home

1  with you?  Do you take them home with you and tell them, "Oh, I
2  prepared the documents, I believe I should have kept them
3  myself."  She's going to be attacked; and after these attacks,
4  it's going to be clear to you what she's done, okay?
5              Now, in addition to her, I submit to you every
6  person on this witness list, okay, has something to gain by
7  testifying here.  Either they're working for DEA or they've been
8  paid in some kind of manner.
9              Next witness that we think is going to come in
10 that I think is going to be significant to you-all is a person
11 by the name of Davis Webster, a convicted felon.  All right?
12 He's pled guilty to being involved in one of these pain clinics
13 in 2016.
14             Now, why does he become important?  Because the
15 evidence from this witness stand will show that on three
16 separate occasions DEA sent people into this particular clinic,
17 all right?  And they were turned away.  Turned away.  Three
18 separate occasions.  Turned away.  They want you to believe it's
19 a pill mill, that you just come in, pay your money, you get the
20 scripts.
21             That's what a pill mill is.  If you're a pill
22 mill, you're not going to turn any money away.  You come in, you
23 got the money, we're going to give it to you.  There was set
24 protocol there that they followed; and as a result, it weeded
25 out certain people who shouldn't have gotten these particular

1 prescriptions.

2         Now, let's get back to Davis Webster. You have
3 to go get him because he's worked in a clinic before. He knows
4 buzz words. He knows the things to operate. All right? And
5 what does he do? He goes in and commits the scene of all
6 scenes. You lie to your doctor. I always go to the doctor, I
7 always tell the truth. And if your doctor can't rely upon what
8 you're telling them, how are they going to make a proper
9 diagnosis?

10         But he's going to tell you, "Yeah, I lied. I put
11 things on my chart that weren't true." Okay? And he's going to
12 tell you, "Oh, I knew from the beginning I was going to get a
13 script. I know what to do."

14         Now, Davis Webster, was he paid? No. Not in
15 cash. He received the benefit that any of us would give up in
16 exchange for anything on earth. That's an opportunity to get a
17 reduced sentence from a crime that he has pled guilty to and he
18 is currently awaiting sentence for.

19         Now, Mr. Armstrong wants to tell you and he wants
20 to you tell, ah, no guarantees. But I can bet you hundred to
21 one he'll tell you he's fully expecting some -- this Government
22 to tell some judge that his sentence -- now, mind you, he pled
23 guilty in 2016; still hasn't been sentenced yet. It's part of
24 his work, part of his attempt to get his sentence down.

25         But he's going to tell you, "Well, if I tell the

1 truth, I hope they reduce my sentence." Well, they never put
2 that in writing because they know. Experienced lawyers like me,
3 I understand how it works; and I'm going to question him about
4 it; and I'm going to question him to the point so you can get a
5 true picture as to how the Government does its business, all
6 right?

7            Mind you, three people gone in but none of them
8 can get scripts. Send Davis Webster in March, he gets a script.
9 Goes back in May, he gets a script. Now, because he's a
10 convicted felon, he violates the rule. He takes in something to
11 get recorded.

12           Unfortunately, the first time he goes in, the
13 batteries doesn't work, if that's what you believe. Second time
14 he goes in, fuzzy, fuzzy, fuzzy other than one encounter with
15 Dr. Craig.

16           Now, same line of theory, same theory. He goes
17 in, he lies to the doctor just like the agents lied to the
18 doctor. But they're going in lying to the doctor in hopes that
19 they would get scripts so they could come bring that to you and
20 say, "Oh, see what they're doing." He's made a big deal about
21 millions of scripts being put out there, millions of pills.

22           The problem is nobody is going to talk to you
23 about all these millions of pills. They want to run you down a
24 rabbit trail to believe since they were all prescribed, they
25 were all illegitimate. There's not going to be any testimony

1  regarding that other than from their other expert, Mr. Graves
2  Owen.
3           He's a doctor.  He practiced 20 years, had a
4  clinic, sold it six years ago.   His job now is to testify for
5  the Government for $400 an hour.  He's going to testify that he
6  -- they submitted certain patient files to him for review.  He's
7  going to tell you that everything that was done was incorrect.
8  Everything, okay?  All right?
9           Now, he's also going to tell you he's been paid
10 $21,000 to date not counting what he's going to get testifying
11 here live.  That's how the Government does business.  This is
12 what they're going to bring you.  This is what they're going to
13 bring you.
14           Now, he's going to also tell you that in all of
15 his time in testifying he has never in testifying for the
16 Government found anybody to meet the standard of care when he's
17 being paid $400 an hour from the Government.  Ever.
18           Now, there are three other witnesses on this list
19 whom I know worked at this particular clinic:  Shametra Morgan,
20 Olivia Caldwell, and Ericka Hayes.  I don't know who the
21 Government is going to bring, don't know.  All right?  It's
22 their case to prove, not mine.
23           But I submit to you standing here right now each
24 one of them will tell you that they're disgruntled employees,
25 all right, who are no longer working for the clinic at the time

1 it was closed.  They have an ax to grind with this clinic,

2 Dr. Craig and Shane Faithful; and you will hear that their paid

3 informant, Ms. Loren Phillips, after she quit the clinic, was

4 being used by the Government to reel them in so they can come in

5 and say what they wanted to say about this particular clinic.

6 They're going to put the pieces together, and all of them are

7 going to be from the person who they're paying to do this, all

8 right?

