| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | SOUTHERN DISTRICT OF TEXAS |
| 3 | HOUSTON DIVISION |

```
 4   UNITED STATES OF AMERICA            .
                                         .  Criminal Action
 5   VERSUS                              .  No. H-17-CR-419
                                         .
 6   GAZELLE CRAIG, D.O., and            .  Houston, Texas
     SHANE FAITHFUL,                     .  March 20, 2018
 7                                       .  11:40 a.m.
                         Defendants.     .
 8   . . . . . . . . . . . . . . . . . . .

 9
                      TRANSCRIPT OF PROCEEDINGS
10
             BEFORE THE HONORABLE DAVID HITTNER AND A JURY
11
                           DAY 2 OF 9
12
     APPEARANCES:
13
     FOR THE UNITED STATES OF AMERICA:
14
             Mr. Scott Philip Armstrong
15           Assistant United States Attorney
             UNITED STATES DEPARTMENT OF JUSTICE
16           1400 New York Avenue, NW
             Washington, DC  20005
17           202.355.5704
             scott.armstrong@usdoj.gov
18
             Mr. Devon Morel Helfmeyer
19           Assistant United States Attorney
             UNITED STATES DEPARTMENT OF JUSTICE
20           1000 Louisiana
             Suite 2300
21           Houston, Texas  77002
             713.567.9513
22           devon.helfmeyer@usdoj.gov

23

24
              PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25        TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

```
 1                      APPEARANCES

 2                      (continued)

 3  FOR THE DEFENDANT GAZELLE CRAIG, D.O.:

 4          Mr. Don E. Lewis
            ATTORNEY AT LAW
 5          1717 St. James Place
            Suite 625
 6          Houston, Texas  77056
            713.622.0318
 7          lewisfirm@aol.com

 8  FOR THE DEFENDANT SHANE FAITHFUL:

 9          Mr. Cornel A. Williams
            CORNEL A. WILLIAMS & ASSOCIATES
10          1405 Palm Street
            Houston, Texas  77004
11          713.520.5153
            FAX:  713.524.4528
12          willassoc@aol.com

13

14

15  COURT REPORTER:

16          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8007A
17          Houston, Texas  77002
            713.250.5582
18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF WITNESSES

 2                                                    Page

 3  FOR THE UNITED STATES OF AMERICA:

 4  TONYA GRAHAM
```

```
 5      DIRECT EXAMINATION (CONTINUED) BY MR. HELFMEYER      4
        CROSS-EXAMINATION BY MR. WILLIAMS                   61
 6      CROSS-EXAMINATION BY MR. LEWIS                      93
        REDIRECT EXAMINATION BY MR. HELFMEYER              122
 7      RECROSS-EXAMINATION BY MR. WILLIAMS                123
```

