4  UNITED STATES OF AMERICA          .
                                     . Criminal Action
5  VERSUS                            . No. H-17-CR-419
                                     .
6  GAZELLE CRAIG, D.O., and          . Houston, Texas
   SHANE FAITHFUL,                   . March 28, 2018
7                                    . 10:25 a.m.
                    Defendants.      .
8  . . . . . . . . . . . . . . . . . .

9
                 TRANSCRIPT OF PROCEEDINGS
10
         BEFORE THE HONORABLE DAVID HITTNER AND A JURY
11
                      DAY 8 OF 9
12
   APPEARANCES:
13
   FOR THE UNITED STATES OF AMERICA:
14
           Mr. Scott Philip Armstrong
15         Assistant United States Attorney
           UNITED STATES DEPARTMENT OF JUSTICE
16         1400 New York Avenue, NW
           Washington, DC  20005
17         202.355.5704
           scott.armstrong@usdoj.gov
18
           Mr. Devon Morel Helfmeyer
19         Assistant United States Attorney
           UNITED STATES DEPARTMENT OF JUSTICE
20         1000 Louisiana
           Suite 2300
21         Houston, Texas  77002
           713.567.9513
22         devon.helfmeyer@usdoj.gov

23

24
              PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

```
 1                        APPEARANCES

 2                        (continued)

 3  FOR THE DEFENDANT GAZELLE CRAIG, D.O.:

 4            Mr. Don E. Lewis
            ATTORNEY AT LAW
 5            1717 St. James Place
            Suite 625
 6            Houston, Texas  77056
            713.622.0318
 7            lewisfirm@aol.com

 8  FOR THE DEFENDANT SHANE FAITHFUL:

 9            Mr. Cornel A. Williams
            CORNEL A. WILLIAMS & ASSOCIATES
10            1405 Palm Street
            Houston, Texas  77004
11            713.520.5153
            FAX:  713.524.4528
12            willassoc@aol.com

13

14

15  COURT REPORTER:

16            GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8007A
17            Houston, Texas  77002
            713.250.5582
18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF WITNESSES

 2                                                      Page

 3  FOR THE DEFENDANT GAZELLE CRAIG, D.O.:

 4  GAZELLE CRAIG, D.O.
```

```
 5      CROSS-EXAMINATION (CONTINUED) BY MR. ARMSTRONG        5
        REDIRECT EXAMINATION BY MR. LEWIS                    12
 6      RECROSS-EXAMINATION BY MR. WILLIAMS                  34
        RECROSS-EXAMINATION BY MR. ARMSTRONG                 36
 7      FURTHER REDIRECT EXAMINATION BY MR. LEWIS            38
        FURTHER RECROSS-EXAMINATION BY MR. ARMSTRONG         41
 8

 9

10  EXAMINATION OF AGENT ANTHONY ARMOUR BY THE COURT         60
    EXAMINATION OF AGENT ANTHONY ARMOUR BY MR. ARMSTRONG     62
11  EXAMINATION OF AGENT ANTHONY ARMOUR BY MR. WILLIAMS      62
    EXAMINATION OF AGENT ANTHONY ARMOUR BY MR. LEWIS         64
12

13  EXAMINATION OF A JUROR BY THE COURT                      67
    EXAMINATION OF A JUROR BY MR. WILLIAMS                   71
14  EXAMINATION OF A JUROR BY THE COURT                      71
```

```
15
                            INDEX
16
    CHARGE OF THE COURT                                      78
17  GOVERNMENT'S CLOSING ARGUMENT BY MR. HELFMEYER           99
    DEFENDANT SHANE FAITHFUL'S CLOSING ARGUMENT
18      BY MR. WILLIAMS                                     129
    DEFENDANT GAZELLE CRAIG, D.O.'s CLOSING ARGUMENT
19      BY MR. LEWIS                                        155
    GOVERNMENT'S REBUTTAL ARGUMENT BY MR. ARMSTRONG         168
20

21

22

23

24

25
```

```
 1                      PROCEEDINGS
 2                    March 28, 2018
 3      (Jury not present.)
 4          THE COURT:  I just want to remind the attorneys right
 5  on Ellen's desk --
 6              If you'll hold that up.
 7              -- is the little green box.  I will do the same
 8  thing I did the last time.  I will go through all of the names
 9  up here, make sure everybody's in there, and put them back in;
10  but I always just invite everybody, if you want to look up and
11  make sure 14 names are there, you're welcome to.
12          MR. ARMSTRONG:  Thank you, Judge.
13          MR. WILLIAMS:  Yeah.  And I guess we'll do that prior
14  to.
15          THE COURT:  Pardon me?
16          MR. WILLIAMS:  Yeah.  We'll do that prior to.  That's
17  fine.
18          THE COURT:  Okay.  Whatever you want to do; but when I
19  -- when summation begins, that's up here; and I go through them
20  myself, okay, to make sure we have all 14?
21              All right.  Call the jury in, please.
22      (The jury was brought into the courtroom at 10:26 a.m.)
23          THE COURT:  All right, be seated, please.
24              Go right ahead, sir.
25          MR. ARMSTRONG:  Thank you, your Honor.
```

1      (The witness, **GAZELLE CRAIG, D.O.**, Defendant, called on her

2 own behalf, was previously sworn.)

3                        CROSS-EXAMINATION

4                          (continued)

5 BY MR. ARMSTRONG:

6 **Q**    Good morning.

7 **A**    Good morning.

8 **Q**    We left off yesterday talking about the patient file of

9 Charlotte Mason.

10              Do you recall those questions?

11 **A**   Yes.

12 **Q**   I want to shift gears and talk about Paul Fernandez.

13              You were here for his testimony, right?

14 **A**   Yes.

15 **Q**   And you saw him on the stand, right?

16 **A**   Yes.

17 **Q**   And you recognize this to be a picture of Paul Fernandez,

18 right?

19 **A**   Yes.

20       MR. ARMSTRONG:  Your Honor, at this time, we would

21 move to admit Government Exhibit 1002.

22       THE COURT:  Any objection?

23       MR. WILLIAMS:  No objection.

24       THE COURT:  It's admitted.

25       MR. ARMSTRONG:  Ms. Mortezavi, can we, please, pull up

1 Government's Exhibit 1002.

2 BY MR. ARMSTRONG:

3 **Q** Ma'am, that's a picture of Paul Fernandez, right?

4 **A** Correct.

5 **Q** And you heard his testimony that he has cirrhosis of the

6 liver, correct?

7 **A** Correct.

8 **Q** And that's a very serious medical condition, right?

9 **A** Correct.

10 **Q** And that is the type of condition that you would not

11 prescribe someone hydrocodone for if you knew that, right?

12 **A** Correct.

13 **Q** Now, you testified yesterday about how you would review

14 patient files for all new and pertinent information, correct?

15 **A** Correct.

16 **Q** What does that mean?

17 **A** I reviewed the files when patients came in for any new

18 information we may have received.

19 **Q** And what does that mean, "pertinent information"?

20 **A** Information that would be important to my care and

21 treatment of the patient.

22 **Q** And surely, it would be important to know if Mr. Fernandez

23 has cirrhosis of the liver or not, right?

24 **A** Correct.

25 　　　　MR. ARMSTRONG: Government Exhibit 345 at 88.

1  BY MR. ARMSTRONG:

2  **Q**    Ma'am, you recognize this to be a progress note of

3  Mr. Fernandez, correct?

4  **A**    Not my progress note but someone's progress note, yes.

5  **Q**    Okay.  You see his name in the top left corner of

6  Government Exhibit 245 at 88, right?

7  **A**    Yes, I do.

8  **Q**    And what is the date of this progress note?

9  **A**    It says encounter date is 10-14-2014.

10  **Q**    And that's in the top right corner of the progress note,

11  correct?

12  **A**    Yes.

13  **Q**    So, this is not your progress note, right?

14  **A**    Correct.

15  **Q**    But it does describe Mr. Fernandez and his medical

16  condition, right?

17  **A**    Correct.

18  **Q**    And this document was --

19        MR. ARMSTRONG:  Ms. Mortezavi, if we can flip it

20  around.

21              One more time, please.

22  BY MR. ARMSTRONG:

23  **Q**    Now, what is the fax header date of this document?

24  **A**    It says July 22, 2015.

25  **Q**    So, it was faxed to Gulfton, right?

1  **A**    I guess so.

2  **Q**    Well, it ended up in your file, right?

3  **A**    Yes.

4          MR. ARMSTRONG:  Government Exhibit 364 at 64.

5          MR. WILLIAMS:  364, I'm sorry?

6          MR. ARMSTRONG:  Yeah.  My apologies.  My mistake.

7               345 at 64, please.

8          MR. WILLIAMS:  Thank you.

9          MR. ARMSTRONG:  Court's indulgence, your Honor.

10              And your Honor, if we can, please, switch back to

11 the Elmo.  My apologies.

12         THE COURT:  My unit is dead again.  It keeps getting

13 unplugged in the back.

14 BY MR. ARMSTRONG:

15 **Q**   And ma'am, I'm looking at Paul Fernandez's file,

16 Government's Exhibit 345.

17              What does it say about whether Mr. Fernandez has

18 cirrhosis of the liver or not?

19 **A**   I see that it says cirrhosis of the liver.

20 **Q**   And that's for Mr. Fernandez?

21 **A**   Correct.

22 **Q**   So, you had information in your file saying that

23 Mr. Fernandez has cirrhosis of the liver but you still

24 prescribed him hydrocodone?

25 **A**   I never saw that in the file.

1 **Q**   This wouldn't be new and pertinent information about the

2 patient?

3 **A**   It would be pertinent, but I never saw it.

4 **Q**   Now, ma'am, after that document was faxed to Gulfton -- I

5 believe it was in July of 2015 -- how many prescriptions for

6 hydrocodone did you write to Mr. Fernandez?

7 **A**   I wouldn't remember that.

8 **Q**   Let's take a look.

9       MR. ARMSTRONG:  Government Exhibit 364 at 64, please

10 -- I'm sorry, 345 at 64.

11 BY MR. ARMSTRONG:

12 **Q**   This is a prescription to Mr. Fernandez, right?

13 **A**   Correct.

14 **Q**   How many pills of hydrocodone?

15 **A**   120.

16 **Q**   Let's do it this way.  I believe we went over this

17 information with Mr. Fernandez.  You were here for that

18 testimony, correct?

19 **A**   Correct.

20 **Q**   And when we went over this information with Mr. Fernandez,

21 I believe that the total volume of hydrocodone pills you

22 prescribed to him was in the ball park of 900; is that correct?

23 **A**   I don't know if that was referring to Mr. Fernandez or not.

24 **Q**   All right.  So, we have to go through it?

25 **A**   If you want to.

1  **Q**    Okay.

2            MR. ARMSTRONG:  Government Exhibit 345 at 64.

3  BY MR. ARMSTRONG:

4  **Q**    How many pills of hydrocodone did you prescribe to

5  Mr. Fernandez?

6  **A**    That's 120.

7  **Q**    Okay.

8            MR. ARMSTRONG:  Government Exhibit 364 at 63, please.

9  BY MR. ARMSTRONG:

10 **Q**    How many pills of hydrocodone did you prescribe to

11 Mr. Fernandez?

12 **A**    That's 120.

13           MR. ARMSTRONG:  Government's Exhibit 345 at 62.

14 BY MR. ARMSTRONG:

15 **Q**    How many pills of hydrocodone did you prescribe to

16 Mr. Fernandez?

17 **A**    That's 120.

18           MR. ARMSTRONG:  Government's Exhibit 345 at 61.

19 BY MR. ARMSTRONG:

20 **Q**    How many pills of hydrocodone did you prescribe to

21 Mr. Fernandez?

22 **A**    115.

23 **Q**    Was he on his phone that day?

24 **A**    I'm sorry?

25 **Q**    Was he on his phone that day?

1 **A**    No, I don't believe so.

2         MR. ARMSTRONG:  Government's Exhibit 364 at 60 -- I'm

3 sorry, 345 at 60.

4             Government's Exhibit 345 at 59.

5 BY MR. ARMSTRONG:

6 **Q**    How many pills did you prescribe to Mr. Fernandez?

7 **A**    120.

8 **Q**    Of hydrocodone, right?

9 **A**    Correct.

10         MR. ARMSTRONG:  Government's Exhibit 345 at 58.

11 BY MR. ARMSTRONG:

12 **Q**    How many pills of hydrocodone did you prescribe to

13 Mr. Fernandez?

14 **A**    120.

15 **Q**    If you trust my math, that is about -- more than 700 pills

16 of hydrocodone to Mr. Fernandez, right?

17 **A**    Sure.

18 **Q**    Is that correct or not?

19 **A**    I didn't do the math so I'm trusting your math.

20         THE COURT:  Let's assume that it is.

21             Keep moving.

22         MR. ARMSTRONG:  Thank you, your Honor.

23 BY MR. ARMSTRONG:

24 **Q**    Okay.  So, you prescribed over 700 pills to someone with

25 cirrhosis of the liver?

1  **A**    I was not aware that he had cirrhosis of the liver.

2  **Q**    So, you prescribed over 700 pills to someone who has

3  cirrhosis of the liver, right?

4  **A**    Now, I know he has cirrhosis of the liver.

5  **Q**    That wasn't my question, ma'am.  You prescribed over 700

6  pills to someone who has cirrhosis of the liver, right?

7  **A**    At that time, yes, correct.

8            MR. ARMSTRONG:  No further questions, your Honor.

9            THE COURT:  Do you pass the witness?

10            MR. ARMSTRONG:  Yes.

11            THE COURT:  Okay.

12            MR. LEWIS:  May I proceed, Judge?

13            THE COURT:  Yes, sir.

14            MR. LEWIS:  Can we have that 345 at 88.

15               May I approach, Judge?

16            THE COURT:  Yes.

17                    REDIRECT EXAMINATION

18  BY MR. LEWIS:

19  **Q**    Do you recall the fax number for Gulfton clinic, Dr. Craig?

20  **A**    No, I don't.  It actually changed a couple of times.

21  **Q**    Okay.  Would it be the number that's listed on your

22  prescriptions?

23  **A**    That would have been the number at that time, yes.

24  **Q**    Oh, so, it changed at one point, okay.

25  **A**    Exactly.

1 **Q** All right. Can you -- I think in response to

2 Mr. Armstrong, he asked you if this particular document was

3 faxed to Gulfton. Can you determine from looking at this

4 document whether or not it was faxed to Gulfton?

5 **A** At this time, I can't.

6 **Q** So, you're not sure whether or not Gulfton received this?

7 **A** Well, I know we received it because it was in the chart

8 but --

9 **Q** Okay. Did Mr. Fernandez at any time make you aware that he

10 had cirrhosis of the liver?

11 **A** No, he did not.

12 **Q** And I think according to his chart you saw him on at least

13 six encounters?

14 **A** Yes.

15 **Q** Yesterday, Mr. Armstrong asked you questions regarding

16 board certification.

17 Do you recall some of those questions, Dr. Craig?

18 **A** Yes.

19 **Q** Is board certification of a physician required in order to

20 treat a chronic pain patient?

21 **A** No.

22 **Q** In response to Mr. Armstrong yesterday, I think he also

23 asked you questions regarding whether or not the clinic

24 administrator had medical training -- I'm sorry, that was not

25 the question -- whether or not the individual that interviewed

1 you for your job had any medical training or not.

2                 Do you recall that?

3 **A**   Yes, I do.

4 **Q**   Okay.  As far as medical training, is a -- someone that's

5 interviewing you for a job, is that person required to have

6 medical training before they can interview you?

7 **A**   No, definitely not.

8 **Q**   Have you ever been interviewed for a job by someone that

9 did not have medical training?

10 **A**   Yes, absolutely.

11 **Q**   How many times?

12 **A**   Several times.

13 **Q**   Is a clinic administrator required to have medical

14 training?

15 **A**   No, they're not.

16 **Q**   Is a clinic manager -- a health clinic manager similar to

17 one at Gulfton, is that individual required to have medical

18 training?

19 **A**   No, they are not.

20 **Q**   Loren Phillips was a manager at Gulfton?

21 **A**   She was the clinic manager, yes.

22 **Q**   And as far as Loren Phillips, did Loren Phillips have

23 medical training?

24 **A**   No, she did not.

25 **Q**   Yesterday, Mr. Armstrong asked you questions regarding

Craig - Redirect/Lewis

1  risks and benefits of drugs.

2           Do you recall those questions?

3  **A**    Yes.

4  **Q**    How frequent does drugs have risks?

5  **A**    All drugs have risks.

6  **Q**    When you say "all drugs," would that mean prescription

7  drugs and non-prescription drugs?

8  **A**    That's correct.

9  **Q**    Are you familiar with aspirin?

10 **A**    Yes, I am.

11 **Q**    Does aspirin have a risk?

12 **A**    Absolutely.

13 **Q**    What happens when an individual -- well, first, before we

14 go there, what are the risks associated with aspirin?

15 **A**    The most concerning --

16           MR. ARMSTRONG:  Objection, your Honor.  Scope.

17           THE COURT:  Sustained.

18 BY MR. LEWIS:

19 **Q**    It is your testimony -- does aspirin have a serious risk of

20 death?

21           MR. ARMSTRONG:  Objection, your Honor.  Scope.

22           THE COURT:  Sustained.

23           Remember, now, it's going back to redirect.  It's

24 got to have been covered, to some extent, by the other lawyer in

25 order to go there.  So, that's when he says scope, it's beyond

1 the scope of what he claims was discussed during the first part

2 of the direct and the cross-examination.

3         Go right ahead.

4 BY MR. LEWIS:

5 **Q**    As far as risks are concerned, though, is it your testimony

6 that all drugs have risk?

7 **A**    Yes, they do.

8 **Q**    Does all drugs have serious risks?

9 **A**    Yes.

10 **Q**    And does all drugs have risks of death?

11 **A**    Yes.

12 **Q**    What steps do you take as a clinician at Gulfton clinic to

13 address the risks associated with the drugs that you prescribe?

14 **A**    The risks for -- maybe for the hydrocodone is outlined in

15 the pain contract that the patient signs.

16 **Q**    And same question as relate to the benefits of drugs that

17 you prescribed at Gulfton.

18 **A**    Yes.

19 **Q**    Is that addressed as part of your care of a patient at

20 Gulfton?

21 **A**    Yes, it is.

22 **Q**    Dr. Craig, have you ever been treated as a patient?

23 **A**    Yes, absolutely.

24 **Q**    As a new patient, did you sign intake forms?

25         MR. ARMSTRONG:  Objection, your Honor.  Scope.

1          THE COURT:  Sustained.

2  BY MR. LEWIS:

3  **Q**    When a patient goes to a doctor as a new patient, do they

4  normally sign intake forms?

5          MR. ARMSTRONG:  Objection, your Honor.  Scope.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes, they do.

8  BY MR. LEWIS:

9  **Q**    And based on your understanding and training, is the doctor

10  required to reread those forms to the question?

11  **A**    No, they are not.

12  **Q**    Dr. Craig, did you issue written prescriptions to Davis

13  Webster and Tonya Graham?

14  **A**    Yes, I did.

15  **Q**    And did you issue written prescriptions for hydrocodone and

16  Soma to both of these individuals?

17  **A**    Yes, I did.

18  **Q**    How would Davis Webster and Tonya Graham acquire those

19  medications?

20  **A**    They would have to have them filled at the pharmacy.

21  **Q**    Okay.  And at a pharmacy -- and that would be by a

22  registered pharmacist?

23  **A**    Yes.

24  **Q**    Based on your understanding and training, is a registered

25  pharmacist required to counsel a patient about medications on

1 each new prescription?

2 **A**    Yes, they are.

3 **Q**    And when I say "required to counsel," what does that mean?

4 **A**    They're required by law to explain the medication to the

5 patient.

6 **Q**    If a pharmacist inaccurately fills a prescription, is that

7 your responsibility?

8 **A**    No, it's not.

9 **Q**    Whose responsibility is it?

10 **A**    The pharmacist.

11 **Q**    Other than taking pictures of patient charts, what other

12 privacy concerns did you have about patients using their

13 telephone at Gulfton?

14 **A**    Well, a patient could also take a picture of another

15 patient with their phone.

16 **Q**    And would taking that picture be a wrongful disclosure of

17 that patient's identity?

18 **A**    Yes, it would.

19 **Q**    And would that be covered under HIPAA?

20 **A**    It would be a violation of HIPAA, yes.

21         MR. LEWIS:  Judge, I'm going to need the Elmo on,

22 please.

23              It says it's not detected, Judge.

24 BY MR. LEWIS:

25 **Q**    Dr. Craig, I'm showing you what has been admitted into

1 evidence as Government's Exhibit 900.

2          Do you recall getting questions regarding this

3 particular document yesterday from Mr. Armstrong?

4 **A**   Yes.

5 **Q**   And again, what is this document that's being depicted on

6 the screen?

7 **A**   That's my response to the Texas Medical Board.

8 **Q**   Now, yesterday, Mr. Armstrong had you read, I think, the

9 first two sentences.

10          Do you recall that?

11 **A**   Yes.

12 **Q**   Okay.  Now -- and this was a response in reference to a

13 notice letter that you received from the Texas Medical Board,

14 right?

15 **A**   That's correct.

16 **Q**   Would you read the sentence in that response starting at

17 "However."

18 **A**   "However, in response to the allegations, I believe that

19 they are completely baseless and unfounded.  In fact, one of the

20 allegations, failure to supervise delegates, doesn't even apply

21 to my current practice at all."

22 **Q**   And was that your response to the allegations that

23 Mr. Armstrong -- to the statutory grounds of allegations that

24 Mr. Armstrong asked you about yesterday?

25 **A**   Yes, that's correct.

1  **Q**    Could you read the next sentence regarding that response.

2  **A**    It says, "Although I believe that one can always find areas

3  in which they can make improvements, I have gone to great

4  lengths ever since I began working in this practice to ensure

5  that I am providing the expected standard of care according to

6  the laws that govern this particular area of medicine."

7  **Q**    What did you mean by that sentence, Dr. Craig?

8  **A**    My point was that I would never claim that I'm perfect.  I

9  can always make improvements.  But I'm doing as much as I can at

10  the time to make sure that I'm meeting the standard of care.

11  **Q**    Do you remember questions yesterday from Mr. Armstrong

12  regarding -- regarding urine drug screens?

13         MR. LEWIS:  Thank you.

14         THE WITNESS:  Yes.

15  BY MR. LEWIS:

16  **Q**    Before I go further, though, are you familiar with a --

17  with Chapter 170.3 of the Texas Administrative Code?

18  **A**    Yes, I am.

19  **Q**    And what is Chapter 170.3 of the Texas Administrative Code?

20  **A**    They are guidelines for the treatment of chronic pain.

21  **Q**    Based on your understanding of that chapter and that

22  regulation, are you required to conduct urine drug screens?

23  **A**    No, it's not required.

24  **Q**    Based on your understanding as a clinician and also your

25  education, what is the best practice of using the urine drug

1  screen?

2  **A**   When you do use urine testing, it's best to do it randomly

3  so the patient doesn't know when to expect it.

4  **Q**   Okay.  Now, Mr. Armstrong asked you questions regarding

5  Mr. Fernandez, Mr. Sedberry, and Ms. Robinson.

6           Do you remember questions related to whether or

7  not they took urine drug screens?

8  **A**   Yes.

9  **Q**   Why did you not give these patients a urine drug screen?

10  **A**   If we were selecting patients randomly, that means those

11  particular patients had not been selected.

12  **Q**   As far as the PMP report, what is your understanding of the

13  PMP report?

14  **A**   It is a database that gives information about controlled

15  substances that were prescribed to a particular patient.

16  **Q**   And are you familiar with ICD-10 codes?

17  **A**   Yes.

18  **Q**   And would that be synonymous -- well, could that be

19  synonymous to codes related to a diagnosis?

20  **A**   Yes.

21           MR. LEWIS:  I'm showing her 357 at 21.

22  BY MR. LEWIS:

23  **Q**   Dr. Craig, I'm now showing you what's been admitted into

24  evidence as Government's Exhibit 357 at page 21.

25           Are you familiar with this document?

1  **A**   Yes.

2  **Q**   And what is it?

3  **A**   It's a prescription that was written to Tonya Jackson.

4  **Q**   And was it a prescription that's issued by you?

5  **A**   Yes.

6  **Q**   Now, does this prescription indicate that -- a diagnosis

7  for Tonya Jackson?

8  **A**   Yes.

9  **Q**   And what does it indicate?

10  **A**   Right under her name next to diagnosis.

11  **Q**   Would that be here (indicating)?

12  **A**   There and at the top.

13  **Q**   Right here (indicating) --

14  **A**   Correct.

15  **Q**   -- myospasm?

16  **A**   Yes.

17  **Q**   And right here (indicating)?

18  **A**   Yes.

19  **Q**   And what would that diagnosis be?

20  **A**   Chronic lumbar pain.

21  **Q**   Okay.  Now, I think you just testified that you're familiar

22  with the PMP and how it works; is that correct?

23  **A**   Yes.

24  **Q**   And when the data from the pharmacy is uploaded to the PMP

25  system, does that data include the diagnosis for a patient?

1  **A**    No, it doesn't.

2  **Q**    So, when you looked at that report yesterday, that wouldn't

3  have been any reason for the diagnosis to appear on that report,

4  would it?

5  **A**    No.

6  **Q**    How was this report utilized in the Gulfton clinic?

7          MR. ARMSTRONG:  Objection, your Honor.  Asked and

8  answered.

9          MR. LEWIS:  I'll move on.

10          THE COURT:  That's sustained.

11          MR. LEWIS:  I'll move on.

12  BY MR. LEWIS:

13  **Q**    Dr. Craig, I'm going to direct you now to the screen that's

14  displaying Government's Exhibit 360 at 27.

15          Are you familiar with that?

16  **A**    Yes.

17  **Q**    And what is it?

18  **A**    It's a receipt for x-rays for David Webster.

19  **Q**    Okay.  And what is the date of that receipt?

20  **A**    5-15-2017.

21  **Q**    And what is significant about that receipt?

22  **A**    It shows that he got x-rays from One Step Diagnostic and

23  paid $35.

24  **Q**    On May the 15th?

25  **A**    On May 15, 2017.

1 **Q**    Okay.  And would that x-ray been pursuant to an x-ray order
2 that you authorized from Gulfton?
3 **A**    Yes.  He had received an x-ray order form from the clinic.
4 **Q**    Okay.  And was he seen in the clinic on May the 16th of
5 2017?
6 **A**    Yes, I believe so.
7 **Q**    Okay.  And that would -- and he would have taken that x-ray
8 before he was seen?
9 **A**    The day before.
10 **Q**    Okay.  Yesterday, Mr. Armstrong asked you some questions
11 regarding an individual.  I can't say the last name but the
12 first name is Hawraa or Hawraa?
13 **A**    Yes.
14 **Q**    Do you recall those questions?
15 **A**    I do.
16 **Q**    Was this individual qualified under your supervision to
17 perform the acts that they performed at the Gulfton clinic?
18           MR. ARMSTRONG:  Objection, your Honor.  Qualified how?
19           THE COURT:  All right.  Explain it.
20           MR. LEWIS:  I'll reask it.
21 BY MR. LEWIS:
22 **Q**    Was this individual qualified by their training in order to
23 perform the acts that they performed at Gulfton?
24 **A**    Yes, she was.
25 **Q**    And why were they qualified?

1   **A**   She was a medical doctor in her country.

2   **Q**   Yesterday, Mr. Armstrong asked you questions regarding

3   security cameras.