9            Now, in all of these particular cases, you're

10 going to have Tonya Graham go in and appear to be a patient,

11 going to appear -- she was under an alias.  It's not going to be

12 her real name.  She's an agent.  She can do that.  Davis

13 Webster, the person who is awaiting sentencing, convicted felon,

14 the Government informant since 2006.  Loren Phillips being paid

15 by the Government.  Dr. Graves Owen being paid by the

16 Government.  And the agents.

17            Now, there's one person on this witness list by

18 the name of Paul Fernandez; and I believe he was a patient of

19 the clinic.  He's going to be the only person who will be able

20 to testify he was a legitimate patient.  Now, I believe the

21 evidence will show with him that someone paid him to go in to

22 get these particular scripts.  They paid him.  They paid him to

23 go in and do this.  He, in turn, turned around and gave them to

24 somebody else.

25            Now, ladies and gentlemen, that's against the

1  law.  I don't know if he knows it or not, but it's surely

2  against the law.  But they're going to bring him here, all

3  right?  And you're going to see with him, too, he's a convicted

4  felon.

5              Now, I don't know what he's going to say; but I

6  do know this:  He's never been prosecuted for anything that he's

7  done wrong because he's given the Government what they want.

8  Give them what they want, they leave you alone; but I'm certain

9  that the evidence will show that he will come in here and

10 testify to you he went in.  He'll probably say that medicine

11 stinks, okay?

12             All right.  He's going to come in and say that;

13 but he's also going to say to you, "I lied to the doctor to get

14 the scripts."  Okay.  He'll never be able to tell you that she

15 knew what he was doing.

16             And again, it's going to go back to the

17 credibility of these particular witnesses.  If you go to the

18 doctor, the doctor ought to be able to rely upon what you tell

19 them.

20             Now, what are we talking about here?  Talking

21 about pain.  Everybody knows pain is subjective, okay?  Nobody

22 can tell you what your pain is, okay?  You go in and tell the

23 doctor you hurt there, how is the doctor going to determine if

24 you're hurting or not?  You tell him you got a pain level of

25 "X," "Y," "Z," she's going to have to rely upon that.

1            So, basically, what you're going to hear from all
2  this particular evidence is that these witnesses lied to the
3  doctor, received their -- and given scripts that she wrote
4  legitimate prescriptions for; and now, they want to come back
5  and say what you did is wrong.
6            Now, you're going to hear from a couple of other
7  DEA agents.  James Gainer who is sitting here is going to
8  testify about how he entered into the agreement, signed off on
9  the agreement with Loren Phillips, the relationship that they
10 had from the time that she signed up with them to the time that
11 they closed the particular clinic, how they used her as for
12 intelligence to gather against this particular clinic; and there
13 was money to pay.
14            You're also going to hear from his partner,
15 Diversion Investigator Michael Mills, this gentleman sitting
16 here.  And what you're going to hear is that every time somebody
17 testifies from here, they will be able to say that's right,
18 that's right, that's right.  Okay?  That's what's going to
19 happen.  They're going to tell you that, all right?  Then,
20 they're going to admit to the mistakes.  They're going to admit
21 to the mistakes that they made in gathering evidence.
22            You're going to hear from Loren Phillips when she
23 brought the evidence in, they told her, "Take it back, bring it
24 on a thumb drive."  She brings it back on a thumb drive.  They
25 download the thumb drive.

1           "Well, what date did you do it?"

2           "I don't know.  Didn't put the date on it," okay?

3           "What did you do with the thumb drive?"

4           "Gave it back to her."

5           "Where is the thumb drive?"

6           "We don't know."

7           Okay.  "Did she eventually bring some documents

8    with her?"

9           "Yeah, they brought some documents back."

10          "Well, when they brought the documents back, how

11   can you be sure that what was on the thumb drive is the same

12   documents?"

13          "We don't know.  We didn't hand it to her."

14          These are the kind of attacks that you're going

15   to see; and once you hear this particular evidence, it's going

16   to make you hesitate to say "What in the world is really going

17   on?"

18          Now, I'd submit to you while you're listening to

19   the evidence, there's certain things that the Government has to

20   prove, okay?  They've already started the rabbit trail of

21   millions of scripts.  They don't have to prove millions of

22   scripts.  There are going to be four counts.  The first one is

23   going to be a conspiracy.

24          All a conspiracy is is an agreement between two

25   or more people to do something wrong, okay?  They're going to

1 submit that Dr. Craig and Shane Faithful did something wrong,

2 okay?  Within that, they're going to also say that others known

3 and unknown to the grand jury, okay?  All right.  These are the

4 people who worked at the clinic.  The people at the clinic were

5 doing things, these very witnesses, that neither of them knew

6 about, benefiting for themselves.  You'll hear that from the

7 evidence, all right?

8                Now, the other three counts are going to be

9 aiding and abetting each other by writing a script for -- two

10 scripts to Davis Webster, the convicted felon, who's testifying

11 to get a better deal and for Tonya Graham, the DEA agent, who

12 went in and deceived this lady into giving her a script, okay?

13 That's what they have to prove.

14                But you're going to hear about all the money.

15 Nobody has to prove that they made a dime, but you're going to

16 hear a lot of that evidence, okay?  That's what they're going to

17 bring you because they want you to think, "Oh, they're just drug

18 dealers if they're doing this."