```
 8  LOREN PHILLIPS
```

```
 9      DIRECT EXAMINATION BY MR. ARMSTRONG                126
```

```
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      PROCEEDINGS
 2                      March 20, 2018
 3              THE COURT:  All right, be seated.  I think we're ready
 4   to go.
 5                      Government, you're up.
 6              MR. HELFMEYER:  Thank you, your Honor.
 7         (The witness, TONYA GRAHAM, called on behalf of the
 8   Government, was previously sworn.)
 9                      DIRECT EXAMINATION
10                      (continued)
11   BY MR. HELFMEYER:
12   Q    Good morning, ma'am.
13   A    Good morning.
14   Q    Special Agent Graham, when we left off yesterday, we had
15   started to talk about June 15th of 2017; is that correct?
16   A    Yes.
17   Q    And was that the day that you went to Gulfton Community
18   Health Center?
19   A    Yes.
20   Q    You testified yesterday that you took multiple recording
21   devices with you that day?
22   A    Yes.
23   Q    And why do you take multiple recording devices?
24   A    I take multiple recording devices for safety as well as if
25   the battery runs out or if there's a malfunction with one of the
```

1    devices.

2    **Q**    Was one of the recording devices that you took that day an

3    audio recorder?

4    **A**    Yes.

5    **Q**    Did the audio recorder that you took with you that day

6    capture your entire trip at Gulfton?

7    **A**    Yes, it did.

8    **Q**    Hundred percent?

9    **A**    100 percent.

10   **Q**    Did you also have a video recorder?

11   **A**    Yes, I did.

12   **Q**    Have you had a chance to review the video from your trip to

13   Gulfton?

14   **A**    Yes.

15   **Q**    Does the video accurately reflect your -- the beginning of

16   your trip to Gulfton?

17   **A**    Yes, it does.

18          MR. HELFMEYER:  At this time I'd like to play a few

19   minutes of the recording from June 15th.

20          THE COURT:  Is this audio or video?

21          MR. HELFMEYER:  This is video, your Honor; and the

22   quality is good enough, your Honor, that I think that these

23   lights should be sufficient.

24          THE COURT:  Okay.

25          (Video recording was played in open court.)

1  BY MR. HELFMEYER:

2  **Q**   Special Agent Graham, what are we looking at?  Where are

3  we?

4  **A**   In the back parking lot of the Gulf clinic.

5  **Q**   Straight ahead -- straight ahead where my pointer is, what

6  are we looking at?

7  **A**   The gate to the parking lot.

8  **Q**   Is that the same gate that we saw on the -- looks like --

9  is there a second gate ahead of that?

10 **A**   Yes.

11 **Q**   All right.  And is that second gate the same gate that we

12 saw on the pole camera yesterday afternoon?

13 **A**   Yes, it is.

14        MR. HELFMEYER:  Can we pause it for a second.

15 BY MR. HELFMEYER:

16 **Q**   Special Agent Graham, we just heard a voice.  Whose voice

17 was that?

18 **A**   That was my voice.

19 **Q**   And what were you saying?

20 **A**   I was calling out the license plate of the Corvette that

21 was parked there.

22 **Q**   Why call out that license plate?

23 **A**   Because based on our investigation, we knew that

24 Mr. Faithful drove a black Corvette.

25        MR. HELFMEYER:  You can resume the video.  Thank you.

1        (Video recording continued to be played in open court.)

2            MR. HELFMEYER:  All right.  If we can stop the video

3  again.

4  BY MR. HELFMEYER:

5  **Q**    Special Agent Graham, when you opened the door, we heard a

6  voice.  What was that?

7  **A**    That was myself.

8  **Q**    And what were you saying and what were you doing?

9  **A**    I said, "Whew."

10 **Q**    Why did you say, "Whew"?

11 **A**    I didn't realize there was that many people out in that

12 area.

13 **Q**    Special Agent Graham, what is the time stamp on the screen

14 right now?

15 **A**    058 -- 8:58 in the morning.

16 **Q**    You testified that you arrived around 9:55; is that

17 correct?

18            THE COURT:  Microphone, please.  Pull it down.

19            MR. HELFMEYER:  Thank you, your Honor.

20 BY MR. HELFMEYER:

21 **Q**    You testified that you arrived at about 9:55 a.m.; is that

22 correct?

23 **A**    That is correct.

24 **Q**    And on the time stamp, it says 8:58.  Was it off an hour?

25 **A**    Yes, it was.

1 **Q**    So, what time is it actually on the video that we're

2 looking at right now?

3 **A**    It says 8:58.

4 **Q**    And what time was it actually?

5 **A**    9:55 -- 9:58.

6 **Q**    Where are you now in the video that we're looking at?

7 **A**    I just walked into the building, and this is like an open

8 front foyer area.

9 **Q**    Was it like an overflow waiting room?

10          MR. WILLIAMS:  Objection.  Leading.

11          THE COURT:  Sustained.

12 BY MR. HELFMEYER:

13 **Q**    Special Agent Graham, how many people were in this area

14 that is pictured on the screen right now?

15 **A**    There were approximately 30 people in that area.

16          MR. HELFMEYER:  If we can resume the video?

17          (Video recording continued to be played in open court.)

18          MR. HELFMEYER:  If we could pause the video.

19 BY MR. HELFMEYER:

20 **Q**    Special Agent Graham, what just happened?

21 **A**    The door was opened to the clinic by the security guard,

22 and he told us to -- we were going --

23          MR. WILLIAMS:  Objection if she's going into what

24 somebody else said.

25          THE COURT:  Overruled.

1 BY MR. HELFMEYER:

2 **Q**    Go ahead, Special Agent.

3 **A**    He told us to open the door and have our IDs out and ready.

4 **Q**    And did you have a reaction to that?

5 **A**    Yes, I did.

6 **Q**    What happened?

7 **A**    I realized I left my undercover ID.  So, I had to leave to

8 go and get it.

9 **Q**    While you were in that second waiting room with the folks

10 lining up out the door, did you see anybody lying on the ground?

11 **A**    Yes, they were.

12          MR. WILLIAMS:  Objection.  Leading, Judge.

13          THE COURT:  Overruled.

14 BY MR. HELFMEYER:

15 **Q**    You can answer the question, Special Agent Graham.

16 **A**    Yes, they were lying on the ground.

17 **Q**    So, on the screen is your hand opening the door.  What are

18 you doing?

19 **A**    I'm going out to go to my car.

20 **Q**    To do what?

21 **A**    To get my undercover ID.

22          MR. HELFMEYER:  I'd like to fast-forward the video to

23 9:03:52 on the video.

24 BY MR. HELFMEYER:

25 **Q**    What did you do when you left the clinic to get your ID?

1  **A**    I went to a neutral location and got my purse and got my

2  undercover ID; and then, I came back.

3  **Q**    On the screen right now, what are we looking at?

4  **A**    This is me driving back into the parking lot after I

5  received my ID.

6         MR. HELFMEYER:  If we could resume the video, please,

7  Ms. Mortezavi.

8      (Video recording continued to be played in open court.)

9         MR. HELFMEYER:  Stop the video here.

10 BY MR. HELFMEYER:

11 **Q**    Special Agent Graham, where are you right now in the video?

12 **A**    I'm now inside the waiting room area.

13 **Q**    How many people were -- roughly, how many people were in

14 the waiting room?

15 **A**    Approximately 30.

16 **Q**    What was the general atmosphere of the waiting room?

17 **A**    The general atmosphere of the waiting room was a lot of

18 people, just a lot of noise.

19 **Q**    So, it was loud?

20 **A**    Yes.

21 **Q**    What's on the walls right here (indicating) -- and I'll use

22 the pointer -- the walls right here (indicating)?  And on the TV

23 screen, you can barely see --

24         THE COURT:  We can't hear you.

25 //

1 BY MR. HELFMEYER:

2 **Q**    Special Agent Graham, what's on the walls?

3 **A**    Those are signs saying that there were no cell phones, no

4 electronics, no large backpacks, and purses, things of that

5 nature.

6         MR. HELFMEYER:  If we can resume the video.

7    (Video recording continued to be played in open court.)

8 BY MR. HELFMEYER:

9 **Q**    Special Agent Graham, what does that sign say right here

10 (indicating)?

11 **A**    "No cell phones allowed."

12 **Q**    And to the left, the yellow sign?

13 **A**    "Capacity, 23.  Chairs are reserved for patients only."

14 **Q**    Do you remember if there were more than 23 people in that

15 room or was that about right?

16 **A**    No.  There was about 30 people in that room.

17    (Video recording continued to be played in open court.)

18         MR. HELFMEYER:  Stop the video.

19 BY MR. HELFMEYER:

20 **Q**    Special Agent Graham, what just happened?

21 **A**    I walked up to the counter to give my ID.

22 **Q**    And did you have an exchange with the person behind the

23 counter?

24 **A**    Yes, I did.

25 **Q**    What did the person behind the counter tell you?

1 **A**    That they were almost --

2         MR. WILLIAMS:  Objection, Judge.  Hearsay as to what

3 somebody else said.

4         THE COURT:  All right.

5              How do you get around that, counsel?

6 BY MR. HELFMEYER:

7 **Q**    Special Agent Graham, what did you learn from your

8 interaction with the person behind the counter?

9 **A**    That I didn't know if I was going to be seen that day

10 because they were almost at capacity.

11 **Q**    Do you know who the person was behind the counter?

12 **A**    Yes, I do.

13 **Q**    Who was that?

14 **A**    Shametra Morgan.

15 **Q**    Had you learned about her during your investigation?

16 **A**    Yes, I did.

17 **Q**    Did she work for Gulfton?

18 **A**    Yes, she did.

19         MR. HELFMEYER:  If we can resume the video, please.

20         (Video recording continued to be played in open court.)

21         MR. HELFMEYER:  Stop the recording.

22 BY MR. HELFMEYER:

23 **Q**    Special Agent Graham, it's 9:07:49 in the video.  I'm

24 highlighting a portion with my pointer.  What is that right here

25 (indicating)?  And the curser is going over it as well for the

1  TV screen?

2  **A**    Those are surveillance cameras.

3  **Q**    Did you notice any other surveillance cameras in the

4  waiting room?

5  **A**    Yes, I did.

6  **Q**    How many were there?

7  **A**    I remember approximately three in that room.

8  **Q**    Early on in the video, you testified there was an

9  interaction with a security guard at the front door.  Do you

10  remember whether he was armed?

11  **A**    Yes, he was.

12  **Q**    What was he armed with?

13  **A**    He was armed with a weapon, a handgun.

14  **Q**    Where?  Where was it held?

15  **A**    It was on his right side in a holster.

16  **Q**    Did you notice any other security guards -- armed security

17  guards while you were at Gulfton on June 15th?

18  **A**    Yes, I did.

19  **Q**    How many?

20  **A**    Six.

21  **Q**    Special Agent Graham, on the player, it showed that there

22  were only a few minutes left on the video.  Did something happen

23  with the video recorder?

24  **A**    Yes, it did.

25  **Q**    What happened?

1 **A**    The battery ran out.

2 **Q**    Is that why you had multiple recording devices?

3 **A**    Yes.

4        MR. WILLIAMS:  Objection, Judge.  Leading again.

5        THE COURT:  Overruled.

6 BY MR. HELFMEYER:

7 **Q**    If we could --

8        THE COURT:  Mr. Williams, pull the microphone around,

9 okay?

10             Okay, that's fine.

11        MR. HELFMEYER:  If we could put up on the screen,

12 Ms. Mortezavi, Government Exhibit 319.1 -- or at page 1.

13 BY MR. HELFMEYER:

14 **Q**    Special Agent Graham, when we were going through the video,

15 you testified about the wall signs.  What is depicted on the

16 screen right now?

17 **A**    A wall sign that was there that day.

18 **Q**    Could you read that for the record, please.

19 **A**    "All electronic devices must be powered off, including

20 Bluetooth, headphones, et cetera.  You will be escorted off the

21 premises.  No exceptions."

22        MR. HELFMEYER:  If we could go to the next one.

23 BY MR. HELFMEYER:

24 **Q**    What is this -- what is this on the screen?

25 **A**    Another sign that was on the wall the day of my visit.

1          MR. HELFMEYER:  If we could go to Government Exhibit

2  319 at page 2.

3               Oh, I'm sorry, 361 at page 4.

4               Thank you.

5  BY MR. HELFMEYER:

6  **Q**    Special Agent Graham, what is on the screen right now?

7  **A**    It's another sign that was posted on the wall.

8  **Q**    Could you read that for the record.

9  **A**    "No bookbags or large purses allowed, male or female.  No

10 exceptions."

11 **Q**    Special Agent Graham, could DEA put a recording device in a

12 large purse?

13 **A**    I'm sorry, what was your question?

14 **Q**    Could DEA put a recording device in a large purse?

15 **A**    Yes.

16 **Q**    What about in a backpack?

17 **A**    Yes.

18 **Q**    Did you see anyone get caught using their cell phones when

19 you were at Gulfton?

20 **A**    Yes, I did.

21 **Q**    What happened?

22 **A**    The plainclothes security guard came from the back and took

23 the phone.

24          MR. HELFMEYER:  If we could have the lights back on,

25 your Honor.

1                    Thank you, sir.

2  BY MR. HELFMEYER:

3  **Q**    Special Agent Graham, did you eventually get called back to

4  the counter?

5  **A**    Yes, I did.

6  **Q**    What did you learn at the counter?

7  **A**    I learned that I was going to be seen that day.

8  **Q**    Did you pay at the counter then?

9  **A**    I did.

10 **Q**    How much did you pay?

11 **A**    $270.

12 **Q**    How did you pay the $270?

13 **A**    In cash.

14 **Q**    Special Agent Graham, did you write a report based on your

15 visit to Gulfton that day?

16 **A**    Yes, I did.

17 **Q**    Did you -- what amount did you put in the report that you

18 had paid for Gulfton?

19 **A**    I put $280.

20 **Q**    Why did you put $280?

21 **A**    It was a typo.

22 **Q**    Just a typo?

23 **A**    Just a typo.

24 **Q**    How much did the visit cost?

25 **A**    $270.

1  **Q**    And you testified you paid cash.

2              Did you have an option for how you could pay?

3  **A**    No.

4  **Q**    Could you have paid with a credit card?

5  **A**    No.

6  **Q**    What about insurance?

7  **A**    No.

8  **Q**    Did you receive any paperwork when you paid?

9  **A**    Yes, I did.

10  **Q**    What kind of paperwork?

11  **A**    A bunch of forms.

12  **Q**    And did you have to sign into a sign-in sheet?

13  **A**    Yes, I did.

14              MR. HELFMEYER:  Your Honor, if we could have the

15  lights over the projector off again.

16              If we could go to Government Exhibit 315 at page

17  32.

18  BY MR. HELFMEYER:

19  **Q**    Special Agent Graham, what is the -- what is on the screen

20  right now?

21  **A**    Sign-in sheet.

22  **Q**    Do you see yourself?

23  **A**    Yes, I do.

24  **Q**    Where is your name?

25  **A**    At number 57.

1  **Q**    Is it where I have my pointer?

2  **A**    Yes.

3  **Q**    And what does it say?

4  **A**    Tonya Jackson.

5  **Q**    Who is Tonya Jackson?

6  **A**    That's my undercover name.

7          MR. HELFMEYER:  If we could zoom in, Ms. Mortezavi,

8  over 56.

9                  If we could zoom in.

10 BY MR. HELFMEYER:

11 **Q**    Can you read what's written next to 56?

12 **A**    It says, "Replace tomorrow."

13 **Q**    Keep that in our back -- the back of our brain.

14         MR. HELFMEYER:  If we can go back to page 30 of this

15 exhibit.

16                 Thank you.

17 BY MR. HELFMEYER:

18 **Q**    What date is listed on the sign-in sheet?

19 **A**    June the 15th, 2017.

20 **Q**    Special Agent Graham, how many customers are listed on the

21 sign-in sheet?

22 **A**    60.

23 **Q**    Based on your observations that day, is it consistent with

24 the number of people you observed at Gulfton?

25 **A**    Yes.

1  **Q**   That there were 60 people there?

2  **A**   Yes.

3  **Q**   Can you describe for the jury the other customers that were

4  at Gulfton that day?

5  **A**   They were men and women, white, black, Hispanic.  They wore

6  flip-flops.  Some wore pajama pants, tank tops.

7  **Q**   Did you notice any odors?

8  **A**   Yes, I did.

9          MR. WILLIAMS:  Objection.  Leading, Judge.

10         THE COURT:  Overruled.

11 BY MR. HELFMEYER:

12 **Q**   What odors did you notice?

13 **A**   Marijuana.

14 **Q**   Any other odors?

15 **A**   No, sir.

16 **Q**   Did -- you got a good look at the other customers that were

17 in the waiting room?

18 **A**   Yes, I did.

19 **Q**   Did they appear like they had access to $270 cash?

20 **A**   No.

21 **Q**   Why do you say that?

22 **A**   Because they looked homeless.

23 **Q**   Did they smell homeless?

24 **A**   No.  I wasn't that close to them.  The ones that I was

25 sitting next to.

2-20

1 **Q**    Did you notice any behavior from the people in the waiting

2 room that was inconsistent with someone being a patient?

3 **A**    Yes, I did.

4 **Q**    Can you describe for the jury what you noticed?

5 **A**    I saw people coming from the outside to the inside sitting

6 next to people helping them fill out their paperwork.

7 **Q**    Can you describe that a little more for the jury when you

8 mean "help them fill out their paperwork"?

9 **A**    Yes.  I saw people from the outside come in and help people

10 fill out their paperwork.  Specifically, the area where you have

11 the diagram of the body and you have to place an "X" in the area

12 where the pain is, I saw people come in from the outside; and

13 they did it themselves.  The person sitting in the waiting room

14 did not do it.

15        MR. HELFMEYER:  If we can display Government Exhibit

16 357 at page 13.

17 BY MR. HELFMEYER:

18 **Q**    Special Agent Graham, do you recognize what's displayed?

19 **A**    Yes, I do.

20 **Q**    What is that?

21 **A**    This is my form from my undercover visit.

22 **Q**    Is this the part of the paperwork where I'm putting my

23 highlighter that you saw other people fill out the paperwork?

24 **A**    Yes, I did.

25 **Q**    What's the point of the paperwork if the patient isn't the

1  one filling it out?

2       MR. WILLIAMS:  Objection, Judge.  That's speculation

3  on her part as to what the purpose of the paperwork is.  That's

4  the clinic's paperwork, it's not her paperwork.

5       THE COURT:  Do you want to rephrase it then?

6  BY MR. HELFMEYER:

7  **Q**   What's your understanding of why somebody other than the

8  patient was filling out the paperwork?

9  **A**   If the patient was filling out the paperwork, then they

10  know where they have the pain.  If someone else is filling out

11  the paperwork, to me that's to mean that the person doesn't have

12  pain.  The paperwork is fixed.

13  **Q**   Do you have a term to describe this person that's coming in

14  from the outside?

15  **A**   Yes, I do.

16  **Q**   What is the term the DEA uses?

17  **A**   Crew leaders.

18  **Q**   Can you describe to the jury what a crew leader is.

19  **A**   A crew leader is a person that brings a group of people to

20  the clinic, pays for their doctor's visit, and then takes them

21  to the pharmacy and pays to get their prescription filled in

22  exchange for the drugs to be sold on the street for a profit.

23  **Q**   And you observed crew leaders on June 15th, 2017, while you

24  were at Gulfton?

25  **A**   Yes, I did.

1 **Q**     Special Agent Graham, how many hours were you in the
2 waiting room at Gulfton before you got called again?
3 **A**     A long time.  I don't remember the exact hour.  It was a
4 long time.
5 **Q**     Did you eventually get called back?
6 **A**     Yes, I did.
7 **Q**     While you were waiting, did you see either of the
8 Defendants?
9 **A**     Yes, I did.
10 **Q**     Can you describe -- explain to the jury how you saw them?
11 **A**     When I was sitting in the front waiting area, I saw the
12 plainclothes security guy walk from the back real fast on a
13 two-way radio.  He walked out of the building.  I looked out of
14 the window over my right shoulder, and I saw him escorting
15 Dr. Craig into the building.
16 **Q**     And did you notice anything about Dr. Craig, the way she
17 was dressed or what she was carrying?
18 **A**     Yes.  Dr. Craig was wearing yellow scrubs and she was
19 carrying --
20          THE COURT:  Yellow what?
21          THE WITNESS:  Scrubs.
22          THE COURT:  Okay.
23          THE WITNESS:  She was wearing yellow scrubs, and she
24 was carrying a black backpack that was on wheels that she was
25 pulling in.

1  BY MR. HELFMEYER:

2  **Q**    Do you know how long you had been at Gulfton before

3  Dr. Craig arrived?

4  **A**    No.  It was a long time.

5  **Q**    It was a long time.

6              And you arrived at 9:00 a.m. or 10:00 a.m.?

7  **A**    10:00.

8  **Q**    10:00 a.m.?

9  **A**    Yes.

10  **Q**    So, she arrived after 10:00 a.m.?

11  **A**    Yes.

12  **Q**    Did you see Mr. Faithful while you were at the clinic that

13  day?

14  **A**    Yes, I did.

15  **Q**    Can you describe to the jury how you saw Mr. Faithful?

16  **A**    When I went to the counter to pay my money, I saw

17  Mr. Faithful in the back room where Shametra Morgan was.  When I

18  paid the money, he was off to my right, her left.

19  **Q**    Did you see him with any items?

20  **A**    I could not tell, no.

21  **Q**    Did you see him again while you were there at Gulfton that

22  day?

23  **A**    Yes, I did.

24  **Q**    Can you describe that for the jury.

25  **A**    Yes.  When he walked out from that room, he was carrying a

1 black -- a small black Oakley backpack.  He had on a black --

2          MR. WILLIAMS:  Non-responsive, Judge.

3          THE COURT:  Overruled.

4 BY MR. HELFMEYER:

5 **Q**    What was he carrying, Special Agent Graham?

6 **A**    A small black Oakley backpack.

7 **Q**    And what did you see him do?

8 **A**    He walked out of the room where the money was paid where

9 Shametra Morgan was, and he walked out of the clinic.

10 **Q**    Special Agent Graham, what happened when you were

11 eventually called again to the back?

12 **A**    I go to another waiting area.

13 **Q**    And did you go into a room eventually?

14 **A**    Yes, I did.

15 **Q**    What happened in the room?

16 **A**    When I got to the room, there was a woman there.  She put a

17 blood pressure cuff on me and told me to have a seat; and then,

18 she sat behind a desk.

19 **Q**    Did she take your vitals?

20 **A**    My vitals?

21 **Q**    Did she?

22 **A**    She took my blood pressure.

23 **Q**    Okay.  And did she ask you questions?

24 **A**    Yes, she did.

25 **Q**    Was she writing stuff down on a form?

1  **A**    I don't know if it was a form, but she was writing.

2  **Q**    After you met with the woman in that room, did you go back

3  to the front waiting room?

4  **A**    Yes, I did.

5  **Q**    Did you see any more armed security guards?

6  **A**    Yes, I did.

7  **Q**    Did you see the uniform or the plainclothes security

8  guards?

9  **A**    I saw both.

10  **Q**    Did you see the plainclothes security guard doing anything

11  odd or suspicious?

12  **A**    Yes, I did.

13  **Q**    Could you describe what he was doing for the jury.

14  **A**    The door that goes to the back to the other waiting room,

15  as he was walking in, he ran his hand across the top of the door

16  and along the right seam of the door looking back at us sitting

17  in the area as if he was looking for recording devices.

18         MR. WILLIAMS:  Objection, Judge.  That's speculation

19  that he was looking for something.

20         THE COURT:  Sustained.

21  BY MR. HELFMEYER:

22  **Q**    Did he say anything that explained the purpose of what he

23  was doing?

24         MR. WILLIAMS:  And again, that's hearsay, Judge, as to

25  what he said.

1          THE COURT:  Overruled.

2  BY MR. HELFMEYER:

3  **Q**   You can answer the question, Special Agent.

4  **A**   He looked back at us and said, "I'm looking for bugs"; and

5  when he didn't find any, he said, "That's what I like."

6  **Q**   Special Agent Graham, what is your understanding of what he

7  meant by "bugs"?

8          MR. WILLIAMS:  Again, that's speculation as to what he

9  meant that somebody else did.  That's speculation on her part.

10         THE COURT:  Sustained.

11  BY MR. HELFMEYER:

12  **Q**   What does bugs mean to you?

13  **A**   Bugs means to me recording devices used by law enforcement.

14  **Q**   Could you use your hands to the jury to show how the

15  plainclothes security guard was acting, what he did with his

16  hands.

17  **A**   Yes.  The door -- he went across the top of the door and

18  along the side -- the right side of the door.

19  **Q**   While it was open or closed?

20  **A**   Open.

21  **Q**   Special Agent Graham, did you get called back again?

22  **A**   Yes, I did.

23  **Q**   What did you -- who did you see next?

24  **A**   I saw another lady.

25  **Q**   In a different room or the same room?

1  **A**    In a different room.

2  **Q**    Did she ask you questions when you met with her?

3  **A**    Yes, she did.

4  **Q**    Did she have you do anything?

5  **A**    Yes, she did.

6  **Q**    What did she have you do?

7  **A**    She had me bend over and touch my toes.

8  **Q**    Anything else?

9  **A**    She had me do leg raises.

10  **Q**    So, you're just lifting your legs up?

11  **A**    Yes.

12  **Q**    Did she do anything to you?

13  **A**    Yes, she did.  She touched my stomach.  She touched my

14  chest.  And then, she took a hammer and was hitting my knees.

15  **Q**    Were you ever drug tested?

16  **A**    No.

17  **Q**    Did they ever draw your blood?

18  **A**    No.

19  **Q**    That second woman, was that Dr. Craig?

20  **A**    No, it was not.

21  **Q**    After the second woman left the room, did you stay in that

22  room or did you go elsewhere?

23  **A**    I stayed in the room.

24  **Q**    Do you know for how long?

25  **A**    It was about 25 minutes.

1  Q    What happened after those 25 minutes?

2  A    I sat in the room.

3  Q    After 25 minutes, what happened?  Did somebody else come

4  in?

5  A    Dr. Craig came in.

6  Q    Did she introduce yourself -- herself, I'm sorry?

7  A    Yes, she did.

8  Q    Before she came in and introduced herself, had you ever

9  interacted with her before?

10  A    Never.

11  Q    So, you had never been her patient before?

12  A    Never.

13  Q    Do you see Dr. Craig in court today?

14  A    Yes, I do.

15  Q    Could you identify her by an article of clothing for the

16  jury.

17  A    She's wearing a blue suit with a red blouse.

18        MR. HELFMEYER:  For the record, the witness has

19  identified the Defendant.

20        THE COURT:  The record will so reflect.

21  BY MR. HELFMEYER:

22  Q    You testified earlier about the video device that you were

23  carrying that day running out of batteries and you said you also

24  had an audio device.

25            Did that audio device capture your interaction

1 with Dr. Craig?

2 **A**    Yes, it did.

3 **Q**    Did it capture your entire trip to Gulfton?

4 **A**    Yes, it did.

5 **Q**    How many hours is that in total, that recording?

6 **A**    I don't know.  Approximately, three hours.  I don't

7 remember.

8 **Q**    You arrived at about 10:00, right?

9 **A**    Yes.

10 **Q**    Do you know -- do you remember when you left?

11 **A**    No.  It was a long day.

12 **Q**    Rather than playing the full however many hours it is, I'd

13 like to focus on your encounter with Dr. Craig.

14            Have you listened to the entirety of your

15 encounter with Dr. Craig?

16 **A**    Yes, I did.

17 **Q**    Does it fairly, accurately, and completely record your

18 interaction with her?

19 **A**    Yes, it does.

20            MR. HELFMEYER:  At this time, we'd like to play

21 Government's Exhibit 501A starting at 28 minutes and 58 seconds.

22            THE COURT REPORTER:  508?

23            MR. HELFMEYER:  501A, as in apple -- alpha.

24            And for the record, there's an unofficial

25 transcript that will be below the player.

1      (A portion of Government's Exhibit 501A, audio recording,

2  was played in open court.)

3  BY MR. HELFMEYER:

4  **Q**    Special Agent Graham, what just happened in the audio file?

5  **A**    Dr. Craig was just talking to me; and she, towards the end

6  there, had me bend over and touch my toes.

7  **Q**    And what just happened on the player?  Did the file cut?

8  **A**    It just cut.

9  **Q**    Is that a function of the recording device?

10  **A**    Yes, it is.

11  **Q**    Does it chop the recording up into 30-minute segments?

12  **A**    Yes, it does.

13  **Q**    Is there any gap in the recording?

14  **A**    None whatsoever.

15  **Q**    So, when we start the next track, is it going to start

16  right where we left off?

17  **A**    Yes, it is.

18        MR. HELFMEYER:  If we can play 501B, please, as in

19  bravo.

20      (A portion of Government's Exhibit Number 501B, audio

21  recording, was played in open court.)

22  BY MR. HELFMEYER:

23  **Q**    "Well, that's it."  Was that it?

24        MR. WILLIAMS:  Objection, Judge.  Objection.

25        THE COURT:  What?

1          MR. WILLIAMS:  That's not a question, that's a

2   statement.

3          THE COURT:  Sustained.

4          MR. WILLIAMS:  He said, "Well, that's it."

5          THE COURT:  Sustained.  It's struck.

6              Go on.

7          MR. WILLIAMS:  Thank you, your Honor.

8   BY MR. HELFMEYER:

9   **Q**    Was that it?

10  **A**    Yes, it was.

11  **Q**    Was that your entire interaction with Dr. Craig?

12  **A**    Yes, it was.

13  **Q**    Anything beyond those 91 seconds?

14  **A**    No.

15  **Q**    Did you hear Dr. Craig say, "Well, that's it"?

16  **A**    Yes, I did.

17  **Q**    Has the jury now heard your entire interaction with

18  Dr. Craig?

19  **A**    Yes, they have.

20  **Q**    Nothing before that?

21  **A**    No.

22  **Q**    Anything after?

23  **A**    No.

24  **Q**    If someone said you had more than a 91-second interaction

25  with Dr. Craig, would that be true?

1  **A**    No.

2  **Q**    During your 91 seconds with Dr. Craig, did you trick her?

3  **A**    No.

4  **Q**    What were you doing?

5  **A**    I was doing my job.

6  **Q**    Let's talk about those 91 seconds, Special Agent Graham.

7         At the beginning, Dr. Craig asked if you had been

8  in an accident.  Did she ask any questions about the accident?

9  **A**    No, she did not.

10 **Q**    You volunteered that it was a little fender bender, right?

11 **A**    Yes.

12 **Q**    Did she ask you to elaborate at all?

13 **A**    No.

14 **Q**    Did she ask if you went to the hospital after that little

15 fender bender?

16 **A**    No.

17 **Q**    Did she ask what direction you were hit from, the front,

18 the back, or the center?

19         MR. WILLIAMS:  Leading, Judge.

20         THE COURT:  Overruled.

21         THE WITNESS:  No.

22 BY MR. HELFMEYER:

23 **Q**    Did she ask how you were treated after that accident?

24 **A**    No.

25 **Q**    Did she ask how you managed the pain after that little

1  fender bender?

2  **A**    No.

3  **Q**    Did she ask you whether you had taken narcotics to treat

4  this pain from the 2015 fender bender?

5  **A**    No.

6  **Q**    Did she ask whether you had tried physical therapy?

7  **A**    No.

8  **Q**    Did she ask how your current pain in 2017 compared to your

9  pain from 2015?

10  **A**    No.

11  **Q**    Did she ask you any questions about your past pain?

12  **A**    No.

13  **Q**    Did Dr. Craig ask you any questions about your past

14  treatment?

15         MR. WILLIAMS:  Again, Judge, this whole line of

16  questioning is leading.

17         THE COURT:  Overruled.

18  BY MR. HELFMEYER:

19  **Q**    Special Agent Graham, did she ask you any questions about

20  your past treatment?

21  **A**    No.

22  **Q**    To your knowledge, did Dr. Craig request any of your