4                  Do you remember those questions?

5   **A**   Yes.

6   **Q**   And was there -- did you have a concern while you were

7   medical director at Gulfton that there was too many security

8   cameras in the clinic?

9   **A**   No, never.

10  **Q**   What was your opinion of the -- of the existence of those

11  security cameras?

12  **A**   I thought they were appropriate.

13  **Q**   And as far as location of the security cameras, do you

14  believe that they were placed appropriately?

15  **A**   Yes, I do.

16  **Q**   In response to questions yesterday regarding CAMs, I think

17  Mr. Armstrong asked you some questions.

18                  Do you recall those questions?

19  **A**   Yes.

20  **Q**   Before I ask you about them, I think he also brought up the

21  term "evidence-based."

22                  Do you recall that question?

23  **A**   Yes.

24  **Q**   And what does -- in relationship to a CAM, what does -- how

25  does evidence-based relate to a CAM?

1 **A**    Just means that research was done to study those

2 modalities.

3 **Q**    And would it mean that the research in this regard shows

4 that a CAM was effective for some type of treatment that the

5 patient needed?

6 **A**    It just means -- yes, generally.

7 **Q**    That it could be used --

8 **A**    Yes.

9 **Q**    -- in treating the patient?

10           Now, are you familiar with the -- well, is

11 massage a CAM?

12 **A**    Yes, it is.

13 **Q**    Is stretching a CAM?

14 **A**    Yes, it is.

15 **Q**    And are both of these CAMs evidence based?

16 **A**    Yes.

17 **Q**    I think you testified that you are familiar with Texas

18 Administrative Code 170.3 which is the chronic pain guidelines,

19 correct?

20 **A**    Yes.

21 **Q**    And are CAMs referred to under these guidelines?

22 **A**    Yes.

23 **Q**    Based on your understanding of those rules, are CAMs

24 required -- based on your understanding of those rules, is there

25 a certain number of CAMs that's required when you treat a

1 patient?

2 **A**    No, there's not.

3 **Q**    Now, I think in response to questions from Mr. Armstrong,

4 he asked you about individualized care for patients.

5           Do you recall those questions, Dr. Craig?

6 **A**    Yes.

7 **Q**    Now, he showed you that in reference to Amanda Robinson,

8 Alice Goulsby, and Paul Fernandez that they all received

9 prescriptions for the same amount of pills.

10           Do you recall that?

11 **A**    Yes.

12 **Q**    Now -- well, if they all received the same amount of pills,

13 how do you purport that they received individualized care?

14 **A**    The patients had indicated that Norco and -- specifically,

15 was working -- it was effective in treating their pain.  The

16 number of pills, that was one month supply.

17 **Q**    Okay.  And why did you prescribe a month supply?

18 **A**    Because the patients had to return every month.  We did not

19 authorize refills.

20 **Q**    And prescribing that amount of pills, based on your

21 education and training and your experience as a doctor, was that

22 within the standard of care?

23 **A**    Yes.

24 **Q**    And was that within the guidelines set forth by the

25 manufacturer, the FDA, and the CDC?

1  **A**    Yes.

2  **Q**    Yesterday, Mr. Armstrong asked you some questions regarding

3  a compliance binder.

4               Do you remember that?

5  **A**    Yes.

6  **Q**    And what types of things were included in your compliance

7  binder?

8  **A**    It was extensive, but it gives basic guidelines for

9  utilization of treatments in the practice.

10 **Q**    Was a document referred to -- and I think he referred to

11 it.  Was a document referred to -- referred to as a

12 Collaborative Practice Agreement included in your compliance

13 binder?

14 **A**    Yes, it was in there.

15 **Q**    And what is a Collaborative Practice Agreement?

16 **A**    It's an agreement between myself and mid-level providers.

17 **Q**    What does that agreement cover?

18 **A**    It covers a bunch of things that we have to agree upon for

19 them to work under my supervision.

20 **Q**    Why is that agreement used?

21 **A**    It's required by the Medical Practice Act.

22 **Q**    Yesterday, Mr. Armstrong asked you questions about some CME

23 courses that you had taken.

24               Do you recall that, Dr. Craig?

25 **A**    Yes.

1 **Q**    In 2017, how many CME courses did you complete?

2 **A**    In 2017?

3 **Q**    I'm sorry, in 2016.

4 **A**    I don't remember the specific number.  I think about ten.

5 **Q**    Okay.  And did you complete any in 2017?

6 **A**    No, I did not.

7 **Q**    Okay.  Now, the CME courses that you took, were they all

8 from the same CME provider?

9 **A**    No.

10 **Q**    What is your -- the CME courses that you took, do they

11 cover various areas related to treating a patient?

12 **A**    Yes.

13 **Q**    The CME courses that you took, did they cover areas

14 relating to chronic pain patients?

15 **A**    Yes.

16 **Q**    Was each one of those courses the same content?

17 **A**    No.

18 **Q**    And as far as the provider of that course, is the contents

19 of that course that provider's opinion?

20 **A**    Yes.

21 **Q**    Yesterday, I think Mr. Armstrong asked you questions

22 regarding the care for Patient Esther Magana.

23           Do you recall that?

24 **A**    Yes.

25 **Q**    And you did issue prescriptions for Esther Magana, did you

1 not?

2 **A** Yes, I did.

3 **Q** All right. In response to questions from Mr. Armstrong

4 yesterday, he asked you questions related to prescribing a

5 benzodiazepine, a Soma, and hydrocodone.

6 Do you recall those questions?

7 **A** Yes.

8 **Q** How many times did you prescribe a benzodiazepine for

9 Esther Magana?

10 **A** I never did.

11 **Q** Did Esther Magana, based on your review of her PMP report,

12 receive a prescription from Gulfton --

13 MR. LEWIS: Strike that question.

14 BY MR. LEWIS:

15 **Q** Did any patient that you treated at Gulfton receive a

16 prescription that -- or prescriptions that included a

17 benzodiazepine, Soma, and hydrocodone?

18 **A** No, they did not.

19 **Q** Why? Why didn't you prescribe that combination of drugs?

20 **A** Because I knew that particular combination was

21 contraindicated.

22 **Q** Yesterday, Mr. Armstrong asked you some questions -- well,

23 first, do you recognize this document from yesterday, Dr. Craig?

24 **A** Yes, I do.

25 **Q** And why do you recognize it?

1 **A**    It's regarding medical records on a patient Charlotte

2 Mason.

3 **Q**    Okay.  And that's one of the patients that we talked about

4 earlier this morning; is that correct?

5 **A**    I'm not sure we talked about her this morning.

6 **Q**    We talked about her yesterday afternoon then at the end of

7 the day?

8 **A**    Yes.

9 **Q**    Okay.  And I think Mr. Armstrong had you read some

10 information from this particular page?

11 **A**    Yes.

12 **Q**    Okay.  Yesterday, I think that Mr. Armstrong had you read

13 this sentence beginning "During."

14                    Do you recall that?

15 **A**    Yes, I do.

16 **Q**    And could you read that -- could you start reading that

17 sentence now for me.

18 **A**    "During her MICU stay, psych was consulted as family had

19 told MICU team that patient had taken a whole bottle of Ambien

20 while patient stated she had only taken one tab."

21 **Q**    Now, Mr. Armstrong did not ask you to read the next

22 sentence of this form, did he?

23 **A**    No, he did not.

24 **Q**    Can you read that sentence.

25 **A**    "Psych believes she has no current depressive episode and

1 having appropriate grief response to her husband's recent

2 passing."

3 **Q**   What does that mean to you?

4 **A**   That means that the psych team who came to evaluate her

5 says she was not having a depressive episode and she was

6 actually having appropriate grief response from her husband's

7 dying recently.

8 **Q**   Now, that is not a report that's been issued by you, was

9 it, Dr. Craig?

10 **A**   No, it was not.

11 **Q**   Well, Dr. Craig, I'm showing you a page that's also

12 included in the medical chart for Charlotte Mason.

13           Do you see that, Dr. Craig?

14 **A**   Yes.

15 **Q**   And does it indicate that this was in the medical chart for

16 Charlotte Mason when she was treated as a patient at Gulfton?

17 **A**   Yes.

18 **Q**   Do you recognize this form, Dr. Craig?

19 **A**   Yes, I do

20 **Q**   And how do you recognize this form?

21 **A**   It's one of Gulfton's follow-up exam forms.

22 **Q**   Did you sign this form?

23 **A**   Yes, I did.

24 **Q**   And was this form one of the documents used to assess

25 Charlotte Mason as a patient at Gulfton?

1  **A**    Yes.

2  **Q**    Now, this form in this area has some wording.

3              Do you see that, Dr. Craig?

4  **A**    Yes.

5  **Q**    And who entered that wording?

6  **A**    I wrote that.

7  **Q**    And could you read what that says to the jury regarding

8  Charlotte Mason?

9  **A**    Top says, "Needs x-rays.  Then, x-ray negative.  Patient

10  with history of respiratory failure.  Not use CPAP.  History of

11  non-compliance.  Will not continue to treat patient."

12  **Q**    What's the date that you entered that note, Dr. Craig?

13  **A**    It was February 11, 2016.

14  **Q**    What does that mean -- what you've just read to this jury,

15  what does that mean as relate to treating this patient?

16  **A**    Well, that was regarding a discussion we had had with the

17  patient.  She admitted that she wasn't using her CPAP machine

18  the way she needed to; and I, basically, told her, because she

19  wasn't -- that she wasn't being compliant, I couldn't continue

20  to treat her condition.

21  **Q**    Okay.  Now, on this date, you issued a prescription for

22  Ms. Mason, did you not?

23  **A**    Yes, I did.

24  **Q**    And why did you issue a prescription for Ms. Mason since

25  you were not going to treat her anymore?

1 **A**   That had to do with the requirement of continuation of
2 care.  I can't just abandon her.  So, I treated her with the
3 understanding that this is the last time I could treat her.
4 **Q**   Now, if you didn't treat this patient anymore, could that
5 affect how much economic benefit you would get from her as a
6 patient at Gulfton?
7 **A**   Yes.
8 **Q**   Is the notation that you just read to the jury, is that a
9 notation related to patient care?
10 **A**   Yes, it is.
11 **Q**   And do you believe you acted within the standard of care
12 when you reached that conclusion regarding Ms. Mason?
13 **A**   Yes, absolutely.
14          MR. LEWIS:  Pass the witness.
15          MR. WILLIAMS:  Turn the lights back on, please, your
16 Honor.  I'm not going to need any of these documents.
17          THE COURT:  Yes.
18                    RECROSS-EXAMINATION
19 BY MR. WILLIAMS:
20 **Q**   Dr. Craig, I'm Cornel Williams.  Just a few questions for
21 you, I'm sorry.
22          Now, I believe yesterday, upon examination from
23 Mr. Armstrong, you talked about that Mr. Faithful ran certain
24 activities of the clinic; is that correct?
25 **A**   Yes.

1  **Q**    Okay.  Did that include him running the medicine that --
2  the treatment of these patients that you did?
3  **A**    No, he had nothing to do with that.
4  **Q**    Did you ever discuss the patient care with Mr. Faithful?
5  **A**    No, I did not.
6  **Q**    Does Mr. Faithful have any medical training, to your
7  knowledge?
8  **A**    No, not to my knowledge.
9  **Q**    So, you wouldn't have any reason to discuss what you -- how
10  you would treat patients and what went on with patients with
11  Mr. Faithful, would you?
12  **A**    No.
13  **Q**    Did any of these patients ever inform you that they would
14  divert the particular drugs that you prescribed them to somebody
15  else?
16  **A**    No, no one ever told me that.
17  **Q**    And when these patients came in, isn't it true that you
18  relied upon what the patients told you in order to make a
19  diagnosis for what you would treat them for?
20  **A**    Yes, I did.
21  **Q**    And of course, we now know that Tonya Graham deceived you
22  in terms of what she told you in terms of -- when she visited
23  you; is that correct?
24  **A**    Yes, she did.
25  **Q**    And the same goes for Davis Webster; is that correct?

1 **A**    Yes, correct.

2         MR. WILLIAMS:  I have no further questions for this

3 witness, Judge.

4         MR. ARMSTRONG:  A few questions, your Honor.

5         THE COURT:  Okay.

6                     RECROSS-EXAMINATION

7 BY MR. ARMSTRONG:

8 **Q**    Ma'am, is it your testimony that if the patient didn't

9 understand how to take these risky addictive drugs, it was the

10 pharmacist's fault?

11 **A**    I said it was the pharmacist's responsibility to explain

12 the medications to the patient.

13 **Q**    But not your responsibility, right?

14 **A**    I did not have to repeat that information to the patient,

15 no.

16         THE COURT:  Repeat what information?

17         THE WITNESS:  My point is --

18         THE COURT:  The pharmacist hadn't given any advice yet

19 when you wrote a new prescription.

20         THE WITNESS:  My point is the patients had taken the

21 medications before coming to me.

22 BY MR. ARMSTRONG:

23 **Q**    And so, in your mind, your responsibility is over because

24 they had taken the drugs before?

25         MR. LEWIS:  Objection.  Asked and answered.

1          THE COURT:  Overruled.

2  BY MR. ARMSTRONG:

3  **Q**    And so, in your mind, your responsibility ends because they

4  had taken the drugs at some point before?

5  **A**    I didn't say that.  I said it wasn't required of me to

6  explain the medications again to the patient.

7  **Q**    So, you just didn't do it?

8  **A**    No, I did not until it was required.

9  **Q**    Now, you're not really trying to say that the risks of

10  ibuprofen are the same as the risks of hydrocodone, are you?

11  **A**    The most significant risks, yes, are the same.

12  **Q**    Seriously?

13  **A**    A patient can --

14          THE COURT:  Wait.  Hold it.

15          That's what she said, okay?

16          MR. ARMSTRONG:  Thank you, your Honor.

17          Ms. Mortezavi, if you can, please, pull up

18  Government's Exhibit 360 at 27.

19          THE COURT:  I need to flip the video, right?  Hang on.

20  BY MR. ARMSTRONG:

21  **Q**    Ma'am, this is the document that you went over with

22  Mr. Lewis just now, right?

23  **A**    Yes.

24  **Q**    Now, where in this document does it tell you what

25  Mr. Webster actually got x-rayed?

1  **A**    It does not say that on the receipt.

2  **Q**    So, did he get his head x-rayed?

3        THE COURT:  Speak up, counsel.

4  BY MR. ARMSTRONG:

5  **Q**    Did he get his head x-rayed?

6  **A**    He would have gotten x-rayed what I put on the x-ray order

7  form, which was his back.

8  **Q**    All right.  But according to this record that was very

9  important, it tells you nothing about what he actually got

10  x-rayed, right?

11  **A**    It does not say it on the receipt, no.

12  **Q**    Does the -- ibuprofen have a risk of respiratory failure?

13  **A**    No.

14  **Q**    Okay.  So, the risks are different between ibuprofen and

15  hydrocodone, right?

16  **A**    Yes, they are.

17  **Q**    So, it was false testimony you gave just a minute ago?

18  **A**    No.

19        MR. ARMSTRONG:  No further questions, your Honor.

20        MR. LEWIS:  Just a couple, Judge.

21        THE COURT:  Yes, sir.

22         MR. LEWIS:  Pull that back up, the receipt.

23                FURTHER REDIRECT EXAMINATION

24  BY MR. LEWIS:

25  **Q**    Dr. Craig, do you recall as part of your direct (sic)

1  examination Mr. Armstrong asking you questions regarding blank

2  x-ray request forms?

3  **A**    Yes, I do.

4         MR. ARMSTRONG:  Objection, your Honor.  Scope.

5         THE COURT:  Overruled.

6  BY MR. LEWIS:

7  **Q**    Would a -- that type of form been given to Mr. Webster in

8  order for him to get an x-ray?

9  **A**    Yes, exactly.

10  **Q**    And would that x-ray -- on that blank form, what did it

11  indicate the -- as the site for that individual's x-ray?

12  **A**    X-ray of the lumbar sacral spine.

13  **Q**    And why was that x-ray being requested?

14  **A**    For low back pain.

15  **Q**    And if Mr. Webster received that x-ray, he would have paid

16  for it with a -- the receipt that's being depicted is evidence

17  that he actually had that x-ray?

18  **A**    Yes.

19  **Q**    As far as ibuprofen -- I think Mr. Armstrong just asked you

20  questions regarding ibuprofen.

21         What strength ibuprofen did you prescribe to

22  Davis Webster?

23  **A**    I don't recall the strength.

24  **Q**    Hold on.

25         MR. LEWIS:  Could I have the Elmo on, Judge.

1          357, 21.

2  BY MR. LEWIS:

3  **Q**    I'm showing you what is Government's Exhibit 357 at 21; and

4  that's a prescription for Tonya Graham, not Davis Webster.  Is

5  there an order for ibuprofen that's being shown on the

6  prescription, Dr. Craig?

7  **A**    Yes.  For 800 milligrams.

8  **Q**    And would that have -- how does an individual get a

9  prescription for ibuprofen, 800 milligrams?

10  **A**    They would have to have it filled at the pharmacy.

11  **Q**    Can you go in and buy that off the counter?

12  **A**    Not in 800 milligram form.

13  **Q**    Okay.  So, that -- as far as ibuprofen, 800 milligrams is

14  concerned, are there any serious effects associated -- side

15  effects or adverse effects associated with ibuprofen, 800

16  milligrams?

17  **A**    Yes, there can be.

18  **Q**    And would those serious side effects or adverse effects be

19  similar to the same ones regarding opiates?

20  **A**    In excess, yes.

21  **Q**    What do you mean by "in excess"?

22  **A**    Basically, an overdose.

23          MR. LEWIS:  No further questions.

24          THE COURT:  Mr. Williams?

25          MR. WILLIAMS:  Nothing further from this witness, your

1 Honor.

2          THE COURT:  Government?

3                    FURTHER RECROSS-EXAMINATION

4 BY MR. ARMSTRONG:

5 **Q**    Ma'am, in your training and experience as a doctor, how

6 many people get addicted to ibuprofen?

7 **A**    I've never heard of anyone getting addicted to ibuprofen.

8          MR. ARMSTRONG:  No further questions.

9          THE COURT:  Mr. Williams?

10          MR. WILLIAMS:  No further questions, your Honor.

11          MR. LEWIS:  Nothing further, Judge.

12          THE COURT:  Mr. Lewis?  Nothing, okay.

13              Thank you, ma'am.  You may step down.

14              Call your next witness.

15          MR. LEWIS:  At this time, Judge, Defendant Craig

16 rests.

17          THE COURT:  Ladies and gentlemen, we need to take

18 about a five-minute break, just five minutes; and we'll be right

19 back with you.  So, we'll see you in about five minutes.

20          THE COURT SECURITY OFFICER:  All rise for the jury.

21    (The jury recessed at 11:19 a.m.)

22          THE COURT:  All right.  Mr. Williams, do you elect to

23 proceed with any witnesses in this case?

24          MR. WILLIAMS:  Other than, Judge, I think me and

25 Mr. Armstrong talked about those text messages when we first

1  started; but I don't think we agreed to -- well, I think we

2  agreed.  I just never let you know if we were going to introduce

3  them or not.  I would like to introduce those, and I'll rest

4  upon no objection.

5          They're just the text messages that I gave to you

6  on my exhibit list.  Text messages that you gave to me, okay, as

7  part of the particular discovery, I filed an exhibit list with

8  those; and you asked me if we were going to introduce those.

9          MR. ARMSTRONG:  I think that ship has sailed,

10  Mr. Williams.

11          MR. WILLIAMS:  Well, it hasn't been sailed.  I mean,

12  if you don't agree, I can move to introduce them now.

13          MR. ARMSTRONG:  No objection, your Honor.

14          THE COURT:  No objection.

15          What are they?

16          MR. WILLIAMS:  They're just text messages from the --

17  from Loren Phillips to some of the agents.  That's all.

18          THE COURT:  All right.  No objection, they're

19  admitted.

20          What number are they?  Well, work that out.

21          MR. WILLIAMS:  We'll work that out.

22          THE COURT:  Okay, work that out; and they'll be

23  admitted.

24          All right.  Aside from that, sir, do you desire

25  to call any witnesses?

1          MR. WILLIAMS:  No, sir, your Honor.

2          THE COURT:  All right.  Everybody can be seated.

3              Mr. Williams, if you want to discuss with your

4   client now and I'll ask a few questions like we did last time as

5   to his right to testify, his right to remain silent --

6          MR. WILLIAMS:  Absolutely.

7          THE COURT:  -- and what his election is.

8          MR. WILLIAMS:  Yes, sir, your Honor.

9      (Discussion off the record between Mr. Williams and

10  Defendant Shane Faithful.)

11         MR. WILLIAMS:  After consulting with my client, I

12  think it's his decision not to testify; but if the Court desires

13  to --

14         THE COURT:  Well, if you want to ask him a question or

15  two and then I'll briefly follow up.

16         MR. WILLIAMS:  Okay.

17             Now, Mr. Faithful, we've spoken regarding whether

18  you -- your right to testify in this particular matter, have we

19  not?

20         DEFENDANT SHANE FAITHFUL:  Yes.

21         MR. WILLIAMS:  And is it your desire at this point not

22  to testify at this particular time in this proceeding?

23         DEFENDANT SHANE FAITHFUL:  That's correct.

24         MR. WILLIAMS:  No further questions, Judge.

25         THE COURT:  All right.  Mr. Faithful, I just want to

1 reiterate that.  You understand under the laws and the

2 constitution you have the right to remain silent and not call

3 any witnesses in this case; is that correct, sir?

4             DEFENDANT SHANE FAITHFUL:  Yes, sir.

5             THE COURT:  You understand, though, that you have that

6 right to take the stand and to testify if you desire, correct?

7             DEFENDANT SHANE FAITHFUL:  Yes.

8             THE COURT:  And you've discussed this with your

9 attorney, both here in open court and in your communications

10 with your attorney, and it remains your desire not to testify in

11 this case; is that correct, sir?

12             DEFENDANT SHANE FAITHFUL:  That's right, your Honor.

13             THE COURT:  Okay.  Then, I'll accept that as a knowing

14 waiver of his right.

15                  All right.  Anything further, counsel?

16             MR. WILLIAMS:  Nothing further, your Honor.

17             THE COURT:  All right.  Let's talk about housekeeping

18 before we get them back in.  I have the jury instructions from

19 the last go-round.  Again, we'll do this formally.  But any

20 objections to the prior set of jury instructions as now

21 constructed --

22             MR. ARMSTRONG:  No, your Honor.

23             THE COURT:  -- by the Government?

24                  Any objections by the defense?

25             MR. WILLIAMS:  I think I'd like to object to Jury

1  Instruction Number 20, I think it is, or on page 20.

2        THE COURT:  Okay.  Which is?

3        MR. WILLIAMS:  I think that's the one regarding, if

4  they find him guilty of a conspiracy, they could then -- if the

5  conspiracy continues, they could then find him guilty of Counts

6  2, 3, and 4 based upon a continuing conspiracy, Judge.  I think

7  that's the one.

8        THE COURT:  What instruction is that?

9        MR. ARMSTRONG:  I believe that's the Pinkerton

10 instruction.

11       THE COURT:  What?

12       MR. WILLIAMS:  The Pinkerton instruction, that's

13 exactly what it was.

14       MR. ARMSTRONG:  The Pinkerton instruction, your Honor.

15       THE COURT:  The which one?

16       MR. ARMSTRONG:  The Pinkerton.

17       THE COURT:  Okay.

18       MR. WILLIAMS:  I think it was on either -- I think it

19 was either 20 or on page 20, if I remember correctly.

20       THE COURT:  Is it on page twenty --

21       MR. WILLIAMS:  I think it's on page 25.

22       THE COURT:  Right.

23       MR. WILLIAMS:  It's Number 20.  That's correct.

24       THE COURT:  I see it, yes.  So, you do object to that?

25       MR. WILLIAMS:  I do, your Honor.

1          THE COURT:  Okay.  That's overruled.  Objection

2   overruled.

3          MR. WILLIAMS:  Thank you.

4          MR. ARMSTRONG:  And your Honor, is Mr. Williams also

5   renewing, as well as Mr. Lewis, all of his prior objections to

6   the jury instruction from the last go-round?

7          MR. WILLIAMS:  Absolutely.  It was my understanding

8   that those would stand based upon the Court's previous rulings;

9   but yeah, we are reurging.

10              Thank you, Mr. Armstrong.

11         THE COURT:  Mr. Williams, do you also -- I mean,

12  Mr. Lewis, same -- you, also?

13         MR. LEWIS:  I'm reurging the same objections as the

14  last time.

15         THE COURT:  At that time, the objections are

16  overruled; and therefore, the jury instructions that we gave the

17  last time will be submitted once again.

18              Now, each side had what, an hour to sum up?  Was

19  that what we had -- how much each side?

20         MR. WILLIAMS:  I think that's what it was.

21         MR. LEWIS:  We had 40 minutes.

22         MR. WILLIAMS:  I think we had 30 or 40 minutes each;

23  and they had an hour, I think it was.

24         MR. LEWIS:  I think that's what it was.

25         MR. ARMSTRONG:  Your Honor, we would respectfully

1    request 75 minutes.

2            THE COURT:  75 minutes.  You need that amount -- so

3    you want -- the Government wants 75 minutes and defense, the

4    same time, I assume?

5            MR. WILLIAMS:  Well, Judge, I think the last time I

6    didn't even use all of the time.

7            THE COURT:  I know that.  He may not use his either.

8            MR. ARMSTRONG:  Correct.

9            MR. WILLIAMS:  In lieu of that -- and I don't know if

10   the Government used all of theirs last time.  And I don't think

11   there's very much else that's been presented from that last

12   trial to this particular trial.

13           THE COURT:  What's the suggestion of the defense?

14   Joint time of the defense is?

15           MR. WILLIAMS:  We can do whatever it was the last

16   time.  I think it was 40 minutes each.  I think --

17           MR. LEWIS:  It was.

18           MR. WILLIAMS:  -- if I remember correctly.

19           MR. LEWIS:  It was.

20           MR. WILLIAMS:  And I think the Government had an hour

21   total last time.

22           MR. LEWIS:  It was.

23           THE COURT:  All right.  Let's see.  So, the Defendant

24   40 minutes and 40 minutes, right?

25           MR. WILLIAMS:  Yes, sir, your Honor.

1          THE COURT:  And that comes up to 80 minutes, correct?

2          MR. WILLIAMS:  That's correct, your Honor.

3          THE COURT:  And you suggest the Government remain at

4    one hour, correct?

5          MR. WILLIAMS:  Yes, sir, your Honor.

6          THE COURT:  All right.  What I'll do, the Defendant --

7    each Defendant -- are you going to combine this or -- that's

8    each of you, if I remember.

9          MR. WILLIAMS:  Yeah.

10          THE COURT:  This one, you got to take 40 and 40.

11          MR. LEWIS:  Well, actually, last time, Judge, it's my

12    understanding that we were given the block amount of time; and

13    we could use it, you know, however way that we needed to as long

14    as we stayed within that amount of time.

15          MR. WILLIAMS:  Total time.

16          THE COURT:  All right.  The defense then will have --

17    will have 120 -- no, 80.

18          MR. WILLIAMS:  Yes.

19          THE COURT:  It will be 80 minutes.

20          MR. LEWIS:  Okay.

21          THE COURT:  And the Government will have 75.

22          MR. HELFMEYER:  Thank you, your Honor.

23          THE COURT:  We'll give you the 75.

24          MR. ARMSTRONG:  Thank you, Judge.

25          THE COURT:  All right.  Hang on.  Let's -- I can do

1 the bookkeeping.