19                You're going to hear about millions of scripts,

20 millions of pills being handed out, okay?  The problem we have

21 is that there are going to be very few people that come in here

22 and say, "I got them" and "I got them; and what they gave me, I

23 didn't need; and there was no medical use for them."

24                And out of all of these particular scripts, I

25 submit to you that they sent about 35 of these charts to Graves

1  Owen who is going to be their expert, the paid expert, which is
2  correct, all right?  And he's going to tell you everything they
3  did was incorrect.  He's going to also tell you everything --
4  any time he testified for the Government everything any doctor
5  does is incorrect, doesn't meet the standard of care.
6           Now, you're going to hear about what we call the
7  standard of care.  There's not going to be any definition to
8  that.  It's going to be what the doctor thinks.  You know as
9  well as I know you can go to the same doctor you go to -- you
10 can have the same symptoms and go to four or five different
11 doctors and might get four or five different responses, okay,
12 because pain is subjective.  It's subjective.  Nobody can tell
13 you what pain is and nobody can tell you as a doctor how to
14 prescribe.
15          THE COURT:  20 minutes has gone past.  You can stop
16 whenever you want because I know you're sharing time.
17          MR. WILLIAMS:  Thank you very much, your Honor.
18          THE COURT:  I'll give you a 50 -- that's --
19          MR. WILLIAMS:  Five minutes.
20          THE COURT:  No.  Time is 50 percent used.
21          MR. WILLIAMS:  Yes, sir.  Thank you.
22          So, once you hear all this evidence and the
23 attacks that I'm paid to do to put holes in this so-called
24 evidence that they have, it's going to shock your conscience.
25 You'll say, "Wow, it's just that easy?  When the Government

1 decides that, hey, they want to put you on their radar and bring
2 charges, they'll go to any extent to get you, any extent like
3 paying ex-employees, paying convicted felons by reducing their
4 time, paying doctors to come in and say what she did is not
5 correct, giving people free passes for doing things that they
6 clearly are charged with preventing from happening.
7             They are the law.  They're going to come in here
8 and tell you "I did that" and nobody is ever going to charge
9 them with anything.  That's the kind of evidence you're about to
10 get, and they want to just soften the blow up front, and I'm
11 just giving it to you the way I perceive the evidence is going
12 to be shown.
13             I think once you hear this evidence, you're going
14 to say this stinks.  This just stinks.  This is just not the way
15 my government needs to do business.  And as a result, after you
16 hear all this evidence, your verdict out to be not guilty.
17             Thank you very much.
18       THE COURT:  We're going to move the podium, I
19 understand; is that correct?
20       MR. LEWIS:  Thank you for the Court's indulgence.
21       THE COURT:  So, I'll stop the clock for the moment.
22             By the way, when they're moving the podium, in
23 some Federal Courts -- and I don't require it -- they have the
24 one -- some judges have the one-arm rule.  You can never get
25 away more than one arm from the podium.

1              And also, if you sat on juries in state court,
2  you understand in state court they usually examine witnesses
3  sitting down; and I say you can stand, you can sit, whatever
4  you're more comfortable with doing.  So, that's why we're moving
5  the podium at this point.
6              Are you going to plug it in?
7          MR. LEWIS:  I don't think I need it, Judge.  I talk
8  pretty loud.
9          THE COURT:  What do you think, Ellen, plug it in?
10          THE CASE MANAGER:  It's up to you.
11          THE COURT:  All right.  Let's give it a try.  If I
12  can't hear you, then we'll just delay again and plug it in.
13              All right.
14          MR. LEWIS:  May I proceed, Judge?
15          THE COURT:  Go right ahead.
16          MR. LEWIS:  Good afternoon.  As I said to you earlier,
17  my name is Don E. Lewis; and I represent Gazelle Craig who is
18  one of the Defendants here in this case.  Dr. Craig is seated
19  over at the table.
20              One of the things that I love about our system of
21  justice, our laws in this country is one of the things that
22  Judge Hittner spoke about during voir dire examination.  That
23  particular thing is that you are the judge of the credibility of
24  the witnesses and facts related to this case.  Not Mr. Lewis,
25  not Mr. Williams, not Mr. Armstrong; you are.

1           And as you listen to this evidence, I would -- I
2   hope that you remember some of the things that Mr. Armstrong
3   said to you as they relate to my client and the evidence related
4   to my client.
5           As stated, one of the reasons that we're here
6   today is the result of the US Government bringing a criminal
7   indictment against my client, Gazelle Craig, alleging a
8   conspiracy to unlawfully distribute controlled substances in
9   violation of federal law.
10          As part of the defense for Dr. Craig, I think the
11  evidence will show that Dr. Craig was a licensed medical doctor
12  and medical director in the State of Texas and practicing
13  medicine at Gulfton Community Health Center which is located at
14  6306 Gulfton, Texas.
15          The evidence will show that Dr. Craig was one of
16  the medical providers that treated patients at this clinic and
17  patients with complaints of chronic pain in addition to other
18  medical conditions.
19          Let me stop just briefly.  Mr. Williams said a
20  couple of things about this, and I need to follow up on it.
21  It's alleged in this case that Gulfton clinic was operating as a
22  pill mill.  A pill mill by definition is a clinic where you
23  don't have physical examinations of patients, you don't have
24  medical records, you don't have patients with radiographic
25  studies, you don't have patients that fill out paperwork like

1 pain contracts and other types of paper -- of things, you don't
2 have a clinic that utilizes tests.