23  previous medical records?

24  **A**    No.

25  **Q**    Did she ask any information -- for any information about

1 your past medical treatment?

2 **A**   No.

3 **Q**   Did she ask if you had even seen a doctor after your

4 accident in 2015?

5 **A**   No.

6 **Q**   Special Agent Graham, had you actually been in an accident

7 in 2015?

8 **A**   No.

9 **Q**   Did Dr. Craig ask you any questions to verify?

10 **A**   No.

11 **Q**   After -- or when the first part of the audio recording cut

12 out, you said Dr. Craig had told you to do what?

13 **A**   Bend over and touch my toes.

14 **Q**   Did she do anything when you bent over to touch your toes?

15 **A**   Yes, she did.

16 **Q**   What did she do?

17 **A**   She touched my back.

18 **Q**   Can you describe for the jury how she touched your back.

19 **A**   With pointing a finger, like pointing and not with massage

20 or manipulation or any type of care.

21 **Q**   I got my index finger out.  Like that (indicating)?

22 **A**   Yes.

23 **Q**   Was she manipulating your muscles in your back?

24 **A**   No.

25 **Q**   Just pointing to a part of your back?

1  **A**    Yes.

2  **Q**    Did she ask you to do anything other than touch your toes?

3  **A**    No.

4  **Q**    So, the entirety of your encounter with her was her asking

5  you to bend over and touch your toes?

6  **A**    Yes.

7  **Q**    Special Agent Graham, what had you listed as your chief

8  complaint, your chief reason for going to Gulfton?

9  **A**    Neck spasms and shoulder pain.

10  **Q**    Did Dr. Craig ask you any questions about your shoulders?

11  **A**    No.

12  **Q**    Did she ask you questions about your neck?

13  **A**    No.

14  **Q**    Did Dr. Craig touch your shoulders?

15  **A**    No.

16  **Q**    Did she touch your neck?

17  **A**    No.

18  **Q**    Was there anything else?

19  **A**    No.

20  **Q**    Did Dr. Craig tell you her diagnosis?

21  **A**    No, she did not.

22  **Q**    Did she go over any treatments?

23  **A**    No.

24  **Q**    Any exercises you could do?

25  **A**    No.

1   **Q**   Any alternatives to opioids?

2   **A**   No.

3   **Q**   Did she tell you what drugs she was going to prescribe to

4   you?

5   **A**   No.

6   **Q**   What did Dr. Craig give you after your 91-second encounter?

7   **A**   A prescription.

8   **Q**   For what?

9   **A**   I received a prescription for hydrocodone; carisoprodol,

10  which is Soma; and ibuprofen and Biofreeze.

11  **Q**   And hydrocodone, does that go by a brand name?

12  **A**   Norco.

13  **Q**   Special Agent Graham, I want to go over some of your

14  patient files which is Government Exhibit 357, which we have the

15  original of here, as well.

16          MR. HELFMEYER:  If we could go to 357 at page 9.

17  BY MR. HELFMEYER:

18  **Q**   Special Agent Graham, are you familiar with what's on the

19  screen?

20  **A**   Yes.

21  **Q**   What is that?

22  **A**   It's a form for a HIPAA release, patient medical

23  information.

24  **Q**   Did you sign the bottom of this form?

25  **A**   Yes, I did.

1 **Q**   What is a HIPAA release form?

2 **A**   As far as I know, a HIPAA release form is authorizing

3 someone to get access to your medical records.

4 **Q**   What medical records were you releasing by signing this

5 form?

6 **A**   None.

7 **Q**   What --

8        MR. HELFMEYER:  If we could highlight the -- or zoom

9 in on the middle part, Ms. Mortezavi.

10              Thank you.

11 BY MR. HELFMEYER:

12 **Q**   What doctor, clinic, or hospital were you releasing records

13 from?

14 **A**   Nothing, no one, nowhere.

15 **Q**   Did Dr. Craig tell you to write down the name of your

16 doctor, your clinic, or your hospital so she could get records

17 from them?

18 **A**   No.

19 **Q**   Did she put -- tell you to put down the name of your

20 previous pain management doctor so she could get records from

21 them?

22 **A**   No.

23        MR. HELFMEYER:  If we could move to Government Exhibit

24 357 at page 13.

25 //

1  BY MR. HELFMEYER:

2  **Q**     Special Agent Graham, is this the page that we saw a minute

3  earlier?

4  **A**     Yes, it is.

5  **Q**     What did you put down as your chief complaint?

6  **A**     Neck muscle spasms.

7  **Q**     Did you intentionally not include lower back pain?

8  **A**     Yes, I did.

9  **Q**     Why is that?

10  **A**     Based on my training, experience, and the investigation,

11  the majority of the people that come annotate lower back pain.

12  So, I wanted to put something else.

13  **Q**     Even though you didn't put down lower back pain, did

14  Dr. Craig and the other folks at Gulfton ask you questions about

15  lower back pain?

16  **A**     Yes, they did.

17  **Q**     Towards the top on the right under primary care physician,

18  did you indicate who your primary care physician was?

19  **A**     No, I did not.

20  **Q**     Was that on purpose?

21  **A**     Yes, it was.

22  **Q**     Did Dr. Craig ask you who your primary care physician is?

23  **A**     No, she did not.

24  **Q**     What about referring physician?  Did Dr. Craig ask you who

25  your referring physician was?

1  **A**    No.

2            MR. HELFMEYER:  If we could go to Government Exhibit

3  357 at page 15.

4                    And zoom in to the middle section.

5  BY MR. HELFMEYER:

6  **Q**    Special Agent Graham, what did you indicate on this form

7  helped your pain?

8  **A**    Hot and cold packs and massage therapy.

9  **Q**    Did Dr. Craig tell you that you should continue using hot

10 or cold packs?

11 **A**    No.

12 **Q**    Did she tell you you should use massage therapy?

13 **A**    No.

14 **Q**    Did she refer you to a massage therapist?

15 **A**    No.

16 **Q**    Did she make any reference to massages or massage therapy

17 during your 91 seconds with her?

18 **A**    No.

19 **Q**    Did Dr. Craig ask you any questions about your previous

20 treatment?

21 **A**    No.

22 **Q**    Did she ask any questions to determine whether your

23 previous diagnosis was accurate?

24 **A**    No.

25 **Q**    Did she do anything to verify that your previous

1 prescriptions for Norco and Soma were based on a legitimate

2 diagnosis?

3 **A**    No.

4 **Q**    Had you been prescribed Norco and Soma before?

5 **A**    Yes.

6 **Q**    In the 91 seconds you spent with Dr. Craig, did she ask you

7 about whether you had tried physical therapy?

8 **A**    No.

9 **Q**    Whether you had tried chiropractic care?

10 **A**    No.

11 **Q**    Whether you had tried psychological therapy?

12 **A**    No.

13 **Q**    Acupuncture?

14 **A**    No.

15 **Q**    Any other medications?

16 **A**    No.

17 **Q**    Special Agent Graham, what's a TENS unit?

18 **A**    A TENS unit is like a little device that you put on your

19 lower back to try to stimulate muscles or your arms or where you

20 need it.

21 **Q**    In your 91 seconds with Dr. Craig, did she ask you any

22 questions about a TENS unit?

23 **A**    No.

24         MR. HELFMEYER:  If we could go to Government Exhibit

25 357 at page 10.

1 BY MR. HELFMEYER:

2 **Q** Special Agent Graham, did you fill out this document?

3 **A** No, I did not.

4 **Q** Do you know who did?

5 **A** No, I do not.

6 **Q** Was it one of the clinic workers?

7 **A** I guess. I don't know.

8 MR. WILLIAMS: Objection.

9 THE COURT: She says she doesn't know.

10 MR. HELFMEYER: If we could zoom in to the top part.

11 BY MR. HELFMEYER:

12 **Q** Where it says CC, what did your file indicate was your

13 chief complaint?

14 **A** I'm sorry, ask your question again.

15 **Q** What does the file indicate was your chief complaint, where

16 it says CC?

17 **A** Lower back pain with spasms.

18 **Q** And what had you reported was your reason for the visit?

19 **A** My neck -- neck spasms and shoulder area.

20 **Q** You didn't mention lower back?

21 **A** No, I did not.

22 MR. HELFMEYER: If we can zoom back out to the whole

23 document.

24 BY MR. HELFMEYER:

25 **Q** Special Agent Graham, does this document contain true

1 information or false information?

2 **A**    False information.

3 **Q**    I'd like to move to another part of your patient file at

4 page 12.

5          Special Agent Graham, did you fill out this form?

6 **A**    No, I did not.

7 **Q**    Who signed at the bottom?

8 **A**    It says Gazelle Craig, D.O.

9 **Q**    And you testified earlier that Dr. Craig was writing

10 something down while she was in the room with you?

11 **A**    Yes.

12         MR. HELFMEYER:  Let's zoom in to the plan for

13 treatment.

14 BY MR. HELFMEYER:

15 **Q**    In the right-hand corner, it says lab and then some are

16 circled.

17         Did Dr. Craig draw your blood that day?

18 **A**    No.

19 **Q**    Did anybody else?

20 **A**    No.

21 **Q**    Did she tell you you need to get lab work done?

22 **A**    No.

23 **Q**    In the 91 seconds that you spent with Dr. Craig, did she

24 mention getting lab work done?

25 **A**    No.

1 **Q**    Now, onto the complimentary and alternative medicine

2 section, the CAMs.  What does it indicate on the form that had

3 been tried on June 15th, CAMs today?

4 **A**    Massage chair.

5 **Q**    Special Agent, were you -- did you sit in a massage chair?

6 **A**    No, I did not.

7 **Q**    Did you see a massage chair at Gulfton clinic?

8 **A**    No, I did not.

9 **Q**    All right.  Moving up to the CAMs going forward, for 30

10 days what does it indicate that you were supposed to be doing

11 over the next 30 days?

12 **A**    Massage chair, hot and cold packs, and pain relieving

13 ointment.

14 **Q**    Did Dr. Craig ever mention that over the next 30 days you

15 should be doing a massage chair and a hot and cold pack?

16 **A**    No.

17 **Q**    Had you seen this form before it was shown to you after the

18 clinic was searched?

19 **A**    No.

20 **Q**    Did anybody at Gulfton tell you to use a massage chair and

21 a hot and cold pack?

22 **A**    No.

23 **Q**    Moving down to the rationale section, did Dr. Craig tell

24 you that your -- sorry.  Did you tell Dr. Craig that your pain

25 was affecting your ability to perform activities of daily

1 living, ADLs?

2 **A**    No.

3 **Q**    Did she tell you that she was prescribing you narcotics to

4 assist in your ability to perform activities of daily living?

5 **A**    No.

6 **Q**    Did you report to Dr. Craig in the 91 seconds that you

7 spent with her that your pain was preventing you from having

8 meaningful relationships?

9 **A**    No.

10 **Q**    Did she tell you that she was prescribing you hydrocodone

11 and carisoprodol to assist you in having meaningful

12 relationships?

13 **A**    No.

14 **Q**    Did you tell Dr. Craig that your pain was preventing you

15 from maintaining or seeking employment?

16 **A**    No.

17 **Q**    Did she tell you that's why she was prescribing you drugs?

18 **A**    No.

19 **Q**    Did she give you a reason for why she was giving you drugs?

20 **A**    No.

21          MR. HELFMEYER:  If we can zoom back out.

22               Before we go there, I want to highlight in the

23 middle -- if we could zoom in to the CAMs today.

24 BY MR. HELFMEYER:

25 **Q**    Special Agent Graham, did you see a TENS unit at Gulfton

1 clinic?

2 **A**    No, I did not.

3 **Q**    Did you see an exercise bike?

4 **A**    No, I did not.

5 **Q**    What about an exercise ball?

6 **A**    No, I did not.

7 **Q**    Did you see an elliptical?

8 **A**    No.

9 **Q**    A treadmill?

10 **A**    No.

11          MR. HELFMEYER:  If we can zoom back out and then into

12 the discussion and education portion.

13               The first one that she checked, the patient and

14 caregiver reviewed self-help tools.

15 BY MR. HELFMEYER:

16 **Q**    Special Agent Graham, who is your caregiver?

17 **A**    No one.

18 **Q**    Did Dr. Craig give you care?

19 **A**    No.

20 **Q**    What did she give you?

21 **A**    She gave me a prescription.

22 **Q**    The second one, could you read that for the jury, please.

23 **A**    Where it starts "The caregiver explained"?

24 **Q**    Yes.

25 **A**    "The caregiver explained to the patient the risks of using

1 other drugs or ETOH with the prescribed medication and that
2 doing so would not only be dangerous but could result in
3 termination of treatment with this provider.  The patient
4 expresses understanding."
5 **Q**    Did Dr. Craig explain that to you?
6 **A**    No, she did not.
7 **Q**    In your 91 seconds with her, did you express understanding
8 of that?
9 **A**    No.
10 **Q**    The last discussion and education one, can you read the
11 first sentence.
12 **A**    "The patient agrees not to divert or abuse medicine."
13 **Q**    In your 91 seconds with Dr. Craig, did you agree not to
14 divert or abuse the medicine?
15 **A**    No.
16 **Q**    Did she ask you about it?
17 **A**    No.
18 **Q**    The third sentence starting with "The patient was
19 counseled," if you could read that.
20 **A**    "The patient was counseled on proper use of the prescribed
21 medications and reviewed the opioid and pain contract including
22 the need for future urine drug screens, including ETOH and pill
23 counts for the assurance of the patient safety and compliance."
24 **Q**    Special Agent Graham, did Dr. Craig counsel you on how to
25 use the narcotics she was prescribing you?

1  **A**    No.

2  **Q**    Did she counsel you on anything?

3  **A**    No.

4  **Q**    If you could read -- I believe it's the fourth one.  Right

5  where the cursor is.

6  **A**    "The patient was counseled about their chronic medical

7  condition and its relationship to anxiety and depression."

8  **Q**    Special Agent, did Dr. Craig counsel you about your chronic

9  medical condition and its relationship to anxiety and

10  depression?

11  **A**    No.

12  **Q**    In the 91 seconds you spent with Dr. Craig, did she ask you

13  any questions about your mental state?

14  **A**    No.

15  **Q**    Special Agent Graham, did you have any chronic condition?

16  **A**    No.

17         MR. HELFMEYER:  If we could zoom back out and then

18  zoom in to the top, the assessment.

19  BY MR. HELFMEYER:

20  **Q**    What is circled that Dr. Craig was diagnosing you with?

21  **A**    It says chronic lumbar pain, chronic cervical pain,

22  myospasm.

23  **Q**    Special Agent Graham, what is chronic lumbar pain?

24  **A**    I imagine pain in the back.

25         MR. WILLIAMS:  Objection, Judge, if she doesn't know.

1   She's imagining.  She doesn't know.

2           THE COURT:  Sustained.  Sustained as to the form of

3   the question.

4   BY MR. HELFMEYER:

5   **Q**   Is chronic lumbar pain pain in your lower back?

6           MR. WILLIAMS:  Objection.  Leading.

7           THE COURT:  Sustained.

8   BY MR. HELFMEYER:

9   **Q**   Special Agent Graham, do you know what chronic lumbar pain

10  is?

11  **A**   Pain in your back.

12  **Q**   Special Agent Graham, did you have pain in your back?

13  **A**   I did not.

14  **Q**   Is this diagnosis a real diagnosis or a fake diagnosis?

15  **A**   Fake diagnosis.

16  **Q**   Special Agent Graham, what did you do after your 91-second

17  encounter with Dr. Craig?

18  **A**   Repeat your question.

19  **Q**   What did you do after your encounter with Dr. Craig?

20  **A**   I went to the front.

21  **Q**   Did you receive a prescription in the front?

22  **A**   I did.

23  **Q**   Were you able to fill that prescription?

24  **A**   Yes.

25  **Q**   And what did you get from the pharmacy?

1  **A**    The prescription filled, the hydrocodone, the carisoprodol,

2  Biofreeze, and ibuprofen.

3  **Q**    We're going to get to the prescriptions in a second.  But

4  before that, I want to go to page 22 of your patient chart.

5              MR. HELFMEYER:  357 and 22.

6              Thank you.

7  BY MR. HELFMEYER:

8  **Q**    Special Agent Graham, are you familiar with the document

9  that's displayed on the screen?

10  **A**    Yes, I am.

11  **Q**    What is page 22 of Exhibit 357?

12  **A**    It's a printout of the Texas monitoring program of

13  prescriptions that were filled.

14  **Q**    What -- in layman's terms, what is this display?

15  **A**    This display is when you take your prescription to the

16  pharmacy and the pharmacy fills it, it only reports controlled

17  substances that were filled; and the pharmacy has to report.

18  It's self-reporting.

19  **Q**    So, pharmacies keep a record of what prescriptions they

20  fill?

21  **A**    Controlled substances for this report.

22  **Q**    Special Agent, when was this report run?  When was it

23  prepared?  On the left.

24  **A**    It was prepared on June the 15th, 2017.

25  **Q**    Was that the day that you went to Gulfton?

1  **A**    Yes, it is.

2  **Q**    And who is this report prepared for?  What's the patient's

3  name?

4  **A**    Tonya Jackson.

5  **Q**    And who is Tonya Jackson?

6  **A**    That's my undercover name.

7        MR. HELFMEYER:  If we can go to the prescriptions

8  portion.

9  BY MR. HELFMEYER:

10 **Q**    What data is listed under the filled ID written drug part

11 of the exhibit?

12 **A**    It shows the date it was filled, it was written, and the

13 drug that was prescribed.

14 **Q**    That what was filled, written, and prescribed?

15 **A**    Hydrocodone/acetaminophen, 10-325; and carisoprodol, 350

16 milligram tablet.

17 **Q**    What does that information indicate?

18 **A**    That I received -- Tonya Jackson received a prescription

19 for hydrocodone and carisoprodol.

20 **Q**    From who?  It just says re:  Wil?

21 **A**    Dr. Williams.

22 **Q**    So, hydrocodone/acetaminophen, is that Norco?

23 **A**    Yes.

24 **Q**    And carisoprodol, what is that?

25 **A**    Soma.

1 **Q**    Who wrote the prescription for hydrocodone and carisoprodol

2 on April 25th of 2017?

3 **A**    Dr. Williams.

4 **Q**    Was this prescription based on a legitimate medical

5 diagnosis?

6 **A**    No, it was not.

7 **Q**    How do you know that?

8 **A**    Because it was fake.

9 **Q**    Did you ever see Dr. Williams?

10 **A**    I never saw Dr. Williams.

11 **Q**    In the 91 seconds you spent with Dr. Craig, did she ask you

12 any questions about Dr. Williams?

13 **A**    No.

14 **Q**    Any questions about this prescription?

15 **A**    No.

16 **Q**    Any questions to determine whether this was a legitimate

17 prescription or a fake prescription?

18 **A**    No.

19 **Q**    Let's move to page 21 of your patient file.

20         MR. HELFMEYER:  357-21.

21 BY MR. HELFMEYER:

22 **Q**    Special Agent Graham, what is on the screen now?

23 **A**    The prescriptions that were given to me on my undercover

24 visit.

25 **Q**    From Gulfton?

1 **A**    From Gulfton, yes.

2 **Q**    Before you got these prescriptions, had Dr. Craig told you

3 what she was going to prescribe you?

4 **A**    No.

5 **Q**    Did that surprise you?

6 **A**    Yes, it did.

7 **Q**    Why?

8 **A**    Because the entire time I was there, I didn't know what I

9 was being diagnosed with or being prescribed.

10 **Q**    Did you expect to find out?

11 **A**    Yes.

12         MR. HELFMEYER:  Let's zoom in to the first one up top.

13 BY MR. HELFMEYER:

14 **Q**    What's the patient name?

15 **A**    Tonya Jackson.

16 **Q**    What date was this prescription written?

17 **A**    6-15-17.

18 **Q**    And what did Dr. Craig prescribe you?

19 **A**    Soma, 350 milligrams.

20 **Q**    Special Agent, do you know what Soma treats?

21 **A**    Muscle spasms.

22 **Q**    Do you know that because you're a DEA agent or because

23 Dr. Craig told you?

24 **A**    Because I'm a DEA agent.

25 **Q**    Did Dr. Craig tell you what Soma treats?

1 **A**     No.

2 **Q**     How often were you supposed to take the Soma?

3 **A**     I don't know.

4 **Q**     Did she tell you?

5 **A**     No, she did not.

6 **Q**     Were you supposed to take it only when your muscles were

7 spasming or all the time?

8          MR. WILLIAMS:  Objection, Judge.  Objection when she's

9 supposed to take it.

10          THE COURT:  Sustained.

11          MR. HELFMEYER:  What was the objection, your Honor?

12 BY MR. HELFMEYER:

13 **Q**     Did Dr. Craig tell you whether you were supposed to take

14 the Soma when your muscles were spasming or on a certain hourly

15 basis?

16 **A**     No.

17 **Q**     And who signed this prescription?

18 **A**     It says Gazelle Craig, D.O.

19          MR. HELFMEYER:  If we could go down to the second

20 prescription.

21 BY MR. HELFMEYER:

22 **Q**     Who is this prescription written for?

23 **A**     Tonya Jackson.

24 **Q**     And what date was it written?

25 **A**     6-15-17.

1 **Q**    What did Dr. Craig prescribe you here?

2 **A**    Norco, 325 milligrams.

3 **Q**    And is that hydrocodone?

4 **A**    Yes, it is.

5 **Q**    What strength?

6 **A**    10-325.

7 **Q**    And how many?

8 **A**    100.

9 **Q**    A minute ago we were looking at page 22.

10         Do you remember how many -- how many pills

11 Dr. Williams prescribed you?

12 **A**    It was 90.

13 **Q**    And was that before or after this prescription for

14 Dr. Craig?

15 **A**    That was before.

16 **Q**    So, Dr. Williams prescribed you 90; and then, Dr. Craig

17 prescribed you 100?

18 **A**    Yes.

19 **Q**    Did Dr. Craig tell you why she'd increased your pills?

20 **A**    No.

21 **Q**    In your 91 seconds with Dr. Craig, did you tell her that

22 Dr. Williams' prescription wasn't enough?

23 **A**    No.

24 **Q**    Did she ask?

25 **A**    No.

1  **Q**   How often were you supposed to take the Norco?

2  **A**   I don't know.

3  **Q**   Did Dr. Craig tell you?

4  **A**   No.

5  **Q**   Did Dr. Craig tell you whether you were supposed to mix the

6  Norco with the Soma?

7  **A**   No.

8  **Q**   Did she tell you whether you could operate heavy machinery

9  while you were taking Norco or Soma?

10 **A**   No.

11 **Q**   Did she tell you how it would affect you?

12 **A**   No.

13 **Q**   Whether there would be any side effects?

14 **A**   No.

15 **Q**   Were you supposed to take the Norco and the Soma with food?

16 **A**   I don't know.

17 **Q**   In your 91 seconds, did she tell you anything about how to

18 take these drugs?

19 **A**   No.

20         MR. HELFMEYER:  If we can zoom back out.

21 BY MR. HELFMEYER:

22 **Q**   Special Agent Graham, how much did you pay the pharmacy to

23 receive these pills?

24 **A**   I think it was $280.

25         THE COURT:  Pay the pharmacy when you had it filled;

1  is that correct?

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  Okay.

4  BY MR. HELFMEYER:

5  **Q**    And how much did you pay Gulfton to receive this

6  prescription?

7  **A**    $270.

8  **Q**    Special Agent Graham, do you know whether Norco or

9  hydrocodone produces a high or euphoric effect?

10 **A**    Yes.

11 **Q**    Do you know whether Soma when mixed with Norco enhances

12 that high?

13 **A**    Yes, it does.

14 **Q**    Is that why it's popular on the streets?

15         MR. WILLIAMS:  Objection, Judge.  Objection.  She

16 doesn't know why it's popular on the streets.

17         THE COURT:  What's your response?

18         MR. HELFMEYER:  If she knows, your Honor.

19         THE COURT:  Well, what else?  What else is your

20 response?

21         MR. HELFMEYER:  I can ask some questions to lay a

22 foundation, your Honor.

23         THE COURT:  Well, I think you have an objection, how

24 does she know.

25 //

1 BY MR. HELFMEYER:

2 **Q**   Special Agent Graham, how do you know about the effects of

3 these drugs?

4 **A**   Based on my training and experience and working these

5 investigations.

6           MR. HELFMEYER:  Your Honor, may I ask the question?

7           THE COURT:  Yeah, go on.

8 BY MR. HELFMEYER:

9 **Q**   Special Agent Graham, is that euphoric effect why these

10 drugs are popular on the street?

11           MR. WILLIAMS:  Objection, Judge.  Objection.  Unless

12 she -- unless she has specifically taken these drugs to know,

13 she can't testify to that.

14           THE COURT:  Overruled.

15           Based upon your experience, okay, and all of your

16 years of training, you may answer the question.

17           THE WITNESS:  Yes.

18           THE COURT:  Ask it.

19 BY MR. HELFMEYER:

20 **Q**   Special Agent Graham, are these drugs popular on the

21 street?

22 **A**   Yes.

23 **Q**   Is that because of the high and euphoric effect that the

24 combination provides?

25           MR. WILLIAMS:  Again, Judge, she can't testify as to

1  why they're popular on the street, okay?

2          THE COURT:  Now, ma'am, you do this for a living,

3  correct?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  How long have you done it?

6          THE WITNESS:  I've done it for over 15 years.

7          THE COURT:  All right.  And do you have any special

8  training at your academy or any continuing courses in this?

9          THE WITNESS:  Yes, your Honor.

10         THE COURT:  All right.  And have you had interactions

11 with physicians about this?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  All right.  Based upon that, this is not a

14 true -- it's not a medical opinion, but it's based upon her

15 unique background on the street.  I'm going to allow her to

16 testify.

17         And again, you may give it whatever weight you

18 think you ought to give it; but as to the basic admissibility,

19 I'll allow the question.

20         Now, go ahead, ask it --

21 BY MR. HELFMEYER:

22 Q    Special Agent Graham --

23         THE COURT:  -- with the continuing objection by

24 defense counsel.

25         MR. WILLIAMS:  Thank you, your Honor.

1          THE COURT:  Okay, go on.

2  BY MR. HELFMEYER:

3  **Q**     Special Agent Graham, based on your training and

4  experience, is the high or euphoric feeling created by

5  hydrocodone and carisoprodol the reason for its popularity on

6  the streets?

7  **A**     Yes.

8  **Q**     In your 91-second interaction with Dr. Craig, did she

9  mention any of the dangers of mixing these two narcotics?

10  **A**     No.

11  **Q**     Did she warn you of any side effects?

12  **A**     No.

13  **Q**     Did she offer you any advice on how to take this

14  medication?

15  **A**     No.

16  **Q**     Did she tell you why she was prescribing you Norco?

17  **A**     No.

18  **Q**     Did she tell you why she was prescribing you Soma?

19  **A**     No.

20  **Q**     Did she say why Norco over some other painkiller?

21  **A**     No.

22  **Q**     Did she offer you any advice at all?

23          THE COURT:  Excuse me.  We heard what she testified to

24  was the entire visit with the doctor.  Now, you may move on.

25          MR. HELFMEYER:  Thank you, your Honor.

1            If we can zoom back in to the Soma prescription

2 up top.

3 BY MR. HELFMEYER:

4 **Q**    What did Dr. Craig circle was your diagnosis?

5 **A**    Myospasm.

6 **Q**    And what's to the left?

7 **A**    Chronic lumbar pain.

8 **Q**    Special Agent Graham, you testified earlier that you did

9 not have back pain; is that correct?

10 **A**    That is correct.

11 **Q**    Is this a true diagnosis or a fake diagnosis?

12 **A**    A fake diagnosis.

13 **Q**    Whose signature is on this prescription?

14 **A**    Gazelle Craig, D.O.

15            MR. HELFMEYER:  Zooming back out to the Norco

16 prescription.

17 BY MR. HELFMEYER:

18 **Q**    Whose signature is on the Norco prescription?

19 **A**    Gazelle Craig, D.O.

20            MR. HELFMEYER:  No further questions.

21            THE COURT:  Thank you.

22                All right, counsel.

23            MR. WILLIAMS:  Thank you, your Honor.

24            THE COURT:  By the way, we go on -- we'll go on to

25 about between 1:05 and 1:10, somewhere like that.  Okay.  We've

1  right now been in session -- well, it's now 12:40.  So, we'll go

2  on for a little bit more.

3              Go right ahead.

4                    CROSS-EXAMINATION

5  BY MR. WILLIAMS:

6  **Q**    Good afternoon, Special Agent Graham.

7              THE COURT:  Microphone.  Just pull it in towards you.

8              MR. WILLIAMS:  Sorry.

9  BY MR. WILLIAMS:

10 **Q**    Good afternoon, Special Agent Graham.

11 **A**    Good afternoon.

12 **Q**    I'm Cornel Williams.  We've met before, have we not?

13 **A**    Yes.

14 **Q**    Okay.  And we met before -- well, let me just ask you this.

15 Let me start there.  Were you the lead investigator in this

16 particular investigation?

17 **A**    No, sir.

18 **Q**    Who was the lead investigator, please?

19 **A**    It was Special Agent James Gainer and Diversion

20 Investigator Michael Mills.

21 **Q**    And that would be these two people sitting at the table

22 here; is that correct?

23 **A**    Yes, sir.

24 **Q**    Now, when did you first become involved in this particular

25 investigation?

1  **A**    In February of 2017.

2  **Q**    And what was your role on that particular date when you

3  first became involved?

4  **A**    Surveillance.

5  **Q**    Surveillance, okay.  All right.

6            Were you responsible for putting up the pole

7  cams?

8  **A**    No, sir.

9  **Q**    Do you know who was responsible for that?

10  **A**    Someone in our office.

11  **Q**    Okay.  All right.  Were you consistently informed about the

12  status of the particular case as it progressed from February up

13  until the time that you went into this clinic?

14  **A**    Consistently informed?

15  **Q**    Yes.

16  **A**    No.

17  **Q**    Okay.  All right.  How often were you informed about what

18  was going on?

19  **A**    When we were getting ready to do a surveillance operation

20  or some other event.

21  **Q**    So, how many surveillance operations did you do prior to

22  going into this clinic?

23  **A**    I participated in three.

24  **Q**    Three, okay.  All right.

25            Do you remember those dates?

1  **A**    Yes, sir.

2  **Q**    All right.  Which dates were those?

3  **A**    The first one was in February of 2017.

4  **Q**    All right.  Let's just start with that one.  What did you

5  do on that particular day?

6  **A**    Surveillance.

7  **Q**    Okay.  All right.  How long did you do surveillance?

8  **A**    A long time.  The time we were out there.

9  **Q**    How long was that?

10 **A**    A few hours.

11 **Q**    Okay.  One hour, two hours, all day?  How long?

12 **A**    A few hours.  More than two hours.

13 **Q**    More than two hours, okay.  But less than three?

14 **A**    I cannot definitively say, sir.

15 **Q**    Did you prepare a DEA-6 in relationship to that particular

16 incident on February -- 15th, was it?

17 **A**    I didn't give a date.  It was just February, 2017.

18 **Q**    Did you prepare a DEA-6?

19 **A**    I did not, no, sir.

20 **Q**    Okay.  All right.  And explain to this jury what a DEA-6 is

21 because we'll be referring to it again.

22 **A**    A DEA-6 is a report that agents or task force officers

23 write detailing the events of a particular time and location.

24 **Q**    And why did you prepare those?

25 **A**    To refresh our memory as well as to document evidence as

1 well as to key events that took place that day.

2 **Q**   Okay, good enough.

3          Now, February of '17 was your first involvement.

4 When was your second involvement?

5 **A**   It was in March of 2017.

6 **Q**   And what role did you play at that particular time?

7 **A**   Surveillance.

8 **Q**   Surveillance, okay.

9          Do you know when in March you went out there?

10 **A**   I don't remember the particular date, no, sir.

11 **Q**   Okay.  At that particular time in March, were you aware

12 that -- that there had been certain undercover operatives sent

13 to the particular clinic in March?

14 **A**   Undercover operatives?

15 **Q**   Yes.  Well, people working for DEA or at DEA's discretion

16 had gone in attempting to do what you did.

17 **A**   Yes.

18 **Q**   Okay.  All right.  And to your knowledge, how many had been

19 sent in there?

20 **A**   I do not know.

21 **Q**   Okay.  Are you aware of -- if, in fact, the people that

22 went in, they actually got prescriptions or not?

23 **A**   That, I do not know.