2          Ellen, first of all, we might as well get that

3 cracking.  Okay.  You just need a cover sheet without the word

4 "copy" on it or just put something across it.

5          By the way, up at the top, it just shows a

6 document -- just a Document 78.  Anybody have a problem with

7 that?

8          MR. WILLIAMS:  Document as to the jury charge?

9          MR. LEWIS:  Jury charge?

10          THE COURT:  Jury charge.

11          Any objection by the Government?

12          MR. ARMSTRONG:  No, your Honor.

13          THE COURT:  Any objection by the defense?

14          MR. LEWIS:  No.

15          MR. WILLIAMS:  No.

16          THE COURT:  All right.  Then, with that same

17 notation --

18          Ellen, at the top.

19          By the way, it's no problem because this is when

20 it was originally filed; but it does state 2-06-18.  That should

21 have no aspect whatsoever.

22          Any objection by -- now by the Government?

23          MR. ARMSTRONG:  Your Honor, just to confirm, I believe

24 this is the second set of jury instructions that we filed, the

25 final one.  The first one --

1          THE COURT:  This is the final one that is going.  The

2  final one that's going does have that final notation on the top.

3                    Any objection by the Government?

4          MR. ARMSTRONG:  No, your Honor.

5          THE COURT:  Any objection by the defense?

6          MR. WILLIAMS:  No, your Honor.

7          MR. LEWIS:  No, your Honor.

8          THE COURT:  Okay.  So, no objection then to the

9  inclusion of that.  And we can get them running the same number

10  that we have.

11                    Let's get the jury out here.  I'm going to give

12  them what -- they can take a lunch break at this time.  They're

13  going to be all pleased anyhow as far as that it's getting

14  wrapped up.  And so, you can, also.  It's now, let's say, 11:30.

15                    We've heard the same objections.  A ruling has

16  been made.  So, we're there.  This is the final form.  I'm

17  talking with my staff, also.

18                    What time do you think we ought to have them back

19  because running the copies and then -- what do you think, Ellen,

20  quarter to 1:00 or 1:00?

21      (Side-bar discussion off the record between the Court and

22  the case manager.)

23          THE COURT:  We're going to get the jury back at 1:00

24  o'clock.  All right.  So -- and then, we'll have a few

25  additional instructions that we want to talk about.

1    MR. WILLIAMS:  Yes, sir, your Honor.

2         Your Honor, in terms of once they get back, I'm

3  assuming that the Court will read the particular charge, the

4  Government goes.  Is there a break somewhere in there, Judge,

5  because that's a long time?

6    THE COURT:  Yeah, we'll do that.  We'll do that

7  ourselves.  We will do that.  Let's get the jury in and Ellen

8  can start this -- the mechanics going; and we'll talk about that

9  as soon as you get back as far as the time, when do you want

10  your notices and breaks, okay?

11         Let's call the jury back in.

12         Mr. Williams, I'm going to ask you, again, of

13  course, like I did, do you desire to call any witnesses; and

14  you'll announce it; and then, I'll announce that the case is

15  over.

16    MR. WILLIAMS:  Yes, sir, your Honor.

17    THE COURT:  All right.  Let the record reflect that

18  the attorneys have also taken a look at all the names in the

19  green box.

20    MR. ARMSTRONG:  Are you going to pull the names now?

21    THE COURT:  Pardon me?

22    MR. ARMSTRONG:  Are you going to pull the names now?

23    THE COURT:  No.  After everything is argued.  But no,

24  if you want to look at them, make sure that they're there; and

25  you can see me during your closing that I'll be going through

1 every one again.  So, it's a triple check.

2                    MR. ARMSTRONG:  Thank you, your Honor.

3                    THE COURT SECURITY OFFICER:  All rise for the jury.

4          (The jury was brought into the courtroom at 11:30 a.m.)

5                    THE COURT:  Be seated.

6                    All right.  Now, at this time, I ask

7 Mr. Williams, Mr. Williams, do you elect and does your client

8 elect to put on any additional witnesses in this case?

9                    MR. WILLIAMS:  No, your Honor, we do not.

10                   THE COURT:  All right.

11                   So, ladies and gentlemen, the case is done.  We

12 are going -- going -- not right at the moment.  Every case that

13 goes to a jury goes on a set of instructions and questions.

14 This is the draft.  This is it, okay?  I've gone over it with

15 the attorneys.  We're going to go over it briefly again, and I'm

16 going to set the time limits.  Then, Ellen has to run one copy

17 for each one of you.  You'll have a copy of this to read as we

18 get back.

19                   The attorneys have requested, and I've granted

20 the following time for them to sum up.  So, first of all, I need

21 to read this.  It goes quicker than it looks because a lot of

22 the pages have -- are short; and it's all in 14-point type,

23 double spaced.  So it takes me, I would say, about -- oh, about

24 a minute a page.

25                   So, what we're going to do when we get back in,

1  you'll get in, you'll have these in front of you.  I will read
2  it, which I'm required to do; and you'll follow along.  Then,
3  the Government will open its case, open their summation.
4  They've got the burden of proof.  So, what we're going to do,
5  they're going to use -- I gave them 75 minutes and a total of 80
6  minutes to the defense total; and they can split it up like they
7  need to.
8              So, I read it.  Then, the Government goes.  And
9  they'll probably reserve some time.  So, if they have 75
10  minutes, they may talk to you for an hour and reserve that 15
11  minutes to wrap up because they have the right to go last as
12  well as going first.
13              Then, we'll hear from both Defendants, the
14  defense counsel; and they'll visit with you as to their
15  interpretation and discuss the charge with you and review the
16  evidence.  Then, we'll wrap it up with the Government.
17              We're going to have to do some academics here;
18  and also, you need a lunch break.  So, what we're going to do is
19  this:  We're going to take a break right now, and I'm working
20  with the attorneys on any comments they have to this; then, the
21  ability to run all the copies and have it ready for you and,
22  also, the schedule.
23              More than likely, I will read it to you.  We'll
24  hear the Government's opening and then pause for a short break.
25  Then, we'll hear all the defense case and then whatever few

1  minutes they have to wrap up.  Then, you will have the case for

2  your decision.

3           So, I want to thank everybody for working

4  together; and we got this working.  So, as far as the jury is

5  concerned, we will see you back ready to resume at 1:00 p.m.

6  when we will -- we will commence the closing arguments in the

7  case.

8           Thank you and we'll see you at that time.

9           THE COURT SECURITY OFFICER:  All rise for the jury.

10     (The jury recessed at 11:33 a.m.)

11           THE COURT:  All right.  Government, you got 75

12  minutes.  When do you want your first and only notice on your

13  opening, after how much time has gone passed?

14           MR. HELFMEYER:  45 minutes, your Honor.

15           THE COURT:  Okay.  45 minutes gone.

16           Now, as far as the defense goes, you'll get two

17  notices.  The first one after how much time has gone passed?

18           MR. WILLIAMS:  30 minutes, Judge.

19           THE COURT:  Okay.  And on your -- whoever is up, what

20  notice do you want before you have to sit down, how much time

21  left, how many few minutes left and then sit down?

22           MR. WILLIAMS:  Probably -- well, let's rearrange that,

23  Judge -- well, that's fine.  30 minutes and then a two-minute

24  warning, that's fine.

25           THE COURT:  Okay.  And then, two minutes left.

1          MR. LEWIS:  Yeah.

2          THE COURT:  All right.  On your last go-round with the

3   Government, you get one notice after how much time you have

4   left?

5          MR. ARMSTRONG:  At the two-minute warning, your Honor.

6          THE COURT:  Okay.  All right.  We got the case moving

7   along.  We have 75 minutes there, and we have 80 minutes on this

8   end.  All right.

9          Ellen, is there anything else we need?  I think

10  we've covered everything.

11          All right.  Thanks for your work on it.  We'll

12  see you back ready to go at 1:00 p.m.  We stand adjourned.

13          I'm going to sit up here and do a little bit of

14  book work for about one minute; and then, I'll be out of here.

15  (Court recessed at 11:36 a.m.)

16  (Court resumed at 1:24 p.m.; jury not present.)

17          THE COURT:  Okay.  I understand we have some matters

18  to discuss.  We have an objection to the jury instructions since

19  it's got that wording across the top; and we've already run,

20  what, how many pages is it?

21          All right.  If we have to rerun them again, we'll

22  -- we'll do it; but that will throw us behind and probably not

23  be able to have any kind of deliberation or anything today; but

24  we're glad to do it if we have to.

25          So, we have an objection -- in effect, you want

1  to state the objection?  It's, basically, what we talked about,

2  that there's some sort of a header from the prior -- from the

3  prior -- it's not even a header from the prior case.

4          It just says when the jury instructions were put

5  online which was February 6, 2018.  So, we stand ready to redo

6  the whole pack; but it will throw us back another hour.

7          MR. LEWIS:  Judge, I think I was probably the primary

8  reason for creating this problem; but it was brought to my

9  attention, after reviewing the record, that that was addressed

10 prior to us breaking; and at that time, I clearly stated I

11 didn't have any issues with that being there.

12         THE COURT:  But now you do?

13         MR. LEWIS:  No, I do not.  I'm going to withdraw my

14 objection.

15         THE COURT:  Withdraw it?  Okay, fine.  Then, we're

16 ready to go.

17         Ellen.

18 (Side-bar discussion off the record between the Court and

19 the case manager.)

20         THE COURT:  All right.  The other thing is we have one

21 guy -- one of the jurors is under the weather, but he's doing

22 okay, doing okay.

23         The other thing is -- you may be seated -- it was

24 reported to the case manager -- and I have -- I don't have too

25 much details that -- and I'm not saying which juror it is, male,

1  female, or whatever, okay?  One of the jurors who had not

2  discussed this with anyone except with one CSO at one point

3  stated when he or she got on the elevator yesterday to depart

4  that one of the agents got on the elevator with her and was --

5  tried to engage in just some sort of chitchat and then,

6  apparently, was -- according to what we hear, kind of followed

7  the juror out of the courthouse.

8              And the juror said if the agent had come in after

9  the person when she got into the parking garage, she would have

10 come around and reported it, in other words, that she was being

11 tailed.  That's all I know.

12             So, what's your suggestion on handling this

13 matter?

14      MR. ARMSTRONG:  Your Honor, are you referring to a

15 Government agent or a defense agent?

16      THE COURT:  Government.  That's how it was related to

17 me.  I haven't taken any testimony or whatever, but that's all I

18 hear.  They mentioned it to my case manager who brought it to

19 me.

20             It's always something in the business we're in,

21 isn't it?  Always something.

22             What's the Government's position?

23      MR. ARMSTRONG:  Your Honor, I've never encountered

24 this kind of issue before.

25      THE COURT:  I've encountered all sorts of stuff over

1 the years.

2          MR. ARMSTRONG:  I'm trying to think as fast as I can.

3              We would propose maybe that juror be one of the

4 alternates since no one knows who it is.

5          MR. WILLIAMS:  It depends on who it is, Judge.

6          THE COURT:  I'm not going to say who it is because the

7 facts are what they are.

8          MR. WILLIAMS:  I understand.  I think the juror should

9 be taken on voir dire by the Court as to if that's going to

10 affect what she's doing here today, Judge.

11          THE COURT:  Well, I --

12          MR. WILLIAMS:  I think we should bring her out and ask

13 her about the particular episode, and let's figure out what it

14 is, and let's get to the bottom of it.

15          THE COURT:  All right.

16          MR. LEWIS:  I would like to know more on behalf of

17 Defendant Craig about what happened in that interaction.

18          THE COURT:  Do you want to see whether or not any of

19 your agents were the guy that they were referring to?

20          MR. ARMSTRONG:  If the Court would give us a minute.

21          THE COURT:  Yeah.  I'll sit right here.

22              I think it might have been some of your agents

23 across the back.

24          MR. WILLIAMS:  That's consistent with the testimony.

25          THE COURT:  Pardon me?

```
 1              MR. WILLIAMS:  Withdraw that, Judge.
 2              THE COURT:  Hey, all we're doing is making an inquiry.
 3                  Mr. Armstrong.
 4              MR. ARMSTRONG:  Thank you, your Honor.  After
 5   conferring with the agent, he relayed to me what he said
 6   happened.  I think --
 7              MR. WILLIAMS:  And Judge --
 8              THE COURT:  Hold it.  Wait a second.  No.  I need to
 9   hear this.
10              MR. ARMSTRONG:  I think that if the route we're going
11   to go is to make an inquiry, it should be done in camera by the
12   Court.
13              THE COURT:  I'm not doing it in camera.  I never do it
14   in camera.  I don't think that's right.  This is an open court.
15              MR. ARMSTRONG:  Okay.  Well, then, we would first
16   request that this juror be struck as one of the alternates and,
17   if not, then to make an inquiry.
18              THE COURT:  All right.
19                  What's your position?
20              MR. WILLIAMS:  I would still like to have more
21   information from the particular juror to see if it's going to
22   affect her deliberations -- him or her, deliberations in terms
23   of what's going on; and then, I would like to hear from the
24   particular agent, too, Judge, because there's always two sides
25   to the story.
```

1          THE COURT:  All right.  Get the agent up here, please.

2  We'll do that first.

3          MR. ARMSTRONG:  Mr. Armour.

4          THE COURT:  Sir, raise your right hand to be sworn.

5      (The witness, **ANTHONY ARMOUR,** was sworn.)

6                          **EXAMINATION**

7          THE COURT:  Please have a seat.

8              All right.  State your name, sir.

9          SPECIAL AGENT ANTHONY ARMOUR:  Anthony Armour.

10         THE COURT:  How do you spell it?

11         SPECIAL AGENT ANTHONY ARMOUR:  A-n-t-h-o-n-y,

12  A-r-m-o-u-r.

13         THE COURT:  Were you the agent that visited with -- at

14  least had a -- intersected with this juror at one point?

15         SPECIAL AGENT ANTHONY ARMOUR:  Yes, Judge.

16         THE COURT:  What went on?

17         SPECIAL AGENT ANTHONY ARMOUR:  So, as I was leaving,

18  she caught the elevator; and I was there, also.  So, I caught

19  the elevator with her.  As we were leaving and going downstairs,

20  I made a comment, "It's been a long day"; and she said -- what

21  did she say?  She said, "It has been a long day"; and she said,

22  "But I'm alert"; and that was the extent of the conversation.

23         THE COURT:  That was it?

24         SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

25         THE COURT:  All right.  Did you follow her out of the

1   building?

2          SPECIAL AGENT ANTHONY ARMOUR:  As we were leaving

3   outside the building, she left.  She made the right as she was

4   leaving the courthouse -- or the courthouse.  I went to go get

5   my gun; and as I was leaving, she was in front of me.

6          THE COURT:  I don't understand.  In other words, the

7   elevator opens and you went to get your gun?

8          SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

9          THE COURT:  Where is that, downstairs?

10         SPECIAL AGENT ANTHONY ARMOUR:  Downstairs to the right

11  as you're exiting the building.

12         THE COURT:  Right, correct.

13         SPECIAL AGENT ANTHONY ARMOUR:  And she was already

14  exiting.

15         THE COURT:  Okay.

16         SPECIAL AGENT ANTHONY ARMOUR:  So, when I leave, after

17  I retrieve my gun and after I leave the courthouse, sir, I'm

18  walking behind her; but I'm, at least, like, 20 feet behind her.

19         THE COURT:  All right.

20         SPECIAL AGENT ANTHONY ARMOUR:  And that was it.

21         THE COURT:  Well, did she go into -- into a parking

22  garage?

23         SPECIAL AGENT ANTHONY ARMOUR:  I don't know where she

24  went.  I didn't follow her.

25         THE COURT:  How far behind her were you at any time?

1          SPECIAL AGENT ANTHONY ARMOUR:  Probably 15, 20 feet at

2    the max.

3          THE COURT:  And that was the only interaction you had

4    in the elevator and the outside?  You went to get your gun.  So,

5    you were that amount of time behind her, correct?

6          SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

7          THE COURT:  All right.

8               Questions, Government?

9                          **EXAMINATION**

10         MR. ARMSTRONG:  So, Mr. Armour, it's your

11   understanding that after you exited the elevator, how long were

12   you getting your gun for?

13         SPECIAL AGENT ANTHONY ARMOUR:  Less than a minute.

14         MR. ARMSTRONG:  Okay.  And she hadn't left yet.  And

15   she walked out and you walked out?

16         SPECIAL AGENT ANTHONY ARMOUR:  She was already walking

17   out as I was going to get my gun.

18         MR. ARMSTRONG:  No further questions, your Honor.

19         SPECIAL AGENT ANTHONY ARMOUR:  Anything further?

20                          **EXAMINATION**

21         MR. WILLIAMS:  Were you aware that this person was on

22   this jury?

23         SPECIAL AGENT ANTHONY ARMOUR:  Yes.

24         MR. WILLIAMS:  How long have you been a DEA agent?

25         SPECIAL AGENT ANTHONY ARMOUR:  14 years, sir.

1          MR. WILLIAMS:  And you're aware of the rules in not

2  engaging the particular jurors, are you not?

3          SPECIAL AGENT ANTHONY ARMOUR:  I don't believe that

4  was a particular rule not to engage in the juror.

5          MR. WILLIAMS:  Okay.  All right.  And just for

6  clarification purposes, when she got off the elevator, she left

7  the particular building, did she not?

8          SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

9          MR. WILLIAMS:  Okay.  And while she was leaving the

10  building, you were detained briefly enough to get your gun; is

11  that correct?

12          SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

13          MR. WILLIAMS:  All right.  And it's your testimony now

14  that you were only 20 feet behind her after waiting a minute

15  while she's walking to her car?  Is that the testimony?

16          SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.  I have to

17  retrieve my weapon and then sign out, yes, sir.

18          MR. WILLIAMS:  Okay.  All right.

19                  No further questions, Judge.

20                  Well, let me ask you this:  Can you identify who

21  the juror was?

22          THE COURT:  I'll take care of that.

23          MR. WILLIAMS:  Okay.

24          THE COURT:  I'll take care of that.

25          MR. WILLIAMS:  All right.

1              THE COURT:  Counsel, Mr. Lewis?

2                        **EXAMINATION**

3              MR. LEWIS:  Mr. Armour, I'm Don Lewis.  I think you

4    know who I am, right?

5              SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

6              MR. LEWIS:  How fast was this juror walking?

7              SPECIAL AGENT ANTHONY ARMOUR:  Normal speed.

8              MR. LEWIS:  And while she was walking normal speed,

9    you went -- you went inside to retrieve your weapon?

10             SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

11             MR. LEWIS:  And about -- about -- it took you about a

12   minute in order for you to do that?

13             SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

14             MR. LEWIS:  And she only gained a distance of 20 feet

15   between the two of you during the time that that happened?

16             SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

17             MR. LEWIS:  Do you know whether or not this juror

18   stopped or slowed down or something detained her before you

19   actually retrieved your weapon and started to walk behind her?

20             SPECIAL AGENT ANTHONY ARMOUR:  I don't know, sir.  I

21   wasn't paying attention.

22             MR. LEWIS:  Mr. Armour, were you an agent that's been

23   involved in the investigation of the Gulfton clinic?

24             SPECIAL AGENT ANTHONY ARMOUR:  Yes, sir.

25             MR. LEWIS:  And what was your involvement?

1          SPECIAL AGENT ANTHONY ARMOUR:  I assisted in all

2    surveillance.

3          MR. LEWIS:  So, as a DEA agent and as someone in

4    court, you were aware that jurors were not supposed to be

5    approached by anyone connected to this case?

6          SPECIAL AGENT ANTHONY ARMOUR:  I didn't approach her,

7    sir.

8          MR. LEWIS:  Did she say anything to you other than

9    what you've said here?

10         SPECIAL AGENT ANTHONY ARMOUR:  She said -- I'm trying

11   to remember -- that it's been a long day and that she was -- she

12   was alert.

13         MR. LEWIS:  Nothing further.

14         THE COURT:  All right.

15         Thank you, sir.  You may step down.  You can stay

16   in the room.

17         I'm just looking back at the instructions I give

18   to every juror.  It says, first of all, we don't -- let's see.

19   We do not desire that you decide who you like and who you

20   dislike and try to decide the case accordingly; therefore, you

21   will have no contact with anyone related to this case.  This

22   includes the attorneys, the parties, and the witnesses.  You may

23   say good morning or good afternoon to them as you pass them in

24   the hall, but you may say nothing further.  You certainly will

25   not accept from nor extend to anyone related to this case any

1 favors, however slight.

2          Those were the instructions.  I give it to every

3 single jury.  You still want to call the juror out?

4          MR. ARMSTRONG:  Your Honor, we would still move to use

5 one of the alternate positions for this juror.  It, obviously,

6 bothered her enough to contact the case manager; and we would

7 have significant concerns about her impartiality going forward.

8          THE COURT:  Meaning what?  You think she would be

9 leaning which way, at least, your perception?

10          MR. ARMSTRONG:  Our perception is that this incident

11 may have swayed her ability to fairly and accurately and

12 impartially look at the evidence.

13          THE COURT:  All right.

14          Defense?

15          MR. WILLIAMS:  I would like to hear from her, your

16 Honor.  We don't know who it is.  This jury makeup, there are 14

17 particular members of this makeup.  There are two

18 African-Americans.  If it's an African-American that was

19 approached, Judge, it would unfairly imbalance the makeup of

20 this particular jury as it relates to African-Americans on the

21 particular jury.

22          THE COURT:  All right.  Let's call --

23          MR. WILLIAMS:  I think that would be with Batson,

24 Judge.

25          THE COURT:  I understand that.  I've written articles

1    on that.

2              MR. WILLIAMS:  I understand.  I understand.

3              THE COURT:  Let's call the juror in.

4              MR. ARMSTRONG:  And your Honor, you'll do the

5    questioning?

6              THE COURT:  I'll do the questioning.  I'll then -- I

7    may probably turn it over to -- I'm going to do the questioning.

8         (A juror was brought into the courtroom.)

9              MR. WILLIAMS:  Just what I thought.

10                           **EXAMINATION**

11             THE COURT:  Yes, ma'am, okay.  How are you?  Now, you

12   see -- now, you see -- every one is here.  We just want to visit

13   with you a little bit.

14             A JUROR:  Okay.

15             THE COURT:  State your name, if you would, for the

16   record.

17             A JUROR:  ███████████.

18             THE COURT:  ███████████, did you have any interaction,

19   however slight, with anyone related to this case yesterday?

20             A JUROR:  Yes, sir, I think so.

21             THE COURT:  You think so?

22             A JUROR:  Yes, sir, I do.  I did.

23             THE COURT:  I mean, yeah, it was reported that, at

24   least, you did.

25             A JUROR:  I did.

1      THE COURT:  Give us your scenario of what happened

2 completely.

3      A JUROR:  Well --

4      THE COURT:  No, forget it.  You're not accused of

5 anything.  We just need to know.

6      A JUROR:  When I left -- you dismissed us yesterday,

7 everybody went ahead and went; and I went to the ladies'

8 restroom right here.  And so, everybody else had walked out.

9 So, I was rushing trying to get out; and as I was walking down

10 the aisle -- I didn't really turn and look this way because I

11 just didn't want to look that way.

12           But I saw a little glimpse out of my eye.  I saw

13 someone with a light blue shirt, and I think they were sitting

14 down, but I sort of rushed and went on to the elevator.  And

15 that person got up, came behind me, and got in the elevator with

16 me.

17           And then, he leaned up -- I was on one side and

18 he was on the other side.  He leaned up and he says -- to get it

19 straight, he said, "These are some very long days, aren't they?"

20 I looked at him and I said, "Well, you've been here as long as I

21 have, the same amount of time that I have."  And then, he

22 laughed and he said something like "It's been hard for me to

23 stay awake, huh?"  And I said, "No, that's not my problem."

24           And then, I rushed out of the elevator and got to

25 the door.  He was still behind me.  So, I felt -- I felt

1 uncomfortable.  So, then, I just sort of said, "You can go ahead
2 in front of me"; and so, I just act like I was looking in my
3 purse for something; and then, he went through another door.  I
4 didn't really look, but I thought he was gone.

5          But once I went through the glass doors -- and I
6 could hear somebody coming from behind and I turned around and I
7 looked and I was like, "Huh."  So, then, I said, "When I go to
8 my car, if he follows me, then I'm going to turn right back
9 around and come in here."  I just felt uncomfortable.  But he
10 kept walking straight.

11          I don't know if that meant anything or not; but I
12 didn't give him the opportunity to, you know --

13          THE COURT:  Let me ask you this:  Looking back on
14 this, does it mean anything to you, positive or negative?  By
15 the way, only you know this.

16          A JUROR:  Yes, only me knows this.

17          THE COURT:  Only you know this.

18          A JUROR:  Right.

19          THE COURT:  And you know him to be an agent on the
20 Government's side.

21          A JUROR:  Right.

22          THE COURT:  Only you know this.  There's no right
23 answer or wrong answer.  We just need to know.

24          A JUROR:  Huh.  I just felt uncomfortable about it,
25 you know.  But what was your question?

1           THE COURT:  I say only you know.

2           A JUROR:  And you said do I look at it as being a

3 what?

4           THE COURT:  I forgot what.

5           A JUROR:  A positive or a negative?

6           THE COURT:  Yeah.  In other words, as far as this case

7 goes.  You know, you were selected because you were able to call

8 it right down the center.  Now, you've had some interaction, an

9 uncomfortable interaction, you believe, with someone who is

10 aligned --

11          A JUROR:  Right.

12          THE COURT:  -- with the Government's side of the case.

13          A JUROR:  Right.  I don't think that will influence me

14 at all.

15          THE COURT:  You don't think?

16          A JUROR:  I know that won't influence me at all.

17          THE COURT:  Why not?

18          A JUROR:  Because I'm able to discern based upon what

19 was presented here today; and I have -- I don't know what that

20 person's intentions were; but I know what my intentions were is

21 not to, you know, jeopardize this case in any way.  So, I'm

22 pretty -- I'm hundred percent certain that it has no effect on

23 me.  I just felt a little uncomfortable, you know, leaving and

24 someone was walking behind me, you know, and all my other peers

25 were gone.

1          THE COURT:  Any questions?

2          MR. ARMSTRONG:  No, your Honor.

3          THE COURT:  Defense?

4                    **EXAMINATION**

5          MR. WILLIAMS:  So, ma'am, am I hearing from you that

6   this incident wouldn't sway your deliberations one way or the

7   other if you still were on this jury?

8          A JUROR:  That's correct, it wouldn't sway it.

9          MR. WILLIAMS:  No further questions.

10         MR. LEWIS:  I have nothing.

11                   **EXAMINATION**

12         THE COURT:  Have you discussed this with anyone else

13  except for my case manager and, I guess, the CSO, the Court

14  Security Officer?

15         A JUROR:  These two.

16         THE COURT:  That's it?  Nothing else?

17         A JUROR:  Nothing else.

18         THE COURT:  All right.  Thank you, you can go back

19  inside.

20     (The juror left the courtroom.)

21         THE COURT:  All right.  Anything from the Government?

22         MR. ARMSTRONG:  No, your Honor.

23         THE COURT:  Anything from the defense?

24         MR. WILLIAMS:  Even though she says it's not bothering

25  her, Judge, I just think it's improper.  I think Government

1 agents have been in this courthouse forever.  They know about

2 the particular rules.  They know not to communicate with people.

3 They know that; and I think that, given some of the prior

4 testimony here regarding agent's conduct, it's kind of in line

5 with that.