3            They don't take blood pressures, they don't do
4 anything like that.  A pill mill is a clinic where an individual
5 shows up with their money; they go into a room where the doctor
6 is seated; they say to the doctor, "Here's the money in return
7 for a prescription"; and they walk out the door.  That's not
8 what happened at Gulfton Community Clinic.

9            There was patient care and medical services that
10 the evidence will show that happened at Gulfton Community
11 Clinic, Dr. Craig utilizing in treating these patients
12 medications to include both controlled and non-controlled
13 medications.

14            These medications are medications that are
15 approved by the FDA, the Food and Drug Administration, for
16 treating these conditions.  They're approved by the CDC, which
17 is the Center of Disease Control; approved by the manufacturer
18 with recognized indications for the complaints and the
19 conditions that these patients had.  And it's documented in the
20 patient's records.

21            They didn't just go in and ask for a drug and
22 walk out the door.  That's not what happened at Gulfton clinic.
23 Dr. Craig determined after a series of things that happened with
24 these patients that these medications were medically necessary
25 for the chief complaint that's documented in the file regarding

1  why that -- what brought that patient to the clinic.  That's
2  what the evidence will show.
3          The evidence will show that as a medical director
4  and medical doctor treating patients at Gulfton, Dr. Craig
5  created protocols which are systems to screen individuals that
6  were seeking medications for purposes of abuse or diversion.
7          There were several tools that the evidence will
8  show that were utilized in order to screen those patients to
9  determine whether or not there was a valid reason for
10 prescribing these drugs to the patient.  Just like what happens
11 when you and I go to a doctor.
12         We go to our doctors.  We give them certain
13 information, and that doctor acts on that information to
14 determine how they treat us.  That's what happened at Gulfton.
15 It wasn't a pill mill.
16         The evidence will show that Dr. Craig or others
17 performed appropriate physical assessments and examinations to
18 include lumbar examinations, musculoskeletal examinations,
19 neurological examinations for patients that arrived at this
20 clinic in order to arrive at a forensic diagnosis for each of
21 the patients that she treated.  That's not what happens at a
22 pill mill.
23         The evidence will show that she utilized blood
24 tests, radiographic studies to evaluate the patient and the
25 patient's condition in order to determine the appropriate

1    medication to prescribe for the patient's condition.

2                    The evidence will show as medical director she

3    implemented protocols as stated earlier; and these protocols

4    will screen patients for what you will hear from their expert,

5    Dr. Graves Owen, regarding aberrant behavior, what's referred to

6    as aberrant behavior, drug-seeking behavior.

7                    These protocols worked because the evidence will

8    show that individuals were recognized as doctor shoppers.

9    Individuals were recognized that they were non-compliant with

10   the contract that they had with the clinic.  And the evidence

11   will show that these individuals were dismissed.

12                   The evidence will show that these protocols were

13   effective and prevented at least two of the Government's

14   undercover agents that was sent into the clinic for the express

15   purpose of obtaining treatment and opiate medication from

16   receiving neither, as Mr. Williams has alluded to, sent there

17   for that reason, sent there on -- with knowledge to say what

18   they need to say; but they left with nothing.

19                   Just a failure of them to obtain that medication

20   is proof that these, quote, screening protocols worked and that

21   this clinic was not operating as a pill mill as indicated by the

22   Government.

23                   I have to comment about Dr. Graves Owen who is

24   going to be the Government's expert in this case.  As

25   Mr. Williams has stated to you earlier, Dr. Graves Owen is

1  nothing but a Sunday morning quarterback.  The Government sent
2  him records for him to review, and he reviewed those records.
3  No patients were there, just based on the -- based on the
4  records in addition to the fact that -- a little bit about
5  Dr. Owen.
6              Dr. Owen had a pain clinic over in Round Rock,
7  Texas.  He had it for some time, but he shut that clinic down
8  six years ago.  He's not even a practicing doctor.  And the
9  clinic that he did have that was a pain clinic over in Round
10 Rock, Texas, it was completely different from Gulfton.
11             Dr. Owen didn't treat patients with medication
12 management.  The evidence will show that most of the patients
13 that Dr. Owen treated, he treated them with what's called
14 intervention; and you will hear that right from this stand.
15 Intervention is surgery, epidural steroid injections, trigger
16 point injections, ablations, nerve blocks, not medication
17 management as you see happening in Gulfton.
18             His opinions, again, were solely based on his
19 review of the records; and I'm not going to bore you with this;
20 but it's very important.  Dr. Owen is paid for his testimony.
21 He's paid for it.  And he's never seen a provider has met the
22 standard of care, which is not a standard of care for a
23 consensus of individuals like himself, it's his standard of
24 care.
25             The evidence will show that the medical director

1  -- as medical director, Dr. Owen -- I mean -- I'm sorry.  The

2  evidence will show that Dr. Craig as medical director and

3  treating physician for a patient utilized medication management

4  along with other what's called modalities.

5            Modalities in this case means massage therapy,

6  patient education, stretching.  Those were utilized in addition

7  to the medications that were prescribed.  The use of these types

8  of things are not consistent with a pill mill.