24 **Q**   Do you know how many people were sent in there?

25 **A**   Total, no, sir.

1 **Q**    Okay.  But you are aware that some people were sent and

2 rejected, did not get prescriptions out of this particular

3 clinic?

4 **A**    I know some got rejected and some got prescriptions.

5 **Q**    Okay.  All right.  But you don't know how many got rejected

6 and how many --

7             MR. HELFMEYER:  Objection.  Asked and answered.

8             THE COURT:  Sustained.

9             MR. WILLIAMS:  Okay, fair enough.

10 BY MR. WILLIAMS:

11 **Q**    Now, were you present on -- in March -- on the date that

12 you were doing surveillance, are you aware of anyone going in or

13 attempting to get prescriptions on that particular day?

14 **A**    No, sir.

15 **Q**    Now, your third encounter was when?

16 **A**    In May of 2017.

17 **Q**    May of 2017.

18             And what was your role at that particular time?

19 **A**    Surveillance.

20 **Q**    Surveillance, again.  Okay.

21             And I'm presuming that the next time is the time

22 that we're talking about here, June 15th of 2017?

23 **A**    Yes.

24 **Q**    All right.  Now, did you prepare DEA-6s on each particular

25 time that you were present at Gulfton, whether it was

1 surveillance or otherwise?

2 **A**    I did not.  Someone else on my team did.

3 **Q**    Okay.  All right.  And you used their DEA-6s for the same

4 purposes that you use yours, is that correct --

5 **A**    Yes.

6 **Q**    -- to refresh your memory and make a report of what was

7 memorialized at that particular time?

8 **A**    Yes.

9 **Q**    Now, I think we went through the videotape showing the

10 gates opening.  Do you know who, in fact, opened those

11 particular gates that were depicted in this particular video?

12 **A**    No, I do not.

13 **Q**    Okay.  And you can't testify from personal knowledge as to

14 whether all these cars that came through, if, in fact, they went

15 to this clinic or not?  You can't testify to that, can you?

16 **A**    Yes, sir.

17 **Q**    Okay.  So, what you're telling these people is that every

18 car that went in there went to this particular clinic?  Is that

19 what you're testifying to?

20 **A**    Yes, sir.  They went to the back and they parked.

21 **Q**    All right.  And each one of these particular people in

22 these cars went to that clinic; is that correct?

23 **A**    Each and every one of them, no, sir, I cannot say.

24 **Q**    That's my question.

25 **A**    No, sir.

1 **Q**   So, you don't know who went to that clinic that particular

2 day.  All you know is that the cars came through the particular

3 gates; is that correct?

4 **A**   Yes, sir.

5 **Q**   All right.  And I think you testified that there was other

6 business there.  I think it was a dental office; is that

7 correct?

8 **A**   Yes, sir.

9 **Q**   All right.  And I think your testimony was that -- as far

10 as you know that they -- what their office hours were; is that

11 correct?

12 **A**   Yes, sir.

13 **Q**   On the date in question from these particular videos, you

14 can't say from personal knowledge if, in fact, that dental

15 office was open or not, can you?

16 **A**   On the Thursday, it was closed.

17 **Q**   No, that's not my question.

18         Do you know from personal knowledge, okay,

19 yourself, do you know -- did you go in there and see if that

20 dental office was open on that particular day?

21 **A**   No, I did not.

22 **Q**   All right.  All you testified to the jury is what you

23 believe to be the office hours were for the particular dental

24 office; is that correct?

25 **A**   Not what I believe but yes, sir.

1 **Q**   Okay.

2 **A**   I did not go there.

3 **Q**   Okay.  But you didn't go so you don't know if it was open

4 that day?

5 **A**   That is correct.

6 **Q**   So, just because they say they have office hours or are

7 closed on that particular day doesn't, in fact, mean that it's

8 actually closed, does it?

9 **A**   Yes.

10 **Q**   Yes meaning?

11 **A**   Yes, you're right.

12 **Q**   Thank you very much.

13          Now, I think the video was June 19th.  Were you

14 present that particular day?

15 **A**   No, sir.

16 **Q**   Were you present any of the particular dates that you saw

17 on this particular video?

18 **A**   No, sir.

19 **Q**   So, you wouldn't have any personal knowledge as to what

20 actually happened on those particular dates; is that correct?

21 **A**   I don't understand your question.

22 **Q**   You weren't there.  You wouldn't know what went on because

23 you weren't there; is that correct?

24 **A**   The pole camera depicts what happens.

25 **Q**   I understand that, okay.

1       My question to you is do you have any personal

2  knowledge as to what happened other than what you see on the

3  video?  Just because it's what you see doesn't mean that they

4  went into the clinic is what I'm getting to.

5  **A**    Oh.  No, sir.

6  **Q**    Okay, thank you.

7       Now, I'm curious as to the visit -- the actual

8  prescription that you had prior to going to see Gulfton clinic.

9  You had a prescription that was allegedly filled by another

10 doctor?  Is that correct?  Another pain script; is that correct?

11 **A**    Not allegedly, no, sir.

12 **Q**    Okay.  Was that actually filled -- well, let's talk about

13 this script.  Who wrote that particular prescription?

14 **A**    Dr. Williams.

15 **Q**    Okay.  Did you see a Dr. Williams?

16 **A**    I did not.

17 **Q**    Okay.  How did you obtain the prescription if you did not

18 see the doctor?

19 **A**    An undercover went in with my undercover ID and received a

20 prescription from Dr. Williams.

21 **Q**    So, just for my clarification, somebody else took your ID

22 to a different -- to a doctor, this Dr. Williams; is that

23 correct?

24 **A**    Yes.

25 **Q**    All right.  And that person obtained a prescription with

1 your ID?

2 **A**    Yes.  On another investigation, yes.

3 **Q**    On another investigation, okay.

4            So, you didn't personally get that, did you?

5 **A**    No.  It was written for me, but I did not.

6 **Q**    Right, right.  Was that prescription actually filled?

7 **A**    Yes, it was.

8 **Q**    Okay.  All right.  And then, that particular prescription

9 showed up on what we call a PMP report; is that correct?

10 **A**    Yes.

11 **Q**    Now, isn't it true that Dr. Craig wouldn't have known if,

12 in fact, you saw the doctor or how that prescription was done?

13 Isn't that true?

14            MR. HELFMEYER:  Objection, your Honor.  Speculation.

15            THE COURT:  Sustained.

16            MR. WILLIAMS:  All right.

17 BY MR. WILLIAMS:

18 **Q**    But you didn't tell the doctor that the prescription that

19 you had gotten was a fake prescription?  You didn't tell her

20 that, did you?

21 **A**    No.  I'm working undercover.

22 **Q**    I understand.  Okay.

23            And your job as undercover was to go in and see

24 what the prescription that you could get; is that correct?

25 **A**    See if I can obtain one, yes.

1 **Q**    All right.  And in doing so, you had to fill out certain

2 papers, did you not?

3 **A**    Yes.

4 **Q**    All right.  And a lot of what was in that particular

5 paperwork was a flat-out lie, wasn't it?  It wasn't correct

6 information, was it?

7 **A**    That is correct.

8 **Q**    Okay.  All right.  Now, let's talk about what you saw when

9 you were in there.  I think you testified that there was certain

10 other people that you referred to be as runners who were present

11 in the clinic that particular day; is that correct?

12         MR. HELFMEYER:  Objection.  That's mischaracterizing

13 the testimony.

14         THE COURT:  Sustained.  Rephrase it.

15         MR. WILLIAMS:  I'm sorry.

16 BY MR. WILLIAMS:

17 **Q**    I think the actual terminology was crew leaders.  Okay.

18 You say persons -- what you referred to as crew leaders in the

19 particular clinic on the date that you went; is that correct?

20 **A**    Yes.

21 **Q**    All right.  Did you identify any of those particular crew

22 leaders by name on that particular day?

23 **A**    No, I did not.

24 **Q**    But given what you saw in your mind, you determined that

25 they were crew leaders; is that correct?

1  **A**    It was not in my mind.

2  **Q**    Okay.  All right.  Then did you do anything to determine

3  who these particular crew leaders were?

4  **A**    As far as their identity?

5  **Q**    Yes, ma'am.

6  **A**    No.

7  **Q**    All right.  Now, when you went in, you had audio from the

8  time that you got there until the time that you left; is that

9  correct?

10 **A**    Yes, it is.

11 **Q**    And how long was that entire audio?

12 **A**    About three -- more than three hours.

13 **Q**    More than three hours, okay.

14            But the video was not the same; is that correct?

15 **A**    That's correct.

16 **Q**    How long was the video?

17 **A**    The video, 20, 30 minutes maybe.  It wasn't long.

18 **Q**    Okay.  All right.  Now, when you first got to the clinic,

19 you went through a series of things.  They gave you some

20 paperwork to fill out, did they not?

21 **A**    Yes.

22 **Q**    All right.  And of course, what you put on that paperwork

23 was incorrect, wasn't it?

24 **A**    Not only myself, no.

25 **Q**    I'm sorry?

1  **A**    Not only myself, no.

2  **Q**    I'm sorry, I'm a little slow sometimes.  Not only -- I

3  missed what your answer was.

4  **A**    You said that I put the incorrect information there.  I'm

5  saying not only me, other information was not correct.

6  **Q**    Okay.  All right.  So, the information contained in that

7  particular file was not correct, okay.  It was fictitious, was

8  it not?

9  **A**    It was based on my undercover ID.

10 **Q**    Okay.  All right.  And of course, you don't know -- well,

11 let's do this.  You went in, you got triage; is that correct?

12 **A**    Triage?  Can you explain what triage --

13 **Q**    When you went in, somebody took your blood pressure,

14 height, weight, all of that.  You saw a person first about just

15 general things with you, like, your blood pressure.  I think you

16 testified to that.

17 **A**    Yeah.  The lady just took my blood pressure.

18 **Q**    Okay.  All right.  Did she take your weight?

19 **A**    She had me stand on a -- yes.

20 **Q**    Okay.  All right.  Take your height like most -- did she

21 take your height and your weight?

22 **A**    No, no height.

23 **Q**    Just your weight --

24 **A**    Weight.

25 **Q**    -- and your blood pressure?

 1  **A**    Yes.

 2  **Q**    While you were there, you were given several forms to fill

 3  out?

 4  **A**    Yes.

 5  **Q**    Did you read those forms?

 6  **A**    No, I did not.

 7  **Q**    Because those forms did not matter to you, you were just

 8  there to see if you could obtain a prescription; is that

 9  correct?

10  **A**    Yes.  It was fake.  To me, it was fluff.

11  **Q**    My question is did you read them?

12  **A**    No, sir.

13  **Q**    Then, how do you know it's fluff?

14  **A**    Because I wasn't asked anything about them.

15  **Q**    That's not my question.  My question to you is if you did

16  not read them, how can you consider it to be fluff if you did

17  not read the particular document?

18  **A**    And I'm answering you.  You asked me why.  I'm saying

19  because I believe nobody asked me questions about them.  That's

20  why.

21  **Q**    Okay.  But these forms were given to you before you went in

22  to see the doctor, were they not?

23  **A**    Yes.

24  **Q**    And you were sitting out in that waiting room for a long

25  time.  You had plenty of time to read them, did you not?

1   **A**    Yes.

2   **Q**    And you did not read them?

3   **A**    I did not.

4   **Q**    Okay, good enough.

5            Okay.  And did the audio portion of your

6   investigation, it was, what we said, hundred percent.  It was

7   all there; is that correct?

8   **A**    Yes, it was.

9   **Q**    So, the interview that you would have had with the persons

10  prior to seeing Dr. Craig would be on that audio, also?

11  **A**    Yes.

12  **Q**    But not on the video?

13  **A**    That is correct.

14  **Q**    All right.  So, am I to take it then that you only turned

15  the video on when you came in to see Dr. Craig?

16  **A**    No, sir.

17  **Q**    All right.

18  **A**    There is no video with Dr. Craig.

19  **Q**    Okay.  All right.  So, the video was from the beginning

20  when you went inside of the clinic from the beginning; is that

21  correct?

22  **A**    Yes.

23  **Q**    Okay.  And then, at some point it turned off after the 30

24  minutes?

25  **A**    The battery ran out, yes.

1  **Q**    So, it wouldn't depict anything after those -- after what
2  we saw with the patients up front, et cetera, et cetera?
3  **A**    No video, no, sir.
4  **Q**    All right, thank you.
5              And of course, since making that particular
6  video, you've gone over it again with these US Attorneys, have
7  you not?
8  **A**    Yes.
9  **Q**    And that's how you were able to identify a person that you
10  now believe -- now know to be a Shametra Morgan; is that
11  correct?
12  **A**    I'm sorry.  Repeat your question.
13  **Q**    That's how you were able to identify a person in that
14  particular video that you told this jury was Shametra Morgan; is
15  that correct?
16  **A**    It was based on the investigation that I knew prior to
17  going in.
18  **Q**    So, you knew who she was prior to going in?
19  **A**    Yes, I did.
20  **Q**    Had you been shown a picture of her before you went in?
21  **A**    A DL photo.
22  **Q**    Okay.  All right.  And where did you obtain that photo
23  from?
24  **A**    From our open source database checks that we do in our
25  investigation.

1  **Q**    Do you know who provided the information regarding who was
2  working inside of the particular clinic?
3  **A**    Who provided the information?  I don't understand your
4  question.
5  **Q**    Well, my question is this:  You knew it was Shametra Morgan
6  and somebody from either DEA or the United States Attorney's
7  Office went and got a photo; is that correct?
8  **A**    No, sir.
9  **Q**    All right.  How did that come to be?
10 **A**    When we do surveillance, we see license plates, vehicles
11 that arrive.  We look at license plates.  We run the license
12 plates on the vehicles; and then, we get DL photos of the
13 people.  That's how I identified Shametra Morgan.
14 **Q**    Okay, good enough.
15           All right.  Now, you testified as to your opinion
16 as to the people who were in the waiting area.  And I think you
17 said, in your opinion, a lot of them were homeless; is that
18 correct?
19 **A**    I said they appeared to be.
20 **Q**    Appeared to be homeless, okay.
21           But you can't testify to that for a fact if, in
22 fact, they were homeless or not, can you?
23 **A**    No.
24 **Q**    That's just an observation based upon what you saw on that
25 particular day?

1 **A**    Yes.

2 **Q**    Okay.  Now, let's get to -- back to these so-called crew

3 leaders.  Were these the people that you're alleging were

4 helping these people fill out paperwork?

5 **A**    Alleging they were doing it.

6 **Q**    Okay.  So, they were filling out paperwork with them?

7 **A**    Yes, they were.

8 **Q**    How can you determine if they were crew leaders versus

9 daughters or fathers or sons, other particular patients?  How do

10 you differentiate that?

11 **A**    The people sitting next to me were filling out the

12 paperwork.  If the person has pain themselves, they know where

13 their pain is.  So, they can fill it out themselves.  They don't

14 need someone to fill out where their pain is.

15 **Q**    Okay.  All right.  And how many of these so-called crew

16 leaders did you identify in there?  How many people did you

17 identify on that particular date to be a crew leader?  How many?

18 **A**    I saw approximately three to five crew leaders.

19 **Q**    Three to five, okay.

20            Can you describe any of these particular crew

21 leaders?

22 **A**    Male, female.

23 **Q**    All right, male or female.

24            Well, we can assume that they would, at least, be

25 a male or a female.  Any other distinguishing features about

1 these particular crew leaders?

2 **A**    They were dressed flashy.  They had on -- one had on a ball

3 cap.

4 **Q**    Okay.  All right.  But you have no distinguishing features

5 that we can explain to this particular jury differentiating them

6 from anybody else in the particular clinic; is that correct?

7 **A**    I'm sorry, ask your question one more time.

8 **Q**    You can't -- you don't have any identifying information

9 that you could explain to this jury as to why you would consider

10 these people to be crew leaders versus other people who were in

11 there?

12 **A**    Yes.  It's not by the way they were dressed.  By their

13 actions.

14 **Q**    Okay.  All right.  But again, just because somebody helps

15 them fill out some particular paperwork, that doesn't make them

16 a crew leader, does it?

17 **A**    Yes, it does, based on my training and experience.

18 **Q**    Okay, based on your training and experience.

19         Does your training and experience teach you to --

20 because you have other -- cause you to identify these crew

21 leaders?

22 **A**    Yes.

23 **Q**    All right.  But of course, there's nothing that you can

24 present to this jury here today to identify that other than them

25 helping somebody filling out paperwork; is that correct?

1  **A**    Yes.  And I've seen it with my own eyes.

2  **Q**    Okay.  Well, you saw it, okay.

3              But you can't explain to this jury who they were?

4  **A**    Based on the definition of a crew leader, yes, and what I

5  know about crew leader based on my training and experience in

6  working these types of investigations, yes, sir.

7  **Q**    Okay.  All right.  So, you were there, at least, three

8  hours.  How many crew leaders did you see take -- bring patients

9  into the clinic?

10  **A**    When I was out in the parking lot, I saw two.

11  **Q**    You saw two.

12              And how many people did they bring to the clinic?

13  **A**    In one vehicle, there were about six people.

14  **Q**    There were about six people, okay.  All right.

15              And that particular crew leader, could you

16  explain to this jury what he was wearing or she?

17  **A**    It was a he; and no, I could not.

18  **Q**    Okay.  Did you see any of these crew leaders have any

19  interaction with personnel of the Gulfton clinic?

20  **A**    Yes, I did.

21  **Q**    And who did they deal with?

22  **A**    They walked up to the counter there to Shametra Morgan.

23  **Q**    Okay.  All right.  And again, you got there at what time of

24  the day?

25  **A**    9:55.

1 **Q**   Okay.  And the gates usually opened at 7:30, right?

2 **A**   Yes, sir.

3 **Q**   So, there were a lot of people there prior to you getting

4 there; is that correct?

5 **A**   Yes, sir.

6 **Q**   As a matter of fact, you were number 57 on the list, were

7 you not?

8 **A**   Yes, I was.

9 **Q**   Okay.  All right.  So, it stands to reason that there were

10 56 people in front of you, right?

11 **A**   Yes, sir.

12 **Q**   So, how do you identify these -- these other people if

13 they've been there since 7:30 and you don't get there until,

14 what, 9:30, 10:00 o'clock?

15 **A**   Ask your question again.  I don't --

16 **Q**   How can you identify these particular individuals if, in

17 fact, they were there before you and you didn't get there until,

18 what, 10:00 o'clock?

19 **A**   Who am I identifying?

20 **Q**   The crew leaders.

21 **A**   The crew leaders were there helping people fill out the

22 paperwork.

23 **Q**   But most of these people were there long before you got

24 there, were they not?

25 **A**   Yes, sir.

1  **Q**    Okay.  As a matter of fact, you were 57 out of 60; is that

2  correct?

3  **A**    Yes, sir.

4  **Q**    Okay.  And it stands to reason that there were 56 people in

5  front of you who were already there signed in before you got

6  there?

7  **A**    Yes.

8  **Q**    But it's your testimony that these crew leaders were in

9  there and helping these other 56 before you?

10  **A**    I wouldn't say they were helping all of them.  They were

11  helping the people that I saw when I was there, yes.

12  **Q**    Okay, fair enough.

13           Were you able to identify any of these so-called

14  crew leaders on the tape, on the videotape?

15           MR. HELFMEYER:  Objection.  Asked and answered, your

16  Honor.

17           THE COURT:  Overruled.

18           THE WITNESS:  No.

19  BY MR. WILLIAMS:

20  **Q**    And these crew leaders would have been in there when you

21  got there for, at least, 30 minutes, right, because your tape

22  went for 30 minutes; is that correct?

23  **A**    I'm sorry, ask your question again.

24  **Q**    These crew leaders would have been there during that 30

25  minutes that this tape was going on, would they have not?

1  **A**  Yes.

2  **Q**  And you looked at this tape on more than one occasion, have

3  you not?

4  **A**  Yes.

5  **Q**  And you can't identify any crew leader on that particular

6  tape, can you?

7  **A**  When the video stopped, I was still in there.

8  **Q**  That wasn't my question.  My question was you can't

9  identify any of these crew leaders on the particular tape?

10  **A**  No.

11        THE COURT:  All right, counsel.  Maybe we've reached a

12  point that we can take a break.

13        MR. WILLIAMS:  Yes, sir, your Honor.

14        THE COURT:  Let's see.  All right.  Ladies and

15  gentlemen, we'll see you back ready to resume at 2:15.  That's a

16  little more than one hour.  See you back.  You may stand and go

17  into the jury room.

18        THE COURT SECURITY OFFICER:  All rise.

19     (Court recessed at 1:07 p.m.)

20     (Court resumed at 2:22 p.m.)

21        THE COURT:  Let's continue, please.

22        MR. WILLIAMS:  Thank you, your Honor.

23  BY MR. WILLIAMS:

24  **Q**  Okay.  All right.  I think before we broke for lunch, we

25  were covering audios, videos, what was going on with that, okay.

1                    Now, I think the Government played the portion of
2    your encounter with Dr. Craig; is that correct?

3    **A**    The audio, yes.

4    **Q**    Okay.  All right.  And have you listened to that entire
5    audio?

6    **A**    Yes, sir.

7    **Q**    The whole 30 -- the whole three hours?

8    **A**    No, sir.  The encounter with Dr. Craig was 90 seconds.

9    **Q**    No.  I'm talking about the entire audio, not just with
10   Dr. Craig?

11   **A**    Yes.  Yes, sir.

12   **Q**    Was the encounter that you had with the two people prior to
13   seeing Dr. Craig on that particular audio?

14   **A**    Yes.

15   **Q**    And in that particular audio, isn't it true that there were
16   questions that were asked from people who saw you prior to
17   Dr. Craig about some of your medical conditions?  Is that
18   correct?

19   **A**    Yes.

20   **Q**    Okay.  And did -- were you totally honest with those people
21   in terms of what your concerns were?

22   **A**    Yes.

23   **Q**    So, everything you told the people before you got to
24   Dr. Craig was correct?

25   **A**    Yes.  In my undercover capacity, yes.

1  **Q**    Okay.  But when you got to Dr. --

2          MR. WILLIAMS:  Well, strike that.

3  BY MR. WILLIAMS:

4  **Q**    Now -- and that particular audio would cover the blood

5  pressure take and the weight take; is that correct?

6  **A**    Yes, sir.

7  **Q**    Okay.  And it would cover the second people that you saw

8  after they took your blood pressure and your weight; is that

9  correct?

10  **A**    Yes, the second person.

11  **Q**    And how long was that encounter?

12  **A**    With?

13  **Q**    With the second person.

14  **A**    Roughly, five minutes.

15  **Q**    Okay.  All right.  And they asked you several questions,

16  did they not?

17  **A**    Yes.

18  **Q**    Okay.  And they took information down to put in your

19  particular chart?

20  **A**    They wrote it down.  I don't know if it was in my chart.

21  **Q**    Okay.  All right.  And now, your entire goal that day was

22  to go in and see if you can get a prescription from Dr. Craig;

23  is that correct?

24  **A**    Yes.  To go in and see if I can get a prescription.

25  **Q**    And you did that using a fake ID; is that correct?

1  **A**    It's a real ID.

2  **Q**    All right.

3  **A**    It's just a fake name.

4  **Q**    A fake name, okay.

5              So, a real ID with a fake name?

6  **A**    Yes, sir.

7  **Q**    You did that to protect your identity so nobody would know

8  that you were DEA or could possibly trace that back; is that

9  correct?

10 **A**    Yes, sir.

11 **Q**    And unlike the encounter with the previous doctor that you

12 went to see, Dr. Williams, you actually went in yourself and it

13 was actually you.  The only thing that was fake was your name;

14 is that correct?

15 **A**    No, sir.

16 **Q**    All right.  What else was fake?

17 **A**    I never saw Dr. Williams.

18 **Q**    Okay.  That's what I'm saying.  I'm trying to differentiate

19 what happened with Dr. Williams.  Somebody took your ID in and

20 obtain a prescription without you actually having to be there;

21 is that correct?

22 **A**    That is correct.

23 **Q**    That didn't happen with Dr. Craig --

24 **A**    Yes, sir.

25 **Q**    -- because you went in yourself?

Graham - Cross/Williams

1  **A**    Yes.

2  **Q**    Okay.  All right.  And those are two different things.  Was

3  that a pill mill?

4  **A**    Yes, it was.

5  **Q**    Okay.  All right.  Now, I think you testified about why

6  people want these particular drugs.

7  **A**    Yes.

8  **Q**    They use them for -- to -- I guess to get high with; is

9  that correct?

10  **A**    Yes.

11  **Q**    Okay.  Now, of course, you never personally used these

12  drugs, have you?

13  **A**    Me personally?  What do you mean?

14  **Q**    I mean, have you personally taken this -- these two drugs

15  together?

16  **A**    You mean personally Tonya Graham or personally Tonya

17  Jackson?  What are you saying?

18  **Q**    Well, either one, Tonya Graham or Tonya Graham?

19  **A**    Tonya Graham, yes; Tonya Jackson, no.

20  **Q**    Okay.  So, Tonya Graham has taken these drugs before?

21  **A**    Hydrocodone.

22  **Q**    Okay.  All right.  So, have you taken the hydrocodone with

23  the Soma?

24  **A**    No, sir.

25  **Q**    Okay.  So, you wouldn't have any personal knowledge as to

1 what the effects that you testify about are; is that correct?

2 You only are testifying in your capacity -- in your training and

3 experience; is that correct?

4 **A**    Yes, sir.

5 **Q**    Okay.  And that's a whole lot different than personally

6 knowing, isn't it?

7 **A**    No, sir.

8 **Q**    So, to personally know, you would have to take them both

9 together, the Soma and the hydrocodone; is that correct?

10 **A**    Yes, sir.

11 **Q**    And you haven't done that?

12 **A**    That is correct.

13 **Q**    Okay.  All right.  So, you don't personally know the

14 effects?

15 **A**    From doing interviews and debriefings, I know the stuff,

16 yes, sir.

17 **Q**    And that's totally differently from personally taking it,

18 isn't it?

19 **A**    Yes, sir.

20 **Q**    And what you did was legal only because you were working in

21 the capacity as a DEA agent, okay; is that correct?

22 **A**    What I did?  Can you explain what you mean.

23 **Q**    In terms of having an identification that was real with a

24 fake name on it?

25 **A**    Yes, sir.

1  **Q**    Okay.  You can do that in your capacity as a DEA agent; is
2  that correct?
3  **A**    Yes, sir.
4  **Q**    Okay.  But anybody else who would have done that, that's
5  against the law, isn't it?
6  **A**    Yes, sir.
7         MR. HELFMEYER:  Objection.  Relevance.
8         THE COURT:  Overruled.
9  BY MR. WILLIAMS:
10 **Q**    So, it would be against the law if -- if I did what you did
11 because I'm not a DEA agent; is that correct?
12 **A**    Yes.
13 **Q**    Okay.  And they could be charged with an offense for that;
14 is that correct?
15 **A**    Yes, sir.
16 **Q**    Okay.  Now, does your training and experience lead you to
17 believe that the majority of these prescriptions that came from
18 this clinic, that the people didn't need them, they weren't for
19 legitimate medical purpose?
20 **A**    Yes, sir.
21 **Q**    Because you work in diversion and what diversion does is
22 attempt to keep the drugs in the hands of the people who
23 actually need them; is that correct?
24 **A**    Diversion, we enforce the controlled substance laws of the
25 United States --

1 **Q**   All right.

2 **A**   -- and we focus primarily on pharmaceuticals.

3 **Q**   Okay.  So, you focus primarily on pharmaceuticals and you

4 go to these clinics, et cetera, et cetera, to attempt to see if,

5 in fact, these drugs that have been written by these clinics are

6 actually being diverted to the street?

7 **A**   Yes, sir.

8 **Q**   Okay.  And it all starts with what you did in terms of --

9 well, what you did and what you believe other people do.  They

10 go in to try to get these particular drugs that they don't need;

11 is that correct?

12 **A**   I'm sorry, I don't understand your question.

13 **Q**   My question is this:  It all starts with the prescriptions;

14 is that correct?  What you did, you went in to try to get a

15 prescription; is that correct?

16 **A**   Yes, sir.

17 **Q**   You believed that most of these prescriptions were not for

18 a legitimate medical purpose; is that correct?

19 **A**   That is correct.

20 **Q**   And you believed that that's being done by people coming in

21 saying that they need these particular drugs?

22 **A**   Yes, sir.

23 **Q**   Okay.  So, without the people coming in with these

24 so-called crew leaders, okay, we wouldn't -- we wouldn't have

25 the problem that we're -- that we're experiencing with this

1  particular case, would we?

2  **A**  I don't understand your question.

3  **Q**  Well, my question is this.  What I'm trying to get to is

4  people are coming in, okay?  They're telling the doctor that

5  they have certain particular illnesses, certain particular

6  pains, and they want to get these particular prescriptions; is

7  that correct?

8          MR. HELFMEYER:  Objection.  Speculation.

9          THE COURT:  Sustained.

10         MR. WILLIAMS:  All right.

11  BY MR. WILLIAMS:

12  **Q**  When you went in, you went in to tell them that I have

13  certain pains and I'd like to get a prescription, basically.  I

14  mean, I'm not verbatim, of course.  But that's what you were

15  attempting to do; is that correct?

16  **A**  Yes, sir.

17  **Q**  Okay.  And you put the information in that was not correct;

18  is that correct?

19  **A**  I still don't understand what you mean.

20  **Q**  You put information in your particular chart saying you had

21  shoulder problems, et cetera, et cetera, in an attempt to get a

22  prescription from Dr. Craig?

23  **A**  Yes.

24  **Q**  Okay.  And if you believed that most of these scripts were

25  not for a medical purpose, then you're believing that most of

1 the people who are coming in don't need them; is that correct?

2 **A**    Yes, sir.

3 **Q**    Okay.  All right.  And they'd have to tell the doctor

4 something.  They can't come in and tell the doctor, "Oh, I don't

5 need them."

6             MR. HELFMEYER:  Objection.  Speculation.

7             THE COURT:  Sustained.

8             MR. WILLIAMS:  Okay.

9 BY MR. WILLIAMS:

10 **Q**    But they'd have to give some indication that there's some

11 type of pain in order to get these particular --

12             MR. HELFMEYER:  Objection.  Speculation.

13             THE COURT:  Overruled.

14 BY MR. WILLIAMS:

15 **Q**    They'd have to give some indication to the doctor that they

16 have certain pains in order to get these particular scripts; is