6 　　　　　　That just kind of bothers me.  Whether it's going

7 to affect where we are here or not and whether it's enough for

8 -- to even move for a mistrial, I just can't say that sitting

9 here right now; but it bothers me.

10 　　　　THE COURT:  Well, you're going to have to because

11 you're on the record.

12 　　　　MR. WILLIAMS:  I understand, your Honor.

13 　　　　THE COURT:  No.  I'm not jumping you.  I'm saying I

14 understand what you're doing here.  You're balancing it in your

15 mind.

16 　　　　MR. WILLIAMS:  Yes, sir.

17 　　　　THE COURT:  I eventually -- all right.  Let's see what

18 Mr. Lewis says.  We'll come back to you.

19 　　　　MR. WILLIAMS:  Thank you, your Honor.

20 　　　　THE COURT:  All right.

21 　　　　MR. LEWIS:  I, too, am bothered and concerned about,

22 especially in light of what the witness -- what the juror has

23 just said as to how this happened because, even though we've

24 heard what Special Agent Armour said, it don't -- it doesn't

25 seem to align well with what this witness has said.

1        And I am concerned about whether or not the
2   conduct of the agent -- I'm concerned about the intention of the
3   conduct of the agent, and I'm not sure that's sufficient for a
4   mistrial, but I am very concerned about the conduct of the
5   agent, especially in light of his training.
6        THE COURT:  You're going to have -- both sides, I
7   understand that; but I'm going to stay on the defense side.
8            You can be seated, counsel.
9            I need -- I need your point to me.  Then, I'll
10  make the decision.  Now, I've heard analysis from Mr. Williams,
11  and I've heard analysis from Mr. Lewis.  We need to get down to
12  the bottom line as to what your position is; and then, I will
13  rule.
14       MR. WILLIAMS:  Yes, sir, your Honor.
15           Given the fact that this juror is of American --
16  is an African-American juror, okay, and the fact that there are
17  only two on this panel, okay, it -- I look at it as being a
18  possible attempt to -- to alter the jury panel or intimidate
19  people where she won't be there; and then, we have --
20       THE COURT:  Well, let the record reflect that the
21  agent who took the stand was also of African-American descent.
22       MR. WILLIAMS:  Which I understand, okay.  But in lieu
23  of this jury -- being there are 14 jurors here who are in play
24  and there are only two African-Americans, if she's intimidated
25  enough to the point where she's off, then it imbalances the

1  effect of how the jury -- what the actual jury would actually

2  hear in this particular case, Judge; and that's my particular

3  concern.  And because of that, I'd move for a mistrial.

4          THE COURT:  All right.

5              Mr. Williams -- I mean, Mr. Lewis, what's your

6  position?

7          MR. LEWIS:  My position is Defendant Craig does not

8  move for a mistrial.

9          THE COURT:  Government?

10          MR. ARMSTRONG:  Your Honor, I want the record to be

11  clear that there is absolutely zero evidence of any bad faith or

12  any intent to intimidate by the agent.  I think that it is

13  borderline improper to suggest that that happened.  This is a

14  small chitchat in an elevator.  There is absolutely no reason

15  for a mistrial, and there is absolutely no reason to slander a

16  DEA agent.

17          MR. WILLIAMS:  May I respond, Judge?

18          THE COURT:  Yes, sir.

19          MR. WILLIAMS:  I'm not slandering the DEA agent, okay.

20  This is a veteran agent, okay.  We all know the rules.  We all

21  know -- that's why they wear those badges, Judge.  He's been in

22  this courtroom for a week and a half.  He knows not to have any

23  communication with jurors other than good morning or good

24  evening, okay.  And that didn't happen.  All right.

25              Now, whatever conversation it was, it was

1 improper, okay. Now, for him to characterize it as being

2 slanderous, okay, it's offensive to me because I'm not being

3 slanderous. I just want him to follow the rules that he knows,

4 that he's aware of. That's all.

5       THE COURT: Well, the concern I have is we have one of

6 the Defendants moving for a mistrial and the other one not

7 moving for a mistrial.

8           So, your position?

9       MR. ARMSTRONG: We would oppose the motion, your

10 Honor.

11       THE COURT: Why?

12       MR. ARMSTRONG: Your Honor, I don't believe that this

13 rises to the level of affecting the fairness and integrity of

14 the trial. The juror just testified that she can see the

15 evidence fairly and impartially and that it would not affect her

16 decision and her ability to weigh and evaluate the evidence that

17 she's heard in this case.

18       THE COURT: All right.

19         Mr. Williams, do you want to respond to that?

20 Fairness and effectiveness. He says no. And I gather you

21 believe that it probably did or did.

22       MR. WILLIAMS: Well, it, obviously, had an effect on

23 her to the point where she had to report it to somebody. It's

24 an obvious concern for her, okay? And my position is still the

25 same, Judge, in terms of we all know the rules. We have to

1 abide by the particular rules, okay.  And obviously, that didn't

2 happen.

3          THE COURT:  Well, I assume then you feel it affected

4 this one juror, her ability?

5          MR. WILLIAMS:  Obviously, it did because, if it

6 didn't, I don't think she would have brought it to anybody's

7 attention.

8          THE COURT:  All right.  Have a seat.

9               Based upon the statements of the Government and

10 both defense counsel, specifically, the concerns raised by

11 Mr. Williams as to this one juror, this one juror is excused.

12               You'll thank her for her service, and she's

13 excused.

14               And that's the ruling of the Court.  We'll

15 proceed now with 13 jurors; and then, we'll have the blind draw

16 as to one.

17               We stand adjourned.

18          THE COURT SECURITY OFFICER:  All rise.

19     (Court recessed at 1:50 p.m.)

20     (Court resumed at 2:14 p.m.)

21          THE COURT:  Is it satisfactory just granted or

22 overruled from the bench or do you want to come up here?  I

23 mean, let's put it -- let's put it this way:  It's the matter we

24 discussed before.  A ruling was requested, okay.  The motion is

25 overruled.

1          So, counsel, you got that in the record.  If it's
2  not sufficient, we can do it at the next break; but that was one
3  ultimate ruling.  I believe, what is it, Mr. Lewis had a motion
4  on the floor, at least -- Mr. Williams, right.  And so, the
5  ruling has been made.
6          All right.  I will tell you what has been going
7  on during the last half hour after the case is over.  We will
8  move on, and we're going to move on, and we're going to start
9  reading this.
10          You have in front of you the jury instructions.
11 The original one is right here where I have the blue back on it.
12 This is what the presiding juror will sign when you reach a
13 unanimous verdict.  You can mark all of those up and take them
14 with you at the end of the trial but not tonight.  If you hold
15 over tonight, you're not to take those with you.  But you can
16 mark them up; and then, you can take them home with you.
17          So, you heard me say during the trial on a number
18 of occasions, you know, speed up, slow down, slow down.
19 Occasionally, I'll pick the pace up a little bit because, in the
20 bottom line, you've got a copy; and the court reporter has a
21 copy of what I'm reading.
22          Occasionally, I'll put a little explanation in;
23 but more than likely, I'll just read everything that we have
24 here.  So, with that, you know, I learned a long time ago, they
25 said, "Well, how do you eat an elephant?"  "One bite at a time."

1 So, we'll take a look at this. It will move quickly, and I'll
2 read right along with it.

3                    **CHARGE OF THE COURT**

4           THE COURT: In any jury trial, there are, in effect,
5 two judges. I'm one of the judges; the other is the jury. It
6 is my duty to preside over the trial and to decide what evidence
7 is proper for your consideration. It's also my duty at the end
8 of the trial to explain to you the rules of law that you must
9 follow and apply in arriving at your verdict.

10           First, I'll give you some general instructions
11 which apply in every case, for example, instructions about
12 burden of proof and how to judge the believability of witnesses.
13 Then, I'll give you some specific instructions -- specific rules
14 of law about how this particular case -- about this particular
15 case; and finally, I'll explain to you the procedures that you
16 should follow in your deliberation.

17           You, as jurors, are the judges of the facts; but
18 in determining what actually happened, that is, in reaching your
19 decision as to the facts, it's your sworn duty to follow all of
20 the rules of law as I explained them to you. You have no right
21 to disregard or give special attention to any one instruction or
22 to question the wisdom or correctness of any rule I may state to
23 you. You must not substitute or follow your own notion or
24 opinion as to what the law is or ought to be.

25           It's your duty to apply the law as I explain it

1  to you regardless of the consequences.  It's also your duty to

2  base your verdict solely upon the evidence without prejudice or

3  sympathy.  That was the promise you made and the oath that you

4  took before being accepted by the parties as jurors, and they

5  have the right to expect nothing less.

6                    The indictment or formal charge against the

7  Defendant is not evidence of guilt.  Indeed, a Defendant is

8  presumed by the law to be innocent.  The Defendant begins with a

9  clean slate.  The law does not require a Defendant to prove his

10 or her innocence or produce any evidence at all.  And no

11 inference whatsoever may be drawn from the election of a

12 Defendant not to testify.

13                    The Government has the burden of proving each

14 Defendant's guilt beyond a reasonable doubt; and if it fails to,

15 you must acquit the Defendant.  While the Government's burden is

16 a strict or heavy burden, it's not necessary that a Defendant's

17 guilt be proved beyond all possible doubt.  It is only required

18 that a Government -- that the Government's proof exclude any

19 reasonable doubt concerning a Defendant's guilt.

20                    A reasonable doubt is a doubt based upon reason

21 and common sense after careful and impartial consideration of

22 all the evidence in the case.  Proof beyond a reasonable doubt,

23 therefore, is proof of such a convincing character that you

24 would be willing to rely and act upon it without hesitation in

25 making the most important decisions of your own affairs.

1             As I told you earlier, it's your duty to

2    determine the facts.  To do so, you must consider only the

3    evidence presented during the trial.  Evidence is the sworn

4    testimony of the witnesses and the exhibits.  The questions,

5    statements, objections, and arguments made by the lawyers are

6    not evidence.

7             The function of the lawyers is to point out those

8    things that are most significant or most helpful to their side

9    and in so doing to call your attention to certain facts or

10   inferences that might, otherwise, escape your notice.  In the

11   final analysis, however, it's your own recollection and

12   interpretation of the evidence that controls in the case.

13            What the lawyers say is not binding upon you.

14   During the trial, I sustained objections to certain questions

15   and exhibits.  You must disregard those questions and exhibits

16   entirely.  Do not speculate as to what the witness would have

17   said if permitted to answer the question or as to the contents

18   of an exhibit.

19            Also, certain testimony or other evidence has

20   been ordered removed from the record; and you've been instructed

21   to disregard that evidence.  Do not consider any testimony or

22   other evidence that has been removed from your consideration in

23   reaching your decision.  Your verdict must be based solely on

24   the legally admissible evidence and testimony.

25            Also, do not assume from anything that I may have

1 done or said during the trial that I have any opinion concerning
2 any of the issues in this case. Except for the instructions to
3 you on the law, you should disregard anything I may have said
4 during the trial in arriving at your own verdict.

5 In considering the evidence, you are permitted to
6 draw such inferences from the testimony and exhibits as you feel
7 are justified in the light of common experience. As you note
8 the heading here, this is direct -- discussion of direct and
9 circumstantial evidence. In other words, you may make
10 deductions and reach conclusions that reason and common sense
11 lead you to draw from the facts that have been established by
12 the evidence.

13 Do not be concerned about whether evidence is
14 direct evidence or circumstantial evidence. You should consider
15 and weigh all of the evidence that was presented to you. Direct
16 evidence is the testimony of one who asserts actual knowledge of
17 a fact, such as an eyewitness. Circumstantial evidence is proof
18 of a chain of events and circumstances indicating that something
19 is or is not a fact.

20 The law makes no distinction between the weight
21 to be given either to circumstantial or direct evidence. The
22 law requires that you, after weighing all of the evidence,
23 whether direct or circumstantial, be convinced of the guilt of
24 the Defendant beyond a reasonable doubt before you can find him
25 or her guilty.

1             I remind you that it's your job to decide whether

2      the Government has proven the guilt of a Defendant beyond a

3      reasonable doubt.  In doing so, you must consider all of the

4      evidence.  This does not mean, however, that you must accept all

5      of the evidence as true or accurate.  You are the sole judges of

6      the credibility or believability of each witness and the weight

7      to be given to the witness's testimony.

8             An important part of your job will be to make

9      judgments about the testimony of the witness, including the

10     Defendant Gazelle Craig who testified in this case.  You should

11     decide whether you believe all, some, part, or none of what each

12     person had to say and how important their testimony was.

13            In making that decision, I suggest that you ask

14     yourself a few questions:  Did the witness impress you as

15     honest?  Did the witness have any particular reason not to tell

16     the truth?  Did the witness have a personal interest in the

17     outcome of the case?  Did the witness have any relationship with

18     either the Government or the defense?  Did the witness seem to

19     have a good memory?  Did the witness clearly see or hear the

20     things about which he or she testified?  Did the witness have

21     the opportunity and ability to understand the questions clearly

22     and answer them directly?  Did the witness's testimony differ

23     from the testimony of other witnesses?  These are a few of the

24     considerations that will help you to determine the accuracy of

25     what each witness had to say.

1            The testimony of Defendant Gazelle Craig should

2    be weighed and her credibility evaluated in the same way as that

3    of other witnesses -- or of other -- of any other witness.  Your

4    job is to think about the testimony of each witness you have

5    heard and decide how much you believe of what each witness had

6    to say.

7            In making up your mind and reaching a verdict, do

8    not make any decisions simply because there were more witnesses

9    on one side than the other.  Do not reach a conclusion on a

10   particular point just because there were more witnesses

11   testifying for one side or the other on that point.  You will

12   always bear in mind that the law never imposes upon a Defendant

13   in a criminal case the burden or duty of calling any witnesses

14   or producing any evidence.

15           You've been told that the witness Davis Webster

16   was convicted in 1994 -- 1994 of aggravated assault with a

17   deadly weapon and in 2016 of conspiracy to unlawfully distribute

18   controlled substances.  A conviction is a factor you may

19   consider in deciding whether to believe that witness, but it

20   does not necessarily destroy the witness's credibility.  It has

21   been brought to your attention only because you may wish to

22   consider it when you decide whether you believe the witness's

23   testimony.  It's not evidence of anything else.

24           In this case, the Government called as one of its

25   witnesses an individual, Davis Webster, with whom the Government

1  has entered a plea agreement.  This agreement provides, among

2  other things, for a non-binding recommendation for a favorable

3  sentence.  Such plea bargaining, as it is called, has been

4  approved as lawful and proper and is expressly provided for in

5  the rules of this Court.  An individual who has entered into a

6  plea agreement with the Government is not prohibited from

7  testifying.

8              On the contrary, the testimony of such a witness

9  may alone be of sufficient weight to sustain a verdict of

10  guilty.  You should keep in mind that such testimony is always

11  to be received with caution and weighed with great care.  You

12  should never convict a Defendant upon the unsupported testimony

13  of such a witness unless you believe that testimony beyond a

14  reasonable doubt.

15              The fact that an individual has entered a plea of

16  guilty to the offense charged or was convicted of the offense

17  charged is not evidence of the guilt of any other person and

18  should not be considered as evidence of a Defendant's guilt.

19              The testimony of an alleged accomplice and/or the

20  testimony of one who provides evidence against the Defendant as

21  an informer for pay, for immunity from punishment, or for

22  personal advantage or vindication must always be examined and

23  weighed by the jury with greater care and caution than the

24  testimony of ordinary witnesses.

25              You, the jury, must decide whether the witness's

1   testimony has been affected by these circumstances, by the

2   witness's interest in the outcome of the case, by prejudice

3   against the Defendant, or by the benefit that the witness has

4   received either financially or as a result of being immunized

5   from prosecution.

6           You should keep in mind that such testimony is

7   always to be received with caution and weighed with great care,

8   and you should never convict any Defendant upon the unsupported

9   testimony of such a witness unless you believe that testimony

10  beyond a reasonable doubt.

11          You will note that the indictment charges that

12  the defense -- that the offense was committed on or about a

13  certain specified date.  The Government does not have to prove

14  that the crime was committed on the exact date so long as the

15  Government proves beyond a reasonable doubt that a Defendant --

16  that a Defendant committed the crime on a date reasonably near

17  the date stated in the indictment.

18          You are here to decide whether the Government's

19  proved beyond a reasonable doubt that a Defendant is guilty of a

20  crime charged.  The Defendant is not on trial for any act,

21  conduct, or offense not alleged in the indictment.  Neither are

22  you called upon to return a verdict as to the guilt of any other

23  person or persons not on trial as a Defendant in this case

24  except as you are, otherwise, instructed.

25          Certain charts and summaries have been received

1  into evidence.  You should give them only such weight as you
2  think they deserve.
3               Ellen came back in here.  I just want to mention
4  to the jury you will have a copy of the indictment in the jury
5  room.  We'll deliver that in all cases to you in the jury room.
6               During the trial, you heard the testimony of
7  expert Dr. Graves Owen who expressed opinions regarding medical
8  treatment of pain by prescribing opioids and other measures
9  respectfully.  If scientific, technical, or other specialized
10 knowledge might assist the jury in understanding the evidence or
11 in determining a fact in the case, a witness qualified by
12 knowledge, skill, experience, training, or education may testify
13 and state an opinion concerning such matters.
14               Merely because such a witness has expressed an
15 opinion does not mean, however, that you must accept this
16 opinion.  You should judge such testimony like any other
17 testimony.  You may accept it or reject it and give it as much
18 weight as you think it deserves considering the witness's
19 education and experience, the soundness of the reason given for
20 the opinion, and all evidence in the case.
21               A separate crime is charged in each count of the
22 indictment.  Each count and the evidence pertaining to it should
23 be considered separately.  The fact that you may find a
24 Defendant guilty or not guilty as to one of the crimes charged
25 should not control your verdict as to any other.

1          The case of each Defendant and the evidence

2 pertaining to that Defendant should be considered separately and

3 individually.  The fact that you may find one of the Defendants

4 guilty or not guilty should not control your verdict as to any

5 other Defendant.

6          If a Defendant is found guilty, it will be my

7 duty to decide what the punishment will be.  You should not be

8 concerned with punishment in any way.  It should not enter your

9 consideration or discussion.

10          The word "knowingly," as that term is used in

11 these instructions, means that the act was done voluntarily and

12 intentionally, not because of mistake or accident.

13          The word "willfully," as that term is used in

14 these instructions, means that the act was committed voluntarily

15 and purposely with the intent to do something the law forbids,

16 that is, with the bad purpose to disobey or disregard the law.

17          While a person may have acted with the intent to

18 do something the law forbids, before you can find that person

19 acted willfully, the person need not be aware of the specific

20 law or rule that his or her conduct violates.

21          All right.  We're now on page 22.  Count 1 is

22 conspiracy.  Now, what is a conspiracy?  We're going to now look

23 at how it's defined.

24          Count 1 of the indictment charges the Defendants

25 with conspiracy to unlawfully distribute a controlled substance

1  in violation of Title 21 United States Code Section 846.

2              Section 846 makes it a crime for anyone to

3  conspire with someone else to do something which, if carried

4  out, would be a violation of Title 21 United States Code Section

5  841(a).

6              Section 841(a)(1) makes it a crime for any person

7  knowingly and intentionally to distribute a controlled substance

8  not for a legitimate medical purpose or not in the course of

9  professional practice.

10             A conspiracy is an agreement between two or more

11  persons to join together to accomplish some unlawful purpose.

12  It's kind of a partnership in crime in which each member becomes

13  the agent of every other member.

14             For you to find a Defendant guilty of this crime,

15  you must be convinced that the Government has proven each of the

16  following beyond a reasonable doubt:  that two or more persons,

17  directly or indirectly, reached an agreement to unlawfully

18  distribute a controlled substance not for a legitimate medical

19  purpose or not in the usual course of professional practice.

20             The next element:  that the Defendant knew of the

21  unlawful purpose of the agreement and that the Defendant joined

22  in the agreement willfully, that is, with the intent to further

23  its unlawful purpose.  One may become a member of a conspiracy

24  without knowing all the details of the unlawful scheme or

25  identities of all the other alleged conspirators.

1          If a Defendant understands the unlawful nature of

2  a plan or scheme and knowingly and intentionally joins in that

3  plan or scheme on one occasion, that is sufficient to convict

4  him or her for conspiracy even though the Defendant had not

5  participated before and even though the Defendant played only a

6  minor part.

7          The Government need not prove that the alleged

8  conspirators entered into any formal agreement nor that they

9  directly stated between themselves all the details of the

10  scheme.  Similarly, the Government need not prove that -- prove

11  that all of the details of the scheme alleged in the indictment

12  were actually agreed upon or carried out nor must it prove that

13  all of the persons alleged to have been members of the

14  conspiracy were such or that the alleged conspirators actually

15  succeeded in accomplishing their unlawful objectives.

16          Mere presence at the scene of an event, even with

17  knowledge that a crime is being committed or the mere fact that

18  the -- that certain persons may have associated with each other

19  and may have assembled together and discussed common aims and

20  interests, does not necessarily establish proof of the existence

21  of a conspiracy.  A person who has no knowledge of a conspiracy

22  but who happens to act in a way that advances some purpose of

23  the conspiracy does not, therefore, become a conspirator.

24          Now, a conspirator is responsible for offenses

25  committed by another conspirator if the conspirator was a member

1  of the conspiracy when the offense was committed and if the

2  offense was committed in the furtherance of or as a foreseeable

3  consequence of the conspiracy.

4                 Therefore, if you have found the Defendant guilty

5  of the conspiracy charged in Count 1 and if you find beyond a

6  reasonable doubt that during the time the Defendant was a member

7  of that conspiracy another conspirator committed the offense in

8  Count 2, 3, or 4 in furtherance of and as a foreseeable

9  consequence of that conspiracy, then you may find the Defendant

10 guilty of Counts 2, 3, and 4 even though the Defendant may not

11 have participated in any of the acts which constitutes the

12 offenses described in Counts 2, 3, or 4.

13                 Now, it's looking at Counts 2, 3, and 4.  The

14 first one was conspiracy.  Now, we're going to look at the

15 substantive counts.

16                 Counts 2, 3, and 4 of the indictment charges the

17 Defendants with unlawfully distributing controlled substances

18 and aiding and abetting the unlawful distribution of controlled

19 substances in violation of 21 United States Code Section

20 841(a)(1).

21                 Title 28 United States Code Section 841(a)(1)

22 makes it a crime for any person knowingly and intentionally to

23 distribute a controlled substance not for a legitimate medical

24 purpose or not in the course of professional practice.

25                 For you to find the Defendant guilty of this

1  crime, you must be convinced that the Government has proved each
2  of the following beyond a reasonable doubt:  that the Defendant
3  distributed a controlled substance; that the Defendant did so
4  knowingly and intentionally; and that the Defendant did so other
5  than for a legitimate medical purpose or in the usual course of
6  professional practice.
7              A controlled substance is prescribed by a
8  physician for a legitimate medical purpose or in the usual
9  course of professional practice and, therefore, lawfully if the
10 substance is prescribed in good faith.  A physician must act in
11 a manner that is in direct accordance with the standard of care
12 set forth in the medical community or must have a good faith
13 basis for a deviation from the standard of care.
14              Good faith in this context means an honest effort
15 to prescribe for a patient's condition acting in accordance with
16 the standard of medical practice and, generally, recognized and
17 accepted in the United States.  In considering whether a
18 physician prescribed a controlled substance for a legitimate
19 medical purpose or in the usual course of professional practice,
20 you should consider all of the physician's actions and the
21 circumstances surrounding them.
22              Page 28.  Aiding and abetting.  The guilt of a
23 Defendant in a criminal case may be established without proof
24 that the Defendant personally did every act constituting the
25 alleged offense, though the law recognizes that ordinarily

1 anything a person can do for himself or herself may also be
2 accomplished by him or her through the direction of another
3 person as his or her agent or by acting in concert with or under
4 the direction of another person or persons in a joint effort or
5 enterprise.

6          If another person is acting under the direction
7 of the Defendant or if the Defendant joins another person and
8 performs acts with the intent to commit a crime, then the law
9 holds the Defendant responsible for the acts and conduct of such
10 other person just as though the Defendant had committed the acts
11 or engaged in such conduct.

12          Before any Defendant may be held criminally
13 responsible for the acts of others, it is necessary that the
14 accused deliberately associate himself or herself in some way
15 with a crime and participate in it with the intent to bring
16 about the crime.

17          Of course, mere presence at the scene of a crime
18 and knowledge that a crime is being committed are not sufficient
19 to establish that the Defendant either directly or -- directly
20 -- either directed or aided and abetted the crime unless you
21 find beyond a reasonable doubt that the Defendant was a
22 participant and not merely a knowing spectator.

23          In other words, you may not find any Defendant
24 guilty unless you find beyond a reasonable doubt that every
25 element of the offense as defined in these instructions was

1 committed by some person or persons and that the Defendant

2 voluntarily participated in its commission with the intent to

3 violate the law.

4          For you to find the Defendant guilty of this

5 crime, you must be convinced that the Government has proved each

6 of the following beyond a reasonable doubt:  that the offense of

7 unlawful distribution of a controlled substance was committed by

8 some person, that the Defendant associated with the criminal

9 venture, that the Defendant purposefully participated in the

10 criminal venture, and that the Defendant sought by action to

11 make that venture successful.

12          To associate with a criminal venture means that

13 the Defendant shared the criminal intent of the principal.  This

14 element cannot be established if the Defendant had no knowledge

15 of the principal's criminal venture.

16          To participate in the criminal venture means that

17 the Defendant engaged in some affirmative conduct designed to

18 aid the venture or assist the principal of the crime.

19          Now, to reach a verdict, whether it's guilty or

20 not guilty, all of you must agree.  Your verdict must be

21 unanimous on each count of the indictment.  Your deliberations

22 will be secret.  You'll never have to explain your verdict to

23 anyone.  It's your duty to consult with one another and to

24 deliberate in an effort to reach agreement if you can do so.

25          Each of you must decide the case for yourself but

1  only after an impartial consideration of the evidence with your

2  fellow jurors.  During your deliberations, do not hesitate to

3  reexamine your own opinions and change your mind if convinced

4  that you were wrong.  But do not give up your honest beliefs as

5  to the weight or effect of the evidence solely because of the

6  opinion of your fellow jurors or for the mere purpose of

7  returning a verdict.

8               Remember at all times you are judges, judges of

9  the facts.  Your sole interest is to seek the truth from the

10  evidence in this case and to decide whether the Government has

11  proved the Defendant guilty beyond a reasonable doubt.

12               When you go to the jury room, the first thing you

13  need to do is select one of your members as your foreperson who

14  will help to guide your deliberations and will speak for you

15  here in the courtroom, and a verdict form has been prepared for

16  your convenience.

17               The foreperson will write the unanimous answer of

18  the jury in the space provided for each count of the indictment,

19  either guilty or not guilty, as well as answers to

20  interrogatories as explained below.

21               At the conclusion of your deliberations, the

22  foreperson should date and sign the verdict.  If you need to

23  communicate with me during your deliberations, the foreperson

24  should write the message and give it to the Court Security

25  Officer.  I will either reply in writing or bring you back into

1  the court to answer your message.

2          Bear in mind that you're never to reveal to any
3  person, not even to the Court, how the jury stands numerically
4  or otherwise on any count of the indictment until after you've
5  reached a unanimous verdict.

6          Here are some instructions.  We're on page 32.
7  If you find either Defendant guilty of any of the offenses
8  charged, you must answer some questions called jury
9  interrogatories to decide whether the offense involved certain
10 controlled substances.