9            There's evidence that you will hear and you will

10  see that has to give you pause as to its credibility and

11  authenticity.  The Government will show you audio and video; and

12  I submit to you that none of this evidence is credible, that it

13  certainly doesn't show that the plea interaction and the things

14  that are -- that might be there that might be of benefit to my

15  client miraculously some way is missing or we can't understand

16  it or the device didn't work.  Keep in mind again you are the

17  judges of the credibility.  Not me, not Mr. Armstrong; you are.

18            A large part of the evidence and the testimony

19  that the Government will be asking you to use to find Dr. Craig

20  guilty was provided by a paid Government informant who left the

21  clinic as a result of a workplace dispute, not because she

22  believed the clinic was involved in any wrongful conduct; and

23  you will hear it from this stand.

24            There is no way that I can give you an overview

25  of all of the evidence in my time that I have left here, but I

1 submit to you that the evidence -- a large part, if not all, of

2 the evidence is going to lack credibility, it's going to lack

3 authenticity, and it's going to lack trustworthiness.

4          After you have considered -- considered this

5 incompetent and flawed evidence, I assert that you will

6 determine that Dr. Craig did not commit the offenses which she

7 stands charged and return a verdict of not guilty.

8          Thank you

9          THE COURT:  All right.  Are you ready to proceed?

10          MR. ARMSTRONG:  Absolutely, your Honor.

11          THE COURT:  Okay.

12          We're going to have partial with the next

13 witness; and then, we'll adjourn for the day.  Everybody okay

14 with that?

15     (No response.)

16          THE COURT:  Okay.  Call your first witness.

17          MR. WILLIAMS:  May we invoke the rule, Judge?

18          THE COURT:  Yeah.  The rule is now invoked.  If there

19 is anybody here who is not to be -- who is -- what is it, not an

20 expert or is going to testify in this case.

21          Anybody here out in the audience that you see?

22          MR. ARMSTRONG:  No, your Honor.

23          MR. WILLIAMS:  Just for the record, Judge --

24     (Discussion off the record between counsel.)

25          MR. ARMSTRONG:  Sure.

1          Your Honor, the parties have agreed that Task
2   Force Officer Saldana who has involvement in this case will be
3   in the courtroom, but the United States does not expect that he
4   will testify in this case.
5          THE COURT:  Okay.
6          MR. WILLIAMS:  And as a result of him not being under
7   the rule, he can't testify.
8          THE COURT:  Right.
9          MR. WILLIAMS:  Fair enough.
10          THE COURT:  All right.
11          MR. HELFMEYER:  The United States calls --
12          THE COURT:  Hang on one second.
13          Okay.  Yes, ma'am, raise your right hand to be
14   sworn.
15      (The witness, **TONYA GRAHAM,** called on behalf of the
16   Government, was sworn.)
17          THE CASE MANAGER:  Thank you.
18          THE COURT:  Take the stand, please.
19                     DIRECT EXAMINATION
20   BY MR. HELFMEYER:
21   **Q**   Good afternoon, ma'am.
22   **A**   Good afternoon.
23   **Q**   Could you, please, state your name for the record.
24   **A**   Tonya Graham.
25   **Q**   And what do you do for a living, ma'am?

1 **A**    I'm a special agent with Drug Enforcement Administration.

2 **Q**    Special Agent Graham, how long have you been with DEA?

3 **A**    Since August of 2002.

4 **Q**    And where at DEA do you work?

5 **A**    I work in the tactical diversion squad.

6 **Q**    What kind of cases do you investigate at the tactical

7 diversion squad?

8 **A**    We investigate cases on doctors, nurse practitioners,

9 physician assistants, pharmacies, pharmacy owners, clinics.

10 **Q**    Before you came to DEA, did you have any other law

11 enforcement experience?

12 **A**    Yes, I did.

13 **Q**    Where did you work?

14 **A**    I worked with the United States Secret Service.  I was a

15 uniformed division officer where I had the honor and privilege

16 of protecting the 42nd President of the United States, William

17 Jefferson Clinton, and his vice president, Al Gore, as well as

18 the 43rd president of the United States, George W. Bush, and his

19 vice president, Dick Cheney, their families, and other foreign

20 dignitaries.

21 **Q**    Special Agent Graham, you testified that you're with the

22 tactical diversion squad at DEA; is that right?

23 **A**    Yes.

24 **Q**    Could you explain to the jury what "diversion" is?

25 **A**    Diversion is when prescription drugs are prescribed to a

1  person; and then, that person transfers the drugs to someone

2  else for an illicit use.

3  **Q**    How does that work?

4  **A**    That works like a person is prescribed drugs; and then,

5  they give those drugs to someone else whom the drugs were not

6  prescribed.

7  **Q**    Does DEA focus on any particular drugs that are being

8  diverted?

9  **A**    Primarily, opioids because they're dangerous and highly

10  addictive.

11  **Q**    At the tactical diversion squad, what kind of investigative

12  tools do you guys use?

13  **A**    We utilize surveillance, undercover operations, as well as

14  confidential sources.

15  **Q**    Why confidential sources?

16  **A**    Confidential sources, they bring us intelligence regarding

17  criminal activity.

18  **Q**    Special Agent Graham, in this case, what was the name of

19  the clinic that you were -- that your squad was investigating?

20  **A**    Gulfton Medical Clinic.

21  **Q**    Generally, what part of Houston is that in?

22  **A**    59 and the Hillcroft area in Houston.

23  **Q**    And Special Agent Graham, what was your role in this

24  investigation?

25  **A**    My role was as an undercover agent.