17 that correct?

18 **A**    Yes.

19 **Q**    Okay.  And that's where it all starts because -- well,

20 that's where it all starts.

21             Now, what was done in this case to stop the

22 people who you believe were going in to get scripts that were

23 not for legitimate medical purpose?  What were done to those

24 people, the patients?

25 **A**    What was done to them?

1 **Q**   Yes.

2 **A**   Nothing.

3 **Q**   Okay.  And if you had actual proof that they were getting

4 them without a legitimate medical purpose, you could charge the

5 people that went in and got them, couldn't you not?

6 **A**   Not me personally, no, sir.

7 **Q**   But the United States Government could?

8 **A**   Yes.

9 **Q**   Okay.  Do you know if anybody -- out of all of these from

10 Gulfton who went in to get a script who was actually charged?

11 **A**   No, sir.

12         MR. WILLIAMS:  I pass the witness, your Honor.

13         THE COURT:  Go right ahead, sir.

14         MR. LEWIS:  May I proceed?

15         THE COURT:  Yes.  Pull the microphone in, please.

16             Pull it in from the base, counsel.

17             Lift it up and pull it in.

18         MR. LEWIS:  I see it.

19                 CROSS-EXAMINATION

20 BY MR. LEWIS:

21 **Q**   Good afternoon, Ms. Graham.  I think we met before.  You

22 know my name is Don Lewis and I represent Gazelle Craig in this

23 matter?

24 **A**   Yes.  Good afternoon.

25 **Q**   Okay.  Based on your training and your experience as a

1  diversion investigator, would you agree with me that pain is

2  subjective?

3  **A**    I'm sorry, I'm not a diversion investigator.  I'm a special

4  agent.

5  **Q**    Special agent, I'm sorry.

6              Based on your experience as a special agent,

7  would you agree with me that -- regarding the term that pain is

8  subjective?

9  **A**    Yes, sir.

10  **Q**    And what does that mean to you?

11  **A**    That it's individualized.

12  **Q**    And does it mean that when a person has pain that you can

13  always see it?

14  **A**    No, sir.

15  **Q**    Okay.  I also am aware that one time you played basketball,

16  did you not, Special Agent Graham?

17  **A**    Yes, sir.

18  **Q**    Okay.  And as a basketball player, were you ever injured?

19  **A**    Yes, sir.

20  **Q**    Now, when you were injured, unless you broke your leg or

21  something like that, if you had a sprain, would that injury be

22  manifested to your coach in some kind of way that he could see

23  it?

24  **A**    What do you mean, "manifested"?

25  **Q**    Would the coach be able to determine that you had a muscle

1  sprain without you telling him?

2  **A**    He would have saw me fall down on the floor and grab my

3  ankle or whatever was in pain.

4  **Q**    But would they be able to tell the amount of pain that you

5  had without you telling them?

6  **A**    Sometimes they can look and tell but -- yes.

7  **Q**    In a normal situation?

8  **A**    Yes, sometimes.  Yes.

9  **Q**    Okay.  But in other times, would they always be able to

10  tell how much pain you had?

11  **A**    No, sir.

12  **Q**    And you would have to communicate that to them, would you

13  not?

14  **A**    Yes, sir.

15  **Q**    Would that be similar to what -- a patient that goes to a

16  pain clinic like Gulfton, would that patient have to communicate

17  their level of pain to the provider?

18              MR. HELFMEYER:  Objection.  Speculation.

19              THE COURT:  Sustained.

20  BY MR. LEWIS:

21  **Q**    In your case based on your training and experience and also

22  your patient interaction at Gulfton clinic, did you -- was it

23  reasonable that you would need to communicate to the provider

24  how much pain you were in?

25  **A**    Was it reasonable?

1 **Q**    Would it be reasonable that you would need to tell the
2 provider how much pain you were in?

3 **A**    Yes.

4 **Q**    And did you tell Dr. Craig in this case how much pain you
5 were in?

6 **A**    No, sir.

7 **Q**    Did you fill out paperwork that indicated that you had
8 pain?

9 **A**    Yes.  I filled out paperwork, yes.

10 **Q**    And would that paperwork be paperwork that would be part of
11 your patient's chart regarding your treatment at Gulfton?

12 **A**    Can you rephrase the question.

13 **Q**    Would the paperwork that you fill out indicating pain,
14 would that be part of your patient chart at Gulfton?

15 **A**    It should be.

16 **Q**    Agent Graham, have you had medical training regarding
17 performing a reflex test?

18 **A**    No, sir.

19 **Q**    Have you had -- based on your training and experience, have
20 you had training in performing a straight leg raise test?

21 **A**    No, sir.

22 **Q**    Based on your experience and training, have you had
23 training regarding the performance of a strength test?

24 **A**    No, sir.

25 **Q**    Based on your experience and training, have you had

1  training regarding the performance of a neurological exam?

2  **A**    No, sir.

3  **Q**    Based on your -- based on your experience and training,

4  have you had training regarding performing a musculoskeletal

5  test?

6  **A**    No, sir.

7  **Q**    Now, based on your prior testimony today, I think you have

8  testified that the provider did ask you to bend over?

9          MR. HELFMEYER:  Objection to the word "provider."

10          THE COURT:  Say again.  I can't hear you.

11          MR. HELFMEYER:  Objection.  Confusing question.  Who

12  is the provider?

13          THE COURT:  Sustained.

14  BY MR. LEWIS:

15  **Q**    In response -- while you were being evaluated by an

16  individual at Gulfton clinic I think based on your testimony

17  today, did that individual that were -- that you were

18  interacting with during your patient encounter ask you to bend

19  over?

20  **A**    Yes.

21  **Q**    Did the individual -- based on your experience and also

22  based on your testimony here today, did that individual that you

23  interacted with at Gulfton ask you to raise your leg?

24  **A**    Yes.

25  **Q**    And based on your testimony here today, is it your

1 testimony that the provider also used a hammer to hit your knee?

2 **A**    Provider?

3 **Q**    Did the individual that you interacted with at Gulfton, one

4 of the individuals, use a small metal hammer to tap on your

5 knee?

6 **A**    Yes, sir.

7 **Q**    Would all of the tests that I've asked you about, the knee

8 test, the bend over, touching you, your stomach, is -- are those

9 tests recorded on the video or audio that we -- that we've

10 listened to in court today?

11 **A**    I'm sorry, I don't consider them to be tests.

12 **Q**    The -- well, if they're not tests, okay, if they're not --

13 if you don't consider them to be tests, was all of the actions

14 related to you, bending over, touching you, touching your

15 stomach, tapping you on your knee and using a hammer against

16 your knee, is that recorded on the audio or video that we've

17 heard here in court today?

18 **A**    The audio.

19 **Q**    Was that portion of the audio played?

20 **A**    No, sir.

21 **Q**    I'm going to direct your attention now to Government's

22 Exhibit 357 and I want to go to page 22.

23          MR. LEWIS:  And Judge, I don't know, can we turn the

24 lights down just a little bit?

25          THE COURT:  Okay.

1          MR. LEWIS:  Yes.

2   BY MR. LEWIS:

3   **Q**    And I think you have testified you're familiar with this

4   document that's being depicted at Government Exhibit's 357, page

5   22?

6   **A**    Yes, sir.

7   **Q**    Okay.  Now -- and I think your prior testimony was that

8   this is what you referred to as the prescription monitoring

9   report, or the PMP; is that correct?

10  **A**    Yes, sir.

11  **Q**    Okay.  Now -- and this purports to be a prescription

12  monitoring report, or PMP, that is actually depicting medication

13  -- controlled medication related to Tonya Jackson?

14  **A**    Yes, sir.

15  **Q**    And that Tonya Jackson being -- that's your undercover

16  name; is that correct?

17  **A**    Yes, sir.

18  **Q**    By the way, how long have you been acquainted with the PMP

19  reports?

20  **A**    Since I became in the tactical diversion group.

21  **Q**    Okay.  And would you -- would it be a fair statement to say

22  that this is a report that is actually -- it actually at this

23  point comes under the auspices of the Texas State Board of

24  Pharmacy?

25  **A**    Yes.

1  **Q**    And this report is designed to indicate any controlled

2  substance prescription that was sold to an individual in the

3  State of Texas?

4  **A**    I don't think that's quite accurate what you're asking me.

5  **Q**    Okay.  What is your understanding of the PMP report then?

6  **A**    That it has -- it's pharmacy reported.  It's pharmacy

7  generated.  If the pharmacy doesn't report it to the pharmacy

8  board, it would not reflect it.

9  **Q**    Okay.  Unless -- but if the pharmacy board is reporting it

10  and it is reflected on that report, it does indicate

11  prescriptions that were sold by the pharmacy?

12  **A**    Filled by the pharmacy.  I wouldn't necessarily say sold.

13  **Q**    Filled by the pharmacy?

14  **A**    Yes, sir.

15  **Q**    Okay.  All right.  Now, is this report designed -- as far

16  as you know, is this report designed to be accurate?

17  **A**    As far as I know, yes, sir.

18  **Q**    And is this a report that is designed to be a tool that a

19  medical provider can use to determine -- to monitor an

20  individual's prescriptions that has been issued by -- by

21  doctors?

22  **A**    Yes.

23  **Q**    And is this a report that is routinely used based on your

24  training and experience by doctors that treat pain patients?

25  **A**    Yes.

1 **Q**   And is it your understanding that when this report is
2 generated that the doctor should have the ability to rely on the
3 information as being accurate?

4 **A**   Yes.

5 **Q**   So, in this case when this report was ran on you for June
6 the 15th, I think, of 2017, Dr. Craig, as a provider, was --
7 should have had the -- should have been able to rely on this
8 report as accurate?

9         MR. HELFMEYER:  Objection.  Speculation.

10        THE COURT:  Sustained.

11 BY MR. LEWIS:

12 **Q**   Based on your experience as an agent and based on your
13 knowledge as an investigator, would it be an accurate statement
14 to say that Dr. Craig in this case should be able to rely on the
15 information reflected by the PMP?

16 **A**   Yes.

17 **Q**   I'm going to ask you now to focus on what's being depicted
18 as page 6 of Government's Exhibit 357.

19             Are you familiar with this document, Agent
20 Graham?

21 **A**   Yes.

22 **Q**   And based on your understanding, what is being depicted on
23 page 6 of Government's Exhibit 357?

24 **A**   It's titled "Patient Informed Consent and Patient
25 Management Agreement."

1 **Q**    Okay.  And would that be an agreement that you would have

2 been given when you went to Gulfton clinic on June the 6th of

3 2017?

4 **A**    As far as the new patient paperwork?

5         MR. HELFMEYER:  Objection to the date.

6         THE COURT:  Okay.

7         MR. HELFMEYER:  June the 15th.

8         MR. LEWIS:  What did I say?

9 BY MR. LEWIS:

10 **Q**    June the 15th of 2017.

11         Well, I ask you:  What date is on this form?

12 **A**    June the 15th, 2017.

13 **Q**    And whose name is on this form?

14 **A**    Tonya Jackson.

15 **Q**    Who put Tonya Jackson's name on this form?

16 **A**    I did.

17 **Q**    And my question now is that, based -- would this be a form

18 that you were given when you went to Gulfton clinic on June the

19 15th of 2017?

20 **A**    Yes, sir.

21 **Q**    Now, would this form show as a patient at Gulfton that you

22 are giving consent for treatment at Gulfton?

23 **A**    I wouldn't say that, no, sir.

24 **Q**    Well, why don't you read the paragraph that starts with

25 "Consent."

1 **A**    "Consent to treatment," that paragraph?

2 **Q**    Yeah, consent to treatment.

3 **A**    "Consent to treatment and/or drug therapy.  I voluntarily

4 request my physician, name at the bottom of the agreement, to

5 treat my condition which has been explained to me as chronic

6 pain.  I hereby authorize and give my voluntary consent for my

7 physician to administer or write prescriptions for dangerous

8 and/or controlled drugs, medications as an element in the

9 treatment of my chronic pain."

10 **Q**    What does that mean to you, Agent Graham?

11 **A**    That they're just words on the paper.  It says that I

12 voluntarily request my physician, but I don't have a physician.

13 I'm in an under --

14 **Q**    Okay.  Agent Graham, I don't think we've covered this.  But

15 what is your educational background?

16 **A**    I have a Bachelor Degree from Texas Southern University, a

17 Master's Degree in Organizational Management from the University

18 of Phoenix, and a Doctorate in Business Administration

19 specializing in criminal justice from North Central University.

20 **Q**    So, is your answer still the same, that you don't

21 understand what that's saying?

22 **A**    I didn't say that I didn't understand.

23 **Q**    My question is what is your understanding of what that --

24 what that paragraph means?

25 **A**    That is just words.  I mean, it says consent to treatment

1  and/or drug therapy.  I signed -- I put my name there; but under

2  the capacity of the investigation, it's just words on a paper.

3  I don't --

4           MR. LEWIS:  Objection.  Non-responsive.

5           THE COURT:  Sustained.

6  BY MR. LEWIS:

7  **Q**    Agent Graham, I'm going to ask you again:  What does that

8  paragraph mean to you as an agent?  The words in that paragraph,

9  what does that mean to you?

10          MR. HELFMEYER:  Objection.  Asked and answered, your

11 Honor.

12          THE COURT:  Overruled.

13              One more time.

14          THE WITNESS:  "I voluntarily request my physician,

15 name at the bottom of the agreement" -- I don't have a physician

16 -- "to treat my condition which has been explained to me as

17 chronic pain."

18          MR. LEWIS:  Objection.  Non-responsive.

19          THE COURT:  Overruled.

20              Wait a second.  What's -- get right -- this is an

21 adverse witness.  You can lead her.

22              By that, I mean it's not his witness.  I'll

23 explain that in a minute.

24              You can lead the witness.  And let's do it and

25 get it moving.

1  BY MR. LEWIS:

2  **Q**    Agent Graham, does that paragraph indicate that you're
3  consenting to treatment?

4  **A**    Yes.

5  **Q**    Does it also seem to indicate that you are being treated as
6  a chronic pain patient?

7  **A**    Yes.

8  **Q**    And does it also indicate that you are voluntarily agreeing
9  to be treated and seen as a chronic pain patient?

10  **A**    Yes.

11  **Q**    Can you skip down now to the paragraph that starts with "I
12  have been informed and understand."

13                Do you see that, Agent Graham?

14  **A**    Yes, I do.

15  **Q**    And could you just take a second to read that.  You don't
16  have to read it out loud.  Just read it to yourself.

17  **A**    Yes, sir.

18  **Q**    And what does -- the paragraph that begins with "I have
19  been informed and" -- what does that mean to you, Agent Graham?

20  **A**    It says:  I understand that I will undergo medical tests
21  and examinations for treatment; and if I refuse, the termination
22  of treatment -- if I refuse, it may lead to termination of
23  treatment.

24  **Q**    Does that paragraph -- it would be accurate to say that
25  paragraph does indicate to you as a patient there that you are

1 agreeing to undergo examinations; is that correct?

2 **A**    Yes, sir.

3 **Q**    And that you also are agreeing to undergo -- to undergo

4 evaluations?

5 **A**    Examinations, yes.

6 **Q**    Could you go to the next page at the top.

7 **A**    Yes, sir.

8 **Q**    And do you see what -- what begins with "I certify and

9 agree to the following"?

10 **A**    Yes, sir.

11 **Q**    And as far as number one, are you -- are you certifying and

12 agreeing as a condition of the contract with Gulfton that you're

13 not using illegal drugs?

14 **A**    Yes, sir.

15 **Q**    And that you're not abusing illegal drugs?

16 **A**    Yes, sir.

17 **Q**    And that you're not an addict?

18 **A**    That is correct.

19 **Q**    Okay.  And that you are reading this agreement while in the

20 full possession of your faculties and not under the influence of

21 any substance that might impair your faculties?

22 **A**    Yes, sir.

23 **Q**    And you do understand what those words mean, do you not,

24 Agent Graham?

25 **A**    Yes, sir.

1 **Q**    Does number two seem to indicate that you're also saying

2 that you're not selling these drugs?

3 **A**    Yes, sir.

4 **Q**    Now, actually, this form is out of order.  But would it be

5 accurate to say that this pain contract is four full pages?

6 **A**    I would have to take your word.

7            THE COURT:  Let's assume that it is.

8                 Next question.

9            THE WITNESS:  Yes, sir.

10 BY MR. LEWIS:

11 **Q**    Okay.  At the -- on page 7 of 357, did you sign this

12 document?

13 **A**    Yes, I did.

14 **Q**    Did you date the document?

15 **A**    Yes, I did.

16 **Q**    And who else signed this document?

17 **A**    Gazelle Craig, D.O.

18 **Q**    And would your signature on this page indicate that,

19 according -- as far as Dr. Craig is concerned, that you are

20 agreeing to the terms and conditions of this contract?

21            MR. HELFMEYER:  Objection.  Speculation.

22            THE COURT:  Sustained.

23 BY MR. LEWIS:

24 **Q**    By signing this document and dating it, does it indicate

25 that you are agreeing to the terms of this contract?

1  **A**    Yes.

2  **Q**    I'm going to show you now what's shown on page 3 of

3  Government's Exhibit 357.

4               Are you familiar with this, Ms. Graham -- Agent

5  Graham, I'm sorry?

6  **A**    Yes, sir.

7  **Q**    Okay.  And is this a document that you completed on June

8  the 15th of 2017?

9  **A**    Yes, sir.

10 **Q**    Who supplied the writing on this document?

11 **A**    This part right here is myself.  I don't see the rest of

12 the document.  Yes, myself.

13 **Q**    So, would it be fair to say that you supplied all of the

14 writing on this document?

15 **A**    Yes, sir.

16 **Q**    And does it ask you on this document why you are coming to

17 Gulfton clinic?

18 **A**    Yes, sir.

19 **Q**    And what did you indicate?

20 **A**    Neck, muscle spasm.

21 **Q**    And again, this is a document you filled out, right, Agent

22 Graham?

23 **A**    Yes.

24          THE COURT:  You filled it out in your -- in the

25 capacity as an undercover officer; is that correct?

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  I think we got it.

3          MR. LEWIS:  Sure.

4 BY MR. LEWIS:

5 **Q**    Did you sign the document?

6 **A**    Yes, I did.

7 **Q**    And you dated it?

8 **A**    Yes, it is.

9          THE COURT:  Is that your real signature or somebody

10 else's name?

11          THE WITNESS:  My signature.

12          THE COURT:  Okay.  But did you sign it yourself or in

13 the undercover capacity?

14          THE WITNESS:  In the undercover capacity.

15 BY MR. LEWIS:

16 **Q**    I'm going to show you now what is being shown on page 9 of

17 Government Exhibit's 357.

18          Now, while you were at Gulfton clinic, I think

19 you've testified you did speak to more than one individual while

20 you were at the clinic; is that correct?

21 **A**    Yes, sir.

22 **Q**    And -- and I think you are familiar with the term "triage,"

23 are you not, Agent Graham?

24 **A**    Yes, sir.

25 **Q**    Okay.  What does triage mean?

1 **A**    Triage means when you go into a room, they take your blood
2 pressure, your height, your weight; and they ask you what your
3 problem is for coming today, have you been taking any
4 medication, things of that nature.

5 **Q**    Would it be fair to say that the information that is --
6 that is shown on the top of page 9 of Government's Exhibit 357
7 was information that was acquired by you during triage?

8 **A**    No, sir.

9 **Q**    Did anyone ask you questions, Agent Graham?

10 **A**    Yes, sir.

11 **Q**    And did the individual that asked you questions, did they
12 record your responses?

13 **A**    Yes, sir.

14 **Q**    And did they ask you a question about what your chief
15 complaint was?

16 **A**    Yes, sir.

17 **Q**    And as far as you know, they recorded what you told them?

18 **A**    Yes, sir.

19 **Q**    Did they ask you questions regarding the nature of your
20 pain?

21 **A**    Yes, sir.

22 **Q**    And did they record that based on your response?

23 **A**    Yes, sir.

24 **Q**    Have you heard the term "medical assistant" before?

25 **A**    Yes, sir.

1 **Q** And what is a medical assistant?

2 **A** Someone that would do the triage and that would help the

3 doctor out.

4 **Q** So, would it be fair to say that a medical assistant was

5 assisting you at this point?

6 **A** I cannot say their -- what their title was, if it was

7 accurate.

8 **Q** But normally, at this stage of triage, would a medical

9 assistant or someone other than a doctor be asking you these

10 questions?

11 MR. HELFMEYER: Objection. Speculation.

12 THE COURT: Sustained.

13 BY MR. LEWIS:

14 **Q** Based on your training and experience as a special agent,

15 at this point of triage, would these questions be asked to you

16 by someone other than a doctor?

17 **A** Yes.

18 **Q** And in this case, were these -- at Gulfton, were these

19 questions asked to you by someone other than Dr. Craig?

20 **A** Yes, they were.

21 **Q** Did you indicate to this individual in response to

22 questions the medication that you were taking?

23 **A** Yes.

24 **Q** And is that documented on page 10 of Government's Exhibit

25 357?

1  **A**    Yes.

2  **Q**    Have you ever -- based on your experience as an agent, have

3  you ever heard the term "review of systems" before?

4  **A**    No, sir.

5  **Q**    Okay.  Have you ever seen the acronym ROS?

6  **A**    No, sir.

7  **Q**    Okay, fair enough.

8            I'm going to show you now also what is on page --

9  I think this is page 10.  I'm sorry, it's page 11 of

10 Government's Exhibit 357.  Have you seen this document before?

11           Agent Graham, have you seen this document before?

12 **A**    In these proceedings.

13 **Q**    In these proceedings?

14 **A**    Yes.

15 **Q**    Okay.  Did you review these documents as part of your

16 testifying in this case?

17 **A**    Yes.

18 **Q**    Okay.  The work -- the writing on Government's Exhibit

19 Number 11 -- I mean, on Government's Exhibit 357, page 11, is

20 that your handwriting?

21 **A**    No, sir.

22 **Q**    Do you know whose handwriting it is?

23 **A**    No, sir.

24 **Q**    Do you see on the right-hand side of the page something

25 that says, "flex"?  In the right-hand column, do you see where

1 it says, "flex"?  Kind of right where I'm putting the cursor

2 right here (indicating).

3 **A**    I don't know what -- I can't make that out.

4 **Q**    Okay, that's fine.  That's fair.

5          What about underneath?  Do you -- do you see that

6 -- that writing there?

7 **A**    No, sir.  I just can make out the word "test."

8 **Q**    Is that -- could that -- could that mean to you --

9          MR. HELFMEYER:  Objection.  Speculation.

10         THE COURT:  Sustained.

11 BY MR. LEWIS:

12 **Q**    Do you see on the left-hand corner toward the bottom of the

13 page DTR?

14 **A**    Yes, I see DTR.

15 **Q**    And what does that mean to you, Agent Graham?

16 **A**    I have no idea.

17 **Q**    That's fair.

18         Do you see on the bottom of that page 5 over 5

19 "R"?

20 **A**    Yes, sir, I see it.

21 **Q**    What does that mean to you?

22 **A**    I don't know.

23 **Q**    Okay, fair enough.

24         Going on to page 12 of Government's Exhibit 357,

25 do you see some things being circled on -- on this page, Agent

1  Graham?

2  **A**   Yes, sir.

3  **Q**   And did you circle -- circle these items or was it done by

4  someone else?

5  **A**   Someone else.

6  **Q**   And could that someone else be the medical provider that

7  you saw on June the 15th of 2017?

8  **A**   No, I cannot say.

9  **Q**   So, you were not -- did you speak with the medical provider

10  on June the 15th of 2017?

11  **A**   Who is the medical provider?  I'm confused.

12  **Q**   I'm asking you did you -- did you speak to a medical

13  provider or personnel at Gulfton clinic on June the 15th of

14  2017?

15  **A**   Yes, sir.

16  **Q**   And would these -- would this information being documented

17  here be -- be documentation by one of the individuals that you

18  spoke to?

19  **A**   Yes, sir.

20  **Q**   By the way, you haven't had any medical training, have you?

21  **A**   No, sir.

22  **Q**   Okay.  Who explained to you what CAMs was?

23  **A**   No one.

24  **Q**   I think in response to questions from Mr. Helfmeyer, you

25  answered questions regarding CAMs, did you not?

1  **A**    CAMs as being with other things?

2  **Q**    Again, I think the question was in response to his

3  questions of whether or not you realized that a CAM was massage?

4  **A**    I don't remember what the acronym was, what it stood for,

5  no; but I know that's a massage chair and other things, yes.

6  **Q**    Was the term -- well, I think the term was used "adjunctive

7  modality."  Do you remember that testimony?

8  **A**    I know it as other modalities.

9  **Q**    Complementary -- adjunctive modalities, could that

10 represent what CAMs means?

11 **A**    Yes, sir.

12 **Q**    And you didn't circle massage on this page, did you not?

13 **A**    No, sir.

14 **Q**    And you didn't circle 30 days?

15 **A**    No, sir.

16 **Q**    You didn't do it but someone at Gulfton that you interacted

17 with would have had to do that?

18 **A**    Yes, sir.

19 **Q**    Does it appear at the bottom of the page that this document

20 was signed by Dr. Gazelle Craig?

21 **A**    Yes, sir.

22 **Q**    And does it appear that it was signed on June the 15th of

23 2017?

24 **A**    Yes, sir.

25 **Q**    In your undercover capacity, did you complete the document

1 that is reflected on page 13 of Government's Exhibit 357?

2 **A**    Is this 13?

3 **Q**    This is page 13 -- I'm sorry, that's page 13.

4 **A**    Yes.  Is this the full page?

5 **Q**    I can try to show you the full page.

6              Well, we can go through.  Actually --

7              THE COURT:  No, we don't have to go through it all.

8 She asked a question.  If you can answer it, counsel, please do

9 it.

10 BY MR. LEWIS:

11 **Q**    I'm showing you -- I'm showing you the top of page 13 which

12 is --

13              THE COURT:  Do you recognize that, ma'am?

14              THE WITNESS:  Yes, your Honor.

15              THE COURT:  All right, let's keep it moving.

16 BY MR. LEWIS:

17 **Q**    And this is the document that you completed on June the

18 15th of 2017?

19              THE COURT:  Correct?

20              THE WITNESS:  Yes.

21 BY MR. LEWIS:

22 **Q**    And I'm showing you now at the bottom of page 18 -- this

23 would be information that you provided on that day?

24 **A**    That, I do not remember, no, sir.

25 **Q**    Is that your handwriting?

1  **A**    It looks like my handwriting, yes, sir.

2  **Q**    Okay.  And if it is your handwriting, this would be

3  information that you provided in your undercover capacity?

4  **A**    Yes, sir.

5        THE COURT:  All the information on these sheets were

6  provided by you in your undercover capacity; is that correct?

7        THE WITNESS:  Yes, your Honor.

8        THE COURT:  All right, we've been over that.

9        MR. LEWIS:  Moving on, Judge.

10  BY MR. LEWIS:

11  **Q**    Now, I think in response to a question from Mr. Helfmeyer

12  you indicated that no one at Gulfton, including Dr. Craig,

13  advised you how to take this medication.

14            Do you remember that testimony?

15  **A**    Yes, sir.

16  **Q**    Okay.  So, let's start out with the Soma.  You received

17  this prescription on June the 15th of 2017; is that correct?

18  **A**    Yes, sir.

19  **Q**    And that first drug there that's being prescribed to you,

20  that is Soma, 350 milligrams, is it not?

21  **A**    Yes, sir.

22  **Q**    Does it have directions regarding the use of that drug?

23  **A**    That, I don't know.

24  **Q**    Okay.  Are you a pharmacist?

25  **A**    I am not.

2-118

Graham - Cross/Lewis

1  **Q**    Okay.  When you took this prescription to a pharmacy, did
2  the pharmacist fill it?

3  **A**    Yes, he did.

4  **Q**    And as part of filling that prescription, was directions
5  put on the prescription label that was attached to the bottle?

6  **A**    Yes, sir.

7  **Q**    And would the directions in this case read that this is a
8  tablet that you take three times a day?

9  **A**    I don't remember what it said.

10  **Q**    It did have words on it and it did give you instructions
11  about how to take the medication, does it not?

12  **A**    Yes, sir.

13  **Q**    The other drug on here is Biofreeze; is that correct, Agent
14  Graham?

15  **A**    Yes, sir.

16  **Q**    Was a prescription label also attached to this -- to this
17  medication?

18  **A**    Yes, it was.

19  **Q**    And would that prescription label indicate directions for
20  use?

21  **A**    Yes, sir.

22  **Q**    The next item down is ibuprofen.

23             Do you see that?

24  **A**    Yes, sir.

25  **Q**    And when that medication was filled, was a prescription

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  label produced by the pharmacist?

2  **A**    Yes, sir.

3  **Q**    And was that prescription label attached to the bottle?

4  **A**    Yes, sir.

5  **Q**    And what -- did it have directions for use of that drug?

6  **A**    Yes, sir.

7  **Q**    The last drug is Norco.

8             Do you see that, Agent Graham?

9  **A**    Yes, sir.

10 **Q**    Was that prescription also filled by the pharmacy?

11 **A**    Yes, sir.

12 **Q**    And did the pharmacy attach a prescription label to the

13 bottle that the Norco was placed in?

14 **A**    Yes, sir.

15 **Q**    And would that prescription label indicate directions for

16 use?

17 **A**    Yes, sir.

18 **Q**    And would the directions in all of these cases been in

19 English?

20 **A**    Yes, sir.

21 **Q**    And English and in words that you could understand?

22 **A**    Yes, sir.

23 **Q**    Do you recall as to whether or not these prescription

24 containers had auxiliary labels attached to the bottles?

25             THE COURT:  Do you know what that term means?

1          THE WITNESS:  No, your Honor.

2          THE COURT:  Neither do I.

3               What is it, counsel?

4  BY MR. LEWIS:

5  **Q**    A label -- was a label -- a small label attached to --

6  attached to the bottle adjacent to the large label with your

7  name and the prescription -- and the prescription directions?

8  **A**    I don't remember.

9  **Q**    Okay.  But you don't remember but -- you don't remember?

10 **A**    I don't remember.

11         THE COURT:  She says she doesn't remember.

12         MR. LEWIS:  Okay, that's fine.  We have pictures.

13 BY MR. LEWIS:

14 **Q**    Based on your training as a special agent, when you went to

15 Gulfton clinic on June the 15th of 2017, the paperwork that you

16 were given to complete in your undercover capacity, was it your

17 understanding that that paperwork would become part of your

18 patient file at Gulfton for receiving treatment that day?

19         MR. HELFMEYER:  Objection.  Speculation.

20         THE COURT:  Sustained.

21 BY MR. LEWIS:

22 **Q**    When you filled out the documents at Gulfton on June the

23 15th of 2017, do you believe that the -- well, were those

24 documents used by individuals at Gulfton regarding rendering

25 medical treatment for you?