11         Do not answer these jury interrogatories until
12 after you've reached your verdict.  If you find the Government
13 has not proved the Defendant guilty of a count, then you do not
14 need to answer the interrogatory as to that Defendant for that
15 count.  If you find the Defendant guilty, then in answering
16 these interrogatories and in deciding your verdict, you must be
17 unanimous; and in order to find the offense involved a certain
18 controlled substance, you must all be satisfied that the
19 Government proved the identity beyond a reasonable doubt.

20         We have two separate sections here as to both --
21 as to each Defendant.  They're, basically, similar; but I'm
22 going to read you the first one; and then, we'll summarize the
23 second.

24         So, let's see, it just so happens that the first
25 Defendant is Dr. Craig.  We're on page 34.

1          Conspiracy to unlawfully distribute a controlled
2   substance.  We, the jury, unanimously find Defendant Gazelle
3   Craig, D.O. as to Count 1 -- that's conspiracy to unlawfully
4   distribute a controlled substance -- and this is the conspiracy
5   -- guilty, not guilty.
6          If you find that Dr. Craig is not guilty of
7   conspiracy to unlawfully distribute a controlled substance as
8   described in Count 1, proceed to the next count.  Do not answer
9   the jury interrogatory.
10         If you find Dr. Craig guilty of conspiracy to
11  unlawfully distribute a controlled substance as charged in Count
12  1, please answer the following jury interrogatory before
13  proceeding to the next count.
14         So, assuming you found guilty, then you look at
15  the next one.  It says do you unanimously find that the
16  Government proved beyond a reasonable doubt that the mixture or
17  substances contained -- and check all that apply.  And one is
18  hydrocodone and the other one is caris -- what is it,
19  carisoprodol.  All right?
20         Now, Count 2, we, the jury, unanimously find --
21  now, this is the unlawful distribution.  The first one was the
22  conspiracy.  So, the next count is unlawful distribution of a
23  controlled substance.  We, the jury, unanimously find Dr. Craig
24  as to Count 2, unlawful distribution of a controlled substance,
25  guilty, not guilty.

1          If you find the Defendant not guilty of unlawful

2 distribution as charged in Count 2, proceed to the next count.

3 Do not answer the jury interrogatory.  If you find the Defendant

4 guilty in this count, then you need to answer the following

5 interrogatory:  Do you unanimously find the Government proved

6 beyond a reasonable doubt that the mixture or substance

7 contained -- and check all that apply.

8          Now, I'm talking to the attorneys.  I believe the

9 next one is similar to the other ones, right, but it's a

10 separate count?

11          We're now looking on page 36 as to Count 3.  You

12 need to first determine relative to Count 3, unlawful

13 distribution, guilty or not guilty.  If it's guilty, you then

14 need to go down and check the boxes down below as to -- if you

15 find each of those drugs do apply.

16          Now, again, Count 4 as to Dr. Craig -- again,

17 it's Count 4, unlawful distribution.  Once again, initially

18 guilty or not guilty; and if you find guilty, then you need to

19 make the decision down below there.

20          Now, you will see -- when you reach the end of

21 the questions concerning Dr. Craig, take a look at the bottom.

22 The presiding juror, whoever he or she is, must sign that and

23 date that.  That's your first set of jury questions that need

24 the signature of the presiding juror.

25          Now, we move to the set on page 38, the verdict

1  form as to Mr. Faithful.  I'm just going to go over this,

2  generally, because we've been over before all of the wording;

3  and correct me if -- it is the same; but now, we have to

4  consider each Defendant separately.  So, now, it's Mr. Faithful.

5          The first one, conspiracy to unlawfully

6  distribute a controlled substance, guilty or not guilty; and if

7  it's guilty, check the appropriate box, if any.

8          As to Mr. Faithful, Count 2, which is the

9  unlawful distribution of a controlled substance, guilty or not

10 guilty; and if it happens to be guilty, then down below, check

11 the appropriate boxes for the drugs.

12         Count 3, unlawful distribution.  This is the jury

13 verdict for Count 3.  Again, guilty or not guilty; and if it

14 happens to be guilty, fill in the appropriate box below.

15         And the final one for Mr. Faithful, again,

16 unlawful distribution of a controlled substance.  If it happens

17 to be guilty, then fill in -- check the appropriate box; and

18 then, you note down at the bottom of page 42, it must be signed

19 and dated by the presiding juror.

20         At that point, you will then notify the marshal

21 that you've reached a verdict and return it to court.

22         We're now going to hear from the Government,

23 okay?  The Government is going to open its case, open the

24 summarization.  Then, we're going to take a break, take a break

25 partway through.  The Government has 75 minutes.  They need to

1  take, at least, as they know, at least, half of that time on

2  their opening; and when they're through with their opening, we

3  will take a break, come back in, hear the full summation by the

4  defense and any wrap-up that the Government has.

5           So, I'll now turn the clock on as far as this

6  goes, as far as summation goes.

7           Counsel, go right ahead.

8       MR. HELFMEYER:  Thank you, your Honor.

9           If we could have the screen down.  The lights can

10  stay on for a minute or two, your Honor.

11           Uncle Ronnie, Kiwi, Braylon, Dre, Tasha, Wilbert,

12  Keke, Kool, and Tywoo, those were the Defendants' customers at

13  Gulfton clinic.  These facilitators, these street-level drug

14  dealers were Gulfton's real customers, not Paul Fernandez, not

15  Amanda Robinson, not Reginald Sedberry, not Charlotte Mason.

16           99 percent.  That's what Ms. Ericka Hayes

17  testified was how many of the people that went to Gulfton were

18  brought by facilitators.  Getting prescriptions from Dr. Craig,

19  lining the pockets of Dr. Craig and Shane Faithful.

20           Ericka Hayes is a small woman; but on Friday, she

21  spoke with a booming voice.  She exposed Gulfton for what it

22  was:  a drug trafficking organization masquerading as a medical

23  clinic.  Dr. Craig and Shane Faithful were hiding their criminal

24  organization in plain sight just like Mr. Armstrong told you at

25  the start of trial; but they can't hide from you, ladies and

1  gentlemen.  Craig and Faithful, partners in Gulfton, partners in

2  crime.

3          I've been speaking to you for almost two minutes,

4  longer than it took for Gazelle Craig to see someone and

5  prescribe the Vegas cocktail.

6          MR. WILLIAMS:  Objection, your Honor.  It's not a Las

7  Vegas cocktail.  There's been no testimony as to that.  He's

8  aware that the Las Vegas cocktail contains three drugs.

9          MR. HELFMEYER:  Your Honor --

10         THE COURT:  Wait a second.  I'll take care of it.

11         MR. WILLIAMS:  Thank you, your Honor.

12         THE COURT:  Overruled.

13         MR. HELFMEYER:  Long enough to make her $150.  Long

14 enough to make Shane Faithful $150.  Long enough to make Tywoo

15 or Uncle Ronnie $800 on the street.  Their real customers.  Over

16 2.1 million pills of hydrocodone.  Almost 1.4 million pills of

17 carisoprodol.  Norco plus Soma.  Norco will get you high.  Add

18 Soma and it will get you higher.  Gazelle Craig wrote over

19 18,000 prescriptions for hydrocodone between 2015 and 2017.  99

20 percent of them, as Ericka Hayes testified, ending up on the

21 streets of Houston.

22         Dr. Craig knew her pills were ending up on the

23 streets.  Shane Faithful knew the pills were ending up on the

24 streets.

25         And your Honor, if we could have the lights.

1              I made a demonstrative --

2              And the TV screen for the jurors, your Honor.

3              I made a demonstrative that's going to be up on

4    the screen.

5         MR. ARMSTRONG:  Your Honor, I believe you have to

6    switch to our system, as well.

7         THE COURT:  Okay.  That's probably why.

8         MR. HELFMEYER:  The demonstrative is going to have

9    four images on it of the cards for store credit that were given

10   by facilitators.

11        THE COURT:  I'll stop the clock for a second here.

12             Okay, keep going as best you can.

13        MR. HELFMEYER:  Facilitators.  That was Shane

14   Faithful's term, Shane Faithful's term to disguise the drug

15   dealers for what they were.  The Defendants knew these pills

16   were ending up on the streets.  What's his response?  More.

17             And if we can play the recording from

18   Government's Exhibit 504 for 30 seconds.

19        (A portion of Government's Exhibit Number 504, audio

20   recording, was played in open court.)

21        MR. HELFMEYER:  He went on to say, as you remember,

22   that, without her, you all lose your jobs.  He needed her to

23   write the prescriptions.  She needed him to run the business.

24             If we could go to the demonstrative with the four

25   cards, Ms. Mortezavi.

1          In the left-hand corner is one of the cards for
2    store credit from Government's Exhibit 203 found at Shane
3    Faithful's house by DEA agents during the execution of the
4    search warrant.  We can see that it's for Patient Number 30 in
5    July of 2016.  In the upper right-hand corner, of course, it is
6    signed by Dr. Gazelle Craig; and it says patient replacement.
7          Below that, another one of the cards for store
8    credit given to a facilitator.  Just above that card is a note:
9    "Shane approved full credit."  Shane is Shane Faithful.  This
10   card is in Government's Exhibit 314 found at the Gulfton clinic
11   by DEA agents during the execution of the search warrant.
12         On the right, we have two more.  The first for
13   Kool, again for a replacement, again signed by Gazelle Craig.
14   On the bottom, another credit to another facilitator, this time
15   Braylon; again, signed by Gazelle Craig for someone who got
16   kicked out, according to the DPS reports which you've heard
17   about during the trial.  Partners in Gulfton; partners in crime.
18   Hand-in-hand.  Scripts for cash every day for two years.
19         The United States has charged each Defendant with
20   four counts each.  The first count of a conspiracy to distribute
21   a controlled substance and then three individual counts of
22   distributing a controlled substance.
23         Very briefly, the conspiracy charge accounts for
24   the running of a pill mill by Gazelle Craig and Shane Faithful
25   from 2015 to 2017.

1    Count 2 is for the prescription of hydrocodone
2 and carisoprodol to Davis Webster on March 10th of 2017.
3    Count 3 is the prescription for hydrocodone and
4 carisoprodol by Dr. Craig again to Davis Webster on May 16th of
5 2017.
6    And Count 4 is for the prescription to Tonya
7 Graham on June 15th of 2017.  Count 1, the conspiracy, is no
8 more than an agreement to commit a crime just as Judge Hittner
9 explained to you.  The partnership was between Craig and
10 Faithful.  The crime was dealing drugs.  Dealing drugs by
11 writing prescriptions.
12    Dr. Craig, of course, was allowed to write the
13 prescriptions as a medical doctor; but she broke the law because
14 her prescriptions were not for a legitimate medical purpose.
15 And they were outside the scope of professional practice.  She
16 broke the law because her prescriptions were given to drug
17 dealers to sell on the street.  There is no legitimate medical
18 purpose for that.
19    She broke the law when she wrote prescriptions
20 without evaluating patients with a disregard for patients'
21 medical history and with a disregard for patients' needs and the
22 risks.  She broke the law when she wrote the same prescriptions
23 for the same drugs in the same amount day after day after day
24 for two and a half years.  Dr. Craig broke the law when she
25 wrote the same prescription for Norco and Soma to everyone.

1 Practicing below the standard of care.

2                 Gazelle Craig became a drug dealer when she
3 prescribed drugs that she knew would end up on the street.
4 Defendant Faithful broke the law when he helped her do it.  He
5 broke the law when he set up Gulfton to keep the facilitators'
6 cash coming in and the prescriptions going out.

7                 He, of course, did not write the prescriptions;
8 but he was a necessary part of the criminal organization.  He
9 was a partner.  Partners in Gulfton; partners in crime.  And
10 what was the goal of their partnership?  You saw it, ladies and
11 gentlemen.  Cash.

12                 Government Exhibit 208 at 4 on the left and 3 at
13 5 on the right.  $141,000 recovered from Shane Faithful's house.
14 Almost 40,000 on the right recovered from Gazelle Craig's
15 apartment.  How do they get that kind of cash?  Facilitators,
16 ladies and gentlemen.  Cash for scripts every day split 50/50,
17 all to line the pockets of Gazelle Craig and Shane Faithful.

18                 Ladies and gentlemen, you got to see how Shane
19 Faithful ran Gulfton clinic on a day-to-day basis.  The gates
20 opened at 7:30.  You saw that at the beginning of the trial with
21 the pole camera footage.  Take everyone's ID and run their
22 prescription history.  That was Faithful's rule to protect
23 Dr. Craig and a rule to detect law enforcement.

24                 Diversion Investigator Mills testified last week
25 that DEA had difficulty infiltrating Gulfton because they didn't

1 have any agents with the right prescription history, and Craig

2 and Faithful knew that.  That's why they set up that barrier.

3 Roughly, 300 per person, $300 cash, no credit cards, no

4 insurance.  Faithful's price; Faithful's rule.

5                    Why no credit cards?  Because credit card

6 transactions create records.  Records are traceable.  They knew

7 that DEA could find out who was really paying for the

8 prescription.  The same customers every day, the same

9 facilitators.

10                   And why no insurance?  Because insurance

11 companies keep records.  Employees were paid in cash until

12 Ericka Hayes asked to be given a paycheck.  She wanted proof of

13 income.  Proof of income is exactly what Gazelle Craig and Shane

14 Faithful didn't want.

15                   Surveillance cameras everywhere.  Faithful's rule

16 to keep an eye on everyone all the time.  No cell phones.  No

17 bookbags.  No binders.  No headphones.  Faithful's rule to deter

18 law enforcement.  Faithful instructed staff to do pat-downs

19 instead of physical exams.  Faithful's rule to detect law

20 enforcement.

21                   You heard Ms. Loren Phillips say that she heard

22 Mr. Faithful give that instruction to the staff; and then, you

23 heard Mr. Webster testify when he went the second time, he got a

24 pat-down.  And then, if someone broke one of the Defendant's

25 rules, they would kick that person out of Gulfton and give the

1  facilitator a credit for a future person.

2              The credit was never given back to the patient.
3  The credit was given back to the facilitator.  It wasn't the
4  patient's money.  It wasn't the patient's prescription.
5  Faithful's rule; Craig's rule.  Corroborated by the expense
6  reports and the store credit seized in Faithful's house.
7  Corroborated by the sign-in sheets and the store credit found at
8  the clinic.  And corroborated by Gulfton's records that were
9  given to DEA by Ms. Loren Phillips.  And it was never enough.

10             Shane Faithful had the employees call 50 to 100
11 people at random every day trying to keep the people coming in,
12 but it didn't work because the numbers in the files were fake.
13 It was not a democracy.  He runs the show.  You heard it, ladies
14 and gentlemen.

15             You also heard how Dr. Craig ran the medical side
16 of Gulfton.  No patient allowed without a prescription history.
17 No medical records requested from doctors.  Or when there were
18 medical records in the file, she didn't look at them.  Quick
19 interactions with patients and then on to the next one.

20             If she catches someone on their phone, kick them
21 out and give a store credit to the facilitator or reduce the
22 pills on their prescription.  If they're going to give a
23 facilitator store credit, she's got to sign it, he's got to
24 approve it.

25             Last week you saw and heard how she ran her

1   practice.  This week, you've seen and heard from her.  She
2   provided a lot of answers that didn't make sense and some were
3   just not true.  She told you that her unlicensed assistant
4   spent, at least, 30 minutes with every person that she saw.
5   Simple math, ladies and gentlemen.  30 minutes, 60 patients a
6   day, that would be 30 hours that that unlicensed assistant was
7   spending with people.  That's physically impossible.
8                    She had the audacity to tell you, ladies and
9   gentlemen, she didn't know who got the other half of the cash.
10  Maybe most brazen of all was her response to the investigation
11  by the Texas Medical Board.  As soon as Dr. Craig discovered
12  that the Texas Medical Board was investigating her practice, she
13  tried to get out of dodge.
14                    Within two weeks of finding out about that
15  investigation, she had applied to two other states' medical
16  boards and then lied on those applications.  She lied to Hawaii.
17  She lied to California.  And then, she lied to you.
18                    Craig and Faithful's formula was simple:  Have
19  the prescription history, bring the cash, check the boxes to say
20  you're in pain, don't use your phone, and get the prescription.
21                    Next, I want to go through a five-day period --
22  or five days in the business of Gulfton.  Five days showing
23  Craig and Faithful's partnership, their conspiracy, and what it
24  got them.  Five days in the evidence from five different
25  sources:  evidence seized from Faithful's house, evidence seized

1  from Dr. Craig's house, evidence seized from the clinic,

2  evidence brought by Ms. Phillips to DEA, and then the

3  Prescription Monitoring Program report.

4            The first of the three -- the first three days

5  are June 28th, 29th, and 30th of 2016.

6            If we could go to Government's Exhibit 318.

7            This exhibit, ladies and gentlemen, is from one

8  of the appointment books that was recovered by DEA agents at the

9  Gulfton clinic.  If you look on the screen, we have June 29th,

10 June 30th, and June --

11           It should be 28th, 29th and 30th.

12           If you look on the screen, you see that E. J. was

13 bringing four patients; Ronnie was bringing four patients;

14 Cherry was bringing two; Kool was bringing four; Tywoo was

15 listed there; Wilbert was bringing four; and Dre, four.

16           What do those patients turn into on June 28th of

17 2016?  Government Exhibit 201 seized during the search of Shane

18 Faithful's house.  This is one of the expense reports identical

19 to the ones that Ms. Phillips brought to DEA.  On June 28th of

20 2016, you can see that Gulfton made $8,840 from those patients.

21           Next page of this exhibit, 201 at 2, is the

22 sign-in sheet from that day; and if we can zoom in to the right,

23 you can see -- and this was again recovered at Mr. Faithful's

24 house.  It says phone, Tywoo, credit, $130.

25           Ladies and gentlemen, remember seeing on the

1  previous exhibit, the planner, that Tywoo was bringing a

2  patient.  Here, we have Tywoo's patient being caught on the

3  phone.  So, he's getting a credit for $130 back.

4                     If we could go to the next page, please, of the

5  exhibit.

6                     You see that there are 33 patients that came to

7  Gulfton that day, June 28th.  And what do those 33 patients get?

8  Government Exhibit 800 is one of the summary charts.  They got

9  3,715 pills of Norco, 2,880 pills of Soma.  All but two of those

10 are for 120 and 90; 120 Norco, 90 Soma.

11                     The next day, June 29, 2016.  Let's start with

12 the sign-in sheet.  This was one seized by agents at Gulfton.

13                     And if we can zoom in again to between 12 and 13.

14                     Tywoo was back the next day.  His patient gets

15 kicked out on the 28th.  Then, he brings another person back on

16 the 29th.  Here, he's using his credit for $130 because the

17 previous day his patient got kicked out on the phone.  This

18 document was seized by agents at Gulfton.  Their own records.

19                     And if we could go to the next page.

20                     And then the next page.

21                     On June 29th, 58 patients at Gulfton clinic.

22 What does that 58 patient number mean for Gazelle Craig and

23 Shane Faithful?  Government's Exhibit 205 at 5 is another

24 expense report again found at Shane Faithful's house that tells

25 you exactly what he and Dr. Craig received from those patients,

1  those people.  $15,080 for business that day.  That meant $6,515

2  for him, $6,515 for Dr. Craig.  Notice here that, of course,

3  they had to take out Tywoo's credit of $130 so the numbers

4  matched.

5           The next day is June 30th of 2016.

6           If we can start at -- oh, sorry, you're right.

7  If we can go to Government's Exhibit 205 at 7.

8           This card for store credit was found at Shane

9  Faithful's house attached to that expense record.  This is for

10  Tywoo's patient.  This is the one that had been caught on the

11  phone on the 28th and then given the $130 credit to Tywoo and

12  replaced on the 29th.  In the upper left-hand corner signed by

13  Gazelle Craig.

14           June 30, 2016, the sign-in sheet.

15           The next page.

16           Next page.

17           48 patients.  What did Dr. Craig give those 48

18  people?

19           Next page.

20           45 of them got Norco and Soma.  5,400 pills of

21  Norco, 3,930 pills of Soma, all for the maximum strength at her

22  maximum dosage.  The maximum strength and the maximum dosage for

23  people reeking of alcohol, reeking of marijuana.

24           I want to move to a different month, November

25  11th of 2016.  We can start with the sign-in sheet.

1          Next page.

2          Next page.

3          Ladies and gentlemen, it's upside down; but it's

4 59 patients on 11-11-16.

5          If we could go to Government Exhibit 603 at 21.

6          This was an expense report provided to DEA by

7 Ms. Phillips.  You'll notice --

8          This is the wrong one.

9          The November 11, 2016, expense report brought by

10 Ms. Phillips to DEA indicates 59 patients just like were shown

11 on the sign-in sheet.  It reflects that $18,880 cash was brought

12 into Gulfton clinic split halfway between Gazelle Craig and

13 Shane Faithful.  Split between the two of them, that was

14 $3,978.44 after expenses.  And Government Exhibit 3 at 15 which

15 is a photograph taken at Dr. Craig's house, 11-11-16, for

16 $3,978.44.  Just like is written on the expense report.

17          Finally, let's move to July 7th of 2017.  That's

18 Gazelle Craig and Shane Faithful's last day at Gulfton.  Let's

19 start with the sign-in sheet.

20          Next page.

21          Next page.

22          One more.

23          66 patients on July 7th, the last day they were

24 in operation.  What does 66 patients look like?

25          Well, ladies and gentlemen, you saw at the

1 beginning of trial from the pole camera footage -- we're going

2 to play that again in a moment.  From July 7th of 2017.

3          (Video recording played in open court.)

4          MR. HELFMEYER:  You'll notice the gates opening, the

5 cars are rushing in.  And then, in a few seconds, you're going

6 to see the masses of people coming from the right.  It's going

7 to look like white blobs, but they're moving, and it's people

8 coming in lining up to get into Gulfton clinic to see Dr. Craig.

9               Remember, Ericka Hayes' testimony.  99 percent of

10 these people that you see coming in right here were brought by

11 facilitators.  The prescriptions that these people are about to

12 get by Dr. Craig are going to be filled at a pharmacy and then

13 sold on the street.  These 99 percent were professional patients

14 given breakfast and beer and $60 just like Paul Fernandez and

15 then sent on their way.

16               But who profits?  You know who profits the most?

17 They're sitting right here at this table.  These two.  From July

18 7th of 2017 --

19               If we can go to Government's Exhibit 361 at 18.

20               This is the photograph that agents took after

21 they did the raid at the clinic.  $5,720 to Dr. Craig; $5,720 to

22 Shane Faithful, all drug money.  You heard testimony from two

23 experienced doctors:  Dr. Owen and Dr. Ajinder Dhatt.

24               Dr. Owen testified about the standard of care.

25 The standard of care is the floor for a medical practice.

1 Dr. Craig was prescribing in the basement.  Dr. Owen testified
2 that it is grossly below the standard of care to prescribe Norco
3 and Soma together based on the danger for abuse, the lack of any
4 proven benefit; and he wasn't alone.
5               Dr. Owen testified to it; and then, when
6 Dr. Craig took the stand, we showed her her continuing medical
7 education; and it's on the screen right now.  Carisoprodol
8 should not be used particularly in combination with opioids.
9 That's all of Gazelle Craig's practice.
10               In the next paragraph, the combination of an
11 opioid, a benzodiazepine like alprazolam, and carisoprodol is
12 inappropriate and is a substitute for cocaine and heroin.
13 That's what Dr. Craig prescribed because that's what her
14 customers wanted.
15               Ladies and gentlemen, remember Monday morning,
16 Ms. Esther Magana testified.  When we showed Dr. Craig
17 Ms. Magana's DPS report, the prescription history, we learned
18 that Dr. Craig was prescribing Norco and Soma on top of another
19 doctor's prescription for alprazolam, this combination that is
20 cocaine and heroin and should never be prescribed.  That was her
21 practice.
22               Dr. Owen went through in detail the other way
23 that Dr. Craig was falling below the standard of care:  not
24 requesting prior medical records; and we did see two instances
25 where prior medical records were in the patient files:  for

Mr. Paul Fernandez with cirrhosis of the liver and Ms. Charlotte
Mason with severe respiratory failure, both people that never
should have been prescribed the drug cocktail that Dr. Craig was
prescribing.

            And what did she do?  Prescribe, prescribe,
prescribe.  Even after she found out that Ms. Mason had this
serious condition that her lungs were failing, she wrote her a
prescription for 120 pills of Norco that day.  Dr. Owen said she
fell below the standard of care for not providing adequate
examination, not trying less dangerous treatments before
opioids, not doing blood tests.

            And Dr. Craig told you that, that she didn't have
the ability to do blood tests.  Nonetheless -- and you'll have a
chance to go through the patient files if you'd like -- every
single examination where there's a lab component on the form,
there are three of them circled every single time.

            Remember Paul Fernandez?  He first went to
Dr. Craig in 2015.  Plan is circled for the labs.  He went again
in 2016 and, again, in 2017.  Each time she's planning in the
future to do lab tests.  Never done.  And why does it matter for
Mr. Fernandez?  Because Mr. Fernandez has cirrhosis of the
liver.  And if she had actually done those blood tests, she
would have known that.  It would have shown up in the test.  But
I guess she did know that because it was in her patient file
that he had cirrhosis, and she wrote him six prescriptions for

1  Norco.

2           Dr. Owen said that Dr. Craig fell below the

3  standard of care by not providing individualized treatment, that

4  is, prescribing the same strength Norco to everyone regardless

5  of age, sex, height, weight, or medical history.  She provided

6  the same strength to everyone.

7           This is Government's Exhibit 801 again that we

8  looked at before from June 30th.  The same strength to everyone.

9  18,000 prescriptions for Norco, all but one for the same

10 strength, the maximum strength, ten milligrams.  One

11 prescription for one person below the maximum.  That one person?

12 Shane Faithful.  One prescription for five milligrams of Norco.

13 Maybe she cared about him.

14           Based on the 35 random files that Dr. Owen

15 reviewed, in his expert opinion he concluded -- and it wasn't

16 close -- that Dr. Craig was falling below the standard of care.

17 She was not practicing medicine.  But ladies and gentlemen, you

18 don't need Dr. Owen to tell you that.  You just need to use your

19 common sense.

20           What decision have you seen or heard that

21 Dr. Craig made during her practice at Gulfton that anyone

22 couldn't have made regardless of medical training?  What have

23 you seen or heard that she did that made you believe that she

24 needed a day of medical school?  Not the way she prescribed the

25 same thing -- same strength to everyone, not the way she filled

1  in the cookie-cutter charts, not the way she never advised any

2  of the people about how to take their meds.

3              She didn't need to advise them how to take their

4  meds.  The drugs were not for them.  The money was not from

5  them.  The meds belonged to Uncle Ronnie or Wilbert or Tywoo who

6  got their $800 on the street just like Gazelle Craig and Shane

7  Faithful raked in their cash at the end of the day.

8              You don't need -- you don't need medical school

9  to do what Dr. Craig did, but you do need a medical license.

10  You need a license to practice medicine and a DEA number.  She

11  had that license, and she had that number.  She had the license

12  to prescribe medication, but she treated it like a license to

13  deal.

14              All she needed was a partner to handle the

15  business side, and she had that in Shane Faithful.  With Shane

16  Faithful's help, his aiding and abetting, Dr. Craig took that

17  DEA number, that trust of first do no harm, and she pushed over

18  two million pills of hydrocodone onto the streets of Houston.

19              Dr. Dhatt, Dr. Ajinder Dhatt, testified about his

20  treatment of two patients:  Amanda Robinson and Reginald

21  Sedberry.  He remembers his patients.  He knows facts about

22  their life.  He was practicing medicine.  All Dr. Craig did was

23  pocket the cash and prescribe the pills.