1 **Q**    As a --

2         THE COURT:  Counsel, we're going to stop the clock for

3 a moment.  We're going to plug in the microphone, okay?  That

4 way we don't have to worry about it, worry about the sound

5 carrying behind to counsel and myself, okay.

6         MR. HELFMEYER:  Your Honor, is that better?

7         THE COURT:  Yeah.  Tap it now and make sure it's --

8 it's on.  Okay.  Pull it into you, counsel.

9         MR. HELFMEYER:  Is that better, your Honor?

10        THE COURT:  Yeah.

11        MR. HELFMEYER:  Thank you, sir.

12 BY MR. HELFMEYER:

13 **Q**    I'm going to ask you the same question again in case the

14 jury has forgotten:  What was your involvement in this case,

15 Special Agent Graham?

16 **A**    I was the undercover agent.

17 **Q**    In addition to being the undercover agent, are you aware

18 generally of the investigation and tools that your squad used?

19 **A**    Yes.

20 **Q**    Are you aware -- are you familiar with the surveillance

21 that was set up on the Gulfton clinic?

22 **A**    Yes, I am.

23 **Q**    And what type of surveillance did your squad use to surveil

24 Gulfton clinic?

25 **A**    It was electronic surveillance.  We call it a pole camera.

1   **Q**   What is a pole camera, Special Agent?

2   **A**   A pole camera is a device that's placed where you can

3   monitor the activity 24 hours, seven days a week; and it's being

4   recorded.

5   **Q**   Why do you use a pole camera in investigations?

6   **A**   A pole camera just captures all of the activity during

7   business hours, non-business hours, on the weekend.  It just

8   gives you a big picture of the activity that's going on.

9           MR. HELFMEYER:  Your Honor, if we could hit the

10  lights, I'd like to play for the jury Government's Exhibit 507.

11  BY MR. HELFMEYER:

12  **Q**   Before we get started, Special Agent Graham, could you tell

13  the jury what date is shown on this screen.

14  **A**   June 19, 2017.

15  **Q**   And what is depicted on this video from June 19, 2017?

16  **A**   This is the side view of the Gulfton Medical Clinic.

17          THE COURT:  That's pretty -- pretty -- you can't see

18  it too well.  Oh, wait.  I think it may be on the other screen.

19  We all got -- we all have the pictures on our -- all right.

20  Well, it's pretty -- it's not --

21          MR. WILLIAMS:  Excuse me, your Honor, my monitor is

22  not portraying these.

23          MR. LEWIS:  Could you turn me on, too.

24          THE COURT:  Yeah.  Ellen will take care of that.

25          MR. WILLIAMS:  Sure, your Honor.

1      MR. HELFMEYER:  I'll wait until counsel's videos are

2  up before I ask to play the video.

3      THE COURT:  All right.

4  BY MR. HELFMEYER:

5  **Q**   Special Agent Graham, what words are depicted at the top of

6  the screen?

7      MR. WILLIAMS:  Wait, wait.

8      MR. HELFMEYER:  We're not going to play the video.

9      MR. WILLIAMS:  Okay.

10      THE WITNESS:  It says Gulfton Medical.

11  BY MR. HELFMEYER:

12  **Q**   And what time is the video starting at right now?

13      THE COURT:  I'll tell you what, is it all going to be

14  that --

15      MR. HELFMEYER:  It will improve, your Honor.

16      THE COURT:  It will improve, okay.  Because,

17  otherwise, we can kill all the lights.

18      MR. HELFMEYER:  I believe it will be okay the way it

19  is.

20      THE COURT:  Okay.

21      MR. HELFMEYER:  If not, thank you.

22      THE COURT:  All right, go on.

23  BY MR. HELFMEYER:

24  **Q**   Special Agent Graham, what time is depicted there?

25  **A**   7:25 a.m.

1  **Q**    Does that mean that this video starts at 7:25 a.m.?

2  **A**    Yes.

3            THE COURT:  Are we going to play it?

4            MR. HELFMEYER:  I'm waiting for --

5                Is it up?

6            MR. WILLIAMS:  It's here.  Can't see it, but it's

7  here.

8            THE COURT:  Yeah.  It's not clear, but you say it will

9  improve.  All right, go right ahead.

10            MR. HELFMEYER:  And for the record, we're going to

11  play it at double speed.

12            THE COURT:  You object to that, counsel?

13            MR. WILLIAMS:  Absolutely, Judge.  How am I going to

14  determine what's going on at double speed?  And how is this jury

15  going to see it?

16            THE COURT:  Well, it depends on how fast double speed

17  is, I suppose.

18                All right.  Do it regular speed, if we can.

19            MR. HELFMEYER:  And Judge, my only concern is that

20  it's a better understanding of what's depicted on the video at

21  double speed than it's --

22            THE COURT:  Okay.  Then, objection overruled.

23                I'll allow you to proceed.

24                If you want it replayed later at regular speed,

25  I'll be glad to do it.

1          MR. HELFMEYER:  Thank you, your Honor.

2          THE COURT:  Okay, go on.

3      (Government's Exhibit Number 507, video recording, was

4  played in open court.)

5  BY MR. HELFMEYER:

6  Q    What can you see on the video?

7          THE COURT:  All right.  Hold it a second.  Hold it a

8  second.