```
 1              MR. HELFMEYER:  Objection.  Speculation.
 2              THE COURT:  Sustained.
 3  BY MR. LEWIS:
 4  Q    Well, why did you fill out the documents that you filled
 5  out at Gulfton on June the 15th of 2017?
 6  A    I filled them out to turn them back in to -- to be seen.
 7  Q    In order to receive medical -- medical services?  In your
 8  undercover capacity, you filled out those documents to receive
 9  medical services?
10  A    Medical services, no, sir.
11  Q    In order to be seen.  You filled out those documents in
12  order to be seen by -- at Gulfton?
13  A    Yes, sir.
14  Q    And those documents were, based on your experience as an
15  agent, documents that would be used -- or were used as part of
16  your interaction at Gulfton?
17              MR. HELFMEYER:  Objection.  Speculation.
18              THE COURT:  Well, we've been over it, also.  Over and
19  over it.
20              MR. LEWIS:  Just a second, Judge.
21                  Pass the witness.
22              MR. HELFMEYER:  Can we switch the computers?  I want
23  to ask about two slides.
24              THE COURT:  You got it?  You got it there?
25              MR. HELFMEYER:  I think it's --
```

1              Let's look at Government's Exhibit 357 at page 7.

2                    REDIRECT EXAMINATION

3  BY MR. HELFMEYER:

4  **Q**    Special Agent Graham, this was the -- it's titled, what,

5  "Patient Informed Consent and Patient Management Agreement"?  Is

6  that correct?

7  **A**    Yes, sir.

8  **Q**    And this was, what, four pages?

9  **A**    Yes, sir, approximately four pages.

10 **Q**    Who spent more time going over this with you, Mr. Lewis or

11 Dr. Craig?

12 **A**    Mr. Lewis.

13              MR. HELFMEYER:  If we could go to Government Exhibit

14 357 at page 13, I believe.

15 BY MR. HELFMEYER:

16 **Q**    Special Agent Graham, this was the new patient intake form.

17 It was about seven or ten pages, somewhere between there?

18 **A**    Yes, sir.

19 **Q**    Who spent more time going over this with you, Dr. Craig or

20 Mr. Lewis?

21 **A**    Mr. Lewis.

22              MR. HELFMEYER:  No further questions, your Honor.

23 Thank you.

24              THE COURT:  Anything further?

25              MR. WILLIAMS:  Just a couple of questions.

1                    RECROSS EXAMINATION

2  BY MR. WILLIAMS:

3  **Q**    Now, you had lots of time to review these particular

4  documents when you were sitting there, did you not?

5            MR. HELFMEYER:  Objection.  Outside the scope of

6  redirect.

7            THE COURT:  Overruled.

8            MR. WILLIAMS:  Can you turn the lights on, Judge?  I'm

9  thinking we're not going to need that anymore.

10  BY MR. WILLIAMS:

11  **Q**    Now, you had several hours to go over this particular

12  document when you were at the clinic, did you not?

13  **A**    Yes, sir.

14  **Q**    All right.  But you didn't read it, did you?

15  **A**    No, sir.

16  **Q**    You didn't think there was a need to read it, did you?

17  **A**    No, sir.

18  **Q**    Because you had already had your eyes set on what it is

19  that you wanted to do?

20            MR. HELFMEYER:  Objection.  Outside the scope of

21  redirect.

22            THE COURT:  Sustained.  I'm going to -- meaning --

23  what we're talking about is when you take somebody on recross,

24  they can only go into what the Government had said on their

25  redirect.  So, it's -- that's where we're at.  That's what the

1 -- the colloquy going back and forth.

2 BY MR. WILLIAMS:

3 **Q**   So, when you testified that you went over it more with

4 Mr. Lewis here in court today than you did with Dr. Craig,

5 that's misleading because you never read it on the date that you

6 went in there, did you?

7            MR. HELFMEYER:  Objection.  Argumentative as to her --

8            THE COURT:  Overruled.  I'll allow you to do that.

9                Is that correct?

10           THE WITNESS:  I'm sorry.  Repeat the question again.

11           THE COURT:  Hold it.  Let's have it read back.

12           MR. WILLIAMS:  Thank you.

13     (The last question was read.)

14           THE WITNESS:  No, sir.

15 BY MR. WILLIAMS:

16 **Q**   And as to that particular document, you signed it; but you

17 didn't sign it in the presence of Dr. Craig, did you?

18 **A**   That is correct.

19 **Q**   You signed the document well before seeing her, did you

20 not?

21 **A**   That is correct.

22 **Q**   All right.  And you didn't see her sign it, did you?

23 **A**   I did not.

24 **Q**   But obviously, your signature was on there before you saw

25 her; is that correct?

1  **A**    Yes.

2  **Q**    So, it stands to reason that she signed it after you signed

3  it?

4  **A**    Yes.

5  **Q**    And you had plenty of time to read it but you didn't?

6              MR. HELFMEYER:  Objection.  Asked and answered.

7              THE COURT:  Sustained.

8              MR. WILLIAMS:  No further questions, Judge.

9              THE COURT:  Mr. Lewis, anything?

10             MR. LEWIS:  Nothing, Judge.

11             THE COURT:  All right.  Thank you, ma'am.  You may

12  step down.  You're excused.  You're free to leave.  You're free

13  to remain, if you desire, in the courtroom.

14                  Call your next witness.

15             MR. ARMSTRONG:  Thank you, Judge.

16                  Loren Phillips.

17                  And your Honor, if I may have your indulgence

18  just to move this a little bit.

19             THE COURT:  Okay.  Move it wherever you want.  Just

20  don't block any of the attorneys.

21                  Raise your right hand to be sworn, please.

22        (The witness, **LOREN PHILLIPS,** called on behalf of the

23  Government, was sworn.)

24             THE CASE MANAGER:  Thank you.  You may have a seat.

25  //

1                        DIRECT EXAMINATION

2 BY MR. ARMSTRONG:

3 **Q**    Ma'am, good afternoon.

4 **A**    Good afternoon.

5 **Q**    Please introduce yourself to the jury.

6 **A**    Loren Phillips.

7 **Q**    And please spell your name for the record, ma'am.

8 **A**    L-o-r-e-n, P-h-i-l-l-i-p-s.

9 **Q**    Ma'am, where are you from?

10 **A**    New Orleans, Louisiana.

11 **Q**    Where did you grow up?

12 **A**    New Orleans, Louisiana.

13 **Q**    At some point, did you move to Houston?

14 **A**    Yes, sir.

15 **Q**    When was that?

16 **A**    2005.

17 **Q**    Where have you lived ever since then?

18 **A**    Houston.

19 **Q**    At some point in your life, did you meet an individual

20 named Shane Faithful?

21 **A**    Yes, sir.

22 **Q**    How did you first meet Mr. Faithful?

23 **A**    In a clothing store where I was working.

24 **Q**    Did you-all stay in contact after that?

25 **A**    Yes, sir.

1  **Q**    How did that happen?

2  **A**    Mr. Faithful asked for my phone number and would call me

3  from time to time to check on me.

4  **Q**    Did you-all socialize after that point?

5  **A**    He would take me out to eat.

6  **Q**    Did you-all do any other activities together?

7  **A**    No, sir.

8  **Q**    Do you see Mr. Faithful in court here today?

9  **A**    Yes, sir.

10 **Q**    Could you, please, identify him by where he is sitting and

11 what he is wearing.

12 **A**    He's sitting behind you.  He has on a blue suit with a

13 purple necktie.

14         MR. ARMSTRONG:  Your Honor, let the record reflect the

15 in-court identification of Mr. Faithful.

16         THE COURT:  The record will so reflect.

17 BY MR. ARMSTRONG:

18 **Q**    Did you have a chance to work for Mr. Faithful?

19 **A**    Yes, sir.

20 **Q**    Where did you first work for Mr. Faithful?

21 **A**    At one of his clinics called Aesthetica in 2015.

22 **Q**    And ma'am, when did you start working for Mr. Faithful at

23 Aesthetica?

24 **A**    In the fall of 2015.

25 **Q**    How did that come about?

1 **A**     Mr. Faithful asked me if I would be his assistant and

2 assist him with that particular clinic.

3 **Q**     And did you agree?

4 **A**     Yes, sir.

5 **Q**     For about how long did you work at that other clinic for

6 Mr. Faithful?

7 **A**     About four months.

8 **Q**     Are you familiar with a place called Gulfton?

9 **A**     Yes, sir.

10 **Q**     How are you familiar with Gulfton?

11 **A**     I was an employee at Gulfton.

12 **Q**     Who hired you to work at Gulfton?

13 **A**     Mr. Faithful.

14 **Q**     What was your position?

15 **A**     I was office manager.

16 **Q**     Was Gulfton a business?

17 **A**     Yes, sir.

18 **Q**     What kind of business was it?

19 **A**     It was a pain management clinic.

20 **Q**     What city was it in?

21 **A**     Houston, Texas.

22 **Q**     Do you recall the address?

23 **A**     6303 Gulfton Street.

24 **Q**     What part of town is that in?

25 **A**     It's on the south side of Texas -- I mean south side of

1    Houston, I apologize.

2 **Q**    No problem.

3            MR. ARMSTRONG:  Your Honor, if we could, please, dim

4    the lights.

5                And Ms. Mortezavi, if we can, please, pull up

6    Government's Exhibit 361 at 1, please.

7    BY MR. ARMSTRONG:

8 **Q**    Ma'am, what are we looking at?

9 **A**    The outside of Gulfton.

10 **Q**    Now, was there anything around Gulfton?

11 **A**    A black iron gate.

12 **Q**    And where in this picture is that black iron gate?

13 **A**    In the front of the building.

14 **Q**    And was that black iron gate there the whole time you

15    worked there?

16 **A**    Yes, sir.

17 **Q**    So, you testified that you started working at Gulfton.

18                When did you start working there?

19 **A**    In the spring of 2016.

20 **Q**    Do you recall, generally, what month?

21 **A**    I think it was between March and April.

22 **Q**    And for how long did you work there for?

23 **A**    Until December 28th of 2016.

24 **Q**    So, roughly, from March to April to December of what year?

25 **A**    2016.

1 **Q**   So, that's a span of about how many months?

2 **A**   Eight months.

3 **Q**   How many days a week did you work there?

4 **A**   Five days a week.

5 **Q**   What were your hours, generally?

6 **A**   Between 7:30 and 5:30.

7 **Q**   Were you paid?

8 **A**   Yes, sir.

9 **Q**   How were you paid?

10 **A**   In cash.

11 **Q**   How else were you paid?

12 **A**   By check.

13 **Q**   How much were you paid?

14 **A**   $1,040 a week.

15 **Q**   All right, ma'am.  I want to play for you a video.

16          MR. ARMSTRONG:  And just to orient the jury,

17 Ms. Mortezavi, if you can, please, pull up Government Exhibit

18 510, please.

19              And your Honor, for the record, all these

20 exhibits are already in evidence.

21          THE COURT:  Correct.

22    (Government's Exhibit Number 510, video recording, was

23 played in open court.)

24          MR. ARMSTRONG:  With the Court's indulgence, we're

25 having technical difficulties.

1                    All right.  Ms. Mortezavi, if you can, please,
2  start the video again from the beginning.
3      (Government's Exhibit Number 510, video recording,
4  continued to be played in open court.)
5  BY MR. ARMSTRONG:
6  **Q**    Ma'am, where are we?
7            THE COURT REPORTER:  I'm sorry, I can't hear you.
8            MR. ARMSTRONG:  Ms. Mortezavi, if you can pause right
9  here, please.
10 BY MR. ARMSTRONG:
11 **Q**    So, what --
12           THE COURT REPORTER:  I didn't hear her answer.
13           THE WITNESS:  Outside the lobby of Gulfton.
14           THE COURT:  Yeah, we can't have it blasting because we
15 can't get it down.
16           MR. ARMSTRONG:  Thank you, Judge.
17 BY MR. ARMSTRONG:
18 **Q**    All right.  So, Ms. Phillips, what room are we in in the
19 video?
20 **A**    That's the patient's waiting area.
21 **Q**    And what is this window here (indicating)?
22 **A**    That's the inside of the clinic.  That's where the patients
23 come up to.
24 **Q**    Now, where did you actually work when you worked at Gulfton
25 for about eight months?

1  **A**    Behind that window.

2  **Q**    So, is there a room behind this window?

3  **A**    There's a desk.

4         THE COURT:  Can you pull the microphone in, please.

5         THE WITNESS:  There's a desk right on the other side

6  of the window.

7  BY MR. ARMSTRONG:

8  **Q**    And where did you sit when you worked there for about eight

9  months?

10  **A**    Facing the window.

11  **Q**    And where could you see out when you were facing the

12  window?

13  **A**    The lobby.

14  **Q**    Also known as what?

15  **A**    The patient waiting area.

16  **Q**    How often were you sitting at that desk?

17  **A**    I would say most of the day until Dr. Craig saw the last

18  patient.

19  **Q**    Were you there every day or just some days?

20  **A**    Five days a week.

21  **Q**    You mentioned before that Gulfton was a pain management

22  clinic?

23  **A**    Yes, sir.

24  **Q**    Did people come to Gulfton?

25  **A**    Yes, sir.

1  **Q**    About how many people came to Gulfton on the high end?

2  **A**    About 56.

3  **Q**    And on the low end?

4  **A**    Maybe 30, 20.

5  **Q**    Now, were these people called patients?

6  **A**    Yes, sir.

7  **Q**    About, on average, how many people or patients came to

8  Gulfton on any given day?

9  **A**    Anywhere between 40 and 50.

10 **Q**    Have you heard the term "facilitator"?

11 **A**    Yes, sir.

12 **Q**    Where did you first hear that term?

13 **A**    It was a phrase Mr. Faithful used to describe the people

14 who brought patients in.

15 **Q**    That term "facilitator," whose term was that?

16 **A**    Mr. Faithful's.

17 **Q**    Did anyone else use that term?

18 **A**    The facilitators and the rest of the staff.

19 **Q**    Who else was part of the staff that used that term?

20 **A**    The MAs -- basically, the MAs and the security guards.

21 **Q**    Okay.  Did Dr. Craig ever use that term?

22 **A**    Yes, sir.

23           MR. WILLIAMS:  Objection, Judge.  Objection.  She's

24 asked and answered the question.

25           THE COURT:  Overruled.  Overruled.

1 BY MR. ARMSTRONG:

2 **Q**    Did Dr. Craig ever use the term "facilitators"?

3 **A**    Yes, sir.

4 **Q**    You mentioned that facilitators came to Gulfton.  Did you

5 actually interact with these facilitators?

6 **A**    Yes, sir.

7 **Q**    How did you interact with them?

8 **A**    I accepted payment from the patients that they brought in.

9 **Q**    On whose behalf were you accepting payment?

10 **A**    On behalf of the facilitators.

11 **Q**    Were they giving money to you in a personal capacity?

12         MR. WILLIAMS:  Objection, Judge.  Leading.

13         THE COURT:  Sustained.

14 BY MR. ARMSTRONG:

15 **Q**    You were accepting money.  Who were you accepting money

16 for, if anyone?

17 **A**    I would accept money on behalf of the facilitators from the

18 patients.

19 **Q**    On whose behalf, if anyone, were you accepting money?

20 **A**    On behalf of the facilitators.

21 **Q**    And who, if anyone, received the money from the

22 facilitators?

23 **A**    Dr. Craig and Mr. Faithful.

24 **Q**    What was your understanding of what facilitators actually

25 did at Gulfton?

1  **A**   They were people who would bring in patients into the

2  clinic to purchase the patient's visit in exchange for a

3  prescription.

4  **Q**   About how many facilitators came to Gulfton?

5  **A**   It would vary from day to day.

6          MR. WILLIAMS:  Leading.  Judge, that's leading.

7          THE COURT:  Overruled.

8  BY MR. ARMSTRONG:

9  **Q**   About how many --

10          THE COURT:  Hold it.

11              Repeat the question.

12          MR. ARMSTRONG:  Your Honor, about --

13          THE COURT:  Hold it.  Repeat that last question when

14  we had the objection, about how many people.

15      (The last question was read.)

16          THE COURT:  How is that leading?

17          MR. WILLIAMS:  It's suggesting that the facilitators

18  brought people to the particular clinic.

19          THE COURT:  Overruled.

20              Go on.

21  BY MR. ARMSTRONG:

22  **Q**   Ma'am, I'll ask it again:  About how many facilitators came

23  to Gulfton?

24  **A**   It would vary from day to day.

25  **Q**   On the high end?

1   **A**   Would be ten.

2   **Q**   On the low end?

3   **A**   Five.

4   **Q**   On average?

5           THE COURT:  Somewhere between five and ten, how about

6   that?

7               Okay, next question.

8   BY MR. ARMSTRONG:

9   **Q**   Now, you mentioned that facilitators brought patients to

10  the clinic.  About how many patients or people would

11  facilitators bring to the clinic?

12  **A**   On a high end, most of the facilitators would bring in five

13  patients each.

14          THE COURT:  Average -- they average about bringing in

15  five patients each?

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  Okay, go on.

18  BY MR. ARMSTRONG:

19  **Q**   How often did this happen?

20  **A**   Every day.

21          THE COURT:  Same people?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  Meaning by that, I mean, same

24  facilitators?

25          THE WITNESS:  Yes, your Honor.

1 BY MR. ARMSTRONG:

2 **Q**   Over the eight months that you worked there, do you have an

3 understanding of what percentage of the patients or the people

4 were brought to Gulfton by facilitators?

5 **A**   I would say anywhere from -- it depends on each day.  It

6 could be from 75 to 90 percent.

7 **Q**   Were facilitators charged anything?

8 **A**   Yes, sir.

9 **Q**   What were they charged?

10 **A**   Whatever the fee was for the visit.  It could range from

11 300 to 350 -- 340, I'm sorry.

12 **Q**   Did the facilitators actually pay that money?

13 **A**   Yes.

14          MR. WILLIAMS:  Objection.  Leading.

15          THE COURT:  Overruled.

16          THE WITNESS:  Yes, sir.

17 BY MR. ARMSTRONG:

18 **Q**   How did they pay?

19 **A**   In cash.

20 **Q**   What was your understanding of what they were paying for?

21 **A**   Prescriptions.

22 **Q**   What kind of prescriptions?

23 **A**   Norco and Soma.

24 **Q**   Who were those prescriptions for?

25 **A**   I'm sorry?

1  **Q**    Who were those prescriptions for?

2  **A**    They were for the facilitators.

3  **Q**    Who signed those prescriptions?

4  **A**    Dr. Craig.

5  **Q**    Now, over the eight months that you worked at Gulfton, did

6  you see the people or the patients give the prescriptions to

7  anyone?

8  **A**    I did.

9  **Q**    And who would the people or the patients give the

10  prescriptions to?

11  **A**    The facilitators.

12  **Q**    Did you actually see it happen?

13  **A**    Yes, sir.

14  **Q**    How did you see it happen?

15  **A**    Sometimes they'd do it in the lobby or in the waiting area.

16  **Q**    What was your understanding of what was going on when you

17  saw that?

18  **A**    Rephrase the question.

19  **Q**    When you saw a person or a patient give a prescription to a

20  facilitator, what was your understanding of what was going on?

21  **A**    That the facilitators purchased the prescription to sell

22  the medicine.

23  **Q**    If you could describe in your own words what facilitators

24  did at Gulfton, what would you say?

25  **A**    Rephrase your question.

1  **Q**    Is facilitator your term?

2  **A**    No, sir.

3  **Q**    If you could call facilitators by your own term, what term

4  would you use?

5  **A**    Drug dealers.

6  **Q**    Generally speaking, on average, how much money from

7  facilitators would Gulfton take in on any given day?

8  **A**    Depends on the number of patients that came in that day.

9  It could -- on the high end, it could be 21,000; on the low end,

10 it could be anywhere from 12,000.

11 **Q**    21,000 what?

12 **A**    Dollars, I'm sorry.

13 **Q**    And 12,000 what?

14 **A**    Dollars.

15 **Q**    Was that in the form of a credit card?

16 **A**    No, sir.

17 **Q**    Was that in the form of a check?

18 **A**    No, sir.

19 **Q**    What kind of denominations was that $21,000?

20 **A**    Cash.

21 **Q**    And what happened to all that cash at the end of the day?

22 **A**    The expenses for the day would be subtracted from it, and

23 the rest would be split between Dr. Craig and Mr. Faithful.

24 **Q**    Did that happen every day?

25 **A**    Yes, sir.

1  **Q**    Did that happen every day for the eight months you worked

2  there?

3  **A**    Yes, sir.

4  **Q**    Ma'am, I want to shift gears a little bit and talk about

5  the prescriptions themselves.

6            Were the people who were brought to Gulfton seen

7  by anyone?

8  **A**    Yes, sir.

9  **Q**    Were they seen by Dr. Craig?

10  **A**    Yes, sir.

11  **Q**    And did Dr. Craig give the people that were brought by

12  facilitators anything?

13  **A**    Yes, sir.

14  **Q**    What did she give them?

15  **A**    Two prescriptions.

16  **Q**    Did you actually see the prescriptions yourself?

17  **A**    Yes, sir.

18  **Q**    How did that work?

19  **A**    We -- Dr. Craig would hand us the charts with the

20  prescriptions in them, and we would have to photocopy them.

21  **Q**    And then, what did you do with the prescriptions after you

22  photocopied them, if anything?

23  **A**    We would hand them to the patient.

24  **Q**    What percentage of people -- let me back up.  What were

25  these prescriptions for?

1 **A**    They were for pain.

2 **Q**    What were the drugs?

3 **A**    Norco and Soma.

4 **Q**    Does Norco go by another name?

5 **A**    Hydrocodone.

6 **Q**    What percentage of people were brought to Gulfton and who

7 saw Dr. Craig got a prescription for hydrocodone and Soma?

8 **A**    All of them.

9 **Q**    Did Dr. Craig prescribe to these people who were brought by

10 facilitators the same amount of pills or a different amount of

11 pills?

12 **A**    It would vary.

13 **Q**    On average -- let me back up.  Generally speaking, what

14 number would she prescribe to people of hydrocodone?

15 **A**    120.

16 **Q**    And generally speaking, what number of Soma pills would she

17 prescribe to people?

18 **A**    90; nine, zero.

19 **Q**    And what percentage of people were prescribed by Dr. Craig

20 120 pills of hydrocodone and 90 pills of Soma?

21 **A**    It would vary.

22 **Q**    Over the eight months that you worked there, did Dr. Craig

23 prescribe any other drugs?

24 **A**    Not that I recall, sir.

25 **Q**    Over the eight months that you worked at Gulfton, did you

1 have an opportunity to interact with the people or the patients?

2 **A** Yes, sir.

3 **Q** Just describe, generally, your interactions with those

4 people or the patients that came to Gulfton over the eight

5 months that you worked there.

6 **A** I greeted them. A lot of times the facilitators would talk

7 to us because they wanted to, basically, keep an eye on their

8 patients.

9 MR. WILLIAMS: Objection, Judge, as to why they talked

10 to her. That's non-responsive.

11 THE COURT: Sustained.

12 BY MR. ARMSTRONG:

13 **Q** Ma'am, based on your interactions and your discussions with

14 the people or the patients, did you personally think that they

15 were actually in pain?

16 MR. WILLIAMS: Leading, Judge.

17 THE COURT: Overruled.

18 BY MR. ARMSTRONG:

19 **Q** Ma'am, based on your interactions and your discussions and

20 what you saw when you worked at Gulfton over eight months, do

21 you personally believe that the people who were there were in

22 pain?

23 THE COURT: Oh, wait a second. Sustained.

24 MR. WILLIAMS: Thank you, your Honor.

25 //

1 BY MR. ARMSTRONG:

2 **Q**    Why did you believe that the people that were brought by

3 facilitators were actually at Gulfton?

4            MR. WILLIAMS:  Leading, Judge.

5            THE COURT:  Overruled.

6 BY MR. ARMSTRONG:

7 **Q**    Ma'am, why did you believe that the people who were brought

8 to Gulfton by facilitators were there?

9 **A**    To receive prescriptions to give to the facilitators.

10 **Q**    How many doctors were there at Gulfton?

11 **A**    One.

12 **Q**    Who was the one doctor at Gulfton over the entire time you

13 worked there?

14 **A**    Dr. Craig.

15 **Q**    Who signed all the prescriptions for hydrocodone?

16 **A**    Dr. Craig.

17 **Q**    Do you see Dr. Craig here today?

18 **A**    Yes, I do.

19 **Q**    Can you, please, identify her by where she's sitting and

20 what she's wearing.

21 **A**    She's wearing a dark blue suit with a red blouse.

22            MR. ARMSTRONG:  Your Honor, let the record reflect the

23 in-court identification.

24            THE COURT:  The record will so reflect.

25 //

1  BY MR. ARMSTRONG:

2  **Q**    Who set the prices that were charged to facilitators?

3  **A**    Mr. Faithful and Dr. Craig.

4  **Q**    Who was the boss --

5  **A**    Mr. Faithful --

6  **Q**    -- at Gulfton?

7  **A**    Mr. Faithful and Dr. Craig.

8  **Q**    Ma'am, I want to play for you right now --

9          MR. ARMSTRONG:  Ms. Mortezavi, will you, please, put

10  the volume up.

11  BY MR. ARMSTRONG:

12  **Q**    I want to play for you Government Exhibit 504.

13          (Government's Exhibit Number 504, audio recording, was

14  played in open court.)

15          MR. WILLIAMS:  Judge, excuse me.  Can we turn the

16  lights back on, please?

17          THE COURT:  You want the lights on?

18          MR. ARMSTRONG:  I don't, Judge.

19          MR. WILLIAMS:  Well, if it's -- I don't have no

20  problem if it's something that's on the screen, Judge; but if

21  it's just an audio --

22          THE COURT:  Is it audio?

23          MR. ARMSTRONG:  Yeah.  But Judge, I don't want to

24  inconvenience you by going back and forth.

25          THE COURT:  Okay.  Let's leave it off.

1          MR. ARMSTRONG:  All right.  Ms. Mortezavi, if you can,
2   please --
3          THE COURT:  This is audio, correct?
4          MR. ARMSTRONG:  Yes, your Honor.
5          Ms. Mortezavi, if you can, please, start the
6   video from the beginning.
7      (Government's Exhibit Number 504, audio recording,
8   continued to be played in open court.)
9          THE COURT:  I thought it was just an audio?
10         MR. ARMSTRONG:  It is, your Honor.  That was a
11  mistake.  It's Government's Exhibit 504.
12     (Government's Exhibit Number 504, audio recording,
13  continued to be played in open court.)
14         THE COURT:  Where are we?  What's the surroundings?
15         MR. ARMSTRONG:  Exactly.
16  BY MR. ARMSTRONG:
17  **Q**   Ma'am, who is talking in the video?
18  **A**   Mr. Faithful.
19  **Q**   My apologies.  Who is talking in the audio?
20  **A**   Mr. Faithful.
21  **Q**   And where is he speaking?
22  **A**   He's speaking to the MAs and myself at Gulfton.
23  **Q**   Were you there?
24  **A**   Yes, sir.
25  **Q**   When was this conversation captured in Government Exhibit

1  504 happening?

2  **A**   In the fall of 2016.

3  **Q**   Did you actually tape this audio recording yourself?

4  **A**   One of our MAs did.

5  **Q**   Who specifically took the audio recording?

6  **A**   Olivia Caldwell.

7  **Q**   Have you listened to this video (sic) before?

8  **A**   Yes, I have.

9  **Q**   Does it accurately capture --

10 **A**   Yes, sir.

11 **Q**   -- what was said on that date?

12 **A**   Yes, sir.

13          MR. ARMSTRONG:  Ms. Mortezavi, if you can, please,

14 play it through 140.

15     (Government's Exhibit Number 504, audio recording,

16 continued to be played in open court.)

17 BY MR. ARMSTRONG:

18 **Q**   Ma'am, did you hear Mr. Faithful say, "This is not a

19 democracy"?

20 **A**   Yes, sir.

21 **Q**   What did you take him to mean?

22 **A**   That he runs the show, that we don't have no opinion.

23 **Q**   Runs the show where?

24 **A**   At Gulfton.

25 **Q**   Did you hear Mr. Faithful say, "I run the f'ing show"?

1  **A**    Yes, sir.

2  **Q**    What did you take him to mean?

3  **A**    We didn't have no opinion or rights there.

4  **Q**    And where is "there"?

5  **A**    At Gulfton.

6  **Q**    Did you hear Mr. Faithful say, "What I say goes regardless

7  of whether you agree or disagree"?

8  **A**    Yes, sir.

9  **Q**    Is that a true statement?

10  **A**    Very much so.

11  **Q**    Did you hear Mr. Faithful say, "I'm not going to tolerate

12  insubordination"?

13  **A**    Yes, sir.

14  **Q**    What did you take him to mean?

15  **A**    He was upset with the girls because they questioned the

16  loss of their paycheck.  He took money out of all of our checks.

17        MR. WILLIAMS:  Objection, Judge.  Again, that's

18  non-responsive to the question.

19        THE COURT:  Overruled.

20  BY MR. ARMSTRONG:

21  **Q**    Where is it that Mr. Faithful would not tolerate

22  insubordination?

23  **A**    Nowhere.

24  **Q**    Would he tolerate insubordination at Gulfton?

25  **A**    Not at all.

1  **Q**    Did you hear Mr. Faithful say, "I will shit-can your ass
2  quick as hell"?
3  **A**    Yes, sir.
4  **Q**    What does that mean?
5  **A**    He'd fire you.
6  **Q**    If what?
7  **A**    If you questioned him or if he found you to be
8  insubordinate.
9  **Q**    If he questioned you or he found you to be insubordinate
10  where?
11  **A**    At Gulfton.
12         MR. ARMSTRONG:  Ms. Mortezavi, if we could keep
13  playing the tape, please.
14         (Government's Exhibit Number 504, audio recording,
15  continued to be played in open court.)
16  BY MR. ARMSTRONG:
17  **Q**    Ma'am, did you hear Mr. Faithful say, "When the final
18  say-so comes down, that's it"?
19  **A**    Yes, sir.
20  **Q**    What did you take him to mean?
21  **A**    His word is final.
22  **Q**    Where is his order final?
23  **A**    At Gulfton.
24         (Government's Exhibit Number 504, audio recording,
25  continued to be played in open court.)

1  BY MR. ARMSTRONG:

2  **Q**    Ma'am, did you hear Mr. Faithful say, "Once she's in

3  jeopardy and says, 'I'm not coming to work,' guess who's not

4  making paycheck?"

5  **A**    Yes, sir.

6  **Q**    Who is "she"?

7  **A**    Dr. Craig.

8  **Q**    And what did you take him to mean by "guess who's not

9  making paycheck if Dr. Craig isn't coming to work"?

10  **A**    The staff.

11  **Q**    So, who, if anyone, needed to be at Gulfton in order to

12  make paycheck?

13  **A**    Dr. Craig.

14          THE COURT:  All right.  At that point, we've been in

15  session for almost exactly an hour and a half.  If you would,

16  check your watch.  We're going to take a 15-minute break; and

17  then, we'll pick it up.  See you back in 15 minutes.

18          THE COURT SECURITY OFFICER:  All rise.

19      (Court recessed at 3:48 p.m.)

20      (Court resumed at 4:12 p.m.)

21          THE COURT:  Okay, go right ahead.

22          MR. ARMSTRONG:  Thank you, your Honor.

23          THE COURT:  Pull the mike in, counsel.  Just pull it

24  down a little bit.

25          MR. ARMSTRONG:  Yes, your Honor.

1          THE COURT:  Okay.

2  BY MR. ARMSTRONG:

3  **Q**    Ma'am, you testified before about how you worked at Gulfton

4  for about eight months; is that right?

5  **A**    Yes, sir.

6  **Q**    At some point, did you quit?

7  **A**    Yes, sir.

8  **Q**    When did you quit Gulfton?

9  **A**    In December.  I believe it was the 28th of December of

10  2016.

11          THE COURT:  Two thousand which?

12          THE WITNESS:  '16.

13          THE COURT:  '16.

14  BY MR. ARMSTRONG:

15  **Q**    December 28th?

16  **A**    Yes, sir.

17  **Q**    Before you quit, did you call anybody?

18  **A**    Yes, I did.

19  **Q**    Who did you call?

20  **A**    I contacted the DEA.

21  **Q**    Why did you call the DEA?

22  **A**    I just wasn't comfortable with what was going on and

23  self-evaluation.

24  **Q**    "Self-evaluation," what do you mean?

25  **A**    What side of the law am I going to stand on?

1  **Q**   What, if anything, did you report to DEA on December 28th?

2  **A**   The activities at the clinic.

3  **Q**   Which clinic was that?

4  **A**   Gulfton.

5  **Q**   How did you get in contact with DEA?

6  **A**   I saw the number on the Internet and called from my phone.

7  **Q**   Did you tell DEA who you were?

8  **A**   No, sir.

9  **Q**   Who did you tell DEA that you were?

10 **A**   I asked the question "If someone worked at a medical clinic

11 that had illegal activities, how would they report it?"

12 **Q**   Why did you do that?

13 **A**   I just felt it was the right thing to do.

14 **Q**   After you quit on December 28th, did you take any documents

15 with you when you left?

16 **A**   I already had the documents with me.

17 **Q**   If someone was to say that you stole documents, would that

18 statement be true or false?

19       MR. WILLIAMS:  Objection, Judge.  Objection.  That's

20 leading.

21       THE COURT:  Overruled.

22 BY MR. ARMSTRONG:

23 **Q**   If someone were to say that you stole documents, would that

24 be true or false?

25 **A**   False.

1  **Q**    After you called agents in December, did you have an
2  opportunity to meet with them?

3  **A**    Yes, sir.

4  **Q**    Who do you recall first meeting with from DEA?

5  **A**    Mike Mills.

6  **Q**    And is that Mr. Mills sitting at counsel table here today?

7  **A**    Yes, sir.

8  **Q**    When did you first meet with Mr. Mills?

9  **A**    I believe it was the end of January.

10 **Q**    Where did you meet him?

11 **A**    At the DEA office.

12 **Q**    Did you report anything to Mr. Mills?

13 **A**    I sat down, did an interview, explained to him my position
14 at the clinic, and what I witnessed.

15 **Q**    And which clinic are we talking about?

16 **A**    I'm sorry?

17 **Q**    Which clinic did you report to Mr. Mills about?

18 **A**    Gulfton.

19 **Q**    Did you provide any information to Mr. Mills about Gulfton?

20 **A**    Verbal at that initial meeting.

21 **Q**    After that January meeting, did you have an opportunity to
22 meet with the agents again?

23 **A**    Yes, sir.

24 **Q**    Who did you meet with?

25 **A**    I met with Mr. Mills and James.

1  Q    James, is that Mr. Gainer at the table?

2  A    Yes, sir.

3  Q    And where did you meet with Mr. Mills and Mr. Gainer?

4  A    At the DEA's office.

5  Q    And you might have mentioned this.  I apologize if you did.

6  Do you recall the date on which you met with Mr. Mills and

7  Mr. Gainer?

8  A    I believe it was March 1st.

9  Q    Did you become something called a confidential human

10 source?

11 A    Yes, sir.

12 Q    Did you actually have to sign anything to become a

13 confidential human source?

14 A    Yes, sir.

15       MR. ARMSTRONG:  Your Honor, if we could, please, turn

16 off the lights over the projector, please.

17            And Ms. Mortezavi, if you can, please, pull up

18 Government Exhibit 602.

19            And Ms. Mortezavi, if you can, please, just flip

20 through the pages of this document.

21            Perfect.

22            And if we can, please, go back to page 1,

23 Ms. Mortezavi.

24 BY MR. ARMSTRONG:

25 Q    Ma'am, do you recognize what's Government Exhibit 602?

1  **A**   Yes, sir.

2  **Q**   How do you recognize it?

3  **A**   It has my signature on it.  It was my confidential source

4  agreement.

5  **Q**   Your agreement between who and who?

6  **A**   Myself and the DEA.

7  **Q**   Did you actually sign this document?

8  **A**   Yes, sir.

9           MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

10 to Government Exhibit 602 at 2.

11              And Ms. Mortezavi, if we can, please, pull up the

12 signature block.

13              Thank you.

14 BY MR. ARMSTRONG:

15 **Q**   Ma'am, whose signature is this next to confidential source?

16 **A**   It's mine.  My signature.

17 **Q**   And what is the date?

18 **A**   March 1st.

19 **Q**   And to what are you signing?

20 **A**   Understanding that I would be a confidential source for the

21 DEA and had to provide true information.

22           MR. ARMSTRONG:  Ms. Mortezavi, if can we, please, go

23 to page 1 of 602.

24              And Ms. Mortezavi, if we can, please, pull up

25 this block right here.

1 BY MR. ARMSTRONG:

2 **Q**   Ma'am, can you, please, read that for the jury.

3 **A**   "The Drug Enforcement Administration has requested I

4 provide assistance in the investigation of violations of the

5 Controlled Substances Act.  I understand I am authorized, while

6 under the direct supervision of the DEA controlling

7 investigators, to perform activities that include the following:

8 The purchase of controlled substances in any undercover capacity

9 at the direction of the DEA controlling investigators."

10 **Q**   Ma'am, that first paragraph, does that accurately reflect

11 what happened?

12 **A**   Yes, sir.

13 **Q**   Who asked you to become a confidential human source?

14 **A**   DEA.

15      MR. ARMSTRONG:  And Ms. Mortezavi, if we can, please,

16 go to Bullet Point Number 6 under this preamble.

17 BY MR. ARMSTRONG:

18 **Q**   And ma'am, did you agree to do -- first off, what does that

19 say?

20 **A**   The consensual wearing of a recording -- consensual wearing

21 of a recording or transmitting device in furtherance of these

22 activities.

23 **Q**   Did you agree to make recordings for DEA?

24 **A**   Yes, I did.

25 **Q**   And did you actually make recordings for DEA?

1 **A**    Yes, I did.

2 **Q**    How did that work?

3 **A**    I had a recording device that I could connect to my cell

4 phone; and whenever someone would call, I could record from my

5 cell phone.

6 **Q**    And sitting here today, do you recall how many recordings

7 you made with that device?

8 **A**    I would -- if I recall, I think it was three or four.

9 **Q**    And did you give that recording device back to anyone?

10 **A**    Yes, I did.

11 **Q**    Who did you give it back to?

12 **A**    Well, I was coming through the marshals stand, and it was

13 removed from my purse at that time.

14 **Q**    Do you know what happened to it after that?

15 **A**    No, sir.

16         MR. ARMSTRONG:  Government Exhibit 602 at 2, please,

17 Ms. Mortezavi.

18              Ms. Mortezavi, will you, please, pull up starting

19 at 3 all the way down to the page, please.

20 BY MR. ARMSTRONG:

21 **Q**    Ma'am, could you, please, read for the jury the sentence

22 that starts "In performing."

23 **A**    "In performing the investigative functions detailed above,

24 I understand and agree to the following."

25 **Q**    And can you, please, read Number 2.

1  **A**    "I will provide truthful information at all times."

2  **Q**    What's that marking next to Number 2?

3  **A**    My initials.

4  **Q**    Did you agree to provide truthful information at all times?

5  **A**    Yes, I do.

6           MR. ARMSTRONG:  Ms. Mortezavi --