24              Any basic inquiry into Reginald -- any basic

25  inquiry would have shown that Reginald Sedberry is severely

1  mentally disabled.  He's addicted to cocaine.  He's an

2  alcoholic.  He hallucinates and reports seeing demonic black

3  cats.

4           Dr. Dhatt testified that Mr. Sedberry doesn't use

5  Norco.  Cocaine and alcohol are his drugs.  Dr. Dhatt testified

6  that Mr. Sedberry is homeless and relies on government

7  assistance.  No way he has access to $300.  The only explanation

8  is that Mr. Sedberry, like Paul Fernandez, was being brought by

9  one of these facilitators.

10          A quick glance at Amanda Robinson's medical

11  history would show that she's already detoxing from Dr. Craig's

12  cocktail, that she's depressed and bipolar and that the last

13  thing she needs is 120 pills of Norco.

14          And Charlotte Mason.  Charlotte Mason has severe

15  respiratory failure.  She tried to commit suicide by downing a

16  bottle of Ambien.  She demanded Norcos.  Two doctors at

17  University of Texas Medical Branch refused to serve her Norcos

18  because she was seeking.  So, she went to Gazelle Craig and got

19  her Norcos.

20          It wasn't that Dr. Craig didn't know about the

21  patients, it's that she didn't care because it didn't matter.

22  The prescriptions weren't for them, the money wasn't from them.

23  They weren't her real customers.

24          You saw and heard about the steps that Faithful

25  and Craig took to conceal their crimes.  All of Faithful's

1 rules, no phones, no bookbags, no Bluetooth, no binders, all
2 were designed to prevent law enforcement from infiltrating their
3 criminal organization; and they worked.
4          Davis Webster testified to you last week that he
5 had a binder the second time he went in.  The security guard
6 made him leave with the binder because they knew that you could
7 hide a recording device in there.  Having a binder is not a
8 violation of HIPAA, ladies and gentlemen.  Dr. Craig's story is
9 nonsense, transparent, and false.
10          They did pat-downs instead of exams.  Four or
11 five or six armed security guards, armed security guards testing
12 for bugs and wires on the door like Special Agent Graham
13 testified.  They had surveillance cameras.  More money spent on
14 surveillance cameras than all of the medical equipment at the
15 Gulfton clinic combined.
16          And Mr. Faithful gave instructions to
17 Ms. Phillips about what she should do with these expense reports
18 that are in Government's Exhibit 603.  First, he said don't put
19 Gulfton's name up at the top where it says "Company name here."
20 Then, he said shred them.  Don't keep any records at the clinic.
21          And you'll notice that when DEA agents raided the
22 clinic, executed the search warrant, there weren't any expense
23 reports because they had all been shredded; but they were found
24 at Shane Faithful's house; and the ones found at Shane
25 Faithful's house corroborate the envelopes found at Shane

1  Faithful's house, corroborate the sign-in sheets that were found
2  at Gulfton clinic, corroborate the envelopes that were found at
3  Dr. Craig's house.

4            Craig and Faithful set the most superficial rules
5  to weed out doctor shoppers, doctor shoppers they knew would
6  raise red flags for the Texas Medical Board or the DEA.  The
7  only people who got turned away were those who would get them
8  caught; and when they did get turned away, they let a
9  facilitator fill that spot, not practicing medicine, just trying
10 not to get caught.

11            And they put filler in the medical files.
12 Remember what Ms. Hayes testified earlier.  After looking at the
13 medical files and urine test reports, she said it was fluff.
14 Every step Gazelle Craig and Shane Faithful took at Gulfton was
15 an attempt to either conceal their crime or increase their cash.

16            I want to turn to the undercover visit that
17 account for Counts 2, 3, and 4 of the indictment, the visits of
18 Davis Webster and Special Agent Graham.  First, Davis Webster
19 went on March 10th of 2017 which is Count 2.  When he arrived,
20 he immediately saw two crew leaders that he recognized from his
21 time as a crew leader.

22            And let me take a second.  Crew leader is the
23 same as facilitator; is the same as another term that was used,
24 I believe, a runner; is the same as what some other people have
25 called a driver.  It's all different terms for the same idea.

1        So, Mr. Webster sees Uncle Ronnie; and then, he
2  goes into the clinic; and as soon as he steps foot in the
3  clinic, he realizes what's going on.  He knows he's going to
4  have no difficulty getting a script.  Mr. Webster followed Craig
5  and Faithful's rules.  He brought the cash.  He had the
6  prescription history.  He didn't use his phone.  He claimed to
7  be in pain.  And he got the prescription.

8        He's not a real patient, but Dr. Craig doesn't
9  care.  She doesn't ask.  Dr. Craig doesn't even bother to ask
10 what he had done with his previous prescription that he told
11 you, ladies and gentlemen, he sold on the streets.

12       Government's Exhibit 360 at 24 is the
13 prescription that Davis Webster received from Dr. Craig.  March
14 10, 2017, 100 -- 100 pills of Norco, 80 pills of Soma.  That's
15 Count 2, ladies and gentlemen.  The same drug cocktail she
16 prescribed everyone.

17       Two months later, May 16, 2017, Mr. Webster comes
18 back.  He followed the same rules.  He paid his cash.  He
19 reported the pain.  He didn't use his phone.  He got the
20 prescription.  On May 16th before seeing Dr. Craig, Mr. Webster
21 got a pat-down, a pat-down checking for wires, not a strength
22 test or a Spurling's exam or a flexion test, a pat-down.  That
23 was Mr. Faithful's orders, to check for a wire.

24       You-all heard Mr. Webster's interaction with
25 Dr. Craig on May 16th.  46 seconds.  Dr. Craig admitted on the

stand that she only spent 46 seconds with Davis Webster.  All of
the time on cross-examination when there was some insinuation
that something else happened that wasn't recorded between Davis
Webster and Dr. Craig, gone.  46 seconds; and then, she
prescribed him Norco and Soma.

And ladies and gentlemen, remember that
recording.  What was her response when Mr. Webster reported that
he had reinjured part of his body.  "Oh, that's possible."  She
wasn't practicing medicine when she saw Davis Webster on May 16,
2017.  She was checking out the boxes on a piece of paper and
writing a prescription for the same cocktail she gave everyone.
On May 16th, his prescription, again, was for Norco and Soma.
That's Count 3.

Finally, Count 4 is Special Agent Tonya Graham,
formerly with the Secret Service undercover as Tonya Jackson.
You saw what Special Agent Graham saw as she entered Gulfton
clinic, and I want to play a little less than a minute of it for
you.

(Video recording played in open court.)

MR. HELFMEYER:  Got people lined up out the door.
People lying on the floor.  So, you could see two people lying
on the floor.  And remember what Special Agent Graham testified
to.  She said that she left; came back; and then, after she came
back, saw Dr. Craig come in wheeling her backpack that she would
take the cash home in later that day.

1    So, Dr. Craig would have to go by these people

2 lying on the floor.  So, she lied to you when she told you that

3 she never saw that.  She didn't want you to think that that was

4 actually going on and that she knew it.  But Special Agent

5 Graham followed Craig and Faithful's rules.  She had the cash.

6 She had the prescription history.  She reported the pain.  And

7 she got her prescription.

8    Government's Exhibit 357 at 21 is the

9 prescription for Special Agent Graham -- this is Count 4 --

10 prescribing Soma, prescribing Norco.

11    THE COURT:  45 minutes has gone past, counsel.

12    MR. HELFMEYER:  Thank you, your Honor.

13    She spent 91 seconds with Tonya Graham, a person

14 she had never met before and then prescribed her Norco and Soma.

15 You don't need Dr. Owen to tell you that that's not practicing

16 medicine.  Just like you don't need Dr. Owen or Dr. Dhatt to

17 tell you that she wasn't practicing medicine when she prescribed

18 Paul Fernandez the same dangerous drug cocktail eight times.

19    Paul Fernandez went to Dr. Craig in 2015, in

20 2016, in 2017, both before and after Ericka Hayes and Loren

21 Phillips worked there.  The same prescription every time.  955

22 pills of Norco.  How many did he take?  One.  But one is more

23 than the number of physical examinations he received by

24 Dr. Craig or anyone else at Gulfton.

25    I wrote down an exchange between, I believe,

1 Mr. Lewis and Mr. Fernandez on cross-examination.  Question:
2 Did you get examined by somebody at the clinic, by the doctor or
3 someone else at the clinic as far as a physical examination?
4          Answer:  No.
5          Almost a thousand Norco pills, zero examinations.
6 But Paul Fernandez is just an example, albeit an offensive one.
7 He's just one of the 99 percent that Ericka Hayes talked about.
8          Alice Goulsby, the other person that testified on
9 Monday.  She said she went to Gulfton with an unknown and
10 unidentified associate.  She said she didn't know what kind of
11 clinic it was before she got there.  She said that money is
12 tight, and it's hard to come up with $300.  Sometimes she had to
13 take a loan to pay those $300.  And she went every month but
14 only took 60 pills.  And when I asked her what she did with
15 those other 60 pills, she said threw them out.
16          Dr. Craig wrote the prescriptions; Shane Faithful
17 wrote -- made the rules.  They both got the cash every day.
18 Partners in Gulfton; partners in crime.
19          Judge Hittner has already instructed you on the
20 law.  So, I just want to apply the law to the facts of this
21 case.  The first element of the conspiracy is an agreement to
22 unlawfully distribute a controlled substance.  That agreement
23 was proven by evidence of each day Shane Faithful and Dr. Craig
24 going to Gulfton or working at Gulfton or setting the rules at
25 Gulfton or enforcing the rules at Gulfton, and each time they

1  took home an envelope stuffed with cash.

2            The second element is that they knew of the
3  unlawful purpose of this enterprise.  The facilitators, ladies
4  and gentlemen, Craig and Faithful's real customers at Gulfton
5  clinic.  Faithful knew it.  It was his term.  He had to approve
6  any time a facilitator wanted to replace a patient or they
7  wanted to give that person a store credit.

8            Dr. Craig knew it.  She had to initial all of the
9  credit cards.  They knew who their customers were.  Ericka Hayes
10  knew within a month.  She was fresh out of MA school, but she
11  figured out what was going on.  Dr. Craig and Shane Faithful ran
12  the clinic for two and a half years.  How could they possibly
13  claim they didn't know what was going on?  Think of all the
14  steps they took to avoid detection that I went over a few
15  minutes ago.

16            Now, during trial, Mr. Lewis has continually
17  emphasized this idea that pain is subjective as if to say that
18  because pain is subjective you have to believe every word out of
19  a patient's mouth.  But the two doctors who testified last week,
20  Dr. Owen and Dr. Dhatt, testified that because pain is
21  subjective, the physician has to work even harder; that when
22  somebody reports pain, they have to dig; that when Dr. Dhatt
23  treated Amanda Robinson and Reginald Sedberry, he dug and didn't
24  prescribe them hydrocodone.  You can't just take the patient's
25  word for it.  The risks are too high.  Amanda Robinson's story

1   tells you that.

2           And finally, as to their knowledge, Dr. Craig

3   testified yesterday that she got a copy of every single sign-in

4   sheet every day.  Remember the sign-in sheet that I put up on

5   the board.  Two days in a row it mentioned Tywoo replacement

6   credit.  That was the sign-in sheet that Dr. Craig got back in

7   her office.  And now, she's telling you she didn't know.

8   Partners in Gulfton; partners in crime.  And as partners in

9   crime, they're both guilty of each other's crimes.

10          Dr. Craig distributed controlled substances by

11  writing prescriptions for Norco and Soma without a legitimate

12  medical purpose and outside the scope of professional practice.

13  As a co-conspirator and somebody who assisted her in the

14  operation, Shane Faithful is as guilty as if he was the one

15  holding the pen.  As partners, they acted together, they

16  profited together, and they should be convicted together.

17          In his opening statement, Mr. Williams told you

18  to pay close attention to the sources of the evidence.  I agree.

19  Look at all of the sources of the evidence that the Government

20  brought you in this trial.  Special Agent Graham set the scene.

21  You saw the video.  You saw the way she saw it.

22          You learned the insider's perspective from Ericka

23  Hayes and Loren Phillips, how Craig and Faithful relied on the

24  facilitators for almost all of their income.  That testimony was

25  corroborated by document after document, expense reports,

1  sign-in sheets, and envelopes seized from Shane Faithful's
2  house, from the clinic, and envelopes seized from Dr. Craig's
3  house.  You heard the perspective of Davis Webster who
4  previously operated a pill mill.  He testified that he knew as
5  soon as he came in what was going to happen, and that is what
6  happened.
7              Then, you saw the why of all of this.  The cash.
8  We don't have to prove the why, ladies and gentlemen.  But we do
9  because it helps show the motive for this crime.  You saw
10 $180,000 displayed on Mr. Faithful's bed that had been seized
11 from his house, almost $40,000 from Dr. Craig's.
12             You learned the volume of Dr. Craig's prescribing
13 through Agent Mills and the Prescription Monitoring Program.
14 And why is that volume important?  It shows that this is not a
15 mistake, that Dr. Craig prescribed the same drugs to everyone
16 over two and a half years, willfully and intentionally doing it
17 every single day.
18             And then, you saw and heard about the real
19 dangers of the Defendants' crimes.  Paul Fernandez, Amanda
20 Robinson, Reginald Sedberry, and Charlotte Mason; and that was
21 put into the medical context by Dr. Dhatt and Dr. Owen.
22 Remember what Dr. Dhatt said when I asked him why he didn't
23 prescribe Amanda Robinson with Norcos.  He said it would be a
24 disservice to her, that she's an addict.
25             And you'll notice over there on the side, as I

1  talk about sources, what we've written here are the exhibit
2  numbers and what they correspond to.  Exhibits 2 and 3 were
3  taken from Dr. Craig's house.  So, that's envelopes and
4  photographs.
5            The 200s are the evidence taken from Shane
6  Faithful's house.  Those are the expense reports, the sign-in
7  sheet, the envelopes stuffed with cash, and the cards for store
8  credit given to facilitators.
9            And then, the 300s are all of the items that were
10 seized from the clinic, all the sign-in sheets, the cards for
11 store credit, and the photographs of the cash, the photographs
12 of the rules that they put in place, the rules that said it was
13 inappropriate to prescribe Soma and Norco together.
14           Ladies and gentlemen, we all want to believe that
15 we can trust physicians.  We rely on them to treat us.  We rely
16 on them to treat our loved ones.  We rely on them to get us
17 better when we're ill.  When they violate that trust, we hold
18 them accountable.
19           Dr. Craig violated the trust that was put in her
20 as a doctor.  All of Shane Faithful's and Gazelle Craig's
21 actions in running Gulfton were either designed not to get
22 caught or to make more money.  Gulfton clinic was a drug
23 trafficking organization masquerading as a medical clinic.
24           Shane Faithful set the rules; Gazelle Craig wrote
25 the prescriptions.  Partners in Gulfton; partners in crime.

1  They're guilty of all counts as charged.  Convict them, ladies

2  and gentlemen.

3        THE COURT:  All right.  You've used about 52 and a

4  half minutes, okay?

5            All right, ladies and gentlemen, we'll take a

6  break at this time.  It's about right at 3:45.  We'll get right

7  back at 4:00 o'clock.  See you in 15 minutes.

8        THE COURT SECURITY OFFICER:  All rise for the jury.

9     (The jury recessed at 3:45 p.m.)

10        THE COURT:  Just before we started up, there was a

11  reminder about a ruling.  I made it orally in front of the jury;

12  but again, just to be clear, Mr. Williams' motion for mistrial

13  is overruled.

14            All right.  We'll see you back in 15 minutes.

15            Ellen, you took the one out.

16            So, there are now 13 names in that box.  If you

17  want to check it, do it during the break.  I'll double-check it

18  as soon as we begin with the defense case.  I'll go double-check

19  again for you.

20            All right.  See you in 15 minutes.

21     (Court recessed at 3:46 p.m.)

22     (Court resumed at 4:06 p.m.)

23        THE COURT:  All right.  The defense has a total of 80

24  minutes, ladies and gentlemen.  Then, we'll hear the remaining

25  part from the Government; and then, we'll wrap it up.

1          MR. WILLIAMS:  May I proceed, your Honor?

2          THE COURT:  Yes, sir, go right ahead.

3          MR. WILLIAMS:  Thank you.

4               Ladies and gentlemen of the jury, first of all, I

5     want to thank you-all for serving.  Jury duty, I hear questions

6     from my friends all the time:  "What can I do to get out of jury

7     duty?"  And I always tell them to go serve, okay, because we

8     always -- nobody wants to serve until it's somebody close to

9     them.  It's their loved ones.  And then, they get a jury and

10    say, "Oh, I didn't like that jury."  Well, if you don't serve,

11    you can't complain.

12              I appreciate each and every one of you-all for

13    serving.  We've been here eight days now.  I look at you every

14    day.  I see the attentiveness that you've provided for my

15    client, Mr. Faithful; and without you, we don't get a day in

16    court.  And we appreciate you being here.

17              Now, let's go back to the beginning when I

18    opened.  I told you from the beginning you have to consider the

19    source of the particular evidence that this Government is going

20    to bring.  I told you that there are going to be paid

21    informants.  I told you there are going to be convicted felons,

22    okay.  I told you that there are going to be people who have a

23    direct stake in the outcome of this.  And you've seen that from

24    all of these witnesses, each and every one of them.

25              Now, I also told you you're going to get bits and

1 pieces from the Government.  I told you they're going to play
2 you a little snippet of this, okay.  I told you that.  You've
3 seen that.  They did it all trial.  They've done it in closing
4 arguments.  They give you a little piece of it.

5            Now, you've heard the evidence.  However, let me
6 explain something to you right now.  You didn't hear all of the
7 particular evidence, and you still have an opportunity to do it.
8 Okay.  We have an exhibit list that's been filed.  All of this
9 stuff has been admitted into evidence, and you can ask for any
10 of it that you want to review.  Those tapes that you've been
11 hearing portions of, I submit to you ask for them and listen to
12 the whole tape.

13            Now, the problem that the Government has is the
14 same problem that I have in terms of playing these whole tapes,
15 okay.  The problem is we're under an order from this Court as to
16 time.  If we spend an hour, two hours listening to the tapes,
17 looking at pole cams, it cuts into the time that we want to
18 present our evidence.  As a result, we don't play it all.  But
19 until you hear it all, it doesn't make a lot of sense.

20            You've heard portions of what Mr. Faithful said.
21 You've heard portions of it.  I submit to you when you go back,
22 ask for the evidence.  You can get it.  You can listen to it.  I
23 know that's tough to do sometimes.  Sometimes you just figure I
24 don't want to hear all that, I've heard enough.  But if you
25 don't hear it all, it's difficult to render the correct verdict.

1      So, I submit to you, even though you've heard
2  evidence because you heard it from the witness stand -- you're
3  not going to get any more evidence from the witness stand; but
4  you are allowed to ask for certain things, okay, that are
5  already in the particular evidence, all right.
6      Now, the judge has given you -- charged you.  He
7  spent 35 minutes reading this 42 pages of documents, and I
8  submit to you you got some homework to do.  You got some
9  homework to do.  This is the law.  This is the charge that his
10  Honor has given you.  You got to follow it.  You got to follow
11  it.
12      There's some things in here that give you a clear
13  roadmap as to what you do when you examine the particular
14  evidence.  Your job now is to take this law and apply the
15  evidence to this law to determine if, in fact, Mr. Faithful is
16  guilty of what they've charged him with.
17      Now, I know it's long.  I know it's a lot of
18  stuff in here; but you got to read it because, if you don't
19  understand the law, you can't apply the facts; and I want to
20  just point some of those things out to you, okay.
21      Now, number one, you-all are the jury; and what
22  the jury does is assess the particular evidence.  There's
23  something called a presumption of innocence.  Mr. Faithful is
24  innocent, okay.  They have to prove each and every element that
25  his Honor has given to you-all.  How do they have to prove it?

1 They have to prove it beyond a reasonable doubt.

2                    Now, I'm sure you've heard that all your life,

3 beyond a reasonable doubt.  This judge is going to give you a

4 clear and concise definition as to what that is.  You pay

5 attention to it.  It's the last paragraph on page four.  And it

6 reads:  Reasonable doubt is based -- is a doubt based upon

7 reason and common sense after careful and impartial

8 consideration of all the evidence in the case.  That's why I'm

9 telling you you have to listen to those tapes to hear all of it.

10 You can't just listen to one part of it because it's deceptive,

11 okay.  It only gives you part of it.

12                    Now, proof beyond a reasonable doubt, therefore,

13 is proof of such a convincing character you would be willing to

14 rely and act upon it without hesitation in making the most

15 important decisions of your own affairs.  That's what reasonable

16 doubt is.  I submit to you that's a high burden, a high burden.

17 It's not easy to do, okay.  But you have to look at this

18 particular evidence and make a decision if, in fact, you believe

19 the evidence that the Government has given you beyond a

20 reasonable doubt.

21                    Now, the judge has also given you some

22 instructions regarding accomplice, informers, immunity, okay?

23 Now, what that applies to is people who have been paid, people

24 like Loren Phillips, okay?  All right.  People like Graves Owen,

25 all right?  Think about that.  He's going to charge you, and

1  he's going to tell you the testimony of these particular people,

2  okay, must always be examined and weighed by a jury with greater

3  care and caution than the testimony of an ordinary witness.

4  Keep that in mind when you think about who's presenting this

5  evidence to you, okay?

6              Now, you, the jury, must decide whether the

7  witness's testimony has been affected by these circumstances,

8  okay.  By the money that's been paid, okay.  By the witness's

9  interest in the outcome of the case, okay.  By prejudice

10  against the Defendants or by benefits that the witness has

11  received either financially or as a result of being immunized

12  from prosecution, meaning we aren't going to charge you.  Okay?

13  Think about that when you evaluate the particular evidence

14  that's been brought to you.

15              There's also one in here which deals with plea

16  agreement.  That goes directly to Davis Webster.  Okay.  All

17  right.  It's on page 11.  I don't have enough time to go into

18  all of this because I only have 40 minutes.  It sounds like a

19  lot of time; but before you blink, I'll be sitting down again.

20              Now, understand what summation is.  The summation

21  that I'm giving you is what I believe the evidence shows, and

22  I'm not trying to deceive you.  I'm not trying to mislead you.

23  I'm going by my memory.  It's been a long trial.  It's been

24  eight days, okay.  Things -- we've been here a long time, okay.

25  Sometimes, I forget things.  Sometimes, what somebody said, I

1  may misconstrue; but what I want you to do is rely upon your own
2  understanding, okay.
3            You've heard from Mr. Helfmeyer regarding his
4  particular view of what happened.  He's given you 52 minutes of
5  what he believes happens.  Some of the characterizations I
6  disagree with.  But it's going to be up to you-all to determine
7  what you heard from the witness stand and what you evaluate from
8  all these particular witnesses, all this particular evidence
9  that's on this particular exhibit list.
10           Now, let's talk about the source of this
11  particular evidence.  Let's talk about the sources of the
12  evidence.  Now, you've had special agents.  You've had
13  confidential informants.  You've had paid experts.  You've had
14  patients, and you've had convicted felons.  Let's take them in
15  the order.  Let's take them in the order.
16           First person I would like to talk about is Loren
17  Phillips.  The Government's paid what they call a confidential
18  source.  I call her a snitch, basically.  They're paying her.
19  Think about it.  They've been telling you in summation it is so
20  hard to infiltrate this particular organization.  But then,
21  think about the dates.  Think about the particular dates.  It's
22  so difficult to get in here.
23           But they decide to pay Loren Phillips on March
24  1st.  Davis Webster goes in March 10th.  March 10th.  Now, prior
25  to that, they sent two other people in who couldn't get in.

1  Davis Webster had no problem getting in.  Tonya Graham had no
2  problem getting in.  But they want you to believe that it was so
3  tough that we just had to pay this person money so we could
4  figure out what's going on.

5           Now, let's talk about Loren Phillips.  From the
6  beginning, her testimony was a lie, first time she called, she
7  lied.  She lied.  She said, "I'm" -- "I got a friend who works
8  in a particular clinic," okay.  We asked her about that.  "Well,
9  I was scared," okay.  Now -- but somewhere along the way she
10  stopped being afraid.  She stopped being afraid.

11           Now, when I asked her about that date that she
12  decided that she finally wanted to call, what does she come up
13  with?  "Well, I had a talk with God, had to determine what side
14  I wanted to be on."  All of a sudden, you wake up one day and
15  God tells me this is what I got to do.

16           Now, obviously, early on, the Government decides
17  we might be able to use her.  So, what do they do?  They present
18  her options.  Ladies and gentlemen of the jury, what's wrong
19  with the option of if, in fact, what you're saying is true,
20  stand on your convictions?  When you start paying people, you
21  create a whole other bias that can't be overcome.

22           They created that with her; and from the
23  beginning, it was chaos.  I asked her, "When did you first
24  call?"

25           "December 28th, 2016."

1              "Next time you see them?"

2              "Saw them in February."

3              "How long did you see them?"

4              "Oh, about five minutes."

5              "What did you-all talk about?"

6              "Well, we just got familiar."

7              "When is the next time you had a face-to-face?"

8              "March 1st."

9              "March 1st, what happens?"

10             "Well, now, all of a sudden, I'm signing an

11 agreement."

12             And again, this agreement is part of the

13 evidence.

14             You can pull it up, okay.

15             You can pull it up.

16             It's going to be Government's Exhibit Number 602.

17 Write that down.  Pull that and look at it and read it, okay?

18 All right.  It's there.  It's part of your particular evidence.

19 It's difficult for me to go through all of that in the time

20 allotted by this particular Court.  But it's there.  It tells

21 you everything.

22             I asked her a few questions about it, okay; and

23 when we pulled that up, I asked her about some specific

24 questions about it.  I asked her about the part which says

25 you're not to destroy evidence, you're not to obstruct justice,

1 et cetera, et cetera.  It's in the agreement.  Please pull it.
2 Please look at it, all right.  And I asked her about it.

3                And she does a wonderful job.  When Mr. Armstrong
4 asked her questions, she goes right down the line, okay.  But
5 for me, getting her to answer a simple -- a question as simple
6 as "Did you lie to the Government when you first called and said
7 that you were somebody else?"

8                "I don't think so.  I don't remember that.  I
9 wouldn't look at it that way."  I had to ask her the same
10 questions three or four times just to get an answer, a simple
11 answer.

12                Now, the judge has charged you, also -- there's
13 some things in this particular charge that shows you how you
14 judge credibility of witnesses.  They're in this jury charge,
15 okay.  Take a look at it.  That's why I'm saying you have to do
16 your homework.  You have to read the charge to understand how
17 you take in the particular evidence that's been presented and
18 how do you evaluate the evidence that you can still get, okay?

19                Now, she comes in, she talks to them, okay.  I
20 asked the particular agents did you-all take DEA-6s?  Now, what
21 that is is a report that they make which memorializes the events
22 that happened at that particular time so you can remember what
23 goes on, okay.  They put all the relevant stuff in there
24 because, let's face it, this stuff happened over a year ago.
25 You can't remember everything.  But you can always refer to your

1 report.

2                Now, they have several of those reports; but

3 interesting enough, when it comes to her providing evidence,

4 it's nowhere recorded.  Nowhere in any of these reports are they

5 reporting what they're bringing.  Now, obviously, there's got to

6 be protocol from DEA as to how you take evidence.