9               Jeremy, let's knock out all the lights.

10          THE LAW CLERK:  Yes, sir.

11          THE COURT:  Sorry about that, everybody.  Come on.

12               Wow.  But it is clearer.  Just for the record,

13  let the record reflect every light in the courthouse is down.

14          MR. WILLIAMS:  Judge, the problem is I can't take

15  notes.

16          THE COURT:  Well, if we need to, we can play it back

17  regular speed and you can take notes at that time.

18               All right.  Go right ahead.

19               But by the way, no.  Your objection is overruled.

20          MR. WILLIAMS:  And at that particular time, the

21  question would have already been asked, Judge.

22          THE COURT:  Well, overruled.  You got a ruling.

23               Go on.

24  BY MR. HELFMEYER:

25  Q    Before we get started, Special Agent Graham, what is going

1 on in the video right now?

2          THE COURT:  Do you have a laser pointer?

3          MR. HELFMEYER:  I do not, your Honor; but I'm happy --

4          THE COURT:  No.  Wait a second.  On the contrary.

5 Let's get it done right.

6               We have one, don't we, Ellen?

7          THE CASE MANAGER:  We do.

8          THE COURT:  If you can see what it looks like.

9          THE CASE MANAGER:  If I can see what I'm doing.

10         THE COURT:  Here you go, counsel.

11 BY MR. HELFMEYER:

12 **Q**    Special Agent Graham, can you see where my laser pointer

13 is?

14 **A**    Yes.

15 **Q**    All right.  And what is right here (indicating)?

16 **A**    That's a line of people sitting outside the gate.

17 **Q**    All right.  And Special Agent Graham, where my laser

18 pointer is right now, what is that?

19 **A**    That's a gate that has just been opened.

20         MR. HELFMEYER:  For the record, I'm highlighting on

21 the other screen --

22         THE COURT:  I can't hear you.

23         MR. HELFMEYER:  For the record, I'm highlighting on

24 the other screen -- it doesn't work.  No problem.

25              All right.  If we can play the video, Special

1  Agent Gainer.  Thank you.

2      (Government's Exhibit Number 507, video recording,

3  continued to be played in open court.)

4  BY MR. HELFMEYER:

5  **Q**   Special Agent Graham, where is my pointer right now?

6  **A**   People are still walking inside the gate.

7  **Q**   And what about where my pointer is now?

8  **A**   There's several cars, numerous cars going inside the gate,

9  as well.

10          THE COURT:  This was taken on a pole on the opposite

11  side of the street; is that correct?

12          THE WITNESS:  Yes, your Honor.  I don't know exactly

13  which -- where it was located, but it was the opposite street.

14  BY MR. HELFMEYER:

15  **Q**   Special Agent Graham, what is going through the gate right

16  now?

17  **A**   A 15-passenger van.

18          MR. HELFMEYER:  And for the record, we've stopped the

19  recording.

20  BY MR. HELFMEYER:

21  **Q**   What time is depicted on the video screen?

22  **A**   7:28 a.m.

23  **Q**   During your investigation, Special Agent Graham, did you

24  learn what time Gulfton clinic opened?

25  **A**   At approximately 7:30 a.m.

1  **Q**    And during your investigation, did you learn whether there

2  were other businesses in that building?

3  **A**    Yes, I did.

4  **Q**    What did you learn about those other businesses?

5  **A**    Yes.  To my knowledge, there was a dental office, as well,

6  in that building.

7  **Q**    And what time did that dental office open?

8  **A**    That dental office opened at 9:00 a.m. to 6:00 p.m., Monday

9  through Friday.  Except on Tuesdays and Thursdays, it was

10  closed.  And on Saturdays, from 9:00 a.m. to 3:00 p.m.

11          MR. HELFMEYER:  At this time, I'd like to play

12  Government's Exhibit 508.

13      (Government's Exhibit Number 508, video recording, was

14  played in open court.)

15  BY MR. HELFMEYER:

16  **Q**    Special Agent Graham, what date is depicted on the screen

17  in Government's Exhibit 508?

18  **A**    January 29, 2017.

19  **Q**    Is it January?

20  **A**    I'm sorry, June 29, 2017.

21  **Q**    And that's a Thursday, is it not?

22  **A**    Yes, it is.

23  **Q**    What did you say about the Thursday with respect to the

24  dental clinic?

25  **A**    That it was closed.

1  **Q**   What time is depicted on the screen on the video?

2  **A**   7:17 a.m.

3  **Q**   And what is written at the top of the screen here in the

4  video?

5  **A**   Gulfton Medical Centers.

6        MR. HELFMEYER:  And we can play at double speed this

7  one, as well?

8        (Government's Exhibit Number 508, video recording,

9  continued to be played in open court.)

10  BY MR. HELFMEYER:

11  **Q**   What is on the screen in the right-hand side where my

12  pointer is?

13  **A**   People are gathering on the sidewalk along the fence.

14  **Q**   What am I highlighting here (indicating)?

15  **A**   Someone is walking up, opening the gate; and the people

16  along the sidewalk are waiting for the gate to open.

17        (Government's Exhibit Number 508, video recording,

18  continued to be played in open court.)

19  BY MR. HELFMEYER:

20  **Q**   And Special Agent Graham, what is going through the gate?

21  **A**   A long line of cars are going through the gate.

22  **Q**   Special Agent Graham, do you know roughly how many cars

23  we've seen go through the gate on this video?

24  **A**   There's been approximately 20 to 30 cars go through.