7  BY MR. ARMSTRONG:

8  **Q**    I'm sorry.  Ma'am, if you can, please, read Bullet Point

9  Number 3 for the jury.

10 **A**    "The United States Government and the DEA will strive to

11 protect my identity but cannot guarantee that my identity will

12 not be divulged as a result of legal or other compelling

13 considerations or that I will not be called to testify in court

14 as a witness."

15 **Q**    And did you sign that you understood that?

16 **A**    Yes, sir.

17 **Q**    And how did you sign?

18 **A**    I initialed it.

19 **Q**    Did you want to testify in this case?

20 **A**    No, sir.

21 **Q**    Did you want to testify at all on March 1st, 2017?

22 **A**    I don't understand what you're saying.

23 **Q**    Did you want to testify on March 1st, 2017?

24 **A**    Yes, sir.  I wanted to speak to the DEA, if that's what

25 you're asking.

1 **Q**    Did you want to testify in court as a witness?

2 **A**    No, sir.

3        MR. ARMSTRONG:  Ms. Mortezavi, if you can, please, go

4 to the next page of Government Exhibit 602.

5           Ms. Mortezavi, if we can, please, pull up Bullet

6 Point Number 9.

7 BY MR. ARMSTRONG:

8 **Q**    Ma'am, can you read that for the jury.

9 **A**    "I understand that, although I may be eligible for

10 compensation for my services, the DEA reserves the exclusive

11 right to determine whether I will receive any payment or

12 compensation and to determine the amount of such payment or

13 compensation."

14 **Q**    Did you understand that paragraph?

15 **A**    Yes, sir.

16 **Q**    And did you express your understanding at all?

17 **A**    To a limit, I did.

18 **Q**    I'm sorry, did you sign anywhere next to this box?

19 **A**    I initialed it by Number 9.

20 **Q**    So, was it your understanding -- is it your understanding

21 that you get to decide what compensation you get?

22 **A**    No, sir.

23 **Q**    Who decides that?

24 **A**    The DEA and the Government.

25 **Q**    So, you became a source on March 1st, correct?

1 **A**    Yes, sir.

2 **Q**    Of 2017?

3 **A**    Yes, sir.

4 **Q**    At some point, did you learn that there was the possibility

5 of payment for information?

6 **A**    Yes, sir.

7 **Q**    Did you actually ask DEA agents about possibly getting

8 money?

9 **A**    Not immediately.

10 **Q**    At some point down the road, did you?

11 **A**    I discussed it, yes, sir.

12 **Q**    And did you text -- did you exchange text messages with

13 agents in this case?

14 **A**    Yes, I did.

15 **Q**    Did you ask agents a text message, "How is this helping

16 me?"

17 **A**    Yes, I did.

18 **Q**    What did you mean?

19 **A**    I was afraid of, one, if I would have to testify the risk

20 because I understood the type of people that came to Gulfton.

21 And I mean, at the end of the day, I'm still fearful; and I

22 wasn't employed at that time because I left Gulfton; and I asked

23 them how is this helping me because I'm constantly coming here

24 placing my life at risk.

25 **Q**    You mentioned risking your life?

1  **A**    Yes, sir.

2  **Q**    Why did you -- why do you say that?

3  **A**    Mr. Faithful and the facilitators.

4  **Q**    Ma'am, I'm going to hand you what's been marked as

5  Government's Exhibit 603.

6            Do you recognize that bag?

7  **A**    Yes, I do.

8  **Q**    How do you recognize that bag?

9  **A**    This is the bag that I provided the DEA with.

10 **Q**    What's inside the bag?

11 **A**    The expense reports that were at my apartment.

12 **Q**    And can you, please, just open the bag up and confirm that

13 that is, in fact, the case.

14 **A**    (Complied.)

15 **Q**    Please take your time, flip through them, and make sure

16 you're comfortable.

17 **A**    Yes, sir.

18 **Q**    And if you could, please, put the documents back in the

19 bag.

20            You know what, I can help you.

21            Ma'am, you've had a chance to review the

22 documents that are in Government's Exhibit 603?

23 **A**    Yes, sir.

24 **Q**    We'll talk about the details later; but generally speaking,

25 what are the documents that are in Government's Exhibit 603?

1  **A**    Those are the expense reports and receipts from the end of

2  the day that I would prepare.

3  **Q**    And we'll talk about the details later.  But on a high

4  level, what's an expense report?

5  **A**    The expense report would show the expenses of the day minus

6  -- I'm sorry, the expense report would have what monies were

7  earned that day minus the expenses of the day and the monies

8  that were divided between Dr. Craig and Mr. Faithful.

9  **Q**    The documents in Government Exhibit 603, who did you give

10  those documents to?

11  **A**    I gave them to the DEA agents.

12  **Q**    Did you give them the documents in this actual bag or

13  somewhere else?

14  **A**    No.  Those were in my bag.

15  **Q**    Do you recall when you gave the agents those documents in

16  Government Exhibit 603?

17  **A**    I believe it was the middle of March.

18  **Q**    Did you give them copies, as well?

19  **A**    Yes, sir.

20  **Q**    How did that work?

21  **A**    I gave them -- I copied some onto a flash drive.  I gave

22  them the flash drive so they could upload them and the bag

23  itself with the original documents.

24  **Q**    So, is it fair to say you gave DEA agents the documents in

25  603 in two ways?

1   **A**    Yes, sir.

2   **Q**    Did you give it to them in hard copy?

3   **A**    Yes, sir.

4   **Q**    You also gave it to DEA on a flash drive?

5   **A**    On a flash drive.

6   **Q**    Do you know what DEA did with the documents after you gave

7   them the flash drive?

8   **A**    I can only assume.  I don't know, sir.

9   **Q**    Did you receive payment from DEA?

10  **A**    Yes, I did.

11  **Q**    Do you recall the date of your first payment from DEA?

12  **A**    I believe it was March 22nd.

13  **Q**    What was the amount?

14  **A**    3,000.

15  **Q**    What was that money for?

16  **A**    For my assistance.

17  **Q**    Assistance in what?

18  **A**    In being a confidential source.

19  **Q**    As a confidential human source, did you provide any

20  information to DEA?

21  **A**    Yes, I did.

22  **Q**    Information about what?

23  **A**    Gulfton Community Health Center.

24  **Q**    After you became a confidential human source in March, did

25  you have an opportunity to meet with agents again?

1  **A**   Yes, I did.

2  **Q**   When did you meet with agents again?

3  **A**   I met with them twice in May.

4  **Q**   And what, if anything, did you provide to them in those

5  meetings in May?

6  **A**   More information about the clinic.

7  **Q**   Which clinic is that?

8  **A**   Gulfton.  I apologize.

9  **Q**   And after you provided that information about Gulfton, did

10  you receive any money from DEA?

11  **A**   I believe I did in March.  I'm sorry.  I believe it was in

12  May or it may have been June.

13  **Q**   Can you not recall sitting here today?

14  **A**   I can't.

15  **Q**   Ma'am, if you would, please, read the document to yourself

16  to see if this document refreshes your recollection as to when

17  you received any payment from DEA.

18              And if you could, please, look up when you're

19  done.

20  **A**   Okay.

21  **Q**   Ma'am, does the document refresh your recollection as to

22  when you received payment from DEA?

23  **A**   June.

24  **Q**   June what?

25  **A**   June 9th.

1  **Q**    And what amount did you receive from DEA on June 9th?

2  **A**    $1,000.

3  **Q**    And what was that payment for?

4  **A**    For my assistance as a source, a confidential source.

5  **Q**    What kind of assistance?

6  **A**    Providing documents and information.

7  **Q**    Documents and information about what?

8  **A**    Gulfton Community Health Center.

9  **Q**    Ma'am, did you receive another payment from DEA at some

10 point?

11 **A**    I believe in July.

12 **Q**    Okay.  Do you not recall sitting here today?

13              All right, ma'am.  I'll ask you to, please, look

14 at this document and see if this document refreshes your

15 recollection as to when you received payment from DEA in July.

16 Please read it to yourself and look up when you're done.

17              Ma'am, does that document, in fact, refresh your

18 recollection as to when you received payment from DEA?

19 **A**    Yes, sir.

20 **Q**    And when did you receive payment from DEA in July?

21 **A**    July 7th.

22 **Q**    And what was the amount?

23 **A**    $1500.

24 **Q**    And what was that payment for?

25 **A**    For information about Gulfton Community Health Center.

1  **Q**    Did you ask the DEA to protect your identity?

2  **A**    Yes, I did.

3  **Q**    Why did you do that?

4  **A**    Fear.

5  **Q**    At some point, did you text agents "I'm on your team"?

6  **A**    Yes, I did.

7  **Q**    Why?

8  **A**    I think they were concerned that, because of the fear, that

9  I wouldn't go through with it and that I was going to back out.

10  I just wanted them to know that I was still with them.

11  **Q**    Go through with what?

12  **A**    Go through with providing information and, if necessary,

13  testifying.

14  **Q**    In around August, did you text with agents "Has your

15  supervisor approved anything for me?"

16  **A**    Yes, sir.

17  **Q**    What did you mean?

18  **A**    I spoke with one of the agents.  I believe it was Mike.

19  **Q**    Let me back up.  What did you mean by that text?

20  **A**    I was asking if any documents -- or any assistance had been

21  approved.

22  **Q**    What kind of assistance?

23  **A**    Payment.

24  **Q**    Payment to who?

25  **A**    To me.

1 **Q**    Did you receive any money after asking for it?

2 **A**    No.

3 **Q**    What's your only obligation here today?

4 **A**    To give a truthful testimony.

5 **Q**    At some point, did you learn about the possibility of a

6 reward?

7 **A**    Yes, I did.

8 **Q**    What was your understanding of that reward?

9 **A**    That it wasn't guaranteed, it was a possibility; and my

10 testimony should not be based on the reward.

11 **Q**    What was the reward for?

12 **A**    If anything had been recovered from the clinic at Gulfton

13 or from Dr. Craig or Mr. Faithful, there would be a percentage

14 of reward given to me.

15 **Q**    Taking a step back, what was your understanding of why you,

16 Ms. Phillips, might get a reward?

17 **A**    Because I was assisting them with this case.

18 **Q**    And how were you assisting them in this case?

19 **A**    Providing truthful information and necessary documents.

20 **Q**    And by "them," you mean who?

21 **A**    The agents and the DEA.

22 **Q**    Do you know that -- do you know what the amount of money

23 you may get as a reward is?

24 **A**    I only know the percentage.

25 **Q**    What's the percentage?

1  **A**   20 percent.

2  **Q**   20 percent of what?

3  **A**   Of whatever is recovered.

4  **Q**   Recovered from where?

5  **A**   Gulfton.

6  **Q**   Where else?

7  **A**   And Dr. Craig and Mr. Faithful.

8  **Q**   Has anyone made you any promises about this reward at all?

9  **A**   No, sir.

10 **Q**   Do you know who decides if you get this reward?

11 **A**   The government does.

12 **Q**   Do I decide if you get the reward or not?

13 **A**   No.

14 **Q**   Does Mr. Helfmeyer?

15 **A**   No, sir.

16 **Q**   Does anyone in this courthouse?

17 **A**   No, sir.

18 **Q**   Do you know if you're even going to get a reward?

19 **A**   No, sir.

20 **Q**   Ma'am, I want to shift gears and talk about Gulfton again,

21 all right?

22 **A**   Yes, sir.

23 **Q**   So, you worked at Gulfton for how many months?

24 **A**   Approximately, eight months.

25 **Q**   When you worked there for eight months, what time did

1 Gulfton open?

2 **A**    7:30 in the morning.

3 **Q**    And were there people there when Gulfton opened up?

4           MR. WILLIAMS:  Leading, Judge.

5           THE COURT:  Overruled.

6           THE WITNESS:  Yes, sir.

7 BY MR. ARMSTRONG:

8 **Q**    I'll ask it again:  Who, if anyone, was there when Gulfton

9 opened up?

10 **A**    Patients and facilitators.

11 **Q**    Did you actually see people arrive at Gulfton?

12 **A**    Yes, sir.

13 **Q**    How did they arrive?

14 **A**    In cars.

15 **Q**    Was it just one person to a car?

16 **A**    No.  Sometimes four to a car.

17 **Q**    Who was driving the car?

18 **A**    The facilitator.

19 **Q**    Where did the people in the car go?

20 **A**    Inside the Gulfton clinic.

21 **Q**    Did you actually have to open the gate for people to come

22 inside?

23 **A**    Yes, sir.

24 **Q**    After you opened the gate, what happened?

25 **A**    I have to try to command order and then open the main

1  building to allow them to come in.

2  **Q**    You said "command order."  What was the scene like when you

3  opened the gate?

4  **A**    Crazy.

5  **Q**    Why was it crazy?

6  **A**    Each facilitator was trying to get their patients seen

7  first.

8  **Q**    Now, did all of these people at 7:30 in the morning have

9  the same appointment time?

10  **A**   Technically, no.  But to them, it was whoever came first.

11         MR. WILLIAMS:  Objection as to what -- okay.

12         THE COURT:  Overruled.

13         MR. WILLIAMS:  I withdraw it, Judge.

14         THE COURT:  Okay, thank you.

15  BY MR. ARMSTRONG:

16  **Q**   How did you try to -- what did you do, if anything, to

17  command order?

18  **A**   We'd collect the driver's license and put stickers on the

19  back of them with numbers.

20  **Q**   Did you create a line?

21  **A**   After collecting the driver's license.

22  **Q**   Who, if anyone, went into the line?

23  **A**   The patients.

24  **Q**   Who, if anyone, made people stay in line?

25  **A**   Security and the facilitators.

1 **Q**   What kind of security?

2 **A**   Armed guards.

3 **Q**   How many?

4 **A**   One in the parking lot and one in the lobby and one in the

5 area of where the staff was.

6 **Q**   How many people would be in a line, generally speaking, at

7 7:30 in the morning?

8 **A**   Around 7:30, could be 20 to 30.

9 **Q**   And where were they lining up to go?

10 **A**   Lining up to come inside of Gulfton.

11 **Q**   How did you figure out who went first?

12 **A**   If I got there after security and security had already

13 collected the IDs, I'd have to trust what they say, that the

14 patients arrived in that order.

15 **Q**   All right.  So, let's take it one step at a time.  Were IDs

16 collected?

17 **A**   Yes, sir.

18 **Q**   From whom were IDs collected?

19 **A**   Patients.

20 **Q**   And when I say "IDs," what does that mean?

21 **A**   State IDs.

22 **Q**   What kind of IDs?

23 **A**   Government IDs or driver's license.

24 **Q**   And who, if anyone, handed you the IDs?

25 **A**   Sometimes the facilitator; sometimes the patient; sometimes

1  security.

2  **Q**   And what did you do with the IDs?

3  **A**   We put markings -- numbers on the back of the IDs.

4  **Q**   What kind of markings?

5  **A**   They were little dots, colored dots -- colored-coded dots

6  with numbers.

7  **Q**   And what did those numbers represent, if anything?

8  **A**   The order in which we received the IDs.

9  **Q**   And what did that order mean, if anything?

10 **A**   Nothing, basically.

11 **Q**   Then, why do it?

12 **A**   Trying to keep order.

13 **Q**   How did you figure out who actually got to go back and see

14 Dr. Craig first?

15 **A**   The ones who cleared in DPS.

16 **Q**   Were there any arguments about who gets to go first?

17 **A**   Sometimes.

18 **Q**   Who would argue?

19 **A**   The facilitators would say that they were there first with

20 their patients; and then, some of them would say they were there

21 first.

22 **Q**   Who, if anyone, would resolve these disputes?

23 **A**   Security or myself.

24 **Q**   All right.  So, Step 1 -- is it fair to say, step one, you

25 get all the IDs together?

1  **A**   Yes, sir.

2  **Q**   What's Step 2 in the process on any given day at Gulfton?

3  **A**   Step 2 is to pull the charts of the patients.

4  **Q**   Before that, do you run something called DPS?

5  **A**   That's after we pull the charts.

6  **Q**   Let's talk about DPS; and then, we'll talk about pulling

7  the charts.

8  **A**   Okay.

9  **Q**   "DPS," what does that mean?

10 **A**   That's the prescription history of the patient.

11 **Q**   What kind of prescription history?

12 **A**   To see what type of medications they've been taken, if any

13 opioids or -- whatever the prescription history might be.

14 **Q**   How do you, Loren Phillips, in Gulfton get the patient's

15 prescription history?

16 **A**   From the DPS system.

17 **Q**   And how do you check the DPS system?

18 **A**   I log in with Dr. Craig's information that she gives me.

19 Once the history comes up, we print it and then we view it on

20 the desk.

21       MR. ARMSTRONG:  Your Honor, if we could, please, turn

22 off the lights over the projector, please.

23             And Ms. Mortezavi, if we can, please, pull up

24 Government Exhibit 357 at 22.

25             And Ms. Mortezavi, if we can, please, pull up --

1 back out, please, Ms. Mortezavi.

2              If you can, please, pull up starting with patient

3 report down to Reginald Williams, please.

4 BY MR. ARMSTRONG:

5 **Q**    So, ma'am, do you recognize this document?

6 **A**    It's DPS.

7 **Q**    Is this -- is this document similar to the DPS reports that

8 you ran when you were working at Gulfton?

9 **A**    Yes, sir.

10 **Q**    Let's take this one step at a time.

11              Whose DPS report is this?

12 **A**    Tonya Jackson.

13 **Q**    And what information, if anything, does it tell you about

14 what drugs were prescribed to Tonya Jackson?

15 **A**    April 25th, 2017, she received hydrocodone.

16 **Q**    Okay.  This column says "filled."  Let's take it one step

17 at a time.  What does that mean it was filled?

18 **A**    That's when the prescription was filled.

19 **Q**    And this column says "written."

20              What does that mean?

21 **A**    It was written on the 12th.

22 **Q**    And this column says "drug."

23              What does that mean?

24 **A**    The medication.

25 **Q**    And which drugs were written for Tonya Jackson on April

1   12th?

2   **A**   Hydrocodone and Soma.

3   **Q**   Soma is what?

4   **A**   Carisoprodol.  I can't pronounce it correctly.

5   **Q**   Carisoprodol?

6   **A**   Yes.

7   **Q**   All right.  So, Ms. Jackson received, according to this

8   report, hydrocodone and carisoprodol on April 12, 2017?

9   **A**   Yes.

10  **Q**   And which doctor prescribed Ms. Jackson, according to this

11  report, those two drugs on that date?

12  **A**   Dr. Reginald Williams.

13  **Q**   Okay.  Now, does this report tell you anything at all about

14  why Mr. Williams' report -- prescribed those drugs to

15  Ms. Jackson?

16  **A**   No, sir.

17  **Q**   Does it tell you anything at all about Ms. Jackson's

18  condition?

19  **A**   No, sir.

20  **Q**   Does it tell you anything about the reason that Ms. Jackson

21  got those drugs according to the report?

22  **A**   It says it was prescribed for pain, but that's it.

23  **Q**   Why did you run DPS reports?

24  **A**   To make sure that this patient is not going from doctor to

25  doctor.

1 **Q**    Did Mr. Faithful give you any reason for why you were to

2 run these reports?

3           MR. WILLIAMS:  Objection.  Leading, Judge.

4           THE COURT:  Overruled.

5           THE WITNESS:  Because they have to be in the -- in the

6 charts, according to Mr. Faithful, in the event the Texas

7 Medical Board should come.

8 BY MR. ARMSTRONG:

9 **Q**    What's a doctor shopper?

10 **A**    A doctor shopper is a patient who has seen two doctors and

11 received the same prescription within a 30-day frame.

12 **Q**    What kind of prescriptions?

13 **A**    Opioids.

14 **Q**    So, would you say a doctor shopper is someone who receives

15 more than one prescription within 30 days?

16 **A**    Yes.

17           MR. WILLIAMS:  Judge, this is leading.

18           THE COURT:  Well, that's what she said.

19           MR. WILLIAMS:  Yeah, she said it.  But he's leading

20 her -- it's the same question again.

21           THE COURT:  Well, then, it's repetitious.

22               Sustained.

23           MR. WILLIAMS:  Thank you.

24           THE COURT:  Go on.

25 //

1  BY MR. ARMSTRONG:

2  **Q**    Now, did Gulfton see doctor shoppers?

3  **A**    No, sir.

4  **Q**    Did doctor shoppers receive prescriptions?

5  **A**    Every now and then one might slip in but, no, sir.

6  **Q**    Generally speaking, they did not receive prescriptions; is

7  that fair?

8  **A**    No, sir.

9  **Q**    Were you told by anyone why you-all were not to see doctor

10 shoppers?

11 **A**    Mr. Faithful said it was against the law.

12         MR. ARMSTRONG:  Now, Government Exhibit 328 at 22.

13 BY MR. ARMSTRONG:

14 **Q**    Ma'am, do you recognize this document?

15 **A**    Yes, sir.

16         MR. ARMSTRONG:  Ms. Mortezavi, perfect.  Thank you.

17 BY MR. ARMSTRONG:

18 **Q**    And what is this document?

19 **A**    DPS.

20 **Q**    For which patient?

21 **A**    Tonya Abe -- I'm sorry Tacorya Abe.

22 **Q**    Now, how many -- according to this document, how many

23 different prescriptions for hydrocodone did this person receive?

24 **A**    Three -- four.

25 **Q**    Does this document show that she first received a

1 prescription on December 30, 2016?

2 **A**    Yes, sir.

3        MR. ARMSTRONG:  Ms. Mortezavi, can we, please,

4 highlight that one.

5 BY MR. ARMSTRONG:

6 **Q**    And that was prescribed by a physician with these initials

7 in his or her name, correct?

8 **A**    Yes, sir.

9 **Q**    And according to this document, did Ms. Abe receive a

10 second prescription for hydrocodone?

11 **A**    Yes, sir.

12 **Q**    On what date?

13 **A**    February 9th.

14 **Q**    Is that from the same doctor or a different doctor than she

15 received a prescription just two months earlier?

16 **A**    A different doctor.

17 **Q**    And did Ms. Abe receive a third prescription for

18 hydrocodone one month later --

19 **A**    Yes, sir.

20 **Q**    -- according to this document?

21 **A**    Yes, sir.

22 **Q**    And was the person who prescribed Ms. Abe hydrocodone,

23 according to this document, different from the previous two

24 doctors who prescribed her hydrocodone?

25 **A**    Yes, sir.

1 **Q**    So, to you, what's the difference between this person and a

2 doctor shopper?

3 **A**    None.

4 **Q**    And would a person like this still receive a prescription

5 at Gulfton?

6 **A**    Yes, sir.

7 **Q**    Now, was this information put anywhere?

8 **A**    In a patient chart.

9 **Q**    I'm sorry, we were talking over each other.

10          Were PMP reports or DPS reports put anywhere?

11 **A**    Inside the patient's chart.

12 **Q**    And did you ever see Dr. Craig review these DPS or PMP

13 reports?

14 **A**    I wasn't in her office during that time.

15 **Q**    Did Dr. Craig ever ask you to request information from the

16 doctors listed in these DPS reports?

17 **A**    No, sir.

18          MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, pull

19 up Government Exhibit 357 at 9.

20          And Ms. Mortezavi, if we can, please, pull up the

21 top half of this document starting with "probably HIPAA

22 complaint" going through this part right here.

23 BY MR. ARMSTRONG:

24 **Q**    Ma'am, do you recognize this document?

25 **A**    Yes, sir.

1  **Q**    What is it?

2  **A**    It's a HIPAA form.

3  **Q**    Who used these documents?

4  **A**    Physicians --

5  **Q**    Who used --

6  **A**    -- and hospitals.

7  **Q**    Who used these documents at Gulfton?

8  **A**    We do -- well, when I was working there, we used those.

9  **Q**    Where, if anywhere, were these documents put?

10 **A**    Inside the patient's chart.

11 **Q**    Now, did you actually send out these documents?

12 **A**    Only for an x-ray report.

13 **Q**    So, what is your understanding of what kind of document --

14 what is your understanding of what kind of information you can

15 theoretically obtain with this document?

16 **A**    The patient's medical report.

17 **Q**    Now, did you ever send out this document in the eight

18 months that you worked there to request entire medical records?

19 **A**    No, sir.

20 **Q**    Over the eight months that you worked at Gulfton, did you

21 ever send out this document for history and physical records?

22 **A**    No, sir.

23 **Q**    For any patient?

24 **A**    No, sir.

25 **Q**    Over the eight months that you worked there, did you ever

1 request drug and physical documents for any patient?

2 **A**   No, sir.

3 **Q**   Over the eight months that you worked at Gulfton, did you

4 ever request for any patient emergency room records?

5 **A**   No, sir.

6 **Q**   Did you ever request any records for any patient about

7 operative reports?

8 **A**   No, sir.

9 **Q**   What about discharge summaries?

10 **A**   No, sir.

11 **Q**   What about lab tests, results, or reports?

12 **A**   No, sir.

13 **Q**   X-ray reports?

14 **A**   Yes, sir.

15 **Q**   Psychiatric reports?

16 **A**   No, sir.

17 **Q**   MRI reports?

18 **A**   Yes, sir.

19 **Q**   So, this form was sent out to receive what kind of

20 documents?

21 **A**   X-rays and MRI reports.

22 **Q**   That's it?

23 **A**   That's it.

24 **Q**   Did Dr. Craig ever ask you to request any of the records

25 beyond x-rays or MRIs listed on this form?

1 **A**    No, sir.

2 **Q**    Do you have an understanding why it's even in the file at

3 all?

4 **A**    They were audited by the Texas Medical Board before.  So,

5 it was to make sure if we got audited again.

6 **Q**    And how do you have that understanding?

7 **A**    Mr. Faithful.

8 **Q**    So, after you checked DPS or PMP that we discussed, do you

9 collect money?

10 **A**    Yes, sir.

11 **Q**    How much -- how much did Gulfton charge over the time you

12 worked there?

13 **A**    It would vary depending on the other clinics.  It could go

14 from 300 to 340.

15 **Q**    Who sets those prices?

16 **A**    Mr. Faithful.

17 **Q**    Did he tell you how he set the prices?

18 **A**    Based on the clinics that -- that are similar to Gulfton,

19 other pain management clinics.  If one clinic shuts down, then

20 the price goes up.  If more clinics open up, then the price goes

21 down.

22 **Q**    Is that what he told you?

23 **A**    Yes, sir.

24 **Q**    Did people pay before or after they saw Dr. Craig?

25 **A**    Before.

1  **Q**   Why was that?

2  **A**   That was just the policy.

3  **Q**   Whose policy?

4  **A**   Mr. Faithful's and Dr. Craig's.

5  **Q**   How were these payments made?

6  **A**   In cash.

7  **Q**   Did you-all take credit cards?

8  **A**   No, sir.

9  **Q**   Do you know why?

10  **A**   Most of the patients didn't have credit cards anyway.

11  **Q**   Did you take insurance?

12  **A**   No, sir.

13  **Q**   Did some people try to pay with credit card?

14  **A**   They thought they could pay with a debit card.

15  **Q**   And what, if anything, would you tell them when they tried

16  to pay with a debit card?

17  **A**   Cash only.

18  **Q**   Did some people try to pay with insurance?

19  **A**   Yes, sir.

20  **Q**   And what, if anything, would you tell them when they tried

21  to pay with insurance?

22  **A**   We didn't accept insurance; cash only.

23  **Q**   Did you guys have a credit card machine?

24  **A**   No, sir.

25  **Q**   What was the only method of payment at Gulfton?

1   **A**    Cash.

2          MR. ARMSTRONG:  Government Exhibit 357 at 4, please,

3   Ms. Mortezavi.

4   BY MR. ARMSTRONG:

5   **Q**    Ma'am, do you recognize this document?  Not this specific

6   document.  Do you recognize these types of documents?

7   **A**    Yes, sir.

8   **Q**    And generally speaking, what are these types of documents?

9   **A**    That's one of the documents for the intake -- the new

10  patient's intake file.  It's filled out by the patient.

11  **Q**    And did you-all use these documents at Gulfton?

12  **A**    Yes, sir.

13  **Q**    And where did this information go?

14  **A**    Inside the patient's file.

15  **Q**    What information is, generally, in this box under insurance

16  information?

17  **A**    Insurance information.

18  **Q**    Did you-all accept Blue Cross/Blue Shield?

19  **A**    No, sir.

20  **Q**    What about United Healthcare?

21  **A**    No, sir.

22  **Q**    What about Aetna?

23  **A**    No, sir.

24  **Q**    Did you-all accept employer self-insured plans?

25  **A**    No, sir.

1  **Q**    Why have that form in the patient files at all if you don't
2  accept all that stuff?
3  **A**    Mr. Faithful wanted it in there.
4  **Q**    He tell you why?
5  **A**    Texas Medical Board.
6  **Q**    What was your understanding of what that means?
7  **A**    That in the event there's another audit, the right
8  information would be in the patient's chart.
9  **Q**    So, who collected the money on a day-to-day basis?
10 **A**    I did.
11 **Q**    How did that work?
12 **A**    The patients come to the window.  If their DPS cleared, we
13 tell them the amount.  I would put the amount inside of an
14 envelope and lock it up.
15 **Q**    Would facilitators ever give you money?
16 **A**    They tried to, and I would tell them the patient has to
17 give me the money.
18 **Q**    And when you told them that the patient has to give you the
19 money, what happened?
20 **A**    They tried to exchange money in the patient waiting area,
21 and I would tell them you have to do it outside.
22 **Q**    Did facilitators give you money for anything?
23 **A**    No, sir.
24 **Q**    Did facilitators give money to Gulfton for anything?
25 **A**    No, sir.

1  **Q**    Were there any rules about taking money from facilitators?

2  **A**    Yes, sir.

3  **Q**    What were those rules?

4  **A**    Facilitators and patients cannot exchange money in the

5  patient waiting area.

6  **Q**    Whose rule was that?

7  **A**    Mr. Faithful's.

8  **Q**    Did he tell you why he had that rule?

9  **A**    Because you don't know who is waiting in the patient

10  waiting area.

11  **Q**    What did you take him to mean?

12  **A**    If it's not a patient, it could be anyone watching the

13  clinic.

14  **Q**    What did you take him to mean "anyone watching the clinic"?

15  **A**    Agent, Texas Board -- Medical Board.

16  **Q**    Ma'am, I want to show you what has been marked as

17  Government's Exhibit 317.

18                    Do you recognize that document?

19  **A**    It's an appointment book.

20  **Q**    Please just flip through and make sure you're familiar with

21  it.

22  **A**    It's the appointment book that we used to write down the

23  facilitators' patients.

24  **Q**    What information went inside the appointment book?

25  **A**    Either the name of the patients or the number of patients

1 they promised to bring the next day.

2 **Q**    Who is "they" that you're referring to?

3 **A**    The facilitators.

4 **Q**    And who put that information in this book?

5 **A**    The staff members, either of us.

6 **Q**    Did you, as well?

7 **A**    Yes, sir.

8 **Q**    And how frequently would you put that kind of information

9 into this book?

10 **A**    Every day.

11 **Q**    Why?

12 **A**    Because at the end of the day we had to give a report to

13 Mr. Faithful on how many patients we're going to have the next

14 day.

15 **Q**    Now, Government Exhibit 317.  Did you take this document

16 with you when you left --

17 **A**    No, sir.

18 **Q**    -- when you quit on December 28, 2016?

19 **A**    No, sir.

20 **Q**    Where did you leave it?

21 **A**    I left it at Gulfton.

22 **Q**    Why did you do that?

23 **A**    It wasn't mine.

24 **Q**    Whose was it?

25 **A**    It belonged to the clinic.

1          MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

2  to page 41 of Government Exhibit 317.

3  BY MR. ARMSTRONG:

4  **Q**    What's the date on this appointment page book?

5  **A**    April 24th.

6          MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, pull

7  up this column here (indicating).

8  BY MR. ARMSTRONG:

9  **Q**    Ma'am, this says Kiwi -- let me back up.  What does that

10  say?

11  **A**    Kiwi.

12  **Q**    Who is Kiwi?

13  **A**    That's a facilitator.

14  **Q**    And what do these marks mean next to Kiwi's name?

15  **A**    Six patients.

16  **Q**    Six patients where?

17  **A**    That Mr. Kiwi would either bring in the next day --

18  **Q**    Bring --

19  **A**    -- to Gulfton as his patients.

20  **Q**    To?

21  **A**    To receive prescriptions.

22  **Q**    Ma'am, what does this mean down here (indicating)?

23  **A**    Will.

24  **Q**    Who is Will?

25  **A**    A facilitator.

1  **Q**    What do these markings mean next to Will's name?

2  **A**    Three patients.

3  **Q**    What does that mean?

4  **A**    He was going to bring in three patients the next day.

5  **Q**    For what purpose?

6  **A**    To receive prescriptions.

7  **Q**    From who?

8  **A**    Dr. Craig.

9          MR. ARMSTRONG:  Ms. Mortezavi, can we, please, zoom

10 out and zoom in on the bottom half of this page.

11              Actually, Ms. Mortezavi, if we can back up for

12 just one second.

13 BY MR. ARMSTRONG:

14 **Q**    Ma'am, what is the date of this column here (indicating)?

15          MR. ARMSTRONG:  Ms. Mortezavi, please go up there

16 (indicating).

17          THE WITNESS:  April 22nd.

18 BY MR. ARMSTRONG:

19 **Q**    All right.  So, on April 22nd, who is bringing patients --

20 who is bringing people to Gulfton?

21 **A**    E. J.

22 **Q**    Where do you see E. J.?

23 **A**    At the very top.

24          MR. ARMSTRONG:  And Ms. Mortezavi, if we can just,

25 please, zoom out just a little bit, please.

1                    The zoom is a little bit too big.

2  BY MR. ARMSTRONG:

3  **Q**    What does this say here (indicating)?

4  **A**    Uncle Ronnie.

5  **Q**    Who is Uncle Ronnie?

6  **A**    A facilitator.

7  **Q**    And how many people was Uncle Ronnie bringing to Gulfton?

8  **A**    Three.

9  **Q**    For what purpose?

10 **A**    To receive prescriptions.

11 **Q**    What does it say below Uncle Ronnie?

12 **A**    Wilbert.

13 **Q**    Who is Wilbert.

14 **A**    A facilitator.

15 **Q**    And what was Wilbert bringing to Gulfton?

16 **A**    Two patients.

17 **Q**    For what purpose?

18 **A**    To receive prescriptions.

19 **Q**    What does this say down here (indicating)?

20 **A**    Monk.

21 **Q**    Who is Monk?

22 **A**    A facilitator.

23 **Q**    And what do these markings next to Monk represent?

24 **A**    Three patients.

25 **Q**    What was the purpose of Monk bringing three people to

1 Gulfton?

2 **A**    To receive prescriptions.

3 **Q**    Out of all these entries, what kind of prescriptions are we

4 talking about?

5          THE COURT REPORTER:  I'm sorry?

6 BY MR. ARMSTRONG:

7 **Q**    For all of these prescriptions that we referenced on this

8 page, what kind of prescriptions are we talking about?

9 **A**    Norco and Soma.

10 **Q**    Signed by who?

11 **A**    Dr. Craig.

12 **Q**    Ma'am, we see also over here (indicating).  What's this

13 name?

14 **A**    Tasha.

15 **Q**    Who is Tasha?

16          MR. ARMSTRONG:  Ms. Mortezavi, if we can zoom out.

17             That's too much.

18 BY MR. ARMSTRONG:

19 **Q**    Who is Tasha?

20 **A**    Facilitator.

21 **Q**    And what do those markings under Tasha's name represent?

22 **A**    Three patients.

23 **Q**    For what purpose was Tasha bringing three patients to

24 Gulfton?

25 **A**    To receive prescriptions.

1  **Q**   What kind of prescriptions?

2  **A**   Norco and Soma.

3  **Q**   From who?

4  **A**   Dr. Craig.

5         MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

6  to page 48 of Government Exhibit 317.

7              And Ms. Mortezavi, if we can, please, pull up

8  starting on Monday going down to about here (indicating),

9  please.

10             Too much zoom.

11             Let's back out just a little bit, please.

12  BY MR. ARMSTRONG:

13  **Q**   Ma'am, what is the date on Government's Exhibit 317 at page

14  48?

15  **A**   May 16th.

16  **Q**   And what does this mean -- whose name is that?

17  **A**   Tasha.

18  **Q**   Is that the same Tasha we saw on the previous page?

19  **A**   Yes, sir.

20  **Q**   Who is Tasha?

21  **A**   Facilitator.

22  **Q**   Okay.  Whose name is under Tasha?

23  **A**   Dre.

24  **Q**   Who is Dre?

25  **A**   Her husband, a facilitator.

1  **Q**  Okay.  And whose name is this underneath Dre?

2  **A**  Will.

3  **Q**  Who is Will?

4  **A**  A facilitator.

5  **Q**  And whose name is under Will?

6  **A**  I think it's Toya.

7  **Q**  Tywoo?

8  **A**  I can't see it.

9  **Q**  Fair enough.

10          I think you're right, it is Toya.  Who is Toya?

11 **A**  A facilitator.

12 **Q**  And whose name is under Toya's name?

13 **A**  Trina.

14 **Q**  And who is Trina?

15 **A**  A facilitator.

16 **Q**  And Uncle Ronnie, we've seen that name before, right?

17 **A**  Yes.

18 **Q**  Who is Uncle Ronnie?

19 **A**  A facilitator.

20 **Q**  And whose name is under Uncle Ronnie's?

21 **A**  Kiwi.

22 **Q**  Who is Kiwi?

23 **A**  Facilitator.

24 **Q**  And whose name is under Kiwi's?

25 **A**  Kool.

1  Q    What do all of these numbers represent next to all of these
2  facilitators' names?
3  A    The number of patients.
4  Q    The number of patients for what?
5  A    That they're going to bring in that day -- the next day.
6  Q    For what purpose?
7  A    To receive a prescription.
8  Q    From who?
9  A    Dr. Craig.
10 Q    What drugs?
11 A    Norco and Soma.
12 Q    So, if we add all these numbers, 4 plus 4 is 8; 5 is 13;
13 plus 2 is 15; plus 4, 19; plus 2 is 21; plus 4 is twenty -- I'm
14 sorry, plus 2 is 23; plus 2 is 25.
15          Is my math close to right?
16 A    Yes, sir.
17 Q    So, how many people in all were bringing -- were being
18 brought by facilitators to Gulfton to receive prescriptions?
19          THE COURT:  You just added it up, right?
20 BY MR. ARMSTRONG:
21 Q    25, correct?
22 A    Well, you didn't say Paul Hall.  He had two and one at the
23 bottom.
24 Q    I missed two.
25 A    So, it's like 27.

1  **Q**    And if we go to the next day, what day is the next day on

2  this log?

3  **A**    May 17th.

4  **Q**    And whose name is here?

5  **A**    Brandon.