7                And for anybody to testify that this girl wants

8 to come in with evidence, documents that we don't inventory, we

9 don't mark, we don't look at, we allow her to suggest to us, you

10 take them back -- "I'll take them back, I'll put them on a thumb

11 drive, and I'll bring them back to you."

12                Now, I asked about when did she bring them back?

13 Nobody knows.  Maybe in March, maybe in May, maybe -- what's the

14 problem with this?  But the testimony is I put them on a thumb

15 drive or bring them back.  The testimony from Special Agent

16 Mills is "I downloaded them and I give the evidence back to her,

17 give the thumb drive back."

18                I asked her, "Where is that thumb drive?"  She

19 still doesn't have it.  So, how am I to know if what she put on

20 that thumb drive mirrors what the documents are if you don't

21 inventory them.  That's done on purpose.

22                You mean to tell me DEA agents, our government,

23 doesn't have enough sense when somebody brings you some evidence

24 to mark it and say, "Okay, here it is, all right.  This is what

25 she brought on this particular date, okay.  We made copies of

1  it, we mark it, and here it is.  We keep the original

2  documents."  That way, if there's a thumb drive, I can compare

3  the original documents to what they have.  Don't do it that way.

4  But when she comes in on that particular day, bingo, "Got a

5  check for you."

6              Now, mind you, this is March 22nd, after Davis

7  Webster has gone in, after the date that they claim is so

8  difficult to get inside of this particular clinic.  All right.

9  Now, so, what happens next?  She continues to provide

10  information to the government.  They link up text messages with

11  her, okay.  Link them up.  These are evidence, too.  You can

12  pull them.  You can get them, okay.

13              And if you look at them closely -- and I advise

14  you to look at them -- it's going to show you what's going on

15  with Ms. Phillips and these particular agents.  She's

16  consistently providing things to them while attempting to hide

17  her particular identity the whole time.

18              Now, we eventually get these particular

19  documents.  They bring them back, put them on the thumb drive

20  that we still don't have, and then she brings the blue bag of

21  documents which she claims to be original documents.  I asked

22  her -- took them up to her, "These are the particular

23  documents?"

24              "Yes, they are."

25              That's why I published it to you.  She said

1  they're all original -- in original ink.  That's why I gave them
2  to you.  That's why you're the judges of the facts.  You
3  determine if they're, in fact, the original documents.  The
4  point I'm getting at, you can't rely on those documents because
5  we don't know when they were created, where they were created,
6  if they're originals or not, or where that particular thumb
7  drive is that allegedly was downloaded to produce these
8  documents.
9          Now, anybody can reproduce documents; and I
10 submit to you, again, that's evidence; and if you want to see it
11 again, you can.  And I submit to you to look at it real closely.
12 There are some original receipts, okay?  Office Depot, I can
13 remember.  There's some other documents there, okay, that are
14 originals.
15         These so-called facilitator cards looked to be
16 original, but these expense sheets are not original documents.
17 It's ripe for fraud.  It's ripe for deception, and the
18 Government cannot tell you-all where these documents are, when
19 they got them, okay, and when she produced them.  For all we
20 know, they were produced after the raid.  We don't know.
21         And why don't we know?  They didn't document it.
22 Something as simple as that, as simple as that.  Mr. Armstrong
23 admitted that in his opening.  "Oh, they made some mistakes."
24 Uh-uh.  These are seasoned government agents.  They know better.
25 They know better.  But once they made up their mind that "We

1 want to get to Shane Faithful," they did whatever they thought
2 they needed to do to get to him.

3             And the first thing that they did was get in bed
4 with Loren Phillips who's, basically, the devil herself; and
5 now, they're beholden to her.  So, what do they have to do?
6 They have to do whatever they can to clean her up and make her
7 credible.  I think after seeing her testify on the particular
8 witness stand, there's nothing credible about her at all.

9             So, what does the Government do?  They go out and
10 miraculously find Ericka Hayes less than 30 days ago to come in
11 and clean up Loren Phillips.  And if you notice -- if you look
12 at the particular evidence, that's going to be a pattern with
13 the Government.  For every person that they know they have a
14 problem with, they go find somebody else to try to prop them up.
15 But right now, we're dealing with Loren Phillips and Ericka
16 Hayes.

17             Now, obviously, Ericka Hayes is a liar.
18 Obviously, she's a thief, okay.  Obviously, she allegedly made
19 recordings; but when she turned those recordings over -- those
20 recordings allegedly made back in June, July, when did the
21 Government get them?  They got them this year.  When did
22 Mr. Gainer listen to them?  Two weeks ago.

23             So, you know, if he didn't listen to them until
24 then, when did I get them?  Last minute.  All of a sudden, we
25 got these people to corroborate things.  Here they are.  That's

1  why I went into that questioning regarding the resources of the

2  Government.  Because they act like, "Oh, we just can't find

3  anybody, okay.  We can't find them."  But we found them.  We

4  found patients.  They can't find anybody.  They found one

5  patient.  But we'll get to that.  Let me not get ahead of

6  myself.

7            So, Loren Phillips.  We know she's a thief.  She

8  stole the computer, okay.  And but for that tape, her lie would

9  have stood.  Oh, I didn't take -- "I didn't take a computer."

10 But what did she say on the tape?  "Oh, he may have paid for it

11 but that's my severance pay."

12           Now, anybody who has ever worked understands you

13 don't get severance pay when you quit.  She stole that computer,

14 okay.  I asked her about those particular documents.  "Well, I

15 was supposed to take them home and shred them."  Take them home

16 and shred them?  But you made three copies, and you were taking

17 them home every day, according to you -- according to her

18 testimony.

19           I submit to you that a reasonable deduction from

20 this evidence was she set this up long before and was planning

21 her exit strategy.  Now, why did she do it this way?  Think

22 about the particular testimony.  She testified as to she was

23 making these particular sheets.  The problem with the sheets is

24 they have Shane Faithful and Dr. Craig's name under the bottom

25 of it.  Every one that she brings to you, okay?

1           The ones that they allegedly found elsewhere
2   didn't have that on it.  All right.  I asked Special Agent Mills
3   about that.  There may have been a few.  I asked him to look for
4   them.  Okay.  Now, you can -- you can -- I'm asking you to
5   continue your deliberations by looking at the evidence.
6           It's more than just what was presented from the
7   witness stand.  There are lots of things that they're not going
8   to show you.  They don't want you to see them.  They don't want
9   you to make the particular comparison.  They want to give you
10  what they want to give you in an attempt to get Mr. Faithful by
11  any means necessary.
12          So, we've dealt with Loren Phillips.  Then, I
13  asked -- the last question I asked, I asked her about an e-mail
14  -- I'm sorry, a text message that she sent to somebody with DEA,
15  okay?
16          Judge, could we turn this Elmo on, please.
17          I asked her about that.  "No, I never told them
18  anything like that.  I never did anything of that sort."  Now,
19  this is the text message I'm talking about.  I believe if Shane
20  and Dr. Craig are told that DEA came to my house and removed
21  those accounting sheets and subpoenaed me, they'll rethink going
22  to trial.
23          Who's running the show here, ladies and
24  gentlemen?  Who's running the show?  But she said, "I just made
25  a suggestion."  Well, what's the suggestion?  The suggestion is

1  a lie.  They lied to Shane Faithful, lied to his lawyers about
2  where the source of this evidence came from; and they can lie
3  about it real easily.  Why?  Because it's not documented.
4                Now, there are several of these.  We can go
5  through them all day, okay.  We got -- I've got several pages of
6  these that you can get.  Any time you want them, I've got them
7  right here.  They're part of the evidence.  They're part of my
8  exhibits.  They're in evidence, and you can look at them all.  I
9  don't have time to go through them all, but they're here, and I
10 want you to look at them.  I want you to look at them very
11 closely.
12               Now -- so -- you can turn the lights back on,
13 please; and you can keep this up.  I'm going to use this again,
14 but I like the lights.  Thank you.
15               So, since we know -- and the Government knows it
16 as well as I do -- that Loren Phillips' credibility is zero, we
17 have to come in and try to prop her.  Who do we prop her up
18 with?  Ericka Hayes.  Where has Ericka Hayes been during this
19 whole investigation?  She shows up two, three weeks ago.
20               She testifies.  She testifies about everything
21 she thinks is going on in this particular clinic.  She tells you
22 that "I worked in the back.  I worked in the front, okay.  I saw
23 everything going on, okay."  Now -- but you have to listen
24 closely because when people's testimony are scripted, sometimes
25 they lose thought of things.  Two key things:  When I asked her

1  on cross-examination about facilitators, "I've never heard
2  anybody use that word."
3              What did Loren Phillips tell you?  "Oh, that's
4  Shane Faithful's word," okay.  She didn't say anything about
5  runners.  She didn't say anything -- what was her word?  They're
6  drug dealers.  "When did you formulate this?"
7              "Well, I was there for a little while; and it
8  didn't take me long to formulate it."
9              "What did you do about it?"
10             "Well, I just wanted to get another job and
11 leave."
12             Okay.  When I asked Dr. Craig did anybody from a
13 hospital call to get a reference for her about a job, it hasn't
14 happened.  Okay?  When I asked her about is she working now, she
15 says no.  I can respect that.  I asked her why.  She said
16 personal.  And I understand that.  I didn't badger her.  I
17 wasn't going to treat her like these agents treated Ms. Magana,
18 go to her house, knock on the door, "I'm not going to leave
19 until you tell me what I want to know."
20             I'm not going to treat her like that.  But that's
21 what we're getting from the Government.  That's what we're
22 getting.  And again, in all of these particular conversations,
23 they give you what they want you to have.  And why do they do it
24 that way?  Because they're the federal government, and they hit
25 that stand under the color of "I'm here to protect and serve,

1  all right; and you're going to believe me over anybody else

2  because I'm the government."

3          Why would this lady have a reason to lie to them?

4  Why would she have a reason to lie about somebody coming to her

5  door.  She tells them, "I don't want to talk to you."  Now, all

6  of a sudden, it turns into "I'm not going anywhere, okay.

7  You're going to talk to me.  I'm going to stay here as long as I

8  have to to get what I need."  That's the way the government

9  operates, all right?

10          What happens is the easiest way to get around

11  that is pull your cell phone out, pull it out.  "I'm here.  I'm

12  from the government.  Here's my ID," click.  Then, we don't have

13  these disputes.  We don't have those disputes because we have

14  it.  But have you heard -- the only recording you've heard here

15  is Shane Faithful, okay.

16          By the way, another point with Ericka Hayes.

17  Loren Phillips says a person by the name of Olivia Caldwell made

18  that particular tape.  "Well, how did you get it?"

19          "She sent it to everybody in the clinic."

20          I asked Ericka Hayes.  "I never got it."

21          "Do you remember those meetings?"

22          "Yeah, I remember the meetings.  I never got it."

23          Now, when you script testimony, which she did --

24  and I asked Dr. Craig why did you fire her.  Insubordination.

25  If you listen to her testimony, she knows everything; and the

1 most damning part about any of her testimony is "I can look at a
2 person and tell they're in pain."  Okay?

3             She's not a doctor, hasn't been trained; but she
4 knows, okay.  You can see why she was let go for
5 insubordination.  And by the way, when you listen to that tape,
6 that's what Shane Faithful is talking about, insubordination.
7 He's not going to tolerate it.  The Government wants it to be a
8 democracy.  I don't know where you work.  But everywhere I've
9 ever worked, if you got a boss, you're going to do what the boss
10 tells you or there are consequences.

11             Again, the pattern.  Loren Phillips got to be
12 propped up by Ericka Hayes.  And Ericka Hayes has an ax to grind
13 with this particular clinic, too, because they let her go for
14 being insubordinate; and she's saying, "I still don't know why,"
15 all right.

16             Now, Davis Webster, a confidential informant
17 since 2006, a confessed drug dealer, confessed convicted felon,
18 comes in here attempting to reduce his sentence.  So, what does
19 he do?  The day he pleads guilty, he signs another confidential
20 source agreement with the Government.  He had already had a
21 number in the system because he had one since 2006.  He's done
22 this before.

23             THE COURT:  30 minutes has gone past.

24             MR. WILLIAMS:  Okay.

25             Been on the streets all this particular time,

1  knows all the particular players.  They send him in.

2              The Government knows if they're going to use him,

3  they better have some backup because he's a convicted felon.

4  What happens the first time?  No batteries.  No batteries.  Get

5  the script, but we don't know what happened.

6              Goes in the second time.  What's relevant about

7  him:  Each time he goes in, he deceives the doctor in the same,

8  "Look, this is my problem.  I need the meds."  Okay.  She

9  evaluates him, gives them to him.  Who do they prop his

10 testimony up with?  Tonya Graham.

11             She does the same thing.  She goes in and gets

12 what she needs, okay.  But miraculously, she's got PMP history

13 somewhere, too, under the alias, okay; and they're all going in

14 for the specific purpose of deceiving the particular doctor.

15             Now, the problem with all of this is nobody has

16 ever testified that Shane Faithful was aware of the care that

17 Dr. Craig was giving the particular patients; but they want to

18 say it's a conspiracy.  How do they want to do it?  They want to

19 tie it to these sheets, want to run you down the rabbit trail.

20 Look at all this money.  You had to know.  Okay.

21             All of these things that even he admitted to you.

22 He doesn't have to prove that.  He's putting that up there for

23 bias, to make you-all think, oh, that's a whole lot of money

24 that they found so he must have known something that was going

25 on was wrong.  But there's been no testimony from anybody, Loren

1 Phillips or Ericka Hayes or anybody else, that he was aware of

2 what was going on in that room.

3             Now, got to speed up.  Time is short.  I told you

4 it would go like this, and it's almost gone.

5             So, next witness, Graves Owen, $22,000 paid

6 informant, AKA expert.  Where does he come from?  He comes from

7 -- testifies that, "Hey, every time I testify for the

8 Government, I never found a standard of care."  That's why they

9 pay him so much.

10             Well, the Government knowing that, how do we prop

11 him up?  Let's go find Dr. Dhatt.  When did he show up?  Less

12 than 30 days ago.  30 days ago, okay.  He comes in and testifies

13 to, "Oh, I knew these particular patients," okay.  They want you

14 to believe he sets the standard of care.  But what did he tell

15 you?  I don't do pain.  I don't write any of that.  And more

16 overview, they can't prove that she knew about the conditions of

17 these patients that they brought him in to testify about.

18             Now, Mr. Fernandez.  He comes in.  He tells you

19 he deceives the doctor, been deceiving the doctor forever.  Now,

20 has cirrhosis of the liver.  They want you to believe that,

21 okay, had she -- had she ordered the particular records, she

22 would have known this; but even with all of this, he tells you,

23 "I deceived the doctor.  Why did I do it?"  He told you how it

24 worked.

25             Facilitators come get me.  They pay me.  I get

1 the hydrocodone, Soma, and the ibuprofen. I keep the ibuprofen
2 because it helps me, because it helps me. He knows he's not
3 going to take this. He never tells her he's diverting it. He's
4 getting what he needs and giving the others away. That's a
5 win-win for him. He's a victim. He's a victim. These runners
6 are taking advantage of him. Just like he's taking advantage of
7 Dr. Craig. That's how it works.

8                Now, Ms. Magana, Ms. Goulsby, they come in and
9 testify "What she's giving me is helping me." But the
10 Government wants you to believe that all of these scripts are
11 wrong, all of them. Now, Mr. Fernandez has runners. Let's talk
12 about these particular runners. Let's talk about how they're
13 implicit in this. Everybody is talking about 99 percent of the
14 people there are coming from these particular runners AKA
15 facilitators.

16                Do the math. Look at these particular
17 appointment books kept by Loren Phillips. Look at the
18 appointment books very carefully. Do the math. They're saying
19 99 percent; but when you look at the sign-in sheets and you look
20 at how many patients were brought by these particular
21 facilitators, nowhere close to 99 percent.

22                Now, ask yourself why would she keep these in her
23 appointment books? She had the relationship with these
24 so-called facilitators and runners, and she wanted to make sure
25 she knew how many were coming in each day so they could pay her.

1 She had her own little hustle going on inside of this; and
2 Dr. Craig didn't know; and obviously, Mr. Faithful didn't know
3 because he wasn't there.
4          So, how do they want to tie that to him?  Well,
5 they got these facilitator cards.  Look at the facilitator
6 cards.  It doesn't make a lot of sense either.  It has
7 Dr. Craig's initials on it.  The Government wants you to believe
8 that they're partners but you got to call Shane Faithful in
9 order to get it.
10          What sense does that make?  If the doctor signs
11 off on it, why are you calling him?  That's Loren Phillips
12 propping up the testimony because the only way that they could
13 try to get to him is through her.
14          Now, you want to talk about a conspiracy, I'll
15 give you one.  The Government's conspired with Loren Phillips,
16 Davis Webster, Dr. Graves Owen because they want to get to Shane
17 Faithful.
18          Let's talk about aiding and abetting.  These
19 particular agents here aided and abetted.  Every time I asked
20 somebody something about Loren Phillips, they come clean her up.
21 "Oh, she was afraid," okay.  "Oh, she wasn't suggesting it.  She
22 was doing it because she was afraid of this."  Did she appear to
23 be afraid on that particular tape she was making?  Did she
24 appear to be afraid here?  Her goal in this is to testify to
25 make the money.

1          The Government is playing Robinhood.  They're
2 taking monies from people who work and earn their money running
3 the clinic and giving it to paid informants.  Didn't cost them a
4 dime.  Didn't cost them a dime.  Then, they want you to believe
5 these particular people.
6          Now, I'd submit to you that this evidence just
7 stinks.  It reeks with a conspiratorial flavor that's created by
8 the Government.  I submit to you that, once they ran the initial
9 PMP report and saw the initial things going out, okay, and when
10 they had the investigation started, they figured out we got to
11 get them and we'll get them by any means necessary; and they've
12 used any means necessary by using paid informants, paid experts
13 and convicted felons to bring a case against Shane Faithful.
14          Now, again, there's been no evidence that he was
15 aware of her particular medicine.  You have to -- in order to
16 get to him, you have to believe that he knew what she was doing.
17 I asked her about that.  Did Shane Faithful ever talk to you
18 about her medicine?  No.  But they want to use Loren Phillips to
19 get to him.  They want to use Ericka Hayes to get to him.
20 That's it.
21          I've been sitting here all eight days, and I'm
22 rather shocked at what I have to do because I don't have a whole
23 lot of questions regarding Shane Faithful.  Most of the evidence
24 in this case comes from -- involves Dr. Craig and her particular
25 medicine.  And nobody here would be able to testify that he knew

1  what she was doing in that particular room.  All right.

2                    And who is he to question her medicine?  Just

3  like who are you to question a doctor's medicine.  They want you

4  to believe that anybody could do this, anybody could figure this

5  out.  If they could, then why are they paying Graves Owen

6  $22,000?  Why are they going out the last minute to try to find

7  another doctor to prop up his testimony?

8                    If it's that simple, present the evidence as it

9  is and ask you to act upon it.  They haven't done that.  They've

10  cut a deal with paid informants and convicted felons in an

11  effort to get to Shane Faithful, and it doesn't rise to the

12  level of beyond a reasonable doubt.

13                    Now, I just hope you're not the type of people

14  that believe the last thing they say.  Unfortunately, the rules

15  are set up.  Mr. Armstrong has been going first the whole time.

16  The rules are at the end he gets to go last.  I submit to you to

17  go back, listen to all of the particular evidence.  Don't be

18  swayed by the snippets that the Government has given you.

19  Listen to the entire tape.

20                    We apologize if we didn't have enough time to

21  proffer it out there.  If we had had another month, you would

22  have heard a whole lot of things.  Who wants to be here for a

23  month?  I can respect the Judge's decision as to giving us time

24  limitations, and we have to -- we have to put our case on based

25  upon the time limits that he gives us, and that's why you don't

1  have it all.  However, I urge you to go back and listen to the

2  evidence.  Go back and look through the particular documents.

3  It's painstaking, but my client's life is depending on it.

4              And you've listened.  You've been attentive.  And

5  I ask you to give a little more and look at all of this

6  particular evidence; and I think once you evaluate it all and

7  see it all, you'll understand that the source of the evidence

8  stinks; and as a result, you can't say beyond a reasonable doubt

9  that Shane Faithful engaged in a conspiracy with Dr. Craig.  You

10 can't do it.  That's why they keep running you around the things

11 that don't matter, to make it appear that, "Oh, this is so bad.

12 This is what's going on."

13             Now, I believe my time is about up; and I'd ask

14 you, after considering all of this particular evidence -- we got

15 it here.  Please ask for it.  You got a jury charge.  Please

16 read it.  And after looking at the charge that the Government --

17 that the judge has given us and evaluating this particular

18 evidence, the only reasonable verdict would be a not guilty.

19             Thank you very much.

20             THE COURT:  42 minutes have been used.

21             MR. LEWIS:  Okay.

22             May I proceed, Judge?

23             THE COURT:  Yes.

24             MR. LEWIS:  Good afternoon.  As you know, I represent

25 Gazelle Craig who is a physician and one of the Defendants that

1   is accused in this case.

2           Before I proceed on behalf of Dr. Gazelle Craig,
3   I thank you for your service.  It is a privilege and honor to
4   speak to you.  It's also a privilege and honor to represent
5   Dr. Craig in this matter.  One of the things that has happened
6   in my life I'd like to share with you, and I'll be brief.

7           One of the reasons that I stand here before you
8   today is the result of a boyhood experience that I had where an
9   individual who happened to be one of my best friends was
10  represented in a case where he had been falsely accused by an
11  attorney.  It moved me.  It motivated me, and I decided then I
12  want to do that.

13          And ironically, today, that's exactly what I'm
14  doing because Dr. Craig has been falsely accused in this case.
15  As part of the charge that Judge Hittner read you, he told you
16  that one of the things that you can do, should do, and
17  absolutely must do is use your common sense.  You bring that
18  with you when you go back to that room.

19          There is no substitute for it.  And all of you
20  have it.  And it's absolutely something that you need to use
21  when you are evaluating the evidence and the testimony and the
22  individuals involved in this case.  You use your common sense
23  when you start assessing individual's credibility.  You use your
24  common sense, in addition to other things, when you start
25  assessing testimony.

1          One of the things that you'll likely hear when
2  you enter in that room is a recording; and we've talked about it
3  for eight days, a recording that was produced by an informant of
4  the Government; and it was about 20 minutes long.  You have to
5  listen to that.
6          Now, the Government played you about 91 seconds
7  of it where they say, well, we can figure out what was said or
8  what was going on for 91 seconds; but there's 19 minutes where
9  you don't know what's going on.  They don't know.  We don't
10  know.  This is a recorder that purportedly was working and that
11  the individual that had it knew how to operate it, turned it on
12  and off.
13          Now, Mr. Helfmeyer said this individual went over
14  there the first time he had a recorder; but it was in a pad; and
15  they say, "Okay, you can't have that pad.  So, he had to leave."
16  Mr. Helfmeyer didn't say that he went back, he didn't have it in
17  a pad, he put it in his pocket.
18          Why couldn't he have had it in his pocket when he
19  went the first time?  Why didn't he have it in his pocket?  Now,
20  all of us are aware that we live in 2018.  You don't need a lot
21  of resources.  You don't need a lot of technology in order to
22  come up with an accurate recorder.
23          You can buy one from Best Buy, Micro Center, or
24  Amazon -- don't take much money -- and buy one that's reliable.
25          Now, if we had an accurate device, I think you

1  would want to know as a jury what happened before that 91

2  seconds.  Davis Webster said he was at the clinic for, at least,

3  an hour filling out paperwork, sitting there, being triaged.

4  Did you hear any of that?  I didn't.  And if I did hear it, you

5  couldn't understand it.

6           It should give you some pause.  Because it goes

7  back to what Mr. Williams has said.  The only things that were

8  brought forward by the Government like that are things that they

9  want you to hear, that they want you to know about.  Why am I

10  talking about Mr. Webster?  Mr. Webster, he wasn't paid.  I take

11  that back.  He wasn't paid, but he sure would like to be paid

12  because he's cooperating because of his liberty.

13           Which one of us would not do whatever we needed

14  to do in order to regain our liberty or to -- or to not have to

15  be deprived of it?  You'll do whatever you could.  I think you

16  would do it.  I think I would do it.  And Davis Webster did it.

17           One day of your liberty is priceless.  There's no

18  value you can put on that.  He recognized that after committing

19  those felonies where he has to pay for now, and he doesn't want

20  to pay for them because he wants to convince the Government to

21  give him leniency even though he know he was wrong.  He's

22  already said he was.  And if you are wrong, shouldn't you pay

23  for it?

24           Now, you will be -- have a chance to read and

25  review a document that's called an indictment.  As Judge Hittner

said, it's not evidence and it doesn't make it true just because
those words are on that page. That's going to be for you to
determine, whether or not those words apply to my client,
Gazelle Craig, or to Mr. Faithful.

That is your roadmap. That's what you are sworn
to do. You use that indictment to determine whether or not it
applies. Please do not fall for these rabbit trails that we've
gone through for almost eight days.

What your job is is to go to that indictment to
determine whether or not the facts in that -- in the indictment
or that apply to that indictment are facts that can be proven
beyond a reasonable doubt. Not how many pills, not how much
money, not you filled out the form wrong, not you didn't do the
right tests. What's got to be proven is those words that's in
that indictment.

And if those words are not proven beyond a
reasonable doubt, then those words cannot and should not be used
to reach a decision regarding the guilt of my client, Gazelle
Craig. Bring your common sense when you go.

We saw as part of the evidence in this case video
recordings where you could see things. Specifically, there's a
couple of them that I'd like to comment about. There's more
than a couple as far as the evidence is concerned in this case,
and you certainly have a right to see them all.

The one we saw -- one of the ones, the Air Wing

1  surveillance -- we all know the term "a picture is worth a
2  thousand words"; and you should be able to use that to
3  determine.  On that Air Wing surveillance, we heard -- well,
4  prior to looking to that, we heard testimony that there's large
5  groups of individuals at Gulfton clinic, that they're all
6  outside hanging out at their cars, that they are coming and
7  going all times of day and so on and so forth.
8              On that Air Wing video -- bring your common sense
9  -- do you see -- see if you see any large groups.  I don't think
10 you will.  See if you see any large groups entering the clinic.
11 I don't think you will.  See if you see anyone that the
12 Government has presented to you that was a facilitator.
13             If you saw a figure, we don't know why they were
14 there.  They had not been identified.  Supposedly, there's lots
15 of security guards.  Look at that video, see if you see any.  I
16 submit to you you will not.
17             We also saw a video regarding a gold van
18 purportedly being driven by an individual that's referred to as
19 a facilitator or a runner or crew leader.  We had testimony from
20 these agents, specifically this one right here, Agent Gainer,
21 that he followed it.  It was full of people.  Look at that
22 video.  When it stopped or when it -- before it started, didn't
23 see a lot of people.  When it stopped, saw three people get out.
24             He said it was several people in there; and he
25 wasn't far away, even though he don't remember how far he was

1 away.  Bring your common sense.  We heard -- and you will be

2 able to look at evidence related to clinic visits for Davis

3 Webster and Tonya Graham.

4          Now, Davis Webster I've commented about already.

5 I think you understand what his role was.  He was a paid

6 facilitator -- a paid informant; and of course, he's trying to

7 reduce his sentence by cooperating with the Government.

8          Tonya Graham, Secret Service Tonya Graham.

9 Another story.  She went to the clinic; and because of her

10 training and skill, she know what to say, she know what to do,

11 she know how to say things to lie to Dr. Craig about her

12 condition in order to encourage her to get a prescription; and

13 that's exactly what -- what she did.