25  **Q**   Was that consistent with the June 19, 2017, video?

1  **A**    The June 29, 2017?

2  **Q**    The June 19th, Government Exhibit 507, the first video we

3  played for the jury.

4  **A**    Yes.

5  **Q**    At this time, we stopped the recording.

6              What time is shown on the video?

7  **A**    7:23 a.m.

8  **Q**    All right.

9          MR. HELFMEYER:  At this time, we would like to play

10  Government's Exhibit 509.

11          (Government's Exhibit Number 509, video, was played in open

12  court.)

13  BY MR. HELFMEYER:

14  **Q**    Is that sun glare that is depicted on the video right now?

15          MR. WILLIAMS:  Objection, Judge.  Leading.

16          THE COURT:  Sustained.

17  BY MR. HELFMEYER:

18  **Q**    Can you tell why it's kind of fuzzy on the screen?

19  **A**    The sun is glaring.

20  **Q**    What date is this video from, Special Agent?

21  **A**    July the 7th, 2017.

22  **Q**    And what time does it start?

23  **A**    7:31 a.m.

24  **Q**    If we could play this video.

25          (Government's Exhibit Number 509, video recording,

1 continued to be played in open court.)

2 BY MR. HELFMEYER:

3 **Q**   And where is this video taken?

4 **A**   It's taken the same location, in front of Gulfton Medical

5 Clinic.

6 **Q**   What are we looking at on the screen here (indicating)?

7 **A**   We're looking at several cars go through the gate that's

8 been opened.

9 **Q**   And what about where my pointer is above the cars?

10 **A**   People along the fence line walking inside the gate.

11       THE COURT:  All right.  Do you want to keep moving,

12 please.

13       MR. HELFMEYER:  We're almost done with the recording,

14 your Honor.

15       THE COURT:  Okay.

16 BY MR. HELFMEYER:

17 **Q**   And we've stopped the recording.

18       Special Agent Graham, what time is depicted on

19 the screen?

20 **A**   7:36 a.m.

21       MR. HELFMEYER:  If we could put the lights back on,

22 your Honor.

23       Thank you.

24 BY MR. HELFMEYER:

25 **Q**   Special Agent Graham, you testified that your role in this

1  investigation was to go undercover into the clinic.  What does

2  it mean to go undercover?

3  **A**    To go undercover as a law enforcement officer, you portray

4  a fictitious person to gather evidence.

5  **Q**    Why do you go undercover?

6  **A**    I go undercover for officer's safety as well as so I won't

7  be recognized.

8  **Q**    Do you use your real name?

9  **A**    I do not use my real name.

10  **Q**    For the same reasons?

11  **A**    Yes.

12  **Q**    I'd like to turn your attention to June 15th of 2017.

13          Did you go to Gulfton clinic that day?

14  **A**    Yes, I did.

15  **Q**    Why were you going to Gulfton clinic?

16  **A**    I was going that day acting as a patient to see if I can

17  get a prescription.

18  **Q**    On June 15th of 2017, did you take any recording devices

19  with you?

20  **A**    Yes, I did.

21  **Q**    Why?

22  **A**    I took recording devices with me to gather the evidence

23  during my visit there at Gulfton as well as for officer safety.

24  **Q**    Did you take more than one?

25  **A**    I did.

1    **Q**    And why more than one?

2    **A**    I take more than one just in case one malfunctions or the

3    battery runs out.

4    **Q**    Roughly, what time did you arrive at Gulfton?

5    **A**    Approximately, 9:55 in the morning.

6              THE COURT:  All right.  I think -- ladies and

7    gentlemen, you were -- I understand you were downstairs, a lot

8    of you, before 8:00 in the morning, correct?

9         (No response.)

10             THE COURT:  I think it's been a good long day for you.

11   So, I think we're going to adjourn at this time.  Keep in mind,

12   tomorrow, we get back in at 11:30; and we'll go 11:30 to 1:00,

13   take a lunch break, and then start on that schedule from then

14   on.

15                  Thank you for your patience.  Thank you for your

16   attention.  So, we're going to adjourn for the day.  We'll see

17   you tomorrow morning ready to resume at 11:30.  You may stand

18   and leave.

19             THE COURT SECURITY OFFICER:  All rise.

20        (The jury recessed for the day at 5:24 p.m.)

21             THE COURT:  All right.  We're still on the record.  I

22   do want to state that the Government's used 36 minutes, the

23   Defendants have used 38.  That's what the time says for today,

24   and I'll put it on the chart tomorrow.

25                  I have one other thing I want to discuss, please,

1  on the record.  By the way, the action I'm taking and the order

2  that is in a moment being, what is it, distributed to the

3  Government's attorneys and the defense attorneys -- and you may

4  have to explain it to your client -- is based on US Supreme

5  Court precedent, not just District Court, not just Circuit Court

6  but US District Court -- the US Supreme Court precedent.

7              Mr. Faithful's bond is hereby revoked; and he's

8  committed to the custody of the United States Marshal, there to

9  remain until the completion of trial.

10             We stand adjourned.

11        (Court recessed for the day at 5:26 p.m.)

12

13

14                  C E R T I F I C A T E

15

16     I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter, to

18  the best of my ability.

19

20  By: /s/Gayle L. Dye_____        05-07-2018_____

21        Gayle L. Dye, CSR, RDR, CRR        Date

22

23

24

25