6  **Q**    Is it Brandon or Braylon?

7  **A**    Kind of hard to read.

8  **Q**    Whose name is underneath Brandon's?

9  **A**    John Hill.

10 **Q**    Who is John Hill?

11 **A**    A facilitator.

12 **Q**    Whose name is under John Hill?

13 **A**    Monkey Man.

14 **Q**    Who is Monkey Man?

15 **A**    Monk.

16 **Q**    What's his job?

17 **A**    Facilitator.

18 **Q**    And whose name is under Monkey Man's?

19 **A**    Black.

20 **Q**    Who is Black?

21 **A**    A facilitator.

22 **Q**    And whose name is under Black's?

23 **A**    Dre.

24 **Q**    And again, what do all of these numbers next to all of

25 these facilitators represent?

1  **A**    Patients.

2  **Q**    Patients brought where?

3  **A**    To Gulfton.

4  **Q**    By who?

5  **A**    Facilitators.

6  **Q**    For what purpose?

7  **A**    To receive a prescription.

8  **Q**    Prescription for what?

9  **A**    Norco and Soma.

10 **Q**    Signed by who?

11 **A**    Dr. Craig.

12           MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

13 to page 53 of Government Exhibit 317.

14 BY MR. ARMSTRONG:

15 **Q**    And ma'am, what's the date on this appointment book entry?

16 **A**    June 2nd.

17 **Q**    And whose name is that?

18 **A**    At the very top?

19           THE COURT:  Now, what are we learning different from

20 what we just saw page after page?  What's different?  Is it just

21 cumulative or what?

22           MR. ARMSTRONG:  Just the continuing operation month

23 after month, Judge.

24           THE COURT:  Go on.

25           MR. ARMSTRONG:  Thank you, Judge.

1  BY MR. ARMSTRONG:

2  **Q**    Who's Tywoo?

3  **A**    A facilitator.

4  **Q**    And who is Kool?

5  **A**    Facilitator.

6           THE COURT:  Why don't you just go down it and name

7  everyone and ask her are these all facilitators if you need to

8  get it in, counsel?

9           MR. ARMSTRONG:  Thank you, Judge.

10          THE COURT:  And you can move along.

11  BY MR. ARMSTRONG:

12  **Q**    Who is Braylon?

13  **A**    Facilitator.

14          THE COURT:  I presume it's a facilitator.

15  BY MR. ARMSTRONG:

16  **Q**    Okay.  Braylon, Keke, who are all those people?

17  **A**    Facilitators.

18  **Q**    And what are they bringing to Gulfton?

19  **A**    Patients.

20  **Q**    For what?

21          THE COURT:  Same testimony as before; is that correct,

22  ma'am?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right, next question.

25          MR. ARMSTRONG:  Thank you, Judge.

1                    All right.  Government Exhibit 318.

2 BY MR. ARMSTRONG:

3 **Q**    Ma'am, do you recognize this document?

4 **A**    Yes, sir.

5 **Q**    How do you recognize it?

6 **A**    It's an appointment book, another one.

7 **Q**    What kind of information went into this appointment book?

8 **A**    Patient information and the facilitators' numbers.

9 **Q**    Did you take this appointment book with you when you left

10 Gulfton?

11 **A**    No, sir.

12 **Q**    What did you do with it?

13 **A**    I left it at Gulfton.

14                    MR. ARMSTRONG:  Court's indulgence.

15                    Ms. Mortezavi, if we can, please, go to page 8.

16 BY MR. ARMSTRONG:

17 **Q**    Now, ma'am, we're going to go through this a little bit

18 more quickly.

19                    MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, pull

20 up Wednesday through Friday.

21 BY MR. ARMSTRONG:

22 **Q**    Ma'am, what I'm going to do is I'm just going to read off

23 names and I'll ask you one big question at the end.  E. J.,

24 Ronnie, Dre, Cherry, Kool, Monk, Tywoo, Braylon, Wilbert,

25 Jessie, Keke, Dre, Ronnie Williams, Black, Tywoo, E. J.,

1 Wilbert, Jeremy, Cherry, Charles, Keke.

2          Do you know who that is?  Can you read that?

3 **A**   Roshay.

4 **Q**   Who are all of the names that are highlighted on these

5 three dates?

6 **A**   Facilitators.

7 **Q**   And who, if anyone, did they bring to Gulfton?

8 **A**   Patients.

9 **Q**   For what purpose?

10 **A**   To receive prescriptions.

11 **Q**   For what?

12 **A**   Norco and Soma.

13 **Q**   Let's just do a rough calculation of all the patients

14 brought to receive prescriptions.

15          THE COURT:  Just estimate it or somebody who has it

16 added up.  We're all looking at it.

17 BY MR. ARMSTRONG:

18 **Q**   Is it fair to say about 50 people brought to Gulfton?

19 **A**   Yes, sir.

20 **Q**   By facilitators?

21 **A**   Yes, sir.

22          THE COURT:  By the way, ladies and gentlemen, it's now

23 ten minutes after 5:00.  We got back in at ten after 4:00.  I do

24 this when we get to the late afternoon.  We can go straight

25 through to 6:00.  If you want to take a quick ten-minute break,

1  we can do it.  What's your decision?  Everybody okay?

2          All right, let's go.

3          Do the attorneys need to take a break?

4          MR. WILLIAMS:  Yeah.  I'm an old man.  If possible,

5  Judge.

6          THE COURT:  Not older than I am.

7          MR. WILLIAMS:  I understand.  I hope I get to be.

8          THE COURT:  I can just tell you that.

9          MR. WILLIAMS:  I hope I get to be.

10          THE COURT:  All right.  We'll take a ten-minute break.

11  We'll get in, we'll go until about 6:00 or 6:05.  See you back

12  in ten minutes.

13          THE COURT SECURITY OFFICER:  All rise.

14      (Court recessed at 5:10 p.m.)

15      (Court resumed at 5:21 p.m.)

16          THE COURT:  Be seated, please.

17          Let's continue.

18          MR. ARMSTRONG:  Your Honor, if we could, please, hit

19  the lights over the projector.

20          THE COURT:  Okay.

21  BY MR. ARMSTRONG:

22  Q    Ms. Phillips, one more page in the appointment book to go

23  over with you.

24          MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

25  to Exhibit 318 at page 52.

1          MR. WILLIAMS:  Which page?

2          MR. ARMSTRONG:  52.

3          MR. WILLIAMS:  Thank you.

4          MR. ARMSTRONG:  And, Ms. Mortezavi, can we, please,

5   blow up this column here (indicating).

6   BY MR. ARMSTRONG:

7   **Q**    Ma'am, what's the date on this appointment book?

8   **A**    September 20th.

9          MR. ARMSTRONG:  All right.  Ms. Mortezavi, if you can,

10  please, highlight these names as I call them out.

11               Kiwi, Tywoo, Perry, Dre, Drew.

12  BY MR. ARMSTRONG:

13  **Q**    Ma'am, who are all those people?

14  **A**    Facilitators.

15  **Q**    And who are they bringing?

16  **A**    Patients.

17  **Q**    Are all those facilitators bringing about 17 people to

18  Gulfton for prescriptions?

19  **A**    Yes, sir.

20  **Q**    For what drugs?

21  **A**    Norco and Soma.

22  **Q**    What percentage of people who were brought to Gulfton by

23  facilitators actually, in fact, did receive prescriptions for

24  Norco and Soma?

25  **A**    Anywhere from 75 to 90 percent of them.

1 **Q**   Ma'am, let's talk about the waiting room at Gulfton.  Over
2 the eight months that you were there, what were the highest
3 number of people that would be in the waiting room at Gulfton?
4 **A**   It can only hold a certain amount.  So, some of them would
5 have to be in the parking lot in their cars or in the halls.
6              Maybe 25 patients at a time.
7 **Q**   And who else would be in the waiting room with people --
8 with patients?
9              MR. WILLIAMS:  Objection.  Leading.
10              THE COURT:  Overruled.  Said who.  Who, if anyone?
11 BY MR. ARMSTRONG:
12 **Q**   Who else, if anyone -- who else, if anyone, would be in the
13 waiting room with people or patients?
14 **A**   Facilitators.
15 **Q**   Who else, if anyone?
16 **A**   Security.
17 **Q**   Were there chairs in the waiting room?
18 **A**   Yes, sir.
19 **Q**   What rule, if any, was there about whether patients had to
20 use the chairs?
21 **A**   Patients are supposed to be seated.
22 **Q**   Do you know why?
23 **A**   Just for order.
24 **Q**   Now, were patients allowed to just pass their time on cell
25 phones?

1  **A**    No, sir.

2  **Q**    Why not?

3  **A**    No cell phones were allowed.

4         MR. ARMSTRONG:  Government Exhibit 319 at 1, please.

5  BY MR. ARMSTRONG:

6  **Q**    Ma'am, do you recognize this sign -- do you recognize this

7  document?

8  **A**    Yes, sir.

9  **Q**    What is it?

10 **A**    It's "No electronic devices.  All devices must be powered

11 off.  No exceptions."

12 **Q**    Where, if anywhere, was this document?

13 **A**    Throughout the clinic.

14 **Q**    Which clinic are we talking about?

15 **A**    Gulfton.

16 **Q**    Would patients sometimes be caught using a cell phone?

17 **A**    Yes, sir.

18 **Q**    What would happen to them?

19 **A**    They would get their prescriptions cut.

20 **Q**    "Get their prescriptions cut," what does that mean?

21 **A**    Instead of getting a full prescription, some of the pills

22 would be taken from them.

23        THE COURT:  What do you mean by "taken from them"?

24        THE WITNESS:  They wouldn't get the full prescription.

25 Instead of 120, it may end up like 110 or something like that.

1  BY MR. ARMSTRONG:

2  **Q**   And who decided if a patient would get fewer opioids for

3  being on their phone?

4  **A**   Dr. Craig.

5  **Q**   Would some patients get thrown out for being on their cell

6  phones?

7  **A**   Not really.

8  **Q**   The sign says that no Bluetooths and headphones are

9  allowed.

10              Do you see that?

11 **A**   Yes, sir.

12 **Q**   Do you know why that was?

13 **A**   I'm still reading it, I'm sorry.

14 **Q**   Take your time, please.

15 **A**   To avoid -- well, the Bluetooth because you can hide the

16 Bluetooth in your ear.  To avoid them talking to other people on

17 the phone.  Because you can hide your phone but still have your

18 Bluetooth.

19 **Q**   What reason, if any, did Mr. Faithful give you for no cell

20 phones, no Bluetooths, no headphones?

21 **A**   Because the patients could be using their phones as a

22 recording device.

23 **Q**   Recording device for what purpose?

24 **A**   For any purpose.

25 **Q**   Did you think that this rule was for a legitimate or not

1  legitimate reason?

2          MR. WILLIAMS:  Which thought, Judge?  It's --

3          THE COURT:  Yeah.  Specific.

4          MR. WILLIAMS:  It's a legal conclusion.

5          MR. ARMSTRONG:  I'm sorry, what's the objection, your

6  Honor?

7          THE COURT:  Well --

8              Read the question back, please.

9      (The last question was read.)

10         THE COURT:  Sustain the objection to the form of the

11 question.  Because, in effect, that's part of what the jury is

12 going to have to decide at the end of the case or, at least, an

13 element they're going to have to take into consideration as a

14 fact issue.

15             So, go on, just rephrase it.

16         MR. ARMSTRONG:  Of course, Judge.

17 BY MR. ARMSTRONG:

18 **Q**    What, if anything, did Mr. Faithful tell you why this rule

19 was in place?

20 **A**    One, to not record the layout of the clinic or to make sure

21 that it wasn't law enforcement or someone.

22 **Q**    What did you take him to mean by law enforcement?

23 **A**    Police.

24 **Q**    Now, the people who were brought -- the people who --

25         MR. ARMSTRONG:  Let me rephrase.

1  BY MR. ARMSTRONG:

2  **Q**  When people were brought to Gulfton, did they see anyone?

3  **A**  I'm sorry, rephrase.

4  **Q**  Were there medical assistants also at Gulfton?

5  **A**  Yes, sir.

6  **Q**  And are you familiar with the term "pat-down"?

7  **A**  Yes, sir.

8  **Q**  What's your understanding of a pat-down?

9  **A**  Basically, checking to make sure that the patient didn't

10 have any recording devices or anything on them.

11 **Q**  Now, did you hear Mr. Faithful give any instructions about

12 pat-downs at Gulfton?

13 **A**  Yes, sir.

14 **Q**  What instructions did you overhear?

15 **A**  To make sure that the patients do not have recording

16 devices.  If they do, don't see them -- or don't allow Dr. Craig

17 to see them.

18 **Q**  And who, if anyone, did Mr. Faithful give these

19 instructions to?

20 **A**  The physician assistants.

21 **Q**  What was your understanding of why this instruction was

22 given?

23 **A**  Legal reasons.

24 **Q**  What kind of legal reasons?

25 **A**  To make sure that we're not being recorded.

1  **Q**   By who?

2  **A**   By law enforcement.

3  **Q**   All right, ma'am, back to the procedure.

4        After a patient has their DPS or PMP history run

5  and after that person pays, what happens next?

6  **A**   The MA takes them into triage.

7  **Q**   Before triage, is there a sign-in process?

8  **A**   They get to sign in afterwards, after they pay.

9  **Q**   Okay.  Who signs in?

10 **A**   The patients.

11 **Q**   How do they sign in?

12 **A**   On the sign-in sheet that's placed in the window.

13 **Q**   What role, if any, did you have with the sign-in sheet?

14 **A**   When the money is collected, the number on the envelope, we

15 had to make sure that that number matches the sign-in sheet.

16 **Q**   Take it a few steps before that.  What responsibility, if

17 any, did you have over the actual sign-in sheets themselves?

18 **A**   It was held on my desk.

19 **Q**   How often?

20 **A**   Every day.

21 **Q**   And how often would patients sign in on the sign-in sheets?

22 **A**   Every day.

23 **Q**   Why?

24 **A**   Because that's how we kept track of the patients and the

25 money.

1 **Q**    Would you ever go over the sign-in sheets with anyone?

2 **A**    Yes, sir.

3 **Q**    Who?

4 **A**    Mr. Faithful and Dr. Craig.

5 **Q**    For what purpose?

6 **A**    To make sure that the money matched the number of patients.

7 **Q**    Did you ever report the number of patients to anyone on

8 each day?

9 **A**    Yes, sir.

10 **Q**    Who would you report to?

11 **A**    Mr. Faithful.

12 **Q**    Why would you do that?

13 **A**    Because he wanted a report at the end of the day.

14 **Q**    Would you ever report that not many patients came to

15 Gulfton on a particular day?

16 **A**    Yes, sir.

17 **Q**    And how would Mr. Faithful react, if at all?

18 **A**    Pretty much the way he did on the recording.

19 **Q**    And how is that?

20 **A**    Angry.

21 **Q**    Ma'am, I'm going to hand you Government Exhibit 314.  And

22 please tell me if you're -- if you recognize it.

23 **A**    The original sign-in sheets.

24 **Q**    For what year?

25 **A**    2016.

1  **Q**   Now, when you left Gulfton on December 28, 2016, did you

2  take this big binder with you?

3  **A**   No, sir.

4  **Q**   What did you do with it?

5  **A**   It was left at the -- at the clinic.

6  **Q**   What clinic?

7  **A**   At Gulfton.

8  **Q**   All right.

9          MR. ARMSTRONG:  Government Exhibit -- let's look at

10 just a few pages.  Government Exhibit 314 at 158.

11 BY MR. ARMSTRONG:

12 **Q**   Ma'am, what's the -- what is this document?

13 **A**   It's a sign-in sheet.

14 **Q**   Okay.  For what date?

15 **A**   June 3, 2016.

16 **Q**   And how many patients signed in on June 3, 2016?

17 **A**   41.

18 **Q**   And where do you see that?

19 **A**   At the very bottom.

20 **Q**   And what does this say over in the corner between lines 33

21 and 34?

22 **A**   Replace cell phone.  Tasha's patient had to be replaced.

23 He was on a cell phone, and Dr. Craig refused to see him.  So,

24 she had to swap her patients out.

25 **Q**   What does that mean "Tasha's patient"?

1 **A**    She's the facilitator.  So, one of the patients --

2 Dominique Holmes was her patient.  She replaced Dominique Holmes

3 with Jasmine Carr.

4 **Q**    Just to be clear, what does that mean that Tasha replaced

5 her patient?

6 **A**    She's a facilitator.  Those are her patients that she

7 brought in with her and --

8 **Q**    According to this note, why is Tasha replacing her patient?

9 **A**    Because it's her money, and she can't get her money back.

10 So, she has to replace the patient.

11 **Q**    And for what reason?

12 **A**    The patient was on the cell phone.

13 **Q**    When you say it's her money, whose money are you talking

14 about?

15 **A**    The facilitator.

16         MR. ARMSTRONG:  The Court's indulgence.  I'm trying to

17 streamline?

18         THE COURT:  Okay.

19         MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

20 to Government Exhibit 314 at page 167.

21 BY MR. ARMSTRONG:

22 **Q**    Ma'am, what's this document the jury is looking at?

23 **A**    Sign-in sheet.

24 **Q**    For what date?

25 **A**    June 9, 2016.

1  **Q**    And how many people came to Gulfton on June 9, 2016?

2  **A**    41.

3  **Q**    And what does this say next to lines 37 and 38?

4  **A**    "Braylon to replace."

5  **Q**    What does that mean?

6  **A**    There was a problem with this patient.  I remember him.

7  Earnest Grigsby.

8  **Q**    What was the problem?

9  **A**    He caused, like, this huge issue in the clinic.

10            THE COURT:  He what?

11            THE WITNESS:  He caused a big issue at the clinic.

12            THE COURT:  Okay.  Doing what?

13            THE WITNESS:  I think he was on his cell phone, and he

14  refused to get off it.

15  BY MR. ARMSTRONG:

16  **Q**    So, what happened?

17  **A**    So, he was Braylon's patient.  So, instead of replacing him

18  with a patient that day, we gave him a card.

19            THE COURT:  Gave who a card?

20  BY MR. ARMSTRONG:

21  **Q**    Who did you give the card to?

22  **A**    The facilitator.

23            THE COURT:  All right.

24  BY MR. ARMSTRONG:

25  **Q**    Why did you give a card to the facilitator?

1  **A**   It was his money.

2  **Q**   Why not give the card to the patient?

3  **A**   The patient didn't pay for the visit.

4  **Q**   Who did pay for the visit?

5  **A**   Braylon.

6  **Q**   What was your understanding of why Braylon was paying for

7  someone else's visit?

8  **A**   It was his patient and his prescription.

9  **Q**   What was he buying?

10 **A**   Prescription.

11 **Q**   Prescription for what?

12 **A**   Norco and Soma.

13 **Q**   Signed by who?

14 **A**   Dr. Craig.

15       MR. ARMSTRONG:  Government Exhibit 314 at 28, please

16 -- I'm sorry, 218.

17 BY MR. ARMSTRONG:

18 **Q**   And what's the date of this document, ma'am?

19 **A**   June 21st, 2016.

20 **Q**   And what is this document?

21 **A**   A sign-in sheet.

22       MR. ARMSTRONG:  And if we could, please, focus on

23 Entries 12 and 13.

24 BY MR. ARMSTRONG:

25 **Q**   And whose name is over here?

1  **A**   Uncle Ronnie.

2  **Q**   What does that mean "Uncle Ronnie replaced"?

3  **A**   He replaced a patient with a card that he was given.

4          MR. ARMSTRONG:  Ms. Mortezavi, if we can, please, go

5  to 314 at 240, please.

6              And if we can, please, pull up next to -- at 240,

7  page 241.

8  BY MR. ARMSTRONG:

9  **Q**   All right.  Ma'am, I want to look at just two entries on

10 this page.  The first entry I want to look at is on page 240.

11             First off, before we get there, what is this

12 document?

13 **A**   Sign-in sheet.

14 **Q**   Okay.  What date?

15 **A**   June 23rd, 2016.

16 **Q**   And what is this entry between lines 18 and 19 mean?

17 **A**   "Braylon credit."

18 **Q**   What does that mean, "Braylon credit"?

19 **A**   The card that he received for the other patient, he's using

20 it for that patient.

21 **Q**   Using what?

22 **A**   It's a little card that we give out with a credit instead

23 of giving a refund.  He received a card.  So, he's using it to

24 sign in that patient.

25 **Q**   All right.  So, did Braylon receive anything back from the

1 clinic?

2 **A**    The prescription.

3 **Q**    And line 28 over here (indicating), whose name is that?

4 **A**    At the end?

5 **Q**    Uh-huh.

6 **A**    Dre.

7 **Q**    Who is Dre?

8 **A**    A facilitator.

9 **Q**    Okay.  And what number patient are we talking about for

10 Dre?

11 **A**    Number 28.

12        MR. ARMSTRONG:  And Ms. Mortezavi, if we can, please,

13 go to Government Exhibit 314 at 242, please.

14 BY MR. ARMSTRONG:

15 **Q**    What's this document?

16 **A**    That's the credit.

17 **Q**    Credit given to who?

18 **A**    To Dre.

19 **Q**    For which patient?

20 **A**    For Patient Number 28, Shanika.

21 **Q**    What does this mean, "$80 credit"?

22 **A**    He didn't get a full credit.  So, he only received $80.

23 **Q**    Who didn't get a full credit?

24 **A**    Dre.

25 **Q**    Why wasn't a credit given to the patient?

1  **A**    Because Dre paid for it.

2  **Q**    And what does this note mean up here (indicating)?

3  **A**    We have to call Shane before we give the card out.

4  **Q**    First off, what does it say?

5  **A**    "Shane approved full credit."

6  **Q**    What does that mean?

7  **A**    He approved the credit for the -- for Dre to receive that

8  card.

9  **Q**    How did that work?

10 **A**    I would have to call him and let him know what the

11 situation is; and then, he'll tell me if it's okay.

12 **Q**    Is that what happened here?

13 **A**    Yes, sir.

14 **Q**    So, who approved Dre getting $80 for credit?

15 **A**    Mr. Faithful.

16 **Q**    All right, ma'am, one more example, last example from this

17 Government exhibit.

18         MR. ARMSTRONG:  Government Exhibit 314 at page 270,

19 please.

20 BY MR. ARMSTRONG:

21 **Q**    Ma'am, what's this document?

22 **A**    A sign-in sheet.

23 **Q**    For what date?

24 **A**    June 28, 2016.

25 **Q**    Okay.  And what does this entry over here (indicating)

1  mean?

2  **A**    Tywoo's patient was on the phone.

3  **Q**    And because Tywoo's patient was on the phone, what, if

4  anything, did he receive back?

5  **A**    Half of his visit.

6  **Q**    Half of whose visit?

7  **A**    Half of the patient's visit.

8  **Q**    Why didn't the patient get money back?

9  **A**    Tywoo paid for it.

10  **Q**    And who had to approve giving money back to Tywoo as a

11  credit?

12  **A**    Mr. Faithful.

13  **Q**    So, on what date did Mr. Tywoo receive the credit?

14  **A**    On the 28th.

15          MR. ARMSTRONG:  Government Exhibit 314 at 270, please.

16              Government Exhibit 314 at 276, please.

17  BY MR. ARMSTRONG:

18  **Q**    Ma'am, is this the date after the document we just looked

19  at?

20  **A**    Yes, sir.

21  **Q**    So, if the previous day was June 28, 2016, the date of this

22  document is what?

23  **A**    June 29, 2016.

24  **Q**    And this document is what?

25  **A**    The sign-in sheet.

1 **Q**    Okay.  Now, what does this note mean right here

2 (indicating)?

3 **A**    The credit from the previous day, Tywoo was using it for

4 this patient.

5 **Q**    How much is the credit that Tywoo was redeeming for this

6 new person he's bringing to the clinic?

7 **A**    130.  $130.

8 **Q**    And what's the reason that Mr. Tywoo got the credit in the

9 first place?

10 **A**    The patient was on their cell phone.

11 **Q**    So, is this credit system kind of like a coupon or a --

12 **A**    Pretty much, yes.

13 **Q**    -- coupon system?

14           All right, ma'am, we're done with Government

15 Exhibit 314; and we can move on to a different topic.

16           Ma'am, I want to look at a patient file very

17 quickly.

18           MR. ARMSTRONG:  Government Exhibit 357 at 13, please.

19 BY MR. ARMSTRONG:

20 **Q**    Ma'am, do you recognize this document?

21 **A**    Yes, sir.

22 **Q**    Not for this specific patient but, generally speaking, what

23 kind of document is this?

24 **A**    It's a patient intake form.

25           MR. ARMSTRONG:  And Ms. Mortezavi, if we can, please,

1 just quickly flip through the pages.

2 BY MR. ARMSTRONG:

3 **Q**    Is it fair to say it's about ten pages long?

4 **A**    Yes, sir.

5 **Q**    Okay.  Now, where do these patient intake forms go, if

6 anywhere?

7 **A**    Inside the chart.

8 **Q**    And what information, generally speaking, goes into them?

9 **A**    The patient would go over their pain, like, the pain

10 assessment, with the MA.

11 **Q**    Before they get to the MA, where is this information in

12 this document filled out?

13 **A**    In the waiting area.

14 **Q**    And who is supposed to fill it out?

15 **A**    The patient.

16 **Q**    Now, did you see other people actually filling it out?

17 **A**    Yes, sir.

18 **Q**    Who?

19 **A**    Sometimes the facilitators because the patients couldn't

20 read or another patient.

21 **Q**    When you saw facilitators filling out those forms for other

22 people, what did you think was going on?

23 **A**    Pretty much protecting his interest?

24 **Q**    What do you mean?

25 **A**    That's his prescription at the end of the day.  So, he

1  wants to make sure that the information is filled out correctly.

2  **Q**    Is it the patient's prescription or is it the facilitator's

3  prescription?

4  **A**    The facilitator's prescription.

5  **Q**    After people fill out that intake form, where do they go

6  next?

7  **A**    It's placed back inside the chart.

8  **Q**    Do the people then go to an examination room?

9  **A**    They go to triage with the medical assistants.

10 **Q**    Does triage happen in the waiting room?

11 **A**    No, sir.

12 **Q**    Where does that process happen?

13 **A**    That's in the back office.  There are two triage rooms.

14 **Q**    And do people eventually see Dr. Craig?

15 **A**    They have to see the physician assistant after that.

16 **Q**    After they see that person, do they then see Dr. Craig?

17 **A**    Yes, sir.

18 **Q**    Now, did it ever happen where Dr. Craig would walk in and

19 see someone on their phone?

20 **A**    Yes, sir.

21 **Q**    How would she react?

22 **A**    She would walk out and say that she doesn't want to see

23 that patient or she's going to cut their prescription.

24 **Q**    What do you mean she would walk out and say, "I don't want

25 the see that patient on the phone"?

1  **A**   I guess she felt disrespected because they broke the rule.

2  **Q**   Now, you mentioned this before.  If she caught patients on

3  their cell phone, what, if anything, would she do to their

4  prescriptions?

5          MR. WILLIAMS:  Asked and answered, Judge.

6          THE COURT:  We haven't been over that already?

7          MR. ARMSTRONG:  We have, Judge.

8          THE COURT:  All right, keep going.

9  BY MR. ARMSTRONG:

10  **Q**   Now, if a person was not on their phone, generally

11  speaking, how many pills of hydrocodone would they receive?

12  **A**   120.

13  **Q**   And if they were caught on their phone, what would happen

14  to the number of pills they would receive?

15  **A**   They would be cut.

16  **Q**   Cut by who?

17  **A**   Dr. Craig.

18  **Q**   How would she cut the prescription?

19  **A**   It's at her discretion.

20  **Q**   Would she physically, like, cut it with scissors?

21  **A**   No.

22          MR. WILLIAMS:  Objection, Judge.  Leading.

23          THE COURT:  Sustained.

24  BY MR. ARMSTRONG:

25  **Q**   What does that mean "She would cut the prescription"?

1  **A**    It would be less than what we normally give out.

2  **Q**    Less what?

3  **A**    Less pills.

4  **Q**    Pills of what?

5  **A**    Hydrocodone.

6  **Q**    Did she -- did Dr. Craig ever tell you the reason that she

7  was cutting people's prescriptions for hydrocodone?

8  **A**    Yes.  When she would give us the chart, she would let us

9  know.

10  **Q**    What was the reason that she gave you for prescribing

11  people fewer pills of hydrocodone?

12  **A**    They were on their cell phone.

13  **Q**    Did she ever give you a medical reason for why she was

14  prescribing people fewer pills of hydrocodone?

15            MR. WILLIAMS:  Leading, Judge.

16            THE COURT:  Sustained.

17                All right.  Rephrase it, counsel.

18  BY MR. ARMSTRONG:

19  **Q**    When Dr. Craig told you that she was prescribing someone

20  fewer pills for being on their phone, were you aware of any

21  medical reason for that reduction?

22  **A**    No, sir.

23            MR. WILLIAMS:  Objection, Judge.  Leading.

24            THE COURT:  Overruled.

25            THE WITNESS:  No, sir.

1  BY MR. ARMSTRONG:

2  **Q**    So, were you aware of any medical reason --

3  **A**    It wasn't medically related.

4  **Q**    What was it related to?

5  **A**    The telephone.

6  **Q**    Why did you need to know how many pills of hydrocodone a

7  person received in a prescription?

8  **A**    Because the facilitators will come back to the window and,

9  basically, threaten us.

10 **Q**    Tell the jury what happened in those circumstances, please.

11 **A**    We had one facilitator, he almost broke the window because

12 he was upset about his money because at the end of the day the

13 prescription is his money; and we had to call the police.

14 **Q**    How often would facilitators get upset that prescriptions

15 for people they brought to the clinic were cut?

16 **A**    Every time.

17 **Q**    What was your understanding of why they were upset?

18 **A**    Because that's their money.

19 **Q**    Whose money?

20 **A**    The facilitators' money.

21 **Q**    Did you ever see people in the waiting room give their

22 prescriptions to anybody?

23 **A**    Yes, sir.

24 **Q**    Who?

25 **A**    The facilitators.

1  **Q**    Would that be the same facilitator or a different

2  facilitator than the one who gave money to the clinic?

3  **A**    The same facilitator.

4  **Q**    What was your understanding of why a person would give a

5  prescription to a facilitator?

6  **A**    The facilitator paid for it, and he wanted the

7  prescription.

8  **Q**    Ma'am, I want to shift gears and talk about some other

9  procedures in Gulfton.

10           Was there any pressure on you to have people come

11  to the clinic?

12  **A**    No, sir.

13  **Q**    And who put pressure on you to have people come to Gulfton?

14  **A**    Mr. Faithful.

15  **Q**    How would he pressure you to have people come to Gulfton?

16  **A**    He would tell me it's my responsibility to get the MAs to

17  make phone calls to call in more patients.

18  **Q**    What instructions would he give you about having other

19  people call supposed patients?

20  **A**    He wanted the MAs to call at least hundred to 200 patients

21  a day, each medical assistant tech to make the phone calls.

22  **Q**    How many medical assistants would be doing that?

23  **A**    About four.

24  **Q**    And how would they figure out which people to call?

25  **A**    They would, basically, randomly pull the charts off the

1 wall.

2 **Q**   And where would they get the phone numbers to call the

3 people?

4 **A**   Out of the charts.

5 **Q**   Were they successful in making appointments with people?

6 **A**   Not all the time.

7 **Q**   If the MAs, generally speaking, called hundred people, how

8 many appointments --

9             THE COURT REPORTER:  I'm sorry, how many what?

10            THE COURT:  Try it again.  Don't answer the question.

11 Let's hear it.  We have objections, and the court reporter

12 didn't catch it either.

13               Go on.

14            MR. ARMSTRONG:  Sure.

15            THE COURT:  Question.

16            MR. ARMSTRONG:  Thank you, Judge.  I'll rephrase it.

17 BY MR. ARMSTRONG:

18 **Q**   You testified before that these medical assistants would

19 call about hundred people.

20 **A**   Yes, sir.

21 **Q**   Of those hundred people, how many appointments would

22 actually be made?

23            MR. WILLIAMS:  Speculation, Judge.

24            THE COURT:  Overruled.

25 //

2-224

Phillips - Direct/Armstrong

1 BY MR. ARMSTRONG:

2 **Q**    Of those hundred people that the MAs called, generally

3 speaking, how many appointments would actually be made?

4 **A**    Sometimes two; sometimes none.

5 **Q**    What was your understanding of why so few appointments were

6 actually made?

7 **A**    It wasn't their actual phone numbers.

8 **Q**    What do you mean?

9 **A**    A lot of the lines were disconnected, and some of the

10 numbers belonged to other people.

11 **Q**    And where were those numbers from?

12 **A**    They were numbers that were in the charts given to us.

13 **Q**    Did you-all have something called urine testing at Gulfton?

14 **A**    Yes, sir.

15 **Q**    What was the test for?

16 **A**    It was to test for drugs.

17 **Q**    What kind of drugs, if you know?

18 **A**    Just drugs.

19 **Q**    How were the tests done?

20 **A**    With a dip stick in a cup.

21 **Q**    Did anyone have to give anything that goes in the cup?

22 **A**    They would give us the urine contents inside of a cup, and

23 they're brought to the back where a gentleman would test them.

24 **Q**    Who actually put the contents into the cup?

25 **A**    The patient.

1  **Q**   What was supposed to be in the cup?

2  **A**   Urine.

3  **Q**   What actually went into the cup?

4  **A**   Water.

5  **Q**   How do you know that?

6  **A**   Because it was clear.  It wasn't even the color of straw.

7  A lot of times when they tested it, it tested negative.

8  **Q**   Would you tell anyone about that?

9  **A**   Yes, sir.

10 **Q**   Who would you tell about that?

11 **A**   Mr. Faithful.

12 **Q**   Anybody else?

13 **A**   Dr. Craig.

14 **Q**   What was Dr. Craig's reaction when you told her that?

15 **A**   Retest them.

16 **Q**   What would happen?

17 **A**   Sometimes they refused to test again, or they say they

18 can't use the restroom.

19 **Q**   Would those people get prescriptions?

20 **A**   Yes, sir.

21 **Q**   Were there periods where you guys just didn't do any urine

22 testing at all?

23 **A**   Yes, sir.

24 **Q**   How long of periods would that happen for?

25 **A**   Three months sometimes.

1  **Q**   Three months of zero testing?

2  **A**   No testing.

3  **Q**   And would patients still get prescriptions for hydrocodone

4  during those three-month periods?

5  **A**   Yes, sir.

6  **Q**   Who paid for this urine testing?

7  **A**   Dr. Craig and Mr. Faithful.

8  **Q**   So, when there was no testing going on, who, if anyone,

9  made more money?

10 **A**   Dr. Craig and Mr. Faithful.

11 **Q**   I want to talk very briefly about the actual inside of the

12 clinic.

13              Did you guys do physical therapy at Gulfton?

14 **A**   No, sir.

15 **Q**   Did you guys have any physical therapy equipment at all?

16 **A**   Like, home massage chairs, the thing you cover your chair

17 with.

18 **Q**   Did you guys have, like, exercise ropes?

19 **A**   No, sir.

20 **Q**   What about medicine balls?

21 **A**   No, sir.

22 **Q**   Did you have any x-ray machines?

23 **A**   No, sir.

24 **Q**   Did you have x-ray readers?

25 **A**   No, sir.

1  **Q**    Did you have any stationary bikes?

2  **A**    No, sir.

3  **Q**    What about, like, elliptical machines?

4  **A**    No, sir.

5  **Q**    Treadmills?

6  **A**    No, sir.

7  **Q**    Did you have any free weights for any exercise or anything

8  like that?

9  **A**    No, sir.

10  **Q**    Did you have any exercise bands at Gulfton?

11  **A**    No, sir.

12  **Q**    Did you have any space at all for any person to do any kind

13  of physical therapy or exercise?

14  **A**    No, sir.

15  **Q**    Did you guys have any ultrasound machines?

16  **A**    No, sir.

17  **Q**    Did you guys have medical supplies?

18  **A**    Band-aids, tongue depressors, cotton balls, alcohol.

19  **Q**    You mentioned massage chairs.

20         MR. ARMSTRONG:  Government Exhibit 361 at 3, please,

21  Ms. Mortezavi.

22  BY MR. ARMSTRONG:

23  **Q**    What's that?

24  **A**    That's the chair.

25  **Q**    What kind of chair?

1  **A**     It's a regular chair with the massage covering.

2  **Q**     Were those the massage chairs that Gulfton actually had in

3  the clinic?

4  **A**     Yes, sir.

5  **Q**     Who ordered those chairs?

6  **A**     I did.

7  **Q**     How did you find them?

8  **A**     On Amazon.

9  **Q**     How much did they cost?

10 **A**     I believe they were, like, $29 each.

11 **Q**     Were they even plugged in?

12 **A**     Sometimes, yes.

13 **Q**     Sometimes not?

14 **A**     Sometimes not.

15 **Q**     Now, if those were the chairs you guys had in the clinic,

16 how many armed security guards were in Gulfton?

17 **A**     About three.  Three or four.

18 **Q**     And do you know how much it cost to have armed guards at

19 Gulfton?

20 **A**     It was expensive.

21 **Q**     How expensive?

22 **A**     Per week?  Because we had -- at one point we had two

23 different companies.  Sometimes $2,000, $3,000.  It would depend

24 on --

25                THE COURT:  A week?

1          THE WITNESS:  Yes, sir.

2 BY MR. ARMSTRONG:

3 **Q**    Did you guys have security cameras, as well?

4 **A**    Yes, sir.

5 **Q**    Where?

6 **A**    In the waiting area, in the office where I was, down the

7 hall near the triage rooms, Dr. Craig's office.  I'm just trying

8 to picture the clinic right now.

9 **Q**    Take your time.

10 **A**    There was one over the window where I worked, and one in

11 the back where the money was counted.

12 **Q**    Do you know how much those cameras cost?

13 **A**    Just the cost of the cameras I think was $800; and the

14 installment, I can't remember.

15 **Q**    $800 for all of the cameras or just one?

16 **A**    Just the set that was in the front of the office.

17          MR. ARMSTRONG:  Your Honor, would this be a good time

18 to stop?

19          THE COURT:  Yeah, this will be fine.

20          All right, ladies and gentlemen, thank you.  I'm

21 looking at the clock.  We put in a full day even though -- well,

22 not a full day but close to the maximum hours that's been my --

23 what is it, as I've seen it over -- through the years.  We're

24 doing fine.  The time is moving.

25          So, in any event, we'll see you tomorrow ready to

1  resume at 10:00 a.m.  Thank you and good afternoon.

2          THE COURT SECURITY OFFICER:  All rise.

3      (The jury recessed for the day at 6:01 p.m.)

4          THE COURT:  Ma'am, the witness, you may step down.

5              All right.  I'll have your time for you in just a

6  moment.

7              Okay, here's your time.

8          MR. WILLIAMS:  May we be excused, Judge?

9          THE COURT:  Yeah, excused for the day.

10     (Court recessed for the day at 6:03 p.m.)

11                    C E R T I F I C A T E

12

13      I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter, to
14  the best of my ability.

15

16  By: /s/ Gayle L. Dye_____        05-08-2018_____
        Gayle L. Dye, CSR, RDR, CRR          Date
17

18

19

20

21

22

23

24

25