14          Her actions were nothing more than entrapment.

15 Nothing more.  Dr. Craig -- and as far as Davis Webster and

16 Tonya Graham, it's documented; and I want you to look at these

17 documents.  We've only displayed some of them as it relate to

18 these patients.  There's documentation in the file of physical

19 examinations.  There's documentation in the file regarding the

20 patient encounter where the patient is giving information.

21          And by the way, Davis Graham (sic) had a recorder

22 on him during the time he was being triaged.  Did we hear any of

23 that?  All we heard was 91 seconds of a 20-minute tape; but

24 supposedly, either it didn't work during the time he was being

25 triaged or he didn't have it on; and he's admitted that he could

1  turn it on and off.

2            Bring your common sense.  There's physical
3  examination documents.  There's medical rationale documents in
4  the charts.  There's patient information regarding medication
5  history, family history documented.  There's chief complaints.
6  There's problem-focused examinations that are all part of the
7  records that, even from Graves Owen, as far as problem-focused
8  examinations, it was defined.

9            We talked about flexion test, deep tendon reflex
10 test, straight leg raise test, cervical exams, all appropriate
11 exams for an individual having a complaint of chronic pain.
12 They're in the charts.  You and I might not be able to read them
13 like Dr. Craig, but they're there.  Look at them.  And it's
14 documented.  One of the things that Mr. Owen said -- Dr. Owen,
15 if it's not documented, that mean it didn't happen.  So, I think
16 that means, if it is documented, that means it happened.

17           Let's talk a little bit about this PMP report
18 just briefly.  A PMP report is a screening tool that everybody
19 has agreed that should be used for an individual treating
20 chronic pain.  This screening tool, it doesn't -- it's not a
21 tool that actually says that there's a diagnosis, it's just a
22 tool that actually reports data when a prescription is sold by a
23 pharmacy.

24           And it's not the only thing that was utilized in
25 this case by Dr. Craig in determining criteria related to

1 dispensing of medication.  It was a tool, and it's only one of
2 the tools that was used.
3            By the way, the term "doctor shopping," doctor
4 shopping is not an individual getting -- going to a doctor over
5 several months, every other month; and of course, we've heard
6 testimony from Dr. Owen that he is -- that an individual can
7 change doctors at their discretion.  There's no law against
8 that.  Doctor shopping is that individual seeing two doctors
9 within the same 30-day period.  Look at those reports.
10 Determine that.  And I submit to you that you will not find
11 that.
12            Since I'm talking about Dr. Owen.  Now, Dr. Owen
13 is an individual that's an expert.  I know who he is.  I've
14 known him for a long time.  He testifies in these matters and
15 matters like this all over the State of Texas and all over --
16 and beginning to be the United States.
17            From his own mouth, you have heard that he's
18 testified for medical providers regarding pain management cases
19 in the past; and not one single time out of hundreds of cases
20 has he ever determined that a provider has met the standard of
21 care.  Not one time.
22            Now, also, take a look at Dr. Owen regarding
23 himself.  From his own admission, Dr. Owen sold his practice
24 back in 2011.  He doesn't have a practice today and has not had
25 one for seven months -- I mean seven years, I'm sorry.  And he

1  doesn't treat chronic pain patients today and hasn't treated
2  them for seven years.
3          And when he did treat chronic pain patients, he
4  didn't treat them as patients with the same demographics of
5  Gulfton clinic.  You heard him say, "My patients received
6  interventional measures.  Some of them cost $22,000.  I don't
7  have a single patient that pays cash, not one."  Because his
8  patients get ablations, nerve blocks, fusions.  These things
9  cost a lot of money.
10          Some of his patients, a percentage of them, get
11  medication management; but medication management was involved
12  with all of the patients at Gulfton.  And Dr. Owen's practice
13  certainly doesn't mirror the practice that Dr. Craig had at
14  Gulfton for demographics and for the scope of practice.
15          Let's talk a little bit about Dr. Dhatt.
16  Mr. Helfmeyer has come in here and said Dr. Dhatt -- bring him
17  in here.  He said he wouldn't have done this.  Dr. Dhatt is a
18  psychiatrist.  Prescribing is not even within his professional
19  scope of practice, not prescribing these drugs.
20          Dr. Dhatt evaluating Dr. Craig is like a
21  neurosurgeon evaluating a cardiologist.  I don't think that
22  neurosurgeon would be qualified even though they're both
23  doctors.  Dr. Dhatt don't write these prescriptions.  He
24  admitted to you he's never prescribed a muscle relaxant in his
25  entire practice.  So, how can he be an expert in a clinic like

1 Gulfton where individuals are prescribed muscle relaxants a lot

2 because it's relative to their chief complaint and to their

3 diagnosis.

4             Let's talk a little bit about Gulfton.  There's

5 been a lot of evidence in this case from the Government that

6 part of the problem at the Gulfton clinic was everybody got the

7 same thing, no individualized care; and that is evidence of a

8 problem.

9             The nature of Gulfton Medical Clinic was -- is or

10 was that it's a chronic pain management clinic.  It's a

11 specialty clinic; and because it's a chronic pain management

12 clinic, there's only certain medications that's appropriate and

13 pertinent for a pertinent diagnosis related to the persons that

14 go there.  That's not unusual.

15             When an individual goes to a weight control

16 clinic, what do you expect them to get?  An appetite

17 suppressant.  When an individual goes to a family planning

18 clinic, what do you expect them to get?  A birth control pill.

19 When an individual goes to a hypertension clinic, what do you

20 expect them to get?  Something to treat their blood pressure.

21             You don't expect them to get a sedative.  You

22 don't expect them to get an antibiotic to treat an infection

23 because that's not the nature of the clinic.  You would expect

24 them to get -- that patient to get something appropriate for the

25 nature of that clinic.  That's what happens in those specialty

1  clinics.  This is what happens at Gulfton.

2            Let's talk a little bit about these drugs that

3  are the nature of the problem according to the Government.

4  First one being hydrocodone.  Hydrocodone is a drug that is

5  utilized to treat chronic pain.  It is indicated by the FDA, the

6  CDC, and other manufacturers and other references as far as

7  treatment for those conditions.  That's the approved treatment.

8            Same thing holds true for Soma as it relate to

9  treating muscle spasms or musculoskeletal conditions.  Now,

10 since the FDA is powered to -- regarding the safety and efficacy

11 of drugs, if the combination of hydrocodone and Soma was so

12 toxic that every time it's used it caused patient harm, I think

13 they would probably do something about that.

14           They wouldn't leave it up to a CME course to tell

15 providers that.  They wouldn't leave it up to guidelines by

16 medical boards to tell providers that.  I think it would be

17 incumbent upon them to do -- to take affirmative action and

18 response if, in fact, that combination was a combination that

19 can never be used safely.

20           That combination is used safely, can be used

21 safely as indicated by the literature, as indicated by other

22 types of things related to prescribing.  By the way, some of you

23 might know this; but you need to take this back with you, too.

24 The number one drug that's prescribed in the United States is

25 hydrocodone for all medical conditions.  Not just chronic pain,

1  for all medical conditions.

2            Now, Dr. Craig has testified that she's qualified

3  as a medical doctor, that she's been trained as a medical

4  doctor, that what she was doing she was qualified to do.  She

5  knew how to do medical examinations regarding musculoskeletal

6  examinations, cervical examinations, regular physical

7  examinations.  She was trained to do that, and she did.

8            They want to send you down a rabbit trail, "Well,

9  you can't do that in 45 seconds."  Look at the -- look at the

10 patient records.  Davis Webster didn't stay at the Gulfton

11 clinic for 45 seconds.  He interacted with several levels of

12 medical clinicians when he was there.

13            She reviewed his information.  She examined him.

14 She went into the room.  And the time that they're talking about

15 is a follow-up examination.  There was no need -- she didn't see

16 any need to take any -- any extended time with him, and I think

17 that that is normal.  All of us have been to the doctor; and

18 doctor -- that's what happened in the doctor's office,

19 especially for a continuing problem.

20            As Mr. Williams has said to you, you have to view

21 this -- all of this evidence in the case very carefully because

22 this entire case is built on information from individuals that

23 are tainted, that are biased or they have -- they are a

24 stakeholder, they have a reason not to be truthful; and because

25 of that, you have to question as to whether or not this evidence

1  is credible.

2            And by the way, you should know this; and it was

3  part of your charge when you read it.  You are the only one in

4  this room that can judge the credibility of this evidence and

5  these witnesses, the only one; not me, not the judge, not the

6  Government, not the Defendant.  You are the only one.

7            And I submit to you that's what you should do to

8  determine whether or not this evidence is competent, is

9  credible, especially that coming from all of these individuals

10 that have a reason to not present the evidence to you fairly,

11 especially as it relate to Dr. Craig.

12           I submit to you that, if you view this evidence

13 fairly and you look at more than what's been presented here --

14 because this case is thousands of pages as part of that exhibit

15 list, and you can look at anything you want as it relate to this

16 in addition to what you heard here in court.

17           I submit to you that, if you do that and you do

18 it fairly as it relate to my client, Gazelle Craig, I submit to

19 you that you will be able and you will return a verdict of not

20 guilty for Gazelle Craig.

21           Thank you.

22           THE COURT:  Ladies and gentlemen, we have 23 minutes

23 left.  I'm going to give you a 30-minute stretch for all of it

24 -- a 30-second stretch.  No, no, no, no more minutes, okay.

25 Just a 30-second stretch, and we're going to wrap it up.

1          Government, get ready to go, please.

2          All right.  Let's wrap it up.  You got 23

3  minutes, counsel.

4          MR. ARMSTRONG:  May I proceed, Judge?

5          THE COURT:  Yes, sir.

6          MR. ARMSTRONG:  Thank you.

7          And if can we, please, switch to the Government's

8  system, Judge.

9          Ladies and gentlemen, good afternoon.  Amanda

10  Robinson.  Amanda Robinson was abusing hydrocodone for over two

11  years before she even set foot in Defendant's operation.  First

12  time she walked into the Defendant's operation, she walks out

13  with a prescription for hydrocodone and Soma.  She walks out

14  with pills to feed her addiction.

15          Three weeks later, she checks into rehab, detox.

16  She's in the hospital for over a month trying to get her life

17  back on track.  She feels worthless and has thoughts of suicide.

18  About a month later when she gets out of the hospital, she's

19  back in Defendant's operation.  She walks out again, same

20  prescription:  hydrocodone and Soma.  Who knows what happened

21  next.

22          Reginald Sedberry.  Mr. Sedberry has probably

23  every problem someone could imagine, a 64 year old elderly

24  gentleman.  He's homeless, has a cocaine addiction, walks in

25  traffic, and hallucinates.  What's the one problem he doesn't

1  have?  Pain.  Same story, though.  First time he sets foot in

2  Defendant's operation, he walks out with a prescription for

3  hydrocodone and Soma.

4           Davis Webster, Tonya Jackson.  Neither of them

5  have chronic pain, but they both walk into the Defendant's

6  operation.  They both say those magic words, "I'm in pain"; and

7  they both walk out with a fake diagnosis and the same

8  prescription.

9           Paul Fernandez.  Mr. Fernandez --

10         THE COURT:  You want the lights out?

11         MR. ARMSTRONG:  That's fine.

12         Mr. Fernandez goes to the Defendant's operation

13  because some guy named Brother-in-Law hooks him up with a driver

14  who gives him breakfast, beer, and $60.  He never goes alone.

15  Every time he goes, he goes with a van full of people.  Everyone

16  in the van gets paid.  Everyone walks in together.  Everyone

17  gets the same prescription.  Everyone walks out together.

18         It gets worse.  Mr. Fernandez actually has

19  cirrhosis of the liver.  If he had taken a fraction -- just a

20  fraction of the drugs that Defendants prescribed him, he would

21  probably be dead.

22         Charlotte Mason, the last person you heard about.

23  Ms. Mason has a severe respiratory problem.  She has a history

24  of crack cocaine abuse, and she took a whole bottle of Ambien, a

25  sleeping pill.  She saw two prior doctors.  Both doctors said,

1  "I'm sorry, Ms. Mason, I just can't give you hydrocodone.  The
2  risks are too high."  And the first principle of medicine is do
3  no harm.  She walks into the Defendant's operation three times.
4  Every single time she walks out, she walks out with that 120/90
5  prescription, hydrocodone and Soma.

6             Now, ladies and gentlemen, how does -- how does
7  this happen?  How does this happen?  This happens when
8  Defendants' business partners are facilitators.  It happens when
9  they put their desire for cash above everything else.  It
10 happens when Defendant Craig throws the standard of care out the
11 window and when she becomes a rubber stamp, just signing
12 prescription after prescription after prescription, all for
13 different patients, the same two drugs.

14            I want to put a few issues to bed.  The first
15 issue is, oh, there's some suggestion that, oh, Dr. Craig was
16 tricked.  There's some suggestion that, oh, the Defendants were
17 just really good actors and, oh, gee willikers, they were just
18 caught in this web of lies by these patients.  That's just not
19 the evidence, ladies and gentlemen.

20            You've seen a laundry list of evidence.  The
21 Defendants accepted the facilitators' money and willingly took
22 their business.  I'm not going to go through all that evidence
23 again.  You get it.  Giving prescriptions to drug dealers has no
24 legitimate medical purpose.

25            But there's something else.  The recordings.  90

1  seconds with Tonya Jackson; 45 seconds with Davis Webster.  You
2  heard those recordings.  Does it sound like somebody getting
3  tricked?  Really?  Does it?  The 90 seconds with Tonya Jackson:
4  "Doctor, I got in a little fender bender."  Did you hear any
5  probing questions?  Did you hear any questions to get to the
6  bottom of the complex issue like chronic pain?  Absolutely not.
7  You hear none of that.
8               All you hear are those questions to elicit the
9  magic words to cover up the crime.  "Hey, are you in pain?"
10              "Yes, I am."
11              "Do you have muscle spasms?"
12              "I sure do."
13              "Does it hurt here?"
14              "Yes."
15              After those 90 seconds are up, after Defendant
16  hears those magic words, she's out the door.  Same story with
17  Davis Webster.  45 seconds.  45 seconds.  "Doctor, I think I
18  reinjured my back."
19              Defendant's response?  "That's possible."
20  Basically, saying who knows?  Who cares?
21              Once Defendant Craig hears those magic words
22  about injury, there's some chitchat about a chiropractor; and
23  again, she's out the door.  Defendant Craig didn't take the time
24  to get tricked.  She didn't put the effort in to get tricked.
25              Now, there's been a lot of talk about, oh, Davis

1  Webster is this, Tonya Jackson is this, DEA is that.  The reason
2  we brought Davis Webster to trial, the reason we brought Tonya
3  Graham, Tonya Jackson, to trial was for those recordings.  Those
4  recordings provided snapshots -- a beautiful snapshot of
5  Defendant Craig's unlawful and bad intent.  Those recordings
6  show you for certain that she had one objective:  just to hear
7  the magic words to cover up the crime.
8                One last point on this, oh, the doctor was
9  tricked, Mr. Faithful was tricked, this is all entrapment.  You
10 heard from Ericka Hayes.  Ericka Hayes, 25 years old, fresh out
11 of school.  She figured out the rot behind the Defendants'
12 disguise in a month.  The Defendants were there for two and a
13 half years, and they didn't know what was going on?  No way.
14                Defendant Craig is supposedly the smartest person
15 in the room, the doctor, and didn't know what was going on?  No
16 way.  Mr. Faithful, the man is bragging when he thinks no one is
17 listening about running the show, about being the boss.  He
18 didn't know what was going on?  No way.
19                Now, ladies and gentlemen, a second issue that
20 needs to be put to bed:  this whole idea about patient files.
21 Oh, look, there's paper, there's checkmarks, there's some words
22 on a page, as if having patient files somehow excuses taking
23 money from facilitators.  It absolutely doesn't.  But it bears
24 repeating:  Everything at Gulfton, every single thing was part
25 of the disguise.  It was part of the coverup.  It was all to

1  pretend that drug dealing was medicine.

2           Defendant Craig, she's the doctor, a position of

3  authority.  What does she do?  She takes that title and the

4  trust that comes with it and abuses it at every single turn.

5           Defendant Faithful, he's the administrator.  Sure

6  sounds official, right?  The administrator.  What does he

7  administrate?  You heard on the tape he's just browbeating his

8  employees to make sure the facilitators' money comes in, the

9  prescriptions go out, and the piles of cash stack up.  Street

10  level drug dealers are called facilitators.  Again, that sure

11  sounds official, sounds legitimate.  It's anything but.  Vans

12  full of people are called patients, and they're paid to go

13  there.

14           Ladies and gentlemen, there is no doubt that the

15  Defendants used these people to make money.  The suggestion that

16  patients used them is ridiculous.  The patient files, again, all

17  show -- Ericka Hayes said it best:  The paper in the files was

18  just fluff.  And what happens when someone questions the show,

19  questions the disguise?

20           You heard from Ericka Hayes.  She said, "Doctor,

21  Doctor, what's up with patients giving me blank intake forms?

22  How does someone not know their medical condition?"  Defendant

23  Craig's response?  Laughed it off.  Ericka Hayes comes back,

24  "Doctor, why are the patients putting water in the urine test?"

25  Defendant Craig's response?  Just laughed it off.  Defendant

1 Craig is just laughing in Ericka Hayes' face as if she's saying,
2 "Ericka, don't you realize this is all a show?  Don't you
3 realize it's all a disguise?  This is not real medicine."
4          A few more issues I want to talk about very
5 briefly.  I got about a few minutes left.  There have been a lot
6 of attacks on Dr. Owen.  Really?  Did Dr. Owen appear to you to
7 be someone who is out here just shucking his opinion for a buck?
8 Did he really tell you anything that you didn't already know?
9 That wasn't common sense?
10         It's a good idea to understand the patient's
11 medical condition from actual files before prescribing dangerous
12 addictive drugs?  Is that so complicated?  It's a good idea to
13 try less dangerous treatments first before just jumping into
14 hundreds of pills of opioids for every person?  Is that so
15 complicated?  I think it's common sense.
16         Defendants also made some suggestion that there
17 is something complicated about what is the legitimate medical
18 purpose.  It boils down to three things:  Number one, don't give
19 drugs to drug dealers.  Don't give drugs to addicts.  And follow
20 the standard of care.
21         Now, ladies and gentlemen, you probably notice
22 that I have some quirks and some idiosyncrasies.  One of them is
23 that I use these dumb files to keep track of my thoughts.  I
24 want to address some points that I heard -- I heard during
25 defense counsels' summations.

1          First one I want to address is that we're somehow

2   hiding really important information on these tapes, on these

3   tapes.  Somewhere lurking on these tapes is some other

4   mysterious, some other encounter with Dr. Craig and Tonya

5   Jackson or Davis Webster.

6          Well, ladies and gentlemen, we always have the

7   burden of proof; but the tapes are in evidence; and you didn't

8   hear it because it doesn't exist.  There is no other encounter.

9   The 90 seconds is it.  The 45 seconds is it.  It is complete and

10  utter fantasy to suggest that there's something else out there.

11          The defense has suggested that there has been

12  some suggestion, oh, this case just rises and falls on Loren

13  Phillips.  Not the case.  Every single piece of evidence in this

14  case is corroborated by something else.  Mr. Helfmeyer walked

15  you through it for 45 minutes.  I'm not going to do it again.

16          There's been some suggestion that Loren Phillips

17  just made up these expense reports, that she's just out there

18  making up these expense reports after she left Gulfton to set up

19  the Defendants.  Okay.  Well, was she also sneaking around Shane

20  Faithful's house placing made-up expense reports in his house,

21  dropping them in his safe?  I don't think so.

22          Credibility of witnesses.  I think Mr. Williams

23  called Loren Phillips the devil herself.  Really?  Is that how

24  she came across to you?  And he mentioned how the credibility of

25  witnesses is assessed in part by how they answer questions.  I

1  couldn't agree more.

2                You saw Defendant Craig's performance on the
3  stand.  Not much more needs to be said about that.  One thing
4  you didn't hear a lot about is Ericka Hayes.  Ericka Hayes.  Why
5  didn't we hear a lot about Ericka Hayes?  Because they can't
6  touch her.  She's not paid.  She doesn't have any bias or
7  motive.  She just came here and testified.

8                If you can't beat someone on the facts, what do
9  you do?  Attack.  Attack Ericka Hayes.  She's insubordinate.
10  She's a bad employee.  And who do those attacks come from?  The
11  only attacks on Ms. Hayes you heard were from Defendant Craig
12  herself.  She have a motive maybe?

13                One thing that really tickled my funny bone was
14  Mr. Williams saying that Loren Phillips ran the show.  Loren
15  Phillips is the puppeteer -- the puppet master.  She is, quote,
16  running the show.  Well, who's -- what evidence have you seen of
17  that?  Absolutely zero.  But who's own words did you actually
18  hear saying he runs the f'ing show?  Not my words, not Agent
19  Gainer's words, not Mr. Helfmeyer's words.  The Defendant's own
20  words.  He runs the show.  Take that to the bank and cash it.

21                There was also some suggestion that, oh, this is
22  like going to -- going to the Defendants' operation is like
23  going to CVS.  Now, ladies and gentlemen, there's just zero real
24  world comparison for the total underworld you saw in this case.

25                Ladies and gentlemen, all the evidence is in.

1  You have the facts.  You have the law.  The facts prove beyond a

2  reasonable doubt that Defendants worked hand in hand with

3  facilitators to give prescriptions of dangerous addictive drugs

4  to anyone who would say the magic words, "I'm in pain" and

5  anyone who would pay $300 to line their pockets.

6            Defendants were partners in crime.  They're

7  guilty as charged.

8            Thank you very much.

9       THE COURT:  Ladies and gentlemen, stop the clock.

10            In a moment, I'll hand the original of what you

11 have to Ellen.  She'll escort you into the jury room.  Let me

12 tell you about the schedule and how I work it and how I worked

13 it since day one on State Court, okay?  Every day you can

14 deliberate until 6:00 p.m.  But no one will be available to take

15 the verdict after 5:00.  I've done that all the way through.

16            So, in other words, if -- well, we're going to

17 adjourn for the night, of course; but tomorrow, let's say as an

18 example, we'll -- you know, if you're still working at 5:00

19 o'clock, that's fine.  If you reach a verdict, seal it up; and

20 the next business day when we get back, we'll come back and

21 unseal it.

22            So, also, you may now -- you may begin

23 deliberations tomorrow morning as early at 9:00 -- that's up to

24 you -- but not later than 10:00.  So, you can go 10:00 to 6:00

25 but knowing you need to get underway, at least, by 10:00; and no

1  verdict between 5:00 and 6:00; but you're welcome to work until
2  6:00 each evening.  I know you won't rush it.  It's an important
3  case to everybody.
4            I guess the next thing is saying, well, who is
5  the alternate, okay?  Now, when the name -- whoever is picked,
6  you don't have to get up and crawl over everybody else to get
7  the you-know-what out of here.  I had that happen.  Boy, that
8  name was called; and they're scrambling over fellow jurors.
9            Now, if you would, once you go back in there,
10 certainly, visit with your colleagues, exchange your phone
11 number or whatever; and you can discuss it completely and fully
12 once it's done.
13            So, let's see, let me have that sheet.  All
14 right.  Just to do the drawing, we usually go to the first --
15 well, all right.  ███████, at the end of the first row,
16 you're up.  But sit down.  You're going to reach over the top
17 and pull one of the squares out, please.
18            If you would, once I call your name, please raise
19 your hand; and we'll discuss it.
20            ████████████, all right.  You couldn't have
21 been -- this thing couldn't have been possible without you,
22 okay?  So, we certainly thank you; and visit with each other.
23 Again, you're not to discuss this case with anyone, including
24 with each other, unless the remaining 12 of you are in there by
25 yourself.

1              When you come -- you can stay here until 6:00
2   o'clock if you want to, at least, get a little bit underway, a
3   little bit of organization; but do let us know before you leave
4   whether you elect to be back at 9:00 or 10:00.
5              I got one hearing tomorrow morning; but even if
6   you have a question, we can take that; or if there's a verdict,
7   we'll wait just a few minutes until I get through with it.  It's
8   a pretrial conference for another something like two- to
9   three-week trial beginning next Monday.
10             So, if you want in on that, you know, if we need
11  extra jurors, we know where to look.  But in any event, thank
12  you-all so much, the attorneys do; and since it's the late hour,
13  we're going to have all -- get all the exhibits done; and
14  they'll be into you the first thing in the morning.
15             So, ladies and gentlemen, you heard this before;
16  but now, it's for real.  Please stand and commence your
17  deliberations.
18        THE COURT SECURITY OFFICER:  All rise for the jury.
19      (The jury was excused to commence deliberations at 5:45
20  p.m.)
21        THE COURT:  All right.  Be seated for just a moment.
22             We need both sides to get together and decide
23  what's in evidence and what's not in evidence.  If there's any
24  concern, some of the Court staff needs to catch a bus; and the
25  last one I think is about 6:15 or 6:20.  So, if you could get

1 together and get all of the exhibits that go back in and just
2 place them on Ellen's desk.  If there's a concern -- if there's
3 a concern, then, tomorrow when I get in for that -- that early
4 hearing, I'll consider any objections that there are as to what
5 goes in and what's not.

6            So, everything that's agreed to on top of Ellen's
7 desk.  I'm going to be here for a little while longer.  I'm not
8 going to require the court reporter, the court staff, or the
9 marshals; but if there's one bit of contention that you want me
10 to rule on, I'll be in here for awhile, I guess, until, at
11 least, until 6:30; but there shouldn't be a problem; but if
12 there is, I'll be around but no record.  The only thing for a
13 record will be tomorrow morning sometime to get on.

14            Let's say I'll look at it and I'll say it's in or
15 it's out.  As soon as I get in in the morning, we'll put it on
16 the record in this case.  But I'm going to let the staff go
17 after the last few -- last long nights.

18            Any other questions of housekeeping or whatever?
19     (No response.)

20     THE COURT:  Okay.  I need you, again, on ten-minute
21 call starting, let's say, at 9:00 o'clock in the morning.  All
22 right.  Ten-minute call meaning that you got -- well, let's make
23 it 10:00 o'clock.  If they come in at 9:00 o'clock, that's their
24 own business.

25            All right.  Starting at 10:00 o'clock, you'll be

1 on ten-minute call where if the jury -- a verdict or if a

2 question comes out, we'll wait ten minutes after we give you a

3 call; and then, I'll take it, okay?  So, if you would, make sure

4 Ellen has your cell phone number if you're in the area.

5             I want to thank you for moving it along.  I have

6 -- believe it or not, I would have had those yellow sheets for

7 you.  It's the first time the defense used more time than the

8 Government, but I'll have them for you tomorrow.  Believe it or

9 not, the main copier with all these copies ran out of black ink;

10 and there's not a black cartridge in this building.  So, they're

11 delivering it.  So, that's why.  But you'll have those sheets

12 tomorrow.

13             All right.  Anything further from the Government?

14       MR. ARMSTRONG:  Nothing further, your Honor.

15       THE COURT:  Anything further from the defense?

16       MR. WILLIAMS:  Nothing.

17       MR. LEWIS:  Nothing further.

18       THE COURT:  All right.  Not hearing anything, again,

19 I'll be in there for about a half hour; otherwise, I'll see you

20 tomorrow.

21       (Court recessed for the day at 5:48 p.m.)

22                 C E R T I F I C A T E

23       I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter, to
24 the best of my ability.

25 By: /s/Gayle L. Dye_____          05-12-2018_____
         Gayle L. Dye, CSR, RDR, CRR          Date